1:25-cv-08098
Judge Sara L. Ellis
Magistrate Judge Jeffrey T. Gilbert
RANDOM / Cat. 1

**Defendant Parties:** University of Chicago, Board of Trustee's at The University of Chicago, University of Chicago Senate, Provost Uchicago (And Office), President Office Uchicago (And Office), Department of Physics, Campus and Student Life, Harris School of Public Policy, UChicago human resources, Social Sciences Computing Services, University of Chicago Bursar Office, Mansueto Institute for Urban Innovation, Office of International Affairs, Student Disability Service, University of Chicago Medicine, University of Chicago Hospitals, Chartwells Higher Education University of Chicago, Uchicago Dinning, Campus Dining Advisory Board, Teamsters Local 743, University of Chicago Arts, Graduate Student United (Uchicago), Equal Opportunity Programs, Dean Kate Shannon Biddle (Harris School of Public Policy), Dean Ethan Bueno de Mesquita, Dean Bahareh Lampert, Dr. Don Coursey, Dr. Bruce Meyer, Dr. Marin Bautista, Dean Micheal Hayes, President Paul Alivisatos, Provost Katherine Baicker, Melissa B. M. Vergara, Jeremy W Inabinet , Danielle Nemschoff, Angie Gleghorn (HR), Christina Klespies, Traci Verleyen Hope, Carol Bridgeman(CSI), Annie Diamond(Divisional Coordinator, Social Science Collegiate), Dr. Ada Palmer, Ayrelle Giles (QAD, Chartwells Higher Education), Arun Banotra (SSCS), Bart Longacre (Assistant Dean for Information Technology, SSCS), Diana González (SSD Dean Office), Dean and office of Social Sciences Division, Kerry Sharkey (SSCS), Scott Bradwell (SSCS), Shomari Tate (SSCS), Nelson Balbarin (SSCS), Cory Martin (SSCS), Arkus Rose (Rustandy), Cara Parrish (Uchicago Arts), Logan center, Erin Brenner (Logan center), Frank Gilbert (Logan Center), Brian Wilson (Mansueto Institute for urban innovation), Aimee Giles-Scott, Heidi Lee, Professor Dr. John Burrows, Jasmin Johnson, Christina Klespies (SSD HR), Mary Mcclelland, Office for Sexual Misconduct Prevention, Megan Heckel (Office for Sexual Misconduct Prevention), Vickie Sides, Vogel Labs, Uchicago facilities, Title IX and ADA/Section 504 Coordinator offices/group at UChicago, Uchicago CARES, Department of Safety and Security, Sexual Assault Dean on Call, Campus Security Authority UChicago, The Center for Awareness, Resolution, Education & Support, Uchicago Help, and Many individuals, institutes, Offices and organizations mentioned below **but not limited to these** institutions and mentioned individuals.

**Note:** This is redacted version from any identifiable information. **[Data Redacted]**: - Added at most places data is removed; after seal allowance plaintiff can share full data.

BC

RECEIVED
7/16/2025
AXK

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

also this will need experience complex litigator for how to put things, this haven't been proofread and updated by attorney yet.

**Table of Contents**

## Contents

Table of Contents ................................................................................................................. 2

Preliminary Statement ........................................................................................................ 7

MOTION FOR JURISDICTIONAL DETERMINATION ................................................. 11

MOTION TO SEAL PLAINTIFF'S IDENTITY AND CONFIDENTIAL INFORMATION ................. 12

MOTION TO PROCEED UNDER PSEUDONYM AND TO FILE REDACTED COMPLAINT .......... 14

Request to Court for Investigative Oversight and Protective Relief (Preliminary Filing) ........................ 16

Plaintiff's motion for protective order pursuant to federal rule of civil procedure 26(C) ........................ 18

Assertion of Whistleblower Status and Request for Protection: .................................................. 19

MOTION FOR APPOINTMENT OF COUNSEL UNDER LR 83.35 AND LR 83.36 ............................ 21

MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS PURSUANT TO LR 3.3 .................. 23

MOTION TO SEAL IN FORMA PAUPERIS APPLICATION AND RESTRICT DISCLOSURE ......... 26

Motion to Restrict Recording and Public Access to Remote Proceedings .................................. 27

MOTION FOR ORDER TO RESTRICT DISCLOSURE OF PLAINTIFF'S DOCUMENTS AND INFORMATION .......................................................................................................... 28

Request for Agencies Coordination for Criminal and Civil Action Consideration ...................... 30

Summary and Letter for Multi-Agencies Complaint Submission ................................................ 32

Complaints ....................................................................................................................... 35

    1. Arbitrary and Retaliatory Expulsion, and Employment Termination: Denial of Due Process in Violation of Federal Title VII and the Illinois Human Rights Act ........................................ 35

    2. Unauthorized and Discriminatory Surveillance of International Students: Violations of Constitutional, Privacy, and Federal Civil Rights Protections .................................................. 39

    3. Autocratic Employment Practices and Inadequate Union Representation: Unilateral Disciplinary Actions Violating Due Process and Labor Law Rights ...................................... 41

    4. Union's Failure to Provide Statutorily Mandated Legal Representation for Student Workers: Breach of Duty of Fair Representation and Demand for Union Procedural Reform .......................... 46

    5.    Failure to Apply Progressive Discipline and Reliance on Pretextual Justification: Unlawful Retaliatory and Discriminatory Disciplinary Action .............................................................. 51

    6. Coordinated Retaliatory Terminations and Discriminatory Communication in a Non-Union Setting: Alleged Violations of Federal and State Labor Rights Protections ................................ 53

    7. Falsification of Disciplinary Evidence and Unauthorized Surveillance in Disciplinary Proceedings: Claims for Fraud, Forgery, and Privacy Rights Violations ...................................... 58

    8. Biased Disciplinary Proceedings Involving Forged Evidence and Breach of Institutional Duties: Violations of Contractual, Due Process, and Statutory Obligations in Expulsion Actions .................. 60

    9. Retaliatory Termination in Response to Protected Whistleblower Activity: Violations of Public Policy, Implied Contract, and Constitutional Rights ............................................................ 66

    10. Retaliatory Termination in Response to Protected Whistleblower Activity; Violations of Public Policy, Implied Contract, and Constitutional Rights ........................................................... 70

    11. Failure to Provide Disability Accommodations and Discriminatory Neglect; Violations of the Rehabilitation Act, Americans with Disabilities Act, Title IX and Civil Rights Protections ............ 72

    12. Pattern of Retaliatory Job Revocations and Constructive Professional Exclusion; Violations of Anti-Retaliation Statutes, Implied Employment Contracts and Due Process Protections ................ 74

    13. Political Retaliation During Student Government Elections and Viewpoint Discrimination; Violations of First Amendment, Equal Representation and Election Integrity ................................ 76

    14. Financial misconduct and misuse of restricted funds; violations of tax-exempt regulations, grant conditions and fiduciary duties ........................................................................................ 78

    15. Improper Sales Tax Practices in the Maroon Dollars Program and Misapplication of Tax-Exempt Provisions; Violations of Illinois Tax Law and Nonprofit Financial Obligations ............................ 80

16. Misuse of nonprofit tax-exempt status for personal purchases by university personnel and violations of IRS regulations and state revenue laws ............................................................................ 82

17. Pre-emptive retaliation and suppression of grievance rights and union activity and violations of national labour relations protections and educational labour laws ........................................... 83

18. Suspected digital retaliation and unauthorized access to personal accounts and violations of federal computer fraud laws and privacy protections ...................................................................... 84

19. Artificial pricing schemes and deceptive trade practices in tuition strategy and violations of consumer fraud laws and antitrust regulations .................................................................. 86

20. Misrepresentation of graduate employment outcomes and deceptive practices in student recruitment and violations of consumer protection laws .......................................................................... 87

21. Inadequate educational delivery and discriminatory allocation of financial and academic resources and violations of Title VI and contractual obligations ................................................................ 90

22. Request for Oversight of Research Funding Use and Institutional Title IX Misconduct and Witness Intimidation and Violations of False Claims Act, Civil Rights Protections and Federal Oversight Obligations ......................................................................................................... 95

23. Breach of duty of care by the university and violations of federal civil rights protections, Clery Act reporting obligations and Title IX compliance ................................................................... 101

24. Manipulation of governance structures misuse of nonprofit status and co-optation of student government and violations of fiduciary obligations and governance transparency ........................... 105

25. Disparate treatment in workplace amenities and creation of a hostile environment and violations of Title VII and workplace discrimination protections ........................................................... 107

26. Coercive course evaluation practices misrepresentation of educational quality and academic integrity violations and violations of consumer protection laws and educational fairness standards ... 111

27. Political Viewpoint Discrimination and Retaliation for Association with College Republicans Violates First Amendment Protections and Equal Treatment Rights .................................................... 118

28. Discriminatory Treatment Based on Religion, National Origin, Caste and Race and Procedural Irregularities in Academic Decisions ................................................................................... 134

29. Gender-Based Disparities in Institutional Response to Assault Reports and Misuse of Confidential Student Communications and Violations of Title IX, FERPA and Due Process Protections .............. 137

30. Pattern of Systemic Whistleblower Retaliation, Disregard of Grievance Rights, and Coordinated Suppression of Due Process ............................................................................................... 139

31. Psychological Distress, Retaliatory Intimidation, and Chilling of Rights Following Protected Activity by UCPD (University of Chicago Police) .................................................................. 143

32. Systematic Unauthorized Surveillance and Retaliatory Infiltration by the University of Chicago Police; Violations of Constitutional Free Speech, Privacy Rights, and Statutory Protections in the Context of Student Activism ............................................................................................... 146

33. University of Chicago's Systemic Failure to Establish and Maintain Effective and Equitable Crime Prevention and Campus Safety Measures; Violations of the Clery Act, Title VI, and Constitutional Due Process Standards, Including Evident Racial Discrimination and Lack of Transparency in UCPD Oversight ....................................................................................................................... 148

34. University of Chicago Police Department's Breach of Duty and Unlawful Surveillance: Inadequate Campus Safety Measures and Unauthorized Monitoring of Student Activists ............................... 151

35. Harris School of Public Policy's Discriminatory Employment Practices: Unlawful Hiring Criteria Affecting Student Employment Opportunities Under Federal Civil Rights Laws ............................. 152

36. University of Chicago's Discriminatory Allocation of Financial Aid and Emergency Funding: Unequal Distribution Favouring Specific National and Religious Groups in Violation of Anti-Discrimination Statutes .................................................................................................... 153

37. University of Chicago's Systematic Religious Discrimination: Marginalization of [Data Redacted] Cultural Representation and Inequitable Funding of Religious Events ........................................ 154

38. University of Chicago's Protection of Electoral Misconduct and Biased Disciplinary Practices, Institutional Retaliation and Due Process Violations .......................................................... 155

39. Continued Operation of the CARES Program as a Deceptive Financial Mechanism, Misrepresentation and Illicit Additional Funding in Violation of Consumer Fraud, Anti-Discrimination, and Antitrust Statutes .................................................................................................... 156

40 Arbitrary and Politically Motivated Termination of SSCS Office Employees; Procedural Unfairness and Discriminatory Employment Practices in Violation of Title VII, EEOC, and Due Process Protections ....................................................................................................................... 157

41. Alleged Erroneous SEVIS Record Reporting, Defamatory Disclosures, Unauthorized Surveillance, and Abuse of Administrative Authority in International Student Affairs ............................................ 158

42. Alleged Use of Legal Technicalities to Circumvent Protections Under Title IX and Union Representation, and the Resulting Curtailment of Free Expression and Academic Freedom .............. 159

43. Systemic Failure to Resolve Formal Grievances and Protect Student and Employee Rights – Noncompliance with Title IX, Title VII, NLRA, and University Grievance Policies .......................... 161

44. Failure to Initiate a Formal Grievance Process in Title IX and Employment Disputes – Breach of Statutory Requirements, Due Process Protections, and Internal University Procedures ..................... 163

45. Denial of Informal Grievance Resolution in Disciplinary Matter: Breach of University Grievance Policies, Due Process, and Contractual Obligations, Reflecting Autocratic Abuse of Authority ......... 167

46. Violation of University of Chicago Disciplinary Committee Composition Requirement Under Step 7.4 – Breach of Internal Grievance Protocols, Procedural Due Process, and Impartial Review .......... 170

47. Systematic Noncompliance with Title IX and Denial of Equal Educational Opportunities – Failure to Provide a Safe, Non-Discriminatory Learning Environment ............................................................ 172

48 Denial of Accommodations and Failure to Provide Interim Safety Measures – Violation of University Policy, Title IX Requirements, and Breach of Contractual Duty to Ensure Student Safety 175

49. Breach of Client Confidentiality and Invasive Solicitation Practices by Legal Counsel – Undermining Ethical Obligations in the Legal Representation Intake Process ..................................... 179

50. Institutional Suppression of Legal Complaints and Public Scrutiny – Violation of Transparency, Due Process, and Accountability through Manipulated Complaint Reporting and Intimidatory Enforcement Practices ............................................................................................................................ 181

51. Misrepresentation and Deceptive Practices by the University of Chicago and Harris School of Public Policy – Violations of Consumer Protection Laws, the FTC Act, and the Covenant of Good Faith ........................................................................................................................................................... 184

52. Pretextual Retaliation and Entrapment Through Administrative Deception in Response to a Grievance – Violations of Title VII, the Due Process Clause, and Institutional Commitments to Fair Review ...................................................................................................................................................... 185

53. Coercive Financial Practices via Preferred Loan Providers – Forcing Students into Private Lending Arrangements in Violation of the Higher Education Act, TILA, Federal Student Aid Regulations, and Consumer Fraud Statutes ....................................................................................................................... 186

54. Pattern and Practice of Retaliatory and Unlawful Conduct by the University of Chicago – Systematic Violations of Federal Civil Rights, Labor, Antitrust, and Consumer Protection Laws ...... 188

55. Research Misconduct(s) and Misuse(s) of Federal Funds by the University of Chicago – Institutional Violations of Federal Research Integrity Standards and Ethical Funding Practices.......... 190

56. Judicial Review of the University of Chicago's Tax-Exempt Status Under Section 501(c)(3) – Noncompliance with Public Policy Mandates, Research Integrity, and Non-Discrimination Standards .................................................................................................................................................................. 210

57. Unequal Treatment and Lack of Transparency in Recognized Student Organization Funding and Recognition – Violations of Title VI, Equal Protection, and First Amendment Principles .................. 212

58. Historical Retaliatory Practices Against Students Pursuing Legal Action – Precedents Illustrating Unjust Expulsions, Housing Evictions, and Denial of Due Process ..................................................... 215

59. Foreign and Federal Fund Misuse in Support of Campus Protests – Violations of Tax-Exempt Public Policy, FARA, and Federal Funding Regulations .................................................................... 218

60. Unlawful Financial Distribution by University Personnel for Potential Terror-Linked Purposes – Misappropriation of Federal and Institutional Funds, and Violations of Anti-Terrorism, Money Laundering, and Reporting Obligations................................................................................................. 220

61. Coordinated Desecration and Ideological Intrusion at University Grounds, Removal & Disrespect of the Great American Flag – Alleged Violations of Federal Desecration Statutes, Material Support Provisions, and Campus Security Funding Obligations ....................................................................... 225

62. Religious Discrimination and Failure to Provide Adequate Dietary Accommodations and Alcohol Safety Measures – Violations of Federal Civil Rights and State Anti-Discrimination Laws .............. 227

63. Investigation of Foreign Funding Sources from Adversarial Nations – Review of Undisclosed Grants, Donations, and Institutional Partnerships with Potential National Security Implications........ 230

64. Financial Aid Collusion and Antitrust Violations at the University of Chicago – Investigation Requested in Light of Ivy League Settlements ................................................................................. 231

65. Exploitative Fundraising Practices Through Recognized Student Organizations – Violations of Financial, Contractual, and Institutional Policy Obligations ................................................................ 233

66. Oversight of Commercial Revenue Activities at the University of Chicago – Ensuring Compliance with Tax-Exempt Purposes and IRS Regulations ................................................................................ 234

67. Misrepresentation, Breach of Contract, and Deceptive Advertising at the University of Chicago Harris School of Public Policy – Violations of the False Claims Act, Consumer Fraud Statutes, and Implied Educational and Financial Service Commitments ................................................................ 243

68. Alleged Misrepresentation and Deceptive Advertising by the Harris School of Public Policy – Breach of Contract, False Claims Act Violations, and Misleading Financial Aid Disclosures ............ 245

69. Environmental Misrepresentation ("Greenwashing") and Hypocrisy Regarding Sustainability Practices at the University of Chicago; Greenwashing in Violation of FTC and Consumer Fraud Statutes .............................................................................................................................................. 248

70. Systematic Breach of Academic Contract, Fraud, and Misconduct in Core Courses at the Harris School of Public Policy – Unfair Examination Practices and Compromised Academic Integrity ....... 250

71. Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act by the Harris School of Public Policy – Misrepresentation of Educational Standards, Breach of Contract, and Deceptive Testing Practices .............................................................................................................. 251

72. Potential Financial Misconduct and Securities-Related Concerns at the University of Chicago – Request for Financial Auditing, Investment Oversight, and Investigation of Securities Compliance .. 254

73. Potential SEVP Noncompliance by the University of Chicago – Request for a Comprehensive Audit of International Student Recordkeeping, Reporting, and F-1 Visa Sponsorship Practices ......... 255

74. Whistleblower Claim of Systematic Misrepresentation of Academic Program Credentials – Encouraging False Representations to Enhance Employment Outcomes ............................................ 257

75. Abuse of Authority and Predatory Conduct in Handling Plaintiff's Transcripts – Retaliatory Delays and Pre-emptive Alteration of Academic Records to Undermine Legal and Professional Prospects ... 258

76. Discrimination Against Graduate Students in Access to Benefits and Opportunities – Systematic Exclusion in Violation of Federal and State Civil Rights Laws .......................................................... 261

77. Unauthorized Disclosure of Confidential Employment Communications by Mansueto Institute – Retaliatory Breach of Confidentiality in a Union-Eligible Context ..................................................... 263

78. Misuse of Donor and Federal Funds in Bad Faith – Breach of Fiduciary Duty, Donor Agreements, and Federal Grant Obligations ........................................................................................................... 264

79. Failure to Act on the Student Petition for Career Development Code of Conduct Reforms – Administrative Neglect Undermining Student Input and Career Support ............................................ 266

80. Federal Funding and Compliance Obligations: Ensuring Non-Discrimination, Non-retaliation, Free Expression, and Responsible Use of Federal Resources ..................................................................... 271

81. Food Waste and Environmental Negligence: Institutional Failure to Implement Sustainable Food Management Practices ....................................................................................................................... 273

82. Repeated Whistleblower Reports of Hazardous Conditions and Subsequent Retaliation for Reporting Mishandling of Chemicals/Gases – Request for Full Investigation and Public Disclosure of OSHA Safety Protocols ..................................................................................................................... 273

83. Unauthorized Access and Tampering with Plaintiff's University Email and Records – Privacy Violations and Alleged Evidence Spoliation ...................................................................................... 279

84. Medical Research Misconduct and Participant Harm in NIH-Affiliated Studies – Informed Consent Violations, Excessive Blood Draw Practices, and Ethnic Exploitation ............................................... 279

85. Misconduct, Underpayment, and Procedural Irregularities in Vogel Lab Research Participation – Allegations of Breach of Contract, Wage Theft, and Unfair Treatment in a Federally Funded Research Environments ..................................................................................................................................... 281

86. Misuse of Federal Funds and Violation of Legal Standards by the University of Chicago – Allegations of Partisan Activity, Discriminatory Practices, and F-1 Sponsorship Noncompliance ..... 283

87. Strategic Omission and Institutional Bias in Disciplinary Proceedings – Retaliation and the Undermining of Union Protections ..................................................................................................... 286

88. Retaliatory Denial of Internship, Interference with Employment Process, and Post-Grievance Document Tampering ........................................................................................................................ 289

89. Failure to Provide Meaningful Instruction and Misrepresentation of Academic Services at the University of Chicago ........................................................................................................................ 291

90. Potential Mishandling of Police Response (Chicago Police Department), Coercion, and Continued Threats Post-Assault ......................................................................................................................... 294

91. Incident Report and Campus Health Oversight Concern – Mystery Dining Program Foodborne Illness at UChicago Law School Café .............................................................................................. 295

92. Retaliation and Food Safety Whistleblower Protections – Federal and Illinois Legal Context ...... 299

93. Trustee and Senate Accountability and Whistleblower Disclosure to U.S. Authorities ................. 300

94. Unlawful compensation practices involving gift cards and cash payments to students in violation of federal and state labour and tax laws ....................................................................................................... 302

95. University-facilitated tax misrepresentation – advice by staff to omit gift card and cash payments from tax returns ................................................................................................................................................ 304

96. Whistleblower Allegation Regarding Sanitation and Public Health Standards in University Facilities | Improper and Infrequent Cleaning of University Buildings Posing Health Risks, Potential violation if IDPH, OSHA rules ...................................................................................................................... 304

97. Retaliation In Violation of Federal Civil Rights and Public Policy Statutes (Title VI, Title IX, First Amendment, and Whistleblower Protections) ...................................................................................... 305

98. Quoting Potential/actual applicable Policies and Legal Considerations for Nonprofit Expansion | IRS, Public Accountability, Fiduciary duties and precedence, Non profit, ........................................... 307

99. Whistleblower Regarding Use of a Minor in Campus Event: Potential Violations of Safety, Labor, and University Compliance Standards .................................................................................................... 310

100. Disability Discrimination, Retaliation, and Whistleblower Retaliation Against Plaintiff by SSCS (Social Sciences Computing Services), Including Hostile Work Environment, Tax Misconduct Concerns, and Improper Employment Practices .............................................................................................. 311

101. Wage Withholding, Retaliatory Termination, and Institutional Misconduct Involving the Mansueto and SSCS Roles .................................................................................................................................... 312

102. Suspected Retaliatory Interference with Plaintiff's Job Applications – Potential Digital Tampering and Administrative Misconduct ....................................................................................................................... 314

103. Suspected Lack of Equal Access to Student Profile Features on Harris School Platform ............ 315

104. Legal Authorities, Doctrines, and Statutory Provisions Implicated by the University of Chicago's Failure to Timely Initiate Disciplinary Action Under Statute 21 and the Disciplinary System for Disruptive Conduct ............................................................................................................................................ 316

105. Declaration of Threat, Surveillance, and Anticipated Harm by University Officials – Allegations of Retaliatory Intimidation and Institutional Abuse ..................................................................................... 322

Consequences .................................................................................................................................................. 323

Educational Terrorism Context and Definition: ..................................................................................... 327

Proposal for Constitutional Consideration: Request for Safeguards Against Educational Terrorism ...... 329

Constitutional Principles at Stake (Not limited to): ................................................................................. 329

Constitutional Questions ............................................................................................................................... 329

Constitutional Consideration ........................................................................................................................ 332

Framework for Legislative Reform ............................................................................................................... 334

Request for Governmental and Judicial Investigation into the University of Chicago Based on Established Legal Standards for Inquiry ........................................................................................................................ 334

Conclusion and Prayer for Relief .................................................................................................................. 335

Final Section: Legal Demands, Discovery Requests, and Relief ............................................................. 336

Compensatory relief and restorative actions ............................................................................................. 340

Past examples of cases for damages that can be considered by jury and court ........................................ 342

Constitutional amendments Draft ................................................................................................................. 356

**Preliminary Statement**

Plaintiff respectfully requests that the agency/courts **refrain from immediately notifying the Respondent of the existence or content of this complaint** until a preliminary investigation has been initiated or sufficient evidence has been preserved, **defendant can only get complete copy of this complaint after matter will be in court**. This request is made in good faith to prevent further destruction, fabrication, falsification, or alteration of evidence by the Respondent and to preserve the integrity of the investigation process. Plaintiff acknowledges that formal notice may ultimately be required under law but seeks this initial delay solely for evidentiary preservation purposes as defendant might have already destroyed some of the proofs. The **Plaintiff asserts** that, under all circumstances, **no agency shall disclose** the referenced information without **prior written consent** from the Plaintiff. Any necessary disclosure must specify **exactly what information is being shared**, and agencies shall provide the details in a **concise legal format**, rather than disclosing all contents, to maintain confidentiality **until the matter is formally presented before the court**.

**Plaintiff respectfully requests** that the Court and any reviewing agencies permit Plaintiff to proceed in this matter under conditions of strict confidentiality. This request is made pursuant to **Federal Rule of Civil Procedure 5.2**, which authorizes the redaction of personal identifiers in court filings, and **Illinois Supreme Court Rule 15**, which allows plaintiffs to proceed under a pseudonym where justice so requires. Additionally, Plaintiff invokes the protections articulated in **Doe v. Stegall, 653 F.2d 180 (5th Cir. 1981)**, which supports the use of pseudonyms in civil rights litigation involving sensitive, stigmatizing, or potentially retaliatory circumstances. The court in *Stegall* recognized that plaintiffs bringing forward such claims may be uniquely vulnerable, and that public identification could deter meritorious litigation. Plaintiff's claims in this matter involve highly sensitive allegations of disability discrimination, religious bias, academic retaliation, mishandling of gases/chemicals, and institutional misconduct. Public disclosure of Plaintiff's identity would pose a substantial risk of academic, professional, and personal harm, and may chill Plaintiff's ability to participate fully and freely in these proceedings. Plaintiff therefore respectfully requests that all filings redact Plaintiff's full name and other identifying information and that the Court enter any necessary orders to preserve confidentiality throughout the course of this litigation.

**Accordingly, Plaintiff requests that:**

1. Plaintiff's name and any personally identifying information be withheld from public filings and records to the fullest extent permitted by law;

2. All parties and agencies involved be instructed to treat this matter as confidential and to avoid disclosing Plaintiff's identity in any public forum;

3. In the event disclosure becomes legally required, Plaintiff be given advance notice and an opportunity to object or seek further protective measures.

If applicable and deemed necessary by the Court, Plaintiff further requests that filings, pleadings, or docket entries containing sensitive content be sealed or otherwise restricted from public dissemination to preserve the integrity of these proceedings and protect Plaintiff from reputational harm, academic or professional retaliation, or other adverse consequences. Plaintiff request to docket only redacted version after removal of any identifying information. Identifying information including but not limited to Plaintiff's name, photographs(like screenshots of emails, video recordings or other personal details capable of linking the individual to the allegations (including religion, caste, sex, disability, but not limited to these), addresses including email if any, Medical or mental health information, Employment records, Harassment or assault allegations, Student or minor data, and IFP form etc, be omitted or anonymized from public records. Plaintiff further requests that the Court maintain the IFP application under seal and restrict access to Defendants and public, as the financial information is solely for the Court's assessment and irrelevant to the merits of the case.

Plaintiff brings this action primarily to **assert claims of retaliation** and to seek a full and fair investigation into the **retaliatory** conduct alleged herein. Plaintiff expressly reserves all rights to pursue additional legal claims based on this investigation requested in good faith and as per whistleblower status, including but not limited to **claims challenging the validity** of **Plaintiff's expulsion** and related **disciplinary actions**, as discovery progresses, and further factual development occurs. **Nothing in this Complaint should be construed as a waiver of any future claims** Plaintiff may assert against Defendant University arising from the same nucleus of operative facts.

This request is made pursuant to Plaintiff's rights under applicable confidentiality protections and in accordance with the public interest in ensuring that individuals can report institutional misconduct **without fear of reprisal**. Plaintiff affirms that the complaint is filed in **good faith**, aiming to address grievances and seek redress for alleged wrongs, **without intent to defame any individual or entity.**

Plaintiff respectfully submits that all allegations contained within this complaint are made **in good faith** and in accordance with Rule 11(b) of the Federal Rules of Civil Procedure. Plaintiff respectfully requests that the Court/agencies evaluate all claims within the context of this good faith pursuit of redress for alleged serious violations of federal and state law. Plaintiff brings this action in good faith, based on information currently available, and alleges claims that are warranted by existing law or by a **nonfrivolous and non-defamatory argument** for the **extension, modification, or reversal of existing law**. Plaintiff respectfully requests that, in the event the Court/agencies finds any particular claim less strong, such finding not result in any additional punishments/ penalties/ sanctions of any kind against Plaintiff, in recognition of Plaintiff's **good faith efforts and whistleblower status**, to seek redress for serious violations of federal and state law.

Plaintiff further represents that, given the nature of the allegations including matters uniquely within the control of the Defendant University and various governmental agencies certain facts

will require formal discovery, Freedom of Information Act (FOIA) disclosures, investigative subpoenas, and further factual development before full substantiation can be achieved.

This Complaint is not presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Rather, it is filed to seek redress for alleged violations of **constitutional rights, statutory protections, common law duties, civil duties, and public interest policies protecting students, community safety, whistleblowers, and consumers**.

Plaintiff acknowledges that complex and multi-faceted complaints such as this may involve claims that, upon further discovery and evidentiary development, are narrowed, refined, or even voluntarily withdrawn, consistent with the Plaintiff's continuing duty of Candor to the Court.

Accordingly, Plaintiff respectfully requests that the Court adjudicate this matter on the merits without penalizing the good-faith assertion of claims designed to protect Plaintiff's civil rights, safeguard public funds, and ensure institutional accountability.

Plaintiff respectfully requests that each receiving agency evaluate, investigate, and address the allegations contained in this Complaint within the scope of its statutory jurisdiction and enforcement authority. Plaintiff acknowledges that certain allegations may fall under multiple regulatory frameworks, including but not limited to civil rights enforcement, consumer protection, fraud investigation, and educational funding oversight. Plaintiff further requests that agencies refer or coordinate the investigation of specific allegations to appropriate internal units or other governmental bodies as necessary to ensure comprehensive review and remedial action. This request is made with good faith, in the interest of efficiency, transparency, and adherence to applicable jurisdictional standards.

Plaintiff is an individual with a disability. At all relevant times, Plaintiff was qualified to participate in Defendant University's academic programs, with or without reasonable accommodations. Defendant University had **actual knowledge** and **constructive knowledge** of Plaintiff's disability. Specifically, Plaintiff disclosed the disability to the University through Students Disability Services Office, medical documentation provided, and Plaintiff was receiving formal disability accommodations and staff including Dean's Harris, President, Provost, was also aware of it. Despite being aware of Plaintiff's disability and Plaintiff's ongoing participation with approved accommodations, Defendant University subjected Plaintiff to adverse treatment culminating in Plaintiff's expulsion. Plaintiff's disability was also a **motivating factor** of the adverse action taken against Plaintiff. Plaintiff requested reasonable disability accommodations pursuant to the Americans with Disabilities Act (ADA), but the University failed to provide them or engage in an interactive process as required by law. Plaintiff submitted a disability accommodation request, yet the University failed to initiate any interactive process, provide alternative solutions, or offer a written denial. Plaintiff received no formal response like letter etc and was not informed of any grievance or appeal process as required by Section 504 of the Rehabilitation Act. Despite Plaintiff's willingness to personally fund the accommodation, an item valued at under $30, the

University took no action to reasonably accommodate the request. Such total inaction constitutes a violation of federal disability law.

All of the Defendant University's actions were intentional, deliberate, and made with reckless disregard for Plaintiff's multiple federally and state protected rights.

As a direct and proximate result of the University's discrimination, denial of accommodation, retaliation, entrapment, and denial of grievances hearing, Plaintiff has suffered damages, including but not limited to educational & research harm, religious harm, emotional distress, mental harassment, humiliation, reputational harm, educational and career disruption, opportunities and economic loss.

**MOTION FOR JURISDICTIONAL DETERMINATION**

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

John Doe

v.

The University of Chicago, et al.,

Case No.

Plaintiff, respectfully moves this Court to determine and confirm its jurisdiction over this case based on the following allegations:

1. The Court has jurisdiction over this case under 28 U.S.C. § 1331 because the claims are brought under the laws and Constitution of the United States.

2. The Court has supplemental jurisdiction over the state law claims in this case under 28 U.S.C. § 1367 because the state law claims are related to the federal claims.

WHEREFORE, Plaintiff prays that this Court confirm its jurisdiction over this matter and grant such other and further relief as may be just and proper.

Given the apparent procedural and substantive irregularities that have allegedly occurred including retaliation following a discrimination grievance and administrative decisions lacking due process I respectfully note that this may be a matter the Court could properly address *sua sponte*, consistent with its inherent obligation to uphold judicial fairness and protect constitutional rights.

Respectfully submitted,

John Doe (Pseudo Name)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
(EASTERN DIVISION)
**JOHN DOE,**

Plaintiff,
v.
**UNIVERSITY OF CHICAGO, et al.,**
Defendants.

**MOTION TO SEAL PLAINTIFF'S IDENTITY AND CONFIDENTIAL INFORMATION**

Plaintiff, proceeding under the pseudonym **John Doe**, respectfully moves this Honorable Court for an order **sealing or restricting public access to Plaintiff's identity and certain confidential records and information filed or to be filed in this matter.** This motion is made to protect Plaintiff's fundamental rights to privacy, security, and fair judicial process.

**GROUNDS FOR THIS MOTION**

1. **Sensitive and Highly Personal Information:** This case involves deeply personal matters, including but not limited to Plaintiff's **national origin, religion and beliefs, caste, medical records and conditions, sexual identity and orientation, and allegations of sexual assault and harassment.**

2. **Risk of Further Harm, Retaliation, and Stigmatization:** Public disclosure of such sensitive information may expose Plaintiff to harassment, discrimination, or social stigma. Plaintiff reasonably fears severe consequences, including reputational harm, retaliation, or misuse of this information especially given the nature of the allegations.

3. **Presence of Non-U.S. Defendants or Individuals:** Some individuals or entities potentially involved may reside outside the United States, raising concerns about international dissemination of sensitive documents. This could lead to broad unauthorized disclosure, including publication on the internet, beyond the jurisdictional reach of this Court.

4. **Protection of Privacy Interests Recognized by Law:** Courts routinely protect highly sensitive matters by allowing pseudonyms and sealing identifying documents to safeguard parties in cases involving sexual assault, private medical issues, and matters implicating personal security.

5. **No Prejudice to Defendants:** Sealing Plaintiff's identity and restricting access to certain sensitive documents does not prejudice Defendants' ability to defend this case. Defendants will continue to have full access to materials under protective order or reasonable confidentiality agreements.

**REQUESTED RELIEF**

Plaintiff respectfully requests that this Court:

1. Allow Plaintiff to proceed under the pseudonym "John Doe" in all public filings and orders, and to file Plaintiff's full name and identifying information under seal.

2. Order that all documents containing Plaintiff's national origin, religion, caste details, medical records and history, sexual identity or assault allegations, or any other uniquely identifying or sensitive personal details be sealed or redacted from the public record.

3. Direct that Defendants, their agents, attorneys, and all parties to this litigation refrain from disclosing Plaintiff's personal identity or these sensitive details to anyone not directly

involved in this case, and expressly prohibit sharing such information in public forums, online, or with third parties.

4. Grant such other relief as the Court deems just and proper to protect Plaintiff's privacy, security, and fair access to justice.

Plaintiff makes this motion in good faith to safeguard fundamental privacy and dignity interests, and to prevent unnecessary public exposure of matters that could irreparably harm Plaintiff. **Respectfully submitted,**

**John Doe (Pseudo Name)**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

JOHN DOE,                                            )

      Plaintiff,                                  )

     v.                                           )        Case No. _____

THE UNIVERSITY OF CHICAGO, et al.,                   )

      Defendants.                                )

**MOTION TO PROCEED UNDER PSEUDONYM AND TO FILE REDACTED COMPLAINT**

Plaintiff, by and through the undersigned pro se, respectfully moves this Honorable Court for leave to proceed under the pseudonym "John Doe" and to file a redacted version of the Complaint on the public docket, while filing an unredacted version under seal pursuant to Local Rule 26.2. In support of this motion, Plaintiff states as follows:

1. Plaintiff is a former graduate student and student-employee at the University of Chicago. The underlying claims include retaliation, disability discrimination, defamation, due process violations, and whistleblower-related misconduct.

2. Public disclosure of Plaintiff's identity would expose him to a significant risk of further reputational, professional, academic, and personal harm, particularly in the event of an unfavorable disposition of the matter.

3. This case involves highly sensitive allegations, including wrongful termination following protected activity, fabricated evidence, and misuse of institutional disciplinary power. The nature of the claims implicates deeply personal information, including health conditions, disability accommodations, immigration status, and sexual misconduct complaints.

4. Courts within this jurisdiction and others have permitted pseudonymous litigation where the plaintiff has a legitimate privacy concern that outweighs the public's interest in disclosure. See *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981); *Doe v. Elmbrook Sch. Dist.*, 658 F.3d 710 (7th Cir. 2011); *Doe v. Indiana Black Expo, Inc.*, 923 F. Supp. 137 (S.D. Ind. 1996).

5. Plaintiff is not seeking anonymity to evade accountability but to preserve access to justice while avoiding irreversible harm to his reputation, career prospects, and mental well-being.

6. Plaintiff is willing to disclose his identity to the Court and to opposing counsel, under seal or protective order as directed by the Court, and requests only that his personal identity not be made public in filings accessible via PACER or other public repositories.

7. This request is narrowly tailored and does not prejudice Defendants. The public can still access the legal and factual basis of this case through a redacted version of the Complaint.

WHEREFORE, Plaintiff respectfully requests that this Court grant leave to proceed under the pseudonym "John Doe," permit filing of a redacted Complaint for public access, and allow the unredacted version to be filed under seal, along with all subsequent filings containing identifying information.

Dated: June 19, 2025

Respectfully,

 John Doe (pseudonym),

Pro Se Plaintiff (*requesting attorney)

**Request to Court for Investigative Oversight and Protective Relief (Preliminary Filing)**

**To the Honourable Court:**

Plaintiff respectfully submits this request seeking judicial oversight and injunctive relief in anticipation of filing a formal civil complaint and criminal complaint/conduct. Plaintiff respectfully requests the Court to consider this submission in the nature of a good-faith **preliminary filing** and **petition for limited court-supervised investigatory action**, with the following purposes and protections:

1. **Request for Investigatory Oversight Prior to Final Complaint**
   Plaintiff requests that the Honourable Court issue an appropriate investigatory order, such as the appointment of a **special master**, **compliance monitor**, or **judicially supervised review**, so that the underlying facts, allegations, and institutional conduct by Defendant University and related parties may be robustly evaluated and preserved for inclusion in a finalized complaint. This will ensure that **relevant, substantiated, and properly structured claims** are brought before the Court.

2. **Mandamus Relief for Investigative Duty**
   To the extent applicable, Plaintiff seeks a **writ of mandamus** to compel the University of Chicago and affiliated administrative units to fulfill their legal obligations to investigate, document, and transparently resolve complaints regarding retaliation, discrimination, and systemic rights violations. Plaintiff asserts that such a duty is **mandatory**, not discretionary, under federal and state statutes and institutional policy frameworks.

3. **Protection Under Whistleblower and Reporting Laws**
   This filing is made under the protections of applicable **whistleblower**, **civil rights**, and **anti-retaliation statutes**, including but not limited to the **Illinois Whistleblower Act (740 ILCS 174/)**, **Title VII**, **Title IX**, and federal **First Amendment** protections. Plaintiff respectfully requests that **no adverse action, retaliation, or penalty** be taken against Plaintiff in any form as a result of this submission in any case, which is provided **in good faith** for the protection of public interest and legal accountability in any case.

4. **Request for Appointment of Counsel**
   Due to the **complexity of the case** which encompasses both **civil and criminal** elements Plaintiff respectfully moves the Court to consider appointment of **qualified legal counsel** under **28 U.S.C. § 1915(e)(1)** or any other relevant authority. Legal counsel will assist in formulating claims with precision and economy, thereby reducing unnecessary burdens on the Court and minimizing the risk of vague or duplicative pleadings. Counsel's assistance

will also ensure that **any amendments, deletions, or additions to claims** are performed in line with professional legal standards and factual verification.

5. **Request                    for                    Injunctive                    Relief**
Plaintiff further requests **injunctive relief** in the form of a **court-supervised compliance audit** or review of the institutional practices and decision-making processes described herein. Plaintiff believes such oversight is essential to ensure lawful conduct, transparency, and preservation of rights during the pendency of this matter.

6. **Good-Faith            Basis            and            Allegation            Disclaimer**
All factual assertions herein are made **as allegations only** and should not be interpreted as conclusive findings. Plaintiff affirms that the contents of this filing are based on available evidence, personal knowledge, and credible belief, but may require **amendment or clarification upon consultation with qualified legal counsel**. Plaintiff expressly reserves the right to **revise claims** based on legal advice, discovery outcomes, and further investigation, and again requests **no prejudicial or any other action be taken** as a result of this early-stage filing.

**Prayer for relief**

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Accept this preliminary request as a **good-faith pre-complaint petition**;

2. Consider issuing an order initiating **limited investigatory oversight** or appointing a neutral review officer;

3. Consider Plaintiff's request for **mandamus relief** to compel lawful investigation by institutional parties;

4. Consider appointment of legal counsel to assist in preparing a full complaint and appointment for complex litigation representation;

5. Grant any such **injunctive or equitable relief** as the Court deems just and proper to protect Plaintiff's rights and the integrity of the process.

Respectfully submitted.

**Plaintiff's motion for protective order pursuant to federal rule of civil procedure 26(C)**

Plaintiff, proceeding pro se, respectfully moves this Court under Rule 26(c) of the Federal Rules of Civil Procedure for a protective order limiting discovery and questioning related to allegations of academic misconduct that are not central to the issues in this litigation.

This request is made in **good faith**, and for the purpose of avoiding **undue embarrassment, reputational harm, and professional prejudice**, particularly where:

1. The issues of "Academic Misconduct" have not been substantiated, and are not material to the legal questions raised in Plaintiff's core claims of **retaliation, breach of contract, due process violations, and whistleblower discrimination**;

2. Such allegations if raised in pleadings or publicly disclosed in court proceedings could have an irreversible negative impact on Plaintiff's future educational, professional, and immigration-related opportunities;

3. Plaintiff is a **former student, whistleblower, and federally funded research subject**, and should be afforded heightened protections from speculative or defamatory character attacks, especially given the **chilling effect** on protected grievance activity;

4. The discovery sought by the Defendant on these matters is **disproportionate, harassing, and not narrowly tailored** to lead to the discovery of admissible evidence;

5. Allowing such inquiry would defeat the interests of justice by creating an environment of intimidation against pro se litigants who raise concerns against large institutions.

**Plaintiff respectfully requests that the Court:**

1. Prohibit Defendant from seeking discovery or introducing testimony regarding allegations of academic misconduct that are unsubstantiated, unrelated, or not central to the Plaintiff's whistleblower retaliation claims.

2. **Seal or redact** any filings or correspondence that refer to such allegations, unless and until the Court determines their probative value and relevance under a separate evidentiary review;

3. **Grant any further relief** this Court deems just and proper under the circumstances of this case, particularly in light of Plaintiff's pro se status and whistleblower activity.

Plaintiff invokes **Cannon v. University of Chicago, 441 U.S. 677 (1979)**, which upheld that individuals have an **implied private right of action under Title IX** against federally funded

institutions. This landmark case supports the **right of an aggrieved student to seek court intervention** when misconduct or discrimination undermines federally protected rights.

**Assertion of Whistleblower Status and Request for Protection:**

Plaintiff respectfully asserts that the allegations made herein involve, among other matters, potential violations of federal civil rights laws, misuse of federal funding, retaliation for protected activity, systemic non-compliance with grant conditions, fraud, waste, and abuse affecting federally funded programs. Accordingly, Plaintiff further requests official recognition as a whistleblower entitled to the protections afforded under applicable federal and state laws, including but not limited to:

- The False Claims Act (31 U.S.C. § 3730(h)),

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d),

- Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681),

- The Whistleblower Protection Act (5 U.S.C. § 2302),

- Relevant state whistleblower protection statutes.

Plaintiff respectfully requests protection from any form of retaliation, adverse action, harassment, or reprisal arising out of the good faith filing of this Complaint or participation in related investigations. Plaintiff further reserves all rights to seek judicial redress in the event of retaliatory conduct by any party related to the matters raised herein.

Plaintiff respectfully requests that this case and all related filings be treated with the understanding that Plaintiff has consistently acted in a whistleblower capacity, reporting institutional misconduct including sexual and physical assault, retaliation, and discrimination, to various University departments and external agencies. Plaintiff raised these concerns with the intent to prevent future harm to others and now seeks protection under applicable whistleblower protection statutes throughout these proceedings before all administrative agencies and judicial forums.

Plaintiff respectfully notes that due to limited legal resources and without access to professional legal representation, this complaint is being submitted in substantially similar form to multiple agencies and bodies of jurisdiction. Plaintiff **requests that each agency review portions of the complaint that fall within its legal scope or authority, and disregards other allegations only if necessary**. Plaintiff is willing to provide additional, agency-specific clarifications or documentation upon request.

Plaintiff respectfully moves this Honourable Court for the appointment of **counsel pursuant** to 28 U.S.C. § 1915(e)(1), on the grounds that he is unable to adequately represent himself due to

significant emotional distress and mental health impairment stemming from ongoing retaliation and procedural misconduct perpetrated by the Defendant. Especially including but not limited to disciplinary summons & proceedings initiated by the Defendant, Plaintiff experienced psychological phenomena including the Misinformation Effect, False Memory Syndrome, and effects consistent with the Labelling Theory and Self-Fulfilling Prophecy, which substantially hindered his ability to accurately defend against unfounded and false allegations.

The Plaintiff further avers that the **legal and factual complexities** of this case render pro se representation impractical, prejudicial, and fundamentally inadequate. The issues involved span multiple areas of law including but not limited to retaliation, civil rights violations, education law, employment law, and immigration law necessitating legal counsel with multidisciplinary complex areas expertise. Plaintiff lacks financial means, being currently unemployed, and has been unable to retain private counsel after substantial efforts due to the intricacy of the case and reluctance of legal practitioners to oppose a well-resourced institutional defendant.

As a result, Plaintiff has suffered from depression, panic attacks, and anxiety requiring psychiatric care, which impaired the ability to meet procedural deadlines (If missed any or some). Plaintiff relied in good faith on publicly available legal information and now seeks equitable tolling based on mental incapacity and reasonable misunderstanding. In the interest of justice and due process, Plaintiff requests the Court to appoint counsel and permit deadline flexibility where appropriate.

Additionally, Plaintiff resides in a different time zone, which imposes further logistical challenges that may affect representation. Accordingly, Plaintiff respectfully requests that the Court appoint or facilitate access to a qualified, neutral, pro bono attorney, preferably legal team with demonstrated experience in **complex civil litigation (or something else as court think necessary)** across the legal domains mentioned on the complaint who can help till US Supreme court appeal for constitution questions arising out of this matter for both trail and appeal process, For the protection of Plaintiff's fundamental rights.

**Request for Appointment of Counsel Under NDIL Local Rules 83.35 and 83.36**
**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**John Doe**

Plaintiff,

v.

**The University of Chicago,**

Defendant.

**MOTION FOR APPOINTMENT OF COUNSEL UNDER LR 83.35 AND LR 83.36**

NOW COMES Plaintiff, appearing pro se, and respectfully moves this Honorable Court for the appointment of counsel pursuant to **28 U.S.C. § 1915(e)(1)** and the Court's **Local Rules 83.35 and 83.36**, and in support states as follows:

1. **Plaintiff is indigent** and unable to afford and find private legal representation, as will be detailed in the attached affidavit of financial status in compliance with **LR 3.3(a)(2)**.

2. Plaintiff has made **diligent and substantial efforts** to obtain private counsel by contacting multiple law firms, pro bono legal aid organizations, civil rights attorneys, and public interest advocates. However, Plaintiff has been unable to secure representation due to the **complexity, resource demands, and institutional nature** of the case.

3. The present matter involves **serious and complex legal issues**, including but not limited to **constitutional claims, retaliation, federal civil rights violations (including claims under Title IX and 42 U.S.C. §§ 1983 and 1981), and allegations implicating protected activities and institutional misconduct**.

4. Plaintiff's claims are not frivolous and present a plausible basis for relief. However, due to the **legal, procedural, and evidentiary complexity**, Plaintiff respectfully submits that **self-representation would prejudice the fair administration of justice**.

5. Pursuant to **LR 83.36(a)**, this motion is accompanied by a completed application form and affidavit of financial status. Plaintiff is eligible for assignment based on financial need and substantial good-faith efforts to obtain counsel independently.

6. Plaintiff further requests that the Court consider this case for inclusion in the **District's Pro Bono Program**, as outlined under **LR 83.35(b)**, or for referral to the **William J. Hibbler Memorial Pro Se Assistance Program** if appropriate.

**WHEREFORE, Plaintiff respectfully prays that this Honorable Court:**

1. **Grant this Motion for Appointment of Counsel** pursuant to 28 U.S.C. § 1915(e)(1), LR 83.35, and LR 83.36;

2. Appoint a qualified member or a panel members for this complex issue of the **Trial Bar** from the Pro Bono Panel to represent Plaintiff;

3. Provide any further relief that this Court deems just and appropriate under the circumstances.

Respectfully submitted,

**John Doe, Pseudo name plaintiff**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS PURSUANT TO LR 3.3**

NOW COMES Plaintiff, appearing pro se, and respectfully moves this Honorable Court for leave to proceed **in forma pauperis** under **Local Rule 3.3** and **28 U.S.C. § 1915**, and in support thereof, states as follows:

1. Plaintiff seeks to file a civil complaint and is unable to pay the required filing fees due to being unemployed implying financial hardship. Plaintiff has no sufficient funds costs and expenses associated with this litigation.

2. In accordance with **LR 3.3(b) and (c)**, Plaintiff has contemporaneously submitted:

   o A completed **IFP petition**;

   o A sworn **financial affidavit** using the court's approved form;

   o A proposed civil complaint stamped "received" by the Clerk.

3. Under **LR 3.3(d)**, Plaintiff respectfully requests that, should the Court grant this motion, the complaint be deemed **filed as of the date of the Court's order**. Alternatively, if the complaint is time-sensitive, Plaintiff prays that the filing date be deemed as of the date it was received by the Clerk.

4. Plaintiff also respectfully requests that, pursuant to **LR 3.3(g)**, the **United States Marshal be authorized to effect service of process** on the Defendant(s) without prepayment of fees, unless otherwise ordered by the Court.

**WHEREFORE, Plaintiff respectfully requests that the Court:**

1. Grant Plaintiff leave to proceed **in forma pauperis**;

2. Order that the complaint be filed without prepayment of the filing fee;

3. Direct the U.S. Marshal to serve process without charge; and

4. Grant any other relief the Court deems just and proper.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

John Doe

(full name of plaintiff or petitioner)

vs.

The University of Chicago

(full name of defendant(s) or respondent(s))

**APPLICATION TO PROCEED
WITHOUT PREPAYING FEES OR
COSTS / FINANCIAL AFFIDAVIT
(NON-PRISONER CASE)**

Case number: none

**Instructions:** Please answer every question. Do not leave blanks.
If the answer is "0" or "none," say so.

**Application:** I am one of the parties in this case. I believe that I am entitled to the relief I am requesting in this case. I am providing the following information under penalty of perjury in support of my request (check all that apply):

☑ to proceed *in forma pauperis* (IFP) (without prepaying fees or costs)
☑ to request an attorney

1. *Are you employed?*
   ☐ Yes   Name and address of employer: none
            Total amount of monthly take-home pay: 0
   ☑ No    Date(s) of last employment: 0   Last monthly take-home pay: 0

2. *If married, is your spouse employed?* ☑ Not married
   ☐ Yes   Name and address of spouse's employer: none
            Total amount of spouse's monthly take-home pay: 0
   ☐ No    Date(s) of spouse's last employment: 0   Spouse's last monthly take-home pay: 0

3. *Other sources of income / money:* For the past 12 months, list the amount of money that you and/or your spouse have received from any of the following sources:

   | | *(list the 12-month total for each)* |
   |---|---|
   | Self-employment, business, or profession: | $ 30000 |
   | Income from interest or dividends: | $ 0 |
   | Income from rent payments: | $ 0 |
   | Pensions, annuities, or life insurance: | $ 0 |
   | Disability or worker's compensation: | $ 0 |
   | Gifts (including deposits into any accounts in your name): | $ 0 |
   | Unemployment, public assistance, or welfare: | $ 0 |
   | Settlements or judgments (include any that are expected): | $ 0 |
   | **Any other source of money:** | $ Not known |

Page 1 of 2

Rev. 2/2020

4. *Cash and bank accounts*: Do you and/or your spouse have any money in cash or in a checking or savings account? ☑ Yes ☐ No   If yes, how much? $1913

5. *Other assets*: Do you and/or your spouse own or have an interest in any real estate (including your home), stocks, bonds, other securities, retirement plans, automobiles, jewelry, or other valuable property (not including ordinary household furnishings and clothing)? ☐ Yes ☑ No

If yes, list each item of property and state its approximate value:

None

6. *Dependents*: Is anyone dependent on you and/or your spouse for support? ☑ Yes ☐ No

If yes, please list their names (for minor children, use only initials); relationship to you; and how much you and/or your spouse contribute toward their support each month:

I list my parents as dependents because, under normal circumstances, I contribute to their support.

Due to the harm caused by the Defendant's actions, currently unable to provide any financial duties.

7. *Debts and financial obligations*: List any amounts you owe to others:

Approx. $30,000 to parents for tuition, housing, and living costs during studies. Currently living

with others due to lack of funds. Market rent and basic expenses (groceries, utilities, personal needs

) total ~$600/month. I contribute to utilities and groceries as able.

8. *Provide any other information that will help explain why you cannot afford to pay court fees / hire an attorney:*

Due to defendent actions plaintiff lost all of the jobs, and despite of trying to get a job is still unempl

Plaintiff also reached out to many legal firm, pro bono organizations etc but they are very expensive

and some appeared not taking case due to powerful defendent institution.

**Declaration**: I declare under penalty of perjury that all of the information listed above is true and correct. I understand that a false statement may result in dismissal of my claims or other sanctions.

Date:   06/26/2025          John Doe
                            *Applicant's signature*
                            John Doe
                            *Printed name*

Respectfully submitted,

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

John Doe,

Vs

The University of Chicago et al.

## MOTION TO SEAL IN FORMA PAUPERIS APPLICATION AND RESTRICT DISCLOSURE

Plaintiff respectfully moves this Court pursuant to Fed. R. Civ. P. 5.2(d), Local Rule 26.2, and the Court's inherent authority to file under seal Plaintiff's **Application to Proceed In Forma Pauperis (IFP)** and supporting affidavit, and to restrict access to such documents from both the general public and Defendants. In support of this motion, Plaintiff states as follows:

1.   Plaintiff is a financially indigent individual currently seeking leave to proceed without payment of fees under 28 U.S.C. § 1915.

2.   The IFP application contains highly sensitive financial and personal information, including income, assets, debts, housing circumstances, and familial obligations, disclosure of which would subject Plaintiff to unnecessary embarrassment and could compromise personal safety and dignity.

3.   Disclosure of this information to the public and Defendants is not necessary to adjudicate the merits of the underlying claims, as the IFP application solely concerns the Plaintiff's eligibility to proceed without fees and with attorney or attorney panel for complex case.

4.   Plaintiff further requests that the IFP application be withheld from Defendants, as Plaintiff reasonably fears that the disclosure of this sensitive material could be used to retaliate, intimidate, or undermine Plaintiff's credibility, especially given the power imbalance between the parties.

6.   The sealing of the IFP application and restriction of its disclosure would not prejudice Defendants and is narrowly tailored to serve compelling privacy interests.

**WHEREFORE, Plaintiff respectfully requests that the Court:**

1.   Grant leave to file the In Forma Pauperis application and affidavit **under seal**;

2.   Order that the sealed documents be **inaccessible to the general public and Defendants**;

3.   Grant any further relief the Court deems just and proper.

Respectfully submitted,

John Doe, Pseudo name

**Motion to Restrict Recording and Public Access to Remote Proceedings**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**MOTION TO RESTRICT RECORDING AND PUBLIC ACCESS TO REMOTE VIDEO PROCEEDINGS**

Plaintiff respectfully moves this Honourable Court to limit the recording and dissemination of any remote video proceedings in this matter, and in support states the following:

1.  Plaintiff will be requesting to appearing remotely.
2.  The nature of the case involves sensitive and potentially stigmatizing issues, and Plaintiff has a legitimate concern that public access to video recordings may lead to further harassment, retaliation, or reputational harm.
3.  Plaintiff is a pro se litigant, and appearing from a foreign jurisdiction further heightens risks of exposure if proceedings are publicly archived or broadcast.
4.  Federal court policy disfavors recording or public broadcast of civil proceedings unless specifically authorized and for compelling reasons.
5.  Plaintiff respectfully requests that the Court (a) refrain from recording any remote video hearings, or (b) if a recording is required for internal court purposes, that such recording remain sealed and not be made accessible to the public or Defendants.
6.  This request is narrowly tailored and does not seek to limit the Defendant's access to proceedings or impair the integrity of the judicial process, but rather to protect Plaintiff's privacy and safety.

**WHEREFORE, Plaintiff respectfully requests that this Court:**

1.  Order that any video proceedings in this case not be recorded for public access;
2.  Alternatively, if recording occurs, order that the recording be sealed and withheld from public and/or Defendant access;
3.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

John Doe (Pseudo Name)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois, Eastern Division**
**John Doe,**
Plaintiff,
v.
**The University of Chicago, et al.,**
Defendants.

## MOTION FOR ORDER TO RESTRICT DISCLOSURE OF PLAINTIFF'S DOCUMENTS AND INFORMATION

Plaintiff respectfully moves this Honorable Court to issue an order **warning and directing Defendants (and anyone acting in concert with them, including those outside the United States)** not to share, publish, disclose, or discuss any documents, evidence, or personal information provided by or related to Plaintiff outside the confines of this litigation, including on the internet or with third parties who are not directly involved in this case.

## GROUNDS FOR THIS MOTION

1. **Risk of Defamation, Harassment, and Further Harm:** Plaintiff believes there is a serious risk that Defendants or individuals aligned with them, including persons outside the United States could share documents or sensitive information from this case publicly or with unrelated parties, which may lead to defamation, harassment, threats, or other harm to Plaintiff.

2. **Sensitive Allegations and Identities:** The case involves allegations that name or imply persons who may attempt to retaliate. Public dissemination or casual discussion of these documents could severely damage Plaintiff's reputation, cause emotional distress, or expose Plaintiff to additional misconduct.

3. **Risk of Data Leaks or Improper International Sharing:** Plaintiff is concerned that because some Defendants may be outside the United States, and because in the name of potential data breaches or improper sharing, sensitive information could be published online or disclosed to third parties in ways that violate Plaintiff's rights to privacy, due process, and personal safety.

4. **Preservation of Fair Proceedings:** Preventing improper sharing of documents and allegations will protect the integrity of this proceeding, avoid unnecessary public spectacle, and ensure that the case is decided on the merits in this Court, not in the court of public opinion or through international and intentional leaks.

## REQUESTED RELIEF

Therefore, Plaintiff respectfully asks the Court to:

1. Order that Defendants (and anyone acting on their behalf, including employees, agents, attorneys, and international counterparts) not disclose, discuss, publish, or otherwise share any documents produced in this case, or information concerning Plaintiff derived from these proceedings, outside this litigation.

2. Direct that all such documents and communications be kept confidential, and that any sharing be limited strictly to necessary participants in this case (e.g., attorneys, parties, expert witnesses under protective duty).

3. Warn Defendants that any violations of this order may result in sanctions, including contempt, criminal violations.

4. Grant such further relief as the Court deems just and proper.

Plaintiff makes this motion in good faith to protect personal privacy, avoid undue harm and harassment, and preserve the integrity of this litigation.
**Respectfully submitted,**
John Doe (Pseudonym Plaintiff)

**If the Hon'ble court is unable to appoint a pro bono attorney/counsel, and given the Plaintiff's sincere pursuit of justice, he respectfully requests the court to consider:**

Plaintiffs ask hon'ble court to allow plaintiff to appear **pro se** in this action and respectfully requests that the Court liberally construe this complaint in accordance with standards established in *Haines v. Kerner*, 404 U.S. 519 (1972), and applicable state law, recognizing that the pleading was filed without the benefit of legal counsel. Plaintiff strongly believe in justice and rule of law so even if plaintiff can't be assigned with attorney by the court plaintiff would still like to fight for the rights, even without having much legal knowledge or support, and keeping in mind that most pro-se case in USA didn't typically decided in favour of plaintiff due to complex litigation, and strong opposition attorneys by these institutions.

Plaintiff may amend the complaint after filing, subject to court approval especially based on guidance or taking over of case by experienced counsel or attorney. The doctrine of estoppel does not generally preclude amendments, especially when new evidence emerges or to correct errors. Federal Rule of Civil Procedure 15(a) allows for amendments to pleadings, emphasizing the court's discretion to permit such changes when justice so requires.

If the Honourable Court is unable to appoint pro bono counsel for the Plaintiff, Plaintiff respectfully requests alternative relief or accommodations to ensure fair access to justice. These may include: (1) extensions of deadlines to account for Plaintiff's medical and mental health conditions; (2) leave to file documents in a less formal or handwritten format due to lack of legal training; (3) referral to legal aid clinics, bar association pro bono panels, or law school legal assistance programs; (4) scheduling flexibility for hearings or filings; and (5) permission to appear remotely all times (6) and other things court think to be granted (7) Transcripts of proceeding provided to plaintiff to avoid issue that will arise from plaintiff short term memory loss. Such accommodations would help ensure that Plaintiff, despite financial and health hardships, should not be deprived of a meaningful opportunity to be heard. Rule of law should **ensure equality, accountability, and justice, protecting rights and limiting arbitrary power. So that justice would be granted by the rule of law.**

Plaintiff hereby demands a **trial by jury** on all issues so triable and respectfully requests that the jury be composed of impartial individuals, free from bias or influence based on religion, political affiliation, or personal relationships or friendship with the Defendant, in accordance with the principles of due process and fair trial under the U.S. Constitution.

---

**Long Live America**

**Request for Agencies Coordination for Criminal and Civil Action Consideration**

The Plaintiff respectfully requests that all recipient agencies review this matter, particularly in light of systemic and potentially unlawful conduct by the institution that may implicate overlapping federal and state civil rights statutes, public safety mandates, employment protections, and misuse of federally derived funds.

Plaintiff further especially requests that the **agencies**, consider initiating or support a **Criminal** and **civil enforcement action and/or lawsuit** under its authority to pursue cases involving systemic discrimination in education, retaliation against whistleblowers, or other violations affecting protected groups of civilians or students.

In particular (**But not limited to**), Plaintiff seeks help/guidance on:

1. Action **on behalf of affected students and whistleblowers** under federal civil rights laws especially **but not limited to** DOJ (CRD), OSHA, OCR, IDHR, EEOC, NLRB;

2. Action on behalf of this plaintiff for full enhanced damages for all cases, also discussed in last section (But not limited to); If can't not be done can they help in getting panel of attorneys through court specializing in each of the matters mentioned.

3. Whether the case qualifies for DOJ coordination with the **United States Attorney's Office (USAO)** for enforcement or injunctive relief;

4. Whether whistleblower protections under **5 U.S.C. § 2302**, the **Whistleblower Protection Act**, or **OSHA Section 11(c)** may apply or be invoked;

5. Whether law enforcement review under **18 U.S.C. §§ 2339A–B** or related national security statutes is appropriate based on the facts alleged.

The Plaintiff affirms that this request is submitted in good faith as a whistleblower and seeks full transparency and legal remedy on behalf of the public and respectfully asks for confirmation of jurisdictional pathways and enforcement recommendations from each agency addressed herein and also referral to other agencies if that agencies and/or multiple agencies in collaboration can take action to protect all rights and laws.

In the event that any of the agencies including **but not limited** to the **EEOC, DOJ Civil Rights Division, Department of Education OCR, OSHA, or other appropriate enforcement bodies**, decline to initiate direct enforcement action or civil litigation on behalf of the Plaintiff and/or similarly affected civilians or students, the Plaintiff respectfully requests the issuance of a **"Notice of Right to Sue"** or comparable letter of declination, consistent with agency procedure and jurisdiction. If in case that is not possible amicus brief may also help, but plaintiff wanted to kindly preferably want to get **representation in litigation and support** till the end, appeal and questions to the hon'ble supreme court.

This formal request is made pursuant to the Plaintiff's intention to preserve all procedural rights to pursue **civil remedies under applicable federal and state statutes**, including but not limited to:

- **Title VII of the Civil Rights Act of 1964** (for EEOC-related claims),

- **Title IX of the Education Amendments of 1972** (for OCR-related claims),

- **Section 504 of the Rehabilitation Act and ADA** (in the event of disability-based discrimination),

- And any other statutory frameworks under which a **private right of action** may exist.

The Plaintiff seeks this confirmation in the **interest of justice,** and to ensure that the matter may proceed to judicial review should administrative enforcement not be pursued.

**Summary and Letter for Multi-Agencies Complaint Submission**

Request for Investigation and Legal Redress Concerning Alleged Misconduct and Violations by the University of Chicago

Plaintiff am submitting this complaint in good faith, seeking a thorough and impartial investigation into multiple alleged violations by the University of Chicago. These concerns encompass areas of civil rights, immigration, employment/labour law, tax compliance, nonprofit governance, food safety, disability rights, and student welfare (But not limited to these). Plaintiff respectfully request that your agency:

- Conduct a comprehensive investigation into the matters outlined.

- Consider granting plaintiff the **right to sue.**

- **Assist in litigation** or act as an intervening party, Amicus Brief where appropriate.

Plaintiffs urge that this complaint be reviewed in its entirety, recognizing that the issues presented are interconnected and indicative of systemic problems. As a student, employee, whistleblower, minority, and immigrant, plaintiff have faced significant challenges without adequate support, while the university has employed various tactics against plaintiff.

**Key Allegations:**

1. **Discrimination and Retaliation:**

   o Experiences of discriminatory treatment based on religion, national origin, and gender.

   o Retaliatory actions following protected activities, including whistleblowing and grievance filings.

   o Denial of disability accommodations during disciplinary processes.

2. **Misuse of Nonprofit Funds and Private Benefit Violations:**

   o Aggressive cost-cutting measures affecting student services, juxtaposed with high executive compensation, potentially indicating misallocation of funds.

   o Redirection of student fees and donations without transparency, necessitating a full audit to ensure compliance with 26 U.S.C. § 501(c)(3).

  o Retaliation against individuals, including myself, who have raised concerns about financial management, possibly constituting private inurement.

3. **Labor Law and Tax Compliance Issues:**

  o Reports of staff advising students that certain cash payments and gift cards need not be reported for tax purposes, raising concerns about systematic tax evasion.

  o Potential overpayment of student employees beyond permissible hours, which may violate labor laws and nonprofit standards.

4. **Food Safety Concerns:**

  o Incidents of foodborne illness and contamination within campus dining services, including the presence of foreign objects in food items.

  o Lack of formal updates or remedial actions following internal investigations, indicating possible non-compliance with food safety regulations.

5. **Health and Safety Violations:**

  o Inadequate cleaning and maintenance of university facilities, particularly restrooms in older buildings like Harper Library and Stuart Hall, leading to unsanitary conditions and health issues.

  o Failure to address these concerns may constitute violations of health and safety standards.

6. **Wrongful Termination and Hostile Work Environment**

7. **Due Process and Procedural Violations in grievance and disciplinary processes**

8. **Discriminatory Treatment based on religion, national origin, and gender**

9. **Discriminatory Allocation of jobs, funding, and academic opportunities**

10. **Inappropriate Surveillance and Violations of Privacy**

11. **Failure to Provide Fair Representation by the student labor union**

**Legal Violations Referenced (Not limited to):**

·   Title VI and Title VII of the Civil Rights Act

·   Title IX of the Education Amendments

·   Americans with Disabilities Act and Rehabilitation Act

·   National Labor Relations Act and applicable Illinois labor statutes

·   Illinois Human Rights Act and Illinois Whistleblower Act

·   Federal Computer Fraud and Abuse Act, FERPA, and Privacy Act

- Breach of contract, defamation, and emotional distress torts

- Violations of internal university policies and student manual

- Common-Law Violations (including breach of contract, defamation, and intentional infliction of emotional distress

- Internal University Policies and Student Manual Provisions

Plaintiff am knocking on the doors of justice, seeking a neutral investigation into these matters. The university's actions have left plaintiff without support, and Plaintiff believe that without intervention, such practices will continue, undermining the integrity of educational institutions, and the educational system US sells. Plaintiff also urge that consideration be given to ensuring access to litigation support as this is vital not only for my personal justice but also for upholding the integrity of our educational system.

Thank you for your prompt attention to this matter.

Please refer to the attached table/list of relevant cases and use "Ctrl+F" to locate headings, laws, acts, agencies name etc, where pertinent for a detailed review.

**Complaints**

## 1. Arbitrary and Retaliatory Expulsion, and Employment Termination: Denial of Due Process in Violation of Federal Title VII and the Illinois Human Rights Act

Defendant University terminated Plaintiff from their student/staff employment role without prior warning, performance evaluation, or any opportunity for review or response. This abrupt decision occurred shortly after Plaintiff whistle-blower about sexual and physical assault, and mishandling of chemicals/gases cylinders, strongly suggesting that the adverse action was retaliatory in nature. Short after Plaintiff filed a grievance with Graduate Student Union (GSU) for wrongful termination before that complaint might have even heard or entertained university filed a counter complaint against plaintiff and lead him to expulsion. The grievance that was filed was never heard and union didn't took it further after step 1 too, even though in one of the grievance chief steward Joseph Rathke confirmed to plaintiff that even plaintiff get expelled still the complaint will go through about wrongful termination of job role in an online meeting where representative from United Electrical(Parent union of GSU) was also present. of Under both federally protected laws specifically but not limited to Title VII of the Civil Rights Act of 1964, and the Illinois Human Rights Act (775 ILCS 5/), retaliation for engaging in protected activity (such as the filing of a grievance) is prohibited. In the landmark case of University of Texas Southwestern Medical Center v. Nassar, the Supreme Court held that a plaintiff must prove that the employer's retaliatory motive was the **"but-for" cause** of the adverse employment action; that is, the action would not have occurred were it not for the employee's protected activity.

The timing of the termination, coming immediately after the formal grievance with union, raises a strong factual concern that the filing of the grievance was not merely a contributing factor but the **determinative (but-for)** cause of Plaintiff's termination and expulsion, since the matter mentioned were ranging for around 1+ year ago, and there was no prior warning, review, or opportunity to respond about any of the issues too and after filing a grievance especially the one for wrongful termination on February 1 by GSU, university started and generated documents within those two days of protected activity, this can be confirmed by the date on the zip file/the box folder of the summons having all details (Currently don't have access to folder because of access taken back along with university ID, the screenshot attached is taken from last appeal), and further expelled with a rushed decision in around 25 days and killed all grievances, suppress protected speech, deny due process, and

eliminate whistleblower redress. This clearly shows defendant retaliated and used power to abuse plaintiff and participation in protected activities. This mirrors the reasoning in Nassar, retaliation claims under Title VII require the plaintiff to establish that the adverse action would not have occurred in the absence of the protected activity. The Defendant's conduct closely mirrors this legal framework, wherein rushed disciplinary proceedings and document creation were triggered abruptly within two days of Plaintiff's protected grievance filing. Document generation starting two days after grievance filing, last thing added on Feb 11, summons on Feb 12 (Access to box folder was not given by Dean Kate till 14th that too after asking, however it was already shared with all other parties), disciplinary biased meeting on Feb 24, Expulsion Feb 25. Additionally, the abrupt nature of the termination devoid of prior performance evaluations or opportunities for review violates the defendant university's own due process guidelines and established employment protocols, bolstering Plaintiff's claim. Before the meeting a member from the Discipline meeting named Jeremy, was changed to Melissa quoting some conflict of time. The cumulative pattern of exclusion, intimidation, and disciplinary threats directed at Plaintiff also supports a claim for hostile environment retaliation under Title VII and the Illinois Human Rights Act. Defendant's failure to provide standard procedural safeguards such as progressive discipline, performance review, or notice violates not only institutional policy but also supports a claim under Title VII and the Illinois Human Rights Act (775 ILCS 5/), which prohibit hostile environment retaliation. The pattern of intimidation, exclusion, and disciplinary escalation directly following Plaintiff's protected grievance activity reveals a retaliatory motive executed under the guise of administrative process.

Plaintiff further asserts that the alleged misconduct, which formed the basis of the disciplinary proceedings and ultimate expulsion, was pretextual in nature fabricated or exaggerated as a retaliatory mechanism to mask the true motivation for the adverse action, namely Plaintiff's protected activity in whistleblowing and filing a formal **grievance(determinative).** The timing, absence of due process, and swift escalation of punitive measures strongly support an inference that the misconduct justification was used as a pretext to retaliate against Plaintiff. Courts recognize that pretextual disciplinary actions, particularly when temporally linked to protected activity, are probative evidence of unlawful retaliation under both Title VII and the Illinois Human Rights Act. Plaintiff further asserts that the university applied its disciplinary processes selectively and inconsistently, deviating from established norms and protocols in a manner that disadvantaged Plaintiff. This disparate treatment is further evidence of retaliatory intent. There are additional indicators of retaliatory motive, including hostile behaviour by university staff, targeted scrutiny, and procedural irregularities in the handling of Plaintiff's case. Courts have long recognized that when disciplinary actions are pretextual and closely follow protected activity, such circumstances provide compelling evidence of retaliatory animus. This principle applies under both **Title VII of the Civil Rights Act** and the **Illinois Human Rights Act (775 ILCS 5/)**, both of which prohibit adverse actions motivated by an individual's assertion of civil rights or engagement in protected activity.

During the disciplinary process, the panel aggressively questioned Plaintiff on an all matters but Non-Union Eligible Role, yet in the final determination document, the university cited only the internship matter as grounds for expulsion, since the other matters were not that strong according to them, else they don't have any digital space problems they would have mentioned like in initial complaint. Notably, Plaintiff was never asked about the Manseuto role, which can be corroborated by union steward Sara. The hearing began roughly 10 minutes late, and the entire proceeding lacked procedural fairness. Plaintiff was confronted with six sudden allegations, manufactured post-grievance, suggesting the university sought to secure an expulsion on any basis, further indicating the **but-for cause** was Plaintiff's protected activity.

Dean Kate Biddle materially misrepresented facts to the panel, including falsely claiming that Plaintiff had admitted to traveling to **[Data Redacted]** over the email, but plaintiff didn't actually go to **[Data Redacted]** and false claimed it, despite Plaintiff's clear clarification in the same email chain that no such travel occurred. Kate's manipulation of the process, despite not being a voting member, along with allegations of potential inducements to faculty and voting staff (e.g., cash, research opportunities), suggest an orchestrated and biased effort to ensure Plaintiff's expulsion. These irregularities, combined with the **lack of a neutral panel**, **no opportunity to be meaningfully heard**, **no progressive discipline**, and **suppression of the grievance process**, further support the conclusion that the stated reason for the expulsion was **pretextual** and that the adverse action was motivated by **retaliatory animus**.

Plaintiff asserts that this termination was not an isolated enforcement of a neutral policy, but was instead motivated, at least in substantial part, by Plaintiff's protected activity in filing the grievance and was purely retaliatory in nature and a but for cause to entrap plaintiff to expulsion since that happened in temporal proximity of grievance and whistleblower status of plaintiff. Moreover, Plaintiff contends that such adverse action was compounded by discriminatory animus based on protected characteristics such as **[Data Redacted]**. These allegations support actionable claims for wrongful termination, hostile work environment, and retaliation. Notably, under the Illinois Human Rights Act, any adverse employment decision that stems from an employee's exercise of their federal or state civil rights even if combined with other non-discriminatory factors, is subject to strict scrutiny and may be deemed unlawful.

**[Data Redacted]**

**Laws and Rules Violated**:

·   **Federal Whistleblower Protection Act** (5 U.S.C. § 2302(b)(8)): Prohibits retaliation against individuals who report misconduct, waste, or public safety threats, including chemical or hazardous violations.

- **Illinois Whistleblower Act** (740 ILCS 174/): Specifically protects employees from retaliation for disclosing information about unlawful or unsafe practices to a supervisor or public body.
- **National Labor Relations Act (NLRA)**, Section 8(a)(3) protects student employees from retaliation due to union involvement or filing grievances through a recognized union body.
- **Title VII of the Civil Rights Act of 1964** (42 U.S.C. § 2000e et seq.) – Prohibits retaliation and discrimination based on race, color, religion, sex, or national origin.
  - o **42 U.S.C. § 2000e-2(a):** Prohibits discrimination in employment based on race, color, religion, sex, or national origin.
  - o **42 U.S.C. § 2000e-3(a):** Prohibits retaliation for engaging in protected activity (e.g., filing a grievance, whistleblowing).
- **Americans with Disabilities Act (ADA), Title I** (42 U.S.C. § 12101 et seq.) – Protects employees and student-workers from discrimination based on disability; requires reasonable accommodation.
- **Section 504 of the Rehabilitation Act of 1973** (29 U.S.C. § 794) – Prohibits disability discrimination in federally funded programs.
- **Whistleblower Protection Act** (5 U.S.C. § 2302(b)(8)) – Protects individuals reporting violations of law, rule, or regulation from retaliation in federally connected settings.
- **Family Educational Rights and Privacy Act (FERPA)** (20 U.S.C. § 1232g) – Protects student records and privacy; relevant if retaliation involves improper sharing of educational records.
- **Illinois Human Rights Act (775 ILCS 5/)** – Prohibits employment and educational discrimination and retaliation based on protected characteristics (race, sex, religion, disability, etc.).
- **Illinois Educational Labor Relations Act** (115 ILCS 5/) – Protects rights of public educational employees engaging in union activities or grievances.
- **Illinois Constitution**, Article I, Section 2 – Guarantees due process and equal protection under state law.
- Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993): Clarifies that conduct creating an intimidating or abusive environment violates Title VII even without tangible economic harm.
- **Section 8.1 – Crime Victims' Rights:** retaliated against after reporting physical assault or unsafe conduct.
- **Section 20 – Individual Dignity:** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in... any person or group because of religion, race, ethnicity or national origin shall be condemned.
- **Section 23 – Fundamental Principles**: Affirms that laws should promote justice, freedom, and opportunity; courts may interpret this to support whistleblower and due process protections.

- **Title IX of the Education Amendments of 1972**: These actions violate Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), which prohibits sex-based discrimination, retaliation for reporting sexual harassment/assault, and violations of due process in educational programs receiving federal funding. Title IX's implementing regulations (34 C.F.R. § 106.71) explicitly bar retaliation against individuals who report sexual harassment or assault (Jackson v. Birmingham Bd. of Educ., 2005).

- 42 U.S.C. § 1981: Protects against racial discrimination in the making and enforcement of contracts, including employment and academic agreements. Covers race-based disparate treatment and retaliation.

- 42 U.S.C. § 1983 applies primarily to public officials and government entities, but in some cases, private actors can also be held liable if they are acting under color of state law: Private Entities Acting Like the Government – If a private company or individual is performing a government function (such as running a prison or enforcing laws), they may also be sued under § 1983

- Plaintiff's race, religion, and national origin **[Data Redacted]** intersect with sex-based retaliation, creating a hostile educational environment cognizable under Title IX (Davis v. Monroe Cty. Bd. of Educ., 1999).

- The "but-for" causation standard (Nassar, 2013) applies to Title IX retaliation claims. The expulsion following Plaintiff's grievance and assault reports satisfies this test.

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**
**[Data Redacted]**

After series of injustices plaintiff was fed up with the university conduct, and felt trauma and tortured: Short after in 2-3 days travel notification thing Kate came up with that was actually a dead matter being that late further it was over after reply to that same Jan 15 email but still after grievance filing with union she again came up with that.

**[Data Redacted]**
**[Data Redacted]**

## 2. Unauthorized and Discriminatory Surveillance of International Students: Violations of Constitutional, Privacy, and Federal Civil Rights Protections

Plaintiff is informed and believes, and thereon alleges, that the Defendant University engaged in discriminatory and unlawful surveillance activities by utilizing university-

controlled systems including Wi-Fi access logs, university login data, bank account data, and potentially federal immigration interfaces such as the U.S. Citizenship and Immigration Services (USCIS) SEVIS portal to monitor and track the physical locations and activities of international students without consent or notice.

· Such conduct may constitute a violation of the Plaintiff's rights under the **Fourth Amendment of the U.S. Constitution**, as enforced via **42 U.S.C. § 1983**, and represents an unreasonable intrusion upon Plaintiff's expectation of privacy. Additionally, if proven to have a disparate impact or targeting based on protected class **[Data Redacted]**, it may support claims under **Title VI of the Civil Rights Act of 1964**, which prohibits discrimination on the basis of race, colour, or national origin in federally funded programs. Discriminatory targeting of international students based on nationality, race, or immigration status may violate **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)**, which prohibits discrimination in federally funded programs.

Plaintiff lacks direct evidence of this surveillance but seeks discovery from Agencies, and, Defendants, including internal communications and system access logs, to demonstrate such unlawful monitoring.

**Factual Allegations:**

· Plaintiff is informed and believes that the University monitored international students' physical locations and activities by utilizing:

   o University-controlled systems such as Wi-Fi access logs and student login records;

   o Interfaces with federal immigration monitoring systems, including the **Student and Exchange Visitor Information System (SEVIS)** managed by the U.S. Department of Homeland Security (DHS);

   o Potential communications with external law enforcement or immigration authorities regarding students' academic, residential, or political activities.

**Potential Legal Violations (But not limited to):**

   · **Fourth Amendment (U.S. Constitution)** — Protects against unreasonable searches and seizures. If SEVIS or university system data was used for surveillance purposes without individualized suspicion or warrant protections, it may constitute a violation under *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), particularly if used for non-immigration or punitive actions.

   · **Fifth Amendment (Due Process Clause)** — Unauthorized surveillance resulting in academic penalties, visa status issues, or intimidation without fair notice or hearing may violate due process rights.

   · **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)** — If surveillance disproportionately targeted students based on nationality, race, ethnicity, or immigration status, it constitutes discrimination in a federally funded program.

   · **Privacy Act of 1974 (5 U.S.C. § 552a)** — Improper access to, dissemination of, or misuse of SEVIS or other protected personal data by university actors or third parties may support a claim for unlawful disclosure or use.

- **First Amendment Retaliation** — If surveillance was conducted in response to political activism, protest participation, or advocacy work by international students, it may form the basis for a First Amendment retaliation claim, as recognized in *Al Haramain Islamic Foundation v. U.S. DOJ*.

**Precedent and Supporting Examples in Plantiff's case:**

- *Doe v. Chao*, 540 U.S. 614 (2004) — A Privacy Act violation case where plaintiffs succeeded in showing harm from unlawful disclosure of protected information.
- *Arab-American Anti-Discrimination Committee v. Reno*, 70 F.3d 1045 (9th Cir. 1995) — Recognized claims based on selective immigration enforcement targeting ethnic groups.
- Recent reports of disproportionate scrutiny faced by Chinese students in STEM fields under national security pretexts further suggest that discriminatory surveillance patterns can and do exist.

**Discovery Requested:** Plaintiff seeks discovery including, but not limited to:

- University internal communications discussing monitoring or reporting of international students;
- Access logs for university Wi-Fi, portals, and SEVIS data use tied to international students;
- Correspondence between the University and federal agencies including DHS, ICE, and USCIS regarding student surveillance or monitoring;
- Policies, trainings, and protocols related to data privacy, student monitoring, and compliance with SEVIS obligations.

**Relief Requested:**

- An order compelling full disclosure of surveillance practices;
- Injunctive relief prohibiting further unauthorized or discriminatory monitoring;
- Damages and remedies under 42 U.S.C. § 1983 for constitutional violations;
- Investigation into whether University actions constituted a **pattern or practice** of discrimination against other international students.

Plaintiff requests discovery and an investigative subpoena for internal university system access logs, communications with federal agencies, and surveillance records. This will determine whether surveillance occurred, whether it was discriminatory, and whether it constituted an unlawful invasion of privacy.

## 3. Autocratic Employment Practices and Inadequate Union Representation: Unilateral Disciplinary Actions Violating Due Process and Labor Law Rights

Plaintiff further alleges that Defendant University has adopted and perpetuated a pattern of **autocratic, non-democratic, and unchecked employment practices**, particularly concerning student workers, including those in roles **not covered by existing collective bargaining agreements**. In these instances, the University has exercised **unilateral authority** to impose severe disciplinary actions including sudden terminations without

notice, justification, or access to due process mechanisms such as hearings, reviews, or internal appeals.

In *Doe v. Columbia University*, the court found it plausible that the university disregarded the plaintiff's appeal after he raised concerns about disciplinary bias. The court allowed the case to proceed, noting that the university's handling of the appeal following the plaintiff's criticism of due process could reasonably support an inference of retaliation or bias rather than neutral policy enforcement.

This conduct undermines the **procedural fairness** expected of institutions of higher education and may implicate **due process protections** under the **Fourteenth Amendment**, particularly when the University operates in coordination with state or federally funded programs or under public oversight. The Plaintiff contends that such practices reflect a systemic abuse of power over economically and institutionally vulnerable student employees, including international students who rely on university jobs as part of their lawful immigration and academic status.

Additionally, in cases where student positions were **ostensibly covered by union-negotiated agreements**, Plaintiff asserts that the **labour union failed to uphold its duty of fair representation**. Rather than advocating on behalf of its member, the union exhibited **passivity and deference** to the University's disciplinary decisions, failing to engage in any substantial review or defense of the Plaintiff's interests. Such conduct constitutes a potential violation of the union's **legal obligation under the duty of fair representation doctrine**, as articulated in *Vaca v. Sipes*, 386 U.S. 171 (1967), which requires unions to act **in good faith and without arbitrary, discriminatory, or bad-faith conduct** when representing members in employment disputes.

Taken together, these practices unchecked disciplinary actions by the University and **abdication of representation** responsibilities by the union represent a **double failure of accountability** that leaves student workers, particularly those **without alternative support systems, exposed to injustice and institutional abuse.** These facts, when proven, support claims under **Title VII of the Civil Rights Act**, applicable provisions of the **National Labor Relations Act**, and the **Illinois Educational Labor Relations Act**, depending on the employment classification of the position at issue.

- The **National Labor Relations Act (29 U.S.C. §§ 157, 158)** prohibits retaliation for concerted workplace activities and mandates good faith in employment actions.
- The **Illinois Educational Labor Relations Act (115 ILCS 5/14)** further prohibits unfair labor practices in educational institutions.
- **Duty of Fair Representation Doctrine (Vaca v. Sipes, 386 U.S. 171 (1967)):** Requires that labor unions act without arbitrariness, discrimination, or bad faith in representing their members. The union's passivity in this case may violate this duty.
- **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e):** Covers retaliation and disparate treatment based on protected characteristics. The failure to apply consistent standards and targeted discipline may implicate discrimination.

- **Breach of Implied Employment Agreement / Contractual Duty:** University's failure to follow its own published disciplinary procedures and due process rights constitutes a breach of implied contract and the covenant of good faith and fair dealing.

- **Tortious Interference with Employment Opportunity:** Sudden and unjustified termination of roles without procedural safeguards may constitute tortious interference, especially where roles are essential to immigration or financial stability.

- **Potential Procedural Due Process Violations (if state actor elements exist):** While generally not applicable to private entities, if the University was acting under color of state or federal authority (e.g., managing federal work-study programs or exercising police powers), Fourteenth Amendment due process standards may be implicated.

- **Labor Management Relations Act (LMRA):** This establishes a federal interest in ensuring that unions act fairly in representing their members.

- **Reference article:** https://chicagomaroon.com/47073/viewpoints/column/who-governs-the-university/

SEARCH    JOIN US   SUBSCRIBE   DONA

# Who Governs the University?

With authoritarian threats looming, our campus needs democracy.

By Gabriel Winant

April 21, 2025

The University of Chicago has a long tradition of valuing dissent, at least rhetorically. The 2014 Report of the Ad Hoc Committee on Protest and Dissent, for example, underscores that dissent and protest are crucial to the cultivation of two qualities essential to the mission of the university: a robust intellectual climate and the cultivation of members of our community as "citizens of a democracy."

These are rousing principles. But it is not always easy to recognize our institution in them. It is often said that the university is not a democracy, and the relationship we bear to it—



The John Crerar Library.

Sruthi Kotla

as students, faculty, staff, or community members—is not that of citizenship. I have heard this point presented many times as self-evident, as though it were sufficient to end an argument about university governance. But if a major purpose of our institution is to cultivate the habits of democratic citizenship, after all, then it would seem paradoxical that these habits cannot be applied to our own institution. If democracy and the critical thinking and deliberation that underpin it are only far away rather than home games, then members of the university community might reasonably conclude that the institution doesn't believe in these values in the way it declares.

SEARCH    JOIN US   SUBSCRIBE   DO

Why, indeed, is the university not a democracy? Why should we accept that we are not its citizens? The common justification, that the university is an aristocracy of knowledge, is insufficient in two ways. First, it's perfectly possible, though not always easy, to combine democratic self-government with expert knowledge. This has been a major area of study and discussion in political theory and constitutional and administrative law for decades, even centuries, as well as an actual site of political experimentation: one thinks for example of the famous "Brain Trust" of the New Deal, a moment of high tide of democratic participation in American society, with a coterie of Ivy-educated lawyers and academics in the lead, building dozens of new federal agencies to represent the people's will through social science–informed policy. Second, and more importantly, the university is not an aristocracy of knowledge. It's an aristocracy of the more literal kind—one of wealth. Our Board of Trustees is notorious for lacking *even a single member* who has spent a career as an academic researcher or educator, despite its unusually large size.

This is not an idle academic matter. In fact, it is of the greatest urgency, not only for our university, but for all of higher education and perhaps American democracy itself. Academia is being remade rapidly from above. Many have been shocked by the demoralizing spectacle of Columbia University and soon no doubt many others capitulating to the extortion of the federal government to repress certain kinds of research, teaching, and, of course, protest.

Yet as university leaders in these cases have themselves acknowledged, external pressure is not the only cause of recently adopted repressive policies. There are elements within these institutions that have greeted the demands from the Trump administration as an opportunity to carry out changes they already wanted to make. Where is the Department of Education getting its list of demands for each institution? The answer, of course, is that it is coming from inside the house. At some of our peer institutions, trustees and administrators have decided, partly on their own account, to carry out an academic purge of unwanted ideas and their thinkers and advocates—a flagrant set of violations of academic as well as religious freedom and freedom of expression—and even apparently to participate in the deportation of their own students.

There is no compelling reason to believe this could not happen at the University of Chicago. Columbia, too, has embraced institutional neutrality and the Kalven Report, the same principled commitments that supposedly protect us. Why should any of us on campus have confidence in our

SEARCH 🔍     JOIN US    SUBSCRIBE    DOC

Board of Trustees, a body that is accountable to us in exactly zero ways? Indeed, one of our own trustees, Antonio Gracias, is currently working for DOGE, one of the federal entities most aggressively targeting university research and teaching, with particularly devastating consequences in the sciences. And our institution is certainly unusually sensitive to financial pressure, given its structural deficit.

Not wishing to get caught in the contradiction between its stated principles and its economic vulnerabilities, the administration seems to have adopted the policy, "If we don't move, they won't see us." Perhaps, but this cowering posture represents a failure to live up to the obligation imposed by the Kalven Report to actively defend the values of free inquiry. It implicitly asks all of us to self-censor to avoid the rougher treatment involved in being censored more coercively. And worst of all, it seems predicated on the fantasy that academic freedom could survive here while being extinguished all around us, as though we would not then live on a knife's edge, obliging us into ever more cautious thoughts, words, and actions. Students here have already been arrested, pepper-sprayed, evicted from housing, and subjected to severe discipline for protest activity. It is not hard to imagine more serious repression arriving even without a formal ransom note from the government—sacrifices offered willingly and unprompted to propitiate the capricious White House.

It is comforting to imagine that the current onslaught can be ducked and evaded—that if we sacrifice some democracy internally, we will prove a less attractive target in an increasingly authoritarian national environment. But this is self-serving rationalization, and such evasion is fast becoming little more than a form of collaboration. The alternative—resistance—is, to repeat, not merely a nice idea but an actual obligation described in the University's own policies. But UChicago need not carry out this obligation suicidally. Rather, it should attempt to help organize collective action across higher education: coordinated noncompliance by hundreds, even thousands of institutions. (An open letter of more than 100 law school deans denouncing the disintegration of the rule of law notably did not include Thomas Miles, dean of our law school.) UChicago should work with the national organizations of students and faculty also seeking to coordinate noncompliance. (It is not.) The failure to meet this obligation is a sign of how far the institution has drifted from its own stated values, itself a consequence of its undemocratic governance.

As if to illustrate this drift, President Paul Alivisatos told the *Wall Street Journal* last year about his

- **Reference:**    https://chicagomaroon.com/47076/viewpoints/editorial/uchicago-must-protect-its-community/

By refusing to comply with the Trump administration, UChicago would indeed risk losing a substantial portion of its funding—a dire threat to the University's core mission to seek and produce knowledge. Yet complying would threaten the very same mission in a slower and more insidious way, and the University would have betrayed its core value of upholding academic freedom. A student cannot pursue their education properly if the threat of being detained or deported hangs over them; a faculty member cannot pursue their research properly if they fear being fired over where they look or what they find. Seeking and producing knowledge can only happen in an environment where scholars are secure and able to inquire, investigate, and debate freely.

We believe that our proposals consist of concrete and meaningful actions that the University can take immediately. Some actions may be more costly and difficult to carry out than others. It is up to the University to determine which are worth pursuing.

In making its decision, UChicago should consider the fact that yielding to the Trump administration's demands would set a dangerous precedent. If it bows now, even in seemingly minor ways, drawing a line in the sand will likely become increasingly difficult under more demands and greater pressure. An open letter to Harvard's president, signed by around 2,000 of the university's alumni as of time of this article's publication, warns, "We cannot appease the Trump administration – it always asks for more."

UChicago does not act in a vacuum. Universities will be stronger when they stand together against an administration that runs roughshod over the Constitution. If UChicago wants to be a leader among higher education institutions, it must have the courage to take a stand when it matters.

**Guaranteeing Funding for Affected International Scholars**

UChicago should guarantee financial support for international students to access immigration attorneys. Offering a connection to legal resources, as the University has already done, is a start—but when 50 percent of UChicago's student body receives some form of financial aid, that support may remain largely inaccessible without financial backing.

Nicole Hallett, a UChicago Law professor and the Immigrants' Rights Clinic director, emphasized in an interview with the *Maroon* the importance of making legal support financially accessible.

"It's very expensive to hire a lawyer in this country, and many students are not in a position to pay very much money to a private lawyer to take their case, and there just simply are not enough nonprofits out there to represent people pro bono," Hallett said.

If the legal counsel UChicago offers to connect students with remains out of their reach due to prohibitive expenses, then the University's gesture is ultimately a hollow one. The University must actively stand behind students with tangible support.

**Publicly Supporting Due Process**

The University needs to publicly support the members of its community that the Trump administration targets and do its utmost to ensure that they receive the due process to which everybody, citizen or noncitizen, in the United States is constitutionally entitled.

As of April 18, over 1,550 international students and recent graduates across 240 institutions of higher education have had their legal status changed by the Department of State, according to Inside Higher Ed. The response from many university administrations has been markedly muted.

However, one notable exception has been Tufts University. Tufts released a statement after Rümeysa Öztürk, a doctoral student from Turkey, was taken into custody by masked Department of Homeland Security agents on March 25 as she was leaving her apartment. The statement requested that Öztürk receive the due process rights to which she is entitled and was filed as a declaration of support in Öztürk's case.

Tufts's Office of the Provost has communicated openly about its policies on a page titled "Answers to Community Questions," including stating its policy regarding Immigration and Customs

**Request**

· Review of the University's disciplinary process across all student employment roles.

· A court declaration that the union failed in its legal duty.

· Investigation into discriminatory motives in both the termination and the union's inaction.

· Other relevant investigations, etc to make plaintiff life as a whole.

**4. Union's Failure to Provide Statutorily Mandated Legal Representation for Student Workers: Breach of Duty of Fair Representation and Demand for Union Procedural Reform**

Plaintiff alleges that the labour union affiliated with the University of Chicago, Graduate Student United (GSU), which governs student employment relations and grievance procedures for union-eligible roles, failed to provide adequate legal representation, advisory support, and procedural advocacy during a disciplinary matter that resulted in wrongful termination and eventual expulsion from both academic and employment settings.

Specifically, Plaintiff, at the onset of disciplinary proceedings, made a good faith request to the union for access to legal counsel or any staff with legal training to assist in navigating the complex disciplinary, employment, and academic grievance processes. The union's response indicated that they lacked such personnel and resources, thereby leaving Plaintiff an international graduate student without access to institutional legal tools without professional guidance while facing a legal dispute against a fully resourced university.

Despite the Plaintiff's grievance filing and the union's initiation of a Step 3 grievance on February 28 challenging the discharge, the union later failed to proceed to Step 4. The union justified its inaction by citing an alleged requirement for a full membership vote a term or procedural step not found anywhere in the controlling Collective Bargaining Agreement (CBA). The union's abandonment at a critical stage in the grievance process left Plaintiff defenceless and exposed to irreversible academic and professional harm.

This experience is symptomatic of a larger systemic issue in student-worker representation and raises urgent questions about the effectiveness, transparency, and accountability of labour unions operating within academic institutions.

The Plaintiff further contends that, in his capacity as an employee working in a library role, he sought assistance from Teamsters Local 743. The Plaintiff asserts that he contacted the Union to inquire about representation and union membership benefits. In response, Teamsters Local 743 provided the following communication. The Plaintiff avers that the Union declined to extend assistance or representation on the basis that, as per their records, he has not maintained the status of a dues-paying member since September 2024. This response is material to the claims at bar as it underscores the challenges the Plaintiff has encountered in securing union support, notwithstanding his employment in a role that traditionally falls within the purview of the Union's representation.

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**Legal and Ethical Grounds (but not limited to):**

1. **Duty of Fair Representation (DFR):** Under federal labor law and as affirmed by the U.S. Supreme Court in *Vaca v. Sipes*, 386 U.S. 171 (1967), unions are legally obligated to represent all members fairly, impartially, and in good faith. This includes taking grievances seriously, avoiding arbitrary decision-making, and making procedural efforts to protect the employment rights of members.

2. **NLRA and IELRA Statutory Frameworks:** Depending on the classification of the student role (federal or state), these failures may also implicate:

- o The **National Labor Relations Act (29 U.S.C. § 151 et seq.),** which grants employees including student workers in many cases the right to unionize and receive representation without retaliation.
- o **NLRA, Section 8(b) (29 U.S.C. § 158(b)):** Prohibits labor organizations from failing in representation duties.
- o The **Illinois Educational Labor Relations Act (115 ILCS 5/1 et seq.),** which similarly provides labor protections for employees of educational institutions.

3. **Illinois Labor Relations Board** precedent requires that all union decisions, even discretionary ones, be carried out without bad faith or discrimination.

4. **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3)**– Prohibits retaliation against an employee for engaging in protected activity, including filing internal complaints and participating in grievances.

5. **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681):** Extends protections against sex-based discrimination and retaliation in educational institutions.

6. **Illinois Human Rights Act (775 ILCS 5/1-102 et seq.):** Prohibits discrimination and retaliation in employment based on protected characteristics and grievance activity.

7. **NLRA Section 7 (29 U.S.C. § 157)** – Protects student workers' right to engage in concerted activity, including filing group grievances or protesting unfair labor practices.

8. **Illinois Whistleblower Act (740 ILCS 174/)**– Prohibits retaliatory action against individuals reporting violations of federal or state law or unsafe practices (e.g., mishandling of chemicals).

9. **Violation of Reasonable Expectations of Representation:** The union's refusal to escalate the grievance based on undefined criteria (e.g., "full member vote") and lack of accessible legal staff undermines not only the procedural rights of individual workers but also the collective legitimacy of the union process itself. Such conduct is comparable to an insurance company refusing to honor valid claims, rendering the union functionally ineffective at the very moment members need protection.

Various **professional and fiduciary obligations** under specific contexts do impose such duties:

| Context | Legal Rule/Doctrine | Explanation |
|---|---|---|
| **Medical** | *Abandonment Doctrine* | A doctor cannot s**top treating a patient mid-care** unless reasonable steps are taken for continuity of care. |
| **Attorney** | *Model Rule 1.16 (ABA)* | Lawyers must **not withdraw from representation** without ensuring no harm comes to the client. |

| Context | Legal Rule/Doctrine | Explanation |
|---|---|---|
| **Union** | *Duty of Fair Representation* | Unions are required by law (NLRA) to represent all members **fairly and fully** in disputes. |
| **Employment** | *Implied Covenant of Good Faith* | In some jurisdictions, particularly in job benefits or commissions, employers can't terminate to avoid obligations. |

**Tort Laws:**

- **Duty of Care**: In tort law, particularly under **negligence**, once a person (like a doctor, lawyer, employer, or unions) undertakes to help or provide a service, they owe a duty to exercise **reasonable care** in performing that service. Abandoning the service without reasonable notice or justification may lead to a tort claim for **negligence** or **malpractice** (especially in medicine, law, and representative activities like union grievence).

- **Special Relationships**: Certain roles (e.g., doctors, therapists, employers, unions) impose higher standards of care and duties due to the dependency or trust involved. For instance, a doctor starting a surgery is legally and ethically bound to **complete it or arrange for competent replacement**, abandonment could be both a tort and an ethical violation.

- **Doctrine of Pretext under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)**– Once an employer provides a non-discriminatory reason, a plaintiff may prove pretext by showing the rationale is false and masking retaliation or bias.

- **University HR Policies and Industry Norms (contractual in nature)**– Implied contract and good faith dealing doctrines are violated when policies requiring progressive discipline are bypassed without cause.

- **Retaliatory Discharge Doctrine under Illinois Common Law**– Recognizes wrongful discharge when motivated by retaliation for asserting protected rights.

**Other Laws:**

- If there's a **contractual and/or verbal agreement** between parties like with employer and/or union with employee, failure to complete the services by union may result in a **breach of contract**. Even implied contracts (e.g., ongoing employment with conditions stated by employer) can lead to **legal consequences if terminated unfairly or prematurely and further didn't get fully represented by union**.

- **Implied Covenant of Good Faith and Fair Dealing**: Especially relevant in employment relationships, unions particularly when an employer initiates actions and then unfairly abandons responsibilities, such as training or job continuity promised.

- **Public Policy Exceptions to At-Will Employment**: If someone is terminated for reasons that violate public policy (e.g., whistleblowing, asserting a right), that may be actionable.

·   Professions such as healthcare, law, union representative, and even education have rules and ethical duties requiring that professionals not abandon clients, patients, or students mid-service without proper transition or justification.

**Policy Recommendations and Mandated Reform Request:**

The Plaintiff respectfully asks this Court and any relevant oversight bodies to order institutional reform in the structure and requirements of labor unions operating within universities, including but not limited to:

1. **Legal Panel Establishment:** Require all labor unions representing student workers to establish or contract with a standing panel of attorneys or legal professionals who can offer confidential, individualized advice to students facing employment or academic disputes involving institutional actors.

2. **Mandatory Access to Counsel:** Require unions to provide immediate access to this legal team upon request by any member or affected student in any matter implicating:

   o   Wrongful termination

   o   Civil rights or discrimination claims

   o   Disciplinary or expulsion proceedings

   o   Immigration implications related to employment status

   o   Wage disputes and overtime pay

   o   Educational access or retaliation concerns

3. **Transparency in Union Finances:** Implement mandatory disclosure rules regarding how union dues collected from students and staff are spent especially to ensure that a portion is allocated to legal services, rather than undefined or undisclosed administrative purposes.

4. **Oversight and Accountability:** Establish third-party monitoring of university labor unions to ensure that their conduct and organizational processes remain consistent with the duties outlined in federal labor statutes, applicable CBAs, and the fair representation standards recognized by courts.

**Rationale and Equity Consideration:**

Universities and their administrators routinely operate with access to specialized legal teams, outside law firms, and strategic advisors in all employment and student discipline matters. To place the burden of self-representation or procedural navigation on vulnerable students particularly international students or students with limited legal literacy without reciprocal institutional support from their own union is unjust and coercive. It also renders the concept of "representation" illusory, depriving members of the very protections they are entitled to when conflicts arise. If unions can withdraw from critical grievance processes at will, without accountability or transparency, then labour rights in academic settings become functionally meaningless. Legal protections should not depend on a student's

personal finances, citizenship status, or capacity to navigate complex legal systems alone.

**Request:** Plaintiff respectfully requests the Court/agencies to:

· Declare that the failure of the union to provide legal assistance or pursue Step 4 grievance procedures constitutes a breach of its statutory and ethical duties under federal and state law.

· Mandate the structural and financial reforms described above, including the formation of legal representation panels and allocation of member dues toward legal services.

· Order the establishment of procedural safeguards and transparent reporting mechanisms that hold unions accountable for failure to represent members in times of institutional conflict.

5. **Failure to Apply Progressive Discipline and Reliance on Pretextual Justification: Unlawful Retaliatory and Discriminatory Disciplinary Action**

Plaintiff alleges that Defendant failed to engage in any meaningful form of **progressive disciplinary process** prior to imposing severe adverse employment action. At no time prior to the termination or related discipline did Defendant issue verbal warnings, written notices, formal performance evaluations, or counselling, nor did they provide Plaintiff with an opportunity to respond to or correct alleged infractions if any.

This absence of procedural fairness violates not only **prevailing industry norms**, but also **Defendant's own published policies and human resource protocols**, which articulate an expectation of escalating disciplinary measures in non-severe cases. Such **inconsistent enforcement** of institutional rules lends support to an inference that the discipline imposed was retaliatory, discriminatory, differential, **arbitrary and selectively applied**, especially where other similarly situated individuals, outside Plaintiff's protected class (e.g., by grievance, religion, race, or national origin), were treated more leniently or not disciplined at all for comparable or more egregious conduct. This conduct constitutes unlawful retaliation, serving no legitimate institutional purpose, and was executed with the intent to harass, intimidate, and inflict emotional, academic, and professional harm upon the Plaintiff in direct response to his protected activities and complaints. The adverse actions taken by the Defendant lack justification and appear to be pretextual, reinforcing the inference of retaliatory motive and harassment.

- Moreover, Plaintiff had proactively and explicitly informed his immediate supervisor that should his working hours exceed the federally imposed **20-hour weekly cap** for international students under F-1 visa status, he was **willing to reduce or retroactively adjust his time records**, in accordance with federal protocols. Plaintiff notes that **such**

**administrative modifications are not student-controlled**, and his offer demonstrated **good faith compliance** with applicable employment and immigration regulations.

Despite this cooperative posture, the University failed to consider such mitigating factors and imposed disproportionate discipline. These facts suggest the stated rationale for the action taken was **pretextual**, designed not to enforce policy but to effectuate **discriminatory or retaliatory motives**, in violation of **Title VII of the Civil Rights Act of 1964**, **Title IX of the Education Amendments of 1972**, and relevant sections of the **Illinois Human Rights Act (775 ILCS 5/)**.

Plaintiff reserves the right to conduct discovery into disciplinary outcomes of other student employees to further establish evidence of **disparate treatment and discriminatory intent**.

**Law violations**:

- Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3) – Prohibits retaliation and discrimination based on race, religion, or national origin; pretextual discipline following protected activity violates this statute.

- Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) – Prohibits sex-based discrimination and retaliation in federally funded educational programs; applicable if academic or employment retaliation was linked to gender or advocacy.

- Illinois Human Rights Act (775 ILCS 5/1-102 et seq.) – Prohibits retaliation and discrimination in employment on the basis of protected characteristics, including race, religion, national origin, and for engaging in protected activity.

- Retaliatory Discharge Doctrine (Illinois Common Law) – Recognizes wrongful termination claims when discharge occurs as retaliation for asserting legally protected rights or compliance actions.

- McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)– U.S. Supreme Court precedent: a plaintiff can prove unlawful discrimination by showing that the employer's stated reason was pretextual and the real reason was discriminatory or retaliatory.

- 8 C.F.R. § 214.2(f)(9)(i) – Federal Student Visa Regulations (F-1 Visa Cap on Work Hours)– Student employees on F-1 visas are restricted to 20 hours per week during academic terms; Plaintiff's cooperative offer to adjust work logs shows good faith compliance, undermining the university's justification.

- University Policy / Implied Contract Doctrines– If the university's HR or student manuals promise progressive discipline, then failure to follow those procedures may breach an implied employment contract or the duty of good faith and fair dealing.

**6. Coordinated Retaliatory Terminations and Discriminatory Communication in a Non-Union Setting: Alleged Violations of Federal and State Labor Rights Protections**

Plaintiff alleges that within a condensed and highly suspicious timeframe, the University of Chicago, through its Social Science Computing Services ("SSCS") division, terminated one other individuals from a small departmental office: Plaintiff; and Dr. Joe Bonni, a full-time staff member at SSCS, and lecturer in the Department of Anthropology. This happened in temporal proximity to someone in office being promoted to a higher level.

Significantly, Dr. Bonni had openly acknowledged his role in the early formation and organizing efforts of the Graduate Student United ("GSU"), an organization advocating for student worker rights. The close temporal proximity of these terminations, particularly in such a small unit, raises a strong and plausible inference of a **coordinated and retaliatory motive**, especially targeting individuals associated with labour rights advocacy or opposition to university employment practices. Further the alleged discriminations was also faced by plaintiff.

Although the University may contend that these decisions were independent and performance-related, the **context and clustered timing**, alongside a **lack of documented cause**, suggest pretextual justification. Plaintiff acknowledges that their position was not governed by a collective bargaining agreement but asserts that such **non-union status does not negate legal protections** from discrimination and retaliation under federal and state law.

**These terminations potentially violate:**

- o **Section 7 of the National Labor Relations Act (29 U.S.C. § 157)**, which protects the rights of employees including student workers to engage in concerted activity for mutual aid or protection, even in non-union settings;
- o **Section 8(a)(3) of the NLRA (29 U.S.C. § 158(a)(3))**, which prohibits discriminatory action to discourage union membership or labor organizing;
- o **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a))**, which forbids employer retaliation against individuals who oppose unlawful practices;
- o **Illinois Human Rights Act (775 ILCS 5/6-101)**, which similarly prohibits retaliatory conduct;
- o And **Illinois Whistleblower Act (740 ILCS 174/15)**, which protects disclosures or opposition to actions in violation of state or federal laws.

Plaintiff further alleges disparate treatment in the communication of disciplinary actions. Following Dr. Bonni's termination, all SSCS staff reportedly received an official internal announcement via email. In contrast, Plaintiff received **no direct communication** from the University regarding Joe's termination. Instead, Plaintiff only learned of the official messaging by requesting a copy from a fellow staff member the following day. This deliberate withholding of communication reflects not only **a lack of professional transparency**, but also a **targeted denial of equal treatment**, reinforcing the inference of **discriminatory and/or retaliatory motive**.

Additionally, Plaintiff highlights the broader administrative context. During the same period, Bart Longacre, the then-Director of SSCS, was promoted to **Dean of Information Technology**, consolidating authority and reinforcing a culture of **centralized, unchecked decision-making**. This shift corresponds with the emergence of what Plaintiff characterizes as an **autocratic disciplinary regime**, lacking due process, transparency, or standard review procedures particularly for student workers in non-union roles.

At present, Plaintiff does not possess internal communications or disciplinary records to demonstrate motive definitively. However, under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and as affirmed in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), Plaintiff may rely on **circumstantial evidence** such as suspicious timing, selective enforcement, unequal treatment, and deviations from policy to establish a **prima facie case of retaliation**.

**[Data Redacted]**

**[Data Redacted]**

- Plaintiff alleges that they were subjected to disparate disciplinary treatment by the University of Chicago in violation of federal and state anti-discrimination statutes, including **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)**, **Section 1981 and 1983 (42 U.S.C. §§ 1981, 1983)**, and the **Illinois Human Rights Act (775 ILCS 5/)**.

- Plaintiff is a practicing and devout adherent of the **[Data Redacted]**. Plaintiff's religious identity is informed by both traditions, and he actively participates in practices, observances, and expressions associated with each (Like Images on profile of WhatsApp etc.). Plaintiff also used to visit **[Data Redacted]**, during his time in Chicago. As such, Plaintiff's beliefs are entitled to protection under federal and state laws prohibiting discrimination and retaliation based on religion.

- Specifically, Plaintiff, a male student of **[Data Redacted],** as identified by everyone in SSCS office including most full time staff (Also most other offices including CII, Harris School, Grad Lounge, Mansueto Institute, IOP, and more), also being follower with religious symbols on profile, sometime on bag pack, keychain etc, also as not eat any meat, eggs, and non-alcohol drinker,  was terminated for **allegedly** working in excess of the federally imposed **20-hour-per-week limit** for international students, a common administrative issue for student workers. However, Plaintiff alleges that **similarly situated student employees**, including female Muslim and Christian students **were not subjected to the same disciplinary measures**, despite engaging in **identical or more egregious conduct**.

Plaintiff identifies Fariha Sameen (a Muslim woman) and Ruben Rodriguez Barron (a Christian male) as appropriate comparators who openly acknowledged receiving payment for work exceeding 20 hours per week. Specifically, Fariha Sameen stated on multiple

occasions that she had been compensated for approximately 22–23 hours per week during academic year. Despite these admissions, no disciplinary or corrective action was taken against either comparator.

In contrast, Plaintiff, who occasionally worked marginally over 20 hours during the academic year (e.g., 20.x hours), was subjected to adverse treatment. Even when plaintiff respectfully asked job seniors to "**Trim it down to 20 hours exact**", even if it goes 1 minutes more. This is a clear-cut discrimination based on **gender, sex, religion, caste**, but not limited to these protected categories. Plaintiff strongly suspect that, even subsequent to his termination and before, Defendant has continued to assigned multiple students to work in excess of 20 hours per week in the same office and/or in various other offices across the campus. Plaintiff contends that such practices are in direct violation of applicable federal regulations, labor laws, and Illinois statutory provisions.

If substantiated, this differential enforcement of workplace policies supports a prima facie case of discriminatory application of workplace rules. Furthermore, Plaintiff notes that full-time and part-time staff, including the aforementioned comparators, frequently engaged in discussions regarding the perceived supremacy of their respective religions within the workplace environment. In addition, they all used to talk about how **woke ideology** is superior, and how Israel is doing on Palestine and Hamas, in favour of Palestine and Hamas. That really created very strong antisemitic environment in office workplace.

Plaintiff further alleges that the University exhibited conduct reflective of a **hostile or discriminatory environment toward Jewish-affiliated programs**, in violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), which prohibits discrimination based on race, colour, or national origin under any program or activity receiving federal financial assistance.

Specifically, Plaintiff participated in the **Jewish Learning Fellowship (JLF)** at the University. On the first scheduled session, only two students including Plaintiff attended. At the second session, Plaintiff was the **sole attendee**. The third class was abruptly cancelled, and the program was subsequently discontinued entirely without promised compensation to Plaintiff. Plaintiff alleges that this abrupt termination, following minimal student participation, suggests a **broader campus climate of antisemitic indifference or bias**, potentially fuelled and tolerated by the University's administrative inaction/support. This series of events reflects not only **programmatic suppression** of Jewish educational opportunities but also reinforces the inference of **systemic antisemitism**, a protected classification under Title VI when tied to shared ethnic characteristics.

**Plaintiff further states** that on one occasion, while in the office space at the Social Sciences Collegiate Services (SSCS), Plaintiff overheard a student employee or staff member identified as a woman making inflammatory and politically charged statements. The individual in question was overheard stating, in substance, that "**[Data Redacted]** is not safe for Muslims" and that the "Government of **[Data Redacted]** is committing

genocide against Muslims." Plaintiff asserts that these comments were made in a public or semi-public workspace and were not grounded in verified institutional discourse or policy but rather appeared to reflect a personal political agenda. Such statements, while representing individual speech, created discomfort and a perception of bias among certain students like including Plaintiff, particularly given the sensitive and diverse cultural backgrounds represented in the academic environment. Plaintiff raises concern that the promotion or tolerance of such one-sided, factually disputed political commentary within a university-affiliated office setting may contribute to a hostile environment for students of **[Data Redacted]** or differing viewpoints and may implicate the University's obligation under Title VI of the Civil Rights Act of 1964 and the Illinois Human Rights Act to maintain a neutral and inclusive educational environment. Apart from that, Ruben saying in office that "America, they don't even produce a pin", also never faced any action.

Plaintiff further alleges that on at least one occasion, while present in Harris School of Public Policy, Plaintiff overheard staff affiliated making highly inflammatory and antisemitic remarks. Statements included, but may not have been limited to, references such as "Jews should die," that "Israel/Jews is/are waiting for another Holocaust," and disturbing comments involving "the blood of Jews."

Although Plaintiff is presently unable to recall the exact date, individuals involved, or the complete wording due to the passage of time and emotional impact of the incident, the effect of hearing such statements was profoundly disturbing. Plaintiff alleges that these remarks, if made by University employees or within institutional spaces, reflect a hostile and discriminatory environment in violation of federal and state anti-discrimination statutes, including Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), and the Illinois Human Rights Act (775 ILCS 5/1-101 et seq.), among others. Plaintiff respectfully requests that this matter be subject to further investigation and that discovery be permitted to identify the individuals responsible and determine the University's knowledge and response to such conduct.

Plaintiff however tried to avoid such conversations even when asked or pointed to speak in between conversations, but as university supports people from religions other than **[Data Redacted]** and highly prioritize the Woke Ideology, Democrat agenda then only took action against plaintiff and not to such people having abovesaid attributess. Plaintiff, a practicing **[Data Redacted]**, did not participate in such discussions but nevertheless observed the conduct, which contributed to a hostile and discriminatory atmosphere.

Under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Plaintiff satisfies the elements of a Title VII claim:

· Plaintiff belongs to multiple protected classes (religion, gender, and national origin);

· Plaintiff was qualified for their role and performed job duties reliably;

· Plaintiff was terminated;

· Similarly situated employees outside of Plaintiff's protected classes were **not disciplined** for the same violations.

Additionally, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and *Anderson v. WBMG-42*, 253 F.3d 561 (11th Cir. 2001), support Plaintiff's claim where **comparators engaged in similar or worse conduct** but were treated differently.

**Facts Supporting Discrimination and Pretextual Justification**

· Plaintiff, and SSCS Student staff had confirmed with supervisor Kerry Sharkey during a team meeting that they could continue working even after graduation and plaintiff also told Kerry that any excess time could be **trimmed** to comply with the 20-hour limit during academic year. Multiple witnesses, including **Fariha, Ruben, and Juliana Theis**, were present when this conversation occurred. When asked later, these individuals gave scripted responses suggesting that Kerry and/or Scott and/or Bart had instructed everyone to limit to 20 hours **a uniformity in testimony that raises suspicion of coordinated defence preparation**, particularly when it contradicted earlier conduct and informal statements.

· When Plaintiff sought post-termination clarification, **Juliana refused to comment**, and **Fariha and Ruben gave similar, potentially coached responses**, suggesting the issue may have been manipulated to justify Plaintiff's termination while shielding others.

· Additionally, Plaintiff was **not notified directly** about Joe Bonni termination (Full time staff), whose departure was formally announced to all staff via email but not forwarded to plaintiff. Plaintiff only learned of their own status from another employee after requesting a copy of the internal communication. This **denial of standard notice procedures** further supports the claim of discriminatory treatment.

· Plaintiff also observed that **female and [Data Redacted] student employees were consistently favoured** in workplace conditions:

   o Women were treated more leniently in terms of expectations and discipline.

   o Certain student staff were allowed to engage in non-work-related activities (e.g., **watching movies, chatting all day**) during official hours without reprimand.

   o Tasks were disproportionately assigned to Plaintiff (e.g., front desk, QC, event setups), despite other staff members being equally available.

· One individual, believed to be employed in a similar capacity, was known to **watch adult content on a large screen** in the workspace during office hours without facing disciplinary action.

· During a conversation with a student employee affiliated with the Office of Multicultural Student Affairs (OMSA), the individual affirmed that the University permits student employees to exceed the 20-hour weekly work limit during the academic term without institutional objection, suggesting that working beyond this threshold is generally tolerated and not subject to enforcement actions. Under U.S. immigration law (8 CFR § 214.2(f)(9)), F-1 visa holders can work a maximum of 20 hours per week on-campus while school is in session. These things highly support the fact that university might be paying even more students who are working on federal work study funds, or getting funding from federal resources by discrimination against student based on caste, gender, sex, color, and etc. **Overtime work more than 20 Sanctions against the university** from the Department of Homeland Security (DHS), the Student and Exchange Visitor Program (SEVP), and **U.S.**

**Citizenship and Immigration Services (USCIS)** that should revoke the university's ability to sponsor F-1 visas.

**Legal Implications (But not limited to)**

This pattern of differential enforcement and treatment supports claims under:

- **Title VII – Discrimination based on religion, gender, and national origin**,
- **Section 1981 and 1983 – Equal protection and deprivation of rights under color of law** (if university is deemed a state actor),
- **Illinois Human Rights Act – Prohibiting discrimination in employment**,
- **Potential constitutional violations** related to selective enforcement and retaliation for asserting rights.

Plaintiff further asserts that management including **Kerry, Scott, Bart, Arun** and potentially others may have conspired to shape the narrative and responses of fellow employees to insulate the University from liability. This undermines any purportedly neutral rationale for Plaintiff's termination.

**Plaintiff respectfully reserves the right to:**

- Seek **discovery** on comparator discipline records, time records, and internal communication,
- Subpoena witnesses involved in the events above,
- And amend these claims to include **retaliation**, **hostile work environment**, or **constructive discharge**, based on findings.

Plaintiff requests that this matter be investigated (not limited to) by the **Department of Education's Office for Civil Rights (OCR)** and considered as further evidence of **institutional discrimination**, viewpoint suppression, and violation of equal access to federally funded programming.

## 7. Falsification of Disciplinary Evidence and Unauthorized Surveillance in Disciplinary Proceedings: Claims for Fraud, Forgery, and Privacy Rights Violations

Plaintiff alleges that during the University's disciplinary proceedings; the Defendant introduced a document purporting to show that Plaintiff submitted a "Travel Notification Form" indicating a planned departure from the United States to **[Data Redacted]** on or about May 30. This document was cited as **key evidence** justifying the disciplinary action against Plaintiff and was emphasized in final expulsion document as the most critical basis for the University's decision.

However, Plaintiff **categorically denies** submitting this document and asserts that it is either **fraudulently created, manipulated, or otherwise falsely attributed**. Plaintiff states that in every previous instance where a travel or administrative form was submitted to the University's system, an automated confirmation receipt was consistently sent to Plaintiff's official University email and/or personal email. No such confirmation was received for the disputed form, despite Plaintiff's routine habit of saving and organizing such communications.

Plaintiff conducted a **comprehensive search** of all University and personal email accounts, including inboxes, archives, deleted folders, and spam filters, and found **no evidence** of submission, acknowledgment, or confirmation of the disputed document. Plaintiff raised this issue explicitly during the **appeal process**, challenging the form's authenticity evidence to verify whether the form was in fact submitted by Plaintiff's authenticated login or device.

**Despite this request, the University failed to provide anything:**

- IP logs,
- Timestamps,
- User metadata,
- Server submission records,
- Or any other form of digital validation demonstrating the origin and authenticity of the document.

This refusal to substantiate the form's origin, combined with its central role in the adverse determination, raises a strong inference of **administrative misconduct, abuse of authority,** including potential **document falsification and fraud**.

**Such conduct may constitute a violation of (not limited to):**

- **Illinois Criminal Code on Forgery (720 ILCS 5/17-3)** – knowingly creating or using a false document to defraud,
- **Federal fraud statutes** (e.g., 18 U.S.C. § 1001) if federal funds, benefits, or reporting are implicated in the disciplinary decision,
- And general **common law claims of fraud, breach of good faith, and administrative malfeasance**.


**Unlawful Surveillance Allegations**

Plaintiff further suspects that the University with the help of UCPD, and other relevant authorities, may have engaged in **unauthorized and potentially illegal surveillance** of students, including the use of **security cameras in spaces where students would not reasonably expect monitoring (but not limited to)** for disciplinary purposes.

This includes areas such as informal lounges, shared workspaces, or semi-private study environments. If surveillance footage or metadata was used to support disciplinary or investigatory claims without appropriate notice, policy authorization, or consent, such actions may violate (not limited to):

- **The Illinois Eavesdropping and Surveillance Act (720 ILCS 5/14-1 et seq.),** which prohibits unauthorized recording in areas where individuals have a reasonable expectation of privacy,
- **Federal constitutional protections under the Fourth Amendment**, if the University is found to be acting as a state actor through federal funding, immigration compliance, or public function delegation,
- **FERPA (Family Educational Rights and Privacy Act)** if student records or behavioural data were improperly shared or monitored.

Plaintiff believes that such surveillance practices, if proven to be targeted or selectively applied, represent **a misuse of institutional resources to support retaliation and discrimination**.

## 8. Biased Disciplinary Proceedings Involving Forged Evidence and Breach of Institutional Duties: Violations of Contractual, Due Process, and Statutory Obligations in Expulsion Actions

Plaintiff alleges that the University of Chicago's expulsion process was infected with procedural misconduct, deliberate mischaracterizations, and potential fraud, constituting violations of both state and federal law as well as the University's own contractual obligations. The final adjudicative process, overseen by the Adjudication and Disciplinary Committee (ADC), failed to review or address a critical document purportedly dated July 3, an alleged "Travel Notification Form" that the University claimed had been submitted by Plaintiff to declare travel to **[Data Redacted]**. Plaintiff asserts that he never submitted such a form and that the document is either **falsified or improperly attributed to him**.

Despite raising these concerns during the appeals process, the University failed to produce any technical validation (e.g., submission logs, metadata, digital timestamps) confirming the document's authenticity. Notably, Plaintiff did not receive any automated acknowledgment email associated with such submissions a procedure consistently followed by the University's internal systems in past interactions. This deviation lends substantial weight to the assertion that the form was either **forged by university personnel, potentially within the Provost's Office UChicago, President Office Uchicago, Harris School of Public Policy, the Board of Trustees, or Uchicago senate as some being professors as members**, or otherwise created without Plaintiff's knowledge or consent.

The use of allegedly falsified documentation, if proven, would constitute **forgery under Illinois law (720 ILCS 5/17-3)** and may also support common law claims for fraud and misrepresentation. Moreover, the **failure to acknowledge or investigate this potential misconduct** raises grave concerns about the University's procedural integrity and due process compliance.

Compounding the above, Plaintiff points to a deliberate **misrepresentation by Dean Kate Biddle** during a disciplinary meeting. Although Plaintiff explicitly clarified in writing (via email) that he did not travel to **[Data Redacted]**, **Dean Biddle falsely stated** in the meeting that Plaintiff had admitted to doing so. This misrepresentation, contrary to clear documentary evidence, suggests either recklessness or intentional misconduct and supports Plaintiff's belief that the disciplinary process was **"match-fixed"**- an outcome prearranged by upper administration, particularly the President, Provost's Office, Uchicago Senate, or Board of Trustees, to justify a punitive decision irrespective of the facts. This may amount to complicity in potentially criminal conduct, in violation of 18 U.S.C. § 371 (conspiracy to defraud), and may also contravene the Illinois Criminal Code 720 ILCS 5/31-4 (obstruction of justice). Such institutional shielding behaviour raises serious concerns of unlawful concealment and failure to act upon known misconduct.

During the ADC meeting, Dean Kate Biddle expressly stated that remote internships were permissible and that other students had similarly received funding for remote internships. She clarified that the only issue was tax-related that if the Plaintiff remained in the United States, taxes would be withheld from the stipend and further plaintiff also confirmed via email that if Plaintiff did not travel to **[Data Redacted]**, tax deductions would simply apply. Despite this explicit understanding and acknowledgment, Kate misinterpreted email in the meeting and she already said that even if I didn't went to she can notify HR to withhold taxes, Plaintiff clearly told Plaintiff didn't went, she asked HR and they deducted it, that should be over but right after couple of days she came up again with summon with this matter being in there, and also in expulsion document of Feb 25 showing that was the most strong thing she got against plaintiff when that matter was sorted already after they took tax from payroll, this clearly means university doesn't have any other strong and substantial proof against Plaintiff and they have to dug the closed matter again to make strong grounds for expulsion. Also there's one thing to note initially, Plaintiff was placed on a internship funding waitlist, and the stipend was only disbursed approximately one month after the internship began, in a reduced amount $840 less identified by the university as tax withholding. Plaintiff accepted this explanation and did not object, demonstrating his intent to comply with all legal and tax obligations, and hence the conversation ended, however after many days they silently added money into account, plaintiff didn't checked the bank account at that time and that's why not aware neither do he got any email that they've given that amount back, it's clear that they **trapped plaintiff by paying it at that time**, and built a trap on their own, that's why university officials including dean was emphasising more on the same July 3, 2024 document which was allegedly not at all filled by plaintiff. Then on January 15, 2025, further they took back the taxes which were silently added to the plaintiff's account, and that conversation ended however after couple of days they made things up again about the same matter.

At no point did Plaintiff state that he had travelled to **[Data Redacted]**; to the contrary, within around two hours of Dean Biddle's inquiry, Plaintiff clearly communicated in plain and unequivocal terms that he had not gone to **[Data Redacted]**. The university's own tax withholding, which occurred contemporaneously with the internship stipend, further confirms its knowledge that Plaintiff remained in the U.S., as such withholdings would not apply if the Plaintiff had been abroad.

Nevertheless, during the ADC meeting, Dean Biddle mischaracterized Plaintiff's communication, falsely suggesting that Plaintiff had claimed to be in **[Data Redacted]**, which contradicts both her prior written acknowledgment and the payroll deductions processed by the university. The disciplinary action and resulting expulsion therefore reflect not only a misrepresentation of material facts but also a punitive response to conduct that had previously been **authorized and resolved administratively** and was concluded. Also this matter too happened after resistance and unofficial grievance for wrongful termination on January 7 and 9 2025 (SSCS, and Mansueto Case), that further shows

retaliation and escalation after grievance filling and raising legit questions about wrongful terminations.

Further exculpatory evidence was ignored by the ADC: **Paige**, an official from the Harris School of Public Policy, reportedly confirmed the **legitimacy of Plaintiff's summer internship**, which was central to the disciplinary dispute. Dean Kate also fetched emails from Paige, so she had given all emails relating to plaintiff to Dean Kate, and she strategically hid this particular email since this was going against their own statement and further fabricated and heavily influenced the meeting. Despite its relevance, this information was **omitted entirely from the final findings**. Such selective treatment of evidence supports Plaintiff's assertion that the disciplinary process was not merely flawed but actively **biased and structurally tilted against him**. Lastly there's still a serious question that **did they even pay those $840 taxes to the government**, or they just took it from plaintiff and not paid it further. Plaintiff's suspicion if they didn't do it.

Notably, the **check date for this transaction precedes the end of the designated pay period, contrary to standard payroll practices, raising further questions regarding intent and accuracy. That already raised strongest suspicion of entrapment.** This raises serious concerns about tax evasion, and financial fraud, by the University and its affiliates. Plaintiff wanted to whistle blow this as well.

**[Data Redacted]**
**[Data Redacted]**

· **Missing Evidence & Email Record Discrepancies:**

　o Plaintiff **received email confirmations** for every required form **except one,** the internship stipend follow up form. Plaintiff use Gmail so all emails at UChicago email ID stays. Whenever we fill out a form from typoform company we get an email from this id " noreply@formresponse.com", on about July 3 Plaintiff checked my email box and didn't find any confirmation email or email from Harris team that Plaintiff filled it wrong or someone else from Harris filled it or copied earlier response. The data in that form is correct if we see scenario of before May 30 when Plaintiff was intending to fly to India, Plaintiff never received this information

　Typical response when we fill that kind of form
　**[Data Redacted]**

　The response shared by Kate
　for July 3 was same format:
　**[Data Redacted]**

As we can observe the email noreply@formresponse.com, Attaching all conversations from this email that we get after filling a form (Note: Plaintiff have forwarding to my gmail account from UChicago). For this particular conversation Plaintiff haven't deleted any email, when Plaintiff verified it with my UChicago outlook app Plaintiff didn't receive anything there are well, and Plaintiff don't delete anything from Outlook box, and open it rarely as well. So, it's seems a mismatch that **I have all other forms but not specifically this one which is the basis of my final expulsion (Solely as signalled in outcome document).**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

o After thoroughly checking both my **UChicago Outlook inbox** and my **forwarded Gmail account**, Plaintiff confirm that Plaintiff **never received an email confirmation for the July 3 form submission** that was used against Plaintiff.

o This missing email is critical evidence that should have been considered before issuing an extreme punishment.

o So, it's also possible that the date may have been falsified or wrongly mentioned in the form by someone else as July 3 documents.

**Legal Violations and Doctrinal Support**

1. **Breach of Contract and Institutional Misrepresentation**
   The University's Student Manual constitutes a **binding contract**, and its failure to follow published policies regarding evidence review, impartiality, and appeal rights constitutes a **breach of that contract**. Illinois courts and federal jurisdictions have held that such handbooks may create enforceable rights (*Furey v. Temple Univ.*, *Smith v. Duquesne Univ.*).

2. **Due Process Violations and State Action**
   Although the University is a private institution, Plaintiff argues that the University may have acted as a **state actor** for the purposes of 42 U.S.C. § 1983 due to its handling of federally funded student statuses (e.g., F-1 visa compliance), its receipt of substantial public funding, and the quasi-judicial nature of its adjudicative functions. As held in *Doe v. Trustees of Boston College*, constitutional due process protections may apply in such quasi-public roles, particularly when the institution functions as both **investigator and adjudicator**.

3. **Negligent Infliction of Emotional Distress and Educational Malpractice**
   The flawed and one-sided proceedings, use of likely falsified documents, and denial of exculpatory information led to severe **emotional distress, educational derailment, and reputational injury**. Plaintiff was deprived of the opportunity to continue his education, secure future academic opportunities, or clear his name in a fair proceeding. These facts

support potential claims for tortious misconduct under both **Illinois common law** and parallel constitutional principles.

4. **Violation of Due Process (Constitutional and Statutory):** The failure to notify, present, and allow rebuttal of critical evidence breaches due process rights guaranteed under both the U.S. Constitution and applicable state statutes, echoing precedents such as Goss v. Lopez.

5. **Fraud and Misrepresentation (Common Law and Statutory):** Deliberate reliance on a fabricated document, coupled with false statements made by administrative officials, meets the elements for fraud and misrepresentation by intentionally deceiving the Plaintiff and the disciplinary body.

6. **Violation of Procedural Fairness Doctrine in Educational Administration:** The administrative process failed to follow established guidelines for fair hearings, thus contravening the doctrines of procedural fairness that are requisite in academic adjudication.

7. **Non-Compliance with Internal Administrative Procedures:** The departure from standard submission protocols, including the failure to generate automated technical validations (logs, metadata, acknowledgement emails), evidences a significant procedural anomaly.

8. **Selective Suppression of Exculpatory Evidence:** Omission of critical evidence (e.g., confirmation from a Harris School official regarding the Plaintiff's summer internship) demonstrates a biased process designed to undermine the Plaintiff's defense.

9. **Obstruction of Justice (Illinois Criminal Code 720 ILCS 5/31-4):** The deliberate failure to produce or properly account for digital submission records, coupled with intentional misrepresentation during disciplinary meetings, may constitute obstruction of justice under Illinois law.

10. **Conspiracy to Defraud (18 U.S.C. § 371):** An orchestrated effort among administrative officials to manipulate the disciplinary outcome by fabricating evidence may give rise to a federal conspiracy charge, as it involves collusion to defraud the Plaintiff of his rights.

11. **Breach of the Implied Covenant of Good Faith and Fair Dealing:** By not honoring the expected and implied standards of fairness inherent in the University's policies, the institution has contravened this covenant, a principle recognized in both contract and tort law.

12. **Abuse of Administrative Discretion:** The ADC and associated officials exceeded the bounds of reasoned administrative discretion by relying on unverified evidence and making demonstrably biased decisions.

13. **Failure to Maintain a Proper Chain of Custody for Electronic Records:** The absence of digital metadata and submission logs raises concerns regarding the integrity and retention of crucial administrative records required for evidentiary purposes.

14. **Violation of Statutory Notice and Record-Keeping Requirements:** The unilateral reliance on an unvalidated document without proper technical substantiation contravenes statutory and local record-keeping requirements, thereby undermining procedural integrity.

15. **Institutional Negligence in Upholding Procedural Integrity:** The University's failure to strictly implement its own digital submission protocols and adherence to internal controls evidences systemic negligence with direct prejudice to the Plaintiff.

16. **Misrepresentation by Administrative Officials:** Misstated admissions during the disciplinary proceedings specifically the false representation made by Dean Biddle, constitute deliberate misrepresentation and may form the basis for claims of administrative misconduct.

17. **Breach of Fair Competition Principles in Administrative Decision-Making:** Although more common in commercial contexts, the deliberate manipulation of administrative proceedings to pre-emptively justify adverse action parallels unfair competitive practices, undermining the fairness owed to the Plaintiff.

18. **Violation of Local Educational and Administrative Guidelines:** The University's behaviour conflicts with established local norms and guidelines governing academic disciplinary processes, as recognized by local governing bodies and regulatory agencies.

19. **Negligence in Verifying Digital Submissions:** The absence of standard verification processes for electronic documents (such as travel notifications) puts at risk the institution's compliance with internal digital governance policies.

20. **Possible Equal Protection Violation:** If the biased disciplinary actions exhibit discriminatory intent or selectively target the Plaintiff compared to similarly situated individuals, this may also implicate equal protection claims under both state and federal law.

21. **Contravention of Judicially Endorsed Administrative Doctrines:** The allegations may invoke doctrines established in seminal cases (e.g., Goss v. Lopez), under which academic disciplinary actions must meet a baseline of procedural fairness and transparency a standard clearly compromised in this instance.

22. **Violation of Ethical Standards and Administrative Justice Doctrines:** The documented selective omission of exculpatory evidence and fabrication of documents

constitute breaches of commonly accepted ethical practices within educational institutions and undermine basic principles of administrative justice.

23. **Failure to Adhere to the University's Own Policy Manual:** The use of an allegedly forged document and the subsequent exclusion of verified information contradict the very policies the University purports to enforce, thereby undermining its internal rule of law.

24. **Erroneous Reliance on Unverified Evidence:** The reliance on an unsubstantiated "Travel Notification Form", absent any digital or administrative corroboration constitutes a methodological flaw that vitiates the evidentiary basis of the disciplinary decision.

25. **Institutional Shielding and Unlawful Concealment:** The refusal or inability to produce key technical and administrative documents constitutes unlawful concealment of evidence, a tactic that further obfuscates the truth and impairs judicial review.

26. **Cumulative Systemic Violation of Procedural and Substantive Rights:** The aggregate of these violations establishes a systemic failure by the University to ensure fair administrative proceedings, thereby infringing upon both the contractual and constitutional rights owed to the Plaintiff.

**[Data Redacted]**

## 9. Retaliatory Termination in Response to Protected Whistleblower Activity: Violations of Public Policy, Implied Contract, and Constitutional Rights

Plaintiff alleges that the termination of their SSCS role shortly after filing a grievance in November constitutes unlawful retaliation under multiple federal and state laws. Specifically, Plaintiff had engaged in protected activity by reporting a crime involving University personnel, which the University failed to act upon. Instead, the Plaintiff was directed to report the incident to Human Resources; however, no action was taken, and shortly thereafter, the Plaintiff's SSCS role was terminated. This sequence of events suggests a strong retaliatory motive, HR was clearly not able to take action on a physical and sexual assaulter but took expediated action against plantiff.

In alignment with the Public Policy Exception to the at-will employment doctrine recognized under Illinois law, Plaintiff contends that their termination from the SSCS role shortly after filing a grievance in November 2024 constitutes retaliatory discharge for engaging in protected activity, including (but not limited to) whistleblowing. The grievance, filed in or around January 24 for wrongful termination, also urged reinstatement of SSCS TnT Supervisor Joe Bonni, a good-faith action prompted by his **foundational role in training** the Plaintiff. Furthermore, the termination violated the Implied Contract Doctrine, where verbal assurances and consistent practices by the Plaintiff's supervisor

created a reasonable expectation of continued employment post-degree completion. Additionally, this conduct falls under the scope of the Covenant of Good Faith and Fair Dealing, which serves as a critical doctrine when assessing employer conduct designed to avoid contractual obligations such as accrued compensation or earned benefits. The Plaintiff's increased work hours and subsequent dismissal following the **University's acknowledgment while terminating SSCS of those hours imply a retaliatory motive to deny benefits,** since plaintiff already asked them to trim down hrs to 20 and Kerry agreed to it since he haves the access to workday not the plaintiff and always staff having access used to update those for us. Plaintiff wanted to mention all the hours were always approved by SSCS Staff/UChicago HR themselves. Analogous to professional obligations in other fields such as a physician's duty to complete surgery once begun employers, especially institutional ones, should not engage an employee under the pretense of support only to prematurely disengage without completing their implied commitment. This matter also raises constitutional and policy concerns, implicating the Plaintiff's rights under the First Amendment (right to petition the government for redress of grievances) and broader substantive due process under the Fourteenth Amendment, suggesting the need for judicial review that may extend to constitutional questions warranting systemic reform.

Secondly, Plaintiff asserts that the adverse employment action taken by Defendant, including the termination of Plaintiff's student staff position, was at least partially motivated by alleged overtime hours worked during the non-academic period in or around July 2024. These hours had been approved or processed by the University itself and occurred during a time when F-1 visa restrictions on hourly limits do not apply, thereby rendering the basis for discipline factually and legally unsupported. Furthermore, there was no warning about hours from that time before, but they just terminated the role right away after Mansueto Role Issue occurred January 7, **right within 2-3 days** they terminated the SSCS role (non-union role).

Further, Plaintiff had proactively communicated months prior to the academic year specifically to supervisor Kerry requesting that hours be reduced to align precisely with the 20-hour weekly threshold applicable during the academic term, demonstrating a good faith effort to remain compliant with visa regulations under 8 C.F.R. § 214.2(f)(9)(i).

Despite this, Defendant proceeded to terminate Plaintiff during the academic term in June 2025 without any contemporaneous violation of the 20-hour rule. Notably, the same position was reposted shortly thereafter on the university's internal student employment portal ("Grad Gargoyle"), thereby suggesting that the termination was not grounded in a true lack of funding or policy breach but was instead retaliatory and pretextual in nature. This sequence of events indicates that Plaintiff's termination was motivated, by retaliation for previously approved and lawfully compensated overtime work performed during non-academic periods, despite such work being fully permitted under applicable university policy and federal visa regulations.

The Defendant's reliance on historical overtime activity, occurring months prior and during periods where no hourly cap was in effect appears pretextual, particularly as Plaintiff's academic-term hours were within permissible limits. Plaintiff's hours during academic sessions, as acknowledged by Dean Kate Biddle during a meeting, were merely close to the 20-hours. Despite this, SSD HR, as relayed by supervisor Bart, characterized the situation as a violation of Plaintiff's "Visitor" status.

Notably, although the final disciplinary letter omitted any mention of alleged overtime violations during the academic term, Plaintiff's termination was nevertheless based on this rationale, as originally stated by Bart. This inconsistency further supports the claim that the termination was a retaliatory act disguised under administrative pretext.

This retaliatory rationale is not unprecedented. In Tooker v. Alief Independent School District (Tex. Ct. App. 2017), a school district altered its overtime policies specifically in response to a teacher's lawful overtime activity and claims, which the court recognized as possible retaliation. Similarly, in Ray v. International Paper Co. (4th Cir. 2018), a reduction in overtime opportunities after protected activity was deemed actionable under retaliation doctrine.

Here too, Plaintiff's termination was explicitly and discriminatorily linked to overtime hours from the past as per reason given by defendant themselves hours that were approved, lawful, and compensated. As such, the termination violated protections under Title VII of the Civil Rights Act, the Illinois Human Rights Act, and federal student visa employment regulations, and stands as a textbook example of retaliatory discharge under both federal and state law.

Plaintiff engaged in protected activity when advocating in good faith for the reinstatement of SSCS TnT Supervisor Joe Bonni, who had trained the Plaintiff and whose role Plaintiff believed was **unjustly/wrongly terminated, since he was terminated while working in between day, not even was able to say bye etc which sounded wrong**. Following this request, Plaintiff experienced retaliatory actions, including but not limited to the cancellation of the Plaintiff's own employment role. Such retaliation violates both the **First Amendment right to petition and associate** and statutory protections under federal and Illinois whistleblower statutes, including the **Illinois Whistleblower Act (740 ILCS 174/)**, which prohibits employers from retaliating against employees who disclose or oppose misconduct. Moreover, the close temporal proximity between the Plaintiff's protected grievance and the adverse employment action provides a **presumption of causality** under prevailing federal retaliation standards (*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)).

1. **Illinois Whistleblower Act (740 ILCS 174):** Protects employees from retaliation for disclosing information to a government or law enforcement agency when the employee has reasonable cause to believe that the information discloses a violation of a state or federal law, rule, or regulation.

2. **Public Policy Exception to At-Will Employment:** Illinois recognizes a public policy exception to the at-will employment doctrine. An employer may not discharge an

employee for a reason that violates a clearly mandated public policy. For instance, terminating an employee for reporting illegal conduct contravenes public policy.

3. **Implied Contract Exception:** Verbal assurances or consistent practices suggesting continued employment can create an implied contract, limiting the employer's ability to terminate without cause.

4. **Covenant of Good Faith and Fair Dealing:** Actions taken by an employer to avoid obligations, such as earned benefits, may be scrutinized under this doctrine.

5. Title VII of the Civil Rights Act of 1964- Prohibits retaliation and discrimination against employees for engaging in protected activities, including whistleblowing.

6. Illinois Human Rights Act- Extends state-level protections against workplace discrimination and retaliatory employment practices.

7. 8 C.F.R. § 214.2(f)(9)(i) - Regulates work hour limits for F-1 visa holders during academic sessions, clarifying permissible overtime during non-academic periods.

8. First Amendment of the U.S. Constitution - Affirms the right to petition the government for redress of grievances and protects free speech in reporting misconduct.

9. Fourteenth Amendment, Substantive Due Process Clause - Ensures that individuals receive fair treatment and judicial review before deprivation of life, liberty, or property, including in employment matters.

**Supporting Case Law:**

· *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124 (1981): Recognized a cause of action for retaliatory discharge when an employee is terminated for reporting criminal activity.

· *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482 (1987): Established that an employee handbook can create contractual obligations if it contains promises that the employer reasonably expects to induce reliance.

**[Data Redacted]**

*As shown below, I often requested adjustments for inconsistencies in my hours, but never did anything, and kept on ignoring which further show entrapment, when it has been always their duty to repair those hours.*

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**10. Retaliatory Termination in Response to Protected Whistleblower Activity; Violations of Public Policy, Implied Contract, and Constitutional Rights**

In the present matter, Plaintiff contends that the disciplinary process leading to his expulsion was not the result of a fair or independent adjudication, but rather a culmination of a deliberate and retaliatory campaign orchestrated by the University to suppress Plaintiff's protected activities. This process was marked by administrative retaliation, selective enforcement, procedural irregularities, and the concealment of prior failures by the institution, including the University's inaction or protection of individuals whose conduct potentially violated both institutional policies and criminal statutes, such as the individual identified by Plaintiff as "Shrivatsa Thulasiram."

Plaintiff engaged in protected activity under Title IX and federal civil rights laws when Plaintiff raised concerns regarding a sexual and physical assault and abuse incident involving University-affiliated individuals in or around November 2024.

Shortly after engaging in this protected activity, Plaintiff suffered adverse employment action (termination in January 2025) and was subsequently targeted for alleged academic misconduct investigations (summoned on February 12, 2025), establishing a strong temporal proximity between Plaintiff's protected activity and adverse actions.

The University's adverse actions, taken soon after protected activity and without independent, non-retaliatory justification, raise a clear case of retaliation in violation of Title IX, 34 C.F.R. § 106.71, and related federal civil rights protections.

Plaintiff alleges that the adverse actions taken against Plaintiff including termination of employment, initiation of academic disciplinary proceedings, and denial of academic opportunities, occurred in close temporal proximity to Plaintiff's protected activities, including raising concerns about serious misconduct, Title IX violations, and filing grievances.

Federal courts have consistently held that **temporal proximity between protected activity and adverse action supports an inference of retaliatory intent.** See *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality uniformly hold that the temporal proximity must be 'very close.'").

Plaintiff had proactively raised concerns about institutional misconduct, discrimination, and policy violations, including incidents involving individuals who were shielded from accountability. These disclosures were made through internal communications to administrative and academic personnel, constituting protected activity under state and federal whistleblower laws. Specifically, Plaintiff's actions fall within the protections of the Illinois Whistleblower Act, 740 ILCS 174/15, which prohibits retaliation against individuals who disclose or threaten to disclose conduct that they reasonably believe constitutes a violation of law, regulation, or rule. As supported by case law including Wright v. Illinois Department of Children & Family Services, 798 F.3d 513 (7th Cir. 2015),

protected disclosures made through internal reporting channels are entitled to statutory protection when the institution has oversight obligations.

Furthermore, Plaintiff alleges that the coordinated efforts to remove, silence, and discredit him not only violated civil protections but potentially implicate multiple federal criminal civil rights laws. These include: (1) **18 U.S.C. § 241 – Conspiracy Against Rights**, as multiple individuals may have conspired to suppress Plaintiff's exercise of free expression and redress; (2) **18 U.S.C. § 242 – Deprivation of Rights Under Color of Law**, given the retaliatory use of university processes and denial of due process within a federally funded institution; (3) **18 U.S.C. § 245 – Federally Protected Activities**, as Plaintiff's access to educational and employment opportunities was interfered with in retaliation for his reporting; and (4) the **Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act**, insofar as actions taken may have been partially motivated by Plaintiff's gender, ethnicity, or perceived identity. Plaintiff further contends that the University's failure to address these issues internally, while protecting known actors, reflects systemic misconduct warranting federal scrutiny, independent investigation, and potential criminal inquiry.

**[Data Redacted]**
**[Data Redacted]**

**[Data Redacted]**
**[Data Redacted]**

·  Violation of Title IX (20 U.S.C. § 1681) for retaliation against Plaintiff's report of sexual and physical assault involving University-affiliated individuals.

·  Violation of 34 C.F.R. § 106.71 for adverse actions taken in response to Plaintiff's protected disclosures, constituting unlawful retaliation under federal education law.

·  Violation of the Illinois Whistleblower Act (740 ILCS 174/15) for retaliating against Plaintiff for reporting conduct Plaintiff reasonably believed was unlawful or unsafe.

·  Violation of Title VII of the Civil Rights Act (42 U.S.C. § 2000e-3) for retaliating against Plaintiff based on protected activity and possibly race, sex, or religion.

·  Violation of the Illinois Human Rights Act (775 ILCS 5/) for discriminatory treatment and retaliation linked to grievance activity and protected characteristics.

·  Violation of Fourteenth Amendment procedural due process rights, if the University functioned in a state capacity or administered federal programs while imposing discipline without hearing or review.

·  Breach of implied contract and university policy where disciplinary actions failed to follow stated protocols for performance review and grievance handling.

·  Violation of the duty of good faith and fair dealing by using pretextual grounds to terminate and expel Plaintiff in retaliation for protected speech and grievances.

·  Causal inference of retaliation supported by temporal proximity between whistleblowing activities in November 2024 and termination/summons/expulsion in

January–February 2025, in line with Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001).

·   But-for causation of adverse action proven under University of Texas Southwestern Med. Ctr. v. Nassar, 570 U.S. 338 (2013), due to protected activity being the primary trigger.

·   Internal disclosures to staff and administrators about misconduct constitute protected activity under Wright v. Illinois DCFS, 798 F.3d 513 (7th Cir. 2015), even without external reporting.

·   Denial of equal access to education and retaliatory discipline also infringe Section 504 of the Rehabilitation Act if Plaintiff had a disability or was perceived as disabled.

·   Retaliatory use of Plaintiff's overtime hours, which were previously approved and paid, violated Title VII and potentially the Fair Labor Standards Act (FLSA).

·   Procedural irregularities, selective enforcement, and concealment of others' misconduct indicate bad faith and abuse of institutional authority.

·   Plaintiff's adverse treatment occurred while similarly situated individuals outside Plaintiff's protected class were not disciplined for comparable conduct, further establishing discriminatory motive.

## 11. Failure to Provide Disability Accommodations and Discriminatory Neglect; Violations of the Rehabilitation Act, Americans with Disabilities Act, Title IX and Civil Rights Protections

Plaintiff further alleges that during the prior academic year, he formally requested accommodations due to a documented disability. Said request, submitted to Dean Kate Biddle and other university representatives, was met with complete inaction. No proper acknowledgment, appropriate response, or engagement in the required interactive process occurred. Such failure constitutes a direct violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12133 et seq., which obligate institutions receiving federal financial assistance to evaluate and provide reasonable accommodations to individuals with disabilities. The institution's failure to engage in any meaningful manner not only denied Plaintiff equal educational access but also reflects systemic deliberate indifference to legally mandated responsibilities. These events, when evaluated collectively, demonstrate a pattern of institutional misconduct and unlawful retaliation. The University engaged in procedural manipulation to orchestrate Plaintiff's expulsion in response to his whistleblower activity and to obscure its own policy violations.

The denial of disability accommodations further evidences discriminatory treatment and breach of duty. These actions resulted in severe mental, and emotional distress, academic disruption, and reputational harm, and they materially impaired Plaintiff's educational and professional opportunities. Therefore, Plaintiff was denied equal access to education and subjected to undue hardship, in violation of their rights under applicable disability and anti-discrimination laws. The University's conduct constitutes violations of applicable civil rights statutes, including but not limited to the Illinois Whistleblower Act, the

Rehabilitation Act, the ADA, Title IX, and potentially 42 U.S.C. § 1983, should the University's functions be determined to fall under the colour of law due to its role in federally funded programs and public regulatory compliance.

Plaintiff accordingly seeks all remedies in law and equity, including compensatory and equitable relief, as well as all other relief the Court/Agencies may deem just and proper.

**[Data Redacted]**

- **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)**– Prohibits retaliation and discrimination based on race, religion, color, national origin, and sex in employment.
- **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)**– Prohibits sex-based discrimination and retaliation in federally funded education programs.
- **Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.)**– Prohibits discrimination on the basis of disability and mandates reasonable accommodations.
- **ADA Amendments Act (ADAAA) of 2008** expanded the definition of major life activities to include bodily functions, such as digestive, bladder, and bowel functions. This means that conditions like Crohn's disease, incontinence, or other medical issues affecting restroom use may be protected under disability laws.
- **Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794)**– Requires federally funded programs to provide equal access to individuals with disabilities.
- **Fair Labor Standards Act (FLSA) (29 U.S.C. § 201 et seq.)**– Protects against retaliation for raising wage, hour, or overtime violations.
- **Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g)**– Protects student education records and may apply if confidential grievances or performance issues were disclosed improperly.

- **Illinois Human Rights Act (775 ILCS 5/)**– Protects against employment discrimination, harassment, and retaliation based on protected characteristics.
- **Illinois Educational Labor Relations Act (115 ILCS 5/)**– Governs collective bargaining and fair labor practices in educational institutions.
- **Illinois Whistleblower Act (740 ILCS 174/)**– Prohibits retaliation against individuals who report violations of law or public safety.
- **Illinois Constitution, Article I, Sections 2 & 17**– Guarantees due process and prohibits discrimination in employment and education.
- **First Amendment**– Protects against retaliation for speaking out on matters of public concern or protest (if public function or funding nexus is shown).
- **Fourteenth Amendment – Due Process Clause**– If the university is acting under color of state law (e.g., police powers or administering federal benefits), due process rights apply to student and employment decisions.
- **Intentional Infliction of Emotional Distress (IIED)**– For outrageous, retaliatory conduct intended to cause severe mental distress.

- **Negligent Supervision / Retention**– For failing to address harassment, retaliation, or misconduct by staff/supervisors.
- **Defamation (Libel/Slander)**– If false and damaging statements were made about Plaintiff without basis.
- **Tortious Interference with Contractual or Business Relations**– For unjustified disruption of Plaintiff's employment or academic prospects.

### Labor and Employment Doctrines

- Vaca v. Sipes, 386 U.S. 171 (1967)– Duty of Fair Representation requires unions to act in good faith and without discrimination in grievance handling.
- McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)– Framework for proving discrimination or retaliation through circumstantial evidence and pretext.
- University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338 (2013)– Retaliation claims under Title VII require "but-for" causation.
- Alexander v. Choate, 469 U.S. 287 (1985)– Clarified that individuals with disabilities must receive "meaningful access" to federally funded programs.

### Examples and Precedents

- Tooker v. Alief ISD – Policy change after overtime complaint found retaliatory.
- Ray v. International Paper Co. – Reduced overtime held as retaliatory conduct.
- Doe v. University of Cincinnati – Courts allowed due process claims against universities for unfair disciplinary proceedings.
- Ross v. Creighton University, 957 F.2d 410 (7th Cir. 1992) – Recognized claims of educational fraud where university failed to deliver promised education.

## 12. Pattern of Retaliatory Job Revocations and Constructive Professional Exclusion; Violations of Anti-Retaliation Statutes, Implied Employment Contracts and Due Process Protections

Plaintiff further asserts that he was subjected to a pattern of retaliatory exclusion from multiple University employment opportunities, many of which had been formally accepted and, in several instances, had progressed through onboarding procedures within the University's internal Workday system. In total, **at least** seven distinct positions were either rescinded, withdrawn, or silently revoked without any formal explanation or notification. These positions included: (1) a Research Assistantship at the Mansueto Institute, (2) an Event Assistant role in the Department of Physics, (3) an Assistant role at Neubauer Collegium, (4) an Academic Technology Assistant (ATA) position at SSCS, (5) a Teaching Assistant (TA) position with Professor Ada Palmer (a union-eligible role), (6) a position at Impact Studio (Rustandy, UChicago Medicine (Arts as in Project)), and (7) a Logan Center Assistant position.

Despite formal onboarding for many of these roles, no satisfactory reasons for revocation were ever provided, and Plaintiff received no opportunity to appeal or respond. The sheer number of removals, the absence of procedural transparency, and the close temporal connection to Plaintiff's

disciplinary proceedings and whistleblower activity suggest that these decisions were not made independently or in good faith, but rather as part of a retaliatory campaign to isolate, discredit, and marginalize Plaintiff professionally within the institution.

In particular, the Teaching Assistant role with Professor Ada Palmer, was never formally terminated through the University's normal employment channels. Instead, Plaintiff discovered that he had been removed from the assignment within Workday without receiving any written notice, justification, or opportunity for response. As a union-eligible role, this silent and undocumented removal may constitute a violation of labor protections under the *National Labor Relations Act* (**29 U.S.C. § 157 et seq.**), which guarantees employees the right to engage in collective bargaining and prohibits retaliatory conduct by employers for union-related activity. The *Illinois Educational Labor Relations Act* (**115 ILCS 5/14**) further prohibits retaliation or discriminatory employment practices against individuals engaged in protected labor activity within educational settings. The unexplained removal from this union-covered role raises significant legal and ethical concerns related to interference with protected employment rights.

Plaintiff contends that the University strategically withheld formal cancellations for union-eligible positions specifically the Mansueto Institute role and the Teaching Assistant position under Dr. Ada Palmer in a manner that may suggest a deliberate effort to avoid triggering applicable labor protections and union grievance procedures. Such omissions appear calculated to obscure employment status and limit the Plaintiff's ability to seek timely redress under relevant labor and academic policies.

In light of these facts, Plaintiff contends that the coordinated cancellation of multiple employment offers each initiated after onboarding or formal offer acceptance amounts to constructive retaliation and a targeted effort to undermine his educational experience, professional development, and financial stability. When viewed together with Plaintiff's prior complaints regarding discrimination, administrative misconduct, and disability-related concerns, the pattern of exclusion further substantiates a broader campaign of institutional retaliation and bias.

Additionally, the University's failure to provide notice, justification, or due process with regard to these role cancellations violated Plaintiff's legitimate expectations under established University employment protocols and student policy documents. These omissions may also breach *implied contractual obligations* related to student employment, particularly where Plaintiff had taken affirmative steps to secure and prepare for the positions.

Plaintiff also states that during or shortly after the disciplinary process, he was invited to interview for three other campus positions. However, the cumulative emotional and psychological toll of the retaliatory actions and procedural trauma rendered Plaintiff unable to pursue these opportunities. Plaintiff suffered severe mental health deterioration, including depression, torture, and loss of morale, as a result of the University's ongoing misconduct. These harms caused direct damage to Plaintiff's career progression, financial well-being, and academic participation.

The University's conduct may give rise to actionable claims under federal and state anti-retaliation and anti-discrimination statutes, including but not limited to: *Title VI* and *Title VII of the Civil*

*Rights Act* (**42 U.S.C. §§ 2000d and 2000e-3**), *Section 504 of the Rehabilitation Act* (**29 U.S.C. § 794**), and the *Illinois Human Rights Act* (**775 ILCS 5/6-101**), all of which prohibit adverse employment and educational actions taken in retaliation for protected activity, whistleblowing, or disability status.

Plaintiff seeks legal and equitable remedies for these violations, including but not limited to reinstatement or restitution for lost employment opportunities, compensatory damages for emotional distress and professional harm, and other relief as appropriate under applicable federal and Illinois law.

- Intentional Infliction of Emotional Distress (IIED) Doctrine: A common law cause of action allowing recovery for conduct that is so outrageous and extreme that it causes severe emotional distress.

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) Prohibits discrimination on the basis of race, color, or national origin in programs or activities receiving federal financial assistance, including educational institutions.

- Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.) Prohibits employment discrimination based on race, color, religion, sex, and national origin, and protects employees from retaliation for engaging in protected activities.

- Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) Prohibits discrimination on the basis of disability in any program or activity receiving federal financial assistance, including employment and education.

- Illinois Human Rights Act (775 ILCS 5/6-101) Provides state-level protection against discrimination in employment and education based on various protected characteristics, extending protections beyond federal statutes.

- National Labor Relations Act (29 U.S.C. § 157 et seq.) Protects employees' rights to engage in collective bargaining and other concerted activities, and prohibits employers from retaliating against employees for union-related or protected labor activities.

- Illinois Educational Labor Relations Act (115 ILCS 5/14) Safeguards the rights of employees in educational settings, including protection against retaliatory or discriminatory practices relating to union and collective bargaining activities.

- Hostile Work Environment Standard (Under Title VII): A legal doctrine, integral to Title VII claims, that holds employers liable when pervasive, severe, or enduring harassment creates an abusive work environment.

**13. Political Retaliation During Student Government Elections and Viewpoint Discrimination; Violations of First Amendment, Equal Representation and Election Integrity**

**Plaintiff further asserts** that he was subjected to political discrimination and institutional bias during the Harris School of Public Policy's Student Government elections in 2024. During the campaign, Plaintiff's lawfully posted campaign materials were selectively

removed from designated areas (Bulletin Boards), while unauthorized posters by other students, campaigners, including a prominent "Thai noodles" flyer, were permitted to remain in violation of the same University posting policies. This selective enforcement of rules reflects impermissible viewpoint, national origin, gender, and caste, discrimination and unequal treatment in violation of Plaintiff's rights under **Healy v. James, 408 U.S. 169 (1972)**, which affirms that students retain First Amendment protections on university campuses.

Plaintiff raised this issue directly with Dean Kate Biddle in Dean Suite at Harris School of Public Policy, and no corrective action or inquiry followed, Particularly he asked her for video footage of the person who removed only the plaintiff posters, and also extra time so that plaintiff will also get equal treatment during election and other actions to make campaigner life as a whole. In the interest of fairness and institutional accountability, Plaintiff now respectfully questions whether the election process was conducted in a transparent and verifiable manner. Although Plaintiff choose not to challenge the results at the time, out of natural respect for the student election process, recent patterns of administrative misconduct and retaliation have raised serious doubts regarding the integrity of that process.

Plaintiff requests that the University produce verifiable records or evidence confirming the vote count, particularly the claim that Plaintiff received only eleven (11) votes. If the votes were not properly tabulated or if procedural safeguards were lacking, such irregularities may point to broader institutional failures in managing student elections and ensuring democratic representation. These deficiencies may further implicate violations of:

- **42 U.S.C. § 1983**, for deprivation of constitutional rights under color of state law; Provides a remedy for violations of constitutional rights by individuals acting under color of state law. In some cases involving public institutions or entities receiving significant public funds, this statute is used to challenge discriminatory or procedurally unfair actions.

- **Illinois Election Code** (10 ILCS 5/1-1 et seq.), to the extent that the university receives public funds and must adhere to fundamental fairness in regulated elections; Sets forth the statutory framework that governs the conduct of elections in Illinois. Where a university receives public funds or where election practices mirror government-operated elections the Code may require adherence to fairness, transparency, and procedural safeguards.

- **University obligations under Title IV and Title VI**, requiring equal access to institutional benefits and protections from retaliation and discrimination based on protected activities.

- Title IV (Higher Education Act provisions related to non-discrimination) : Although more commonly associated with federal student aid, Title IV obligations impose requirements on institutions receiving federal funds to ensure equitable treatment and non-discrimination in educational programs and activities.

·  Title VI of the Civil Rights Act of 1964: Prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. Selective enforcement of posting or election rules based on protected characteristics may violate these protections.

·  Healy v. James, 408 U.S. 169 (1972): A landmark Supreme Court decision that affirmed students' First Amendment rights on university campuses. The decision holds that even public institutions (and by extension, institutions partially funded through public resources) must respect free speech and viewpoint diversity in on-campus political activities.

·  The First Amendment of the U.S. Constitution: Protects the right to free speech and political expression, ensuring that students and campaigners may express their views such as through campaign materials without fear of selective suppression or censorship by educational institutions.

·  Equal Protection and Due Process Clauses (Fourteenth Amendment): These constitutional provisions ensure that individuals are treated equally under the law and that any adverse governmental action is undertaken following fair procedures. They are often invoked in cases alleging discrimination or arbitrary decision-making.

·  Selective Enforcement Doctrine: A judicial principle holding that if a rule (such as campus posting or election policies) is enforced in a discriminatory or inconsistent manner, it may constitute a violation of constitutional or statutory rights. This doctrine is vital when one group is penalized while others are not, based on impermissible factors such as political views or national origin.

·  Procedural Due Process: Requires that any deprivation of a legally protected interest (such as participation in elections or employment) is conducted with fair procedures including notice, an opportunity to be heard, and an opportunity for remedy. A failure to provide these safeguards may form the basis for a constitutional claim.

Plaintiff respectfully requests discovery into the Harris Student Government (HSG) election procedures, vote counts, and administrative actions taken during and after the election process, to evaluate whether the election was free, fair, and compliant with both University policy and federal civil rights law. And further requests all relevant reliefs not limited to declaratory relief.

## 14. Financial misconduct and misuse of restricted funds; violations of tax-exempt regulations, grant conditions and fiduciary duties

Plaintiff also raises concerns related to the **transparency and legality of the University's financial management**, including its use of funds derived from **student fees, endowments, public grants, and other educational subsidies**. Plaintiff reasonably believes that financial resources, which were allocated for educational advancement, nonprofit programming, or student welfare, were diverted for purposes inconsistent with

those representations including potential commercial or profit-making motives. So Plaintiff requests to investigate tax fraud, political bias, or profit-driven behaviour in universities. Especially but not limited to transaction including tax less maroon dollars spent on campus, transactions of on campus places especially but not limited to super expensive bookstore.

Plaintiff further asserts that if University administrators, including disciplinary officers, engaged in actions motivated by personal retaliation or financial self-interest rather than the University's stated educational mission, such conduct may constitute private benefit or inurement in violation of 26 U.S.C. § 501(c)(3). Under IRS regulations, significant deviations from nonprofit purpose, such as using institutional power for personal gain, could jeopardize the University's nonprofit status and merit investigation by appropriate authorities.

Such use of restricted funds may contravene federal regulations applicable to **tax-exempt institutions under 26 U.S.C. § 501(c)(3)**, which prohibit **private** and require that revenues be used solely for charitable, educational, or scientific purposes. Misuse of such funding may also violate federal and state statutes governing grant conditions and financial disclosures. Plaintiff requests that the appropriate financial oversight authorities including internal University auditors, the IRS, or the Department of Education investigate whether these concerns rise to the level of statutory violations or breach of fiduciary duties.

**Lack of Transparency & Student Concerns:**

·   The **Budget Town Hall (Dec. 2023) excluded students**, with administrators claiming discussions were "employee-focused."

·   Critics, including faculty, argue the University's **financial planning lacks feasibility** and transparency. (UChicago's aggressive expansion and rising debt have led to a financial crisis, forcing austerity measures while attempting to maintain competitiveness. Without sustainable revenue strategies or greater fiscal discipline, the University risks long-term instability, raising concerns among students, faculty, and financial analysts., https://chicagomaroon.com/40872/news/expect-growing-pains-university-presentation-reveals-severe-financial-pressures/)

-   **26 U.S.C. § 501(c)(3):** Governs the tax-exempt status of nonprofits and requires that all revenues and resources be used solely for charitable, educational, or scientific purposes, prohibiting private benefit or inurement.

-   **IRS Regulations Governing Tax-Exempt Organizations:** Provide detailed implementation guidelines ensuring that restricted funds are applied exclusively to the organization's nonprofit mission.

-   **Uniform Guidance (2 CFR Part 200):** Establishes federal requirements for the administration and expenditure of federal funds and grants, ensuring strict compliance with approved budgeting protocols.

- **Grant Conditions and Financial Accountability Statutes:** Mandate that funds from public grants and subsidies be used exclusively for their designated purposes, with any diversion constituting a breach of contractual or statutory obligations.

- **Fiduciary Duty (Common Law Doctrine):** Obligates university administrators to manage institutional funds in the best interests of the institution and its stakeholders, with mismanagement potentially resulting in actionable breaches.

- **Nonprofit Transparency and Accountability Requirements:** Entail statutory and regulatory mandates, including mandatory financial disclosures, to ensure that funding is allocated in accordance with the institution's charitable mission.

- Illinois Administrative Code §130.2005: In Illinois, only campus spending programs tied to mandatory meal plans (typically required for students residing in campus housing) may qualify for a sales tax exemption. If prepaid funds like Maroon Dollars are purchased separately or voluntarily, they are generally subject to sales tax unless another specific exemption applies

- State Sales Tax Laws (e.g., under the Retailers' Occupation Tax Act): Prepaid financial instruments, including campus spending accounts, are typically treated as cash equivalents. Absent a specific statutory exemption, these transactions are subject to state sales tax obligations just like other retail transactions.

- General Gift Card Regulations and Prepaid Instrument Guidelines: Many states regulate the sale and redemption of prepaid cards. Such regulations often require the collection of sales tax unless the prepaid funds are expressly purchased under a regulated exemption (as in certain mandatory meal plans).

## 15. Improper Sales Tax Practices in the Maroon Dollars Program and Misapplication of Tax-Exempt Provisions; Violations of Illinois Tax Law and Nonprofit Financial Obligations

Plaintiff respectfully suspects that the University of Chicago may be engaging in improper or non-compliant tax practices through the administration of its "Maroon Dollars" program, which functions as a preloaded spending account tied to University ID cards and is widely referred to as involving "tax-less dollars." Plaintiff asserts that once funds are added to the account, users are unable to withdraw or transfer them back into a bank account. Specifically, Plaintiff maintained around $100 in his account that he was unable to move to his bank, indicating systemic issues with fund accessibility.

**Factual Allegations:**

· Students and faculty are permitted to purchase Maroon Dollars that can be used across various university-affiliated dining establishments.

· While these funds are treated as equivalent to cash within campus facilities, they are often exempted from sales tax upon use, even when they are **purchased independently** from mandatory housing-related meal plans.

- This practice leads to a scenario where users incur **no tax burden** on food or merchandise purchases that would ordinarily be subject to Illinois sales tax under the Retailers' Occupation Tax Act.

**Legal Concerns:**

- Under **Illinois Administrative Code § 130.2005**, only Maroon Dollars tied to **mandatory meal plans** for students living in campus housing may qualify for sales tax exemption. When Maroon Dollars are purchased **separately or voluntarily**, sales tax should apply unless another specific exemption applies.

- If the University is **not collecting or remitting sales tax** on separately purchased Maroon Dollars, such conduct may constitute a violation of **Illinois tax law**, potentially triggering liability under the **Illinois False Claims Act (740 ILCS 175/1 et seq.)** and state revenue enforcement actions.

- The **Illinois Department of Revenue** has previously investigated nonprofit institutions for misuse of tax-exempt status or failure to properly apply sales taxes to retail transactions.

- If proven, this misuse may also challenge the University's compliance with **nonprofit regulations under 26 U.S.C. § 501(c)(3)** regarding proper financial and commercial activities.

- **IRS Regulations for Tax-Exempt Organizations**: Provide the framework for proper financial conduct in nonprofit institutions, ensuring that revenues and expenditures comply strictly with the organization's stated charitable purposes.

- **Retailers' Occupation Tax Act:** Requires sales tax to be applied to retail transactions such as food and merchandise purchases unless a specific statutory exemption applies.

**Request:**

1. An audit and review by the Illinois Department of Revenue and IRS of the University of Chicago's Maroon Dollars program;

2. Disclosure of tax handling procedures for Maroon Dollars all transactions, not only ones linked to housing meal plans;

3. Imposition of corrective measures, financial penalties, or revocation of specific tax exemptions if unlawful avoidance of tax collection is established.

**16. Misuse of nonprofit tax-exempt status for personal purchases by university personnel and violations of IRS regulations and state revenue laws**

Plaintiff respectfully submits that there exists a pattern or systemic practice within the University of Chicago whereby certain employees and staff appear to be misusing the University's nonprofit, tax-exempt purchasing privileges to acquire personal or non-institutional items using university-issued procurement cards or accounts, with the improper effect of evading state and/or federal taxes. Nonprofit universities are expected to use their funds primarily for educational purposes. If they were found to be misusing federal funds or engaging in excessive commercial employment practices, their 501(c)(3) tax-exempt status could be challenged by the IRS.

**Factual Allegations:**

· Plaintiff has directly observed or has credible reason to believe that staff members at various University departments regularly make purchases of items that do not appear to serve any legitimate academic or administrative purpose yet are executed through the University's institutional tax-exempt accounts or payment cards.

· **Such practices, if substantiated, could constitute a violation of:**

  o Internal University policies governing procurement and allowable expenses;

  o State sales tax laws, particularly where exemption certificates are used for private purchases;

  o Federal nonprofit regulations applicable under 26 U.S.C. § 501(c)(3).

**Legal Framework:**

· **IRS Tax-Exempt Status – 26 U.S.C. § 501(c)(3):** Requires that tax-exempt organizations operate exclusively for exempt purposes and prohibits any part of their net earnings from benefiting private individuals or insiders (known as "private inurement").

· **Illinois Department of Revenue Rules:** Tax-exempt entities must ensure that purchases made under a tax exemption are solely for institutional use. Personal use of such exemption constitutes tax fraud and may result in revocation of the entity's sales tax exemption and individual civil or criminal penalties.

· **False Claims Act (31 U.S.C. § 3729):** If purchases made under false pretenses involve federal funds or result in improper benefit through misrepresentation, they may constitute actionable violations under the FCA.

- **IRS Regulations for Tax-Exempt Organizations:** Mandate that institutions must use funds strictly for their nonprofit missions, thereby disallowing personal or unauthorized purchases via institutional accounts.

- State Sales Tax Laws (e.g., under the Retailers' Occupation Tax Act): Require that sales tax be collected on retail transactions unless a specific exemption applies, thus barring the improper use of tax-exempt funds for personal purchases.

**Request:**

1. A forensic audit and regulatory review of University procurement card usage and purchasing logs, particularly where tax-exempt certificates are employed;

2. Disclosure of institutional controls, enforcement mechanisms, and disciplinary policies for procurement fraud or abuse;

3. Referral of findings to the IRS and relevant state/federal revenue agencies if misuse of tax-exempt privileges or improper personal enrichment is identified.

This inquiry is consistent with federal interests in preserving the integrity of public and tax-exempt institutions and ensuring lawful use of benefits afforded under nonprofit designations, and therefore plaintiff request to whistle blow this. In addition one aspect of this is probably the GEMS Card which staff members were allegedly using to do personal purchases.


## 17. Pre-emptive retaliation and suppression of grievance rights and union activity and violations of national labour relations protections and educational labour laws

Most seriously, Plaintiff contends that the University of Chicago engaged in **retaliatory and anti-union conduct** by imposing the harshest possible sanction **expulsion** immediately after the filing of a formal grievance. The decision to terminate Plaintiff's student status came **before the grievance process had even progressed to a preliminary hearing**, effectively short-circuiting Plaintiff's legal and institutional rights to challenge unfair employment conditions, discriminatory treatment, and workplace retaliation. The suspicious timing of discipline, selective enforcement of rules, and inconsistent disciplinary history point to a retaliatory motive. The university's failure to act on the same issue prior to my protected activity (filing a complaint) undermines their claim of neutrality.

Such pre-emptive action reflects a deliberate strategy to **deter or silence lawful advocacy** for improved working conditions under the umbrella of "worker life as a whole." This tactic is explicitly prohibited under the **National Labor Relations Act (29 U.S.C. §§ 157, 158)**, which guarantees the right to engage in concerted activities, including filing grievances and organizing without fear of retaliation. The Supreme Court in *NLRB v.*

*Burnup & Sims, Inc.*, 379 U.S. 21 (1964), held that retaliatory action aimed at discouraging protected conduct especially prior to adjudication of a dispute can constitute an **unfair labor practice**.

Further, under the **Illinois Educational Labor Relations Act (115 ILCS 5/14)**, it is unlawful for an educational institution to retaliate against an employee or student worker for filing a grievance or participating in organizing activity. The University's decision to initiate disciplinary proceedings and impose expulsion **prior to a fair investigation** of Plaintiff's claims violated both these statutory safeguards and the University's internal grievance policies, which are contractually binding under Illinois law.

The collective effect of these actions biased enforcement of election rules, financial irregularities, and retaliation against protected labor activity constitutes a **multi-pronged institutional campaign** to suppress Plaintiff's dissent, remove him from academic and professional spaces, and prevent further exposure of University misconduct.

These events caused Plaintiff profound emotional harm, professional reputational damage, and constitutional injury, and give rise to actionable claims for **civil rights violations, breach of contract, retaliation under federal and Illinois law**, and **intentional infliction of emotional distress**. Plaintiff respectfully requests that all such violations be fully addressed through compensatory, injunctive, and equitable relief.

- **National Labor Relations Act (29 U.S.C. §§157,158)**: Prohibits employers from taking retaliatory actions against employees or student workers engaging in protected concerted activities such as filing grievances or union organizing and thus safeguards the right to collective bargaining.
- **NLRB v. Burnup & Sims, Inc., 379 U.S. 21 (1964)**: A seminal Supreme Court case establishing that taking pre-emptive disciplinary measures to discourage protected activities constitutes an unfair labor practice under federal law.
- **Illinois Educational Labor Relations Act (115 ILCS 5/14)**: Prohibits educational institutions from retaliating against employees or student workers for participating in union or grievance activities and mandates adherence to fair disciplinary proceedings, including providing the opportunity for a hearing before imposing severe sanctions such as expulsion.
- **Due Process and Procedural Fairness Doctrines**: Require that all parties receive notice and an opportunity to be heard before adverse actions are taken, thereby preventing pre-emptive retaliation that suppresses grievance rights and union activity.

**18. Suspected digital retaliation and unauthorized access to personal accounts and violations of federal computer fraud laws and privacy protections**

In addition to the acts of administrative retaliation and institutional misconduct already detailed, Plaintiff reports a concerning escalation in digital security incidents targeting his personal Gmail account. Specifically, Plaintiff received multiple alerts from Google

indicating that his login credentials had been exposed or were being used in suspicious patterns consistent with data breaches or unauthorized access attempts. These notifications, while not uncommon in isolation, occurred repeatedly and in temporal proximity to Plaintiff's protected activities, including the filing of formal grievances, appeals, and legal actions directed against the University of Chicago.

The Gmail account in question was used for sensitive communications, including legal strategy, academic documents, and whistleblower activity related to University misconduct. Plaintiff observes that such digital interference had not previously occurred with the same intensity or frequency, suggesting that the timing may not be coincidental. Given the integration between Plaintiff's University and personal digital identities especially with respect to recovery emails, shared devices, and past access via campus infrastructure Plaintiff raises a credible concern that one or more actors affiliated with the University may have accessed, attempted to access, or facilitated monitoring of Plaintiff's private online activity.

If substantiated, such conduct would violate the **Federal Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030**, which prohibits intentional access to protected computers without authorization or exceeding authorized access. Violations may include civil and criminal penalties where access to personal information is obtained without lawful justification. Additionally, the **Illinois Computer Crime Prevention Law (720 ILCS 5/17-51 et seq.)** similarly criminalizes the unauthorized use, tampering, or manipulation of another's digital accounts, networks, or devices.

Beyond statutory violations, such unauthorized access may also give rise to civil claims under **common law tort theories** of invasion of privacy, abuse of process, and intentional infliction of emotional distress particularly where the conduct forms part of a broader retaliatory campaign. If any access was initiated or facilitated through the University's IT systems or by individuals with privileged access to internal systems, further institutional liability may arise under federal and Illinois law.

Plaintiff has taken steps to preserve all security notifications, digital logs, and account records, and formally requests that the Court authorize discovery into the University's IT infrastructure, administrative access logs, metadata trails, and system monitoring activity. Plaintiff reserves the right to seek a **protective order or third-party forensic examination** to identify and preserve digital evidence of tampering by defendant and their relevant proxies. While the available indicators are circumstantial at present, the alignment between the onset of suspicious digital activity and Plaintiff's legal filings warrants close judicial scrutiny in the context of ongoing allegations of institutional retaliation and privacy breaches.

**[Data Redacted] [Data Redacted] [Data Redacted]**

**[Data Redacted] [Data Redacted] [Data Redacted] [Data Redacted]**

Two days after discussion with Justiceatwork (Barrett & Farahany), Plaintiff began receiving email messages that, as Plaintiff reasonably suspects, contained or referenced evidence of a data breach. **[Data Redacted]**

## 19. Artificial pricing schemes and deceptive trade practices in tuition strategy and violations of consumer fraud laws and antitrust regulations

Plaintiff raises serious concerns about the University of Chicago's tuition pricing model, asserting that it may constitute deceptive and anticompetitive behaviour under federal and state law. Specifically, the University prominently advertises a grossly inflated tuition figure approximately $90,000 annually only to subsequently offer substantial scholarships to a large percentage of admitted students. While presented as a financial benefit to recipients, this structure may operate as an **artificial pricing scheme** designed to mislead applicants regarding the true cost of attendance.

This tactic may amount to a **form of deceptive marketing** or **predatory pricing**, in which the University misrepresents the market value of its programs to influence enrolment decisions. Students evaluating competing offers may reasonably assume the higher sticker price reflects a superior program or prestige, when in fact, the net cost may be on par with or even less favourable than offers from peer institutions. Such conduct may violate **state consumer protection statutes**, such as the **Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.)**, which prohibits deceptive or unfair trade practices.

Additionally, Plaintiff contends that this practice, if used to **systematically recruit students away from peer institutions offering comparable programs at significantly lower cost**, may support a broader theory of **unfair competition**. This is especially true if tied to larger-scale conduct involving **collusive practices**, such as those alleged in the ongoing litigation involving the **568 Presidents Group**, where major universities including the University of Chicago were accused of suppressing competition in financial aid offerings through mutual agreements.

Such conduct may also implicate provisions of the **Sherman Antitrust Act (15 U.S.C. § 1 et seq.)**, where proof of collusion or market manipulation exists. If the University's pricing scheme is shown to interfere with transparent competition among educational institutions, or to falsely advertise tuition costs to induce enrollment under materially misleading premises, **students and potentially rival institutions may have standing** to pursue legal action for **fraudulent inducement, false advertising**, or violations of **unfair competition statutes**.

Plaintiff asserts that the misrepresentation of pricing, when viewed in the context of broader institutional practices, supports a pattern of **commercial manipulation and bad faith dealing**, and respectfully requests further inquiry by appropriate regulatory authorities or judicial intervention, as applicable.

- **Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.)**: Prohibits unfair, deceptive, or misleading acts or practices in consumer transactions, including misrepresentations in tuition pricing and advertising.

- **Sherman Antitrust Act (15 U.S.C. §§ 1 et seq.)**: Bars anticompetitive agreements and practices that restrain trade, which may be applicable if tuition pricing schemes are used collusively to distort market competition among institutions.

- **Federal Trade Commission Act (15 U.S.C. §§ 41-58)**: Makes it unlawful to engage in deceptive marketing practices or unfair methods of competition that mislead consumers, including those relating to tuition costs.

- **Lanham Act (15 U.S.C. § 1125(a))**: Prohibits false or misleading representations in advertising, enabling claims for misrepresentation if tuition prices are advertised in a way that deceives prospective students about the true cost.

- **Deceptive Pricing and Consumer Fraud Doctrines (Common Law)**: Provide a basis for claims of fraudulent inducement and misrepresentation when pricing strategies deliberately obscure actual costs.

- **Unfair Competition and Unjust Enrichment Doctrines (Common Law)**: Address conduct where an institution gains a competitive advantage through deceptive or manipulative pricing practices that harm consumers or rival schools.

- **Predatory Pricing Doctrine (Antitrust Theory)**: Though primarily used in for-profit contexts, may be analogously considered if an institution's pricing strategy artificially inflates sticker prices while selectively subsidizing costs.

## 20. Misrepresentation of graduate employment outcomes and deceptive practices in student recruitment and violations of consumer protection laws

Plaintiff raises significant concerns regarding the accuracy of employment outcome data published by the University of Chicago's Harris School of Public Policy. Based on numerous direct conversations with seniors and recent graduates of the Master of Public Policy (MPP) program many of whom held years of prior work experience Plaintiff learned that a substantial number of these individuals failed to obtain full-time employment after graduation. These findings are in stark contrast to the favourable placement data advertised on the Harris School's official website and marketing materials, which claim high post-graduation employment rates.

This discrepancy strongly suggests that the University may have misrepresented or selectively disclosed employment data in a manner intended to create a materially misleading impression of graduate success. Upon further inquiry, Plaintiff found that this trend extended beyond isolated cases, suggesting the issue may reflect a broader institutional pattern of manipulating employment outcomes to attract students.

Such conduct, if verified, may constitute a violation of the **Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2)**, which prohibits the use of deception, fraud, false promises, misrepresentation, or the concealment of material facts in connection with the sale or promotion of services. Graduate education, particularly at a tuition rate exceeding $90,000 per year, clearly qualifies as a high-value service whose marketing must be held to the standards of truthfulness and transparency under:

- Federal Trade Commission Act (15 U.S.C. §§ 41-58): Bars unfair or deceptive acts or practices in commerce and provides a basis to challenge misleading advertising in educational recruitment and marketing materials.

- Lanham Act (15 U.S.C. § 1125(a)): Offers a private cause of action for false or misleading representations in advertising, allowing recourse when employment outcome data is misrepresented to influence enrollment decisions.

- Common Law Fraudulent Misrepresentation Doctrine: Provides a remedy for situations where false statements such as exaggerated graduate employment achievements are relied upon to induce contractual agreements or enrollment in educational programs.

- Unfair Competition Doctrine: Addresses deceptive practices that distort market competition, including the manipulation of data to present an artificially favorable picture of graduate success.

- Additional Educational Regulatory Oversight: Institutions may also be held accountable by standards imposed by the U.S. Department of Education and state education agencies, which demand transparency and accuracy in reporting outcomes to protect consumer interests.



**HARRIS AT A GLANCE** | EXPLORE OUR CAREER OUTCOMES REPORT ›

Harris students are passionate, driven, and committed to positive change. Rigorous coursework in microeconomics, statistics, and analytical politics equips students with the quantitative and analytical skills to evaluate and recommend sound policies in a variety of contexts.

**1313** Students

**53** Full-time Faculty

**15** Degree Programs

**98%** of students had job offers within 6 months of graduation

**97%** of students secured employment within 6 months of graduation

**92%** of students secured employment within 3 months of graduation



quantitative and analytical skills to evaluate and recommend sound policies in a variety of conte:

**550** graduates

**40** countries represented

**97%** had job offers*

**97%** secured employment*

**89%** secured employment within three months of graduation





## Sector Breakdown**

| 24% | 36% | 40% |
|-----|-----|-----|
| Public/Government Agency | Non-Profit/NGO/IGO | Private |

## Salaries By Sector†

| Salary Range | Public/Government Agency | Nonprofit/NGO/IGO | Private |
|--------------|------------------------|-------------------|---------|
| MEDIAN | $73K | $67K | $85K |
| MAXIMUM | $172K | $147K | $200K |

See response rate details at the bottom of the page.



## 21. Inadequate educational delivery and discriminatory allocation of financial and academic resources and violations of Title VI and contractual obligations

Plaintiff further asserts that the educational experience provided by the Harris School of Public Policy was substantively deficient and failed to meet even a baseline standard of pedagogical effectiveness. Despite nearing graduation from the Master of Public Policy program, Plaintiff remained unclear on foundational concepts central to the discipline, including but not limited to the core definition and application of public policy. At no point did the institution clarify these omissions in its course syllabi, promotional materials, or official website. The University's

portrayal of the Harris curriculum as academically rigorous and practically outcome-oriented sharply contrasts with Plaintiff's experience of unstructured, ineffective instruction and ambiguous academic objectives.

Courts have recognized that while academic institutions retain considerable discretion over curriculum, students may have a viable legal claim where there is a material misrepresentation or a substantial disparity between the promised and actual educational experience. In *Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992), the court allowed an educational malpractice claim to proceed where a university failed to provide the basic skills and instruction it had advertised. Similarly, the failure of Harris to provide substantive learning outcomes constitute a breach of the implied covenant of good faith and fair dealing embedded in the student-institution contractual relationship.

In addition to academic shortcomings, Plaintiff observed preferential and discriminatory treatment toward students from specific countries, like Pakistan (Should not be limited to), and other Muslim countries as well. Multiple students personally disclosed to Plaintiff that they had received financial advantages including additional tuition funding, laptop purchase allowances, and late-stage scholarship increases despite already having been issued I-20 documents or committed to the program. Some were even permitted to transfer into relatively more desirable programs such as the MSCAPP (Master of Science in Computational Analysis and Public Policy) while simultaneously receiving enhanced additional financial aid packages. Plaintiff, who was similarly situated in terms of admission, program status, and financial need, was denied parallel benefits and not afforded the same flexibility in program changes, course enrolments, or financial reconsideration. Plaintiff suspects some MPP students are also allowed to do more than 6 courses outside Harris, as Harris have a form to take permission to which permission was immediately denied to Plaintiff.

Such differential treatment, if based on national origin,5 violates **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)**, which prohibits discrimination on the basis of race, religion, caste, colour, or national origin in any program or activity receiving federal financial assistance, and **title VII** discrimination as well. The Department of Education's **Office for Civil Rights (OCR)** has authority to investigate and enforce compliance in such matters. Additionally, the **Illinois Human Rights Act (775 ILCS 5/1-102)** prohibits educational institutions from discriminating in the allocation of benefits or academic opportunities based on protected characteristics, including national origin.

The combination of academic under delivery and discriminatory financial allocation severely undermined Plaintiff's access to equal educational opportunities. These practices contributed to Plaintiff's sense of marginalization, exclusion, and eventual disengagement, while materially impacting his educational development, professional prospects, and emotional well-being. Plaintiff respectfully asserts that such conduct forms the basis for potential claims of breach of educational contract, educational fraud, and discrimination under both federal and Illinois law, and reserves the right to pursue administrative or legal remedies accordingly.

- **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)**: Prohibits discrimination based on race, color, or national origin in any program or activity receiving federal funds;

this applies to the equitable allocation of academic and financial resources within educational institutions.

· **Illinois Human Rights Act (775 ILCS 5/1-102)**: Forbids discriminatory practices in the provision of educational opportunities and benefits by institutions, ensuring that all students receive fair treatment regardless of national origin or other protected characteristics.

· **Implied Covenant of Good Faith and Fair Dealing**: A common law doctrine requiring educational institutions to perform their contractual obligations honestly and fairly, thus mandating that promised academic quality and resource allocations are delivered as represented.

· **Breach of Contract Doctrine**: Enables claims when an institution fails to provide the educational services or benefits it has contractually promised, constituting a substantial deviation from the agreed-upon educational experience.

· **Educational Malpractice Case Example (Ross v. Creighton University, 957 F.2d 410 (7th Cir. 1992))**: Although educational malpractice claims have limited success, this precedent highlights that misrepresentations regarding the quality of academic instruction can substantiate claims of failing to deliver an advertised educational experience.









**Educational_Dish_749** · 3y ago · Edited 3y ago

I did some research even before I applied at Harris. Here is what I found.
https://harris.uchicago.edu/about/who-we-are/career-outcomes-report

Also as a test scenario, look at LinkedIn job posts by key in " Public Policy" there are so many jobs all over the country. OTP should be easy or do-able to get after graduation.

⊖  ⇧ 1 ⇩   ○ Reply   ⎇ Award   ⌲ Share   ···

> **Professional-Bar-290** · 3y ago
>
> You understand that these career outcome reports are very skewed lol. They don't show you the entire distribution of wages. I wonder why... If you're enticed by the maximum salary that they show... you do understand that you will be studying with some folks who come from engineering backgrounds and have 5+ years of experience? Probably at Harris for a vacation before they get into a technical consulting gig. I am a Harris student. Save your money.
>
> ⇧ 3 ⇩   ○ Reply   ⎇ Award   ⌲ Share   ···

**[deleted]** · 2y ago

This place sucks dude. Dont come here

⇧ 1 ⇩   ○ Reply   ⎇ Award   ⌲ Share   ···



**Iamadistrictmanager** · 1y ago

Well, well, well, look at all these PAID dweebs that came to defend the shit pedagogy at Harris. The only person here that ever says anything true is that professional bar person.

Harris is a cash cow scam, the administration could care less about you once you pay your deposit. Did you know, that without fail, year after year, the core surveys are the same, low scoring, complaints about the speed and difficulty, lack of support? Did you know that these surveys are NOT for the public to access?? Hmmm I wonder why? It's because they are overwhelmingly NEGATIVE.

People here will put the blame on the students, saying things like "they are not prepared" or they are sub par, but these dweebs are gas lighting you on behalf of the administration. They're selling out, they're the same people that will comfort you and tell you that the core is tough but it's not that bad, no ladies and gentlemen, the core is a god awful experience that is not design to teach you but rather see how efficiently you can do things for the sake of completing assignments, not for learning.

The secret is, the core is not design for people without a quant background, the exams are literally designed for the cream of the crop to finish and score high while you are left in the dust crying over your self worth because you hinged it on grades.

There's nothing at Harris for you, turn around and go somewhere else, and tell people what you learn here today, all they care about is selling selling selling you a shit experience for 60k or whatever it goes for now. Go and talk to people at the school, go look at them walk like zombies and then ask them how the job search is going.

Harris will be a nightmare unless you have a strong quant background, and if you do, why the fuck would you go for more quant skills, learn how to write which is not taught at the Harris school.

⇧ 4 ⇩   ○ Reply   ⎇ Award   ⌲ Share   ···



**22. Request for Oversight of Research Funding Use and Institutional Title IX Misconduct and Witness Intimidation and Violations of False Claims Act, Civil Rights Protections and Federal Oversight Obligations**

Plaintiff respectfully urges a comprehensive review of the University of Chicago's use of public and private research funding in light of concerns that reported research outcomes may have been exaggerated or selectively framed to secure continued funding or enhance institutional prestige. Plaintiff believes that certain University projects characterized as "flagship" or extraordinarily impactful may not correspond with the initial scope or scale of funding received. In some cases, post hoc framing may have retroactively inflated the scientific or societal value of the research to secure additional grants or media attention.

Such practices may constitute a misuse of public funds and a potential violation of the **False Claims Act (31 U.S.C. §§ 3729–3733)**, which prohibits knowingly submitting false statements or fraudulent certifications to the federal government for payment or approval. If grant outcome reports or required certifications were knowingly misrepresented to government agencies, such as the NIH, NSF, or DOE, this could trigger civil liability and justify enforcement action or whistleblower inquiry under federal law.

Plaintiff reasonably believed that certain practices involving the reporting of research assistant hours, funding allocation, or administrative handling of federally funded work at

the University of Chicago may constitute misuse of federal funds or fraudulent billing under applicable grant requirements. Plaintiff's attempts to clarify or resist such practices were met with disciplinary scrutiny and adverse action, which Plaintiff alleges constitutes retaliation under the False Claims Act, 31 U.S.C. § 3730(h), and related whistleblower protections.

Even more gravely, Plaintiff alleges that the University systematically failed to uphold its legal obligations under **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)** in responding to Plaintiff's report of physical and sexual assault by an individual identified as "Shrivatsa Thulasiram" (Exact spellings to be checked). During a subsequent meeting with the Dean of the Physical Sciences Division (PSD), rather than receiving support or assurances of an impartial investigation, Plaintiff encountered behaviour suggestive of institutional protectionism. The Dean repeatedly cited statements made by the alleged perpetrator in a manner that undermined Plaintiff's credibility and appeared designed to dissuade further inquiry. Plaintiff clearly told dean when the assaulter came back from somewhere next day after the assault and threatened plaintiff to life, said plaintiff to go back to third world home country, abused and threatened plaintiff and about his family, also said some caste abuse comments about plaintiff's caste that plaintiff belongs to lower caste then him, and he belongs doing cleaning work (Stereotype of relatively lower caste underprivileged group). Then only plaintiff agreed and asked dean to meeting again after firstly saying no to avoid hassle a live freely by paying this price of peace, but that dean kept on rejecting everything and kept saying "he said this okay, no that" especially about life threatening remarks by assaulter as told to the Dean of PSD.

Plaintiff further states, upon information and belief, that the University of Chicago have selectively shielded an individual named Shrivatsa from disciplinary consequences and investigatory action due to potential political motivations and affiliations. Plaintiff asserts that Shrivatsa, a visiting student allegedly participating in an academic exchange program, frequently espoused strong support for the **Democrat Party of USA** and related political agendas during personal conversations and social interactions, including in private settings. However, plaintiff avoided such discussions with him being politically neutral/non-interested, especially by not commenting to his thoughts.

Plaintiff contends that this political alignment, when considered alongside the timing of Shrivatsa's presence in the United States, specifically during a **most important federal election cycle** raises substantially definitive concerns regarding improper protection granted by the University for political or ideological reasons. If, as Plaintiff reasonably suspects, the University extended de facto immunity or declined to act upon legitimate misconduct allegations due to the perceived value of Shrivatsa as an individual aligned with a favoured political ideology or party, such selective enforcement would violate basic principles of institutional neutrality and fair process.

Plaintiff asserts that the University's continued protection of the individual in question despite credible allegations and substantial evidence amounts to complicity in potentially

criminal conduct, in violation of **18 U.S.C. § 4 (misprision of felony), 18 U.S.C. § 371 (conspiracy to defraud), and Illinois Criminal Code 720 ILCS 5/31-4 (obstruction of justice)**. Such institutional shielding behaviour raises serious concerns of unlawful concealment and failure to act upon known misconduct.

Such protection, if proven, may also implicate violations of the **First Amendment**, as public or quasi-public institutions are constitutionally required to refrain from viewpoint-based discrimination, particularly when such bias influences how complaints are investigated or enforced. Moreover, this conduct could potentially constitute a misuse of federally funded academic programs to indirectly influence or benefit domestic political objectives, which may be subject to further scrutiny by agencies such as the **U.S. Department of Education**, the **Department of State**, or oversight offices concerned with misuse of international educational exchange programs.

Title IX of the Education Amendments of 1972 requires universities receiving federal funding to respond to and address sexual harassment, sexual assault, and gender-based violence that affects students in an educational setting or university-sponsored activity.

Plaintiff respectfully requests that this matter be investigated by the relevant federal authorities to determine:

· Order a full investigation into the University's **handling** of the complaint against Shrivatsa.

· Arrest/ Arrest Orders for the crime he did (Sexual and Physical Assault)

· Whether foreign nationals are being used or strategically admitted to further partisan political agendas; and

· Require disclosure of all internal communications relating to protection of politically sympathetic foreign nationals during election cycles.

· Issue declaratory relief that institutional protection of individuals based on political ideology or affiliation violates constitutional and statutory law.

· Whether the University's conduct constituted unequal treatment, retaliatory suppression of Plaintiff's complaints, or a breach of public trust obligations owed by a federally funded institution.

· Refer the matter to the Federal Election Commission, Department of Homeland Security, and Department of Education for investigation into potential election-related misconduct or SEVIS abuse.

**Legal Framework Violated:**

**1. Equal Protection Clause – Fourteenth Amendment**

Prohibits public entities (and private institutions acting under the color of law or receiving federal funds) from engaging in discriminatory practices based on class, belief, or association. The University may have provided differential treatment based on ideological or political alignment, which if proven, constitutes **viewpoint-based discrimination,** a form of selective enforcement rejected by courts.

**Example**: *Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972) – The Court ruled that selective treatment based on the subject of speech violates the Equal Protection Clause.

### 2. First Amendment – Viewpoint Discrimination

Public institutions are prohibited from discriminating against individuals based on the content or viewpoint of their speech or association. Protecting one student due to political alignment while retaliating against another who dissents or files complaints constitutes unlawful viewpoint discrimination.

**Example**: *Healy v. James*, 408 U.S. 169 (1972) – Universities may not suppress student expression or association based on political disagreement or ideological alignment.

### 3. Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)

·   Prohibits discrimination based on race, color, or national origin in programs or activities receiving federal financial assistance. Providing protection or institutional support to one foreign national while neglecting or punishing another based on perceived ideological or national origin differences may trigger Title VI violations.

### 4. SEVIS/SEVP and Immigration Compliance

·   Institutions must maintain accurate, neutral, and non-political records under DHS and ICE guidelines for foreign student exchange and compliance. Institutional manipulation of exchange programs to advance political agendas or protect politically valuable students may constitute fraud or regulatory misconduct.

### 5. Federal Election Campaign Act (52 U.S.C. § 30101 et seq.)

·   Governs and restricts interference, manipulation, or fraud involving federal elections. If proven that institutions strategically hosted politically aligned foreign nationals to support domestic political objectives, it may constitute election-related misconduct or improper influence.

### 6. False Claims Act (31 U.S.C. §§ 3729–3733)

·   Prohibits false or fraudulent use of federal funds. Using federal education or research funds while shielding misconduct for ideological reasons may constitute misuse or fraudulent appropriation of public funds.

Critically, Plaintiff recalls being told, in substance, to leave the country, else plaintiff will die, the day after the incident occurred by Srivatsa. Plaintiff further states here that he got unknown phone call allegedly by some university affiliate/UCPD Staff, an alarming suggestion that constituted a perceived threat. The University's conduct, including that of the Dean, constitute **retaliation** and **witness intimidation**, in violation of **Title IX**, the **Clery Act (20 U.S.C. § 1092(f))**, and **Title IX implementing regulations (34 C.F.R. § 106.44)**, which require institutions to respond promptly and equitably to reports of sexual misconduct and protect complainants from retaliation.

The Title IX, President, Provost, offices, Harris, UCPD, and probably Board of Trustees and university senate, also, were all fully aware of Plaintiff's resource limitations and inability to pursue civil litigation, declined to take meaningful action, effectively abandoning its responsibility under federal law. Instead of initiating an investigation for action, the office initially suggested that Plaintiff's only recourse was to file a lawsuit ignoring its own statutory mandate to act regardless of the complainant's capacity to litigate. They also mentioned that plaintiff will need to go to court, hearings, and police stations multiple times and may have to hire a lawyer as well, which will further impact plaintiff's studies and goals that made. This abdication of duty enabled the accused's continued protection and seriously undermined the institution's credibility and compliance posture under Title IX.

If the accused individual was, as Plaintiff believes, a non-citizen with affiliations implicating sensitive political or institutional concerns such as student enrolment dynamics or links to electoral processes the University's decision to protect that individual despite credible allegations may further raise concerns under **obstruction of justice statutes (18 U.S.C. § 1512)** and **federal immigration enforcement frameworks**, particularly if material facts were withheld or reports suppressed to avoid reputational or political fallout.

**One written example (rest were verbal):**

resolution options available to you. I encourage you to visit our website to learn more.

It is important to note that meeting with this office would not require you to pursue any further action or obligate you to participate in any formal reporting process. The intent of the meeting is to inform you of support, resources, reporting options, and remedies available. There is no time limit on receiving these support and resources while enrolled at the University of Chicago, and you may contact our office at any point during your time at the University for assistance. This report does not automatically trigger an investigation or us contacting the individual who harmed you. In rare circumstances, we may need to move forward with these measures. If our office is considering such a step, you will be contacted and given the opportunity to connect with us further regarding your wishes.

Thank you and sincerely,


**The Center for Awareness, Resolution, Education & Support (UChicago CARES)**
Office of the Provost
Equal Opportunity Programs
The University of Chicago
uchicagocares@uchicago.edu
cares.uchicago.edu


**LLM Model Snip:** Even if this language is designed to reduce fear of retaliation but retaliation still happened.

The language:

> "...would not require you to pursue any further action or obligate you..."

is designed to reduce **fear of retaliation, legal entanglement, or pressure**, and to present the process as **optional** and **student-centered**.

However, to a survivor or complainant, it can *feel dismissive*, especially if:

- You're looking for immediate accountability,
- You expect a more proactive institutional stance,
- You've already experienced inaction (like in your CPD report).


**Reference Article:** https://chicagomaroon.com/45412/news/flagrantly-unlawful-uchicago-sues-nih-over-funding-cuts/



**23. Breach of duty of care by the university and violations of federal civil rights protections, Clery Act reporting obligations and Title IX compliance**

Plaintiff alleges that the University of Chicago owed Plaintiff, and similarly situated students, a duty of care arising from its specific undertakings and federal obligations. Although a university is generally not a legal guardian of its students, legal standards recognize that a special duty of care exists where the university:

· Acts as a sponsor for F-1 or J-1 visa holders under the Student and Exchange Visitor Program (SEVP) regulations (especially 8 C.F.R. § 214.3), thereby assuming federal responsibilities for the accurate reporting, maintenance, and protection of international student status especially when victim of a crime, and a whistleblower;

· Administers housing, health services, or **public safety programs**, which impose a duty to exercise reasonable care in protecting students from foreseeable harm;

· Undertakes obligations under **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681)** and the **Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (20 U.S.C. § 1092(f))**, both of which require active measures to prevent and address discrimination, harassment, and campus security threats.

The University's failure to exercise reasonable care in carrying out these obligations, including through negligence in grievance processing, discriminatory surveillance, mishandling of protected grievances, inadequate safeguarding of student welfare, and retaliation against whistleblowing, constitutes a breach of the recognized duty of care.

Such breaches may give rise to claims under federal civil rights statutes, state common law negligence doctrines, and regulatory enforcement mechanisms. Plaintiff respectfully requests an investigation in good faith into whether the University's conduct demonstrates a pattern of disregard for student welfare and regulatory compliance, meriting remedial action, corrective enforcement, and damages where appropriate.

Pursuant to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, codified at **20 U.S.C. § 1092(f)** and its implementing regulations at **34 C.F.R. § 668.41 and § 668.46**, the Plaintiff respectfully submits this formal request for a comprehensive federal investigation into the University of Chicago's compliance with all reporting and disclosure obligations mandated under the Clery Act.

The Plaintiff strongly believes that the University of Chicago engaging in a systematic pattern of **underreporting, misclassifying, or omitting Clery-reportable crimes**, potentially in an effort to **artificially lower its crime statistics**, thereby **misleading current and prospective students and parents**, and increasing enrolment under false pretences. If substantiated, such actions would constitute a **material violation of federal law and a breach of institutional eligibility to participate in Title IV funding under the Higher Education Act of 1965.**

The Plaintiff because of strong belief and factual self-experience hereby requests that agencies to investigate whether the University has failed to meet its obligations under the following Clery Act requirements, including but not limited to:

1. **Disclose crime statistics** annually in a report called the **Annual Security Report (ASR)**.
2. Issue **timely warnings** about crimes posing a threat to the campus.
3. Maintain a **public crime log**.
4. Develop and disclose **campus safety policies**, including for sexual violence.
5. Designate a **Clery Compliance Officer** or responsible parties.
6. Ensure **victim rights and protections** in disciplinary procedures involving crimes like sexual assault.

**Legal Violations:**

**I. Annual Security Report (ASR) Violations – 34 C.F.R. § 668.46(b)**

· Whether the institution failed to accurately include statistics for the prior three calendar years for the required criminal offenses as listed in **§ 668.46(c)**.

· Whether the ASR omits or misrepresents incidents that occurred in Clery-reportable geographic locations: on-campus, on-campus residential facilities, non-campus buildings or property, and public property adjacent to the campus.

**II. Failure to Issue Timely Warnings – 34 C.F.R. § 668.46(e)**

· Whether the University failed to promptly alert the campus community regarding crimes that represent a continuing threat to students and employees, thereby violating the timely warning requirement.

### III. Public Crime Log Incompleteness – 34 C.F.R. § 668.46(f)

· Whether the University maintains a daily crime log as required, and whether entries are updated within two business days and contain complete and accurate information regarding the nature, date, time, and general location of each crime and disposition if known.

### IV. Failure to Accurately Report VAWA Offenses – 34 C.F.R. § 668.46(c)(6)

· Whether the University has misreported or underreported crimes of **domestic violence, dating violence, stalking, or sexual assault**, either due to reclassification, omission, or lack of proper documentation and adjudication.

### V. Victim Rights in Disciplinary Proceedings – 34 C.F.R. § 668.46(k)

· Whether the institution has denied victims their rights in campus disciplinary processes, including the right to have an advisor, equal opportunity to present evidence, and simultaneous notification of results.

### VI. False Statements or Omissions Related to Title IV Eligibility – 20 U.S.C. § 1092(f)(14)

· Whether the University has knowingly provided false or misleading crime data in order to remain eligible for federal financial aid programs under **Title IV of the Higher Education Act**.

**Potential Harm and Public Interest**

This complaint alleges that the University's practices may amount to **fraudulent inducement** of enrolment, compromising student safety and violating the spirit and letter of the Clery Act. The suppression or manipulation of crime statistics creates an illusion of safety, thereby **unjustly influencing the decisions of students and families**, violating trust, and exposing individuals to potential harm.

The Plaintiff requests that the Department of Education utilize its full investigatory powers, including **data auditing, interviews with Clery Compliance Officers, Campus Security Authorities (CSAs), and examination of all incident reports, security logs, and police data**, whether campus or local.

**Relief Requested**

The Plaintiff respectfully requests:

1. A **formal compliance review and audit** of the University's Clery Act reports, procedures, and statistics.

2. **Public disclosure** of the Department's findings.

3. Consideration of **civil penalties** and possible **suspension of Title IV eligibility** should violations be substantiated.

4. **Placement of the University Under Heightened Monitoring:** Require the institution to submit regular compliance reports, undergo scheduled audits, and establish an internal Clery compliance committee reporting directly to the Department to ensure full adherence to all applicable statutory and regulatory obligations.

5. **Review of Title IV Eligibility Status:** Evaluate whether the University remains eligible for participation in federal student financial aid programs under **Title IV of the Higher Education Act of 1965**, in accordance with the Department's authority to **suspend, limit, or terminate access to Title IV funding** in cases of material noncompliance or misrepresentation.

6. **Public Disclosure of Noncompliance:** Mandate that the institution publicly disclose its noncompliance findings, corrective actions, and revised safety protocols to current and prospective students in all future Annual Security Reports and admissions materials.

7. Check if all these and proper protocol was followed in Plaintiff's Case and it was reported so that community should stay aware from that criminal.

**Legal Background:**

| Legal Theory | Key Cases or Authority | Example |
|---|---|---|
| **Negligence and Duty of Care in Education** | *Doe v. University of the South*, 687 F. Supp. 2d 744 (E.D. Tenn. 2009) — universities owe limited but real duties for student safety. | University liable for failure to address dangers. |
| **Federal Civil Rights Duty** | *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999) — schools must respond properly to known discrimination or harassment. | Title IX duty to act against discrimination. |
| **Clery Act Enforcement** | *U.S. Department of Education v. Penn State* — multimillion-dollar fines for failure to comply with Clery Act obligations. | Duty to report, warn, and prevent campus crimes. |
| **International Students Protection** | SEVP regulations require ongoing maintenance and good-faith reporting of visa holder status. | Universities must protect lawful F-1/J-1 students' rights. |

Plaintiff respectfully submits that the University's systematic failure to uphold its statutory and common law obligations constitutes a breach of duty of care warranting investigation, remedial action, compliance enforcement, and, if necessary, compensatory damages. Plaintiff further requests that regulatory bodies review the University's practices under the Title IX, Clery Act, SEVP obligations, and applicable Illinois common law to ensure accountability and protection for affected students.

## 24. Manipulation of governance structures misuse of nonprofit status and co-optation of student government and violations of fiduciary obligations and governance transparency

Plaintiff raises serious concerns about the University of Chicago's manipulation of formal and informal governance mechanisms designed to foster community input, student representation, and institutional transparency. Specifically, Plaintiff highlights the use of the **Public Safety Advisory Council** and the **Chicago Forum for Free Inquiry and Expression** and such institutes and communities, as performative platforms that present an illusion of democratic engagement while functioning in practice as policy-laundering tools for upper administration. Rather than promoting open dialogue or representing diverse voices, these bodies appear to **rubber-stamp predetermined policy outcomes**, systematically excluding dissenting student voices and genuine community participation. Such a pattern of conduct runs contrary to the University's public mission, student governance charters, and general expectations of participatory governance in higher education.

This systemic undermining of participatory rights, if found to conflict with contractual representations made in student handbooks, governance charters, or program brochures, may support legal claims under **contract law theories** or the **implied covenant of good faith and fair dealing** (see *Tedeschi v. Wagner College*, 49 N.Y.2d 652 (1980)). Institutions that advertise inclusive, democratic governance but substitute scripted and non-transparent mechanisms may also be vulnerable to reputational and regulatory scrutiny, particularly if such misrepresentations influence student enrolment decisions or silence protected expression.

Plaintiff further challenges the University's continued use of **nonprofit status under 26 U.S.C. § 501(c)(3)**, arguing that its fiscal behaviour is increasingly indistinguishable from that of a for-profit entity. Despite receiving hundreds of millions of dollars in tax-exempt revenue from endowments, grants, and donations, the University has implemented extensive cost-cutting measures affecting faculty support, academic programming, community programming activities, and student services. This discrepancy raises concerns about **private inurement** and the potential **misrepresentation of mission-aligned expenditures**, both of which are prohibited under IRS nonprofit guidelines. If the University has misused tax-exempt funding while representing itself as a nonprofit organization, such actions may also be actionable under the **False Claims Act (31 U.S.C.**

**§§ 3729–3733)**, especially if false certifications of compliance or need were submitted in funding applications or public filings.

Finally, Plaintiff asserts that the **Harris Student Government**, a body ostensibly created to represent student interests, operates as an administrative extension rather than an autonomous voice. Throughout Plaintiff's academic tenure, this group was observed **consistently mirroring administrative narratives**, failing to challenge decisions adversely affecting students, and contributing to the institutional silencing of dissent. In matters involving **disciplinary appeals, budget allocation, and public communications**, the student government appeared aligned with the administration, to the detriment of independent advocacy. Such conduct, if accompanied by deceptive representations of independence or accountability, may support claims of **misrepresentation, breach of student trust**, or violation of campus governance policy.

These cumulative practices ranging from **whitewashing through governance bodies**, to **potential nonprofit abuse**, to the **co-optation of student government** demonstrate a broader institutional pattern of **undermining democratic values, legal transparency, and fiduciary obligations**. Plaintiff respectfully urges oversight and investigation by federal and state regulators, including the **Internal Revenue Service**, the **U.S. Department of Education**, and relevant **nonprofit oversight entities**, to determine whether the University is operating in accordance with the laws, standards, and commitments it has publicly made to its community and the broader public.

- o  Violation of the implied covenant of good faith and fair dealing by substituting participatory governance mechanisms with performative advisory bodies that exclude dissenting voices and preempt genuine deliberation.

- o  Potential breach of contract where representations in student handbooks, charters, and promotional materials promised democratic governance and inclusion but were not fulfilled, consistent with the reasoning in Tedeschi v. Wagner College, 49 N.Y.2d 652 (1980).

- o  Potential violation of IRS nonprofit status requirements under 26 U.S.C. § 501(c)(3) where the University's fiscal conduct reflects private inurement or diversion of charitable assets for non-charitable purposes.

- o  Grounds for investigation under the False Claims Act (31 U.S.C. §§ 3729–3733) if the University made false certifications regarding nonprofit use of funds or misrepresented compliance in connection with federally funded grants or tax-exempt funding.

- o  Deceptive practices and misrepresentation through the operation of student governance bodies (e.g., Harris Student Government) as administrative proxies rather than independent student-led bodies, potentially supporting claims of institutional fraud or consumer deception.

- o  Systemic governance misconduct amounting to whitewashing of controversial decisions through curated public forums (e.g., Public Safety Advisory Council,

Chicago Forum for Free Inquiry and Expression), undermining institutional transparency and accountability.

o Failure to uphold fiduciary obligations and public trust inherent to tax-exempt academic institutions, thereby meriting regulatory review by the IRS, U.S. Department of Education, Illinois Attorney General's Charitable Trust Bureau, and other nonprofit compliance agencies.

o Suppression of protected expression and participation in academic governance, which may implicate academic freedom principles and violate university policy or federal education standards when tied to public funding.

**25. Disparate treatment in workplace amenities and creation of a hostile environment and violations of Title VII and workplace discrimination protections**

Plaintiff also recounts an incident reflective of broader patterns of subtle exclusion and disparate treatment in the workplace. On one occasion while obtaining a second cup of coffee in a shared staff area, Plaintiff was subject to a comment by a fellow staff member, Cory, who remarked within discussion with other staff members Kerry and Shomari "You drink a lot of coffee, we're to order again and again because of you." Write after laughingly both other also acknowledge the statement saying "Yes man". Although seemingly casual on its face, this remark was directed exclusively at Plaintiff and was not made to any other student or full-time staff member, despite the general availability of coffee and snacks for all employees in the office.

The selective nature of this comment, in context, led Plaintiff to feel personally singled out, unwelcome, and subject to a standard of scrutiny not applied to others. Following the incident, Plaintiff began refraining from accessing shared office amenities like coffee or snacks, despite their open availability, out of discomfort and a desire to avoid further judgment or subtle ridicule. When such microaggressions occur in a pattern especially when aimed at individuals of certain protected classes they may collectively contribute to the creation of a **hostile work environment**, which is actionable under federal and state civil rights laws if motivated by discriminatory bias.

Plaintiff further states that members of the Student Services and Career Services (SSCS) staff, in professional communications, responded to Plaintiff's written expression "AI sir" with mockery, including a verbal retort of "Aye, sir," delivered in a laughing and dismissive tone. Additionally, Plaintiff recalls instances in which SSCS staff made inappropriate remarks trivializing racially charged references such as former President Trump's controversial "dog-eating" comments during political discussions. Plaintiff reasonably perceived these remarks as culturally insensitive and unprofessional, contributing to a hostile or dismissive environment toward individuals of minority background. These interactions, taken in context, reflect a broader pattern whereby University staff members appear to express and reinforce specific political viewpoints

within professional settings, suggesting a lack of institutional neutrality. Plaintiff asserts that such conduct is unprofessional and fosters an environment where individuals who do not align with, echo, or remain silent in response to the prevailing political tones or cultural views of certain staff may face implicit bias, exclusion, or adverse treatment. This raises concerns about ideological favouritism and the suppression of diverse viewpoints, in violation of principles of fairness and equal treatment.

In addition, Plaintiff allegedly was also subjected to a verbal abuse by a staff member, Kerry Sharkey, who stated in a **serious and threatening tone** that the Plaintiff "you are fired," then after some time laughed and dismissed the remark as a joke. Plaintiff also believe Kerry also said things in bad faith about visa status as an international student, that it'll be cancelled soon. This happened in office when almost all staff including students were allegedly present, and everyone was listening that also felt like public humiliation. This statement occurred one day prior to the Plaintiff's actual termination from, SSCS role, that happened right after raising concerns and having back and forth chat with union eligible role supervisors, about Mansueto union eligible role. This conduct constitutes an instance of reckless and abusive language, potentially falling under the common law tort of **Intentional Infliction of Emotional Distress** ("IIED"), as recognized in *McGrath v. Fahey*, 533 N.E.2d 806 (Ill. 1988), where the Illinois Supreme Court affirmed that conduct must be "so extreme and outrageous" as to go beyond all **bounds of decency**. Here, the threat made by Sharkey exploited a clear power imbalance and directly preceded actual termination, enhancing its menacing character. As a direct result of the statement made by Kerry Sharkey, the Plaintiff experienced emotional distress and torture, that manifested in physical symptoms, including rapid heartbeat, shortness of breath, pale face, chest pain, and a sense of suffocation, **arising from the fear of imminent job loss**. This conduct created a hostile and intimidating work environment, causing the Plaintiff to feel threatened and psychologically tortured, even if briefly.

Additionally, this incident may represent a pretextual threat that could be used to demonstrate threatening, retaliatory or discriminatory intent, depending on the surrounding circumstances. Nothing anything like that was said to any other employee or student employee.

Under **Illinois employment doctrines**, an employer can't violate **public policy (and its exceptions)**, **federal law**, or **state law;** *Duldulao v. Saint Mary of Nazareth Hospital Center*, 505 N.E.2d 314 (Ill. 1987). Threats of termination, may be illegal per se, may be actionable when used to intimidate, retaliate, or harass in violation of Title VII of the **Civil Rights Act of 1964** (42 U.S.C. §2000e), the **Illinois Human Rights Act** (775 ILCS 5/1-101 et seq.), or **retaliation provisions** of the **Fair Labor Standards Act** (29 U.S.C. §215(a)(3)). Federal labor protections under the National Labor Relations Act (NLRA, 29 U.S.C. § 151 et seq.) also prohibit employers from threatening employees. Such conduct may also run afoul of protections under the Illinois Whistleblower Act (740 ILCS 174), if connected to a retaliatory motive of Mansueto role union eligible issues.

These comment rise to the level of a civil rights violation, when considered alongside the broader record of differential treatment, institutional retaliation, and exclusion outlined in this complaint, it adds to the mosaic of evidence suggesting discriminatory animus and workplace hostility. **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)**, as well as the **Illinois Human Rights Act (775 ILCS 5/1-102, 5A-103)**, protect individuals from differential treatment and harassment based on race, religion, national origin, or other protected categories. In workplace discrimination jurisprudence, even facially minor slights can support a hostile work environment claim if they occur in a pattern and are shown to have altered the conditions of employment (*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)). The National Labor Relations Act (29 U.S.C. § 158(a)(1)) prohibits employer threats that interfere with employee rights, and the Fair Labor Standards Act (29 U.S.C. § 215(a)(3)) prohibits retaliation against employees asserting wage-related rights.

Moreover, under the Restatement (Second) of Torts § 46, liability for emotional distress arises when one by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress. Sharkey's actions combining a credible threat of job loss with subsequent ridicule can be construed as such extreme conduct, particularly due to the proximity of the statement to the actual termination.

On constitutional grounds, employment with a private entity may have direct constitutional claims considering federally funded, non-profit and tax exempt status, if this occurred in a private university acting as public university context, involved public and federal funding or authority (e.g., the University of Chicago), the First and Fourteenth Amendments of the U.S. Constitution, as applied through Pickering v. Board of Education, 391 U.S. 563 (1968), and due process protections may be implicated. The Illinois Constitution, Article I, Section 17, affirms equal protection and freedom from discrimination, reinforcing statutory protections. A **private university can be considered a "state actor"** and therefore subject to constitutional constraints like due process or free speech **when it is acting "under color of state law" or in a "public function."** This doctrine stems from U.S. constitutional law, especially under **42 U.S.C. § 1983** and **Fourteenth Amendment** jurisprudence.

A private university may be deemed a state actor when it performs duties that are traditionally and exclusively the province of the state particularly in areas such as public education and employment regulation thus subjecting its conduct to constitutional scrutiny under the Fourteenth Amendment and 42 U.S.C. § 1983. This doctrine, known as the "public function exception," was articulated in Marsh v. Alabama, 326 U.S. 501 (1946), and extended through Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001), where the Court held that substantial government entwinement could convert private conduct into state action.

In Illinois, education is a core state function under Article X, Section 1 of the Illinois Constitution, which mandates that "the State has the primary responsibility for financing

the system of public education." Likewise, employment within educational institutions implicates state labor regulations and Title VII protections under 42 U.S.C. § 2000e, particularly where universities receive federal funds and benefit from 501(c)(3) tax-exempt status, obligating them to comply with federal civil rights statutes and public accountability standards.

Further, when private universities operate state-funded programs, enforce state disciplinary frameworks, employ campus police, or receive substantial public funding, they may be functionally indistinguishable from public institutions. In such cases, due process rights may attach, and courts have allowed constitutional claims under Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982), and West v. Atkins, 487 U.S. 42 (1988).

So, the defendant university, while nominally private, operates with significant state entwinement and performs core governmental functions namely, the administration of educational services, policing, and employment oversight which are historically public in nature. Pursuant to the **public function doctrine** (*Marsh*, 326 U.S. at 506) and **entwinement analysis** (*Brentwood*, 531 U.S. at 302), and in light of its federal funding, tax-exempt status, and invocation of state-delegated policing powers, its conduct constitutes state action for purposes of constitutional liability under **42 U.S.C. § 1983** and **U.S. Const. amend. XIV**.

Accordingly, Plaintiff includes this incident as part of the broader context of workplace discomfort, exclusion, and subtle discriminatory messaging that collectively reinforced Plaintiff's sense of isolation and unequal treatment in the office setting.

1. **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)** – Prohibits employment discrimination and harassment based on race, color, religion, sex, or national origin.

2. **Illinois Human Rights Act (775 ILCS 5/1-102, 5A-103)** – Provides state-level protection against discrimination in employment on the basis of race, religion, ancestry, and other protected characteristics.

3. **Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)** – U.S. Supreme Court clarified that a hostile work environment need not involve overt threats or economic harm; instead, repeated and targeted conduct that undermines dignity and comfort in the workplace can suffice.

4. **National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002)** – Hostile work environment claims can be based on a series of events over time, even if individual acts may not be actionable on their own.

5. **Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986)** – Affirmed that unwelcome conduct of a discriminatory nature can create a hostile or abusive working environment under Title VII.

6. **"Mosaic of Evidence" Doctrine** – Courts recognize that discriminatory intent can be shown not by one act but through an accumulation of subtle acts, microaggressions, and circumstantial evidence (see *Sylvia v. Wis. Dep't of Corr.*, 2022 WL 4016594 (7th Cir. 2022)).

7. **Illinois Constitution, Article I, Section 17** – Guarantees freedom from discrimination in employment settings, reinforcing the policy goals of the Illinois Human Rights Act.

8. **EEOC Guidelines on Harassment** – Clarify that even non-severe conduct may be actionable if it is part of a persistent pattern that contributes to an intimidating or offensive work environment.

9. **Crawford v. Metro. Gov't of Nashville, 555 U.S. 271 (2009)** – Protects individuals from retaliation for opposing discriminatory practices, including speaking up about hostile behavior.

10. **Constructive Discharge Doctrine** – If workplace conditions become so hostile that a reasonable person would feel compelled to resign, courts may treat it as unlawful termination.

**Examples of Relevant Case Law & Doctrines:**

· *Doe v. Calumet City*, 641 N.E.2d 498 (Ill. 1994): Affirmed tort liability when authorities acted with callous disregard for emotional consequences.

· *Harris v. Forklift*, 510 U.S. 17 (1993): Defined psychological harm in hostile work environments.

· *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997): Addressed retaliatory motives as part of post-employment conduct.

· *Richards v. U.S. Steel*, 869 F.3d 557 (7th Cir. 2017): Found threats of termination could be part of a retaliatory pattern when close in time to protected conduct.

Given the hostile, coercive nature of the comment, the Plaintiff asserts that this incident whether considered independently or as part of the broader context of termination contributes to a claim of **constructive discharge**, **retaliation**, and **intentional emotional harm**, in violation of **state and federal employment law**.

## 26. Coercive course evaluation practices misrepresentation of educational quality and academic integrity violations and violations of consumer protection laws and educational fairness standards

Plaintiff further alleges that the University of Chicago employed coercive tactics to compel students to complete course evaluations before the academic quarter concluded by placing administrative holds on student accounts if evaluations were not submitted. While course feedback systems are generally designed to promote pedagogical improvement, the University's approach requiring completion as a condition for continued academic access created an environment where students, including Plaintiff, felt **pressured to rate courses more favourably** than merited.

Plaintiff contends that the imposition of account holds effectively conditioned academic progression on participation in a feedback process that lacked genuine freedom of expression. In practice, this policy disincentivized honest criticism, especially for courses

that were substandard in content, clarity, or learning outcomes. Plaintiff, in particular, found several courses to be **pedagogically inferior**, with unclear instructional goals, minimal applied relevance, and less academic rigor than courses offered at local or lesser-ranked institutions. Nevertheless, due to fear of administrative consequences or academic delays, Plaintiff felt compelled to submit evaluations under conditions of duress, undermining the reliability of the feedback process and obscuring systemic issues in academic quality. Plaintiff also observed that after submitting bad evaluations grades of such subjects get further decreased.

Such practices may rise to the level of **constructive misrepresentation** or breach of implied contractual expectations between the University and its students. Where an institution advertises academic excellence and rigor but systematically prevents or manipulates feedback that would reveal deficiencies, it may be liable under **state consumer protection statutes**, such as the **Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2)**. Courts have also recognized that misrepresentation of educational value or suppressing mechanisms for redress can support claims for breach of educational contract or good faith (*Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992)).





**Legal theories that are potentially violated:**

- o Breach of Contract – Based on catalog/policy promises.
- o Breach of Implied Covenant of Good Faith and Fair Dealing – Course did not reflect reasonable academic standards.
- o Consumer Fraud / Deceptive Practices – If university made exaggerated or false claims in marketing.
- o Educational Malpractice

**Plaintiff respectfully states** that prior to enrolling at the University of Chicago, he participated in an meeting with an individual affiliated with the Harris School of Public Policy. During that meeting, Plaintiff inquired about the good quality of coursework, faculty engagement and quality, and benchmark research opportunities at Harris. The individuals, represented the Harris school, made strong assurances regarding the rigorous academic environment and extensive research integration available to students. Relying on these representations, Plaintiff ultimately decided to enroll. However, upon commencing his studies, Plaintiff did not experience the academic rigor or research access as had been represented and found the course quality and institutional support to fall substantially short of those assurances.

**Plaintiff further states** that a material inducement to enroll in the Harris School of Public Policy was the expectation of obtaining academic and professional letters of recommendation from faculty members (Plaintiff asked since they claimed world class faculty) during the same meeting as abovesaid, which are critical for advancement to higher studies and employment opportunities. Prior to enrolment, Plaintiff directly raised this concern during an initial meeting with a representative of the Harris School, who assured Plaintiff that professors routinely support students through academic and industry recommendations for graduate programs and job placement. Relying on these representations, Plaintiff chose to join the program. However, despite making formal and informal requests to multiple faculty members who had directly instructed him, Plaintiff

was denied recommendation letters in all instances. In several cases, faculty responses were not only **negative but also dismissive and abusive or unprofessional in tone**. As a result, Plaintiff was deprived of a key academic benefit promised as part of the program, which constitutes a material misrepresentation and breach of the reasonable expectations created by the University's agents and communications.

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

He did say no to recommendation in meeting

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**No revert from him after that**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

**[Data Redaction]**

 **[Data Redaction]**

Other Professor like Saba Devdariani, Zarek Brot-Goldberg, Luis Martinez, Naveen Kumar, said no to recommendation when Plantiff asked them after their respective classes.

**Various queries and request got ignored**

**[Data Redaction]**

**Plaintiff further assert** that the quality of academic instruction and student-faculty engagement within the program fell substantially below reasonable academic standards. Plaintiff observed a pervasive lack of meaningful feedback from instructors, including inadequate or delayed responses to assignments and absence of substantive commentary that would facilitate learning or improvement. Additionally, Plaintiff notes a general absence of professional or supportive interaction between faculty and students, which undermined both academic progress and the educational environment. This matter was also hot topics during the Harris Student Government Election, since most of the students appeared to be aggreging to that.

Furthermore, Plaintiff raises concern that there was a failure by certain instructors to adhere to clear or consistent grading rubrics, resulting in apparent inconsistencies and opacity in the assessment process. Plaintiff asserts that this issue warrants further discovery and investigation, as the lack of transparency and objectivity in grading practices may indicate broader systemic deficiencies affecting the academic integrity and reliability of course outcomes.

**Plaintiff further adds** that during a course named management matters taught by **Professor John Burrows,** Plaintiff was subjected to demeaning treatment that adversely affected his educational experience and mental well-being. Specifically, during class, Professor Burrows called Plaintiff an **"idiot"** when Plaintiff asked a question**, an** incident that caused significant emotional distress and led Plaintiff to avoid further academic interaction with the professor, including refraining from attending office hours or seeking academic guidance. **Plaintiff further states** that the professor in question was aware of Plaintiff's documented disability status at the time of the incident. Despite this knowledge, the professor made a demeaning and disparaging remark toward Plaintiff, which Plaintiff reasonably perceived as discriminatory and derogatory in nature. The professor's conduct contributed to Plaintiff's belief that he was being targeted and diminished on the basis of his disability, thereby exacerbating the emotional and educational harm suffered. This was one of the factors that made plaintiff loss of faith in the university. Such conduct, if proven, may constitute discrimination in violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and applicable state anti-discrimination statutes. Plaintiff acknowledges that the precise content of the question asked, the specific date and time of the incident, and the classroom context in which the exchange occurred are no longer within Plaintiff's recollection. However, the emotional and academic impact of the event was substantial and enduring. Plaintiff's inability to recall these details is due in part to the trauma and stress induced by the professor's comment and the hostile environment that followed.

As a result, Plaintiff shifted his approach toward the course from one of active engagement to minimal compliance, focusing solely on completing the requirements without expectation of meaningful instruction or respect. Despite having expressed negative feedback through the course evaluation, Plaintiff later approached Professor Burrows for a recommendation letter due to limited faculty options. Professor Burrows initially said yes in class before the course evaluation filing, and later rudely refused the request in a manner that Plaintiff perceived as unnecessarily harsh and disrespectful. This incident further illustrates the lack of professional faculty support and the emotionally hostile academic environment that Plaintiff was subjected to during the program.

Plaintiff do not expect demeaning or dehumanizing language from any member of the faculty. The comment was not only disrespectful but also undermines the professional and educational environment that plaintiff expect to experience. Plaintiff believe these remarks indicate a misuse of authority, which contributes to a culture that fails to respect student

dignity. Further plaintiff thinks that plaintiff was not enslaved by this professor, Harris school, and university that they can say whatever they want, and control however they want.

**Plaintiff further states** that upon arriving in Chicago, he resided in an apartment shared with a recent graduate of the Harris School of Public Policy who had previously accumulated approximately five years of professional experience before enrolling in the MPP program. That individual was, at the time, employed in the Applied Data Fellowship a program known among students for offering relatively low compensation (approximately $40,000 per year), raising questions in Plaintiff's mind about the program's effectiveness in supporting high-level career advancement as promoted by the school.

When Plaintiff sought guidance from this graduate regarding course selection and faculty quality, the graduate expressed serious concerns, stating that the majority of professors were new hires with limited experience and that faculty turnover, especially in core courses, was high. He advised Plaintiff that the newly appointed instructors lacked effective teaching skills and that the overall instruction quality was well below the standard expected from a so-called "world-class faculty."

These statements were corroborated by Plaintiff's own experience. In the core curriculum consisting of six foundational courses taken over two quarters, Plaintiff found that the professors lacked the instructional proficiency, academic leadership, and mentorship typically associated with so called "leading graduate institution". The reality of instruction at Harris School was thus materially inconsistent with the representations made during admissions and orientation, further contributing to Plaintiff's dissatisfaction and harm.

In this context, Plaintiff argues that the University's evaluation policy served not as a tool for improvement, but as a mechanism for **reputation management** forcing compliance while silencing criticism. This contributed to Plaintiff's belief that he did not receive the standard of education promised and that the institution failed in both academic delivery and in the provision of a transparent, student-responsive academic environment. As such, Plaintiff reserves the right to raise this issue as part of a broader claim for educational fraud, breach of contract, or negligent misrepresentation.

**Laws violated (But not limited to):**

- Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2) through coercive course evaluation policies that misrepresented academic freedom and suppressed criticism of educational quality.
- Breach of implied contract where academic marketing materials promised instructional quality, faculty expertise, and student-responsive policies that were not delivered.
- Breach of the covenant of good faith and fair dealing for conditioning academic access on mandatory feedback and creating academic environments that penalized criticism.

- Educational fraud or negligent misrepresentation when the institution induced enrollment based on representations of "world-class faculty" and "rigorous core curriculum" that did not reflect actual program delivery.

- Discrimination under the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) for demeaning treatment by a professor who had prior knowledge of Plaintiff's disability.

- Violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) for discriminatory educational practices and hostile instructional environment toward a student with a known disability.

- Title IX implications (20 U.S.C. § 1681) where retaliatory behavior or gender-based academic harm was present (if additional evidence supports a Title IX nexus).

- Violation of basic educational fairness standards by implementing grading practices that lacked transparency, consistency, or objectivity, undermining academic integrity.

- Hostile academic environment claim where emotional harm and discriminatory conduct by a professor altered the conditions of educational access.

- Supporting authority: Ross v. Creighton University, 957 F.2d 410 (7th Cir. 1992), affirming that where a university fails to deliver promised academic value, a claim for breach of educational contract or misrepresentation may proceed.

- Constructive coercion through administrative account holds constitutes duress, invalidating the voluntariness of feedback, and undermining student speech rights.

- Suppression of honest academic feedback compromises institutional accountability and may warrant oversight by the Illinois Board of Higher Education or Department of Education under federal funding compliance rules.

- Misuse of nonprofit status and tuition revenue when academic quality falls materially short of advertised expectations, triggering possible IRS nonprofit scrutiny.

- Adverse faculty behavior, when systematically unaddressed, supports a claim for negligent retention or supervision by the university.

- Denial of meaningful access to education and constructive exclusion in violation of ADA/504 and university handbook policies.

## 27. Political Viewpoint Discrimination and Retaliation for Association with College Republicans Violates First Amendment Protections and Equal Treatment Rights

Plaintiff asserts that his association with the University of Chicago's chapter of the **College Republicans** may have been a contributing factor in the pattern of retaliation, exclusion, and abrupt actions taken against him. Although Plaintiff identifies as politically neutral, he attended several Republican student group meetings out of interest and civic engagement. Following this participation, Plaintiff became aware that images from those events may have been circulated online, including via public Instagram posts such as:

Plaintiff believes that this association have been viewed unfavourably by university officials, faculty, or administrative decision-makers, particularly given what Plaintiff characterizes as a **politically skewed campus and administrative environment** favouring

opposing ideological positions. If true, Plaintiff's experiences would support a claim of **viewpoint discrimination**, which is especially concerning in the context of an academic institution where freedom of thought, expression, and political association should be safeguarded.

Under **the First Amendment**, as interpreted in public university settings, and via analog principles sometimes extended to private universities receiving federal funds (via **Title VI and Title IX** frameworks), students may not be penalized, excluded, or treated adversely based on their **political beliefs or affiliations**. In *Healy v. James*, 408 U.S. 169 (1972), the U.S. Supreme Court recognized that student organizations reflecting unpopular or controversial political views are entitled to the same protections as any other group, and institutions may not deny students rights or access based on their expressive associations.

To the extent the University is shown to have acted adversely toward Plaintiff based in whole or in part on his attendance at College Republican events, such actions may constitute **retaliation for protected expression**, or more broadly, **political discrimination**. This claim is strengthened by the broader context of Plaintiff's complaint, including the **lack of due process**, **disparate treatment**, and **institutional retaliation** following protected activity.

Plaintiff respectfully includes this as further evidence of targeted treatment and a hostile environment fostered by the institution toward individuals associated with particular political beliefs. Plaintiff reserves the right to seek relief based on constitutional theories of **freedom of association**, as well as under applicable state civil rights protections and institutional non-discrimination policies.

**[Data Redaction]**


- **First Amendment of the U.S. Constitution**: Protects freedom of thought, expression, and association including in the context of political speech even when extended by analogy to private universities that receive federal funds.

- **Healy v. James, 408 U.S. 169 (1972)**: Establishes that student organizations, regardless of the political views they represent, are entitled to constitutional protections, and institutions may not deny rights or access based solely on expressive associations.

- **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.)**: Prohibits discrimination based on race, color, or national origin in any program receiving federal funds, and by extension can support claims against adverse actions motivated by politically informed biases.

- **Title IX Frameworks (by analogy)**: Although primarily focused on sex discrimination, the principles of non-discrimination and equal access may be invoked when analyzing adverse treatment in educational settings where political affiliation is a factor.

- **State Civil Rights Protections and Institutional Non-Discrimination Policies**: Many states, including Illinois, provide statutory protections that bar discrimination based on political beliefs or associations; these can support claims of unequal treatment in academic and employment decisions.

- Violation of First Amendment principles of freedom of expression and association where institutional retaliation is based on Plaintiff's attendance at political meetings, particularly if federal funding or public functions apply.
- Viewpoint discrimination in violation of Healy v. James, 408 U.S. 169 (1972), which protects students' rights to engage in political association without penalty, including unpopular or minority political viewpoints.
- Retaliation against political expression potentially actionable under federal civil rights laws if the University receives federal funding (Title VI, Title IX analogs).
- Violation of Illinois Human Rights Act (775 ILCS 5/1-103(Q)) prohibiting political affiliation discrimination if such motive influenced adverse academic or employment action.
- Breach of institutional non-discrimination and student conduct policies promising ideological neutrality and equal treatment regardless of political beliefs.
- Retaliatory discipline or exclusion based on protected expressive conduct, contributing to a hostile educational environment in breach of educational fairness doctrines.
- Digital surveillance and reputational harm from the unauthorized or targeted use of social media images may raise privacy and retaliation concerns under institutional IT and FERPA-aligned policies.
- Selective enforcement of disciplinary action following visible political attendance signals pretextual motive and can support inferences of discriminatory animus.
- Plaintiff's inclusion of political affiliation retaliation bolsters his overall retaliation and hostile environment claims by illustrating consistent adverse treatment following protected expression.
- Pattern of chilled speech and intimidation in academic settings is inconsistent with federal education standards and the University's stated commitments to diversity of thought and free inquiry.

**Links:**

niche.com/colleges/university-of-chicago/students/

chicagomaroon.com/22440/news/class-2020-survey/

jamesgmartin.center/2023/05/the-university-of-chicago-isnt-living-up-to-its-principles/







SEARCH 🔍                    JOIN US    SUBSCRIBE

## Experiences

Respondents to the survey tended to not be very religious, with 68.08% saying they were "Not very religious" or "Not religious at all". This was reflected in respondents' religious identifications, as 45.8% of students said they were either Atheist or Agnostic. Respondents were very liberal, with 73.89%, almost three-fourths, saying they are somewhat or very liberal. Regarding gap years, students were much more likely to take a gap year if they went to a non-public high school. However, students who are wealthier aren't dramatically more likely to take a gap year; 4.2% of students whose families make over $500,000 took a gap year, versus 9.3% of students who went to private school.





industrial policy and objectives.

The position I'm identifying stems not just from preferences or values but from economics: The university will, as a routine institutional behavior, take money from most sources, and it will do what those sources generally wish. The scientific method, or rational empiricism, can be modified or suspended as necessary; specific ends can be served if the means are provided. (About this, more below.)

Of course, the Chicago Principles are functional as a first-order practice (that is, as a general, everyday campus observation or pledge). But their establishment can also have larger strategic purposes: They sound welcoming, mature, and independent, even if they turn out to be window dressing. In other words, they may be a curtain, behind which is more political partisanship than you might expect.

This is where the university's actual behavior becomes more interesting. What is the University of Chicago doing *in practice* that turns free speech into doublespeak?

The head of the university's Board of Trustees, David Rubenstein, is a long-time, active DNC political donor, as well as the former head of the defense and security-sector hedge fund The Carlyle Group. He has embraced the BLM movement and went so far as to finance the rewriting of American history by underwriting a multi-million-dollar thematic re-design of Founder James Madison's home to favor "antiracist" narratives and exhibits. The board also includes the Pritzker family, one member of whom is the current progressive-Democrat governor of Illinois, known for his devotion to special interests.

The president of the university is advised by a full-time senior consultant who was Michelle Obama's White House chief of staff, while former Obama aide David Axelrod was, until recently, the director of the University of Chicago's Institute of Politics, a partisan political-advocacy center that masquerades as a student-training program, even as the nearby Obama Foundation acts as a political-influence organization that

---

partisan political-advocacy center that masquerades as a student-training program, even as the nearby Obama Foundation acts as a political-influence organization that finances and promotes political ideologies through an "Obama Scholars" program on campus. Speakers at UChicago's left-leaning law school are nearly exclusively from one political party, and when a conservative does show up, UChicago Law can report to the manners of an elementary-school playground.

*The hiring of so many progressives is a structural flaw that prevents the realization of consistent heterodoxy.*

<span>&#9426; &#xf09a; &#xf0e1;</span>

Chicago's economics department is an interesting case, as well, because it is arguably what the university is best known for. Along with the business school, the economics department is the intellectual and commercial core of the university where Nobel awards, alumni density, corporate relationships, and more are concerned. The economics department produced the "Chicago School," with its culture of merciless academic confrontation based on facts and data. (Chicago Ph.D. and Stanford professor Thomas Sowell calls such economics a "contact sport.") Yet even here, the university's ability to maintain an objective, empirical posture is compromised by excessive "revolving-door" hiring of senior, partisan government officials. Former Obama administration economist Michael Greenstone heads up the university's Becker Friedman Institute, along with "EPIC," the UChicago energy policy institute that acts as an unofficial White House green-energy-policy center. (Note Greenstone's active congressional lobbying.) Former Obama administration chairman of the Council of Economic Advisers, Professor Austan Goolsbee, is also an active political ideologue and casts many economic policy problems as if he were still representing the former president.

The South School of Business's Stigler Center has also been "captured" to some extent by a left-leaning bias and is active in partisan public affairs—for example, by supporting cellphone tracking of Americans' movements or "repeat voting" when progressives don't get their way the first time. Whatever the Chicago Principles say,

---

supporting cellphone tracking of Americans' movements or "repeat voting" when progressives don't get their way the first time. Whatever the Chicago Principles say, the hiring of so many political progressives is a structural flaw that prevents the realization of consistent heterodoxy. The few conservative faculty who exist can be marginalized easily enough.

Indeed, when one looks closely at recent university actions (including, for example, a move to keep a conservative student group off campus), one sees an institution that is trying to thread the needle between taking a stand on free speech and accommodating the political interests of the progressive Left that actually runs the university. Thus, it is unsurprising to read that a business professor "spent much of [his] last few years of teaching afraid," that many students are "hostile to attempts at bipartisan, thoughtful discussion," and that the academic catalog is full of "crazed left-wing course listings."

The fascinating thing about the "Chicago Principles" is that they even exist at all. Would a statement that declares different opinions tolerable be taken seriously if the subject were physics? Or astronomy, chemistry, or aerospace engineering? Why is it necessary to formalize, at an institution of higher learning, a willingness to hear all viewpoints that contribute to knowledge? Since when do we think it noteworthy in America that a university "allows" different perspectives?

What good, then, are the Chicago Principles and the Kalven Report? Free speech is not, in its ideal form, merely an accommodation of opposing viewpoints but a *structural, institutional configuration* that comprises actual, tangible heterodoxies, informed in large part by hiring. Little actual heterodoxy exists on UChicago's campus, either in its faculty or within its administrative ranks. Yes, the principles have some "teeth," but in its institutional and operating culture, the University of Chicago is part of the ideological uniformity of higher education. In this way, it forms a "trust" with schools such as Harvard, Yale, Stanford, and Berkeley, which have consolidated higher education's political ideologies. The "ideals" may be different, but the outcomes are largely the same.



schools such as Harvard, Yale, Stanford, and Berkeley, which have consolidated higher education's political ideologies. The "ideals" may be different, but the outcomes are largely the same.

*Matthew G. Andersson is a graduate of the University of Chicago, a technology professional, a former CEO, and the author of the forthcoming book* Legally Blind, *concerning how ideology affects law and policy.*

administration ■ Chicago Principles ■ Kalven Report ■ political diversity ■ safe spaces ■ trigger warnings ■ University of Chicago ■ viewpoint diversity

Author
Matthew G. Andersson

**Conservative Group at U. Chicago School of Law Under Fire for Immigration Event**

The Edmund Burke Society has indefinitely postponed its event

Rachel Frommer
February 7, 2018

A conservative debate society at the University of Chicago School of Law faced threats of defunding this week after announcing an immigration debate with language that some students found racist.

The Edmund Burke Society was hit with a barrage of criticism from both students and administrators following the release of a whip sheet on Jan. 30 that described immigrants as "inviting disease into the body politic," as well as "wretched refuse," language originating in the Statue of Liberty sonnet by Emma Lazarus, *The New Colossus.*

The whip sheet used the term "chain migration," referenced Trump's campaign promise to build a southern-border wall, and suggested the country will be "on the path to national suicide" if subcultures fail to assimilate.

Titled "Resolved: Raise the Bar," the event was centered around debate of the immigration reform RAISE Act introduced last year to the Senate.

The whip sheet was meant to provoke relevant discussion with language meant to be humorous, said the Society. The document was not representative of the Burke Society's views, added the group.

The Burke Society has indefinitely postponed the event, scheduled for earlier this week, citing a "high risk of serious disturbance."

Since the whip sheet's publication, campus backlash has been fierce.

In an op-ed published by the *Chicago Maroon,* a student smeared the Burke Society as "the place for racists to convene and mock minority groups with full impunity."

"Dear Burke Society, I take it personally when you compare my family to trash and disease," wrote another student, according to the *Maroon.*

At an "emotional" town hall Monday, more than a hundred students, faculty, and staff aired their feelings about the document, the student paper reported.

At that meeting, Burke Society Chairman Eric Wessan apologized to the community for a parody gone wrong.

Wessan explained the whip sheet "employs hyperbolic language that parodies arguments conservatives or commentators might make" to "stimulate interest."

Wessan said that he wished the Society "had not done this," expressed regret that his classmates had been hurt by the language, and promised "to be more deliberate" with their language in the future.

Chicago Law dean Thomas J. Miles issued an initial response Monday in a campus-wide email that mourned an injured campus, but reaffirmed the university's commitment to free expression, even "uncivil" speech.

The Law Students Association president, Sean Planchard, responded by announcing his intention to submit a resolution Thursday to defund and deactivate the society.

In the face of "the abdication of leadership from the administration in response to the vile rhetoric of the Edmund Burke Society," Planchard said he and the LSA must step in to dole out punishment.

Miles replied Wednesday to the LSA's threat with an email warning that the Society "did not violate any university policies" and clarified the school's prohibition of retributory action taken against student organizations "on the basis of their speech."

Miles added that the LSA does not have the ability to unilaterally defund or deactivate student groups, but offered to discuss the development of such mechanisms.

Few have defended the Burke Society. Among those who have is law professor Todd Henderson, a self-described liberal who was to give the pro-immigration side at the debate, who said at the town hall that those who have taken offense are humorless.

The whip sheet was "merely mimicking the orangutan that is our president," said Henderson, according to the *Maroon*.

This week's uproar came as the university has faced heavy backlash over allowing an immigration conversation featuring Steve Bannon to go forward. The business school professor behind the invite held a town hall Monday to

The whip sheet was "merely mimicking the orangutan that is our president," said Henderson, according to the *Maroon*.

This week's uproar came as the university has faced heavy backlash over allowing an immigration conversation featuring Steve Bannon to go forward. The business school professor behind the invite held a town hall Monday to express his position that there is a difference between hateful speech or beliefs and violence, and to say that the Bannon event would give students the opportunity to confront him.

Published under: Chicago , College Campuses , Immigration Reform



Adam Kredo
August 5, 2024

A University of Chicago professor whose brother is a convicted Iranian spy dismissed the notion that Tehran has boosted anti-Semitic protests on U.S. college campuses. Next semester, that professor will teach students about "Zionist settler colonialism."

Alireza Doostdar, an associate professor of Islamic studies and dual United States-Iranian citizen, is slated to teach a course later this year on "liberatory violence" with a focus on "Zionist settler colonialism, ethnic cleansing, and apartheid," according to a copy of the class overview obtained by the *Washington Free Beacon*. His brother, Ahmadreza, was sentenced in 2020 to 38 months in prison for spying on Iranian dissidents as well as Jewish centers on behalf of the hardline regime.

Iran has also used campus protests to spread its tentacles in the United States, according to Director of National Intelligence Avril Haines, who issued a rare public statement in July asserting that the Iranian government has encouraged and paid protesters in the United States.

For Doostdar, such accusations are "ridiculous."

During a BBC News interview in May, Doostdar—a Faculty for Justice in Palestine member who supported unauthorized anti-Israel encampments on campus and was arrested during a "sit-in" protest in November—categorically denied that foreign entities such as Iran are supporting the protest movement in America. He also said he has "never heard anti-Semitic chants" at the University of Chicago, where Jewish students have been targeted with graffiti reading, "Zionist freakshow off our campus" and "Zionist IDF terrorists off our campus."

"This is a ridiculous claim," Doostdar said after a BBC host asked the professor if he had seen "any signs of foreign interference or extremism" in the anti-Semitic protest movement. He specifically targeted New York City mayor Eric Adams, a vocal critic of the protests who linked them to foreign influence efforts, saying the "NYPD has always had close ties to Israel and is still currently close."

"This is an allegation made by authoritarian states, when they frequently label protests as foreign conspirators, like what we see in Iran," Doostdar said. "What I see here at our university, the protests are very inclusive and diverse." Just two months later, Haines revealed that "Iranian government actors have sought to opportunistically take advantage of ongoing protests regarding the war in Gaza."

Doostdar's defense of the protests, and efforts to deflect blame from Iran, raise fresh questions about Tehran's influence on American campuses. Multiple former regime officials have held posts at schools like Oberlin College and Princeton University, where they have used their positions to run defense for Iran's hardline government.

Doostdar's remarks are also garnering attention among the school's Jewish students, who are calling on university leaders to terminate the professor.

"It came as no surprise for me when I first heard that his brother was arrested for conspiracy, or when he claims that Iran is not funding these protests," one University of Chicago student told the *Free Beacon*. "What does surprise me is that the school has done nothing about it."

"Iran has time and time again shown that, if they had it their way, the West would cease; so, no, a diverse perspective cannot be one of anti-Democracy, anti-West, anti-America, and pro-terror," the student continued. "We cannot have a professor like this at our institution."

The University of Chicago did not respond to a request for comment. The school never publicly addressed the case of Doostdar's brother, even after federal law enforcement officials revealed that he used the University of Chicago Oriental Institute and Museum to conduct his spycraft in at least one case.

Doostdar, who also declined to address the charges leveled against his brother at the time, did not respond to a request for comment. He conducted the May BBC interview in Farsi, and the *Free Beacon* commissioned a translation.

"I have never heard anti-Semitic chants at universities," Doostdar said in the interview, which has not been reported in English. "In the case of Columbia [University], it was said that some people had chanted some slogans outside of the university that were not students."

"In the U.S.," the professor continued, "anti-Semitism exists among the fascists, but I have not seen anti-Semitism in the student movements. The other issue is that some interpret certain chants to make them seem anti-Semitic, such as, 'From the river to the sea Palestine will be free,' whereas this is not the case."

Doostdar's comments conflict with numerous reports showing that Jewish students were harassed during protests on a range of college campuses, including Columbia, and subjected to anti-Semitic chants calling for Israel's destruction by Hamas.

Later this year, Doostdar will teach a class centered on how "oppressed peoples' struggles for liberation have often incorporated violent tactics, even against non-combatants." Students will study various "freedom movements," including "Malcolm X and the Black Panthers' mobilization against white supremacy and police violence." The Palestinian conflict with Israel will also be featured.

**Liberatory Violence**
RLST 26635/1 [83939] - SEM In-Person Open
Seminar
Section Enrollment: 0/13
Total Enrollment: 0/13

From 18th century slave rebellions in the Americas to 20th and 21st century anticolonial revolutions, oppressed peoples' struggles for liberation have often incorporated violent tactics, even against non-combatants. This course examines anticolonial violence in light of the work of the Martiniquan revolutionary Frantz Fanon and some of his interlocutors. We study specific freedom movements: Nat Turner's slave rebellion, the Haitian and Algerian revolutions against French colonialism, Malcolm X and the Black Panthers' mobilization against white supremacy and police violence, and the ongoing Palestinian struggle against Zionist settler colonialism, ethnic cleansing, and apartheid. Throughout, we will pay attention to how revolutionaries evaluated the place of violence in their own movements, including religious criteria for justifiable and unjustifiable use of force.

PQ: Graduate student enrollment by permission only. Please send one or two paragraphs explaining your interest and prior preparation.

| Instructor | Days & Times | Timeframe | Location |
|---|---|---|---|
| Alireza Doostdar | Tue Thu : 11:00 AM-12:20 PM | 09/30/2024 - 12/14/2024 | Swift Hall 208 |

In past writings, Doostdar has accused Israel of killing innocent Palestinian journalists during the Jewish state's war on Hamas. Israel has identified a number of those reporters as Hamas operatives.

"Since October 7, Israel has turned Palestine into a graveyard for journalists—a horror that, as if this were thinkable, pales in magnitude to the much larger massacre of children (over a hundred *per day*)," the professor wrote in a piece titled, "Witnessing Genocide."

"There is mounting evidence that the reason more Palestinian journalists have died in the past three months than in any other

"There is mounting evidence that the reason more Palestinian journalists have died in the past three months than in any other conflict in history is that Israel is deliberately killing them," Doostdar wrote.

In a 2022 interview, meanwhile, Doostdar discussed growing up under Iran's hardline government and attending university in Tehran.

"So I had people within my family who were Islamists, there were people who were Communists, there were people who were more liberal, and so on," he said.

Doostdar's brother, Ahmadreza, was convicted with another Iranian in 2020 for spying on Iranian dissidents in California and Chicago. Ahmadreza also monitored a number of Jewish centers, including a Hillel Center and a Rohr Chabad Center.

"This case illustrates Iran's targeting of Americans in the United States in order to silence those who oppose the Iranian regime or otherwise further its goals," Assistant Attorney General for National Security John C. Demers said at the time. "The defendants, working for Iran, gathered information on Americans that could then be used by the Iranian intelligence services to intimidate or harm them or their families."

Janatan Sayeh, a research analyst at the Foundation for Defense of Democracies think tank who assisted with the translation of Doostdar's BBC interview, said that Iran's strategy is to foment unrest in the United States, primarily through protest movements like the one that erupted in the wake of Hamas's Oct. 7 strike.

"The Islamic Republic's strategy towards the West has consistently been to invoke chaos and exploit the momentum generated by civic movements," Sayeh said. "The regime adeptly leverages various progressive causes to further its influence operations in the U.S. In this context, Tehran's Islamist regime propagates anti-Semitism both at home and abroad, cloaked under the guise of anti-Zionism."

**Published under:** Anti-Semitism , Iran , Israel , Palestinians , Protests , Spying , University of Chicago

CAMPUS 

---

SEARCH    🔍      JOIN US    SUBSCRIBE

# University Faculty Aren't Neutral When It Comes to Political Donations

Despite being an imperfect measurement of both political donations and individual beliefs, analyzing which candidates and PACs UChicago faculty donated to over the past five election cycles serves as a meaningful indicator of the collective political leaning of the faculty and their engagement in elections.

By Austin Steinhart

February 12, 2024

Since 1967, the University of Chicago has been committed to institutional neutrality on political and social issues. While the University is officially neutral, faculty members lean decidedly Democratic. According to *The Maroon's* analysis, from 2015 to 2023, 97 percent of all donations were to Democratic-leaning candidates and political action committees (PACs) (see diagram below).



Between 2015 and 2023, University of Chicago faculty have donated...

~$80,000 to Republican candidates and PACs

~$2,400,000 to Democratic candidates and PACs



Jessica Costescu
May 6, 2025

A University of Chicago professor canceled a midterm Thursday and called on his students to use the time to join an anti-Trump protest, an email obtained by the *Washington Free Beacon* shows.

Yali Amit, a statistics professor who has long opposed Israel, told his machine learning and large-scale data analysis class he was canceling the exam as "a small contribution" to the nationwide demonstrations being held that day to oppose President Donald Trump and Elon Musk. In an email to his students, Amit said he would post the exam as a homework assignment and included a link to a sign-up site for the Chicago-area protest, which called to "STOP THE BILLIONAIRE TAKEOVER ."

**"The country is in an emergency**. The Trump administration is kidnapping people off the street, deporting them to foreign prisons, jailing and threatening to deport students who demonstrated in support of Palestinians," Amit wrote in his email. "So, today, thousands across the country are demonstrating in a national day of action. As a small contribution to this day of action **I am cancelling the midterm** and calling you, if you are able, to join the Chicago demonstration announced here" (emphasis in the original).

"Marching against this dangerous authoritarian administration is of utmost importance!" he added in the email.



# Midterm cancelled

Dear Students,

**The country is in an emergency.** The Trump administration is kidnapping people off the street, deporting them to foreign prisons, jailing and threatening to deport students who demonstrated in support of Palestinians, ignoring court orders, ignoring supreme court decisions, attacking higher education institutions, dismantling environmental protections, dismantling the research on climate change and on health, arbitrarily canceling visas of foreign students and on and on.

So, today thousands across the country are demonstrating in a national day of action. As a small contribution to this day of action I am **cancelling the midterm** and calling you, if you are able, to join the Chicago demonstration announced here 🗒. It will begin at 11AM in Union Park 1501 West Randolph. Marching against this dangerous authoritarian administration is of utmost importance!

I know you have studied hard for the exam, so I will post the exam as a homework to be handed in on

---

Done          **Announcement Details**
STAT 37601 1 (Spring 2025) Machine Learning a...

◑ Switch To Light Mode

deporting them to foreign prisons, jailing and threatening to deport students who demonstrated in support of Palestinians, ignoring court orders, ignoring supreme court decisions, attacking higher education institutions, dismantling environmental protections, dismantling the research on climate change and on health, arbitrarily canceling visas of foreign students and on and on.

So, today thousands across the country are

s

So, today thousands across the country are demonstrating in a national day of action. As a small contribution to this day of action I am **cancelling the midterm** and calling you, if you are able, to join the Chicago demonstration announced here ⬚. It will begin at 11AM in Union Park 1501 West Randolph. Marching against this dangerous authoritarian administration is of utmost importance!

I know you have studied hard for the exam, so I will post the exam as a homework to be handed in on Tuesday May 6. Your final grade will be based on a reweighing of the homework, quizzes and final project.

Yours,

Yali Amit

Amit's email comes as the Trump administration pushes for reforms at universities that have failed to rein in anti-Semitism, taught politicized course materials, and maintained legally questionable DEI policies. The administration has not spared the University of Chicago from that push—last month, the Department of Health and Human Services cut nearly $6 million in federal grants to the University of Chicago.

Amit isn't the first professor at a prestigious higher education institution to cancel classes to protest the Trump administration this semester. Several Columbia University professors in March canceled classes in solidarity with Mahmoud Khalil, the student activist and foreign national in ICE custody. One even gave students an automatic "A" for a canceled midterm.

A student in Amit's class told the *Free Beacon* that the professor's behavior was "inappropriate."

"It is inappropriate for a professor to cancel an exam to encourage students to attend a political protest," the student said. "Furthermore the message indicates that this professor, like many others in academia, assumes that all students share his left-wing political beliefs. The professor does not recognize that



COLLEGE REPUBLICANS BOARD CONDEMNS UCHICAGO'S DISCRIMINATORY ACTIONS AND AFFIRMS THE IMPORTANCE OF FREE SPEECH IN ACADEMIA



"The University of Chicago plunged in the annual college free speech rankings produced by the Foundation for Individual Rights in Education (FIRE), falling from first place to thirteenth within a year. Sean Stevens, FIRE's director of polling and analytics, told the Thinker that 'there is a singular reason' for UChicago's fall: the school's controversial refusal to give registered student organization (RSO) status to the campus chapter of Turning Point USA (TPUSA)." — Chicago Thinker

As justification for denying RSO status, CORSO chairwoman Jiayi Yue "pointed to a lack of 'sufficient difference between [TPUSA] and the existing College Republican RSO.'"

The College Republicans Board is disappointed with this discriminatory infringement upon freedom of expression. College Republicans is dedicated to upholding Republican principles and is aligned with the national platform of the Republican Party. We recognize that within the conservative movement, there is diversity of thought and opinion that may not be adequately represented by our organization.

We are proponents of aligned right-leaning organizations and support the addition of a recognized TPUSA chapter on our campus. College Republicans and Turning Point USA are both conservative organizations, but they are not the same. While College Republicans helps students get politically involved with the Republican Party, TPUSA is a nonpartisan conservative nonprofit focusing on ideological discourse and campus activism. The university recognizes both the University of Chicago Democrats and several RSOs geared towards liberal activism. We believe that TPUSA would play a similar role for conservative students, and we welcome options for our fellow conservative students who might not identify with the Republican Party.

**28. Discriminatory Treatment Based on Religion, National Origin, Caste and Race and Procedural Irregularities in Academic Decisions**

Plaintiff asserts that his identity as a **devout [Data Redacted]** have contributed to a pattern of discriminatory and unequal treatment by the University of Chicago. In addition, plaintiff actively participated in events organized by the **[Data Redacted]** on campus and maintained visible religious affiliations. Given the totality of circumstances and disparate outcomes in comparison to similarly situated peers, Plaintiff believes his religious and ethnic background played a material role in how institutional decisions were made about him.

**Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)** prohibits discrimination based on race, color, or national origin in any program receiving federal financial assistance. Disparate treatment of [Data Redacted] students, or those of Indian origin, in access to resources, academic opportunities, or institutional processes, may give rise to a violation of Title VI. Likewise, **Title VII** prohibits **employment discrimination** including student worker roles, and in academia as well, on similar grounds. Where religious expression or participation (such as [Data Redacted] Sangam events) becomes a factor in adverse treatment, **Title VII's protection against religious discrimination** may also be implicated.

Additionally, Plaintiff highlights concern about the **delayed processing and initial waitlisting of internship funding**, despite clear eligibility and qualification. The funding process took more than a month to finalize, without clear explanation, and Plaintiff believes this delay may have been a deliberate attempt to disadvantage him. Plaintiff suspects the University imposed heightened scrutiny or additional, undocumented criteria not applied to other students targeting him based on identity or whistleblower status. If proven, such procedural irregularity may support claims of **disparate treatment**, **bad faith administration**, or **retaliation** under civil rights statutes.

Further aggravating this pattern was the **rushed and premature posting of Plaintiff's disciplinary decision on his academic transcript**, cancellation of all jobs, removal of all career portals, email address and things associated, classes withdrawn, University dean Hold on account, most workday modules removed, hours for logan job and some other job roles never paid including overtime wages over the academic breaks, which all occurred **before the official review period had concluded**. This irregularity strongly suggests procedural misconduct and an institutional intent to finalize punitive outcomes without due process. Such actions may violate the University's own internal policies, as well as contract principles recognized under educational law, including the implied duty of fair dealing between students and universities (*Corso v. Creighton University*, 731 F.2d 529 (8th Cir. 1984)).

Taken together, these incidents reflect systemic institutional failures and possible **bias based on religion, race, and national origin**, which form actionable claims under **Title VI, Title VII**, and the **Illinois Human Rights Act (775 ILCS 5/1-102)**. Plaintiff respectfully includes these issues as key components of his broader civil rights and due

process complaint and reserves the right to seek judicial or administrative remedies accordingly.

- **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)** – Prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance.

- **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2)** – Prohibits discrimination in employment, including against student workers, on the basis of religion, race, color, or national origin.

- **Illinois Human Rights Act (775 ILCS 5/1-102 et seq.)** – Prohibits discrimination in education and employment based on religion, race, color, ancestry, and national origin; applies to both public and private institutions in Illinois.

- **Section 1981 of the Civil Rights Act of 1866 (42 U.S.C. § 1981)** – Protects the right to make and enforce contracts without racial discrimination, applicable to private actors including universities.

- **Corso v. Creighton University, 731 F.2d 529 (8th Cir. 1984)** – Recognized that students may have an implied contractual relationship with their university, enforceable when academic policies or procedures are applied arbitrarily or discriminatorily.

- **Ross v. Creighton University, 957 F.2d 410 (7th Cir. 1992)** – A student may sue a university for breach of an implied educational contract or for misrepresentation when promised services are not delivered.

- **Healy v. James, 408 U.S. 169 (1972)** – Public universities may not suppress or penalize students for attending or affiliating with political or religious groups; affirms students' First Amendment rights.

- **Disparate Impact Theory** – Recognized under Title VI and VII when facially neutral policies result in disproportionate harm to members of a protected class without sufficient justification.

- **Bad Faith Doctrine** – When an institution intentionally misapplies its own rules or policies to reach a prejudged outcome, it can constitute actionable bad faith under contract or tort law.

- **Constructive Discharge/Exclusion** – Where institutional conduct renders participation or benefit from a program so hostile or inaccessible that a reasonable person would withdraw or suffer harm.

- **Procedural Due Process (if university acts in quasi-governmental role)** – Requires notice, a fair hearing, and an opportunity to respond before significant adverse action is taken affecting legal rights or status.

- **Federal Funding Accountability** – U.S. Department of Education Office for Civil Rights (OCR) has jurisdiction to investigate civil rights violations in federally funded institutions including private universities.

**Some Screen Shots of multiple different years falsification history that were handled lightly (https://studentmanual.uchicago.edu/disciplinary-reports/)**

20. A student was charged with theft and **fals**ification of records, specifically the student was paid for falsified work hours entered into Workday. The ADC concluded the student was responsible and issued a four-quarter suspension. The student requested a review of the ADC's decision, but it did not meet the criteria for review.

The **Crown Family School of Social Work, Policy, and Practice** held one disciplinary hearing involving a single student. The student was found responsible for violating University Policy and submitted a request for review, which was denied.

28. A student was charged with **fals**ifying records, specifically the student reported to be a graduate of the PhD program in order to gain employment at a university. The ADC concluded the student was responsible and issued a 10-year suspension. The student requested a review of the ADC's decision. The request did not meet the criteria for convening a Review Board.

The **Humanities Division** held one disciplinary hearing involving a single student. The Area Disciplinary Committee (ADC) found the student responsible for violating University Policy. The student did not request a review of the outcome.

25. A student was charged with lying, failure to comply with the directives of a University official, and breaches of standards of behavior expected of University students, specifically the student made **false** statements to a disciplinary committee and to faculty and administrators across the University. The student also sent numerous unwelcome, inappropriate, and harassing emails to faculty and staff, after being directed to cease sending communication. The ADC concluded the student was responsible and issued a two-quarter suspension.

9. A student was charged with **fals**ification of records and theft, specifically the student intentionally recorded an unapproved number of paid work hours, did not work the hours recorded, and received an overpayment as a result. The CADC concluded the student was responsible and issued a four-quarter suspension. The student requested a review of the CADC's decision. The request did not meet the criteria for convening a Review Board.



and recommended that the instructor assign a letter grade of a D for the course.

- Another full-time MBA student was brought to a disciplinary committee for violating the Standards of Scholarship and Professionalism. The allegations were: 1) misrepresenting to one bank the student's offer status with another bank; 2) continuing to participate in on-campus recruitment after accepting an offer from one bank; 3) providing **false** information and listing inaccurate qualifications on the student's profile. The disciplinary committee suspended the student for seven quarters.

- A fifth student was called before a disciplinary committee charged with falsifying GPA on the transcript for an internship through Career Advising and Planning Services (CAPS). The committee suspended the student for two quarters.

The Divinity School convened two disciplinary hearings.

- A student was accused of falsifying documents related to an appointment in another division. The disciplinary committee expelled the student. The student asked for a review based on the grounds of procedural irregularities; the review committee sustained the decision.
- Another disciplinary committee was convened for a student accused of battery upon another student. The committee suspended the student for nine quarters and recommended that the Dean of Students explore mental health treatment options for the student.

for the student.

The Division of the Humanities convened two disciplinary committees.

- A student was accused of academic dishonesty. The student was accused of lying to a professor about the date when he submitted a final course paper and falsifying the date and time of an email message. The disciplinary committee suspended the student for a period of two quarters.

## 29. Gender-Based Disparities in Institutional Response to Assault Reports and Misuse of Confidential Student Communications and Violations of Title IX, FERPA and Due Process Protections

Plaintiff contends that his **gender identity as a biological male student,** played a substantial role in the University of Chicago's failure to adequately respond to his report of **Sexual & physical assault**. Despite presenting serious proofs, Plaintiff experienced dismissiveness, minimization of harm, and lack of supportive intervention from institutional authorities. This pattern of neglect suggests a **gender-based disparity** in how cases of interpersonal violence are handled, particularly when the complainant is **[Data Redacted].** If true, such discriminatory treatment may constitute a violation of **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)**, which guarantees equal access to institutional remedies for all students, regardless of sex or gender.

Under Title IX, universities are obligated to respond to all complaints of sexual or physical misconduct in a manner that is **prompt, impartial, and equitable**. The **Department of Education's implementing regulations (34 C.F.R. § 106.45)** specify that both male and female complainants are entitled to equal process, supportive measures, and investigation. Failure to afford these protections to Plaintiff because of his male identity support a claim of **gender-based discrimination**, particularly when considered in light of the broader record of institutional bias and selective enforcement.

Additionally, Plaintiff raises serious concerns regarding the University's **selective interpretation and use of confidential student communications**, and its tendency to engage in **"politics of convenience."** According to Plaintiff, university administrators accessed, interpreted, or presented private email communications including those explicitly marked as **confidential** in ways that served institutional objectives or disciplinary agendas. In Plaintiff's case, several allegations raised by the University were based on

communications or characterizations that were either unknown to him at the time or misrepresented during the adjudication process.

This conduct raises potential legal and ethical issues under **FERPA (Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g)**, which protects the privacy of student education records, including emails held by the institution when used in disciplinary contexts. Unauthorized access or disclosure of such records without proper justification, or their use to selectively frame accusations, may violate both **federal privacy protections** and **due process rights** afforded under the Fourteenth Amendment and **42 U.S.C. § 1983** in quasi-public institutional settings.

Plaintiff contends that the University's pattern of manipulating facts, controlling narratives, and selectively presenting evidence to align with predetermined outcomes reflects **bad faith administration**, retaliation, and a breach of fair process. These practices, when combined with other forms of identity-based disparate treatment, contribute to a comprehensive claim of **institutional discrimination**, **procedural misconduct**, and **civil rights violations**.

Plaintiff respectfully includes these claims in the overarching narrative of unequal treatment, privacy violations, and institutional abuse of discretion and calls upon the appropriate judicial and regulatory bodies to investigate and remediate these violations.

- **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)**– Prohibits sex-based discrimination in federally funded educational programs. Unequal treatment of male complainants in assault investigations may constitute a Title IX violation.
- **34 C.F.R. § 106.45**– Title IX regulations requiring that all sexual misconduct complaints be handled impartially and equitably, regardless of the gender of the complainant.
- **Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g**– Protects the privacy of student education records, including emails, notes, or documents used in disciplinary settings. Improper disclosure or unauthorized use can be a federal violation.
- **Illinois School Student Records Act (105 ILCS 10/)**– Mirrors FERPA protections for educational institutions in Illinois, adding state-level compliance obligations regarding record confidentiality and access.
- **Fourteenth Amendment Due Process Clause**– Applies in quasi-public institutions receiving federal funding. Denial of notice, hearing, or fair process in disciplinary matters implicates constitutional protections.
- **42 U.S.C. § 1983**– Federal statute enabling civil rights claims against institutions or officials acting under the color of law who deprive individuals of federally protected rights (e.g., due process, Title IX protections).
- **Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016)**– Court allowed a male student's Title IX claim to proceed when university failed to investigate his claims and showed gender-based bias in handling misconduct proceedings.

- **Bad Faith Administration Doctrine**– Where procedures are manipulated to predetermine outcomes or punish disfavored parties, such conduct may support claims under breach of contract, due process, or retaliation.
- **Retaliation Standard under Title IX and Civil Rights Law**– Retaliation for engaging in protected activity (e.g., filing a complaint) or for speaking up in grievance processes is actionable if causally connected to an adverse institutional response.
- **Selective Enforcement Theory**– Applicable when similarly situated individuals are treated differently without lawful justification; supports inferences of bias or discriminatory animus.
- **Illinois Human Rights Act (775 ILCS 5/1-102)**– Prohibits discrimination based on sex or gender in educational institutions, covering adverse treatment in complaint procedures or academic access.
- Under the Clery Act (20 U.S.C. § 1092(f)), universities must have clear procedures for handling and responding to reports of crimes, including physical assaults if they occur on campus or involve students. If the institution minimized or ignored Plaintiff's report of physical assault and did not provide proper support or notice of rights, it may have violated its obligations to respond promptly and fairly. The Clery Act mandates universities to accurately report and publicly disclose statistics on certain crimes, including assaults. If the university failed to record or include Plaintiff's assault in its Annual Security Report (ASR), this could amount to noncompliance with federal reporting obligations. The law requires institutions to inform victims of their rights, options, and available services. Plaintiff was not informed of protective measures, disciplinary options, or support services, this may be a direct violation of 34 C.F.R. § 668.46(b)-(h).

## 30. Pattern of Systemic Whistleblower Retaliation, Disregard of Grievance Rights, and Coordinated Suppression of Due Process

Plaintiff asserts that the University of Chicago engaged in a pattern of **prejudicial and retaliatory conduct**, beginning well before formal disciplinary actions and continuing throughout the grievance process, with the clear intent to **silence dissent, discourage, demean & deny, suppress legitimate complaints**, and **deny Plaintiff access to both academic and procedural justice**. Plaintiff cites multiple instances of administrative hostility, including the **rejection or ignoring of legitimate academic and employment-related requests** (such as changes to degree programs and participation in student government campaigning), all of which indicate a deeply rooted bias or animosity against Plaintiff.

More than **six student employment roles** were revoked or silently cancelled without justification allegedly being whistle blower for chemical/gas mishandling, sexual and physical assault, despite Plaintiff's prior acceptance and qualification. Plaintiff believes these actions were not isolated or incidental, but **calculated efforts to destabilize** his

academic standing and financial security, beginning on or around **November 2024 (and even before for other mentioned and non-mentioned matters)** of the academic quarter. The cumulative impact of these cancellations disrupted Plaintiff's ability to **focus on studies** and created undue financial and made plaintiff feel psychological strain.

The retaliatory nature of the University's actions became most apparent when, on **February 1**, Plaintiff filed a formal grievance regarding his treatment. In what Plaintiff characterizes as **deliberate retaliation**, the University issued a **disciplinary summons the**, on **February 12 (Within around 10 days, highly temporally proximate)**, initiating proceedings that ultimately led to Plaintiff's **expulsion** well **before the grievance hearing could occur**. These procedural manoeuvres deprived Plaintiff of the opportunity to **assert rights protected under labour and civil rights laws**, including those governing student employment, workplace fairness, and protected grievance activity.

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

This timing, combined with the pre-emptive nature of the expulsion, constitute a violation of **Section 704(a) of Title VII (42 U.S.C. § 2000e-3(a))**, which prohibits retaliation against individuals for engaging in protected activities, such as filing internal complaints. Similarly, Plaintiff's rights under **the National Labor Relations Act (29 U.S.C. § 157, § 158(a)(3))** have been infringed, particularly if the University sought to neutralize Plaintiff's protected concerted activity through expulsion and pre-emption of grievance procedures.

Plaintiff further notes that the **union representing student workers initially pursued a Step 3 grievance** on **February 28**, directly challenging the discharge. However, despite clear procedural grounds, the union **unexpectedly introduced a "full membership vote" requirement** before advancing to Step 4, a requirement **not found in the applicable collective bargaining agreement (CBA)**. This deviation raises substantial concerns under **the duty of fair representation doctrine**, and may indicate **collusion, coercion, or institutional pressure** on the union to abandon Plaintiff's cause. Plaintiff alleges that their grievance was never properly reviewed or adjudicated prior to the imposition of disciplinary punishment, suggesting procedural bias and an improper retaliatory motive intended to silence **protected complaints**.

Plaintiff respectfully submits that the University's failure to fairly and timely process their grievance, coupled with its immediate disciplinary action, constitutes a breach of federal law, state protections, internal institutional policy, and basic principles of fairness and due process.

In tandem with the University's **failure to take action on Plaintiff's report of physical and sexual assault**, this further demonstrates a broader disregard for student safety,

integrity of process, and rights to fair adjudication. The **rushed disciplinary findings**, **pre-emptive transcript notations**, all while Plaintiff was actively challenging the University's conduct, reflect a systematic campaign of pressure and institutional gaslighting.

Taken collectively, these events constitute not only potential **breaches of contract**, **Title IX and Title VII violations**, and **unfair labor practices**, but also **civil rights violations under 42 U.S.C. § 1983**, especially if the University's federally funded status renders its conduct actionable under color of law. Plaintiff respectfully urges the reviewing body or court to consider this broader pattern of retaliation, obstruction, and targeted exclusion as a coherent strategy by the University to suppress whistleblower activity, discriminate on protected grounds, and undermine both the grievance and legal remedy processes.

· The union's alleged refusal to take the grievance to **Step 4**, despite filing at Step 3, and invoking a **"full member vote"** not present in the Collective Bargaining Agreement (CBA), suggests potential arbitrariness or bad faith.

· The union's **failure to defend or advocate meaningfully** during critical disciplinary events may constitute a breach under *Vaca v. Sipes*.

· If the union **acted in deference to university administration** and **abandoned its responsibility**, your claims of labor rights violations become substantially more compelling.

**Laws Violated (But not limited to):**

· **Federal Laws**:

   o **Title VI of the Civil Rights Act of 1964** (42 U.S.C. § 2000d) — retaliation against a complainant in a federally funded program;

   o **Title IX of the Education Amendments of 1972** (20 U.S.C. § 1681) — retaliation based on sex-based grievance protections if applicable;

   o **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a))** – Prohibits retaliation against any individual for engaging in protected activities, such as filing internal complaints or grievances.

   o 42 U.S.C. § 1983 – Creates a cause of action for deprivation of constitutional rights under color of law, applicable if the university's conduct can be linked to state action or federal funding.

   o **National Labor Relations Act (29 U.S.C. §§ 157, 158)** – Protects workers' rights to engage in protected concerted activities and prohibits retaliation or discrimination by employers.

   o **First Amendment** (for public universities or if university is acting under color of law) — suppression of protected speech;

- o Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g – Protects the privacy of student records and limits unauthorized disclosure in disciplinary processes.
- o **Due Process protections** under the Fourteenth Amendment if applicable (for deprivation of rights without fair procedures).

· **Illinois State Law**:

- o **Illinois Human Rights Act** (775 ILCS 5/) — prohibits retaliation in response to reporting discrimination;

- o **Illinois common law** principles protecting against arbitrary and capricious treatment by educational institutions.

- o **Illinois Whistleblower Act (740 ILCS 174/15)** – Protects employees (including student workers) from retaliation for disclosing potential misconduct.

- o Illinois Educational Labor Relations Act (115 ILCS 5/14) – Prohibits unfair labor practices by educational institutions and unions.

- o Illinois Constitution, Article I, Section 2 – Guarantees equal protection and due process under state law.

· **Internal University Rules**:

- o **Violation of University's own Student Manual / Code of Conduct** — which generally guarantees grievance rights, impartial hearing procedures, and non-retaliation assurances.

· **Regulatory Oversight Authorities**:

- o **U.S. Department of Education, Office for Civil Rights (OCR)** — oversees retaliation complaints under Title VI and Title IX;

- o **Department of Justice, Civil Rights Division** — enforces federal civil rights protections;

- o **Illinois Department of Human Rights (IDHR)** — enforces state discrimination and retaliation laws in education;

- o **Internal Revenue Service (IRS)** — oversees compliance with nonprofit obligations under 26 U.S.C. § 501(c)(3), where retaliatory or biased governance practices could affect nonprofit status.

· **Doctrines and Legal Principles**:
- o **Duty of Fair Representation (Vaca v. Sipes, 386 U.S. 171 (1967))** – Requires unions to act without discrimination, in good faith, and with diligence when representing members.

- o **Retaliation Doctrine (University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338 (2013))** – Requires "but-for" causation in retaliation claims under Title VII.
- o **Procedural Due Process** – Requires fair notice and opportunity to be heard before deprivation of significant rights in quasi-public institutions.
- o **Breach of Implied Contract** – Universities may be held liable if they violate their own published disciplinary or grievance procedures (Tedeschi v. Wagner College, 49 N.Y.2d 652 (1980)).

## 31. Psychological Distress, Retaliatory Intimidation, and Chilling of Rights Following Protected Activity by UCPD (University of Chicago Police)

Plaintiff alleges that, in the aftermath of submitting formal grievances and engaging in protected whistleblowing activity including the reporting of a serious assault incident implicating a university-affiliated individual he began to experience a pattern of alarming and intimidating conduct by the University of Chicago Police Department (UCPD). Specifically, Plaintiff observed the sudden and unusual presence of UCPD vehicles stationed or circulating near accommodation, an area that had not previously been subject to routine patrol or stop for UCPD cars.

Plaintiff further asserts that these law enforcement vehicles appeared positioned in a manner clearly visible from plaintiff's accommodation and were encountered during both morning and evening hours as Plaintiff entered or exited his accommodation. Plaintiff contends that the conspicuous nature of these patrols occurring shortly after the protected activity constitutes a form of targeted intimidation, harassment, torture, and implied threat to his personal safety, allegedly intended to exert psychological pressure and deter further pursuit of complaints or legal recourse.

This conduct, if substantiated, may support claims under federal civil rights laws (including 42 U.S.C. § 1983) for retaliatory surveillance or harassment by a quasi-public entity acting under colour of law.

https://mc-1b49d921-43a2-4264-88fd-647979-cdn-endpoint.azureedge.net/-/media/project/uchicago-tenant/shared/uc_campus_clery_map_march24_1.pdf?rev=7bfb51a186814f40b5de6cfec1 1829fc&hash=CABA5AC7E944A3FEFF5BD858262C4D64



The temporal proximity of these sightings to both Plaintiff's grievance and the assault incident gives rise to a **reasonable inference of retaliatory surveillance or psychological intimidation**, particularly when considered against the broader backdrop of institutional retaliation. Plaintiff states that this police presence caused **immense emotional distress**, leading to ongoing **fear, paranoia, anxiety, torture, and feelings of being monitored and targeted**. These circumstances contributed to **fainting (panic attacks), depression, emotional exhaustion, isolation**, and a pervasive sense of **torture and bullying**, creating a **hostile and coercive post-reporting environment** that undermined Plaintiff's ability to focus academically, engage with university systems, or pursue redress.

Additionally, the use of university law enforcement resources to patrol or survey individuals' residential zones **raises Fourth Amendment concerns**, especially if there

was no legitimate law enforcement justification. Such conduct could also give rise to **tort claims under state law**, including **intentional infliction of emotional distress**, particularly if surveillance was conducted with **malicious intent or reckless disregard** for the emotional well-being of the Plaintiff.

Plaintiff respectfully submits that the sudden police presence with absent legitimate investigatory purpose and occurring in the direct aftermath of protected complaints serves as further evidence of **retaliatory intimidation**, institutional abuse of power, and an orchestrated attempt to silence, pressure, or psychologically exhaust him. Plaintiff reserves the right to seek declaratory relief, compensatory and punitive damages for this retaliatory surveillance and its mental health consequences, and requests judicial or administrative investigation into whether such policing tactics were selectively deployed to deter lawful grievance or whistleblower activity. Furthermore, Plaintiff want to consider this as a whistleblower so that another student, an staff member would also feel safe from UCPD Dominance.

This conduct, if intended to monitor or harass Plaintiff for engaging in **protected activity** such as filing a grievance, reporting criminal conduct, or participating in union-related or Title IX proceedings may constitute **retaliation in violation of federal civil rights statutes**, including (but not limited to):

- **Title VII of the Civil Rights Act of 1964** (42 U.S.C. § 2000e-3), which prohibits retaliation against individuals for participating in protected activities; (42 U.S.C. § 2000e-3(a))- Title VII prohibits employers from retaliating against employees who engage in protected activities, such as filing discrimination complaints or participating in investigations. Retaliation claims require demonstrating that the employer took materially adverse actions that could dissuade a reasonable person from engaging in protected activity. The conspicuous surveillance by UCPD, if intended to intimidate, could be construed as such an adverse action.
- **42 U.S.C. § 1983**, if the University, through its police department or under federal funding, is acting under color of law to infringe upon constitutional rights such as freedom of expression or access to redress; Civil Rights Violations Under 42 U.S.C. § 1983Section 1983 provides a remedy against any person who, under color of state law, deprives another of constitutional rights. If the University, through its police department, engaged in surveillance intended to intimidate or retaliate against Plaintiff for exercising his rights, this could constitute a violation of his First Amendment rights to free speech and to petition the government for redress of grievances.
- **The Illinois Whistleblower Act (740 ILCS 174/15)**, which protects employees and students from retaliation for disclosing or attempting to disclose unlawful or improper conduct; The Illinois Whistleblower Act prohibits employers from retaliating against employees who disclose information about violations of laws or regulations. If Plaintiff's grievances and reports qualify as protected disclosures under this Act, and

the subsequent surveillance was retaliatory, the University may be in violation of state law.

- **Fourth Amendment Protections Against Unreasonable Searches and Seizures:** The Fourth Amendment protects individuals from unreasonable searches and seizures, which courts have interpreted to include certain forms of surveillance. In Katz v. United States, 389 U.S. 347 (1967), the Supreme Court held that the Fourth Amendment protects people, not places, establishing the "reasonable expectation of privacy" standard. If UCPD's surveillance intruded upon Plaintiff's reasonable expectation of privacy without proper justification, it could constitute a Fourth Amendment violation.

- **Intentional Infliction of Emotional Distress:** Under Illinois law, a claim for intentional infliction of emotional distress requires showing that the defendant's conduct was extreme and outrageous, intended to cause, or in reckless disregard of the probability of causing, emotional distress. If the University's actions were designed to harass or intimidate Plaintiff, leading to severe emotional distress, this tort claim may be applicable.

- And **the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.)**, if the psychological effects resulting from retaliation are linked to pre-existing or resulting mental health conditions.


## 32. Systematic Unauthorized Surveillance and Retaliatory Infiltration by the University of Chicago Police; Violations of Constitutional Free Speech, Privacy Rights, and Statutory Protections in the Context of Student Activism

Plaintiff alleges that the University of Chicago Police Department ("UCPD") has engaged in a longstanding pattern of unauthorized surveillance and retaliatory conduct directed at students engaged in constitutionally protected expressive activities, including protests and advocacy on matters of public concern. In a notable and documented 2013 incident, a UCPD officer infiltrated a peaceful campus protest advocating for expanded trauma centre access on the South Side of Chicago by posing as a protest participant without lawful justification, probable cause, or administrative oversight. Following **public disclosure** of defendant's own actions, they itself acknowledged the incident as "deeply problematic," resulting in internal disciplinary measures, including the officer's suspension. This also shows university not taking consequences of their own actions and doing and after public disclosures putting blame on others

Plaintiff asserts that the University of Chicago Police Department ("UCPD") has engaged in a pattern of unauthorized, retaliatory, and constitutionally questionable surveillance targeting students participating in protected speech and advocacy activities. This pattern is emblematic of a broader institutional practice of suppressing dissent and controlling student activism.

A notable example includes a widely reported 2013 incident in which a UCPD officer unlawfully infiltrated a peaceful protest advocating for increased trauma care access on the South Side of

Chicago by masquerading as a student protester. This infiltration was conducted without lawful authority, probable cause, or adherence to any publicly disclosed oversight mechanisms. The defendant only after matter become "Publically disclosed" itself, subsequently admitted the conduct was "deeply problematic" and acknowledged the lack of justification by suspending the officer involved. This shows how defendant shifted the blame to an employee and that too only after public disclosure. (https://chicagoist.com/2013/03/06/university_of_chicago_police_employ.php)

Plaintiff submits that this historical precedent evidences a willful institutional tendency to violate students' First Amendment rights under the guise of maintaining order, while failing to accept responsibility until faced with public scrutiny. Rather than instituting meaningful reforms or safeguards, the University has continued its practice of denial, scapegoating, and suppression following public exposure. Such conduct further supports Plaintiff's claims of retaliatory surveillance and institutional abuse aimed at silencing dissent and avoiding accountability.

**This conduct gives rise to serious constitutional and statutory violations, including but not limited to:**

- **First Amendment of the U.S. Constitution**, incorporated against state actors via the Fourteenth Amendment: Prohibits government and quasi-government actors, including university-affiliated police departments, from engaging in viewpoint-based retaliation against individuals exercising free speech, peaceable assembly, and petition rights (see *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969); *Heffernan v. City of Paterson*, 578 U.S. 266 (2016)).

- **42 U.S.C. § 1983**: Permits a private cause of action against state actors for deprivation of constitutional rights under color of law. If UCPD, acting under delegated authority from the state of Illinois, engaged in targeted surveillance or retaliation, it is liable under this statute.

- **Illinois Eavesdropping Statute (720 ILCS 5/14-1 et seq.)**: Prohibits surreptitious recording or surveillance of individuals in certain circumstances without consent, particularly when not conducted in a law enforcement context supported by probable cause or a warrant.

- **Illinois Constitution, Article I, § 4 (Freedom of Speech)** and **§ 6 (Searches, Seizures, Privacy)**: Provide broader protections than their federal counterparts in some instances and may be violated if university police engage in covert surveillance without due cause.

- **Doctrine of Prior Restraint and Chilling Effect**: The pattern of covert monitoring and retaliation constitutes a form of prior restraint and imposes a chilling effect on future student engagement in constitutionally protected expression (see *NAACP v. Button*, 371 U.S. 415 (1963)).

- **Monell Liability (Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978))**: If it can be shown that the UCPD acted pursuant to a policy, practice, or custom approved or tacitly condoned by the University or its governing officials, institutional liability attaches under Section 1983.

Further concern arises from reports suggesting continued and systemic surveillance of activist students and marginalized communities using technology platforms (e.g., license plate readers, social media tracking, geofencing tools), practices which have come under increasing scrutiny nationwide and may constitute violations of due process and privacy expectations.

https://chicagomaroon.com/46936/grey-city/reworking-a-decades-old-disciplinary-system/

https://www.huffpost.com/entry/university-of-chicago-pol_n_2812388

CHICAGO **CHICAGO CRIME**

# University Of Chicago Police Officer On Leave For Going Undercover At Trauma Care Protest

U Of C Officer On Leave For Spying At Trauma Care Protest

Mar 5, 2013, 01:50 PM EST

https://truthout.org/articles/campus-police-are-using-israeli-spy-tech-to-crack-down-on-student-protest/

In April 2018, after University of Chicago Police Department (UCPD) officers shot 21-year-old student Charles Thomas, students and community members launched a #CareNotCops campaign. UCPD is one of the largest private police forces in the country, with approximately 100 officers and an annual budget, student newspaper *Chicago Maroon* reported, of $5.5 million. The University of Chicago butts up against Chicago's majority-Black South Side, and the UCPD strictly police the border.

Community organizations Black Lives Matter Chicago and Black Youth Project 100 (BYP 100) joined in the 2018 protests. The University of Chicago, like other local institutions of higher education, "are not only complicit, but are active stakeholders in the mass-incarceration, over-policing, displacement and overall harm of Black and Brown communities" explained BYP 100. Organizers were calling for, among other things, the "disarming of UCPD officers and reduction of their budget."

**33. University of Chicago's Systemic Failure to Establish and Maintain Effective and Equitable Crime Prevention and Campus Safety Measures; Violations of the Clery Act, Title VI, and Constitutional Due Process Standards, Including Evident Racial Discrimination and Lack of Transparency in UCPD Oversight**

Plaintiff alleges that the University of Chicago has failed to implement adequate and equitable crime prevention and campus safety measures in and around its main campus, in violation of

both federal obligations and community trust. Despite operating one of the largest private university police forces in the United States, the University of Chicago Police Department (UCPD) has repeatedly been criticized for its lack of transparency, accountability, and effective oversight, concerns exacerbated by its exemption from Illinois' Freedom of Information Act (5 ILCS 140/1 et seq.) due to its private status. This exemption denies students and community members access to critical data regarding police stops, racial disparities, and departmental conduct.

The university's conduct potentially violates the **Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (20 U.S.C. § 1092(f))**, commonly known as the **Clery Act**, which mandates federally funded institutions of higher education to disclose campus crime statistics and maintain and implement crime prevention and safety policies. Failure to report or address systemic misconduct, racial profiling, or disparities in campus policing practices may constitute a breach of these federal obligations.

Additionally, **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)** prohibits discrimination in programs receiving federal assistance. If the UCPD or its policies disproportionately target or fail to protect individuals based on race or national origin particularly the predominantly Black and Latino residents of Hyde Park and South Kenwood then liability under Title VI may attach.

Under **Illinois law**, the **Private College Campus Police Act (110 ILCS 1020/1)** grants private university police departments full policing authority akin to municipal law enforcement. However, this delegation of power must be exercised in accordance with **constitutional due process, equal protection, and civil rights standards**. Unchecked policing powers without public accountability or independent review mechanisms raise serious legal and public policy concerns, particularly in light of mounting evidence of racial profiling, misuse of stop-and-frisk practices, and discriminatory enforcement patterns.

Documented incidents and community complaints illustrate a **pattern of systemic racial disparity** in policing outcomes. Examples include:

·   A 2013 infiltration of a student-led protest by a UCPD officer, which the University later admitted was "deeply problematic;"

·   Frequent stop-and-frisk encounters disproportionately affecting Black residents, often without suspicion or justification; (A report by the ACLU of Illinois found that Black Chicagoans were subjected to 72% of all stops by the Chicago Police Department, despite constituting just 32% of the city's population. Even in majority-white police districts, minorities were disproportionately stopped.) (https://www.aclu-il.org/sites/default/files/wp-content/uploads/2015/03/ACLU_StopandFrisk_6.pdf)

·   Testimonies from students and residents describing harassment, intimidation, and denial of access based on race or perceived non-affiliation with the University; (An article in the Chicago Maroon discusses how students and residents described harassment, intimidation,

and denial of access by UCPD officers based on race or perceived non-affiliation with the University. The Independent Review Committee (IRC) reported that six out of nine complainants were Black, indicating a disproportionate impact.) (https://chicagomaroon.com/16832/news/administrators-respond-to-ucpd-allegations/, https://chicagomaroon.com/7153/viewpoints/op-ed/incident-report/, https://chicagomaroon.com/21238/news/irc-releases-annual-report-on-ucpd-complaints/)

- The exclusion of the Independent Review Committee (IRC) from any binding policy authority, despite handling dozens of complaints, the majority of which were filed by Black complainants. (The IRC, which examines complaints against UCPD, lacks binding policy authority. Despite handling numerous complaints, the committee's recommendations are not enforceable, raising concerns about accountability and oversight.) ( https://d3qi0qp55mx5f5.cloudfront.net/safety-security/uploads/files/IRC_Annual_Report_October_2016.pdf)

**These facts support legal theories under(not limited to):**

- **Monell liability** under 42 U.S.C. § 1983 for policies, customs, or practices that cause constitutional violations;

- **Deliberate indifference** to safety needs under **DeShaney v. Winnebago Cty. DSS**, 489 U.S. 189 (1989), when institutions assume control over safety yet fail to protect against foreseeable harm;

- **Negligence and negligent supervision** under Illinois tort law for failing to implement adequate crime prevention in areas known to be subject to safety risks, particularly where UCPD has primary jurisdiction.

- **Clery Act Violations (20 U.S.C. § 1092(f))** – If UCPD fails to publicly report accurate crime statistics, does not maintain crime prevention programs, or fails to ensure equal access to safety, this may support a claim under federal education law.

- **Title VI Discrimination (42 U.S.C. § 2000d)** – Allegations that the University's policing practices disproportionately harm people based on race or national origin fall squarely within Title VI's scope.

- **Due Process & Equal Protection Violations (42 U.S.C. § 1983)** – If the UCPD, by virtue of its delegated policing powers under the Illinois Private College Campus Police Act (110 ILCS 1020/1), acts under color of state law while violating civil rights, you can assert a constitutional claim under Monell v. Department of Social Services, 436 U.S. 658 (1978).

- **DeShaney Standard (489 U.S. 189)** – When institutions take on responsibility for student/public safety and fail to protect against known dangers, they may be liable under a deliberate indifference theory.

- **Negligence under Illinois Common Law** – Lack of reasonable supervision or enforcement of safety protocols in known high-risk areas may give rise to state tort liability.

· **Civil Oversight Failures** – Exclusion of community oversight (e.g., IRC having no binding power) may substantiate claims of systemic abuse and lack of accountability.

**Plaintiff Requests:**

· Discovery of UCPD internal data, stop logs, and use-of-force records (also when and where they go unofficially, unrecorded);

· A full audit of UCPD practices and compliance with Clery Act disclosure requirements;

· Injunctive relief mandating transparent public reporting and the establishment of an independent civilian oversight board with binding authority;

· Damages for any harm suffered by Plaintiff resulting from unequal or ineffective safety practices;

· Declaratory judgment that the University's failure to prevent racial profiling and provide public accountability violates constitutional and statutory rights.

**34. University of Chicago Police Department's Breach of Duty and Unlawful Surveillance: Inadequate Campus Safety Measures and Unauthorized Monitoring of Student Activists**

Plaintiff states that the University of Chicago, through its campus police force (UCPD), has demonstrated a pattern of **incompetence in providing student safety** and **unauthorized surveillance activities** targeting peaceful student activists, constituting a breach of duty of care, civil rights violations, and potential misuse of public safety resources.

**Specifically:**

· **Incompetence in Campus Safety Enforcement:** Despite maintaining one of the largest private police forces in the country, UCPD has repeatedly failed to prevent violent crimes, including a recent armed robbery of three University of Chicago students near the 5800 block of South Dorchester Avenue on March 1, 2025. (https://www.fox32chicago.com/news/university-of-chicago-students-robbed, https://www.cbsnews.com/chicago/news/armed-robbers-target-3-university-of-chicago-students-school-says/, https://abc7chicago.com/post/armed-robbery-suspects-target-3-university-chicago-students-5800-block-south-dorchester-avenue-school-says/15966339/,

· Students openly expressed fear and dissatisfaction with campus safety efforts, indicating a normalized reality of muggings and violence even within core university areas. This failure to maintain a secure environment may constitute negligence under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act) (20 U.S.C. § 1092(f)), which mandates universities to provide transparency, reporting, and effective security measures for students. (https://southsideweekly.com/the-fight-over-chicagos-largest-private-police-force-university-of-chicago-ucpd/)

· **Prior Misuse of Police Authority for Spying on Students:** In a separate incident, UCPD was caught engaging in unauthorized and unsanctioned undercover surveillance of a student protest advocating for expanded trauma care services. A University of Chicago police detective infiltrated a peaceful protest without approval, using university resources to monitor and report on students exercising their First Amendment rights.

· This misconduct was described by President Robert Zimmer and Provost Thomas Rosenbaum as "deeply problematic" and "antithetical to the University's values," leading to the suspension of officers involved and the ordering of an external investigation. Such actions potentially violate students' constitutional rights under the First and Fourth Amendments and indicate a pattern of **retaliatory surveillance** against student activists.

**Legal Implications and Relevant Laws:**

· Violation of the Clery Act (20 U.S.C. § 1092(f)) for failure to ensure campus safety.

· Violation of 42 U.S.C. § 1983 (civil rights statute) for deprivation of First and Fourth Amendment rights under color of law.

· Breach of duty of care owed to students under common law negligence standards.

· Potential breach of implied contractual obligations regarding safety and fairness in university policies and student handbooks.

**Plaintiff respectfully requests:**

· A full federal and state investigation into the University of Chicago's campus policing practices.

· Independent audit of UCPD's activities for unlawful surveillance, racial profiling, and retaliation against students.

· Evaluation of whether federal funding or accreditation requirements under Title IV and Clery Act regulations have been violated.

· Relevant action if violations including past events is articles against UCPD.

· Declaratory and other relevant reliefs as per Respected Jury.

**35. Harris School of Public Policy's Discriminatory Employment Practices: Unlawful Hiring Criteria Affecting Student Employment Opportunities Under Federal Civil Rights Laws**

Upon information and belief, the **Harris School of Public Policy at the University of Chicago** has engaged in **discriminatory hiring practices** with respect to student employment opportunities, **including positions offered to incoming or currently enrolled students in administrative, programmatic, or orientation-related staff roles.**

Specifically, there is reason to believe that the selection process for such positions has been **conducted in a manner that unlawfully considers or is influenced by protected characteristics**, including but not limited to race, national origin, sex, or viewpoint. If substantiated, such actions may constitute a **violation of Title VI of the Civil Rights Act of 1964**, **Title IX of the Education Amendments of 1972**, and other applicable federal and state civil rights statutes.

The Plaintiff respectfully requests that the appropriate federal agencies and institutional oversight bodies investigate whether such conduct has occurred, and whether it has resulted in the **exclusion or marginalization of qualified student applicants on the basis of discriminatory criteria**, in violation of applicable equal opportunity employment standards for federally funded institutions.

## 36. University of Chicago's Discriminatory Allocation of Financial Aid and Emergency Funding: Unequal Distribution Favouring Specific National and Religious Groups in Violation of Anti-Discrimination Statutes

Plaintiff strongly suspects that the University of Chicago, and also Harris School of Public Policy, engages in discriminatory practices in the allocation of financial aid and emergency funding, disproportionately favouring individuals from specific countries and religious backgrounds. Such conduct may constitute a violation of federal and state anti-discrimination laws, including but not limited to:

- **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.)**, which prohibits discrimination on the basis of race, color, or national origin in programs or activities receiving federal financial assistance.
- **Illinois Human Rights Act (775 ILCS 5/1-101 et seq.)**, which prohibits discrimination in education based on religion, national origin, and other protected characteristics.

Plaintiff contends that these practices create a hostile and inequitable environment for students who do not belong to the favored groups, undermining the principles of equal opportunity and fairness. Furthermore, Plaintiff requests that regulatory authorities, such as the **Office for Civil Rights (OCR)** and the **Illinois Department of Human Rights (IDHR)**, investigate these allegations to determine whether the University's funding policies violate applicable anti-discrimination statutes.

In cases where direct evidence of discriminatory intent is unavailable, Plaintiff asserts that statistical disparities in funding allocation may serve as circumstantial evidence of bias, consistent with the evidentiary standards established in **McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)**, which allows plaintiffs to establish a prima facie case of discrimination through indirect evidence.

**37. University of Chicago's Systematic Religious Discrimination: Marginalization of [Data Redacted] Cultural Representation and Inequitable Funding of Religious Events**

Plaintiff alleges that the University of Chicago engages in discriminatory practices that demonstrate a pattern of religious bias and anti **[Data Redacted]**. Specifically, Plaintiff contends that **[Data Redacted]** religious idols are relegated to the basement of the university, a practice that symbolically mirrors historical acts of subjugation and desecration of **[Data Redacted]** temples during periods of **[Data Redacted]** in South Asia. **[Data Redacted]**

**This conduct may violate:**

- **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.),** which prohibits discrimination on the basis of religion in federally funded programs.
- **Illinois Human Rights Act (775 ILCS 5/1-101 et seq.),** which prohibits discrimination in education based on religion.

Furthermore, Plaintiff asserts that during a period of funding cuts, the university disproportionately reduced or eliminated funding for **[Data Redacted]** religious events, such as **[Data Redacted]** celebrations, while continuing to fully fund events for other religious groups, including **[Data Redacted]**. This disparity in funding allocation may constitute a violation of **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.),** which prohibits religious discrimination in employment and education, as well as the **Equal Protection Clause of the Fourteenth Amendment**.

*For example, incidents of religious intolerance targeting* **[Data Redacted]** *festivals, such as disruptions of* **[Data Redacted]** *celebrations in* **[Data Redacted]***, underscore the broader cultural and societal implications of such discriminatory practices* **[Data Redacted]**

Plaintiff contends that the university's actions create a hostile and inequitable environment for **[Data Redacted]**, undermining their ability to freely practice their religion and participate in cultural events. Plaintiff respectfully requests those regulatory authorities, such as the **Office for Civil Rights (OCR)** and the **Illinois Department of Human Rights (IDHR)**, investigate these allegations to determine whether the university's practices violate applicable anti-discrimination statutes.

In cases where direct evidence of discriminatory intent is unavailable, Plaintiff asserts that statistical disparities in funding allocation and the symbolic relegation of **[Data Redacted]** may serve as circumstantial evidence of bias, consistent with the evidentiary standards established in **McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)**.

**[Data Redacted]**

**Relief Requested**

1. **Respectful Handling and Cultural Integrity**
   That the court order the respectful removal of religious imagery, decorative materials, photo frames, and idols currently displayed, and their relocation to a more appropriate,

dignified, and culturally suitable setting, ideally a raised platform or designated sacred space. Such reinstallation should be conducted by individuals trained in traditional **[Data Redacted]** customs and rituals, preferably those with formal instruction from **[Data Redacted]** or qualified practitioners.

2. **Symbolic Recognition and Inclusion**

That as a gesture of acknowledgment and reconciliation, the institution be directed to install representations of the **[Data Redacted]**

3. **Further Equitable Remedies**

That the court or jury grant any additional relief deemed appropriate and just to enhance the inclusion, dignity, and cultural accommodation of **[Data Redacted]** and affiliates within the campus environment.


**38. University of Chicago's Protection of Electoral Misconduct and Biased Disciplinary Practices, Institutional Retaliation and Due Process Violations**

Plaintiff alleges that the University of Chicago has engaged in practices that protect individuals accused of criminal activities, particularly those who have disrupted elections. *For example, the case of Shrivatsa highlights concerns about the protection of individuals involved in alleged electoral and assault misconduct, raising broader questions about institutional accountability and fairness.* Such actions may violate:

- **Federal Election Campaign Act (52 U.S.C. § 30101 et seq.)**, which governs the integrity of elections and prohibits interference or misconduct.

- **Illinois Election Code (10 ILCS 5/29-1 et seq.)**, which outlines penalties for election-related offenses, including voter intimidation and disruption.

Plaintiff further contends that during a meeting with the Dean of the PSD, the Dean attempted to influence Plaintiff's account of events, suggesting a deliberate effort to protect the accused individuals. This conduct may constitute a violation of **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)**, which prohibits retaliation against individuals who report misconduct, as well as the **Equal Protection Clause of the Fourteenth Amendment**, which guarantees impartial treatment under the law.

*For example, the Supreme Court has previously addressed issues of institutional bias and retaliation in cases such as Jackson v. Birmingham Board of Education, 544 U.S. 167 (2005), where the Court held that retaliation against individuals who report discrimination constitutes a violation of Title IX.*

Plaintiff asserts that the University's actions demonstrate a pattern of bias and bad faith, retaliation, particularly in disciplinary proceedings. Plaintiff alleges that all decisions and actions taken by the University have been skewed in favor of expulsion, without due consideration of evidence or procedural fairness. Such conduct may violate:

- **Due Process Clause of the Fourteenth Amendment**, which guarantees fair and impartial disciplinary proceedings.

- **Illinois Human Rights Act (775 ILCS 5/1-101 et seq.)**, which prohibits discrimination and retaliation in educational settings.

Plaintiff respectfully requests those regulatory authorities (not limited to), such as the **Office for Civil Rights (OCR)** and the **Equal Employment Opportunity Commission (EEOC)**, investigate these allegations to determine whether the University's practices violate applicable laws and regulations.

## 39. Continued Operation of the CARES Program as a Deceptive Financial Mechanism, Misrepresentation and Illicit Additional Funding in Violation of Consumer Fraud, Anti-Discrimination, and Antitrust Statutes

Plaintiff alleges that despite demonstrable evidence that every student has independently confirmed adequate funding for their educational expenses, the University of Chicago persists in administering its CARES program. Plaintiff contends that this program is not implemented solely for bona fide financial assistance but may be utilized as a mechanism to indirectly access additional funding or to "whitewash" other questionable practices.

Plaintiff asserts that such conduct may contravene several state and federal legal provisions governing deceptive practices and misrepresentation, including but not limited to:

- **Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.)** – which prohibits practices that intentionally mislead consumers regarding pricing and financial assistance,

- **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.)** – if the program's continued operation indirectly perpetuates discriminatory funding allocation or misrepresents the nature of the assistance provided to students, and

- **Sherman Antitrust Act (15 U.S.C. § 1 et seq.)** – should evidence indicate that the program has been structured to facilitate anti-competitive practices or collusive funding strategies.

*For example, analogous cases in the higher education sector have raised judicial concerns when supplementary funding mechanisms were alleged to mask underlying financial irregularities, leading to regulatory scrutiny and, in some instances, judicial intervention.* This example is illustrative of the potential legal consequences associated with deceptive financial practices in educational institutions.

Plaintiff further contends that the continued existence and utilization of the CARES program, despite every student demonstrating sufficient personal funding, raises material questions regarding the University's true intentions. If direct evidence of ulterior motives

is not presently available, Plaintiff maintains that further discovery is warranted to uncover whether the program is being used to secure additional funds under misleading pretenses.

Plaintiff respectfully requests that this Court, as well as regulatory bodies such as the **Office for Civil Rights (OCR)** and the **Equal Employment Opportunity Commission (EEOC)**, initiate a thorough investigation into whether the continued operation of the CARES program constitutes a violation of the aforementioned legal provisions and any other applicable statutes or regulations.

### 40 Arbitrary and Politically Motivated Termination of SSCS Office Employees; Procedural Unfairness and Discriminatory Employment Practices in Violation of Title VII, EEOC, and Due Process Protections

Plaintiff alleges that the termination of his position, Joe Bonni, within the SSCS office was executed in an arbitrary manner potentially influenced by internal political considerations. Notably, these terminations coincided with the appointment of a higher-ranked official identified as Bart/Scott, raising concerns that the dismissals were not solely based on objective performance metrics or established work criteria, but rather were part of a broader politically influenced agenda.

Plaintiff further contends that the official rationale provided, that the terminations were due to insufficient work hours, is inconsistent with documented evidence. During the academic year, Plaintiff maintained an average workload of approximately 20 hours, a figure that is comparable to or even exceeds the work hours of other student employees who were not terminated. The selective cancellation of positions within the SSCS office, while similar roles in other university offices remain intact, suggests a disparate treatment that may amount to a violation of both procedural fairness and anti-discrimination standards.

The actions described herein may be subject to legal challenges under several applicable laws and regulations, including:

- **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)**, which prohibits employment discrimination based on race, color, religion, sex, or national origin.

- **The Equal Employment Opportunity Commission (EEOC) Guidelines**, which address issues of arbitrary and discriminatory employment practices.

- **Due Process Protections under the Fourteenth Amendment**, requiring that all employees, including student employees, be provided a fair and transparent disciplinary process.

- **Relevant State Employment and Labor Statutes**, which mandate equitable treatment and non-retaliatory actions in employment decisions.

*For example, in analogous cases where courts examined terminations based on arbitrary or pretextual reasons, despite comparable work records among affected employees the findings have underscored that a lack of consistent, documented rationale for such dismissals may indeed constitute retaliatory or politically motivated actions.* Such precedents highlight the importance of objective, uniformly applied criteria in employment matters.

Accordingly, Plaintiff respectfully requests those regulatory authorities (including the Office for Civil Rights (OCR) and the **EEOC, but not limited to**), conduct a thorough investigation into whether the termination process employed by the SSCS office violated established legal standards of due process and equal treatment. Plaintiff further seeks appropriate remedial relief for the alleged wrongful termination and any associated damages arising from this discriminatory practice. Additionally, Plaintiff reserves the right to introduce further evidence to substantiate these claims, particularly any documentation showing that the rationale of insufficient work hours was inconsistently applied compared to similar roles in other offices.

## 41. Alleged Erroneous SEVIS Record Reporting, Defamatory Disclosures, Unauthorized Surveillance, and Abuse of Administrative Authority in International Student Affairs

1. **Erroneous SEVIS Reporting and Resulting Employment Harm**
   On March 13, Plaintiff personally verified that his record in the Student and Exchange Visitor Information System (**SEVIS**) was active and in good standing. Notwithstanding this verified status, Plaintiff subsequently learned that his employment opportunities were cancelled after job supervisors were informed that his visa status had been changed. Plaintiff contends that this erroneous representation of his visa status not supported by SEVIS data has directly resulted in adverse professional consequences. Moreover, Plaintiff asserts that the premature and unsubstantiated dissemination of information regarding his impending disciplinary expulsion to third parties constitutes false and damaging statements. Under established democratic principles and legal standards, such conduct actionable as **defamation**.
   *For example, pursuant to the principles articulated in **New York Times Co. v. Sullivan, 376 U.S. 254 (1964)**, the deliberate publication of demonstrably false statements that can harm an individual's reputation may give rise to a defamation claim.*

2. **Unauthorized Surveillance via SEVIS**
   Plaintiff further alleges that the University of Chicago has improperly accessed and used his SEVIS record beyond its federally mandated purpose of tracking the immigration status of international students. Such purported surveillance, if carried out without proper authorization or legitimate administrative justification, constitutes

an abuse of the SEVIS system and an invasion of Plaintiff's privacy. This conduct potentially violates:

· **The Family Educational Rights and Privacy Act (FERPA, 20 U.S.C. § 1232g)**, which safeguards the confidentiality and appropriate use of student records; and

· **The Privacy Act of 1974 (5 U.S.C. § 552a)**, which restricts unauthorized disclosure of personal information maintained by federal agencies. *Analogous scenarios in administrative law have underscored that unauthorized use of a government-operated system for purposes other than its intended function may invite both civil liability and regulatory sanctions.*

3. **Abuse of Authority in Disciplinary and Administrative Processes**
Plaintiff further avers that the cumulative effect of the erroneous visa status reporting, coupled with unauthorized surveillance through SEVIS, illustrates a broader pattern of abuse of authority by the University. The alleged failure to adhere to proper administrative and due process protocols particularly where direct evidence of intended cause is not manifest compromises Plaintiff's rights under the **Due Process Clause of the Fourteenth Amendment**. Moreover, any selective or arbitrary application of internal policies in relation to international students may contravene the uniform standards required under both federal and state regulatory frameworks. *For example, judicial scrutiny in cases involving administrative overreach has consistently underscored the necessity for transparency and objective criteria when public institutions exercise disciplinary authority.*

Where direct evidence of the University's intent or unauthorized actions is presently incomplete, Plaintiff reserves the right to introduce further documentary evidence, expert testimony, and affidavits through the discovery process to establish a prima facie case of defamation, unauthorized surveillance, and abuse of authority.

**42. Alleged Use of Legal Technicalities to Circumvent Protections Under Title IX and Union Representation, and the Resulting Curtailment of Free Expression and Academic Freedom**

Plaintiff alleges that the Defendant has intentionally structured/implemented its administrative policies and contractual arrangements to exploit legal technicalities that effectively insulate the institution from accountability under **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)** and applicable union representation obligations under the **National Labor Relations Act (NLRA)** and related state statutes. These legal maneuvers, which rely on narrowly legally construed definitions and exemptions, have resulted in the University obstructing meaningful redress for grievances raised by affected parties.

Simultaneously, Plaintiff asserts that in practice the defendant's policies have produced an environment that stifles free expression and academic freedom (**also Chicago principles**), rights

guaranteed under the **First Amendment of the United States Constitution** and recognized as core to the collaborative pursuit of knowledge. This environment is counter to the very principles the Defendent publicly espouses. The Harris School Statement of Standards explicitly mandates that all faculty, academic appointees, and student support staff foster a setting where "every student has the opportunity to learn and to maximize their potential" and where "respect, civility, and professionalism" underpin the University's commitment to both **free expression** and **academic freedom**.

*For example, the Harris School's policy explicitly provides that "abuse of authority is unacceptable" and emphasizes informal and formal grievance processes as essential to maintaining a collegial and vibrant academic environment. This commitment is undermined when technicalities are used to evade oversight and accountability.*

By employing such legal technicalities, the University may be effectively shielding itself from Title IX enforcement and obligations to union-represented employees, thereby impeding students' and employees' access to fair grievance mechanisms and due process. This dual strategy not only circumvents statutory obligations but also jeopardizes the institutional culture by creating a chilling effect on free expression and self-advocacy among students and staff alike.

**Plaintiff respectfully requests:**

- Examine whether the reliance on narrowly interpreted technicalities to avoid Title IX and union representation responsibilities constitutes a deliberate circumvention of established legal protections.

- Order a remedy to ensure that University policies are brought into conformity with the pledge of protecting free expression and academic freedom as affirmed by both the University's own standards (e.g., as embodied in the Harris School Statement of Standards) and applicable federal constitutional and statutory guarantees.

- Award any further relief deemed appropriate, including injunctive relief to prevent ongoing adverse practices and compensatory damages for the harm sustained due to the systematic curtailment of free expression and academic freedom.

In support of these allegations, exercise of these technicalities, and the corresponding policy outcomes, indeed represent a substantive departure from both the statutory mandates of **Title IX** and the democratic principles of free academic inquiry and grievance redress. *For instance, judicial reviews in analogous contexts have recognized that when an institution manipulates legal formalities to limit access to grievance procedures, it may violate the spirit as well as the letter of the law (cf. precedents addressing administrative overreach and undue reliance on technical defenses).* Following Screenshot: https://harris.uchicago.edu/student-life/dean-of-students-office/policies

× **Harris Grievance Procedures**

**1. HARRIS STATEMENT OF STANDARDS**

All University faculty, instructors, academic appointees, and student support staff are responsible for creating a learning environment in which every student has the opportunity to learn and to maximize their potential. Abuse of authority is unacceptable at the University. Respect, civility, and professionalism are essential to the University's mission and are crucial to ensuring that the University's commitment to free expression principles and academic freedom can be realized by all.

Self-advocacy is crucial to preventing abuse of authority. Harris strives to create a learning environment where handling difficult situations is seen as important training and professionalization for faculty, other academic appointees, postdocs, and students. Everyone is responsible for building this environment.

Formal and informal processes are both important for resolving grievances. The formal grievance processes will be available for more serious cases or cases in which the informal process has been ineffective, but because abuse of authority is a complicated concept to define and there is potential for misunderstanding, informal processes should be the starting point. Most issues can and should be addressed informally through collaborative dialogue and problem solving. This is essential to capturing the pedagogical value of self-advocacy while maintaining a vibrant and collegial learning environment that both students and faculty are responsible to create and

**43. Systemic Failure to Resolve Formal Grievances and Protect Student and Employee Rights – Noncompliance with Title IX, Title VII, NLRA, and University Grievance Policies**

Plaintiff alleges that the defendant has exhibited a longstanding pattern of inaction and neglect regarding formal grievances, including and not limited to Title IX claims arising from physical and sexual assault, wrongful job termination grievances, disputes involving union representation, and challenges to unjust discharge processes. This pattern of institutional inaction runs afoul of multiple federal and state laws, as well as the University's own internal policies and student manuals, which unequivocally mandate prompt, impartial, and non-retaliatory resolution of grievances.

1. **Failure to Act on Title IX Grievances:**
   o **Legal Framework:** Under **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)**, institutions that receive federal funding must ensure that no person is subjected to discrimination on the basis of sex, including sexual harassment and assault.
   o **Alleging:** Plaintiff contends that despite numerous reported incidents involving physical and sexual assault with allegations of harassment and misconduct supported by evidence and witness testimony the defendant has consistently failed to initiate any meaningful investigation or remedial action.
   o *For example, in cases such as **Davis v. Monroe County Board of Education, 526 U.S. 629 (1999)** and **Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)**, courts have underscored that systemic inaction on Title IX complaints may constitute a violation of both the letter and spirit of the law.*
2. **Wrongful Job Termination and Union Representation Grievances:**
   o **Legal Framework:** The wrongful termination of student employees may give rise to claims under **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)**, as well as under state employment discrimination statutes and the **National**

**Labor Relations Act (NLRA)** regarding the protection of union-related activities and collective bargaining rights.

o **Allegation:** Plaintiff asserts that the University has neglected grievances relating to wrongful termination where disciplinary actions have been selectively enforced, and grievances raised by union-represented employees, thereby violating both contractual obligations and statutory rights to fair labor practices and non-retaliation.

o *For example, judicial precedents have recognized that an employer's failure to adhere to established grievance protocols, particularly when those protocols are enshrined in both internal policy and labor law, can give rise to liability for retaliatory and discriminatory practices.*

3. **Grievances Challenging Discharge and the General Denial of Redress:**

o **Legal Framework:** The failure to remedy grievances including those challenging wrongful discharge contravenes the **Due Process Clause of the Fourteenth Amendment**, which guarantees fair administrative and disciplinary processes. Moreover, the University's grievance procedures, as set forth in the **Graduate Student Grievance Policy** (available at Student Manual, University Policies: Graduate Student Grievance Policy: https://studentmanual.uchicago.edu/university-policies/graduate-student-grievance-policy/), explicitly command a non-retaliatory, prompt, and deliberative process for resolving student complaints.

o **Allegation:** Plaintiff observes that, historically, such grievances have been ignored or dismissed without proper investigation. The defendant's practice of taking no action even when formal complaints regarding sexual harassment, other forms of misconduct, and wrongful discharge are raised signals a systemic violation of its own policies and obligations to ensure a safe, respectful, and free academic environment.

o *For example, the University's own Statement of Non-Retaliation plainly provides that any act of retaliation or failure to address a grievance is itself a violation of policy. Judicial reviews in similar contexts have found that institutional failure to address substantive grievances may constitute actionable breaches of both statutory and contractual duties.*

4. **Violation of University Policies and the Right to a Respectful Grievance Process:**

o **Internal Policy Mandates:** According to the University Student Manual, all allegations pertaining to sexual harassment, misconduct, or unlawful discrimination must be handled under the defendant's Policy on Harassment, Discrimination, and Sexual Misconduct, with strict assurances that no complainant shall suffer retaliation. Additionally, the manual underscores that complaints regarding student conduct, academic fraud, or other breaches of University standards must be promptly reported to the Dean of Students and processed through an established formal grievance system.

- o **Allegation:** Plaintiff asserts that the University's pattern of inaction evidenced by the lack of corrective measures in response to Title IX complaints, wrongful job termination grievances, union representation issues, and challenges to wrongful discharge not only violates the statutory mandates but also breaches the internal promises of fair and equitable grievance resolution set forth in University policies.

- o *For example, comparisons with other adjudications under similar circumstances have resulted in remedial orders and monetary awards when institutions have demonstrably failed to comply with their internal grievance procedures, thereby reinforcing the validity of the student's right to effective advocacy and protection under the law.*



| Complaints or Disputes about Grades and Academic Evaluations |
| Time Limits |
| Informal Resolution Options |
| Statement of Non-Retaliation |

All members of the University community should be able to bring forward conflicts, concerns, and possible grievances in a respectful environment and are expected to do so in good faith. The University prohibits retaliation against any person who exercises their rights or responsibilities under this policy. Any act of retaliation may be a separate violation of this policy.

## 44. Failure to Initiate a Formal Grievance Process in Title IX and Employment Disputes – Breach of Statutory Requirements, Due Process Protections, and Internal University Procedures

Plaintiff alleges that despite the University's clear and publicly disseminated formal grievance procedures designed to address allegations of sexual misconduct, harassment, wrongful termination, and abuse of authority no such process in plaintiff knowledge was ever initiated in response to Plaintiff's Title IX complaint or his wrongful termination from his student job role. Furthermore, doubts persist as to whether the university even complied with the Clery Act regulations. This systemic failure to convene a proper **Grievance Review Committee** and adhere to the established review process not only contravenes the University's own policies but also violates several federal and state legal standards as outlined below:

1. **Breach of Statutory Obligations under Title IX and Related Laws**
   - o **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)** mandates that educational institutions receiving federal funding must promptly and fairly investigate and adjudicate claims of sexual harassment, assault, and other forms of sex discrimination.
   - o By neglecting to convene a formal review process in response to Plaintiff's Title IX complaint, the University has effectively deprived him of the procedural protections guaranteed by federal law.
   - o *For example, in decisions such as **Davis v. Monroe County Board of Education, 526 U.S. 629 (1999)**, courts have held that failure to implement a proper grievance*

*procedure under Title IX may result in liability for institutions, thereby underscoring the necessity for prompt and unbiased investigations.*

2. **Violation of Due Process and Internal University Policies**

   o The University's published formal grievance procedure explicitly requires that, upon receipt of a complaint, the **Vice Provost** convene a **Grievance Review Committee** composed of three faculty members, one student, one staff member, and the Vice Provost (or their designee). This protocol is intended to ensure that all grievances are reviewed by an independent, unbiased body, with opportunities for both complainant and respondent to present evidence and secure a support person.

   o Plaintiff contends that, despite these clear directives, neither the Grievance Review Committee nor any similar formal process was ever activated in his case. In turn, this failure:

      § Deprives him of an opportunity to have his grievance evaluated by a body free from material bias and conflicts of interest, as required by the University policy.

      § Breaches the University's own **Statement of Non-Retaliation** and the commitment to "create a respectful environment" wherein every complaint is resolved in good faith.

   o This lapse constitutes a violation of the **Due Process Clause of the Fourteenth Amendment**, which requires that all individuals receive a fair and impartial process when their rights or benefits are at stake.

   o *For instance, in analogous claims where courts scrutinized the adequacy of grievance procedures, the absence of a proper review mechanism has been cited as evidence of procedural unfairness and institutional negligence.*

3. **Wrongful Termination and Retaliatory Discharge**

   o Plaintiff further alleges that his wrongful termination from his student job role was not subject to any formal review or grievance process, even though similar termination cases involving student employees especially those alleging retaliatory discharge are supposed to be examined under the University's grievance policies.

   o This omission where no investigative or corrective action was pursued exacerbates the violation of statutory protections under **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)** and applicable labor statutes, in addition to undermining the principles of fair employment practices as set forth in the **National Labor Relations Act (NLRA)**.

   o The lack of any remedial action following Plaintiff's allegations parallels other documented instances where failure to provide an accessible grievance remedy has prompted judicial intervention, thereby reinforcing the importance of compliance with established grievance protocols.

   o *For example, precedents in cases addressing retaliatory terminations have established that failure to allow for a formal review not only diminishes the right to fair labor practices but may also constitute actionable retaliation.*

4. **Comprehensive Failure to Adhere to the Graduate Student Grievance Policy**

- o As outlined in the University's Graduate Student Grievance Policy (available in the Student Manual), the formal grievance process is designed to protect student rights and ensure non-retaliatory handling of all complaints including those involving abuse of authority and discriminatory discharge.
- o Plaintiff asserts that no formal meeting, collection of relevant documentation, or opportunity to present supporting evidence was ever afforded to him pursuant to this policy. This systematic inaction represents a breach of the contractual and statutory obligations the University has undertaken towards its student body.
- o Moreover, the denial of access to the benefits of the formal grievance process not only violates internal policy but also undermines the statutory assurances provided by **Title IX** and related federal and state regulations designed to protect against discriminatory and retaliatory practices.

**Relief** **Sought:**

Based on the foregoing, Plaintiff respectfully requests that the Court:

- · Declare that the University's failure to activate its formal grievance process in connection with Plaintiff's Title IX complaint and wrongful termination constitutes a violation of **Title IX (20 U.S.C. § 1681 et seq.)**, **Title VII (42 U.S.C. § 2000e et seq.)**, the **NLRA**, and the University's own policies as enshrined in its student manuals and grievance procedures.
- · Order injunctive relief mandating the immediate initiation of a comprehensive and independent grievance review mechanism for all pending grievances, including but not limited to those related to Title IX claims and wrongful terminations.
- · Award compensatory and punitive damages to remedy the harm suffered by Plaintiff, including the loss of educational and employment opportunities, emotional distress, and reputational harm resulting from the University's failure to provide due process.
- · Provide for retrospective review of all grievances that were improperly dismissed or ignored, ensuring accountability and adherence to the established formal grievance process.

(https://studentmanual.uchicago.edu/university-policies/graduate-student-grievance-policy/)

### Formal Grievance Process

*Review Committee*

The Vice Provost will convene a Grievance Review Committee to consider the case. The Committee will generally be composed of three faculty members, one student, one staff member, and the Vice Provost (or their designee). Generally, faculty, students, and staff serving on the Committee do not come from the academic department or program of either the complainant or the respondent(s).

All members of the Committee are required to maintain independent judgment and open-mindedness about the alleged grievance, free from material bias and conflicts of interest, or they must recuse themselves.

The student and respondent will be notified of the composition of the Committee as soon as practicable before the Committee begins its review. Either party may request a substitution if the participation of any individual on the Committee poses a conflict of interest. Such requests must be made to the Vice Provost (or their designee) within two business days of receiving notice of the members of the Committee. Requests must identify with specificity the alleged nature of the conflict of interest. Using reasoned judgment, the Vice Provost (or their designee) will decide whether the alleged conflict is genuine and material and, if so, whether it compels the Committee member's replacement.

*Review Process*

The Committee will designate a member or members to:

Activate Windows
Go to Settings to activate Wind

*Review Process*

The Committee will designate a member or members to:

- Conduct interviews, as necessary, with individuals who may have relevant knowledge;
- Collect information, as necessary, including relevant documents.

The student and respondent(s) will be given the opportunity to provide relevant documentation, provide names of individuals who have relevant knowledge with whom the Committee could speak, and meet with the Committee or a designated representative of the Committee.

The Committee will review all information and make a recommendation to the Provost (or their designee).

The Committee will apply a preponderance of evidence standard in making its recommendation. Namely, the Committee will decide whether, in consideration of all the information before it, it is more likely than not that an abuse of authority occurred.

*Role of Support Person*

collegial learning environment that both students and faculty are responsible to create and maintain.

Students can trust that Harris's grievance policies and procedures provide them protection, that they will not be retaliated against for bringing forward conflicts, concerns, and possible grievances, and that Harris staff and leadership will listen to and advocate for them. Faculty and others in positions of authority can trust that those who are in charge of investigating student grievances will treat them fairly and conduct their investigation with integrity.

This policy establishes a process by which currently enrolled graduate students in the Harris School of Public Policy and those on an approved leave of absence can file a formal grievance alleging abuse of authority by faculty, other academic appointees, postdoctoral researchers, or staff.

In the case where a Harris student has a potential grievance alleging abuse of authority by someone outside of Harris, students should follow the Harris grievance policy.

In extraordinary circumstances, students may request that a grievance case be handled by the Office of the Provost. If a student wishes to submit a grievance case to be handled by the Provost's Office, they must provide supporting rationale for why their case cannot be fairly heard within the Harris School. Please consult the **University Grievance Policy for Graduate Students** for more information.

**45. Denial of Informal Grievance Resolution in Disciplinary Matter: Breach of University Grievance Policies, Due Process, and Contractual Obligations, Reflecting Autocratic Abuse of Authority**

Plaintiff contends that the University of Chicago, in deviating from its established grievance policies and procedures, has repeatedly denied access to a bona fide informal resolution option for disciplinary disputes. Specifically, during a meeting held on February 14 with Dean Kate Biddle, when Plaintiff kindly requested an informal resolution process as outlined in the University's grievance policies, the Dean categorically rejected this option without offering any justification or logic or rationale when asked (Point 6: https://harris.uchicago.edu/student-life/dean-of-students-office/policies). This omission represents not only a repudiation of the University's own policy but also serves as an indicator of real autocratic decision-making, a breach of due process rights, and a violation of contractual obligations owed to the student body, and shows the decision was premade to avoid the grievances filed and harass the whistleblower plaintiff. Also in this same meeting, dean confirmed to plaintiff that complainant is the Defendant University since it was not mentioned in the complaint documents shared by the university.

1. **Violation of University Policies and the Right to Informal Resolution**
   The Harris School's Student Manual and Dean of Students Office policies clearly articulate:
   - **Statement of Non-Retaliation:** Affirming that all community members may report grievances without fear of retaliation and that they are entitled to a respectful and good-faith environment.

- o **Informal Resolution (Section 6):** Providing students with multiple options to resolve concerns before the initiation of formal proceedings.

  *For example, the policy explicitly states that students may seek advice from the Dean of Students, the Student Ombuds Office, or other designated campus-wide resources as a first step in approaching conflict resolution. By refusing to discuss any informal resolution options, the University has directly contravened these established guidelines.*

2. **Breach of Due Process and Contractual Obligations**

   The inability to access a procedural avenue for informal resolution especially when such a pathway is contractually promised through the University's published grievance policies undermines the fundamental principles of procedural due process guaranteed by the **Due Process Clause of the Fourteenth Amendment**. As established in judicial precedents addressing internal disciplinary procedures in academic institutions, every student is entitled to a fair opportunity to be heard before any adverse action, including disciplinary measures or termination of roles, is finalized.

   *Analogous cases have held that where educational institutions deny a clearly defined dispute resolution process, such actions constitute a breach of the contractual relationship between the student and the University. This denial not only deprives the student of a fair hearing but also evidences an abuse of authority by unilaterally imposing decisions without appropriate procedural safeguards.*

3. **Indicator of Autocratic Decision Making and Abuse of Authority**

   Plaintiff alleges that the outright rejection of any informal resolution mechanism during the February 14 meeting further signals an autocratic decision-making process, wherein the University expediently bypasses established, fair, and impartial administrative procedures. Such behaviour renders the grievance process illusory by negating an essential component of self-advocacy and conflict resolution demanded by both internal policies and external legal standards.

   *For example, past judicial scrutiny of similar administrative practices has upheld claims where the failure to provide informal, non-retaliatory resolution mechanisms was found to amplify claims of abuse of authority and breach of internal contractual assurances.*

4. **Legal Claims and Relief Sought**

   In light of the foregoing, Plaintiff asserts that the University's actions constitute:

   - o A **breach of contractual obligations** as defined by its own Student Manual and grievance policies;

   - o A clear **violation of procedural due process** rights under the **Fourteenth Amendment**, by denying Plaintiff a chance to resolve disputes in a manner explicitly promised by University policy;

   - o Evidence of **abuse of authority** and an **autocratic modus operandi** inconsistent with the principles of fair administration and non-retaliatory practice mandated by both federal law (such as **Title IX**) and state-specific educational regulations.

**Consequently, Plaintiff respectfully requests that this Court:**

o   Declare that the failure to offer an informal resolution option, as required by University's policies, constitutes a material breach of both contractual and due process rights;

o   Order injunctive relief, compelling the defendant university to adhere to its published grievance procedures, including immediately offering all students a genuine option to engage in informal resolution before any formal or disciplinary action is taken;

o   Award compensatory and punitive damages reflective of the harm suffered, which includes loss of the opportunity for a fair resolution process, reputational damage, and the adverse effects of unilateral, autocratic decision-making;

o   Mandate a retrospective review of all similar cases where informal resolution options were denied, ensuring accountability for past decision-making practices that fall short of the defendant university's own policies.

harris.uchicago.edu/student-life/dean-of-students-office/policies

There is no time limit on filing a grievance, though a grievance may only be filed by a current student or a student on an approved leave of absence. Students are encouraged to file a grievance as soon as is practicable as it maximizes the University's ability to respond promptly and effectively. Delayed reporting often results in the loss of relevant information or documentation, and/or in faded and unreliable memories; it also impairs the University's ability to interview individuals with knowledge of the case, assess information, and, if appropriate, review and resolve complaints.

**5. Statement of Non-Retaliation**



All members of the community should be able to bring forward conflicts, concerns, and possible grievances in a respectful environment and are expected to do so in good faith. The University prohibits retaliation against any person who exercises any rights or responsibilities under this policy. Any act of retaliation may be a separate violation of this policy.

**6. Informal Resolution**

Recognizing that all situations are unique, the Harris School seeks to present students with a number of options and approaches towards addressing conflict and reporting concerns. While formal grievance resolution is only applicable to cases involving an allegation of abuse of authority, the options presented in this section are available to all students regardless of the specific nature of their complaint or concern.

Activate

**6.1 Seek Advice**

The individuals and offices listed below are available to assist students and discuss options for approaching informal resolution. Students should be supported when confronting challenges, and we seek to create an environment that encourages asking for help and providing support. Seeking advice for resolving concerns or complaints is the first step towards constructively addressing an issue of concern.

**Harris Resources:**



- The Dean of Students can meet with students to discuss their individual situation, provide an overview of grievance procedures, and offer guidance on options for informal resolution.

- Students can also bring concerns to the Harris Student Government co-presidents or to the Harris Student Government Academic Committee chair. These positions are not responsible for resolving student grievances but can be a useful sounding board.

**Campus-Wide Resources:**

- Student Ombuds Office serves as a peer resource to assist in the resolution of conflicts, concerns, and other problems that they may encounter through the course of University life. They provide individual consultation and write reports to the campus community identifying recurring student concerns.

---

**46. Violation of University of Chicago Disciplinary Committee Composition Requirement Under Step 7.4 – Breach of Internal Grievance Protocols, Procedural Due Process, and Impartial Review**

Plaintiff asserts that, in contravention of Step 7.4 of the Harris School grievance policy, the University of Chicago convened a grievance committee that exceeded the mandated membership structure. Specifically, instead of limiting the committee's composition to three faculty members, one student, and the Dean of Students, the actual committee incorporated additional representatives from campus student life and other student bodies. Such deviation from the prescribed format undermines the principles of impartiality and independent judgment required for a fair review process.

1. **Breach of Internal Policy and Procedural Due Process:**

   o **Mandated Composition:** According to Step 7.4 of the Harris Grievance Committee guidelines, the Dean is required to convene a committee composed strictly of three faculty members, one student, and the Dean of Students. This defined composition is purposed to ensure that every committee member maintains independent judgment and is free from material bias.

   o **Deviation from Protocol:** The inclusion of extra members, such as additional student representatives from campus student life, constitutes a clear violation of these internal procedures. This departure from the mandated composition deprives the complainant of the very process designed to foster open-mindedness and unbiased decision-making.

o **Due Process Implications:** The failure to adhere to the prescribed format not only breaches internal contractual obligations but also violates the **Due Process Clause of the Fourteenth Amendment**. Judicial precedents have consistently held that irregularities in the grievance process, such as non-compliance with stipulated review committee structures, can render the proceedings unfair and arbitrary, thus warranting remedial action. *For instance, in analogous disputes in academic settings, courts have set aside decisions rendered by grievance committees when significant deviations from established protocols were identified, thereby upholding the complainant's right to a fair process.*

2. **Potential for Bias and Inadequate Representation:**

   o **Conflict of Interest and Material Bias:** The presence of additional, unsolicited members increases the risk of conflicts of interest and compromises the committee's ability to maintain the independence and impartiality required by the policy. The mandatory provision for recusal in the event of such conflicts is rendered ineffective when the committee structure itself is not properly adhered to.

   o **Notification and Transparency:** Furthermore, the policy requires that both the student and the respondent be notified of the committee's composition as soon as practicable so that either party may request a substitution if a conflict of interest exists. The deviation from the prescribed membership likely disrupted this balance, thereby diminishing transparency and the opportunity for meaningful recourse.

3. **Legal and Practical Ramifications:**

   o **Breach of Contract and Abuse of Authority:** The failure to follow the established grievance committee composition not only constitutes a breach of the University's internal policies but also exemplifies an abuse of administrative authority. It signals a departure from the agreed principles of non-retaliation and fair conflict resolution that the University has committed to uphold.

   o **Legal Precedents in Student Favor:** *For example, in cases where academic institutions have deviated from their own grievance procedures, courts have noted that such deviations can serve as a material factor in determining the invalidity of disciplinary actions. This precedent reinforces the importance of strict adherence to established protocols to safeguard student rights and ensure procedural fairness.*

   o **Relief Sought:** In light of these violations, Plaintiff respectfully requests that the Court declare the improper composition of the Grievance

Committee a material breach of the University's policies. Furthermore, Plaintiff seeks injunctive relief ordering the immediate reconstitution of the committee in strict compliance with Step 7.4, along with compensatory and punitive damages for the consequent harm, including the loss of a fair adjudicatory process and the resultant abuse of authority.

### 7.4 Harris Grievance Committee

The Dean will convene a Grievance Committee to consider the case. The Committee is charged with reviewing all information about the case and making a recommendation to the Dean.

The Committee will generally be composed of three faculty members, one student, and the Dean of Students.

All members of the Committee are expected to maintain independent judgment and open-mindedness about the alleged grievance, free from material bias and conflicts of interest, or they should recuse themselves.

## 47. Systematic Noncompliance with Title IX and Denial of Equal Educational Opportunities – Failure to Provide a Safe, Non-Discriminatory Learning Environment

Plaintiff alleges that the defendant university has systematically failed to fulfil its Title IX obligations, thereby denying equal opportunities for safe, non-discriminatory access to its educational programs and activities. This failure amounts to a material breach of both federal law and the University's own policies as set forth in its Title IX policy documents, which were last updated on October 2, 2024.

1. **Failure to Provide Equal Opportunities**

   o **Federal Obligations:** Under **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)**, all educational programs and activities receiving federal funding must be free of sex discrimination, including acts of sexual harassment, assault, and other forms of gender-based discrimination. Failure to adhere to these standards constitutes a direct violation of federal law.

   o **University Policy Requirements:** The University's Title IX policy, available at:

     § **Policy on Title IX Sexual Harassment (Last Updated: October 2, 2024):** _https://bpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/4/2793/files/2024/10/Policy-on-Title-IX-Sexual-Harassment-1.pdf_

     § **Title IX Policy Website:** _https://titleixpolicy.uchicago.edu/_

These documents explicitly state that the policy applies to all of the University's education programs or activities in the United States, irrespective of whether such programs occur on-campus or off-campus. Notably, the policy mandates that the University ensure non-discriminatory and a safe environment for all members of its academic community, including measures to address complaints of sexual harassment and misconduct. The University also extends these protections to matters involving complaints against staff or faculty at the University of Chicago Laboratory Schools, taking into account the age and developmental stage of the student(s) involved.

- o **Allegation:**
  Plaintiff contends that, in practice, the University has failed to provide these equal opportunities. Rather than implementing a robust and accessible process for addressing complaints of sexual misconduct and discrimination, the University has either ignored or inadequately acted upon such complaints. This systematic failure denies students the protection and redress mandated by both federal law and the University's internal policies and amounts to a de facto zero tolerance for equal opportunity under Title IX.

2. **Implications of the Failure:**

- o **Violation of Constitutional and Federal Rights:**
  By neglecting to enforce its Title IX policy, the University not only violates **Title IX (20 U.S.C. § 2000d et seq.)** but also undermines the equal protection rights guaranteed under the **Equal Protection Clause of the Fourteenth Amendment**. Such noncompliance deprives students of a safe educational environment and the opportunity to pursue their studies free from gender-based discrimination and harassment.

- o **Precedents Favoring Students:**
  *For example, in cases such as **Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)**, and **Davis v. Monroe County Board of Education, 526 U.S. 629 (1999)**, courts have held that failure by an educational institution to enforce Title IX obligations can result in liability when such failures lead to a hostile academic environment and the denial of equal educational opportunities.* These precedents underscore the expectation that institutions must actively provide equal opportunities and swift resolution of grievances related to sexual misconduct.

- o **Remedial and Compensatory Relief:**
  The systematic noncompliance with Title IX, coupled with the absence of effective protective and remedial measures, has significant adverse consequences. Students are deprived of the due process and support services

they are entitled to under both federal mandates and the University's own policies.

3. **Relief** **Sought:**

Consequently, Plaintiff respectfully requests that this Court:

o **Declare** that the University's failure to provide equal opportunities and enforce its Title IX obligations constitutes a material violation of federal law and the University's own published policies.

o **Order Injunctive Relief** necessary to compel the University to immediately comply with its Title IX policies, ensuring that all educational and extracurricular activities are conducted in an environment free from gender discrimination and that all complaints of sexual harassment and misconduct are promptly and impartially addressed.

o **Award Compensatory and Punitive Damages** to remedy the harm suffered by students as a result of this systemic failure, including but not limited to the loss of educational opportunities, reputational harm, and emotional distress.

o **Mandate a Retrospective Review** of all Title IX-related complaints to determine whether similar failures occurred in the past, thereby ensuring accountability for any prior violations.

Plaintiff reserves the right to submit additional evidence and expert testimony documenting the University's systematic failure to maintain equal opportunities and comply with its Title IX obligations. This evidence will further substantiate that the University's practices not only violate federal law, but also breach the assurances provided by its internal policies designed to protect and serve its diverse academic community.



**48 Denial of Accommodations and Failure to Provide Interim Safety Measures – Violation of University Policy, Title IX Requirements, and Breach of Contractual Duty to Ensure Student Safety**

Plaintiff alleges that the denial of reasonable accommodations for his documented disability resulted in a substantial limitation of one or more major life activities, including but not limited to **[Data Redacted]** and the ability to manage a serious medical condition in a safe and dignified manner.

Plaintiff communicated his accommodation needs to relevant staff at the Harris School and further informed the Dean, explicitly stating his willingness and ability to pay the nominal $30 fee associated with the requested accommodation. Despite this, the requested accommodation was denied.

As a direct and proximate result of this denial, Plaintiff was forced to utilize an alternative existing system that was medically inappropriate for his condition, leading to adverse physical consequences including infection and exposure to**[Data Redacted]**. The repeated use of this inadequate system required as frequently as every 30 minutes to 90 minutes throughout each day caused continuous harm, disrupted Plaintiff's educational activities, and impaired his ability to function in daily life.

Plaintiff asserts that the University of Chicago, through its Office for Sexual Misconduct Prevention and via a written communication from Megan Heckel, failed to provide legally required safety accommodations following Plaintiff's report of serious sexual and physical assault. Ms. Heckel, Vickie Sides, and some other staff members from university, was talking on calls mainly with plaintiff but, following consultation with the University's Human Resources department, advised Plaintiff that no University policy was implicated because the alleged assault occurred off-campus and outside of an employment context. As a result, the University refused to issue a no-contact directive or to provide any other internal protective measures, including filing formal grievance. Further university considered him as a employee but not a student, but he was also a student completing his bachelor's degree. So here the assaulter was still allowed to complete degree, and it gave him complete leeway to live happily after assault, but this doesn't happen to be the case for plaintiff who didn't assault anyone. This clearly signals that assaulter can take good breaths in university but not the grievance filers, and whistleblowers.

Instead, Plaintiff was instructed to seek external law enforcement remedies without any procedural or institutional support from the University, contrary to prior assurances that the matter **could be addressed internally only**. During this process, some university representatives also **discouraged** Plaintiff from pursuing formal complaints, warning that doing so could jeopardize (have negative affect) Plaintiff's academic, immigration, and employment status. These statements, conveyed over multiple calls by various staff

members, had a **cumulative chilling effect** on Plaintiff's willingness to get justice through channels. Plaintiff strongly suspects that this coordinated **discouragement was a deliberate attempt** to suppress complaints, reduce the public reporting of campus crime under the Clery Act (and other relevant reporting rules), and shield the institution from reputational harm or legal liability, since the crime was done by a university staff (And also since that person/his professor might have been working or worked on federally funded project by NIH, or NSF but not limited to these federal agencies), and maybe reporting that might have taken funding off or there can be other additional reasons as well. Initially, Plaintiff held a reasonable belief that the University would resolve the matter as promised, however, the consistent messaging instilled in Plaintiff a reluctance to take formal legal action an outcome the University seemingly cultivated through intentional psychological influence and deterrence. While the individual who did serious crime was allowed to continue in his university-affiliated role without consequence happily, the Plaintiff as the complainant and victim was subjected to retaliatory treatment, discriminatory actions, and systemic procedural injustice following the report of the incident.

Additionally, Plaintiff was subjected to discriminatory and stereotypical remarks on call by university staff suggesting that plaintiff should exhibit **"masculine character"** in handling the incident and **"let it go"**, thereby trivializing the severity of the alleged misconduct and deterring Plaintiff from reporting. Then further when plaintiff argued about the matter politely, the staff said on that "You should go back to your third world country as soon as possible", and derogatory remarks about my origin, parents. The cumulative effect of these actions was to suppress Plaintiff's access to institutional grievance mechanisms and to silence protected disclosures, in violation of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), which mandates equal access to support services and prohibits retaliation for reporting sex-based misconduct.

organization that is officially recognized by the University.

This policy applies to all of the University's education programs or activities in the United States, regardless of whether such programs or activities occur on-campus or off-campus.
Study-abroad programs and off-campus locations that are not within the University's education program or activity are not covered by the Title IX regulations or by this Policy.

When Plaintiff was discussing university official told that he would be considered as staff and not student and that's why we can't do anything (or no NCD can be given in that case), where it's clearly mentioned that it can be given in any case, including student, staff and even non university members.

https://equalopportunityprograms.uchicago.edu/additional-information/

**No Contact Directives**

A No-contact Directive (NCD) issued in response to an alleged violation of the Policy on Harassment, Discrimination, and Sexual Misconduct is an administrative action designed to prevent contact between two or more individuals. NCDs can be issued based on request or need, as determined by the University official issuing the directive, and do not require the filing of a formal complaint. NCDs are generally mutual in scope and do not determine fault, unless otherwise stated. In certain circumstances a unilateral (single party) NCD may be issued to a respondent. NCDs may be issued to students, faculty, other academic appointees, staff, postdoctoral researchers, alumni, and persons not affiliated with the University.

The parameters of every NCD are determined on a case-by-case basis and are reviewed on an ongoing basis or upon request. An NCD may be an accommodation, an interim measure, or a remedy following a disciplinary proceeding.

An NCD prohibits contact, including, but not limited to in-person, through electronic means, or through a third party, but it does not prevent individuals from being in the same place or seeing one another on- or off-campus. The University may, however, require a respondent to leave a place where a complainant is present or otherwise restrict a respondent's activities as a separate interim measure and/or a remedy if appropriate.

An NCD issued in response to an alleged violation of the Policy on Harassment, Discrimination, and Sexual Misconduct can be implemented by any of the following individuals, and/or their designees:

The Title IX Coordinator and Deputy Title IX Coordinators – titleIX@uchicago.edu

The Dean of Students in the University – DOS-university@uchicago.edu

The Associate Dean of Students for Disciplinary Affairs – umatter@uchicago.edu

Any potential violation of an NCD should be reported, by email or phone, to the University official who issued the directive and may result in disciplinary action. Students are always encouraged to seek any clarification regarding a NCD.

If you have questions about NCDs, you may speak confidentially with a Sexual Assault Dean on Call, or anonymously with the Deputy Title IX Coordinator for

1. **Violation of University Policy and Internal Standards**

   o The University's **Policy on Title IX Sexual Harassment** (last updated October 2, 2024) mandates that the policy applies to all of the University's education programs and activities within the United States. This policy and its attendant promise to provide a safe educational environment requires that appropriate interim measures, such as a no-contact directive, be issued when there is evidence of sexual misconduct or harassment that adversely impacts the complainant.

   o By categorically dismissing Plaintiff's request for such an accommodation on the sole basis that the conduct occurred off campus and was unrelated to employment, the University has contravened its own published policy and failed to uphold the principles of support and protection explicitly promised to its students.

   o *For example, in similar cases where institutions have been found to deny interim measures by narrowly interpreting policy boundaries, courts have recognized that an unwavering duty exists to protect students from a hostile educational environment, regardless of the precise location of certain events.*

2. **Failure to Adhere to Federal Mandates Under Title IX and Other Applicable Laws**

   o Under **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)**, recipients of federal funds are required to ensure that educational programs are free from discrimination on the basis of sex. This includes the obligation to promptly and effectively address complaints of sexual harassment and misconduct by providing appropriate interim measures, even if some conduct occurs off campus when it has a material impact on the University environment.

o The University's decision not to issue a no-contact directive or any other form of accommodation by deferring the remedy to law enforcement rather than addressing Plaintiff's internal grievance demonstrates a failure to protect students in accordance with federal mandates, thereby violating both **Title IX** and related administrative guidelines issued by the **Office for Civil Rights (OCR)**.

o *In analogous adjudications, judicial bodies have invalidated institutional practices that were overly reliant on geographic or technical excuses to deny interim measures, emphasizing that the protection of the educational environment remains paramount.*

3. **Breach of Contractual Obligations and Denial of Equal Opportunities**

o By failing to provide readily available accommodations and by effectively dismissing Plaintiff's concerns under a narrow interpretation of employment connection the University is alleged to have breached its contractual and policy obligations to the student body. The University's internal policies, as reflected in its digital and printed communications, explicitly commit to ensuring that all students have access to remedial measures and protections without fear of retaliation.

o This denial not only restricts Plaintiff's right to an environment free from harassment and potential retaliation but also undermines efforts to provide equal educational opportunities, an imperative supported by both internal policy and federal law.

o *For instance, precedent has shown that when a University denies access to no-contact directives or similar accommodations without objectively considering the impact on the campus climate, such denial is viewed as a breach of the institution's duty of care toward its students.*

4. **Relief**                                                   **Sought**

In light of the foregoing, Plaintiff respectfully requests that the Court:

o **Declare** that the University's refusal to provide the requested accommodations including issuance of a no-contact directive constitutes a violation of its internal policies and federal obligations under **Title IX (20 U.S.C. § 1681 et seq.)**, as well as other applicable statutes aimed at ensuring a safe educational environment.

o **Order Injunctive Relief** requiring the University to immediately provide all appropriate accommodations and interim measures to protect Plaintiff and any similarly situated individuals from further harm.

o **Award Compensatory and Punitive Damages** to redress the emotional distress, reputational harm, and other damages suffered by Plaintiff as a result of this denial.

o **Mandate a Retrospective Review** of past accommodation requests to ascertain if similar denials have occurred, ensuring accountability and future adherence to the University's policy obligations.

5. **34 C.F.R. § 106.44 and § 106.45** – Title IX regulations requiring schools to respond promptly and equitably to reports of sexual harassment and to implement supportive measures.

6. **Illinois Human Rights Act (775 ILCS 5/5-102.1)** – Prohibiting institutions from denying accommodations or discriminating in retaliation for protected activity.

7. **42 U.S.C. § 1983** – If the University is acting under color of state law or administering federally-funded programs, a failure to provide process or accommodations could give rise to a due process or equal protection violation.

8. **Section 504 of the Rehabilitation Act (29 U.S.C. § 794)** and **Title II of the ADA (42 U.S.C. § 12132)** – If Plaintiff's ability to engage with grievance processes or educational access was affected by trauma or related disability, this refusal amount to disability discrimination.

9. **ADA Amendments Act (ADAAA) of 2008** expanded the definition of major life activities to include bodily functions, such as digestive, bladder, and bowel functions. This means that conditions like Crohn's disease, incontinence, or other medical issues affecting restroom use may be protected under disability laws.

**[Data Redacted]**

## 49. Breach of Client Confidentiality and Invasive Solicitation Practices by Legal Counsel – Undermining Ethical Obligations in the Legal Representation Intake Process

Plaintiff asserts that while seeking legal representation for claims related to civil rights, discrimination and wrongful termination, he proactively contacted several legal firms. One such firm, Barrett & Farahany (refer to https://www.justiceatwork.com/), initiated communication on April 19. During this call, the firm's representative inquired regarding the identity of the University involved in the complaint. Plaintiff explicitly requested confidentiality and disclosed that the complaint pertained to the University of Chicago. Despite Plaintiff's instructions at the beginning of call, the representative continued to press for additional details, including Plaintiff's job role, salary, nature of the alleged discrimination, specific comments made, and the rationale behind Plaintiff's belief that the University was engaging in such practices.

Plaintiff noted that this line of questioning deviated from standard expectations of confidentiality in initial legal client intake call, and aroused suspicions regarding potentially improper practices. The call, which was interrupted by the representative, was later resumed from an alternate telephone number. In the subsequent communication, the representative stated that due to a **conflict of interest** the firm was unable to take Plaintiff's case. This sequence of events has led Plaintiff to reasonably infer that not only were confidentiality obligations compromised, but that such practices might signal broader

systemic issues regarding the handling of potentially sensitive information. Two days later, Plaintiff began receiving email messages that, as Plaintiff reasonably suspects, contained or referenced evidence of a data breach on Gmail. Plaintiff alleges that the data given by plaintiff on the call was already shared to university despite to plaintiff requesting them to keep everything confidential.

**In asserting this claim, Plaintiff contends that:**

· The firm's actions including asking invasive questions despite an explicit request for confidentiality may constitute a breach of the professional and ethical obligations mandated by the **American Bar Association's Model Rules of Professional Conduct**, which require that attorneys maintain the confidentiality of all client communications.

· The inadvertent or deliberate disclosure of confidential information raises serious concerns regarding conflicts of interest and the integrity of the legal representation process.

· Such questionable practices also undermine the fundamental right to seek independent legal counsel in a confidential manner, thereby impacting the ability of individuals to access institutional or independent legal teams without fear that their sensitive information will be misused or disseminated.

**Accordingly, Plaintiff seeks the following relief:**

1. **Declaratory Relief:** That any practices or policies which permit or facilitate breaches of confidentiality in the solicitation or provision of legal representation be declared inconsistent with applicable ethical standards and contractual obligations.

2. **Injunctive Relief:** That the University, in conjunction with oversight bodies or through internal policy reform, institute robust safeguards ensuring that all parties whether institutional legal teams or contracted counsel adhere to strict confidentiality rules and conflict-of-interest checks. This should include clear measures that preclude external law firms from engaging in practices that might compromise the confidentiality of student complaints.

3. **Policy Reform:** That rules be established, or existing ones reinforced, granting students unimpeded and confidential access to institutional legal teams. Such measures should prevent external legal representatives from soliciting or interfering with the confidentiality of Plaintiffs' complaints.

4. **Damages:** An award of compensatory damages for any harm suffered as per jury, including reputational damage, emotional distress, and impediments to accessing justice, resulting from the breach or suspected breach of confidentiality.

This allegation is made in good faith without prejudice to any further claims regarding the wrongful disclosure of confidential information and is intended to serve as a basis

for both refining institutional practices and safeguarding Plaintiff's and similarly situated individuals' rights to confidential legal representation.

**[Data Redacted]**


**[Data Redacted]**


## 50. Institutional Suppression of Legal Complaints and Public Scrutiny – Violation of Transparency, Due Process, and Accountability through Manipulated Complaint Reporting and Intimidatory Enforcement Practices

Plaintiff asserts that the University of Chicago may be engaging in institutional practices designed to suppress, obfuscate, or minimize the visibility of complaints and legal claims filed against it. Specifically, Plaintiff notes that a review of publicly available records from the U.S. Department of Education's Office for Civil Rights (ED.gov), PACER, reveals only one active case reported against the University, an unusually low figure for a large, high-profile institution situated in an urban area with significant public engagement and frequent complaints of crime, abuse of authority, discrimination and misconduct.

This anomaly raises concerns about potential manipulation of public reporting mechanisms, internal suppression of formal grievance filings, or systemic discouragement of student, staff, or faculty from pursuing complaints. Plaintiff contends that such conduct may violate principles of transparency, due process, and public accountability, especially when institutions benefit from substantial federal funding and are held to standards of public disclosure under laws such as the **Clery Act (20 U.S.C. § 1092(f))**, which requires accurate crime reporting and transparency in campus safety statistics.

Plaintiff also filed a **official grievance for wrongful termination of role on UChicago CARES Portal prior to union filing grievance**, but that grievance was also never heard. Further, Plaintiff alleges that the University's disciplinary and enforcement mechanisms including the deployment of campus or affiliated law/police enforcement near complainants' residences serve not only administrative purposes but may also function as tools of intimidation or deterrence against those considering formal action. This is particularly concerning in light of the University's geographic location in Hyde Park, Chicago which is an area known for high rates of reported crime, where selective or retaliatory policing tactics could compound the chilling effect on legitimate complaints.

Plaintiff respectfully requests that this Court or relevant oversight agencies, investigate whether the University's complaint handling practices, data reporting mechanisms, or public relations strategies are unlawfully designed to suppress evidence of wrongdoing, discourage reporting, or mislead the public regarding the institution's compliance with civil rights obligations. Since some of the student and staff allegedly check the crime statistics,

number of legal cases before joining the university to check if in case university have many troubles with student or staff.



**Example of some other universities**





| State ^ | Institution | Institution Type | Type of Discrimination | Open Investigation Date |
|---|---|---|---|---|
| MA | HARVARD UNIVERSITY | PSE | Title IX - Sexual Violence | 04/17/2017 |
| MA | HARVARD UNIVERSITY | PSE | Title IX - Single Sex Campus Programs | 01/07/2020 |
| MA | HARVARD COLLEGE | PSE | Title IX - Procedural Requirements | 04/24/2014 |
| MA | HARVARD COLLEGE | PSE | Title IX - Sexual Violence | 04/24/2014 |
| MA | HARVARD UNIVERSITY | PSE | Disability - Others | 08/08/2023 |
| MA | HARVARD UNIVERSITY | PSE | Title VI - Admissions | 07/24/2023 |
| MA | HARVARD UNIVERSITY | PSE | Title VI - National Origin Discrimination Involving Religion | 02/06/2024 |



| State ^ | Institution | Institution Type | Type of Discrimination | Open Investigation Date |
|---|---|---|---|---|
| CA | STANFORD UNIVERSITY | PSE | Title IX - Sexual Harassment | 11/03/2023 |
| CA | STANFORD UNIVERSITY | PSE | Disability - Academic Adjustments | 02/03/2022 |
| CA | STANFORD UNIVERSITY | PSE | Disability - Denial of Benefits | 02/03/2022 |
| CA | STANFORD UNIVERSITY | PSE | Title VI - National Origin Discrimination Involving Religion | 12/07/2023 |



| State ⌃ | Institution | Institution Type | Type of Discrimination | Open Investigation Date |
|---|---|---|---|---|
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title IX - Sexual Harassment | 11/05/2024 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title IX - Sexual Violence | 04/04/2022 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Disability - Retaliation | 06/16/2017 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Disability - Retaliation | 07/11/2024 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Disability - Retaliation | 04/23/2024 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title VI - Denial of Benefits | 08/01/2022 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title VI - Denial of Benefits | 01/26/2024 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title VI - English Language Learners | 11/24/2015 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Disability - Accessibility | 11/03/2023 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Disability - Denial of Benefits | 09/29/2023 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Disability - Disability Harassment | 06/16/2017 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Disability - Disability Harassment | 07/11/2023 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Disability - Disability Harassment | 09/29/2023 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Disability - FAPE | 06/16/2017 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title VI - Racial Harassment | 03/13/2023 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title VI - Retaliation | 05/27/2020 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title VI - Retaliation | 01/26/2024 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title IX - Athletics | 11/08/2013 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title IX - Retaliation | 05/07/2020 |
| DC | DISTRICT OF COLUMBIA PUB SCHLS | ESE | Title IX - Retaliation | 02/25/2022 |

Displaying 1 - 20 of 99 records

1 2 3 4 5 » Last +

**Not any recent case:**



Search Criteria: Case Search; Case Title (Matches): [the university of chicago]
Result Count: 6

| Case Title | Case Number | Court | Date Filed | Date Closed |
|---|---|---|---|---|
| The University of Chicago et al v. Blinken et al | 12022cv04756 | Illinois Northern District Court | 09/06/2022 | 10/27/2022 |
| The University of Chicago Hospitals v. United States of America | 12005cv05120 | Illinois Northern District Court | 09/07/2005 | 03/16/2010 |
| The University of Chicago Medical Center v. International Brotherhood of Teamsters, Local 743 | 12015cv08765 | Illinois Northern District Court | 10/02/2015 | 07/11/2016 |
| The University of Chicago v. Faculty Association of the University of Chicago Laboratory Schools, Local 2063, American Federation of Teachers | 12010cv04843 | Illinois Northern District Court | 08/02/2010 | 09/07/2011 |
| The University of Chicago v. Goody, Clancy & Associates, Inc. | 12010cv07841 | Illinois Northern District Court | 12/09/2010 | 06/27/2012 |
| The University of Chicago v. United States of America | 12006cv03452 | Illinois Northern District Court | 06/26/2006 | 10/10/2007 |

**51. Misrepresentation and Deceptive Practices by the University of Chicago and Harris School of Public Policy – Violations of Consumer Protection Laws, the FTC Act, and the Covenant of Good Faith**

The Plaintiff asserts that the University of Chicago and its Harris School of Public Policy engaged in deceptive and misleading practices, violating multiple federal and state laws, including the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.), the Federal Trade Commission Act (15 U.S.C. §§ 41–58), and the implied covenant of good faith and fair dealing. These practices include, but are not limited to:

· **Inflated Employment Statistics**: The Harris School reported high employment rates post-graduation, such as 343 out of 388 graduates accepting employment offers in 2022. However, these figures may not accurately reflect the quality or relevance of employment to the field of public policy.

- **Misrepresentation of Curriculum**: The core curriculum emphasizes rigorous training in various disciplines. However, discrepancies between advertised and actual course offerings, as well as student feedback expressing dissatisfaction regarding the practical applicability of certain quantitative courses, indicate potential misrepresentation.

- **Suppression of Negative Feedback**: Student surveys reportedly contain overwhelmingly negative feedback, which is not publicly accessible, suggesting an attempt to conceal unfavourable information from prospective students.

- **Financial Aid Antitrust Settlement**: The University of Chicago agreed to a $13.5 million settlement in a financial aid antitrust lawsuit, where it was accused of conspiring with other elite institutions to limit financial aid offers, thereby violating antitrust laws. (University to pay $13.5 Million in Antitrust Settlement Over Financial Aid: https://chicagomaroon.com/42170/news/university-to-pay-13-5-million-in-antitrust-settlement-over-financial-aid/)

- **Title VI Investigation**: The Department of Education is investigating the University for alleged racial discrimination in its graduate programs, specifically concerning race-exclusionary practices through partnerships that limit eligibility based on race. (Department of Education to Investigate UChicago for Alleged Racial Discrimination: https://chicagomaroon.com/46645/news/department-of-education-to-investigate-uchicago-for-alleged-racial-discrimination/)

These actions constitute a pattern of deceptive practices, misrepresentation, and violations of students' rights, warranting legal redress. Furthermore, the Plaintiff strongly alleges based on direct personal experience and discussions with multiple current and former students that similar patterns of misrepresentation, price and financial aid fixing/limiting, and exclusion extend to master's programs, particularly but not limited to within the Harris School of Public Policy. While Ph.D. programs are fully funded, questions have been raised about the transparency and consistency of such funding, further reinforcing concerns about systemic institutional misrepresentation and unfair practices.

## 52. Pretextual Retaliation and Entrapment Through Administrative Deception in Response to a Grievance – Violations of Title VII, the Due Process Clause, and Institutional Commitments to Fair Review

Plaintiff alleges that the University of Chicago engaged in a pattern of retaliatory conduct and administrative deception intended to entrap and remove plantiff through manufactured justifications, rather than any legitimate institutional concern. This conduct unfolded after Plaintiff filed a formal grievance related to the wrongful termination of a student employment position via the University's "**UChicago CARES**" portal. What Plaintiff reasonably believed to be a good-faith attempt at negotiation and resolution was instead leveraged by the University as an opening to initiate retaliatory disciplinary proceedings.

Specifically, Plaintiff asserts that internal communications including emails, meeting notes, and planning records involving the Board of trustees, Office of the Provost, the President's Office, and relevant supervisory staff, may/should reveal a calculated effort to construct a retaliatory disciplinary action. On or about **February 10**, two days prior to being issued a **formal summons**, Plaintiff was contacted and asked to submit an **"accounting outline,"** a request he believes was made in bad faith, as part of an effort to fabricate grounds for adverse action and entrap plaintiff as a predator. This closely timed sequence of events strongly supports a finding that University officials were **actively building a case** under the guise of routine administrative engagement.

**This conduct may constitute a violation of:**

- **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3)**, which prohibits retaliation and discrimination for protected activity, including filing grievances.

- **The Due Process Clause of the Fourteenth Amendment**, where Plaintiff was denied a fair and transparent process.

- **t Corp. v. Green, 411 U.S. 792 (1973)** – under which suspicious timing and false justifications may support a presumption of retaliatory motive.

- **Nassar, 570 U.S. 338 (2013)** – confirming that retaliation must be the "but-for" cause of the adverse action; in this case, Plaintiff contends the grievance submission was that trigger.

- **Ross v. Creighton University, 957 F.2d 410 (7th Cir. 1992)** – supporting breach of institutional promises when students are misled about available protections.

Moreover, Plaintiff states that the **grievance he filed was never heard**, and that retaliation took the form of subsequent disciplinary action rather than genuine engagement with grievance concerns. The sequence of events, including sudden interest in irrelevant documentation (i.e., accounting outline), timed just before disciplinary action, suggests the University exploited its internal channels not to resolve conflict but to suppress protected complaints.

**[Data Redacted]**

**53. Coercive Financial Practices via Preferred Loan Providers – Forcing Students into Private Lending Arrangements in Violation of the Higher Education Act, TILA, Federal Student Aid Regulations, and Consumer Fraud Statutes**

The University of Chicago has engaged in practices that effectively coerce students, particularly international and graduate students, into securing educational loans through private lenders such as **MPower Financing** and **Prodigy Finance**. Students are frequently informed that financial aid eligibility, enrolments or continued status may depend on demonstrating loan approval from one

of these providers, and that documentation from MPower and Prodigy is the "**most acceptable**" form of financial proof for university aid or cost-of-living calculations.

**Such representations and practices violate provisions of:**

- The **Higher Education Act of 1965 (20 U.S.C. § 1094(a)(25))**, which prohibits institutions from engaging in revenue-sharing arrangements with lenders,

- The **Truth in Lending Act (TILA, 15 U.S.C. § 1601 et seq.)**, if insufficient disclosures are provided,

- **Federal Student Aid regulations (34 C.F.R. § 682.212)**, which restrict preferred lender arrangements and require transparency and neutrality in presenting loan options to students,

- **Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.)**, if students are misled into believing these lenders are mandatory or officially endorsed without clear disclosure of alternatives.

Additionally, such conduct may run afoul of **antitrust and fair competition principles**, particularly if there exists an undisclosed referral relationship or institutional benefit tied to the **funnelling of students** toward specific private lenders. The lack of transparency in this process raises serious ethical and legal questions about the University's duty to act in the best financial interests of its students.

These practices, when viewed in the broader context of UChicago's past litigation regarding financial aid antitrust violations, further illustrate a systemic pattern of financial coercion and potentially predatory institutional behaviour. Plaintiff sought to disclose these concerns as a whistleblower, aiming to prompt oversight agencies to initiate corrective measures, including but not limited to, the potential revocation of federal funding sourced from taxpayer dollars and an inquiry into possible misuse of the University's 501(c)(3) nonprofit status for private financial gain particularly relevant given the University's substantial receipt of federal funding. "University of Chicago participates in federal financial aid programs, meaning its students often apply for and receive assistance through mechanisms like the Free Application for Federal Student Aid (FAFSA). This aid can include Federal Pell Grants, Direct Loans, and other Title IV award programs, which help make the cost of education more affordable. Even though the university is a private institution, these forms of federal assistance play a significant role in funding both its research endeavours and helping its students meet educational costs."

**Close Example: Corinthian Colleges & ITT Tech** shut down after lawsuits exposed **fraudulent lending practices**. The **U.S. Department of Education forgave billions in student loans** for affected students.

**54. Pattern and Practice of Retaliatory and Unlawful Conduct by the University of Chicago – Systematic Violations of Federal Civil Rights, Labor, Antitrust, and Consumer Protection Laws**

The University of Chicago has exhibited a consistent pattern of behaviour that demonstrates wilful disregard for federal civil rights statutes, labour protections, antitrust laws, and Illinois employment regulations. This conduct is evidenced by lawsuits and legal actions spanning recent years, supporting the inference that the University has normalized retaliatory and discriminatory practices against students, employees, and other affiliated individuals who assert their legal rights.

**Specifically, the University has been implicated in violations of:**

- **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)**, for mishandling sexual harassment and assault complaints;

- **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.)**, for racially discriminatory practices;

- **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)**, for **employment-based discrimination** based on gender and race;

- **Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794)** and the **Americans with Disabilities Act (ADA)** for failing to accommodate and protect individuals with disabilities;

- **The Fair Labor Standards Act (FLSA, 29 U.S.C. § 201 et seq.)**, in relation to wage theft and improper classification of student workers;

- **Illinois Human Rights Act (775 ILCS 5/1-101 et seq.)**, for retaliatory discharge and discriminatory treatment of employees and students;

- **Illinois Whistleblower Act (740 ILCS 174/1 et seq.)**, for adverse employment actions against individuals reporting misconduct;

- **Antitrust statutes**, as reflected in the 2022–2023 litigation concerning financial aid collusion, with the University settling for $13.5 million while denying liability;

- **Common law contract claims**, exemplified by lawsuits stemming from the refusal to refund tuition during the COVID-19 pandemic.

**The University's legal history further substantiates its institutional tolerance of legal noncompliance:**

1. **Financial Aid Antitrust Lawsuit (2022–2023)**

   o **Issue**: Allegations of collusion to limit financial aid and inflate tuition costs.

   o **Legal Claims**: Violation of antitrust laws; schools coordinated financial aid calculations.

- o **Outcome**: UChicago settled for $13.5 million in 2023, denying wrongdoing. Some schools continue legal battles.

- o **Impact**: Raised scrutiny of universities' financial aid practices.

- o https://chicagomaroon.com/42170/news/university-to-pay-13-5-million-in-antitrust-settlement-over-financial-aid/

2. **COVID-19 Tuition & Fees Refund Lawsuits (2020–2021)**

- o **Issue**: Students sought tuition refunds after in-person classes were canceled due to COVID-19.

- o **Legal Claims**: Breach of contract (paid for in-person education, received online); unjust enrichment.

- o **Outcome**: Partial refunds offered by some schools. UChicago's stance remains unclear.

- o https://chicagomaroon.com/41796/news/uchicago-facing-4-95-million-settlement-payout-over-covid-19-tuition-lawsuit/

3. **Graduate Student Unionization & Labor Disputes (2022–Present)**

- o **Issue**: Graduate students demanded unionization and worker protections.

- o **Legal Claims**: Graduate students argue they are employees under labor laws.

- o **Outcome**: NLRB rulings favor unions at other universities. UChicago faces protests and ongoing challenges but resists recognition.

- o https://chicagomaroon.com/37374/news/gsu-ue-to-file-for-nlrb-election-to-force-university-recognition/

4. **Title IX & Sexual Harassment Lawsuits (2019–Present)**

- o **Issue**: Allegations of mishandling sexual misconduct cases under Title IX.

- o **Legal Claims**: Claims of failure to protect victims or provide due process for the accused.

- o **Outcome**: Settlements in some cases; revised Title IX policies due to legal pressure.

5. **Discrimination & Employment Lawsuits (2020–Present)**

- o **Issue**: Faculty and employees claimed gender and racial discrimination; student workers alleged wage theft and labor violations.

- o **Legal Claims**: Violations of Title VII of the Civil Rights Act; pay disparities; Fair Labor Standards Act breaches.

- o **Outcome**: Some cases settled; others ongoing. Possible labor investigations.

- o https://chicagomaroon.com/28036/grey-city/two-lawsuits-five-internal-complaints-allege-discr/

- o https://www.cullenllp.com/blog/university-chicago-prevails-discrimination-retaliation-lawsuit/

6. **Wrongful Termination & Retaliation Cases (2020–Present)**

- o **Issue**: Employees and faculty alleged unfair dismissal after reporting misconduct.

- o **Legal Claims**: Whistleblowing retaliation; violations of Illinois employment laws.

- o **Outcome**: Resulted in private settlements.

- o **Article**: Plaintiff alleges former employer The University of Chicago violated civil rights through retaliation: https://cookcountyrecord.com/stories/670608919-plaintiff-alleges-former-employer-the-university-of-chicago-violated-civil-rights-through-retaliation

- o Whistleblower Retaliation Verdicts and Settlements Under Federal and State Whistleblower Protection Laws: https://www.zuckermanlaw.com/sp_faq/whistleblower-retaliation-verdicts-and-settlements-under-federal-and-state-whistleblower-protection-laws/

This systemic misconduct suggests a pervasive institutional culture that enables **retaliatory, and discriminatory behaviour**, undermines civil rights protections, and violates labour and consumer protections. The Respondent's actions are not isolated but rather part of an ongoing pattern, and any retaliation against the Complainant must be viewed considering this broader history of violations. These examples also support the claims above.

**55. Research Misconduct(s) and Misuse(s) of Federal Funds by the University of Chicago – Institutional Violations of Federal Research Integrity Standards and Ethical Funding Practices**

Plaintiff asserts that the University of Chicago has exhibited a pattern of research misconduct and potential misuse of federal funds, warranting thorough investigation by relevant authorities. This assertion is based on documented instances where university-affiliated researchers were found to have engaged in research misconduct in federally funded projects, as determined by the U.S. Department of Health and Human Services' Office of Research Integrity (ORI).

**Documented Cases of Research Misconduct:**

1. **Dr. Ricky Malhotra**

- o Positions: Research Assistant Professor at the University of Michigan (2005–2006) and the University of Chicago (2007–2011).

- o   Misconduct: Falsification and fabrication of data in NIH-funded research, including reusing and falsely relabeling Western blot images and falsifying densitometry measurements.

- o   Funding Agencies: National Heart, Lung, and Blood Institute (NHLBI), NIH.

- o   Source: https://www.ahrq.gov/grants/guide/notice-files/NOT-OD-16-111.html

2.  **Dr. H. Rosie Xing**

- o   Position: Former Assistant Professor at the University of Chicago.

- o   Misconduct: Use of manipulated images in NIH-funded research, falsely reported in grant applications and publications.

- o   Funding Agencies: National Cancer Institute (NCI), NIH.

- o   Source:   https://www.ahrq.gov/grants/guide/notice-files/NOT-OD-16-111.html   , https://grants.nih.gov/grants/guide/notice-files/NOT-OD-15-043.html

3.  **Mr. Nicholas McMaster**

- o   Position: Undergraduate student at the University of Chicago.

- o   Misconduct: Fabrication of data in NIH-funded research, specifically in recording scores for the lordosis reflex and cell types in experimental psychology protocols.

- o   Funding Agencies: National Institute of Environmental Health Sciences (NIEHS) and National Institute on Aging (NIA), NIH.

- o   Source:      https://grants.nih.gov/grants/guide/notice-files/NOT-OD-07-029.html, https://grants.nih.gov/grants/guide/notice-files/NOT-OD-07-029.html

**Legal Framework and Precedents:**

·   **Federal Regulations:** Under 42 C.F.R. Part 93, institutions receiving Public Health Service (PHS) funding are mandated to respond to allegations of research misconduct and report findings to the ORI.

·   **Illinois State Law:** The Illinois Whistleblower Act (740 ILCS 174/) protects individuals who disclose information about misconduct in government-funded programs.

·   **Case Law:** In *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), the court held that a university could be liable under the False Claims Act for making false statements to obtain federal funds.

**Request for Investigation:**

Given the documented instances of research misconduct involving University of Chicago personnel, Plaintiff requests that relevant federal agencies, including but not limited to the NIH, EPA, NSF, Department of Education, NASA, DOJ, Department of Energy, and the Office of Naval

Research, conduct thorough investigations into the university's current research practices and use of federal funds. Plaintiff underscores the imperative for transparency and institutional accountability in the administration of federally funded research programs. In furtherance of public interest and regulatory compliance, Plaintiff sought to act as a whistleblower to alert appropriate federal funding agencies to potential misconduct or misrepresentation, thereby enabling such agencies to undertake enforcement actions including, but not limited to, suspension, forfeiture, or cancellation of existing or future federal grants, non-profit status and funding agreements.

**US Spending:** https://www.usaspending.gov/search?hash=5e54c009f845b05d9641c0d9674a5fe9























NCSES: https://ncses.nsf.gov/search?query=university+of+chicago









IES funding:

https://ies.ed.gov/funding/research-training?searchTerms=university%20of%20chicago

https://ies.ed.gov/funding/research/education-research-grants?searchTerms=university%20of%20chicago



**IES Special Education Grants:**

ies.ed.gov/funding/research/special-education-research-grants?searchTerms
University%20of%20Chicago



**IPEDS:** https://nces.ed.gov/ipeds/institution-profile/144050





## Admission and Test scores ⬇



**NiH Report:** https://reporter.nih.gov/search/CigSHbADLkm655ZeOdspsw/projects





United States National Science Foundation:

https://search.nsf.gov/search/docs?affiliate=nsf&dc=2402&query=university+of+chicago

https://www.nsf.gov/awardsearch/simpleSearchResult?queryText=University+of+Chicago&ActiveAwards=true



NCES

https://nces.ed.gov/collegenavigator/?q=university+of+chicago&s=IL&ct=2&id=144050#expenses



**ERIC:** https://eric.ed.gov/?q=university+of+chicago (Not sure about funding here but third link is linked with Physical science.



Nation's Report Card: (Not sure to add or not)

https://www.nationsreportcard.gov/search/?q=university+of+chicago&output=xml_no_dtd&clie
nt=nces&sort=date%3AD%3AL%3Ad1&entqr=3&site=nationsreportcard





**56. Judicial Review of the University of Chicago's Tax-Exempt Status Under Section 501(c)(3) – Noncompliance with Public Policy Mandates, Research Integrity, and Non-Discrimination Standards**

Plaintiff respectfully petitions this Honourable Court/ Agencies to consider initiating an investigation into the University of Chicago's compliance with the requirements for maintaining its tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. Specifically, Plaintiff alleges that the University's actions may be inconsistent with the public policy requirements inherent in tax-exempt status, as established in *Bob Jones University v. United States*, 461 U.S. 574 (1983).

**Legal Framework:**

1. **Internal Revenue Code § 501(c)(3):** Organizations must operate exclusively for exempt purposes and not engage in activities contrary to established public policy.

2. **Public Policy Doctrine:** The Supreme Court in *Bob Jones University* held that tax-exempt status requires adherence to fundamental public policy, including non-discrimination principles. (https://firstamendment.mtsu.edu/article/bob-jones-university-v-united-states/)

**Allegations:**

Plaintiff alleges that the University of Chicago has engaged in practices that may contravene established public policies, including but not limited to:

- **Research Misconduct:** Instances of research misconduct involving University-affiliated personnel, as documented by the Office of Research Integrity (ORI).

- **Discriminatory Practices:** Allegations of discriminatory practices in admissions, hiring, or other institutional policies.

- https://www.federalregister.gov/documents/2016/06/03/2016-13072/findings-of-research-misconduct

- https://retractionwatch.com/2014/12/14/ori-sanctions-former-university-chicago-ucsf-scientists-faking-findings/

- https://www.fox32chicago.com/news/chicago-university-under-investigation-trumps-anti-dei-campaign

- https://news.wttw.com/2025/03/14/university-chicago-among-dozens-schools-facing-federal-investigation-over-dei-programs

- https://chicagomaroon.com/47044/news/doj-says-uchicago-suspended-a-diversity-scholarship-amid-lawsuit-threats-university-claims-it-hasnt-participated-since-2023/

- https://nextshark.com/norc-discrimination-settlement-asian-job-applicants

- https://www.ed.gov/about/news/press-release/office-civil-rights-initiates-title-vi-investigations-institutions-of-higher-education-0

**Precedent:**

In *Bob Jones University v. United States*, the Supreme Court upheld the revocation of tax-exempt status for an institution whose policies were contrary to established public policy, emphasizing that tax benefits are conditioned upon adherence to fundamental public interests.

- The **U.S. Supreme Court ruled (8-1) in favor of the IRS**, holding that **organizations must serve a valid public interest to retain tax-exempt status** and cannot violate fundamental public policies (such as civil rights laws).
- The court stated that **racial discrimination in education is against national public policy**, and thus, **BJU could not claim nonprofit status while engaging in such practices**.

**Request for Relief:**

Plaintiff requests that the Court:

1. Initiate a review of the University of Chicago's compliance with the requirements of Section 501(c)(3), focusing on adherence to public policy mandates.

2. If violations are found, consider appropriate remedies, including the potential revocation of tax-exempt status federal funding, to ensure alignment with federal laws and public policy.

**57. Unequal Treatment and Lack of Transparency in Recognized Student Organization Funding and Recognition – Violations of Title VI, Equal Protection, and First Amendment Principles**

Plaintiff respectfully raises concerns about the inequitable treatment and non-transparent funding practices regarding Recognized Student Organizations (RSOs) at the University of Chicago. Specifically:

- Students report that the process for establishing or formally recognizing certain RSOs is significantly more burdensome, delayed, or scrutinized compared to others, potentially reflecting **viewpoint discrimination** or **administrative bias** in violation of institutional neutrality and First Amendment principles, particularly where public funding or public function doctrine applies.

- The process for disbursing RSO funding lacks transparency, with some communities or groups appearing to receive preferential access to financial resources while others, despite equal or greater demonstrated need or participation, face arbitrary denials or underfunding.

**This disparity, if motivated by content-based or identity-based considerations, may violate:**

- **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)** – prohibiting discrimination based on race, color, or national origin in federally funded programs.

- **First Amendment (via the state actor doctrine)**, if the University, due to its receipt of public funding and participation in federally supported educational programs, is functionally operating in a public capacity with regard to certain student activities.

- **Equal Protection Clause of the Fourteenth Amendment**, if differential treatment among student groups lacks a rational basis or is based on impermissible classifications.

- **Illinois Human Rights Act (775 ILCS 5/5-102)** – which may be implicated if funding disparities are tied to protected categories.

Plaintiff requests a formal review by the Office for Civil Rights (OCR), and relevant authorities, into whether funding practices for RSOs at the University of Chicago adhere to federally mandated non-discrimination principles and whether the current procedural framework unduly burdens the formation or operation of certain communities on campus.





**Black Men in White Coats at The University of Chicago**
Our primary goal is to improve healthcare outcomes for underserved and marginalized communities by introducing youth to careers in medicine, fostering mentorship for medical students, and promoting professional development.



**UChicago Praisebreak**
Praisebreak is a student-run gospel choir that aims to create community surrounding the Black cultural tradition of spirituals and praise music, while also performing secular Black music.



**The Visuals Series**
The Visuals Series serves as a space for Black beauty, euphoria, and excellence to be empowered and celebrated. By hosting quarterly photoshoots and community events, Visuals places creativity and collaboration at the forefront of the art making process.



**National Council of Negro Women - UChicago Collegiate Section**
NCNW – UChicago Collegiate Section is part of a national organization dedicated to supporting and empowering Black women.



**BlackGen Capital**
Spring 2024 New RSO



**Chicago Justice Initiative**
The Chicago Justice Initiative is an organization created to educate University of Chicago students about social justice issues that relate to UChicago students and the broader Chicago community.



**Ankara Magic**
Afrobeats Dance Team



**Blacklight Magazine**
Blacklight Magazine is a collective of young creatives and a platform for marginalized voices. We create visual and literary art. We transform. We disrupt tradition.



**PanAsian Solidarity Coalition**
PanAsia Solidarity Coalition is a student-run RSO at the University of Chicago dedicated to intersectional political advocacy centered on Asian/Asian-American identity.



**African and Caribbean Students Association**
Celebrating the rich cultures of Africa and the Caribbean on campus.



**National Society of Black Engineers**
The mission of the National Society of Black Engineers is "to increase the number of culturally responsible Black Engineers who excel academically, succeed professionally and positively impact the community."



**East African Student Association**
The East African Student Association aims to bring together East African students on campus in addition to celebrating and sharing a shared background and culture.



**UChicago Praisebreak**
Praisebreak is a student-run gospel choir that aims to create community surrounding the Black cultural tradition of spirituals and praise music, while also performing secular Black music.



**Chicago Swing Dance Society**
The Chicago Swing Dance Society is dedicated to teaching and promoting swing dancing to all, and regularly organizes free lessons and social dances for the UChicago and wider Chicagoland community. Contact us through our facebook or instagram!



**Ankara Magic**
Afrobeats Dance Team



## 58. Historical Retaliatory Practices Against Students Pursuing Legal Action – Precedents Illustrating Unjust Expulsions, Housing Evictions, and Denial of Due Process

Plaintiff respectfully brings to the Court's attention several documented cases where students, after initiating legal actions against their respective universities, faced retaliation, including unjust expulsions and other adverse consequences. These cases underscore the potential risks faced by students who challenge institutional decisions and highlight the need for protective measures against such retaliatory actions.

1. **BARBARA KASS vs The University of Chicago:**

    Barbara Kass alleges that her termination from the University of Chicago, after over 30 years of service, was in retaliation for refusing to participate in preparing and submit a false and misleading departmental budget that included unlawful use and allocation of federal grant money. She claims her objections were met with retaliatory discharge, violating her rights under the False Claims Act. Kass seeks a jury trial, reinstatement, compensatory damages, back pay, and legal fees, asserting wrongful termination and retaliatory discharge against the University. Case number: 1:17-cv-06497. (https://legalnewsline.com/stories/511221633-former-university-of-chicago-employee-alleges-she-was-fired-in-retaliation-files-false-claims-act-lawsuit)

# LEGAL NEWSLINE

Friday, May 9, 2025

Lawsuits   Hot Topics   Attorneys & Judges   Campaigns & Elections   Legislation   Asbestos   State Court   Federal Court

Home » Stories » 2017 » September

# Former University of Chicago employee alleges she was fired in retaliation, files False Claims Act lawsuit

2. **Manuel Rivera vs The University of Chicago:**

Manuel Rivera alleges that on October 21, 2024, Defendants unlawfully evicted him from on-campus housing and **falsified records** to suggest he had been given until December 9, 2024, to vacate. Rivera's civil rights complaint, filed on January 14, asserts that his removal from housing and placement on involuntary leave violated the First Amendment and Illinois housing laws. He claims the University's actions were in retaliation for his participation in a peaceful, First Amendment-protected protest on October 11, 2024, against Israel's actions in Gaza.

Rivera accuses the University, Interim Dean Michael Hayes, and unnamed UCPD officers of retaliatory eviction, violations of the Chicago Residential Landlord and Tenant Ordinance (CRLTO), and unlawful deprivation of civil rights under 42 U.S.C. § 1983. The complaint highlights that Rivera was threatened with arrest should he refuse to comply with demands to vacate, leading to homelessness and hardship. (https://chicagomaroon.com/44996/news/uchicago-student-sues-university-alleging-first-amendment-and-tenant-rights-violations/)



3. **Barnes v. Zaccari (Valdosta State University, Georgia):**

In 2007, Hayden Barnes was expelled without due process after protesting the construction of parking garages on campus. The university president deemed his actions a "clear and present danger." Barnes filed a federal civil rights lawsuit, resulting in a settlement in 2015. The court found that the university violated Barnes' constitutional rights, emphasizing the importance of due process in academic settings.

4. **John Doe v. Duke University:**

A former Ph.D. student alleged that after reporting a sexual assault by a faculty advisor,

the university retaliated by expelling him. The lawsuit claims that Duke University created a hostile environment and delayed the investigation due to the victim's gender. This case highlights concerns about institutional responses to sexual assault allegations and potential gender biases in handling such cases.

5. **John Doe v. George Mason University:**
A student expelled for alleged sexual misconduct claimed the university ignored evidence of a consensual relationship and overruled a board that had exonerated him. A federal judge ruled in favor of the student, ordering his reinstatement. This case underscores the necessity for universities to adhere strictly to fair and unbiased disciplinary procedures.

6. **Cullen Roe v. University of Massachusetts:**
After participating in a campus disturbance, Roe was expelled without a hearing. He sued the university, alleging violations of due process. The lawsuit emphasized the importance of providing students with a fair hearing before imposing severe disciplinary actions.

7. **Emma Sulkowicz (Columbia University):**
Sulkowicz carried a mattress around campus to protest the university's handling of her rape allegation. While not a lawsuit, her protest drew national attention to the university's procedures for addressing sexual assault complaints and sparked discussions about institutional accountability.

8. **Burlington Northern & Santa Fe Railway Co. v. White (2006)**: Adverse action after a grievance can be retaliation if it would dissuade a reasonable person from complaining.

9. **University of Texas Southwestern Med. Ctr. v. Nassar (2013)**: Retaliation must be a **but-for cause** — but circumstantial evidence like timing can support it.

10. **Treglia v. Town of Manlius (2d Cir. 2003)**: Even a few weeks between complaint and adverse action can suggest retaliation.

11. **Passananti v. Cook County (7th Cir. 2012)**: Jury awarded $4 million based on retaliatory conduct following a complaint.

**Legal Framework:**

- **First Amendment:** Protects students' rights to free speech and to petition the government for redress of grievances. Retaliation against students for exercising these rights may constitute a violation.

- **Fourteenth Amendment (Due Process Clause):** Ensures that students are provided with fair procedures before being deprived of education or facing disciplinary actions.

- **Title IX of the Education Amendments of 1972:** Prohibits sex-based discrimination in federally funded education programs. Retaliation against individuals for reporting sexual harassment or assault is prohibited under this statute.

**Request for Relief:**

**Given these precedents, Plaintiff seeks the Court's or Agencies intervention to:**

1. Ensure that the University of Chicago does not further engage in retaliatory actions against students who file complaints or lawsuits against the institution.

2. Mandate the establishment of transparent and fair procedures for addressing student grievances, ensuring compliance with constitutional and statutory protections.

3. Order an independent review of the university's disciplinary actions over the past decade to identify and rectify any patterns of retaliation or due process violations.

## 59. Foreign and Federal Fund Misuse in Support of Campus Protests – Violations of Tax-Exempt Public Policy, FARA, and Federal Funding Regulations

Plaintiff respectfully submits that the University of Chicago may have engaged in or enabled activities inconsistent with its tax-exempt and federally funded status, based on recent campus protests related to foreign political matters.

Notably, numerous students, who typically cite intense academic workloads and lack of time for extracurricular engagement, were visibly and consistently participating in prolonged encampments and organized protest actions, such as those in the Main Quad and also showing support at the Harris School of Public Policy but not limited to these. These actions included not only demonstrations **but also the active collection of funds intended for causes overseas**, particularly related to the Palestinian territories, and organization like Hamas (Internationally designated terror org., On October 7, Hamas, which the United States and the European Union have designated as a terrorist organization, launched an attack on southern Israel, killing around 1,200 people and taking 240 hostages. Israel launched a counterattack the same day, which led into the present Israel–Hamas war).

**Articles and observations suggest that:**

· Students were **compensated** and provided with indirect institutional support for their participation in these protests;

· The **defendant allegedly have provided academic (Including Grades), logistical, financial, and administrative support** to such efforts;

· **Funds were actively collected on university property (that too without following university own rules of funds collection)**, raising serious questions about how much money was collected, where the funds originated, how much was actually transferred overseas, and whether any of those funds supported organizations like Hamas and other similar organizations, and even if those were transferred for Palestine, were they in good faith or indirect funding to Hamas, linked to or under investigation for supporting terrorism.

**Legal and Regulatory Violations**

1. **Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 et seq.**
   If any protest activities were supported by foreign principals or received foreign

contributions, and this support was not duly disclosed, it could trigger mandatory registration under FARA. University facilitation or failure to monitor such activity could constitute a violation or complicity.

2. **Internal Revenue Code § 501(c)(3)**
Universities with this status must not engage in substantial political activity or violate clearly established public policy. Supporting unregulated or undisclosed foreign fundraising or funding political protests may lead to scrutiny or revocation of tax-exempt status, particularly if money flows toward organizations connected with proscribed entities.

3. **Title VI of the Civil Rights Act (42 U.S.C. § 2000d)**
If university-supported or hosted protests fostered an environment hostile to certain ethnic or national groups (including, for example, Jewish or Israeli students), this could amount to discriminatory practices in a federally funded institution.

4. **USA PATRIOT Act and Antiterrorism Statutes**
If any portion of collected funds were directed toward entities supporting or suspected of supporting terrorism, the University may face federal criminal liability for material support to foreign terrorist organizations (18 U.S.C. § 2339A and § 2339B).

**Precedents and Investigatory Authority**

· *Bob Jones University v. United States*, 461 U.S. 574 (1983): Established that tax-exempt status can be revoked for actions that violate fundamental public policy, even if educational in nature.

· Complaints against other universities (e.g., Columbia) have prompted federal intervention and loss of funding for failing to regulate student conduct that may breach federal mandates.

**Plaintiff respectfully requests:**

1. **Full Financial Audit** – including a forensic investigation into university-facilitated fundraising activities during protests, to determine the origin, flow, and use of funds.

2. **Disclosure Inquiry** – to confirm whether all foreign contributions to or through the University related to these protests were properly reported to the DOJ under FARA and other applicable statutes.

3. **Public Policy Review** – to determine whether the defendant's support for certain protest activities violates public policy or federal restrictions, justifying potential review or revocation of its tax-exempt status.

4. **Security Review** – to assess whether any collected funds were transmitted or intended to support non-humanitarian activities, act of terrorism, or non-charitable purposes (E.g. To fund war) and if appropriate, refer the matter to federal law enforcement agencies.

**60. Unlawful Financial Distribution by University Personnel for Potential Terror-Linked Purposes – Misappropriation of Federal and Institutional Funds, and Violations of Anti-Terrorism, Money Laundering, and Reporting Obligations**

Plaintiff respectfully submits the following observation as a formal legal point in this complaint and **requests immediate federal investigation**:

On the date(s) of the incident referenced, Plaintiff personally observed an individual who was wearing a visible University of Chicago-issued identification card around his neck, and who, based on this credential and his proximity to university-controlled areas, appeared to be a university staff member or affiliated agent (person was seemed to be aged). Said individual was engaged in the act of handing over what appeared to be a significantly large stacks of cash to individual(s) participating in protests wearing scarf keffiyeh/shemagh in the vicinity of 57th and 58th Streets. In addition, at one other instance this act happened really close to Provost Office on 58th street Edward H. Levi Hall, plaintiff suspected that person came out with a bag of cash from inside of Provost office, wearing university ID and appeared to be a university staff member. These happened around the time of encampment of campus for Palestine support protest. Plaintiff at once observed sitting in main quad, since the person flashed opening the bag to show cash, on the other instance it being transferred to another bag for multiple people wearing same type of scarf. While the exact identity of the staff member and precise time of the incident cannot now be definitively ascertained, the physical presence of the university ID badge and the nature of the transaction occurring in a high-visibility area under university control or influence are grounds to believe that the conduct may have involved the use of institutional resources for potentially unlawful, political, or destabilizing purposes. Furthermore, this conduct may be indicative of an antisemitic agenda aimed at furthering politically charged harm to U.S. society. In light of these observations, and acting in good faith as a **whistleblower**, the Plaintiff contends that this conduct not only violates internal University policies and public trust but also infringes upon several statutory and constitutional safeguards designed to protect against fraudulent misappropriation, abuse of institutional power, and hate-promoting activities. Lastly, while Plaintiff is uncertain of the full relevance or legal implications of the observation, it is noted for the record that during one particular transaction, Plaintiff personally witnessed while walking somewhere on 57/58 street near main quad, what appeared to be a University-affiliated staff member handing a **torn or partial currency note** (i.e., one-half of a paper bill/currency note) to an individual who appeared to be affiliated with a protest group with scarf. While Plaintiff is unaware of the underlying context or justification for such a gesture, this incident raised suspicion as to the purpose and intent of such an exchange, given the lack of monetary utility of a half note. Plaintiff includes this observation in good faith for the purposes of full disclosure and potential relevance to ongoing inquiries regarding financial or institutional irregularities.

This observation, taken together with the preceding allegations, supports a **reasonable basis for federal investigation into potential violations of fiduciary duties, misuse of federal funds, and possible material support of activities that could threaten public order or national security**, in violation of **18 U.S.C. § 2339A**, the **False Claims Act**, and compliance obligations under **Title IV of the Higher Education Act** and **2 C.F.R. Part 200**.

**The Plaintiff believes this conduct may constitute:**

1. **Misappropriation of Institutional or Federally-Linked Funds** – potentially in violation of the **False Claims Act (31 U.S.C. §§ 3729–3733)**, and **federal student aid usage restrictions under Title IV of the Higher Education Act**, which prohibit using federal funds for unlawful, deceptive, or unauthorized purposes.

2. **Violation of Federal Anti-Terrorism and Material Support Statutes**:

   o **18 U.S.C. § 2339A–2339B**, which prohibit providing **material support or resources** to individuals or organizations engaged in activities intended to **coerce, intimidate, or influence** government operations through protest, violence, or disruption, even if conducted under the guise of civil action.

3. **Breach of Institutional Reporting Obligations**:

   o If such conduct is being funded, facilitated, or condoned by the university, the institution may be in breach of its duty to disclose such conduct to federal oversight bodies under:

   § The **Clery Act (20 U.S.C. § 1092(f))**: if related activity results in or is tied to criminal offenses that go unreported in the institution's ASR or daily crime log.

   § The **Uniform Guidance (2 CFR Part 200)**: which mandates financial accountability and transparency for all federal grant recipients.

4. **Precedent and Public Safety Concern**:

   o In *United States v. Holy Land Foundation*, the DOJ successfully prosecuted organizations providing financial support to designated groups under the material support laws.

5. **Breach of Fiduciary Duty** – Applicable if university staff misused institutional funds or betrayed fiduciary responsibilities for private or unlawful aims.

6. **Fraudulent Misrepresentation** – Arises if university falsely represented the purpose of its financial practices or policy enforcement.

7. **Civil Conspiracy** – Applies if multiple individuals within the institution acted in concert to commit retaliatory or deceptive acts.

8. **Misappropriation of Resources:** The alleged cash transaction occurring in a controlled area raises a prima facie violation by potentially diverting or misusing resources (including the use of institutional credentials) for purposes inconsistent with the University's mission.

9. **Fraud and Deceptive Practices:** By seemingly representing itself through a valid University ID while engaging in covert cash-handling, the conduct may satisfy the elements of fraud and deceptive trade practices under Illinois Fraud Statutes and common law.

10. **Breach of Fiduciary Duty (2):** If the individual is an employee or agent of the University, using a University credential to facilitate unauthorized transactions represents a breach of the fiduciary duty owed to the institution and its stakeholders.

11. **Breach of Contractual and Employment Obligations:** Should University employees be contractually bound by conduct codes or policies that prohibit using institutional resources for external political or financial transactions, such use would constitute a contractual breach.

12. **Failure to Adhere to Ethical Standards:** The conduct in question undermines ethical and professional norms expected from University personnel, thereby constituting misconduct that impairs organizational integrity.

13. **Unauthorized Financial Transaction:** Handling large amounts of cash in connection to University-affiliated identification may be actionable as an unauthorized financial transaction under Illinois statutes governing fraud and receipts misappropriation.

14. **Illinois Fraud Statutes Violation:** The conduct may be actionable under Illinois criminal or civil fraud provisions if it is shown that the use of institutional credentials was intended to deceive or mislead third parties.

15. **Illicit Political Financing Concerns:** Should the cash exchanges be connected to influencing or funding political protest activities, the act could potentially violate campaign finance laws or state regulations aimed at preventing unauthorized political expenditure.

16. **Abuse of Public Trust:** The misuse of a University badge in a transaction conducted in a high-visibility area under University surveillance constitutes an abuse of public trust, a core element in many public integrity doctrines.

17. **Conspiracy to Commit Fraud (Common or Statutory):** If the transaction involved collusion between University personnel and external parties to misappropriate funds, this may support a claim of conspiracy to commit fraud under both state and federal law.

18. **Negligence in Safeguarding Institutional Assets:** The incident suggests systemic deficiencies in securing and controlling access to University resources, thereby potentially violating internal administrative and state-mandated procedural controls for asset protection.

19. **Unauthorized Use of Digital or Institutional Records:** Any failure by the University to properly monitor or restrict the use of its identification systems could lead to claims that the institution did not maintain adequate oversight, which is a breach of its internal digital governance policies.

20. **Whistleblower Protections and Retaliation:**
As the Plaintiff sought to whistle blow on this misconduct in good faith, any attempts to suppress or retaliate against such disclosure may be actionable under Illinois and federal whistleblower protection statutes.

21. **Retaliatory Suppression of Disclosures:**
The institution's or related parties' suppression of the Plaintiff's report may constitute retaliation, thereby invoking statutory protections available to whistleblowers in both public and private sectors.

22. **Violation of Public Policy:**
Misusing institutional credentials to facilitate potentially destabilizing and politically motivated transactions contravenes the public policy that underpins ethical financial practices and institutional governance.

23. **Civil Conspiracy for Destabilizing Purposes:**
If evidence suggests collusion between the University's agents and external entities to further a destabilizing or politically partisan agenda, the conduct may be actionable as a civil conspiracy.

24. **Undermining of Institutional Oversight:**
The failure to preclude or detect the misuse of official credentials in sensitive areas reflects a systemic failure in institutional oversight and internal controls, which is a breach of the University's own regulatory frameworks.

25. **Violation of Fiduciary and Loyalty Obligations to Stakeholders:**
University employees are entrusted with safeguarding institutional resources; employing these resources for unauthorized cash transactions is a breach of that loyalty obligation.

26. **Potential Hate Crime Implications:**
If the transaction is further linked to an antisemitic agenda or intended to serve hate-motivated objectives, the conduct may additionally fall within the ambit of hate crime statutes under both state and federal law.

27. **Incitement to Destabilize Public Order:**
The alleged involvement of cash transactions in politically charged protest situations may be seen as an incitement to disrupt public order, which is contrary to statutes safeguarding societal stability.

28. **Violation of Internal Fraud Monitoring Protocols:**
The absence or circumvention of monitoring systems responsible for detecting and preventing unauthorized financial transactions implicates the University in failing to execute its internal fraud prevention mandates.

29. **Breach of the Covenant of Good Faith and Fair Dealing:**
The wrongful use of institutional resources in a manner that distorts the intended purpose

of the University's programs may be seen as a breach of the implied covenant that binds the institution and its staff to fair and honest dealing.

30. **Systemic Failure of Administrative Accountability:** Taken together, the unauthorized use of official credentials, the potential misappropriation of funds, and the deliberate exposure of this misconduct demonstrate a systemic failure in administrative accountability, warranting judicial intervention to redress broad harms inflicted upon both the University and society at large.

**Also, The U.S. has several laws aimed at preventing and prosecuting money laundering:**

- **Money Laundering Control Act (1986)** – The primary law criminalizing money laundering, making it illegal to engage in financial transactions involving proceeds from unlawful activities.

- **Bank Secrecy Act (1970)** – Requires financial institutions to report suspicious transactions and maintain records to help detect money laundering.

- **USA PATRIOT Act (2001)** – Strengthens anti-money laundering regulations, particularly in relation to terrorism financing.

- **18 U.S. Code § 1956** – Defines money laundering offenses, including concealing the source of illicit funds and avoiding reporting requirements.

- **Financial Action Task Force (FATF)** – An international body that sets global standards for combating money laundering and terrorist financing.

- **Freedom of Information Act (5 U.S.C. § 552)** – May be invoked to demand records about funding and surveillance practices if linked to federal oversight.

- **Government in the Sunshine Act (5 U.S.C. § 552b)** – Ensures transparency in federal meetings; could apply if federal funds were distributed without proper review or disclosure.

This observed conduct presents a plausible scenario in which **cash incentives are used to incite public unrest or interfere with public institutions** potentially using public or student-aid-derived funds thus constituting a **threat to the stability and safety of the public and a violation of both fiscal and national security laws.**

**The Plaintiff therefore requests that:**

- This incident be referred to the **U.S. Department of Justice**, **Department of Education**, **Office of Inspector General**, and the **Department of Homeland Security** for **joint investigation**.

- The institution's Title IV and federal funding eligibility be **reviewed** in light of potential criminal conduct and **failure to safeguard public funds**.

- As Defendant used to give funding to potential terror elements using Government in the Sunshine Act (5 U.S.C. § 552b), making federal agencies to conduct meetings in public.

- If possible/applicable consider this matter with FOIA, Freedom of Information Act (FOIA) (5 U.S.C. § 552), that allows the public to request access to federal agency records, except for those protected by exemptions (e.g., national security, trade secrets, personal privacy).

**61. Coordinated Desecration and Ideological Intrusion at University Grounds, Removal & Disrespect of the Great American Flag – Alleged Violations of Federal Desecration Statutes, Material Support Provisions, and Campus Security Funding Obligations**

Plaintiff respectfully asserts that the actions taken on the University of Chicago campus, as described in publicly available reports including **The Chicago Maroon**, raise significant national security and federal compliance concerns. Specifically, the removal of the **American flag** from the main flagpole on university grounds allegedly by University Facilities Services during a so-called thunderstorm was followed by a coordinated and forceful act by protestors who erected a **Palestinian flag** in its place, subsequently **barricading the flagpole and obstructing removal** by physically sealing it with duct tape and forming human shields. This show admin support to organizations agenda be it Hamas or/and Palestine at an admin level to support the disrespect of own country flag.

chicagomaroon.com/42552/news/live-updates-pro-palestine-encampment-enters-fourth-day-on-quad/



SEARCH                                    JOIN US    SUBSCRIBE    DON.

proposal, refusing to end the encampment without a commitment to meet their demands.

UCUP also held a rally at 1:40 p.m. after the University's Deans-on-Call warned that organizing loud chants outside of the hours of noon and 1 p.m. and after 5 p.m. on weekdays would violate University policy. Organizers encouraged participants to be as loud as possible.

Facilities Services took down a Palestinian flag that had been hung in the area allocated for a registered installation from Maroons for Israel (MFI). The move was met with emphatic resistance from demonstrators, who chanted "Leave it up!" as Facilities staff attempted to dislodge the flag. In the evening, MFI released a statement on Instagram denouncing repeated attempts to remove their installation and calling for the University to shut down the encampment.

A thunderstorm in the late afternoon resulted in the University taking down the American flag on the quad. Encampment participants replaced it with a Palestinian flag, barricading the flagpole and securing the lowering mechanism in place with multiple rolls of duct tape to prevent the flag from being removed. The protesters also briefly demonstrated in front of the entrance of Levi Hall, blocking the walkway between the quad and South Ellis Avenue. Later, UCPD blocked that same walkway, where they remained into the night; tensions eased as the evening progressed.

**May 2, 8:20 p.m.**

This sequence of events, carried out with **institutional knowledge, tolerance, or indirect facilitation**, constitute a **symbolic act of anti-American aggression**, **foreign ideological interference**, and a **potential violation of federal statutes related to the protection of national symbols**, including **18 U.S.C. § 700 (Desecration of the Flag of the United States)** and related homeland security protocols.

The Plaintiff further notes that such conduct may also fall under the **scope of federal investigation** for possible violations of (Not limited to):

- **18 U.S.C. § 700 (Desecration of the Flag of the United States):** Prohibits knowingly mutilating, defacing, physically defiling, burning, maintaining on the floor or ground, or trampling upon any flag of the United States.

- **Material support statutes (18 U.S.C. § 2339A–B)**, if evidence links this act to foreign-aligned entities; Under statutes such as 18 U.S.C. § 2339B, it is a federal crime to knowingly provide money, goods, or other resources to a group that is designated as a foreign terrorist organization (FTO)(Like Hamas). If the protestors or the group you donate to are tied by the U.S. government to an FTO (for example, if they're linked to an organization like Hamas that is on the FTO list), then your donation could potentially be interpreted as material support. This provision has been used to target financial support intended to further terrorism-related activities. The problematic issue especially arises when funds are directed (or appear to be directed) toward violent activities or groups that have been legally designated as terrorist organizations.

- **Clery Act (20 U.S.C. § 1092(f))** obligations if any threats, intimidation, or criminal actions occurred as part of the protest;

- **Title IV funding requirements**, if the university allowed or failed to address the incident in a way that meets minimum campus security and safety standards.

- **Illinois Compiled Statutes (ILCS) 720 ILCS 5/49-1 (Flag Desecration):** Prohibits the desecration of the United States or Illinois state flag.

Additionally, Plaintiff urges that the ideological nature of the protest, the obstruction of the American flag's return, and the potential links to foreign-aligned movements or funding sources may invoke the broader national security framework under the USA PATRIOT Act, Pub. L. 107–56. Specifically, Section 802 thereof expanded the definition of domestic terrorism in 18 U.S.C. § 2331(5), covering actions that appear intended 'to intimidate or coerce a civilian population' or 'influence the policy of a government by intimidation or coercion.' If proven, these actions may not only constitute symbolic desecration under 18 U.S.C. § 700 but also cross the threshold into federally prosecutable ideological aggression.

Accordingly, the Plaintiff respectfully requests that the **U.S. Department of Education, DOJ, Department of Homeland Security, and other relevant department/agencies** open a **joint federal investigation** to determine (not limited to):

1. Whether the **removal of the U.S. flag** was institutionally approved or permitted as part of a calculated strategy, and coordinated effort;

2. Whether such actions constitute **a breach of federal law, a national security threat, or symbolic encroachment** on sovereign U.S. territory via foreign-aligned protests;

3. Whether federal funding to the university should be reviewed, suspended, or conditioned on compliance with public safety and patriotic respect obligations.

4. Weather there are credible signs of foreign ideological or material support,

5. And there's institutional complicity or use of federal funds,

Should the Defendant institution be found culpable of acts constituting desecration or disrespect of the Great American flag including but not limited to the unauthorized removal, replacement, or obstruction thereof Plaintiff respectfully requests that the adjudicating body, whether court, jury, or relevant federal or state agency, impose appropriate legal and financial sanctions, and remedial measures. Such action is necessary to ensure that the Defendant is duly held accountable and deterred from engaging in future conduct that undermines national symbols, violates federal statutes such as 18 U.S.C. § 700, and disrespects the patriotic values protected by law.

Should the university be found culpable of acts constituting desecration or disrespect of the American flag, including unauthorized removal, replacement, or obstruction, the following legal consequences may be considered (But not limited to):

- **Civil Sanctions**: Revocation or suspension of federal funding under Title IV for non-compliance with campus safety and security obligations.

- **Criminal Penalties**: Prosecution under federal statutes for desecration of the flag or providing material support to designated foreign terrorist organizations.

- **Institutional Accountability**: Mandated corrective actions to prevent future occurrences, including policy revisions and staff training.


## 62. Religious Discrimination and Failure to Provide Adequate Dietary Accommodations and Alcohol Safety Measures – Violations of Federal Civil Rights and State Anti-Discrimination Laws

Plaintiff respectfully asserts that the University of Chicago, through its staff and event coordinators, has engaged in a pattern of deliberate indifference and discriminatory conduct against Plaintiff's sincerely held [Data Redacted] religious beliefs, in violation of established federal and state civil rights protections.

**Specifically:**

- Plaintiff, a practicing **[Data Redaction]**, does not consume any **[Data Redaction]** in adherence to deeply held religious convictions.

- Despite clear and repeated advance requests for **[Data Redaction]** options at multiple University-hosted events, the University consistently failed to provide appropriate accommodations.

- On several occasions, including an event held in the Harris School basement classroom adjacent to the restroom area, Plaintiff was offered unmarked food items. Upon inquiry, the hosting staff, fully aware of Plaintiff's religious dietary restrictions, as plaintiff filled it in event form, and also asked the staff to provide **[Data Redaction]** option on arrival in event, affirmatively handed Plaintiff a burrito that upon consumption was discovered to contain **[Data Redaction]** an act that profoundly violated Plaintiff's religious principles. Plaintiff had to force vomit it out.

- Following this incident, Plaintiff experienced severe emotional distress, humiliation, and religious injury, yet was too ashamed to publicly object or seek redress at the time.

- The recurrence of such events, despite explicit prior notice and reminders from Plaintiff, strongly suggests deliberate disregard and intentional religious insensitivity by the University's representatives. Some staff despite of having **[Data Redaction]** options still handed over meat and other restrictions content food boxes.

- As a result of these repeated failures to accommodate Plaintiff's religious dietary restrictions and the emotional trauma caused by previous violations, Plaintiff was compelled to avoid consuming food at subsequent university events to prevent further religious violations and humiliation. This de facto fasting, undertaken out of necessity and fear of recurrence, further underscores the University's failure to uphold its obligations under Title VI of the Civil Rights Act and other relevant anti-discrimination protections.

Plaintiff further whistle blows that at several events hosted or sanctioned by the University; alcoholic beverages were served without adherence to applicable legal and university-mandated controls. These violations included:

- o Lack of visible or verified **age verification (ID checking)** prior to distribution.
- o Alcohol being placed in open, unmonitored locations accessible to all individuals, including those who may be under the legal drinking age of 21.
- o Distribution being conducted by individuals who appeared not to possess formal **BASSET (Beverage Alcohol Sellers and Servers Education and Training)** certification, or any responsible server training as required under **Illinois Liquor Control Commission (ILCC)** regulations, at times by university students, and student staff, including in some RSO activities as well.
- o Lack of safeguards to prevent consumption by individuals who may be legally or medically ineligible to drink.

**Legal Violations:**

- **Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.** Prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance. Courts have interpreted this to include protection for individuals subjected to discrimination based on ethnic and religious identity when intertwined with national origin.

- **Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.** Requires reasonable accommodation of religious practices in employment and educational settings.

- **First Amendment to the U.S. Constitution** (via public function or state actor doctrines where federal funds are involved) Protects free exercise of religion and prohibits government actors including federally funded private institutions in certain contexts from burdening religious practice without a compelling justification.

- **Illinois Human Rights Act, 775 ILCS 5/1-101 et seq.** Prohibits discrimination in places of public accommodation on the basis of religion.

- **Illinois Human Rights Act (775 ILCS 5/5-102)** — Prohibiting discrimination in places of public accommodation based on religion;

- **First Amendment Free Exercise Clause**, where the University acts in a quasi-public capacity due to extensive receipt of federal funding.

- **Illinois Liquor Control Act (235 ILCS 5/6-16)** — Prohibiting the distribution or furnishing of alcohol to persons under the legal age;

- **University policy and liability obligations** — Failure to monitor alcohol service may result in exposure to civil liability, particularly if harm arises due to underage or excessive consumption on university premises.

**Supporting Legal Precedents:**

- *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015): Held that failing to accommodate an applicant's religious practice without undue hardship constitutes unlawful discrimination under Title VII.

- *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985): Emphasized the constitutional importance of protecting religious observance in secular settings.

- *Kumar v. University of Minnesota*, No. 19-CV-2508 (D. Minn. 2020): University held to heightened standards for accommodating religious practices where students clearly articulate their needs.

**Relief Sought:**

**Plaintiff respectfully demands:**

1. A full and independent investigation into university practices regarding religious dietary accommodations;

2. Mandatory sensitivity training for staff responsible for event management and student services;

3. Declaratory relief affirming that the University's failure to accommodate Plaintiff's religious dietary needs constitutes unlawful discrimination;

4. Implementation of strict protocols for ensuring clear labelling and respectful service of food options consistent with students' religious beliefs;

5. Compensatory damages for emotional distress, humiliation, and injury to religious conscience;

6. Injunctive relief prohibiting future discriminatory practices at the University of Chicago.

7. Initiate a formal review of the University's food accommodation policies, practices, and training as they pertain to religious dietary needs;

8. Investigate the University's alcohol distribution practices at events and determine whether they are compliant with Illinois state law and institutional liability standards;

9. Require that the University implement and enforce procedures ensuring legal compliance and religious inclusivity at all public and student-oriented events.

## 63. Investigation of Foreign Funding Sources from Adversarial Nations – Review of Undisclosed Grants, Donations, and Institutional Partnerships with Potential National Security Implications

Plaintiff respectfully requests and whistle blows that the appropriate federal authorities conduct a comprehensive review of foreign funding received by the University of Chicago, including but not limited to grants, donations, and institutional partnerships originating from countries deemed strategic competitors or adversaries of the United States, such as China and Russia. This request is made pursuant to heightened concerns over transparency and national security in U.S. higher education institutions.

**Background and Supporting Context:**

- The University of Chicago has received and supplied substantial foreign funding from entities and initiatives linked to China. These include:

  o **Yuen Research Grants**, providing up to $100,000 per award to support faculty research in Hong Kong and the Greater Bay Area of mainland China;

  o The **UChicago Center in Beijing**, which hosts academic collaborations and enhances engagement with Chinese scholars;

  o **Foreign Language Acquisition Grant (FLAG)** programs, supporting student studies in China, Taiwan, and Hong Kong;

  o Funding from the **Cyrus Tang Foundation** and the **China Times Cultural Foundation**, which support research in Chinese studies.

- Although the University severed ties with the Chinese government-funded **Confucius Institute** in 2014, concerns remain regarding ongoing academic and financial engagements with entities potentially linked to foreign government influence or geopolitical strategy.

**Legal Framework and Precedents:**

- **Section 117 of the Higher Education Act of 1965 (20 U.S.C. § 1011f):** Requires institutions of higher education to report gifts or contracts with a foreign source valued at $250,000 or more in a calendar year. Failure to disclose such arrangements is a violation of federal law.

·   **Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 et seq.:** Mandates disclosure when U.S. entities act on behalf of foreign principals in a political or quasi-political capacity.

·   **Cases of Note:**

   o   In 2020, both **Harvard University and MIT** faced scrutiny from federal agencies for failing to adequately disclose foreign gifts and research ties, particularly related to China and Qatar.

   o   The Department of Education has previously launched investigations into Yale, Cornell, and Georgetown regarding undisclosed foreign funds.

Additionally, **U.S. Customs and Border Protection (CBP) regulations** may become relevant under:

·   **19 U.S.C. § 1595a(c)** – Prohibiting importation of merchandise contrary to law.

·   **19 C.F.R. § 12.1 et seq.** – Governing the importation and control of some materials, chemical precursors, or sensitive technologies from foreign countries, particularly from nations like China or Russia.

·   **Export Administration Regulations (EAR)** and CBP partnerships with the **Department of Commerce's Bureau of Industry and Security** may also apply if dual-use scientific equipment or materials were sourced internationally for research.

**Request:**

**Initiate or refer for federal investigation** a full audit of all foreign funding received by the University of Chicago over the past twenty years or more, specifically from nations classified as adversarial or under federal export controls.

1.   **Determine whether the University has complied with Section 117 reporting requirements**, and if not, mandate disclosure and penalties as prescribed by law.

2.   **Assess whether any such funding may compromise national security interests**, influence academic neutrality, or violate federal laws governing public disclosures and educational transparency.

3.   **Mandate public transparency** in foreign financial arrangements, particularly those connected to centers operating overseas or grants that involve strategic collaboration with entities in countries such as China, Russia, Iran, or others currently sanctioned or monitored by U.S. authorities.

**64. Financial Aid Collusion and Antitrust Violations at the University of Chicago – Investigation Requested in Light of Ivy League Settlements**

Plaintiff respectfully submits and whistle blows that the University of Chicago's financial aid policies and its participation in consortiums that influence aid disbursement warrant independent

investigation in light of recent legal precedents, particularly involving Columbia University and other Ivy League institutions. And strongly suspected discrimination in financial aid based on nationality, race, caste, origin, gender, for both need and merit-based models.

**Background and Comparative Context:**

· In 2022, a class-action lawsuit alleged that multiple elite universities, including Columbia University, engaged in antitrust violations by conspiring to limit financial aid through coordinated strategies among the "568 Presidents Group." This scheme purportedly disadvantaged students requiring financial assistance by enforcing rigid formulas for calculating need-based aid.

· In July 2024, Columbia, Brown, and Yale settled these claims by agreeing to pay $62 million collectively, without admitting wrongdoing. The total settlement amount reached $284 million, and legal proceedings continue against other universities. (The Guardian)

**Relevance to University of Chicago:**

· The University of Chicago was also named in related antitrust litigation and subsequently agreed to a $13.5 million settlement in 2023 regarding similar allegations of collusive behaviour designed to limit student aid.

· In light of Columbia University's congressional scrutiny and legal accountability, Plaintiff requests a similar level of scrutiny be applied to the University of Chicago's current and past financial aid practices, including any formal or informal participation in collaborative pricing or aid allocation frameworks.

**Legal (Not limited to):**

· **Sherman Antitrust Act (15 U.S.C. §§ 1–7):** Prohibits collusive practices and price-fixing among competing institutions, including in the context of need-based financial aid.

· **Higher Education Act, Section 117 (20 U.S.C. § 1011f):** Requires reporting of large foreign donations and contracts, ensuring transparency in institutional funding.

**Request for Relief:**

1. **Audit of Financial Aid Practices:** A full investigation into the University of Chicago's internal and collaborative financial aid policies to determine if collusive or anti-competitive behavior persists.

2. **Compliance Review with Federal Reporting Laws:** Examination of the University's compliance with Section 117 disclosure obligations regarding domestic and foreign contributions that may influence tuition setting or aid formulas.

3. **Transparency Mandate:** A requirement that the University publicly disclose any ongoing relationships with financial aid consortiums or think tanks that could affect fair student aid allocation.

This point mirrors the standard of accountability recently applied to Columbia University and is submitted in the interest of ensuring equitable, non-discriminatory access to education and full regulatory compliance at the University of Chicago.

## 65. Exploitative Fundraising Practices Through Recognized Student Organizations – Violations of Financial, Contractual, and Institutional Policy Obligations

Plaintiff alleges that the University of Chicago has institutionalized a practice of using Recognized Student Organizations (RSOs) to engage in indirect fundraising activities under questionable and potentially exploitative circumstances. Specifically:

- The University, through the **Centre for Leadership and Involvement,** located in the basement of the Reynolds Club, allocates limited event funding to RSOs, then effectively compels student members to engage in public fundraising to cover remaining operational needs.

- Fundraising is visibly conducted in the Reynolds Club, often on the ground floor, where students solicit payments via **cash, Zelle, Venmo, and other direct payment methods** a direct violation of the University's own **RSO Finance and Policy Handbook**, which explicitly prohibits cash and peer-to-peer transfer fundraising.

- Additionally, many RSOs sell **home-cooked or unregulated food**, also in violation of institutional health and safety protocols. Many of them do that in Reynolds club as well.

- Despite these clear breaches of policy, the University has failed to intervene, monitor, or enforce its own standards, creating the impression that it **selectively enforces rules based on convenience or profit motive**, and possibly benefits from these informal transactions while maintaining plausible deniability.

- **Unethical and Unregulated Fundraising Activities:** Plaintiff further alleges that the University has allowed Recognized Student Organizations (RSOs) and affiliated staff to engage in fundraising activities that are misaligned with their stated missions and institutional policies. This includes instances where funds have allegedly been solicited in support of internationally designated terrorist organizations such as Hamas, raising serious legal and national security concerns. Moreover, these fundraising efforts are frequently conducted without adherence to mandated University financial protocols, such as the prohibition of cash and peer-to-peer payment platforms (e.g., Venmo, Zelle). The absence of oversight allows individuals including University staff and student leaders to misrepresent total funds collected, divert donations for personal gain, or send only partial amounts to designated recipients. These activities reflect not only a departure from the University's declared educational mission but also present potential violations of federal funding conditions, 26 U.S.C. § 501(c)(3) nonprofit restrictions, and may trigger liability under state consumer protection laws. Such conduct warrants immediate audit and

compliance enforcement to protect students and preserve the University's legal and tax-exempt integrity.

· Harris Student Organization (HSO) and Registered Student Organization (RSO) budgets have been slashed, even though these groups are central to student engagement.

· The university imposed a hiring freeze for full-time staff while continuing to collect significant tuition and fees.

· The Harris Gala funding of $30,000 (originally intended for student development) has been redirected without full transparency about its new allocation.

· If the university is receiving federal tax benefits while reducing student services, it raises concerns about whether tax-exempt funds are being used as intended.

**Legal Implications:**

· These practices may constitute a **breach of implied contract** under Illinois common law principles governing the relationship between students and universities (e.g., *Brody v. Finch University*, 698 N.E.2d 257).

· The University's tolerance of unregulated commerce may also risk **violating tax-exempt limitations under 26 U.S.C. § 501(c)(3)**, which restricts use of nonprofit status for unreported commercial gains.

· Furthermore, such conduct may expose the institution to claims of **constructive fraud** and **deceptive practices** under the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2), especially if students are misled regarding the scope and security of their financial roles.

Plaintiff respectfully requests an audit of all RSO fundraising activities and enforcement of RSO financial and safety regulations to ensure student protection, legal compliance, and institutional integrity. That may include checking of amount spent, amount earned on the name of RSO, and amount reported that earned to CLI by students or staff members as applicable, and also checking where the amount was used or donated, if donated was it donated for antinational activities or support of crime or crime promoting organizations or it was just used for RSO purposes only.

### 66. Oversight of Commercial Revenue Activities at the University of Chicago – Ensuring Compliance with Tax-Exempt Purposes and IRS Regulations

Plaintiff respectfully brings to the respective agencies/ Court's attention significant concerns regarding the breadth of commercial, revenue-generating activities undertaken by the University of Chicago, which, while potentially lawful if properly managed, raise questions as to whether they remain within the boundaries permitted for a 501(c)(3) tax-exempt organization as defined under 26 U.S.C. § 501(c)(3) and related IRS regulations. Running profit-driven businesses under the guise of educational programs can also be a case.

While the University's core missions of teaching, research, and public service are indisputably charitable, the institution also conducts a broad range of operations that resemble those of commercial enterprises. These include:

1. **Publishing and Media Ventures**: The **University of Chicago Press**, among the largest academic publishers in the U.S., functions with a commercial structure similar to for-profit publishing houses. Revenues are generated through sales of books, journals, and licensing raising the question of whether all such activities serve the exempt educational purpose or cross into unrelated business income territory.

2. **Commercialization of Research and Innovation**: Through the **Polsky Center for Entrepreneurship and Innovation**, the University supports and monetizes the transformation of academic research into private-sector products and startups. Similarly, **intellectual property licensing** of patents and discoveries has become a revenue stream albeit indirectly. These efforts, while rooted in research, may, if primarily profit-oriented, fall outside exempt activity definitions per IRS Publication 598. (Limited link: https://intranet.uchicago.edu/en/tools-and-resources/financial-resources/accounting-and-financial-reporting/tax-reporting/taxes/unrelated-business-income)

3. **Real Estate and Facility Rentals**: The University owns substantial real estate holdings, portions of which are leased to outside parties for non-educational purposes (e.g., commercial venues, corporate events). Income from such leases is considered **Unrelated Business Income (UBI)** and must be properly reported and taxed under **26 U.S.C. §§ 511–513**.



## The Chicago Maroon

In 1890, the newly chartered University of Chicago aimed to "remove the mind of the student from the busy mercantile conditions of Chicago." Architect Henry Ives Cobb envisioned a campus with one central quadrangle surrounded by six others, spanning 22 acres of land.

Scroll Down

MapLibre | © CARTO, © OpenStreetMap contributors



Today, the University currently owns or invests in over 250 properties in Hyde Park and the surrounding neighborhoods, spanning from 38th Street to 65th Street and I-90 to Lake Michigan. Including its previous holdings, the portfolio exceeds 300 properties.

MapLibre | © CARTO, © OpenStreetMap contributors

As the University of Chicago has expanded its property footprint on the South Side, conflicting priorities, land use disputes, and racial tension have characterized a historically fraught "town and gown" relationship with the surrounding neighborhoods. Setting the stage for others to follow, the University was the first higher education institution to embark on an urban renewal campaign of its kind, a topic University scholars and students have written on extensively.

The following narration is not an exhaustive history; rather, it traces the contours of shifting values and priorities that have contributed to the University's current institutional identity.

Scroll below to follow a visual history of the University's role in shaping its built environment over its 135-year history.

Scroll to Continue



Finally, the University followed through on a suggestion in the 1949 Treasurer's Report for the University to acquire all property in the strip of land from 60th to 61st Streets and from Cottage Grove to Stony Island Avenues to create a buffer zone between the campus and the "deteriorating neighborhood" of Woodlawn immediately to the South. The city purchased everything not yet owned by the University and then sold it to the University in a process that took a decade due to legal disputes and activist groups opposing the acquisition and the expansion. Notably, The Woodlawn Organization (T.W.O.) successfully prevented the University from expanding further southward than 61st Street.



CHAPTER 5

# 2007-2022: Expansion and Turning to the City

UChicago Arts



In 2006, University President Zimmer made his "Back to the City" speech, posing the question: "How should our relationship with the South Side community, city, and the region evolve?" In the following years, the University simultaneously sought to shrink its portfolio of residential properties acquired during Urban Renewal and the Great Recession and expand non-residential real estate holdings.



The University sold over 1,200 apartment units and four lots in Hyde Park between 2004 and 2016 and has bought 26 mixed-use properties in Washington Park since 2008. They acquired commercial real estate, such as Harper Court in 2008 and the building now containing Jewel Osco, in 2020. Currently, the University owns the buildings containing four of the major grocery stores in the area.



The University also invested in cultural development throughout the South Side through a partnership with the Hyde Park Arts Center, stewarding the Washington Park Arts Block and opening the Green Line Performing Arts Center in 2018.



The future of the University's involvement in Hyde Park and the South Side is at a crucial inflection point. With the opening of the Obama Presidential Center nearing, the University is once again in a position to make decisions that will significantly impact the neighborhood's future. The University, while a minor donor to the Center, is poised to benefit from the estimated $3.1 billion in "economic impact." The Center joins large-scale university-owned projects that are expected to impact the South Side in coming years, including Hyde Park Labs and UCMed's Cancer Pavilion. While the University has emphasized the positive impact the projects will have on the local economy, some residents are concerned about rising rent and how much benefit will reach the community as opposed to investors.



When the *Maroon* asked the University how it is addressing community distrust, it stated that it "is committed to creating opportunities to listen to community residents, providing direct access to University leaders, and proactively sharing information of interest" through "wide-ranging programs to support the local community." It cited recently published maps of University-owned properties in South Side neighborhoods in an effort to "help address misconceptions and foster transparency."



However, recent actions leave many wary of the University's commitments. The opening of the Woodlawn Charter School in 2006 on 64th Street called into question the University's decades-old agreement with The Woodlawn Organization to not develop past 61st Street and further into Woodlawn, according to Eldred. In a statement to the *Maroon*, the University wrote that the opening and a subsequent 2016 relocation were "the result of numerous discussions with local residents and elected officials, and both plans had the support and approval from the community, Aldermen, and Chicago Public Schools." In 2020, former President Zimmer and incoming President Paul Alivisatos committed to exploring and addressing the University's historical relationship with its surrounding neighborhoods by launching the Council on UChicago/Community Relations, tasked with examining the historical relationship between the University and its South Side neighbors. In 2023, after the Council's first two years, it stated that it was not yet prepared to engage meaningfully with the public, but that outreach could begin soon. There have been no public updates since.

- https://chicagomaroon.com/21622/news/university-buys-land-for-charter-school-expansion/
- https://medium.com/@ccree2/impacts-of-university-of-chicago-expansion-and-gentrification-in-hyde-park-4a4637917ae6
- https://chicagomaroon.com/27984/news/universitys-expansion-commercial-real-estate-waver/
- https://www.healthcarefinancenews.com/news/university-chicago-medicine-moves-269-million-expansion-south-side-access-care
- https://chicagomaroon.com/21622/news/university-buys-land-for-charter-school-expansion/
- https://chicagomaroon.com/41897/special-issue/uchicagos-place-in-the-chicago-migrant-crisis-from-articulation-to-action/

- Expanding despite of having significant debt to take further mode donor, endowments, and federal fundings, and loans: https://chicagomaroon.com/41586/viewpoints/op-ed/ando-boyer-debate-a-student-responds/
- https://chicagomaroon.com/28596/viewpoints/column/multistory-failure-uchicagos-housing-plan-disappoints/

4. **Executive and Professional Education Programs**: Programs offered by the **Booth School of Business** and similar units target corporate clients and adult learners and often carry tuition fees comparable to private training firms. While educational in form, these programs are conducted for commercial purposes and may risk classification as unrelated trade or business activities if they lack strong integration with the University's charitable educational mission. (Limited links available: https://www.chicagobooth.edu/executiveeducation, https://polsky.uchicago.edu/tech-commercialization/commercialize-your-invention/)

5. **Auxiliary Enterprises**: Services such as **food, bookstores (Overexpansive items), and parking** are managed under entrepreneurial models. While supportive of campus life, they may function more as profit centres than mission-aligned services, particularly when accessible to the general public.

**Legal and Compliance Implications:**

- Under **IRS Rev. Rul. 69-545**, tax-exempt organizations must be operated primarily for exempt purposes. Excessive engagement in for-profit or commercial activities, even when income is reinvested, can jeopardize exempt status if the activity overshadows the charitable mission.

- **Unrelated Business Income Tax (UBIT)** is imposed on income from any regularly carried-on trade or business not substantially related to the organization's exempt purpose. Failure to report or pay UBIT may constitute tax evasion or misrepresentation on **Form 990** filings.

- The **Private Inurement Doctrine** prohibits earnings from benefiting insiders. If commercialization funnels excessive resources or contracts to affiliated individuals or for-profit partners, the University may risk violations of nonprofit law.

**Request for Oversight and Relief:**

Plaintiff respectfully urges the Court or relevant federal oversight agencies to:

1. Review whether the University of Chicago's non-charitable activities are being appropriately structured and reported in compliance with **UBIT laws**;

2. Determine whether the scale of commercial operations constitutes **primary overreach** into non-exempt activities in violation of § 501(c)(3) regulations;

3. Audit the institution's **Form 990 disclosures** and financial allocations to evaluate the proportionality between charitable and non-charitable revenue.

This point raises the broader issue of whether nonprofit educational institutions are leveraging their tax-exempt status for competitive commercial advantage and revenue generation that may distort the original intent of public tax subsidies.

**67. Misrepresentation, Breach of Contract, and Deceptive Advertising at the University of Chicago Harris School of Public Policy – Violations of the False Claims Act, Consumer Fraud Statutes, and Implied Educational and Financial Service Commitments**

Plaintiff respectfully submits that numerous grievances raised in this complaint are echoed in recent Executive Orders issued by the Executive Branch of the United States Government under President Trump's administration (April 23, 2025), affirming that the harms, discrimination, and systemic failures alleged herein are not isolated experiences but are part of broader, nationally recognized institutional deficiencies in higher education.

1. **Accreditation Reform and Bureaucratic Overreach**
   In alignment with Plaintiff's concerns regarding ideological enforcement, lack of academic freedom, and suppression of student rights at the University of Chicago, the Executive Order titled *"Executive Order to Reform and Strengthen Accreditation"* recognizes that existing accreditation bodies have facilitated administrative bloat, ideological conformity (notably through DEI mandates), and diminished institutional accountability. The Executive Order supports increasing transparency and reducing ideological interference in academic policy a central issue raised in Plaintiff's experience with retaliation and biased institutional behaviour.

   · Requiring unlawful race- and gender-based faculty and student diversity quotas,
   · Mandating ideological compliance as a condition for federal funding access, and
   · Violating the Supreme Court's holding in *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023).

   The Order empowers the Secretary of Education to **deny, suspend, or revoke accreditation recognition** for any accreditor enforcing discriminatory practices and requires the use of program-level student outcome data that excludes race, ethnicity, or sex. Plaintiff's allegations of academic bias and suppression of dissent align directly with this federal repudiation of ideological overreach.

2. **Foreign Influence in Higher Education**
   The *Executive Order to End Harmful Foreign Influence at American Universities* acknowledges federal concern regarding the infiltration of foreign financial influence particularly from China and Qatar into American institutions of higher learning, without sufficient oversight or transparency. Plaintiff's request for investigation into the University's foreign funding sources and affiliations is in direct accordance with this policy initiative and federal acknowledgment of this national security and integrity risk.

The Executive Order on Transparency Regarding Foreign Influence at American Universities (April 23, 2025) mandates full disclosure under 20 U.S.C. § 1011f and identifies that from 2010 to 2016, universities failed to report more than half of foreign gifts. It declares that universities:

"Allowed nations like China and Qatar to funnel billions of dollars to U.S. universities with little to no oversight."

The Order directs the Attorney General and Secretary of Education to conduct audits and revoke federal funding where violations are found. Plaintiff's request for investigation into the University of Chicago's relationships with foreign governments and organizations including funding for programs with potential propaganda elements is directly supported by this federal mandate.

3. **School Safety and Disciplinary Policy Failure**

Plaintiff's experience with unsafe campus environments, selective enforcement of disciplinary actions, and protection of individuals engaging in misconduct due to DEI policies is squarely supported by the *Executive Order to Reinstate Commonsense School Discipline Policies*. This order recognizes that:

*"Their policies placed racial equity quotas over student safety – encouraging schools to turn a blind eye to poor or violent behaviour in the name of inclusion."* This federal policy confirms Plaintiff's observation that ideological mandates have in practice resulted in diminished student protection, failed disciplinary mechanisms, and discriminatory enforcement all of which directly impacted Plaintiff's rights and wellbeing.

Plaintiff further supports this complaint with reference to the *Executive Order on Reinstating Commonsense School Discipline Policies* (April 23, 2025), which condemns prior practices under Title VI where discipline was enforced based on racial statistics rather than objective behaviour. This order was issued after findings by the Federal Commission on School Safety that: Schools ignored or covered up misconduct like assault to avoid racial disparity/crime in discipline statistics," resulting in increased violence and classroom disorder.

Plaintiff's claim of being subjected to selective discipline while others were shielded due to DEI policies in multiple matters mirrors these national findings and underscores a **federal policy shift toward behaviour-based, meritocratic enforcement of rules**, as now required under Title VI.

**4. Elimination of Disparate-Impact Liability**

Plaintiff further references the *Executive Order on Restoring Equality of Opportunity and Meritocracy* (April 23, 2025), which revokes federal agency authority to impose **disparate-impact liability** a theory that presumes racial discrimination from statistical imbalances alone, regardless of intent or fairness.

This order repeals presidential approvals of disparate-impact rules under **Title VI and Title VII**, directing agencies to cease enforcement of such policies. Plaintiff's concerns about being punished or excluded based on group-based policies instead of merit are supported by this national return to individual-based equal protection.

**5. Termination of Radical DEI Programs in Government**

Under the *Executive Order Ending Radical and Wasteful Government DEI Programs* (January 20, 2025), all federal DEI offices, funding, and mandates are ordered shut down. The Order:

· Prohibits consideration of DEI in performance reviews or training,

· Directs OMB and the Attorney General to terminate DEI-related grants and contracts,

· Requires a review of whether agencies or grantees mislabelled DEI activities to evade restrictions.

The University of Chicago's potential use of federal funds for DEI-based enforcement or programming is thus **subject to audit and enforcement**, particularly if DEI initiatives were used to retaliate against the Plaintiff or discriminate under ideological pretence's.

These Executive Orders, reflecting official policy concerns of the U.S. Government, substantiate the Plaintiff's allegations that institutions such as the University of Chicago may be engaged in federally disfavoured practices that compromise academic integrity, student safety, and national interests. Plaintiff requests that the Court consider these aligned policy directives in evaluating the legitimacy and urgency of the issues raised in this complaint.

**Plaintiff respectfully urges that the Court/ Agencies:**

· Take judicial notice of these Executive Orders as persuasive authority,

· Recognize that the U.S. Government acknowledges these systemic abuses,

· And permit further investigation into the University's funding, disciplinary, and accreditation practices under federal law and constitutional standards.

**68. Alleged Misrepresentation and Deceptive Advertising by the Harris School of Public Policy – Breach of Contract, False Claims Act Violations, and Misleading Financial Aid Disclosures**

Plaintiff respectfully alleges and whistle blows that the University of Chicago Harris School of Public Policy may have engaged in a pattern of misrepresentation, consumer fraud, and breach of the implied covenant of good faith and fair dealing in its public representations, marketing materials, and execution of its educational services. These actions, if proven, may also give rise to liability under the **False Claims Act (31 U.S.C. § 3729 et seq.),** the **Illinois Consumer Fraud**

**and Deceptive Business Practices Act (815 ILCS 505/1 et seq.)**, and relevant common law doctrines.

### 1. Misrepresentation of Employment and Placement Statistics

The school has widely promoted its programs as preparing students with "quantitative and analytical skills" for high-impact public policy careers. However, upon discussing with Harris Students and alums, also reading in past from platforms such as Reddit, suggests that actual job placement outcomes may significantly short of these claims. If the institution advertised high employment rates or ROI statistics that were misleading or unsubstantiated, this would constitute a material misrepresentation under both federal and state law.

**Legal Basis:**

- *Consumer fraud claims under ICFA (815 ILCS 505/2)*,

- *Deceptive advertising under FTC Act (15 U.S.C. §§ 45)*,

- *Gomez-Jimenez v. New York Law School*, 956 N.Y.S.2d 54 (App. Div. 2012).

### 2. Curriculum and Course Availability Misrepresentations

The school advertises rigorous coursework in economics, statistics, and analytics, yet there are credible belief from experience that not all promised, or core specialization courses are consistently offered. If students relied on such representations to enrol or take on financial burdens, the school may be liable for fraudulent inducement or breach of implied educational services.

**Legal Basis:**

- *Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992) (failure to deliver promised academic services may support breach claims),

- *Illinois Consumer Fraud Act* (omission of material fact actionable even if innocent).

### 3. Faculty Representation and Instruction Misalignment

The Harris School highlights the participation of prestigious faculty members; however, some may not regularly teach or directly engage with enrolled students. Misrepresenting the availability of such faculty, especially in promotional materials, could constitute deceptive practice. (Only one example listing here: Nobel Prize Winner Dr. James Robinson, he typically doesn't teach or teach only one course occasionally that too only PhD level which is the one of the best faculty they advertise they got(being Nobel winner), there are other examples need to be discovered)

**Legal Grounds:**

- *Violation of ICFA* and *FTC false endorsement rules*,

- *Breach of implied contract* regarding the quality of instruction.

### 4. Financial Aid and Tuition Transparency Issues

The University of Chicago recently settled a $13.5 million lawsuit alleging collusion to restrict financial aid (referencing *In re College Admissions Antitrust Litigation*). If the Harris School continues practices that obscure true tuition costs or overstates financial aid availability, it may amount to a violation of consumer protection laws and a **false certification under federal funding conditions**.

**Statutes Involved:**

- *False Claims Act (31 U.S.C. § 3729)* if misrepresentations affect Title IV funding,

- *Illinois Consumer Fraud Act* for deceptive tuition advertising.

**5. Breach of Good Faith and Arbitrary Conduct**

Where the University makes internal decisions that conflict with its own policies such as student governance, curriculum delivery, or financial transparency this may violate the **implied covenant of good faith and fair dealing**, even absent a direct contract breach.

**Example Precedents:**

- *Yam Seng Pte Ltd v. International Trade Corp Ltd* (duty of honesty as part of contractual good faith),

- *Harnish v. Widener Univ. School of Law*, D.N.J. 2013 (allowing consumer fraud claims over inflated employment stats).

**6. Regulatory and Federal Oversight Implications**

If the Harris School knowingly misrepresents program outcomes or services to obtain or retain federal student aid funds, this could constitute a violation of the **False Claims Act**, especially under theories of:

- **False certification** (submitting compliance forms while violating material terms),

- **Implied certification** (receiving funds while noncompliant with core regulatory conditions),

- Potential referral to the **Department of Education's Office of Inspector General**.

**Plaintiff requests:**

1. A forensic review of the Harris School's public representations, employment data, and financial aid disclosures.

2. Referral to the Illinois Attorney General and U.S. Department of Education for potential violations under state consumer fraud statutes and the federal False Claims Act.

3. Restitution or damages if proven that Plaintiff or other students enrolled based on materially false or misleading representations.

**69. Environmental Misrepresentation ("Greenwashing") and Hypocrisy Regarding Sustainability Practices at the University of Chicago; Greenwashing in Violation of FTC and Consumer Fraud Statutes**

Plaintiff respectfully alleges and whistle blows that the University of Chicago engages in significant environmental misrepresentation by publicly branding itself as an institution committed to sustainability and environmental stewardship, while simultaneously and systematically utilizing large quantities of single-use plastics at daily university events, particularly in food service operations.

**Factual Allegations:**

- Despite heavy promotion of environmental responsibility and sustainability initiatives across university materials, events, and fundraising efforts, the University of Chicago permits and supports the widespread, routine use of plastic cutlery, plates, cups, and other disposable items across campus events, without serious recycling, composting, or plastic reduction programs visible at the point of use.

- Numerous events hosted across the University including those organized under the Harris School of Public Policy, the Centre for Leadership and Involvement, and various RSO's, HSOs, and many more institutes rely extensively on non-disposable one time use plastic service ware, undermining the University's public environmental commitments.

**Summary of Article**

**Green Ambitions, Gray Realities: The University of Chicago's 2030 Plan:**
**https://chicagomaroon.com/43812/viewpoints/op-ed/green-ambitions-gray-realities-the-university-of-chicagos-2030-plan/**

1. **Misalignment Between Goals and Actions**

   o Despite public commitments, emissions have **increased by 1% since baseline years**, while campus size grew by **17%**.

   o Leaders like Sustainability Manager Sara Popenhagen admit the timeline may slip, while others, like Dean Michelle Rasmussen, treat the goal as inevitable revealing **a lack of urgency**.

2. **Expansion vs. Sustainability**

   o The University continues **displacing South Side communities**, particularly low-income Black residents, while justifying expansion as necessary for climate research.

   o **Research buildings consume 38% of energy** despite occupying only 10% of campus space, undermining emission reduction efforts.

3. **Financial and Staffing Shortfalls**

  o The **Office of Sustainability is underfunded and understaffed** (only 3 known leaders), limiting progress.

  o **Prioritizing property investments over sustainability** has worsened financial constraints, per faculty reports.

4. **Lack of Transparency and Student Exclusion**

  o Though students helped draft the plan, the **administration now marginalizes their input** and fails to provide updates.

  o Emissions data is **scattered or inaccessible**, suggesting the plan is **not a priority**.

**Legal and Regulatory Concerns:**

- Such conduct may constitute **"greenwashing"**, a deceptive marketing practice prohibited under the **Federal Trade Commission's Green Guides (16 CFR Part 260)**, which require that environmental claims be substantiated, clear, and not misleading.

- The **Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.)** prohibits false representations or omissions of material facts intended to mislead consumers including students, donors, and grant-providing entities about an institution's environmental practices.

- Universities benefitting from federal grants under environmental, sustainability, or research initiatives could risk noncompliance findings if representations of sustainability materially mislead granting agencies or the public.

**Specific Potential Violations:**

- Publicly advertising "green campus" achievements while using unsustainable practices internally could mislead students deciding to enroll based on environmental values.

- Soliciting donations or public grants for sustainability programs while maintaining internally inconsistent practices could trigger regulatory investigations into misrepresentation and fraud.

**Request for Relief:** Plaintiff respectfully requests that:

1. A formal investigation be conducted into the University's environmental marketing practices versus actual environmental performance;

2. Public sustainability claims by the University be independently audited for truthfulness and compliance with FTC standards;

3. The University be required to implement corrective measures ensuring that sustainability marketing matches operational realities, including a significant reduction in plastic use consistent with their advertised environmental principles.

**70. Systematic Breach of Academic Contract, Fraud, and Misconduct in Core Courses at the Harris School of Public Policy – Unfair Examination Practices and Compromised Academic Integrity**

Plaintiff respectfully alleges and also whistle blows that during the initial core courses at the University of Chicago Harris School of Public Policy, the administration engaged in practices that demonstrate systematic breach of academic standards, breach of contract, and potentially fraudulent conduct.

**Factual Allegations:**

- During core curriculum examinations, Harris School regularly administered exams across **multiple shifts** on the same day.

- Critically, **the content of the exams remained same across shifts**, providing earlier examinees with the opportunity to share exam questions and answers with later examinees. And students used it openly in common open spaces to share to student enrolled in later shifts each other to improve students grades and to earn money.

- This practice undermined the academic integrity of the testing process and created grossly unequal conditions among students, benefiting some while disadvantaging others.

- Students paying significant tuition fees reasonably expect a fair, rigorous, and professionally administered educational experience. This misconduct therefore constitutes a **systematic breach of the implied educational contract** between students and the University.

**Legal and Regulatory Concerns:**

- **Breach of Contract**: By failing to provide fair, equitable, and academically sound evaluation processes, the University may have violated the implied terms of the educational agreement under **Illinois contract law** (e.g., *Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992)).

- **Fraud and Deceptive Practices**: Advertising a world-class education and charging premium tuition while systematically engaging in flawed academic practices may constitute deceptive business practices under the **Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.)**.

- **Constructive Fraud**: The University occupies a position of trust and special fiduciary-like responsibility toward its students. Administering exams under conditions that knowingly compromise academic integrity may constitute constructive fraud under Illinois law.

- **Educational Malpractice/Negligence**: While courts are generally reluctant to entertain "educational malpractice" claims,

egregious failures in examination procedures, combined with substantial tuition charges, may open the door to tort-based claims for damages.

**Impact on Students:**

· Dilution of the value and credibility of the degree awarded.

· Academic inequity and loss of merit-based opportunities.

· Emotional distress, reputational harm, and financial injury resulting from compromised educational standards.

**Relief Requested:**

· An independent audit of academic testing practices at the Harris School.

· Full disclosure of examination policies and records regarding administration across multiple shifts.

· Compensation for harm caused by diminished academic value and misrepresentation to students.

· Declaratory relief.

· Injunctive relief requiring the University to implement standardized, secure examination protocols to prevent future occurrences.

## 71. Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act by the Harris School of Public Policy – Misrepresentation of Educational Standards, Breach of Contract, and Deceptive Testing Practices

Plaintiff realleges and incorporates by reference couple of relevant preceding paragraphs of this Complaint as though fully set forth herein (relevant ones).

1. Plaintiff is a consumer within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1 et seq., and the University of Chicago is a "person" engaged in commerce within the meaning of the ICFA.

2. Plaintiff entered into a contractual relationship with the University of Chicago Harris School of Public Policy by enrolling as a student and paying substantial high tuition and fees in exchange for the promised services of providing a fair, rigorous, and academically sound education.

3. The contractual relationship was formed through the University's academic catalogues, student handbooks, course descriptions, marketing materials, enrolment agreements, and other official representations, which constituted binding terms and conditions of the educational relationship.

4. Among the material terms of the contract were:

   · That Plaintiff would be provided a fair and equitable academic environment;

- That academic assessments would be conducted in a rigorous, secure, and merit-based manner;

- That the value of the degree conferred would be protected through maintenance of academic integrity and standards.

5. Defendant materially breached the contract by:

  - Administering core course examinations in multiple shifts with substantially identical exam content;

  - Failing to implement reasonable measures to prevent advance dissemination of exam questions;

  - Allowing compromised academic practices to devalue the merit-based educational process;

  - Failing to uphold standards of fairness and academic rigor reasonably expected by students.

6. Defendant's breach deprived Plaintiff of the full benefit of the educational bargain and resulted in:

  - Diminished value and credibility of Plaintiff's academic achievements and degree;

  - Harm to Plaintiff's academic reputation and future professional opportunities;

  - Financial losses, including but not limited to tuition, fees, and related expenses paid.

7. The University of Chicago, through its Harris School of Public Policy, solicited Plaintiff's enrolment and tuition payments through representations that it provided a fair, rigorous, and merit-based education and assessment system.

8. Defendant's representations were false, misleading, and deceptive because, as alleged, core course examinations at the Harris School were administered over multiple shifts with substantially identical exams, allowing for widespread advance sharing of exam content among students, thereby systematically compromising the integrity, fairness, and reliability of the evaluation process.

9. Defendant's failure to safeguard the academic examination process constituted a material omission of fact that would have influenced Plaintiff's decision to enroll and continue attending the institution.

10. Plaintiff reasonably relied on Defendant's representations regarding academic quality, academic integrity, and fair evaluation processes in choosing to attend and pay tuition to the Harris School of Public Policy.

11. Defendant's acts and omissions violated the ICFA by:

  o Misrepresenting the standard, quality, and fairness of its educational offerings,

- o Omitting material information regarding flawed testing protocols,

- o Engaging in conduct likely to mislead reasonable students and consumers.

As a direct and proximate result of Defendant's conduct, Plaintiff suffered actual damages, including but not limited to loss of educational opportunities, reputational harm, emotional distress, and financial loss related to tuition and fees paid in reliance on misrepresentations.

- **Misrepresentation and Deceptive Conduct:** The University's marketing and official communications assured prospective students that they would receive a high-quality education with rigorous testing and impartial evaluation. The use of identical exam content across shifts, without adequate safeguards to prevent the dissemination of exam material, constitutes a misleading representation that materially influenced the Plaintiff's decision to enroll.

- **Breach of Contract:** By failing to provide a secure and fair examination process, the University breached the implied contractual terms inherent in its educational offerings. This breach has allegedly diminished the value and credibility of the educational degree, resulting in harm to the Plaintiff's academic reputation and future opportunities.

- **Legal Violations and Damage:** Such practices are alleged to violate the Illinois Consumer Fraud and Deceptive Business Practices Act, as well as common law theories of fraud, constructive fraud, and breach of contract. The Plaintiff claims that these actions led to actual damages including financial loss (tuition and fees), loss of educational opportunities, reputational harm, and emotional distress.

**Request:**

1. An independent audit of the academic testing practices and procedures at the Harris School.

2. Full disclosure of examination records and policies related to how exams are administered across multiple shifts.

3. Injunctive relief requiring the implementation of standardized, secure examination protocols to prevent future breaches of academic integrity.

4. Declaratory Relief that academic contract was breached.

This claim is made in order to hold the Harris School accountable for misrepresenting its academic standards and for the subsequent harm suffered by students who relied upon those representations when deciding to pay substantial tuition and fees for their education.

**72. Potential Financial Misconduct and Securities-Related Concerns at the University of Chicago – Request for Financial Auditing, Investment Oversight, and Investigation of Securities Compliance**

Plaintiff does not assert definitive proof of securities violations but respectfully whistle blows and requests that the appropriate authorities investigate these concerns based on publicly available information, known incidents, and patterns of financial conduct.

Plaintiff respectfully requests that relevant authorities investigate whether the University of Chicago has engaged in any financial misrepresentation, misuse of funds, or securities-related misconduct in connection with its operations, investments, or external financial representations. While the University of Chicago has not publicly been found institutionally liable for securities fraud to date, concerning incidents raise serious questions that warrant closer scrutiny.

Specifically, in December 2021, a University of Chicago associate professor, Dr. Daniel Catenacci, pled guilty to insider trading charges after improperly utilizing confidential clinical trial information to trade biotechnology stocks, resulting in over $134,000 in unlawful profits. Although this misconduct was at the individual faculty member level, it reveals potential vulnerabilities within the University's compliance, oversight, and internal controls regarding the handling of material non-public information in academic and research contexts, which could have broader implications for institutional accountability under securities law.

Furthermore, in 2023, the University of Chicago agreed to pay $13.5 million to settle claims of collusion in an antitrust class action lawsuit, wherein it was alleged that the University, alongside other elite institutions, engaged in price-fixing practices to artificially inflate the cost of higher education and limit student financial aid competition. Although this settlement arose under antitrust law rather than securities law, it nevertheless demonstrates a pattern of financial practices that merit closer governmental review.

UChicago's financial management has also drawn attention due to its substantial debt and budget deficits. While these issues don't directly indicate misconduct, they provide context for potential financial vulnerabilities. From 2006 to 2022, UChicago's debt increased from $2.236 billion to $5.809 billion, a 260% rise according to a draft paper by classics and history professor Clifford Ando. Interest payments are significant, with the university spending $200 million annually in 2021 and 2022. Interest payments are significant, with the university spending $200 million annually in 2021 and 2022.

**Articles:** https://chicagomaroon.com/28163/news/uchicago-endowment-hits-8-6-billion-returning-3-2/, https://www.pionline.com/endowments-and-foundations/university-chicago-endowment-returns-33-fiscal-year(The endowment had returned -8.8% for the fiscal year ended June 30, 2022),

Plaintiff contends that if the University of Chicago engages in issuing municipal bonds, soliciting grants under material representations of financial practices, or managing endowment funds where material misstatements may affect investors, donors, or federal funding bodies, such activities

could fall within the purview of securities regulations and warrant investigation. Municipal securities fraud, false representations in bond prospectuses, misuse of grant funds, or failure to disclose material financial risks could all constitute violations under federal and state laws, including under the jurisdiction of the Securities and Exchange Commission (SEC) and state securities regulators.

Accordingly, Plaintiff respectfully requests that relevant investigative authorities evaluate the University's financial practices to ensure compliance with all applicable laws regarding truthful financial disclosures, ethical research practices, grant fund administration, municipal bond compliance, and securities fraud prevention.

**Laws (Not limited to):**

- **Whistleblower Protection Act (WPA)** – Protects federal employees from retaliation when reporting misconduct.
- **Dodd-Frank Act** – Provides financial incentives for whistleblowers who report securities fraud to the SEC.
- **Sarbanes-Oxley Act (SOX)** – Protects employees of publicly traded companies from retaliation when reporting corporate fraud.
- **IRS Whistleblower Program** – Rewards individuals who expose tax fraud.

## 73. Potential SEVP Noncompliance by the University of Chicago – Request for a Comprehensive Audit of International Student Recordkeeping, Reporting, and F-1 Visa Sponsorship Practices

Plaintiff respectfully whistle blows and requests that investigative authorities assess whether the University of Chicago is fully compliant with its obligations under the Student and Exchange Visitor Program (SEVP), including but not limited to the accurate maintenance, verification, and reporting of international student records and enrolment statuses as required for F-1 visa sponsorship under federal law. This valid concern comes from the fact that university is paying many international students staff (but not limited to) more than 20 hours/week violation and other financial things mentioned above.

There is precedent for U.S. educational institutions facing severe consequences, including the suspension or revocation of their ability to sponsor F-1 visas, based on noncompliance with SEVP regulations. Well-documented cases include:

1. **ITT Technical Institute**

   o **Issue**: Misrepresentation of student outcomes, inaccurate recordkeeping, and SEVP compliance violations.

   o **Outcome**: Suspension of authority to issue I-20 forms, contributing to the institution's ultimate closure.

2. **Heald College**

- o **Issue**: Failure to properly report international student attendance and progress.

- o **Outcome**: Suspension of I-20 sponsorship ability, leading to enrolment and financial decline.

3. **Westwood College**

- o **Issue**: Questionable recruitment practices and failure to maintain current student status records.

- o **Outcome**: Temporary loss of F-1 sponsorship privileges, preceding closure.

4. **Argosy University**

- o **Issue**: Mismanagement of enrolment and reporting practices, leading to SEVP compliance issues.

- o **Outcome**: Loss of ability to issue I-20 forms, contributing to collapse of operations.

5. **Remington College**

- o **Issue**: Discrepancies and delays in reporting enrolment changes for international students.

- o **Outcome**: Suspension of sponsorship privileges until corrective action was demonstrated.

6. **Platt College**

- o **Issue**: Improper verification of full-time enrolment status of international students.

- o **Outcome**: Temporary suspension of I-20 issuance.

**Key Common Themes Among Violating Institutions**:

- · Failure to maintain accurate student records;

- · Misrepresentation of program offerings;

- · Improper enrolment reporting or attendance tracking;

- · Systematic compliance breakdowns affecting federal oversight.

**Legal and Regulatory Context**:

- · Institutions authorized under SEVP must comply with 8 C.F.R. § 214.3(g), which requires maintaining complete and accurate student records and reporting timely information to the Department of Homeland Security.

- · The failure to do so can result in **suspension or termination of SEVP certification** and thereby **loss of the ability to issue Forms I-20, essential for F-1 student visas.**

Although the University of Chicago is a nonprofit and generally considered a reputable institution, Plaintiff raises concerns, particularly based on the pattern of administrative deficiencies, retaliatory and discriminatory practices alleged elsewhere in this Complaint, that there may exist additional areas where internal compliance with SEVP requirements is not being sufficiently monitored or enforced.

Given the seriousness of potential repercussions including **loss of F-1 sponsorship** privileges and **harm to international students**

**Plaintiff respectfully requests:**

· Revocation of university ability to sponsor visa, I-20, F-1.

· A full review of the University of Chicago's SEVP certification compliance;

· An audit of international student recordkeeping and reporting practices;

· Verification that no misrepresentations regarding international programs have been made in violation of SEVP standards.

**Additional Basis for Investigation**:

· Temporary suspensions of sponsorship capacity, even at otherwise prestigious institutions, have lasting reputational damage;

· Consistent with enforcement practices, even nonprofit universities are not immune from SEVP penalties when compliance failures exist;

· Ensuring strict compliance protects not only federal program integrity but also the rights of international students who rely on lawful sponsorship.

Based on historical precedents involving ITT Tech, Heald College, Westwood College, Argosy University, Remington College, and Platt College, Plaintiff urges an immediate review to safeguard the rights and interests of international students and to ensure that the University of Chicago is fully complying with all federal regulatory obligations under SEVP.

**74. Whistleblower Claim of Systematic Misrepresentation of Academic Program Credentials – Encouraging False Representations to Enhance Employment Outcomes**

Plaintiff, acting in the capacity of a good faith whistleblower, respectfully alleges that systemic misrepresentation practices are occurring under the knowledge, encouragement, and tolerance of the University of Chicago Harris School of Public Policy. Based on credible information shared by multiple students, it is alleged that certain students enrolled in the Master of Public Policy (MPP) and Master of Science in Computational Analysis and Public Policy (MSCAPP) programs routinely misstate their academic program as the Master of Arts in Public Policy (MAPP) program, a shorter, one-year program, on résumés, and employment applications.

This deliberate misrepresentation is allegedly encouraged or knowingly tolerated and even encouraged by Harris administrators and career services staff, who fail to correct or appropriately

address such conduct despite awareness. Students reportedly exploit this misstatement to falsely signal imminent graduation to prospective employers, thereby improving their chances of securing internships, jobs, or visa sponsorships under materially false pretences. Following employment offers, students sometimes seek internal program changes to reconcile the earlier misrepresentation.

Additionally, Plaintiff recalls a concerning personal experience during an official career advising session with a Harris career counsellor (specific date and name not presently recalled but have occurred during Plaintiff's enrolment in an academic year). During that advising session, the career advisor appeared to encourage Plaintiff to present certain qualifications or representations in a manner that Plaintiff perceived as materially misleading. Plaintiff, uncomfortable with the suggestion, directly questioned the advisor, asking: **"Would that not be false?"**, that advisor said yes it will be, but you have to do that to get the roles. Plaintiff's reaction highlights the reasonable ethical concerns raised even within university-sanctioned career support processes. No corrective guidance was provided to Plaintiff in response to his ethical concerns, reinforcing the perception that the administration tolerated or even subtly encouraged misrepresentations to enhance job placement statistics.

Such practices, if substantiated, may constitute violations of federal fraud statutes (18 U.S.C. § 1001 - False Statements to Federal Officials, where federal funding or employment is involved), immigration regulations regarding truthful disclosure in Optional Practical Training (OPT) applications, and potentially the False Claims Act (31 U.S.C. § 3729 et seq.) if federal resources are improperly used to support fraudulent representations.

Further, such systemic academic misrepresentation may violate the Higher Education Act's mandates regarding integrity in student records and reporting (20 U.S.C. § 1094), the Department of Education's regulations prohibiting misrepresentation (34 C.F.R. § 668.71 et seq.), and Illinois state consumer fraud protections under the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.).

Plaintiff respectfully requests that the appropriate federal and state agencies, including but not limited to the Department of Education's Office of Inspector General (OIG), the U.S. Department of Justice (DOJ), the U.S. Citizenship and Immigration Services (USCIS), and the Illinois Attorney General's Office, initiate an immediate investigation into whether the University's practices permit or enable academic misrepresentations in violation of federal and state law, thereby compromising the integrity of the educational system, labor market, and immigration processes.

**75. Abuse of Authority and Predatory Conduct in Handling Plaintiff's Transcripts – Retaliatory Delays and Pre-emptive Alteration of Academic Records to Undermine Legal and Professional Prospects**

Plaintiff respectfully alleges that the University of Chicago engaged in **abuse of authority**, **predatory**, and **authoritarian tactics** by unlawfully manipulating the transmission of Plaintiff's academic transcripts to external organizations, specifically but not limited to the Law School

Admission Council (LSAC), and thereby interfering with Plaintiff's academic and professional prospects in violation of multiple federal and state laws.

Specifically, Plaintiff submitted a transcript request well in advance, in accordance with all University procedures. Historically, transcript requests submitted by Plaintiff were processed promptly and without incident. However, in this instance, the University **intentionally delayed the transmission** and/or retransmitted the transcripts until **after** it had added a disciplinary blot or notation on Plaintiff's record.

Plaintiff further alleges that the University's actions were not only retaliatory but also strategically aimed at undermining Plaintiff's future ability to pursue **legal education and potentially hold the institution accountable**. Of particular concern is the fact that the transcript request in question, the one that faced unusual resistance, delay, or obstruction, was specifically designated for submission to **law schools**.

Plaintiff reasonably believes that this selective targeting of a law school transcript request reflects an intent by the University to **sabotage Plaintiff's path toward acquiring legal knowledge**. Such conduct, if substantiated, not only compounds the existing claims of retaliation but also demonstrates a **calculated effort to prevent Plaintiff from accessing the legal tools necessary to seek redress or future accountability against the institution**. Harvard law school then rejected the application for admission of plaintiff.

These facts strengthen the inference that the University's conduct was carried out with **malice or reckless indifference**, aiming not just to punish the Plaintiff for prior grievances, but to **pre-emptively neutralize the Plaintiff's capacity to pursue justice through formal legal channels**.

Critically, at the time the University transmitted the transcript, **the disciplinary decision was not final**, and according to the University's own policies **Plaintiff according to student manual to a 15-day appeal period** during which no adverse final actions should have been taken.

Further, Plaintiff notes that a paper copy of the transcript, received around **February 28**, already included the blot, suggesting that the University pre-emptively altered the academic record with retaliatory intent before allowing due process to conclude. Plaintiff had already **paid a lifetime transcript fee** at the time of admission, reinforcing the University's contractual obligation to act in good faith and process records neutrally.

**This conduct is particularly egregious because:**

· At the time the transcript was sent, the disciplinary decision was **not yet final**.

· Under the University's own policies and procedural rules, **Plaintiff had 15 days to appeal** the disciplinary decision as per student manual and rules.

· Plaintiff had **paid a lifetime transcript fee** at the time of admission, creating a contractual expectation for fair and timely processing of transcript requests.

Further, Plaintiff received a paper copy of the transcript, dated approximately **February 28**, which already included the blot, despite no final resolution being reached, indicating pre-emptive, retaliatory action.

**This sequence of actions constitutes:**

- **Retaliation** for Plaintiff's whistleblower and grievance activities.

- **Interference with prospective economic advantage**, including graduate school admissions and employment opportunities.

- **Breach of contract and violation of good faith and fair dealing**, through the misuse of administrative powers to harm the Plaintiff.

- **Abuse of authority**, violating reasonable expectations of fairness, neutrality, and duty of care owed to students under both federal regulations and common law.

**Legal Basis and examples Supporting Plaintiff's Allegations**

1. **Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g:**
   The University has an obligation under FERPA to ensure that education records, including transcripts, are accurate and not misleading. Preemptively altering Plaintiff's transcript prior to exhaustion of appeal rights could constitute a **violation of FERPA's protection against inaccurate and misleading records**.

2. **Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing (Common Law, Illinois):**
   As recognized in *Ross v. Creighton University*, universities must adhere to good faith practices in their dealings with students, including the issuance of transcripts. By manipulating the timing and contents of Plaintiff's transcript in bad faith, the University breached its contractual and implied obligations.

3. **Tortious Interference with Prospective Economic Advantage:**
   Under Illinois and federal law, universities are liable when they intentionally interfere with a student's reasonable expectancy of future educational or employment opportunities. By altering Plaintiff's transcript in a way designed to undermine applications to law school, the University interfered with Plaintiff's professional trajectory.

4. **Retaliation in Violation of Civil Rights Statutes:**
   The timing of the adverse action supports a claim under *University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338 (2013)*, which held that a retaliatory motive need only be the "but-for" cause of harm to sustain a retaliation claim under Title VII and parallel statutes, such as Title VI. Since university removed all future chances of potential legal degree at top institution like Harvard Law School by causing delay in transcripts transmission and rushing the decision onto transcript before it even get finalized according to their own manual shows clear retaliation as per but for standards, and violated plaintiff's various civil rights.

5. **Doe v. Columbia University, 831 F.3d 46 (2d Cir. 2016):** The Second Circuit recognized that universities could be liable where procedural irregularities in disciplinary or academic processes suggest bias or retaliatory intent. Here, the University's manipulation of the transcript timing and content creates a strong inference of retaliatory motive.

6. **Zubulake v. UBS Warburg LLC:** Courts have sanctioned parties for document manipulation in retaliation cases. Altering the transcript before appeal rights were exhausted constitutes similar misconduct.

**[Data redacted]**

## 76. Discrimination Against Graduate Students in Access to Benefits and Opportunities – Systematic Exclusion in Violation of Federal and State Civil Rights Laws

Plaintiff hereby alleges and further discloses in the nature of a whistleblower report, that the University of Chicago has engaged in a pattern of unlawful and discriminatory conduct in violation of federal and state laws by systematically favouring undergraduate students over graduate students in the allocation of institutional benefits, privileges, and career-enhancing opportunities. These acts have the effect of materially disadvantaging graduate students, including the Plaintiff, in a manner that is inconsistent with the representations made by the University through its publications, promotional materials, and admissions communications.

Specifically, the University routinely restricts or denies graduate students access to critical support systems and benefits that are regularly afforded to undergraduates. These include, but are not limited to, full tuition funding for students from families with annual incomes below $65,000; exclusive access to high-quality career and internship platforms such as Handshake; eligibility to participate in global visiting program tours; inclusion in University-sponsored educational and networking events; and subsidized transportation benefits, including the U-Pass, which is widely advertised as a standard part of the student experience. These services are heavily promoted by the University, contributing to its public image and influencing prospective students' enrollment decisions. However, in actual practice, graduate students are either excluded or provided materially inferior alternatives.

Plaintiff asserts that such disparity is particularly egregious because many graduate students, including Plaintiff, made the decision to enroll at the University based on reasonable reliance upon the availability of these publicly promoted benefits. Upon matriculation, however, Plaintiff and similarly situated students discovered that these benefits were limited or altogether unavailable to graduate-level students, despite being members of the same institution.

By way of illustration, Plaintiff notes that graduate students are provided with access to "Grad Gargoyle" and program-specific job portals such as "Harris Link," both of which offer substantially fewer opportunities, often from less desirable employers, compared to undergraduate-accessible platforms. These portals frequently contain expired postings, even those newly listed, and include roles that are inconsistent with the professional standing of graduate

students from a top-tier institution. Plaintiff has personally witnessed job listings for positions such as dishwasher, janitor/cleaner, or general labourer roles that are not aligned with the advanced academic qualifications of graduate students, nor the expectations set by the University through its marketing, career outcome statistics, and tuition-based investment model. Before joining the program plaintiff also was confirmed that access to handshake will be granted in one of the meetings with some staff member, which turned out to be false claim after arriving at university.

Such discriminatory structuring of career services, funding opportunities, and campus resources represents a deviation from the University's public representations and may constitute false advertising, deceptive business practices, and/or fraudulent inducement under applicable laws, including but not limited to the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2). Moreover, this conduct may also amount to a breach of implied contractual obligations and a violation of federal non-discrimination mandates, including Title VI of the Civil Rights Act of 1964, to the extent that the disparate treatment of graduate students results in unequal access to educational resources and federally funded institutional support systems.

Plaintiff respectfully requests that the Court and/or appropriate oversight agencies investigate this institutional conduct, evaluate whether graduate students are being unlawfully excluded from materially significant benefits, and determine whether corrective or remedial measures are warranted to ensure parity and compliance with legal and ethical standards. The Plaintiff further asserts that these patterns of exclusion warrant scrutiny in light of the University's substantial federal funding and its obligations to provide equitable access to all students, regardless of academic level.

These exclusions materially affect graduate students' access to educational, financial, employment, and future career advancement opportunities. The University's policies and practices violate:

- Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., prohibiting discrimination on the basis of race, color, or national origin in programs receiving federal financial assistance;

- Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq., prohibiting discrimination on the basis of sex in federally funded education programs;

- Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., prohibiting discrimination based on disability;

- The Illinois Human Rights Act (775 ILCS 5/1-101 et seq.), which prohibits discrimination in education based on race, sex, disability, national origin, and other protected classes.

- Illinois Consumer Fraud and Deceptive Business Practices Act

- Federal Trade Commission Act

- Other relevant trade, consumer, protection from business and institution acts and rules including state, and federal rules)

By disproportionately allocating critical educational and career-building resources exclusively to undergraduate students without a legitimate, non-discriminatory justification, the University imposes unlawful barriers to graduate students' full participation and success. Such practices violate the fundamental principles of equity and non-discrimination that federal and state civil rights laws mandate for educational institutions receiving public funding.

Plaintiff reserves the right to seek all available remedies, including injunctive and declaratory relief, compensatory damages, as allowed by law.

### 77. Unauthorized Disclosure of Confidential Employment Communications by Mansueto Institute – Retaliatory Breach of Confidentiality in a Union-Eligible Context

Plaintiff further alleges that in response to a request from the Mansueto Institute regarding Plaintiff's work hours in a union-eligible Research Assistant (RA) role, Plaintiff submitted an email in good faith containing sensitive employment-related information. Within that communication, Plaintiff explicitly requested that the information shared remain confidential (To Aimee, Heidi, Brian at Mansueto Institute). Despite this express request, the Mansueto Institute subsequently disclosed the contents of the email to administrators at the Harris School and other University of Chicago officials. This unauthorized disclosure was later used against Plaintiff in a disciplinary proceeding.

Plaintiff contends that such disclosure constituted a breach of Plaintiff's reasonable expectation of confidentiality and was particularly egregious given the institutional power dynamics involved. This conduct may violate several legal and regulatory frameworks, including:

- The **implied covenant of good faith and fair dealing** recognized in employment relationships;

- **Section 8(a)(1) of the National Labor Relations Act (NLRA)**, which prohibits retaliation and misuse of employee communications in union-eligible contexts;

- Potential implications under the **Family Educational Rights and Privacy Act (FERPA)** if academic or student-status information was involved; and

- Anti-retaliation provisions under federal civil rights laws, including **Title VI, Title IX, the Americans with Disabilities Act (ADA)**, and **state whistleblower protections**.

Plaintiff respectfully asserts that this breach of confidentiality was retaliatory in nature and requests that the matter be subject to further investigation during discovery.

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**[Data redacted]**

**Plaintiff further alleges** that a representative of the Mansueto Institute, identified as Heidi, personally recorded or submitted an entry indicating that Plaintiff had worked eleven (11) consecutive hours on a specific day. Subsequently, in a formal disciplinary meeting, Plaintiff was **aggressively questioned** as to whether he had in fact worked eleven hours straight on that particular day. Plaintiff contends that this sequence of events was orchestrated in bad faith and constituted a deliberate effort to **entrap** Plaintiff and fabricate a basis for disciplinary action, in violation of Plaintiff's rights and reasonable expectations of fair treatment under applicable institutional and labor standards.

**[Data redacted]**

### 78. Misuse of Donor and Federal Funds in Bad Faith – Breach of Fiduciary Duty, Donor Agreements, and Federal Grant Obligations

**Plaintiff alleges and whistle blows**, upon information and belief, that the University of Chicago has engaged in a pattern of misusing donor and federal funds for purposes inconsistent with the institution's stated educational mission and potentially in **bad faith**. These actions raise significant concerns about institutional integrity, transparency, fiduciary responsibility, and potential violations of both federal and Illinois law.

Plaintiff asserts that such conduct, including diversion of resources for retaliatory purposes, failure to uphold donor agreements, and covering up misconduct, may constitute violations of the following laws: Plaintiff contends that the alleged behaviour of the defendant namely the diversion of donor and government resources to fund retaliation, suppress dissent, or obscure misconduct may constitute actionable violations under the above statutes. These actions are inconsistent with the institution's legal obligations as a recipient of federal grants, charitable gifts, and its designation as a tax-exempt educational nonprofit.

**1. Pearson Family Foundation v. University of Chicago**

- The Pearson Family Foundation filed a lawsuit against the University of Chicago seeking return of a $22.9 million donation (from a $100 million pledge), alleging the university **violated terms** by failing to establish the promised Pearson Institute and properly use the funds.

- This case reflects **potential misuse of philanthropic funds and breach of fiduciary responsibility**.

- **Source**: https://apnews.com/general-news-be7265cf567e47e0a6dc2dcc8600eae1

**2. Misuse of Federal Cancer Research Grant Funds**

- The University of Chicago and a former professor were accused of misusing federal funds earmarked for cancer research. Funds were used for **unauthorized expenses**, including personal salaries and equipment unrelated to the grant's purpose.

- The university paid **$250,000**, and the professor **$400,000** in settlements.

- https://www.modernhealthcare.com/article/19980309/PREMIUM/803090331/univ-of-chicago-pays-up-charges-of-misusing-cancer-research-grant-funds-settled

**3. Allegations of Unjust Disciplinary Action and Misuse of Resources**

- While not a settled case, ongoing complaints by former students and faculty suggest a broader institutional pattern where administrative processes and disciplinary tools may be selectively used in retaliation or bad faith. Allegations include the diversion of internal resources to retaliate against students or faculty who raise grievances or report misconduct.

- Though public sources remain limited, anecdotal evidence from students, including this plaintiff, indicate **misuse of funds to support biased investigations, legal defenses, and procedural weaponization**.

**4. Recent Financial Aid Antitrust Lawsuit Settlement**

- The University of Chicago was part of a group of elite institutions accused of colluding to **limit financial aid competitiveness**, potentially disadvantaging low-income students. UChicago agreed to pay **$13.5 million** in a class action settlement.

- This behavior demonstrates **institutional intent to manipulate financial systems for unjust advantage,** funded through tuition and endowment resources.

- https://www.theguardian.com/us-news/2023/aug/16/university-of-chicago-financial-aid-lawsuit-settlement

**Such actions, may constitute violations of federal and state laws, including but not limited to:**

- The False Claims Act, 31 U.S.C. §§ 3729–3733, which prohibits the misuse of federal funds and fraudulent claims related to federal grants;

- Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibiting discrimination and retaliatory use of federal funds in educational institutions;

- Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, concerning misuse of institutional resources to suppress complaints of sex-based discrimination;

- Internal Revenue Code, 26 U.S.C. § 501(c)(3), which restricts tax-exempt nonprofits from using funds for non-charitable or retaliatory purposes;

- Uniform Guidance for Federal Awards, 2 CFR Part 200, which governs the proper use, documentation, and accounting of federal grant funds;

- Illinois Charitable Trust Act, 760 ILCS 55/1 et seq., which mandates that donor funds be used in accordance with donor intent and institutional fiduciary duty;

- Illinois False Claims Act, 740 ILCS 175/1 et seq., prohibiting fraud or misuse involving state funds and grants;de

- Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, which bars deceptive or unfair conduct in a public-facing institution;

- Illinois Whistleblower Act, 740 ILCS 174/1 et seq., prohibiting retaliation against individuals who report misuse of public or private funds;

- Illinois Higher Education Fair Employment and Anti-Discrimination Standards applicable to all public- and private-sector educational institutions operating within the state.

Plaintiff asserts that the misuse of funds for internal retaliation, obstruction of justice, or concealment of misconduct not only undermines public trust but may subject the University to legal liability under both civil and regulatory enforcement actions.

**79. Failure to Act on the Student Petition for Career Development Code of Conduct Reforms – Administrative Neglect Undermining Student Input and Career Support**

**Plaintiff further asserts and wanted to inform** that in response to widespread student dissatisfaction with the University of Chicago Harris School of Public Policy's Career

Development Office (CDO), the Harris Student Government (HSG) formally submitted a petition developed based on concerns raised by multiple students demanding substantive modifications to the CDO's newly issued Code of Conduct. Despite the submission of this well-documented petition, which addressed critical career-related barriers and punitive practices, the administration failed to provide any formal response, engage in dialogue, or implement corrective changes, thereby ignoring the student body's democratic demands and undermining the petition process.

**The petition objected to several policies that disproportionately harmed students, including:**

- **Harsh penalties** for reneging on job offers without considering personal emergencies, ethical concerns, or last-minute job condition changes.

- **Lack of institutional accountability** when employers revoked offers without consequence.

- **Rigid restrictions** on post-offer job searching that left students economically and professionally vulnerable.

Plaintiff contends that the CDO's inaction on this petition is emblematic of broader institutional neglect and disregard for student welfare, career mobility, and fair policy enforcement. The absence of any response violates the spirit of transparency and collaborative governance expected at a federally funded educational institution.

**Legal Theories and Potential Violations**

**1. Breach of Implied Covenant of Good Faith and Fair Dealing:** Universities have a duty to treat students fairly and in good faith, particularly in matters affecting their career outcomes and economic futures. The refusal to meaningfully address the petition after soliciting or receiving student input may constitute a breach of this implied obligation.

**2. Violation of Title IV (Higher Education Act of 1965):** As a recipient of federal financial aid funding under **Title IV**, the University is obligated to ensure equal access to institutional benefits. Denying students fair career resources and enforcing arbitrary punitive policies without proper grievance mechanisms may contravene Title IV and the principles of **equal educational opportunity**.

**3. Potential Retaliation under Title IX and Title VI:** Should any student face adverse treatment after participating in this petition effort especially those who previously filed grievances the University's failure to protect students may constitute **retaliation** under **Title IX (20 U.S.C. § 1681)** or **Title VI (42 U.S.C. § 2000d)**. Retaliation includes any act that dissuades a reasonable person from engaging in protected activity, such as advocacy.

**4. Chilling Effect on Free Expression (Healy v. James, 408 U.S. 169 (1972)):** The U.S. Supreme Court has recognized that students do not relinquish their First Amendment rights at the schoolhouse gate. The lack of response to the petition, combined with career penalties that could discourage advocacy, may amount to a **chilling effect on constitutionally protected speech**.

**5. Negligence or Breach of Fiduciary Duty (Contract-Based Education Claims):** When students pay tuition and rely on institutional career support systems, there is an implicit contract to provide competent, equitable access to those resources. Arbitrary restrictions and non-responsiveness may give rise to breach of duty or negligence claims under **contractual educational theories**, particularly when a student's professional trajectory is materially impaired.

The University's failure to respond to or implement changes proposed in a petition reflecting the voices of its student body indicates not only **administrative indifference** but may also reflect broader patterns of institutional unaccountability. Plaintiff urges that this incident be included in the pattern of discriminatory or retaliatory behaviour, and that discovery be granted to determine:

- Who received and reviewed the petition;

- Whether there were internal communications dismissing or obstructing action;

- What (if any) follow-up actions were taken (Since student's didn't get any update on the matter).

Plaintiff respectfully submits that the administration's failure to act on a clear student mandate further undermines the integrity of its academic and career support systems and reinforces the need for judicial or administrative oversight to ensure compliance with student rights and federal law.



**PETITION TO DEMAND THE MODIFICATION OF THE NEW CODE
OF CONDUCT ISSUED BY THE UCHICAGO HARRIS CAREER
DEVELOPMENT OFFICE (CDO)**

We are urging the Harris student body to sign a petition calling for the modification of the new Code of Conduct issued by the UChicago Harris Career Development Office (CDO). The CDO has made it mandatory for students to sign this Code to access HarrisLinks, the career/job portal dedicated to Harris students.

**Concerns Regarding the Offer Acceptance and Rejection Policy**

We acknowledge the importance of professionalism and ethical conduct in career-related engagements. However, the current provisions regarding offer acceptance and reneging are disproportionately stringent on students while failing to address instances where employers renege on offers. The language used in the Code is punitive, lacks balance, and does not consider the realities of job searching. Our key concerns include:

1. **Harsh and Unilateral Sanctions for Students**
    1.1. The Code currently states that **"reneging on an offer will result in a loss of access to HarrisLink for the remainder of the academic year."** While we understand the importance of honoring commitments, we also recognize that maintaining strong employer relationships is imperative for the school, and last-minute reneging of offers is not desirable. However, the Code of Conduct should allow for exceptions in consultation with the CDO to maintain transparency and ensure that students are not unduly penalized for circumstances beyond their control. This is especially critical when students must withdraw from an accepted offer due to **unexpected personal emergencies, ethical concerns about the employer, or significant changes in employment conditions.** Hence, we propose a redrafted section, *"Reneging on an offer is strongly discouraged and may impact employer relations. However, in cases where a student faces unforeseen circumstances (such as a family emergency, an ethical issue with the employer, or a change in job conditions), they should consult with the CDO to discuss available options. Depending on the situation, a resolution may be reached without imposing severe penalties on the student. Any decision regarding access to HarrisLink will be made on a case-by-case basis."*
    1.2. The **penalty should be modified to specify that access will be revoked only until July 2025,** rather than indefinitely within the academic year. This allows for a clearer, structured consequence rather than an open-ended punitive measure.

2. **Lack of Employer Accountability for Rescinded Offers**
    2.1. The Code does not address the situation where an **employer revokes an offer** after a student has already committed, leaving them without employment. It is unfair to place the entire burden of commitment on students when employers frequently operate on different hiring timelines and,

at times, withdraw offers due to economic downturns, budget constraints, or internal restructuring.

2.2. We propose that the Code include a resolution mechanism for students who experience rescinded offers, ensuring that the CDO provides active support, including priority access to networking resources, advocacy with the employer, and guidance on securing alternative opportunities. Additionally, a record of employers who have rescinded offers should be maintained and made available as a cautionary reference for future students. This transparency will help students make informed decisions about their job search and ensure they are aware of potential risks when considering offers from these companies.

3. **Restrictions on Continuing to Interview or Apply After Accepting an Offer**

3.1. The current Code states that students must **immediately cease applying or interviewing** for opportunities once they accept an offer. This fails to acknowledge that employers may take time to finalize details such as salary, benefits, or work conditions, leaving students in a vulnerable position.

3.2. Instead of outright prohibiting continued job searching, the policy should **encourage students to act in good faith** while allowing flexibility in exceptional circumstances where a student may need to explore additional options. Hence, we suggest a redrafted version that is more clear and inclusive, *"Students are encouraged to act in good faith when navigating job offers. While continuing to interview after accepting an offer should be approached with caution, students should have flexibility in exceptional cases, such as when an employer has not yet provided full compensation details or job conditions. The CDO can play a constructive role in advising students on ethical decision-making during this process."*

**Proposed Revisions to the Code of Conduct**

To create a more balanced and student-supportive policy, we demand the following amendments:

1. **Modify the language around offer reneging** to recognize that students may have legitimate reasons for withdrawing from an accepted offer. The revised section should emphasize professionalism while removing disproportionately punitive measures.

2. **Revise the HarrisLink access penalty** to specify that revocation will be limited **only until July 2025** to ensure clarity and remove ambiguity.

3. **Introduce a policy for employer accountability** when offers are rescinded, ensuring that the CDO supports students in such cases rather than placing all responsibility on them.

4. **Remove the restriction on students applying or interviewing post-acceptance** and instead provide **guidance and counseling** to help students make informed, professional decisions.

By adopting these changes, the CDO can foster a **more student-centric approach** that upholds professional integrity while protecting students from undue risks. We urge the administration to update the Code of Conduct accordingly to reflect these considerations.





**80. Federal Funding and Compliance Obligations: Ensuring Non-Discrimination, Non-retaliation, Free Expression, and Responsible Use of Federal Resources**

The Harris School of Public Policy at the University of Chicago receives federal funding through various channels, including:

- **Federal Student Aid Programs**: U.S. students at Harris are eligible for federal loans such as the Federal Direct Unsubsidized Stafford Loan and the Graduate PLUS Loan, indicating the school's participation in federal financial aid programs. (https://harris.uchicago.edu/admissions/financing-your-degree/loans-work-study)

- **Federal Work-Study Program**: The school offers opportunities through the Federal Work-Study Program, which is funded by the U.S. Department of Education . ( https://harris.uchicago.edu/admissions/financing-your-degree/loans-work-study)

- **Research Grants and Scholarships**: Harris hosts centres like the Centre for Municipal Finance and the Centre for Effective Government, which probably engage in research often supported by federal grants .( https://harris.uchicago.edu/, https://harris.uchicago.edu/research-impact/centers-institutes, https://harris.uchicago.edu/research-impact/centers-institutes/center-for-effective-government, https://harris.uchicago.edu/research-impact/centers-institutes/center-municipal-finance)

**Legal Implications of Receiving Federal Funding**

As a recipient of federal funds, the Harris School is obligated to comply with various federal laws and regulations, including:

- **Title VI of the Civil Rights Act of 1964**: Prohibits discrimination on the basis of race, color, or national origin in programs receiving federal assistance.

- **Title IX of the Education Amendments of 1972**: Prohibits sex-based discrimination in any education program or activity receiving federal financial assistance.

- **Section 504 of the Rehabilitation Act of 1973**: Prohibits discrimination based on disability in programs receiving federal funding.

- **First Amendment Obligations**: While private institutions are not directly bound by the First Amendment, acceptance of federal funds can subject them to certain free speech considerations, especially in contexts involving student expression and association.

**Relevant Case Law**

- **Healy v. James, 408 U.S. 169 (1972)**: The Supreme Court held that state colleges and universities are not enclaves immune from the sweep of the First Amendment. While this case pertains to public institutions, it underscores the principle that educational institutions must uphold students' rights to free expression.

The Harris School's receipt of federal funding subjects it to a range of legal obligations aimed at ensuring non-discrimination and the protection of students' rights. Plaintiff wanted to whistle blow this and request agencies to check compliance with the laws and regulations, to take appropriate action whenever it would be proved.

**81. Food Waste and Environmental Negligence: Institutional Failure to Implement Sustainable Food Management Practices**

Plaintiff observes that the defendant university routinely discards substantial amounts of untouched and unopened edible food during events across various departments, including neuroscience, BSLC, Harris, NORC, Booth, SSPB, PME, CMES, Grad Lounge, Mansueto Institute, Rubenstein, Saieh hall, and multiple offices. Despite the existence of student-led initiatives to redistribute leftover food, significant waste persists, contributing to environmental degradation and also increased use of single-use plastics. Plaintiff wants to submit this information in good faith to save food and feed it to needy at least.

**Legal Grounds:**

1. **Covenant of Good Faith and Fair Dealing:** The University's disregard for sustainable practices may reflect a broader pattern of institutional negligence, potentially undermining its obligations to stakeholders.

2. **Public Policy Considerations:** Illinois has recognized the importance of reducing food waste due to its environmental impact. The Illinois Environmental Protection Agency highlights that food waste constitutes a significant portion of landfill content, producing methane, a potent greenhouse gas.

**Supporting Case Law:**

o While specific case law on food waste is limited, the University's practices may be indicative of a broader disregard for ethical and environmental responsibilities, potentially informing the context of Plaintiff's claims.

o Bill Emerson Good Samaritan Food Donation Act (1996) – Protects food donors from liability when donating food in good faith to nonprofit organizations.

o U.S. 2030 Food Loss and Waste Reduction Goal – A national initiative to cut food waste by 50% by 2030, led by the EPA, USDA, and FDA.

o Federal Interagency Collaboration to Reduce Food Loss and Waste – A partnership between government agencies to improve food donation and waste reduction.

o State-Level Laws – Some states, like California and Vermont, maybe Illinois also have passed laws requiring businesses to divert food waste from landfills through composting or donation programs.

**82. Repeated Whistleblower Reports of Hazardous Conditions and Subsequent Retaliation for Reporting Mishandling of Chemicals/Gases – Request for Full Investigation and Public Disclosure of OSHA Safety Protocols**

Between approximately **November and December 2024**, Plaintiff observed and expressed repeated concerns regarding **large gas cylinder devices** located **in the corridor area of the basement** of the University of Chicago's **Physics Department**. These devices emitted **unusually loud noises on at least three to four separate occasions**, raising serious questions about potential hazardous material use or a gas leak. While Plaintiff is not technically trained in the precise function of the equipment, the location, manner of storage, and auditory disturbance strongly

implied the presence of **hazardous gases or unsafe conditions and highly probable threat to the students staff and also community nearby**. At at-least one instance plaintiff smelled a pungent bad kind of smell.

The cylinders were **not housed in a designated containment or safety room**, but rather **placed openly in the basement hallway**, increasing the potential risk to students, staff, and probably the public. Plaintiff, acting in good faith and motivated by concern for safety and compliance with hazard protocols, discreetly raised the issue with **unidentified University staff members**. Despite this, **no meaningful explanation, corrective measures, written response, or documentation** was provided to address the concern.

Aware that repeated complaints can lead to stigma or negative perception among institutional staff, Plaintiff **exercised caution in tone and manner** of raising the issue but did so out of a legitimate concern for public safety, potential fire hazards, and regulatory non-compliance. Nevertheless, shortly after these complaints were made, Plaintiff was subjected to **retaliatory measures** including **termination from academic job roles** and ultimately **expulsion from the University**. Plaintiff **strongly asserts** that these adverse actions were **motivated, by Plaintiff's whistleblowing activity**, constituting **retaliation in violation of public policy**, and a violation of Plaintiff's right to raise **good-faith safety concerns** without fear of reprisal.

**The nature and usage of the gases, based on publicly known institutional practices, generally may involve highly hazardous materials (But not limited to) such as:**

- **Liquid Nitrogen (LN$_2$)** – Cryogenics, superconductors
- **Helium (He)** – Cryogenics, MRI/NMR systems
- **Argon (Ar), Krypton (Kr), Xenon (Xe)** – Particle detection, plasma physics
- **Hydrogen (H$_2$), Deuterium (D$_2$)** – Atomic experiments, neutron generation
- **Sulfur Hexafluoride (SF$_6$)** – High-voltage insulation
- **Oxygen (O$_2$), Nitrogen (N$_2$)** – General purging and system operations
- **Methane (CH$_4$):** Gas lasers, chemical processes
- **Carbon Dioxide (CO$_2$):** Lasers, cooling
- **Krypton, Xenon:** Particle detectors, ion propulsion

These gases can be **flammable, asphyxiating, cryogenic, or explosive** in nature and fall under **high-risk categories** under multiple safety and regulatory standards. Despite Plaintiff's concerns, the University failed to initiate a visible safety protocol or public investigation, and Plaintiff suspects an official grievance might have been submitted by plaintiff but was uncertain of its procedural status.

**Plaintiff's actions strongly constitute protected activity under multiple frameworks, including but not limited to:**

- **OSHA General Duty Clause (29 U.S.C. § 654)** – Obligates employers, including institutions, to provide a workplace free from recognized hazards. It acts as a **catch-all provision** for serious workplace safety risks.

- **Section 11(c) of the Occupational Safety and Health Act (29 U.S.C. § 660(c))**, which prohibits employers from retaliating against employees who report safety and health concerns;

- **Energy Reorganization Act (ERA)**: Covers retaliation for reporting violations involving the use, storage, or disposal of hazardous energy materials. This is relevant if nuclear or high-energy physics experiments are conducted using hydrogen, deuterium, or radioactive sources.

- The **Illinois Whistleblower Act (740 ILCS 174/)**, which protects individuals from retaliation when they disclose information about violations of law, rule, or regulation;

- The **Federal Whistleblower Protection Act**, applicable where federal funding or federal compliance is involved;

- **Illinois Fire Prevention Code (41 Ill. Adm. Code 100)** – Mandates compliance with gas storage and fire safety requirements.

- **Illinois Administrative Code Title 41, Part 200**: Addresses the storage, transportation, sale, and use of liquefied petroleum gas, referencing NFPA Standard #58.

- Federal Whistleblower Protection Statutes, including those linked to university grants and federal research funding.

- **Freedom of Information Act (FOIA) concerns (Not sure if it can apply in this case)** – Notably, the websites such as "FOIA.uchicago.edu" and UChicago's Environmental Health & Safety (EHS) pages on gas usage are inaccessible to the public. Plaintiff urges regulatory agencies to assess whether this secrecy is in violation of public safety norms, especially given community risk to Hyde Park residents.

- **Section 117 of the Higher Education Act (20 U.S.C. § 1011f)** – Potentially triggered by foreign funding from Russia, China, Qatar, or others in research involving sensitive materials or dual-use technology.

- **CBP Regulations** – If any materials are imported for experimental use, possible violations of 19 C.F.R. §§ 12.1 and 12.43 (hazardous imports and dual-use technologies), and 19 U.S.C. § 1595a(c) (contraband or unsafe goods) may apply.

- **Public Policy Exception to Employment at Will:** In Illinois, employees cannot be terminated for reasons that violate public policy, such as reporting safety violations.

- The **Public Policy Exception to Employment,** particularly where an employee reports actions that may jeopardize public safety or violate statutory law;

- **Negligent Supervision and Failure to Provide a Safe Working Environment:** Employers have a duty to supervise their employees properly and to provide a safe working environment. Failure to do so can result in liability.

- Tort law doctrines of negligent supervision and failure to provide a safe working environment, where the employer owes a duty of care to protect employees and other individuals from reasonably foreseeable risks.

The **Covenant of Good Faith and Fair Dealing** may also apply in this instance, as adverse employment actions appeared temporally connected to Plaintiff's lawful and good faith efforts to bring potential safety violations to light.

Additionally, **U.S. Customs and Border Protection (CBP) regulations** may become relevant under:

- **19 U.S.C. § 1595a(c)** – Prohibiting importation of merchandise contrary to law, including safety standards, and allowing seizure if hazardous or undeclared materials are discovered. Allows for the seizure and forfeiture of merchandise introduced into the U.S. contrary to law, including hazardous materials not in compliance with health and safety regulations.

- **19 C.F.R. § 12.1 et seq.** – Governing the importation and control of hazardous materials, chemical precursors, or sensitive technologies from foreign countries, particularly from nations like China or Russia.

- **Export Administration Regulations (EAR)** and CBP partnerships with the **Department of Commerce's Bureau of Industry and Security** may also apply if dual-use scientific equipment or materials were sourced internationally for research.

If the equipment observed involved foreign-funded research or undeclared hazardous imports, this could implicate both **federal funding compliance** and **CBP national security concerns**, particularly under oversight of foreign transactions with U.S. institutions.

**Along with these laws/frameworks might also be strongly applicable:**

- **Sarbanes-Oxley Act (SOX):** Applies if there are allegations that the university or staff misused federal research grants, falsified safety data, or misrepresented financial risks. This may cover public or donor deception about safety practices.

- **Taxpayer First Act (TFA):** Protects individuals who report misuse or fraud involving public or taxpayer-funded institutions, including universities receiving federal grants (e.g., NIH, DOE). If public funds were used in hazardous research without compliance, this applies.

- **U.S. Securities and Exchange Commission (SEC)** if financial misconduct or reporting fraud is involved.

Plaintiff believes that these retaliatory actions were not isolated and requests that federal and state agencies investigate whether this conduct represents a systemic failure in compliance, possible retaliation under whistleblower statutes, and/or public endangerment due to **poor chemical management practices**. Plaintiff also **raises the question of whether fire extinguishing systems**, gas leak protocols, and emergency preparedness procedures meet state and federal guidelines.

Plaintiff asserts that such retaliatory conduct, including termination of roles and isolation, occurred subsequent to these reports, and this pattern is consistent with retaliatory animus under both statutory and constitutional interpretations. The retaliation following the safety complaint impairs Plaintiff's rights and could constitute a **deprivation of liberty or property** without due process under **the Fourteenth Amendment**.

**Public Safety and Transparency Request:** Given the potential magnitude of the risk posed, Plaintiff requests that all safety protocols, chemical inventory data, and gas handling standards be made publicly accessible in accordance with federal and state right-to-know laws.

Plaintiff most strongly suspects that the **mishandling of chemicals and hazardous gases** by the University of Chicago's Physics Department is **ongoing**, presenting a **substantial, unmitigated threat to public health and safety**. The chilling effect caused by prior retaliation, institutional silence, and lack of corrective action has likely **discouraged others from reporting similar safety violations**. This situation raises the specter of catastrophic outcomes, including **fire hazards, chemical explosions, or asphyxiation risks** to both the university community and surrounding neighbourhoods.

Due to the **mental distress** caused by repeated retaliation, hostile treatment, and fear of further consequences including job termination and academic expulsion Plaintiff has been under **ongoing psychiatric and some other issues**, suffering from **depression, torture, panic attacks, insomnia, and anxiety**. Plaintiff was placed on medication and had to attend regular medical appointments, which significantly impaired the ability to initiate or pursue formal complaints within tight administrative windows. Plaintiff also relied in good faith on **publicly accessible legal resources and websites** that suggested the deadline to file OSHA-related retaliation complaints could extend up to **180 days**, leading to **reasonable but mistaken reliance** on a longer timeframe.

**OSHA recognizes that equitable tolling may apply in certain circumstances, allowing for the extension of this filing period: Equitable Tolling Considerations:**

1. **Mental Incapacity:** Plaintiff was **mentally incapacitated** during the critical window following the retaliatory action; such as experiencing severe depression or panic attacks requiring medical treatment, and this condition prevented timely filing, equitable tolling might be justified.

2. **Misleading Information:** If the individual was misinformed about the filing deadline for instance, believing they had 180 days to file based on information from certain websites this misinformation could support a claim for equitable tolling.

3. **Relocation:** The whistleblower faced significant life disruption such as relocation abroad, especially if tied to forced departure due to retaliation or institutional coercion. This cross-border relocation created substantial legal and logistical challenges, limiting Plaintiff's ability to access domestic legal systems and fully understand or initiate the filing process. The disruptive nature of this forced transition, in combination with Plaintiff's vulnerable status as a student/academic without local support, justifies equitable tolling. Plaintiff further experienced sustained retaliatory conduct beyond the initial adverse action, including acts of intimidation, public humiliation, institutional cold-shouldering, and reputational harm. This chilling effect discouraged timely legal action and materially contributed to Plaintiff's delayed ability to file. Such ongoing retaliation reflects a continuing violation doctrine, where each incident compounded the original harm and deterred reporting thus qualifying for equitable tolling.

4. **Continued Retaliation:** If the retaliatory actions were ongoing, such as continued harassment or adverse employment actions extending beyond the initial incident, this pattern might influence the applicability of equitable tolling.

5. The misconduct and risk are allegedly ongoing even till date.

These protections serve to uphold the fundamental principle that **no individual should be punished for exposing dangerous practices** particularly when the risks implicate public institutions, federal funding, and research environments.

**Plaintiff respectfully requests that this Court and/or the appropriate regulatory authorities grant the following relief:**

· **Injunctive Relief**

    o An order requiring the University of Chicago to immediately conduct a comprehensive third-party safety audit of all hazardous gas storage and handling practices, particularly within the Physics Department and related facilities.

    o An order directing the University to implement transparent and publicly accessible environmental health and safety (EHS) procedures, including inventory disclosure, gas leak response protocols, and whistleblower protection mechanisms.

· **Declaratory Relief**

    o A formal declaration that the University's actions in terminating and expelling Plaintiff following protected safety-related complaints constituted unlawful retaliation in violation of:

        § The **Illinois Whistleblower Act (740 ILCS 174/1 et seq.),**

        § **Section 11(c) of the Occupational Safety and Health Act (29 U.S.C. § 660(c)),** and

        § Applicable public policy doctrines under Illinois common law.

· **Compensatory Damages**

    o For emotional distress, reputational harm, educational disruption, lost wages, and future loss of professional opportunities resulting from the retaliatory expulsion and job termination.

· **Punitive Damages**

    o Where legally permissible, to punish willful, malicious, or reckless disregard for Plaintiff's rights and to deter future retaliatory conduct by similarly situated institutions.

· **Fee Refund of degree program along with penalties and expungement of records and other additional relief as per Jury/court/agency:**

· **Referral to Enforcement Agencies**

    o A formal request that this matter be referred to the **Illinois Office of the State Fire Marshal**, **OSHA**, the **Department of Education's Office for Civil Rights**, and if applicable, the **Department of Homeland Security** or **CBP** for further investigation into institutional compliance with safety, funding, and research regulations.

· **Such Other and Further Relief** as this Court/Jury or agency deems just and proper, in the interests of public safety, whistleblower protection, and institutional accountability.

## 83. Unauthorized Access and Tampering with Plaintiff's University Email and Records – Privacy Violations and Alleged Evidence Spoliation

Plaintiff suspects that the University has accessed and has been accessing their university email account without consent, potentially violating privacy rights. Plaintiff also suspects potential tampering with or deletion of communications and other evidentiary records. These activities may constitute both privacy violations and spoliation of evidence in anticipation of litigation.

· **Legal Grounds:** Unauthorized access to electronic communications may contravene the Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 2510 et seq., which prohibits intentional interception of electronic communications.

· **Spoliation of Evidence Doctrine**: Plaintiff asserts that, at the time of suspected tampering or deletion, the University had a duty to preserve potentially relevant materials due to ongoing or reasonably foreseeable litigation. Any destruction of such materials may constitute **spoliation**, allowing the Court to impose sanctions or adverse inference instructions.

· **Destruction of Digital Evidence**: Courts have held that digital records emails, metadata, log files are subject to the same preservation standards as paper documents. See *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004). The University's failure to preserve such evidence post-termination and post-grievance may reflect willful misconduct or gross negligence.

· Good Faith Requirement under FRCP Rule 37(e): Failure to take reasonable steps to preserve electronically stored information when litigation is foreseeable.

· Federal Records and Email Retention Standards (where federally funded programs are involved) and FERPA, which may impose obligations on educational institutions regarding the handling of student records.

Plaintiff requests the Court to allow limited discovery on digital record retention, audit trails, and access logs to determine the scope of any unauthorized access or manipulation, and to assess whether the University failed its duty to preserve critical evidence relevant to this and future cases on defendant.

## 84. Medical Research Misconduct and Participant Harm in NIH-Affiliated Studies – Informed Consent Violations, Excessive Blood Draw Practices, and Ethnic Exploitation

Plaintiff participated as a volunteer in the **All of Us Research Program**, a federally funded initiative of the **National Institutes of Health (NIH)** conducted in partnership with the **University of Chicago** as part of the **Illinois Precision Medicine Consortium (IPMC)**. Plaintiff was informed at the outset that only a small amount of blood would be drawn, one spoonful when plaintiff asked before signing up for study. However, Plaintiff states that during the procedure, staff extracted blood into **eight test tubes**, each filled to 80–90% capacity, far exceeding the

amount disclosed. Immediately following the blood draw, Plaintiff experienced dizziness, weakness, and was unable to stand without assistance (Initially fell on floor after standing immediately).

Additionally, Plaintiff, a biological male, individual of **[Data Redacted]**, participated in a research study where blood samples were drawn. However, Plaintiff discovered that the volume of blood drawn **exceeded the permissible and informed limits**, raising serious ethical and procedural concerns. Given probably the **limited availability of participants** in the study, Plaintiff contends that the research team have **disproportionately relied on Plaintiff for additional blood collection**, potentially exploiting Plaintiff's ethnic background as a factor in the decision-making process to get more blood to make more data for multiple research projects or data for same project with said multiple human subjects but not only one. This conduct **violates established medical ethics, informed consent protocols, and equal treatment standards** under federal and state research guidelines. Plaintiff seeks immediate review of the study's procedures and accountability for any disparities in subject treatment. Also requests to make plaintiff life as a whole being research subject/participant.

**Links:**  https://www.uchicagomedicine.org/forefront/cancer-articles/all-of-us-nih-press-release, https://www.rushu.rush.edu/news/chicagos-leading-medical-centers-join-nih-launch-all-us-research-program-advance-precision-medicine **($51 Million Grants**)

**This discrepancy raises serious concerns of informed consent violations under:**

- **45 C.F.R. § 46 (Common Rule)** – governing human subjects research funded by federal agencies including NIH.
- **Federal Food, Drug, and Cosmetic Act (FDCA)** and **FDA regulations (21 C.F.R. Part 50)** for any applicable clinical protocols.
- **Illinois Medical Practice Act (225 ILCS 60/)** and related state law protections for medical procedures and participant rights.
- Title **VI of the Civil Rights Act of 1964** (42 U.S.C. § 2000d) – Prohibits discrimination based on race, color, or national origin in programs or activities receiving federal financial assistance.
- **The Common Rule (45 CFR 46.116)** – Governs informed consent requirements in federally funded research; prohibits unauthorized blood draws.
- Title **VII of the Civil Rights Act of 1964** (42 U.S.C. § 2000e) – Protects individuals from discrimination in employment and workplace-related activities, including research settings.
- **Americans with Disabilities Act (ADA)** (42 U.S.C. § 12101 et seq.) – Could be invoked if the excess blood draw exacerbated a medical condition without proper accommodation.
- **Illinois Human Rights Act (775 ILCS 5/)** – Prohibits racial, ethnic, and national origin discrimination in employment, education, and federally funded activities.
- **Illinois Medical Patient Rights Act (410 ILCS 50/)** – Requires full disclosure and informed consent for medical procedures, including blood draws.
- **Illinois Health Care Right of Conscience Act (745 ILCS 70/)** – Protects individuals from being coerced into participating in procedures against their will.

- Doctrine of Informed Consent – Requires that research subjects fully understand and voluntarily consent to all procedures, including the volume of blood drawn.
- Doctrine of Equal Treatment in Research – Ensures that all subjects are treated fairly and not exploited based on race or ethnicity.
- Hostile Work Environment Doctrine –plaintiff was subjected to an environment where race-based selection for excess blood draws occurred, this could support a claim.
- Misuse, Fraudulent and fabrication using federal funds granted by NIH of US Government, Use of taxpayer's hard earned money for research fraud.

Failure to disclose material risks or procedural details in advance may constitute **medical negligence**, **fraudulent inducement**, or **violation of research ethics protocols**, potentially breaching the ethical principles laid out in the **Belmont Report** (Respect for Persons, Beneficence, and Justice).

Plaintiff seeks **immediate review of the study's procedures** and **accountability for any disparities in subject treatment so that community members should also be safe from such illegal activities**, including compensatory damages, injunctive relief, and corrective action against discriminatory practices.

## 85. Misconduct, Underpayment, and Procedural Irregularities in Vogel Lab Research Participation – Allegations of Breach of Contract, Wage Theft, and Unfair Treatment in a Federally Funded Research Environments

Plaintiff also participated in research studies conducted by the **Vogel Lab at the University of Chicago**. In one study session, a female staff member who presented as a student researcher, prepared the EEG head cap and reviewed data during the session. She verbally indicated to Plaintiff that his performance was "good". However, Plaintiff was later barred from further participation, with the lab citing inaccurate data, in contradiction to the staff's prior statements. Plaintiff alleges that this happened after plaintiff raised questions about payment received, at least one instance that plaintiff now remember plaintiff raised questions about payment received being less than what plaintiff was scheduled for to **Piotr Styrkowiec, and Vogel lab staff**.

**Additionally, Plaintiff alleges the following:**

- **Excessive Tasks**: Plaintiff was made to perform tasks beyond the expected scope, including responsibilities related to other study protocols, increasing the time commitment substantially.
- **Underpayment and Documentation Irregularities**: On at least one occasion, Plaintiff was paid less than the documented compensation amount but was asked to sign a register confirming the original, higher payment figure.
- **Inaccurate Timing Logs**: Lab staff allegedly manipulated clock-in and clock-out times, sometimes logging "start" after the EEG setup process (which consumes significant time) and "end" before Plaintiff had time to complete debriefing and equipment removal.

**These allegations raise issues of:**

- **Breach of Contract** and **Fraudulent Misrepresentation** (based on agreed compensation terms).

- **Wage Theft** and violations of the **Illinois Wage Payment and Collection Act (820 ILCS 115/)**.
- **Research Misconduct** under NIH guidelines and federal grant policies (see 42 C.F.R. Part 93).
- **Violation of Human Subject Research Protections** for improper termination from a study without cause or transparency.

Plaintiff respectfully requests that federal agencies including **NIH's Office of Human Research Protections (OHRP)** and relevant university compliance offices investigate these incidents, and that the Court consider this pattern of misconduct in evaluating the University's treatment of research participants.

**Reference:** https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html

- **Emphasis on Fiscal Oversight and Accountability**
  The article highlights NIH's concern that **many institutions charge excessive indirect costs**, sometimes above 50%, and that such overhead is **not easily attributable to specific research activities**. This supports an argument that **research institutions may misallocate funds**, prioritize profit, or cut corners on participant care and ethical obligations **which aligns with your claims of substandard treatment and misrepresentation** during your participation.
- **Legal Precedent of Non-Compliance by Institutions**
  The NIH policy was ruled **"arbitrary and capricious"** by a federal court because the agency failed to follow proper administrative procedures. This reinforces claim that **institutions receiving NIH funds (like University of Chicago or Vogel Lab) are not always compliant with law or ethics**, and may be acting outside proper oversight even when federally funded.
- **Highlighting Disparities in Funding and Treatment Standards**
  The fact that NIH grants allocate $9 billion annually to indirect costs, which are **often untraceable or vague**, while participants like yourself are allegedly **undercompensated, overworked, or misled**, supports a **narrative of imbalance** between institutional gain and participant welfare.
- Being underpaid for some scheduled sessions (Exact date unknown),
- Data mischaracterization by staff despite positive verbal feedback,
- Participant abuse and research misconduct under 45 CFR 46 (Common Rule).
- Misappropriation or unethical use of NIH funds under the NIH Grants Policy Statement.
- Fraud or misrepresentation in study protocols due to mismatched compensation, data logging, or staff instructions.
- **Implication of Misuse or Misreporting of Funds**
  If UChicago or the Vogel Lab claimed full-time or full-session compensation for participation but only partially paid, altered time logs **this could constitute fraudulent reporting** or **breach of NIH grant terms**, especially under 45 CFR § 75.414 and related federal grant compliance regulations.

**86. Misuse of Federal Funds and Violation of Legal Standards by the University of Chicago – Allegations of Partisan Activity, Discriminatory Practices, and F-1 Sponsorship Noncompliance**

Plaintiff respectfully submit that the University of Chicago may be in violation of multiple federal and state statutes and administrative doctrines, and as such, should be subject to investigation and possible forfeiture of its eligibility for federal funding, its tax-exempt status under IRC §501(c)(3), and its authorization to sponsor F-1 international students. One near example can be: https://harris.uchicago.edu/research-impact/centers-institutes/center-municipal-finance, https://harris.uchicago.edu/research-impact/centers-institutes/center-for-effective-government )

**1. Engagement in Partisan Political Activity in Violation of 501(c)(3) Rules**

Under Internal Revenue Code §501(c)(3), tax-exempt entities, including private universities, are strictly prohibited from directly or indirectly participating in any political campaign on behalf of, or in opposition to, any candidate for public office. Public reports and actions attributed to the University of Chicago and/or its faculty or affiliated centres suggest engagement in partisan advocacy, including lobbying efforts targeting federal agencies and Congress constituting a breach of the *IRS Political Campaign Intervention Doctrine* (IRS Rev. Rul. 2007-41). Such activity, if verified, warrants revocation of the University's tax-exempt status. (UChicago Joins Second Lawsuit Against Federal Funding Cuts: https://chicagomaroon.com/47411/news/uchicago-joins-second-lawsuit-against-federal-funding-cuts/, https://chicagomaroon.com/25134/news/uchicago-expands-efforts-prevent-daca-rescission/, https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2024&id=D000030649, https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2023&id=D000030649 , https://www.opensecrets.org/federal-lobbying/clients/summary?id=D000030649, https://chicagomaroon.com/45902/grey-city/uchicago-history-of-lobbying-complicates-institutional-neutrality/, https://www.chicagobusiness.com/subscribe-here?adobe_mc_sdid=SDID%3D2D9C0E3CC37594DD-5EB55C95147EA26F%7CMCORGID%3D138FFF2554E6E7220A4C98C6%40AdobeOrg%7CTS%3D1747271286&adobe_mc_ref=https%3A%2F%2Fwww.chicagobusiness.com%2Feducation%2Funiversity-chicago-deficit-and-debt-raise-alarms-some-faculty-members https://www.bondbuyer.com/news/university-of-chicagos-intricate-bond-financing-explained https://www.chicagobusiness.com/opinion/university-chicago-has-debt-problem-opinion https://www.chicagobusiness.com/education/fitch-lowers-uchicagos-financial-outlook-negative , https://whyevolutionistrue.com/2025/02/11/the-university-of-chicago-takes-an-institutional-position-against-the-trump-administrations-slashing-of-grant-monies/), "The University of Chicago has a history of federal lobbying, despite its policy of institutional neutrality. In 2024, UChicago spent $225,272 on lobbying, focusing on research funding,

immigration policies, and financial aid legislation. Critics argue that this contradicts the University's commitment to neutrality, while supporters see it as a necessary effort to secure resources and influence education-related policies.". Political intervention includes actions by **faculty or staff using university resources** to advocate for or against legislation or government policies, even if indirect.

**2. Misuse of Federal Funds in Violation of the Byrd Amendment (31 U.S.C. §1352)**

The Byrd Amendment prohibits the use of federal grant funds to influence or attempt to influence members of Congress or federal agencies. If university staff or associated departments are using federally funded platforms or personnel to conduct lobbying activities, this constitutes a violation of federal funding conditions. The *Federal Acquisition Regulation (FAR) 52.203-12* also reinforces this standard. Also, If federal grant funds are used for lobbying purposes or to organize opposition to funding restrictions, such conduct violates both the **Byrd Amendment** and **FAR 52.203-12**, which prohibits lobbying with appropriated funds.

**3. Discriminatory Conduct Violating Title VI, Title IX, and Illinois Human Rights Law**

The University is also alleged to have engaged in retaliatory and discriminatory conduct against individuals based on protected characteristics and activities, including:

- **Caste discrimination**, a growing area of legal concern especially under Title VI (42 U.S.C. §2000d) when caste correlates with race, national origin, or ethnicity;
- **Gender and racial discrimination**, in violation of Title IX (20 U.S.C. §1681) and Illinois Human Rights Act (775 ILCS 5/);
- **Political viewpoint discrimination**, while not a protected class per se under federal law, raises concern under academic freedom and equal protection when enforced in discriminatory or retaliatory ways;
- **Retaliation for protected activities**, which is explicitly prohibited under both Title VI and Title IX regulations (see 34 C.F.R. §§100.7(e) and 106.71 respectively).

Discriminatory treatment in admissions, employment, or access to benefits as described above would render the University non-compliant with civil rights statutes that are preconditions for receiving federal funds.

**4. Violations of F-1 Visa Regulations – Labor Violations**

Under 8 C.F.R. §214.2(f)(9)(i), F-1 students are prohibited from working more than 20 hours per week while school is in session. Evidence that the University employs F-1 students beyond this limit, either directly or through coercive academic roles that circumvent classification as employment, would place it in violation of SEVP (Student and Exchange Visitor Program) rules and undermine its ability to lawfully sponsor international students. Violations may trigger scrutiny by **ICE's Student and Exchange Visitor Program (SEVP)** and could impact the University's ability to sponsor F-1 or J-1 visas under **DHS rules**.





**5. Federal and State Precedent and Remedies**

**Relevant legal doctrines include:**

· *Chevron deference*, which may limit court review of agency interpretation, but does not preclude public complaints to IRS, DOE, or DHS;

· *Exhaustion of administrative remedies*, should be initiated through formal channels including DOE's Office for Civil Rights (OCR) and SEVP;

· *Qui tam principles* under the False Claims Act (31 U.S.C. §§3729–3733), if applicable, where false representations are made to obtain federal funds, or **by misrepresenting compliance** (e.g., falsely certifying safety, civil rights, or employment practices).

Based on the above allegations and legal authorities, I request that the relevant federal and state agencies initiate a thorough investigation into the University of Chicago's activities, and consider revoking its:

· Tax-exempt status under IRC §501(c)(3);

· Eligibility to receive federal funds, grants, or financial aid;

· SEVP certification for F-1 sponsorship, pending review of labor law compliance.

· Given that the University of Chicago is likely one of the largest employers in the city, any mass layoffs or terminations of 100 or more employees within a 30-day period would trigger notice obligations under the federal Worker Adjustment and Retraining Notification (WARN) Act (29 U.S.C. §2101 et seq.), and possibly the Illinois WARN Act (820 ILCS 65/). If such employment actions occurred without the required 60-day notice, this would

constitute a serious violation and merit investigation by the U.S. Department of Labor and Illinois Department of Labor.

### 87. Strategic Omission and Institutional Bias in Disciplinary Proceedings – Retaliation and the Undermining of Union Protections

Plaintiff alleges that during the formal disciplinary meeting convened by the University of Chicago, **no questions were asked concerning Plaintiff's prior employment in the Mansueto Institute position**, which was a **union-protected role**. This omission appears to have been deliberate and intended to avoid any record or acknowledgment of Plaintiff's rights under the applicable collective bargaining agreement. This intentional omission appears strategic and supports an inference of institutional bias, and inconsistencies in the process. The professors, staff, and students involved in the proceeding exhibited coordinated conduct, suggesting that they may have been influenced or incentivized by the Deans at Harris including but not limited to Ethan, Kate Biddle, Micheal Hayes Dean, and/or President Paul (and office), and/or Provost's Katherine (And Office), Board of Trustees, Uchicago Senate, to produce an outcome favourable to the administration and adverse to the Plaintiff.

Despite invoking **Weingarten rights** (see *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975)), and having a designated union steward, **Sara Hogenboom,** present to represent plaintiff during the meeting, the structure and conduct of the proceeding effectively **silenced her participation**. The university's panel, composed of professors, staff, and students, **strategically refrained from addressing or permitting any discussion** about the Mansueto position, thereby nullifying the role of the union representative and undermining the protective purpose of union presence. The deliberate silencing of the union representative and systemic exclusion of labor-related discussion constitutes a **deprivation of procedural due process**, a violation of **NLRA principles**, and a **strategic evasion of constitutional and statutory labor protections**.

**Furthermore, Plaintiff strongly alleges the following misconduct and due process violations:**

- **Retaliatory Actions**: The timing and nature of the disciplinary action were closely connected to Plaintiff's prior whistleblowing activities and complaints of discrimination and safety violations, indicating clear retaliatory motive. The last official union grievance filed on February 1 got retaliated within 10 days and expulsion orders within 25 days of grievance, that silenced and killed the grievance.

- **Procedural Manipulation**: The panel's conduct including restricting relevant discussion, preventing evidentiary rebuttal, and failing to document or consider material facts suggests purposeful deviation from fair process.

- **Selective Enforcement**: Similar cases or conduct by other students or staff were not subjected to comparable disciplinary scrutiny, revealing discriminatory enforcement intended to isolate Plaintiff.

- **Suppression of Evidence**: Material facts, documents, and testimony regarding Plaintiff's protected role at the Mansueto Institute were **knowingly excluded** from the hearing record, further corrupting the process.

Also immediately following the un-official termination of Plaintiff's Mansueto Institute role (Initial email around June6/7), a union-covered position, the **University of Chicago also terminated Plaintiff's SSCS role within 1-2 days (On Jan 9)**. This temporal proximity strongly supports an inference of retaliation, especially in light of Plaintiff's union affiliation and whistleblower activity. The coordinated timing of these terminations by an institution receiving substantial federal funding for research and employment programs raises serious concerns of systemic retaliation, employment discrimination, and misuse of federal resources.

Furthermore, the fabrication of disciplinary proceedings including the strategic silencing of union representation, the omission of any reference to the Mansueto position, and the possible incentivization of decision-makers, demonstrates a pattern of unethical and potentially fraudulent conduct by the institution. This conduct may implicate violations of labor law, Title VII, due process under the Fourteenth Amendment, and federal funding compliance regulations.

Taken together, this constellation of structural bias and overt misconduct satisfies, and indeed surpasses, the constitutional threshold set forth in *Peters*, where the U.S. Supreme Court held that **systemic exclusion or bias alone can invalidate a decision**, even "absent overt misconduct." This principle is grounded in the notion that a fundamentally biased or defective process cannot produce a valid outcome, regardless of participants' intentions. Here, both forms are present **structural exclusion and intentional procedural misconduct** which independently and jointly violate **Plaintiff's due process rights** under the **Fourteenth Amendment**, and protections guaranteed under the **National Labor Relations Act** and **Illinois public policy**. **Structural bias** in the University's disciplinary process is evidenced by its deliberate exclusion of union protections from the hearing, the ineffective presence of a union representative, and a panel composed of individuals potentially subject to administrative influence. Even without provable misconduct, this design denied Plaintiff a fair process. With overt misconduct also alleged, constitutional invalidity is clearly established under *Peters v. Kiff*.

In support, Plaintiff invokes Peters v. Kiff, 407 U.S. 493 (1972), where the U.S. Supreme Court held that a decision rendered by a body tainted by improper exclusion or systemic bias will be constitutionally invalid. In that case, the Court emphasized that structural bias alone can render disciplinary or judicial outcomes **unconstitutional**, even absent overt misconduct. Applied here, the University's failure to allow discussion of a union position and the subsequent retaliation not only undermines fairness but may render all disciplinary findings void for constitutional defect.

Plaintiff also wanted to request and tell the agencies that as per Student Manual the following people should be available in the meeting:

studentmanual.uchicago.edu/student-life-conduct/university-disciplinary-systems/area-disciplinary-systems/

The Area Disciplinary Committee ordinarily consists of three faculty members, one student, the Dean of Students (or designee), and a representative from Campus and Student Life. At the discretion of the Academic Dean, up to two of the faculty appointees may be senior lecturers, clinical faculty or other equivalent academic appointees. The three faculty members, senior lecturers, clinical faculty or other equivalent academic appointees, the Dean of Students (or designee), and the representative from Campus and Student Life constitute a quorum. Both the Dean of Students (or designee) and the representative from Campus and Student Life attend the Area Disciplinary Committee meeting in a non voting, advisory capacity. The Area Disciplinary Committee will meet to consider the incident as soon as practicable.

But there was a **additional student representative** which is not mentioned in the student manual.

The faculty representatives will be:
- Bruce Meyer
- Don Coursey
- Maria Bautista

The student representative will be:
- Ralph Valery Valiere

The Campus and Student Life representative will be:
- Jeremy Inabinet

You may request a substitution if the participation of any individual on the committee poses a conflict of interest. If you wish to do this, please contact me as soon as possible.

Lastly, Plaintiff respectfully asserts that Dean Kate Biddle; despite explicitly stating she was not a voting member of the disciplinary committee, improperly and materially influenced the outcome of the proceeding. While claiming to have no official vote, Dean Biddle actively directed the course of the meeting, mischaracterized key facts, and created a misleading narrative that particularly disadvantaged the Plaintiff. This conduct amounted to a de facto casting of a vote and strategic manipulation of the process, constituting an abuse of her administrative authority and a misuse of her position as Dean. Dean Biddle's conduct created an environment in which impartial deliberation was obstructed, and the legitimacy of the hearing was compromised. The procedural impact of her interventions, particularly in steering conversation away from union rights and employment status, demonstrates structural bias and further supports Plaintiff's broader allegation of institutional misconduct and retaliation.

**This conduct constitute:**

- **Violation of the National Labor Relations Act (29 U.S.C. § 157 and § 158(a)(1))** – which guarantees union members the right to representation during investigatory interviews that could result in disciplinary action.

- **National Labor Relations Act (29 U.S.C. § 151 et seq.)** – which protects employees engaged in unionized roles from adverse actions taken in retaliation for protected union activity or for holding union-covered employment.

- **Retaliation against Union Activity**, which is unlawful under both federal (NLRA) and **Illinois Educational Labor Relations Act (115 ILCS 5/)**.

- **Due Process Violations** – by constructing a disciplinary process that was procedurally rigged to avoid material exculpatory facts, especially where disciplinary proceedings fail to provide a neutral forum or ignore material facts critical to the defence.

- **Doctrine of Structural Bias** – as recognized in cases like Withrow v. Larkin, 421 U.S. 35 (1975), which prohibits adjudication by a biased tribunal or one appearing partial.
- **Breach of Dusty of Fair Dealing and Good Faith** – as evidenced by silencing the union representative and intentionally failing to address a legally significant employment position.
- **Peters v. Kiff, 407 U.S. 493 (1972)** – where the U.S. Supreme Court held that a decision made by a body tainted by improper exclusion or bias may be constitutionally defective.
- **Breach of the Implied Covenant of Good Faith and Fair Dealing** – when an employer or institution manipulates or selectively ignores facts for strategic retaliation.

By deliberately omitting discussion of the Mansueto position which is legally significant due to its union protection status the University undermined the integrity of the disciplinary process. Such a maneuver suggests a pretextual justification for disciplinary action and a retaliatory motive, which is actionable under federal labour and civil rights law.

Furthermore, **Plaintiff asserts and alleges upon information and belief** that the individuals presiding over the meeting were **financially or professionally incentivized** by the Dean, Provost, President offices, by Board of Trustees of UChicago, and Uchicago Senate, to steer the outcome in favour of the University. The deliberate exclusion of key evidence and suppression of union representation amounts to a **fraudulent and pretextual disciplinary action**, orchestrated to conceal violations of labour law and retaliate against Plaintiff's protected activities.

Plaintiff requests that the Court or regulatory bodies investigate whether those participating in the decision-making were compensated, promised future benefits, or directed to suppress exculpatory facts thereby violating both procedural fairness and the Plaintiff's substantive rights. Plaintiff further requests that the Court and/or relevant labour enforcement authorities investigate whether this proceeding was in effect a **sham hearing** staged to suppress union protections and whistleblower complaints under the guise of due process. Lastly, Plaintiff respectfully requests that these matters be referred to appropriate federal authorities, including but not limited to the Department of Education, NLRB, and Office of Inspector General (OIG) for investigation into possible ethical breaches, labour violations, and federal fraud.

## 88. Retaliatory Denial of Internship, Interference with Employment Process, and Post-Grievance Document Tampering

Plaintiff alleges that after engaging in protected activity, including filing a grievance, Defendants engaged in a retaliatory pattern of interference with employment opportunities and tampered with employment records, amounting to unlawful retaliation and obstruction. Specifically, Plaintiff interviewed with Noureen regarding an internship under the University's UPREP program in connection with the Cook County Sheriff's Office. During the meeting, Noureen verbally confirmed Plaintiff's selection and explicitly instructed Plaintiff to send an interest statement via email, stating she would immediately forward it to HR for **onboarding**. Plaintiff complied and sent the requested materials. However, following that, Plaintiff was informed that Noureen had departed and that no onboarding would occur, despite her express commitment, creating the false impression that her departure nullified a binding offer.

Additionally, Plaintiff was scheduled for a full-time job interview with Arun Banotra from SSCS for HPC Admin Role, which was abruptly cancelled under circumstances strongly indicating retaliatory motive, since that had nothing to do with on campus jobs or Academics at all university did that in retaliation short after in-fact in 2-3 days of Mansueto Role, and SSCS Role termination. At the same time, Plaintiff discovered through the Workday system that payroll entries for June/July 2024 were being tampered with or rolled back by Arun Banotra too. This data later disappeared entirely from the platform, suggesting intentional deletion or concealment, which may constitute **obstruction of justice** under federal and Illinois law if intended to suppress evidence of retaliation or to undermine Plaintiff's employment and grievance process.

Moreover, Plaintiff received the final decision on their disciplinary matter on the 25th, immediately following an ADC meeting. Despite a 15-day window to file a response, the decision was issued prematurely. Critically, all documents compiled post-February 1st grievance were dismissed by the University as merely **"coincidental,"** reflecting **deliberate indifference to Plaintiff's protected activity** and supporting a **strong inference of retaliatory motive** under federal laws (not limited to):

- Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a)): Prohibits retaliation against any individual who has opposed unlawful employment practices or participated in proceedings under Title VII.

- 42 U.S.C. § 1983: Authorizes claims against persons acting under color of law who violate constitutional or federally protected rights, including retaliation for First Amendment-protected activity and procedural due process violations.

- Illinois Human Rights Act (775 ILCS 5/6-101(A)): Prohibits retaliation for opposing discrimination or participating in protected proceedings.

- Obstruction of Justice (720 ILCS 5/31-4) and Federal 18 U.S.C. § 1519 (Document Destruction): If records in Workday were intentionally altered or deleted to interfere with an administrative or legal process, this may constitute criminal obstruction.

- Retaliation Doctrine (Burlington Northern v. White, 548 U.S. 53 (2006)): Any adverse action that might dissuade a reasonable person from engaging in protected activity can be unlawful retaliation.

- Temporal Proximity + Inconsistent Explanations: A close timeline between grievance filing and job/interview denials, combined with sudden changes in explanation or document concealment, strengthens the inference of retaliation (Miller v. Fairchild Indus., 797 F.2d 727 (9th Cir. 1986)).

- Constructive Denial of Employment Opportunity: Even if the position is technically not "revoked," withdrawing a clear offer due to pretextual reasons (e.g., someone "leaving") after confirmation and documentation is tantamount to denial.

**Request:**
- Declaratory relief confirming the university's actions as retaliatory;

- Apology letter from the university and all staff members.

- Damages for reputational harm, emotional distress, and lost income from all jobs plaintiff got;

- Injunctive relief to prevent future retaliation.

- Other things Jury/Court deems to make student and employee life as a whole

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

## 89. Failure to Provide Meaningful Instruction and Misrepresentation of Academic Services at the University of Chicago

Plaintiff alleges that the University of Chicago, through its faculty, administrators, and academic programs, systematically failed to provide the educational services it promised and promoted, thereby violating express and implied contractual obligations and engaging in deceptive and negligent conduct. Specifically, Plaintiff asserts that many faculty members routinely failed to distribute or publish syllabi for their courses in a timely manner often omitting them entirely before the start of instruction or releasing them only after the enrolment deadlines had passed. This deprived students, including Plaintiff, of a clear understanding of course content, expectations, and academic objectives necessary for informed decision-making and academic success.

Further, Plaintiff alleges that even when syllabi were shared, many of the learning outcomes and instructional materials referenced therein were never actually covered in class, and several courses failed to meet the academic standards or learning outcomes originally advertised. This amounts to a **failure to provide meaningful instruction**, which is central to a student's educational experience and academic development.

Plaintiff further alleges that he scheduled tutoring sessions at the Harris School of Public Policy, particularly during critical core coursework in his first year. Despite confirmation of those appointments, **no tutor arrived or joined the scheduled meetings,** and no explanation or rescheduling was provided. This failure to deliver promised academic support services, despite offering them as part of the student experience, constitutes a breach of both express and implied contracts. It further demonstrates that the institution's academic support infrastructure is negligently administered.

As a result of these failures, Plaintiff was passed through several courses without actually receiving adequate instruction or mastering course content, undermining the legitimacy of the education he received and diminishing the value of his academic record. These educational deficiencies were not incidental but systemic, foreseeable, and avoidable, and they materially frustrated the Plaintiff's educational goals, research goals, and professional development.

1. **Breach of Contract**

   o Under Illinois law, a university-student relationship is quasi-contractual. Promises contained in course catalogs, syllabi, and academic policies can create enforceable obligations. Failure to deliver advertised academic services constitutes a breach (*Ross v. Creighton*, supra).

2. **Fraud and Misrepresentation**

   o Promoting access to tutoring and faculty mentorship while knowingly failing to provide such services constitutes actionable misrepresentation (*Doe v. Columbia College Chicago*, 933 N.E.2d 1124 (Ill. App. Ct. 2010)).

3. **Violation of Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) (815 ILCS 505/1 et seq.)**

   o The University's failure to deliver promised academic services and resources while collecting tuition and fees from Plaintiff constitutes deceptive and unfair practices under Illinois law.

4. **Educational Negligence / Maladministration** (Although disfavoured generally, specific negligent acts related to tutoring or scheduling may be actionable in contract or tort).

5. **Constructive Fraud / Entrapment and Unjust Enrichment**

   o By enrolling students under false pretences regarding academic quality and outcomes, while failing to support their success, the University benefits financially while shifting the burden of failure onto the student.

**Relevant Doctrines & Examples:**

· *Ross v. Creighton University* (7th Cir. 1992): Court recognized breach of contract theory where specific academic support was promised and not delivered.

· *Doe v. Columbia College Chicago*: Student allowed to proceed with fraud claim over misrepresentations regarding academic support.

· *Andre v. Pace University*, 655 N.Y.S.2d 777 (App. Div. 1996): Court upheld breach of contract claim based on failure to provide promised program content.

· **Promissory Estoppel**: Reliance on university representations (e.g., course content, tutoring) which were not fulfilled can support equitable remedies.

**Damages and Relief Sought:**

· Declaratory judgment that the University failed to meet its contractual and statutory obligations;

· Injunctive relief requiring transparency and reform in academic service delivery.

Hello Advisees,

I hope all is well and that you had a great weekend! I'll have open advising on Wednesday from 11:00am-12:00pm.
Below you can find some updates!

-
**Pre-Registration and Pass/Fail Notes** (repeat from last week)

Pre-Registration is coming! Pre-registration opens February 12th
at 8:30am and stays open through February 14th at 5pm. Mark your calendars! Pre-Registration is your
first opportunity to obtain your ideal Spring schedule, and you should absolutely participate. A couple of reminders:

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**[Data Redacted]**

**90. Potential Mishandling of Police Response (Chicago Police Department), Coercion, and Continued Threats Post-Assault**

Plaintiff respectfully submits and whistle blows that following a traumatizing sexual and physical assault by an individual known as "Shrivatsa," Plaintiff promptly contacted the **Chicago Police Department (CPD) through 911**. CPD officers including a female officer responded to the scene and engaged with Plaintiff for several minutes. During this conversation, one officer asked Plaintiff, *"Do you want to get him arrested?"* suggesting discretionary enforcement of the law.

Shockingly, Plaintiff was then informed by the **female CPD officer** something like, if Shrivatsa were arrested, Plaintiff "would have to pay double rent." This comment introduced an **implied threat of financial retaliation** and created a **coercive environment** where Plaintiff was effectively discouraged from pursuing legal remedies. This was further continued by university staff allegedly on unsolicited phone calls.

Plaintiff distressed and disoriented, asked officers if a formal document equivalent to **[Data Redacted]** could be provided. No written report was offered or completed on-site, and then Plaintiff asked for an apology letter from the assailant. Plaintiff then asked Shrivatsa (Criminal) to write such a letter, which he agreed, while plaintiff asked police officers to stop and wait till the criminal writes it down, but they left, appearing disinterested in further action and being interested in providing sense of safety to plaintiff. This failure **may** amount to negligent policing and denial of procedural justice.

Following the initial police encounter, Shrivatsa **escalated his threatening behaviour**, stating that Plaintiff "should die and should go back to home country." These are not only **criminal threats (720 ILCS 5/12-6)** under Illinois law but also have national origin implications potentially implicating **hate crime statutes (720 ILCS 5/12-7.1)**.

**Plaintiff was subsequently subjected to:**

- Aggressive stares and intimidation at the 172-bus stop (Near accommodation),
- Being rushed at near the **Downtown Campus Connector stop**, prompting Plaintiff to **flee for safety**.

Plaintiff **did not report these additional incidents**, citing a complete loss of faith in both the University of Chicago's internal protections and the Chicago Police Department's willingness to uphold Plaintiff's basic safety.

**If and only if CPD violated law/rules** according to court/agencies, Plaintiff respectfully seeks judicial acknowledgment that:

- The Chicago Police Department failed to provide due process or victim support,
- There was coercive suppression of Plaintiff's right to seek arrest and justice,
- The continued harassment following non-enforcement constitutes an **ongoing danger** created or worsened by institutional inaction.
- Potential referral to federal civil rights oversight agencies for violations under 42 U.S.C. § 1983.

**Potential law violation:**

- **Illinois Tort of Negligent Infliction of Emotional Distress (NIED)**
  CPD officers' failure to protect Plaintiff from known threats and their psychologically coercive behaviour (e.g., warning of higher rent if arrest pursued) could support a claim for emotional damages.

- **42 U.S.C. § 1983 – Civil Rights Violation**
  The discouragement from lawful arrest and the lack of equal protection in handling Plaintiff's report may constitute a violation of federal civil rights under this statute.

- **Illinois Hate Crime Act (720 ILCS 5/12-7.1)**
  The assailant's threat that Plaintiff should "go back to home country" may elevate the assault to a hate crime based on national origin.

- **Negligent Policing / Special Duty Doctrine (Illinois case law)**
  Under cases such as *DeSmet v. County of Rock Island*, CPD may face liability where a special duty to protect arises and is breached through inaction or gross negligence.

- **Restatement (Second) of Torts § 315 – Duty to Control Conduct of Third Persons**
  This principle applies where a party (e.g., police) knows of a third person's dangerous propensities and fails to take reasonable steps to prevent foreseeable harm.

## 91. Incident Report and Campus Health Oversight Concern – Mystery Dining Program Foodborne Illness at UChicago Law School Café

Plaintiff respectfully submits this statement as both a factual account of a foodborne illness incident and a **whistleblower disclosure** regarding potential food safety deficiencies within the University of Chicago's on-campus dining services:

- While participating in the **University of Chicago Mystery Dining Program**, Plaintiff visited the **Peach Café at the University of Chicago Law School**.

- Plaintiff ordered a box of noodles, and the cashier incorrectly charged for two boxes instead of one. Upon pointing this out, the cashier stated that **refunds were not possible**, and as a result, Plaintiff was forced to take a second box of noodles, which was not initially desired or consumed.

- After consuming the noodles, Plaintiff experienced **nausea, gastrointestinal illness**, requiring **home medication and recovery**. This raised concerns about **food quality and safety practices** at the café.

- Upon **reporting the issue** as a whistleblower to university staff, Plaintiff was informed that a review or internal investigation was initiated, and it was stated that **similar boxes of noodles were disposed of** as a precautionary measure. However, Plaintiff **never received a formal update** regarding the findings or remedial actions taken.

- At one instance, UChicago dinning gave a sweet item wrapped inside of plastic, that have a bug inside it, Plaintiff have this **video saved**, forwarded it to UChicago Dinning as a

**whistleblower in good faith,** but no revert from them in this matter (File name: Food Video pt 91.mp4 in packet of info shared).



· Harris Café also had a case like this but it had been a lot of time and plaintiff don't remember details of that particular case/matter.

· One general thing, getting hair(or hairs) is common in dinning foods (3-4 instances), no idea how they go through in the food, since sometime staff had head cover things on them.

· Although this specific instance may have been addressed internally, **Plaintiff now formally escalates the issue** as a matter of **public health interest**, encouraging university oversight bodies and relevant agencies to:

   o Investigate the broader safety protocols across **UChicago campus cafés and dining services**,

   o Assess transparency and responsiveness mechanisms for food complaints,

   o Establish clear channels for reporting foodborne illnesses and ensuring follow-up with complainants.

   o Additional incidents involving Bartlett Commons dining services on March 11 and March 14, 2024, are part of the overall concern only few instances had been recorded like that but there were many more.





These were shown to staff by plaintiff and they just took the plate and put it in cleaning area.

**[Data Redacted]**

This incident raises potential concerns under **food safety regulatory standards** applicable to university-operated food services and may implicate obligations under:

·   **Chicago Department of Public Health (CDPH) food inspection codes**,

- **Illinois Food Handling Regulation Enforcement Act (410 ILCS 625/)**,

- Federal **FDA Food Code standards**, as adopted by the State of Illinois for institutional food service providers.

- **FDA Food Safety Modernization Act (FSMA):** Protects whistleblowers who report dangers to public health, including chemical contamination or unsafe handling/storage of materials. Relevant where chemical exposure or risk to human health is possible due to poor safety compliance.

- **U.S. Food and Drug Administration (FDA)** – Oversees food safety standards in commercial and institutional settings.

- **U.S. Department of Agriculture (USDA)** – Monitors meat, poultry, and certain egg products.

## 92. Retaliation and Food Safety Whistleblower Protections – Federal and Illinois Legal Context

Plaintiff respectfully asserts that adverse actions experienced may be partially or wholly in retaliation for reporting unsafe food practices and related health hazards to University of Chicago Dining Services, specifically incidents at the Law School Café (Peach's Café). Plaintiff reasonably believes that these disclosures were protected under various whistleblower protection frameworks. Plaintiff formally reported food safety concerns to University of Chicago Dining Services on **November 19, 2023**, in connection with the Mystery Dining Program experience at Peach's Café. Following this:

- An acknowledgment and request for completion of a food illness complaint form was received.

- On **December 14, 2024**, a follow-up email from Ayrelle Giles confirmed that a food safety investigation had been initiated. Measures such as HACCP logs, cooler temperature checks, and hygiene training were referenced, though no final findings or accountability steps were communicated back to Plaintiff.

In addition to the incident involving spoiled noodles, Plaintiff also reported a separate concern wherein a **pre-packaged dessert item was found to contain a visible insect** and submitted **video documentation** to the dining services team. To date, no acknowledgment or formal action has been communicated regarding this latter complaint.

**Relevant legal authorities and doctrines include:**

- **Illinois Whistleblower Act (740 ILCS 174/)**: Protects employees (and potentially students in institutional employment roles or contractual arrangements) from retaliation for disclosing information about legal violations or threats to public health and safety.

- **Federal Food Safety Modernization Act (FSMA)** – 21 U.S.C. § 399d: Offers whistleblower protections for individuals who report violations related to food safety, sanitation, and quality standards that may pose health risks to consumers.

- **Title IX Retaliation Doctrine**: Although primarily a gender discrimination law, courts have recognized Title IX retaliation claims when a person is retaliated against for reporting institutional misconduct, including unsafe campus conditions.
- **Public Policy Retaliation (Common Law Doctrine – Illinois)**: Protects individuals from retaliation when they report conduct that violates public health, safety, or welfare standards, including food safety.
- **University Policy & Contractual Obligations**: Where applicable, institutional retaliation against a whistleblower may constitute breach of internal policy commitments, especially where the university advertises safety as a priority and offers programs such as the "Mystery Dining Program" implying student involvement in internal oversight.

The adverse actions taken against Plaintiff may also have stemmed from Plaintiff's persistent and good faith reporting of institutional failures including food safety, administrative mismanagement, and reputational risks. These reports, while intended to promote accountability, likely placed pressure on the University to protect its public image, rankings, and revenue, not limited to in light of expensive dining services that are expected to meet the highest health and quality standards.

### 93. Trustee and Senate Accountability and Whistleblower Disclosure to U.S. Authorities

Plaintiff respectfully submits that the cumulative allegations concerning institutional misconduct including potential violations involving federal visa rules, financial mismanagement, negligent oversight, retaliation, discrimination, and suppression of protected union activity raise serious concerns about the role and responsibility of the University of Chicago's **Board of Trustees, and Uchicago Senate**. Based on the patterns observed and documented, Plaintiff **strongly suspects that many or all trustees may have knowingly participated in, approved of, or failed to act upon ongoing unlawful and unethical conduct.**

Given the breadth and severity of the above-described misconduct including but not limited to financial irregularities, misuse of federal and donor funds, labor law violations, civil rights infringements, and retaliatory targeting of whistleblowers **Plaintiff strongly suspects that the Board of Trustees of the University of Chicago has either directly participated in, wilfully ignored, or negligently failed to address a systemic culture of institutional abuse**.

Further, Plaintiff believes that the Board has allowed the misuse of federal funding and nonprofit resources for purposes contrary to law and public interest, including but not limited to:

- Political lobbying in violation of IRS 501(c)(3) restrictions;
- Retaliation against protected individuals;
- Distribution of unaccounted funds to protest organizers or campus actors;
- Obstructive conduct to discourage reporting and grievances;
- Discriminatory actions based on national origin, caste, gender, and political viewpoint.

In good faith and pursuant to applicable law, Plaintiff hereby seeks to **whistle blow these matters** to the relevant **U.S. courts, regulatory authorities, and enforcement agencies** including but not limited to the **Department of Education, Department of Labor, DHS/SEVP, IRS, and DOJ**.

**Legal grounds potentially violated:**

- **Breach of Fiduciary Duty** under Illinois common law and *In re Abbott Labs*, 325 F.3d 795 (7th Cir. 2003)
  - Trustees owe a **duty of care, loyalty, and obedience** to the university's mission.
  - A trustee who **approves, ignores, or conceals misconduct** may breach this duty.
- **Negligent Oversight** (institutional tort liability for foreseeable harms arising from failure to supervise)
- **Sarbanes-Oxley Act (SOX)** – for oversight of false financial reporting or document destruction by nonprofit officers
- **False Claims Act (31 U.S.C. § 3729 et seq.)** – permits qui tam actions against entities fraudulently obtaining federal funds
- **Title VI, VII, Title IX, ADA, ADA Amendments Act (ADAAA) of 2008, FERPA**, and other civil rights statutes – failure to ensure compliance triggers trustee accountability
  - **Title VI, (42 U.S.C. § 2000d)** – race and national origin discrimination,
  - **Title IX (20 U.S.C. § 1681)** – sex/gender discrimination,
  - **FERPA (20 U.S.C. § 1232g)** – student privacy,
  - **ADA & Rehabilitation Act (29 U.S.C. § 794)** – disability discrimination.
- **Illinois Whistleblower Act (740 ILCS 174/)** – prohibits retaliation against employees or students reporting unlawful conduct
- **42 U.S.C. § 1983** – trustee liability for authorizing or failing to stop constitutional violations under color of state law

**Request**

Plaintiff respectfully requests that the Court or applicable agency:

- Initiate a joint investigatory review into the conduct of the University of Chicago's Board of Trustees, its deans and administrative bodies, and affiliated programs receiving federal grants or protected statuses.
- Plaintiff makes this disclosure in good faith to ensure that funding is not going in bad hands from taxpayer's hard earned money, there are no misuses of accreditation, and so that public trust in academic governance are not exploited for retaliatory, discriminatory, or unlawful practices.
- **Review potential violations of:**
  - Federal funding compliance,
  - Labor and union protections,

- o   SEVP visa regulations under 8 C.F.R. § 214.2(f),
- o   Environmental and safety compliance,
- ·   Consider whether the University, through trustee or group of trustee's knowledge or ratification, engaged in a pattern of **fraud, retaliation, or suppression of whistleblowing activity**.

**94. Unlawful compensation practices involving gift cards and cash payments to students in violation of federal and state labour and tax laws**

Plaintiff respectfully whistle blow, that the University of Chicago, a **private nonprofit institution receiving substantial federal funding**, has engaged in compensation practices that involve paying students, including international students, in gift cards or cash for their participation in research activities. These practices have been observed across multiple departments and research centres, including **but not limited to**:

- ·   UChicago Medicine
- ·   Uchiacgo Hospitals
- ·   PIMCO Centre at Booth School of Business
- ·   Vogel Laboratories
- ·   SONA Labs in the Psychology Department
- ·   Centre NORC
- ·   Psychology Department

Such compensation methods raise serious legal concerns under federal and state labour and tax laws, particularly when these payments are made outside formal payroll systems, lack proper documentation, and potentially evade tax reporting obligations.

**Legal Violations but not limited to:**

1. **Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.**

   The FLSA mandates that employees receive compensation for all hours worked, with specific requirements for minimum wage and overtime pay. Payments made in cash or gift cards, without proper documentation and outside the university's payroll system, may constitute violations of the FLSA's recordkeeping and wage payment provisions.

2. **Internal Revenue Code (IRC) and Employment Tax Obligations**

   Under the IRC, compensation to employees must be reported for income tax purposes, and appropriate withholdings for federal income tax, Social Security (FICA), and Federal Unemployment Tax Act (FUTA) taxes must be made. Payments in cash or gift cards that are not processed through official payroll channels may result in non-compliance with these tax obligations.

3. **Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 C.F.R. Part 200)**

   As a recipient of federal funds, the University of Chicago is subject to 2 C.F.R. Part 200, which requires that compensation for personal services be based on records that accurately

reflect the work performed. Informal payments lacking proper documentation violate these federal grant compliance requirements.

4. **Illinois Wage Payment and Collection Act (820 ILCS 115/1 et seq.)**

   This state law requires employers to pay wages in a timely manner and maintain accurate records of hours worked and wages paid. Payments made in cash or gift cards without proper recordkeeping may contravene these provisions.

**Examples and Precedents**

- The University of Chicago's own policies stipulate that payments to research subjects over $100 per occurrence must be made via University check, and gift cards or in-kind payments over this amount are not permitted, https://lbc.ssd.uchicago.edu/expenses-and-reimbursements/account-reconciliations-and-policies/research-subject-payments-gift-cards-other-prolific-payments/, https://intranet.uchicago.edu/en/benefits-and-career/payroll/independent-contractor-services-payments/research-subjects.

- The Department of Labor has previously taken enforcement actions against institutions that failed to comply with wage and hour laws, including improper compensation practices involving non-cash payments (Fact sheet #56A, #56C).

**Responsible Oversight Agencies**

The following agencies have jurisdiction over the alleged violations (but not limited to):

- **U.S. Department of Labor (DOL):** Enforces the FLSA and investigates wage and hour violations.

- **Internal Revenue Service (IRS):** Oversees compliance with federal tax laws, including employment tax obligations.

- **U.S. Department of Education (DOE):** Monitors compliance with federal grant requirements under 2 C.F.R. Part 200.

- **Illinois Department of Labor:** Enforces state wage and hour laws.

**Plaintiff respectfully requests that the Court/agencies (not limited to the following points):**

1. Declare that the University of Chicago's compensation practices involving gift cards and cash payments to students violate federal and state labor and tax laws.

2. Order the University to cease such practices and implement compliant compensation procedures.

3. Mandate restitution to affected students for any unpaid wages or benefits.

4. Impose any additional relief deemed just and proper by the Court.

**95. University-facilitated tax misrepresentation – advice by staff to omit gift card and cash payments from tax returns**

**Plaintiff alleges** and whistle blows that during annual tax filling held by University of Chicago staff at the Graduate Lounge (located on the third floor of the University Bookstore), graduate students many of whom were international students were provided with tax assistance that included guidance on how to fill out their federal and state tax returns. Along with staff, and full-time students including international students', student without training of taxes/finances also guide students to file taxes.

When multiple students, during one of this tax filling session, inquired about whether cash payments or gift cards received as part of university-affiliated research or work should be disclosed on tax filings, defendant staff explicitly responded that such income did not need to be reported. This advice, given repeatedly during official tax preparation events, raises serious concerns about **systemic tax evasion being facilitated or condoned by the University** through affirmative misrepresentations or wilful ignorance of federal tax laws.

This allegation implicates potential violations under the following laws:

- **Internal Revenue Code (IRC):** Misreporting or underreporting income, including non-cash compensation such as gift cards, is a violation of federal tax law. Knowingly advising students to omit reportable income may constitute aiding and abetting tax fraud under 26 U.S.C. § 7206 and 26 U.S.C. § 7201.

- **False Claims Act (31 U.S.C. §§ 3729–3733):** If tax misreporting impacts grant certifications or institutional financial disclosures, this may rise to the level of a false claim submitted to the federal government.

- **Whistleblower Protection Statutes (Federal and Illinois):** Plaintiff asserts this matter as a protected disclosure made in good faith under the **Illinois Whistleblower Act (740 ILCS 174/)** and the **federal Whistleblower Protection Act (5 U.S.C. § 2302)**, as it involves allegations of potential unlawful conduct by a federally funded institution.

- **Uniform Guidance (2 C.F.R. Part 200):** Improper tax practices related to federally compensated research participants or student workers may also violate conditions attached to federal funding.

Plaintiff respectfully requests that the Court, and/or relevant regulatory bodies such as the **Internal Revenue Service (IRS)** and the **U.S. Department of Education**, investigate whether these tax preparation sessions function as institutional schemes to mislead students and underreport taxable income ultimately contributing to federal tax evasion and misuse of nonprofit status.

**96. Whistleblower Allegation Regarding Sanitation and Public Health Standards in University Facilities | Improper and Infrequent Cleaning of University Buildings Posing Health Risks, Potential violation if IDPH, OSHA rules**

Plaintiff respectfully raises, in good faith and as a protected whistleblower activity, the concern that various buildings on the University of Chicago campus are not cleaned at a frequency or

standard consistent with public health, safety, and regulatory expectations. Some examples are, restrooms in older buildings such as (not limited to) Harper Library, Reynolds club, swift hall, and Stuart Hall, among others, are often observed to be dirty, malodorous, and inadequately maintained, many times not even cleaned once daily, but are used quiet a lot by student each and every day. This includes issues such as visible trash accumulation, unsanitary toilet conditions, strong odors, and potential biohazards.

Plaintiff personally experienced adverse health effects from these unsanitary conditions, including an infection requiring medication, believed to have been exacerbated by exposure to unclean restroom facilities. These observations suggest systemic non-compliance with hygiene and sanitation protocols that may be required under:

·   **Occupational Safety and Health Act (OSHA), 29 U.S.C. § 654(a)** — requires employers, including institutions receiving federal funds, to provide environments free from recognized hazards likely to cause harm, including unsanitary facilities.

·   **Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.** — requires that public accommodations (including campus facilities) are safe and accessible, particularly for students with health conditions.

·   **Illinois Department of Public Health (IDPH) Sanitation Code** — sets standards for institutional hygiene and restroom maintenance in educational facilities.

·   Local health ordinances and fire code regulations governing environmental health and cleanliness in public buildings.

Plaintiff requests that relevant oversight agencies (such as OSHA, the Department of Education Office for Civil Rights if health is disability-related, and local public health departments) be notified and conduct an inspection or review of cleaning standards and janitorial staffing across the University of Chicago, particularly (but not limited to) in aging infrastructure buildings where sanitation concerns appear most prevalent.

## 97. Retaliation In Violation of Federal Civil Rights and Public Policy Statutes (Title VI, Title IX, First Amendment, and Whistleblower Protections)

Plaintiff's case is not based on a single incident of retaliation but reflects a sustained and escalating pattern of compound reprisal directly targeting Plaintiff's protected activity (not limited to) under federal civil rights, safety, disability, grievances filing, and public policy statutes. Each time Plaintiff raised legitimate concerns whether related to public safety, discrimination, or institutional compliance the University responded with increased hostility and adverse actions, culminating in disciplinary proceedings that lack neutral justification. Even if one justification stands, the **cumulative retaliatory environment is constitutionally and statutorily impermissible**.

The defendant invocation of academic misconduct, and terminations is not a good-faith enforcement of institutional policy, but a pretextual response designed to suppress Plaintiff's rights to further protect from legal actions. This charge was brought in not only close temporal proximity

to Plaintiff's protected disclosures and is chronologically and causally linked to each instance in which Plaintiff reported noncompliance, unsafe conditions, wrongful terminations, or discriminatory conduct but also bias. Even if one of the University's stated justifications appears facially valid, the overall retaliatory environment is neither constitutionally permissible nor statutorily lawful.

Typically, in evaluating retaliation, courts consider factors such as the temporal proximity between the protected activity and the adverse action, whether the justification is inconsistent or pretextual, the existence of a pattern of hostility, and whether multiple retaliatory acts not just a single disciplinary charge occurred. Each of these factors is present in this case. Plaintiff can demonstrate that each time a concern was raised particularly those related to safety or civil rights there was a subsequent, disproportionate consequence. The alleged misconduct was not enforced in a neutral manner and was selectively applied against Plaintiff, while others engaging in similar behaviour were not subjected to investigation or sanction.

Plaintiff has a consistent record of raising legitimate safety and compliance concerns through appropriate institutional channels. These disclosures are supported by verbal communication, timelines, and evidence that the reported issues were substantive, ongoing, and relevant to public and academic safety.

Finally, because the University receives federal funding and have non-profit status, it is held to heightened standards under laws such as Title VI (prohibiting retaliation for complaints involving race or national origin), Title IX (in cases involving sex-based discrimination and reprisal), the Higher Education Act § 117 (particularly where foreign funding and research transparency are involved), and other federal statutes governing compliance, research integrity, and institutional accountability. If Plaintiff's protected conduct touched on such areas particularly if research labs, chemical safety, or dual-use technology were involved then further scrutiny is warranted under these laws.

Accordingly, the University's conduct constitutes a pattern of retaliation in violation of Plaintiff's rights under federal law, public policy, and the U.S. Constitution.

As a direct consequence of the University's ongoing pattern of retaliatory conduct, discriminatory enforcement of policy, and disproportionate disciplinary measures taken shortly after the Plaintiff's engagement in protected activities, Plaintiff believes that their fundamental and constitutional rights have been violated by the University and its officials, acting under color of law and in positions of authority. These violations include, but are not limited to, the infringement of Plaintiff's **First Amendment right to freedom of speech**, particularly in relation to raising safety, compliance, and civil rights concerns without institutional reprisal; the **right to freedom of religion**, where any expression of faith or identity may have been chilled or selectively targeted; the **right to privacy**, violated through improper disclosure, surveillance, or intrusion into Plaintiff's personal or academic affairs; the **right to due process**, compromised through biased, irregular, and retaliatory disciplinary proceedings that failed to afford Plaintiff fair procedural safeguards; the **right to equal protection under the law**, as guaranteed by the Fourteenth Amendment, due to discriminatory treatment based on Plaintiff's protected characteristics and/or past grievances; and the **right to a fair and impartial adjudicative process**, which was denied through the University's pretextual and punitive response to Plaintiff's protected expressions and

complaints. Plaintiff asserts that these violations are not isolated incidents but reflect a broader institutional failure to uphold the constitutional and statutory rights of individuals who engage in **good-faith whistleblowing or protected conduct within federally funded educational and research settings**. Accordingly, Plaintiff seeks appropriate legal remedy for these infringements under federal civil rights law and the U.S. Constitution.

**Legal:**

1. **Temporal Proximity and Pattern of Retaliation** Emphasize that each time you raised a concern whether safety-related or discriminatory you experienced escalating consequences.

2. **Pretext and Disproportionate Response** Alleged misconduct was **used as a tool to suppress protected activity**, and others were not similarly punished for similar conduct.

3. **Federal Funding Connection** If the university received **federal grants**, it can trigger additional scrutiny under:
   - **HEA § 117** (foreign funding transparency),
   - **Civil Rights Title VI** (if discrimination overlaps with retaliation),
   - **Research compliance** statutes, especially if dual-use tech or chemical labs are involved.

## 98. Quoting Potential/actual applicable Policies and Legal Considerations for Nonprofit Expansion | IRS, Public Accountability, Fiduciary duties and precedence, Non profit,

When a nonprofit institution, such as a university or charity, seeks to **expand its operations or physical footprint**, it must adhere to a variety of **federal, state, and local laws and policy constraints (Not at all limited to these)**.

**Policy considerations**:

**1. IRS Compliance (26 U.S.C. § 501(c)(3))**

Nonprofits must operate **exclusively for charitable, educational, religious, or scientific purposes** to retain tax-exempt status. Expansion efforts **must align with the nonprofit's mission** or risk:
   - IRS penalties
   - Revocation of tax-exempt status
   - Increased scrutiny of unrelated business income (UBI)

**Rule**: If expansion includes commercial elements (e.g., retail, rental property), it must be **substantially related** to the nonprofit's exempt purpose or risk UBIT (Unrelated Business Income Tax).

**2. Zoning and Local Land Use Laws**

Before physical expansion (new campuses, buildings, etc.), the nonprofit must comply with:

- **Zoning laws and variances**
- **Land use regulations**
- **Historic preservation ordinances**
- **Environmental impact assessments**

**Public hearings** or **community board approvals** may be required, especially for large developments.

### 3. Public Accountability and Community Engagement

Large institutions (like universities) expanding into urban areas may face **community opposition** due to concerns over:

- Gentrification or displacement
- Traffic congestion or noise
- Reduction in affordable housing
- Loss of taxable property (if nonprofit buys tax-producing land)

**Best practices include:**

- Conducting **community impact studies**
- Hosting **public forums**
- Creating **community benefit agreements (CBAs)**

### 4. State Attorney General Oversight

In most states, the **Attorney General oversees charitable organizations**. They may investigate:

- Expansion plans that appear to deviate from the mission
- Alleged misuse of charitable assets
- Conflicts of interest in property acquisition or development

### 5. Nonprofit Board Fiduciary Duties

Board members have fiduciary duties to:

- **Act in the best interest** of the nonprofit
- Ensure **reasonable expenditures**
- Avoid **conflicts of interest**
- Maintain **financial transparency**

Expansion involving real estate must be documented, appraised, and executed at fair market value.

### 6. Use of Restricted Funds or Endowments

If donations or grants were **restricted to specific uses**, they **cannot be redirected** for expansion without:

- Donor consent

· Court approval under cy-près doctrine (when the original purpose becomes impossible or impractical)

**7. Bond Financing and Public Funding Conditions**

If a nonprofit uses **tax-exempt bond financing** or receives **federal/state funds** for expansion:

· Must comply with specific use and reporting requirements
· Often includes **Title VI**, **ADA**, and **environmental** obligations

Misuse can result in loss of funding or repayment demands.

**Relevant Legal Doctrines and Principles:**

1. **Fiduciary Duty of Prudence (Nonprofits and Corporations)**
   For nonprofit institutions (like universities), board members owe a **fiduciary duty of care and prudence**. This means:
   o They must manage debt responsibly.
   o Reckless accumulation of debt without a clear repayment plan may be considered **financial mismanagement**.

2. **Fraudulent Conveyance / Insolvency Law**
   Under the **Uniform Fraudulent Transfer Act (UFTA)** or **Bankruptcy Code (11 U.S.C. § 548)**:
   o If an institution borrows irresponsibly while insolvent or near insolvency, and transfers assets in a way that defrauds creditors, it may be liable.
   o Courts can void transactions meant to **delay, hinder, or defraud creditors**.

3. **Commercial Reasonableness (UCC § 1-304)**
   In commercial lending, there's an **implied duty of good faith and fair dealing**. Taking on excessive debt without disclosing risk or without a revenue model could breach this duty, especially if investors or donors are misled.

4. **Breach of Implied Contract or Constructive Fraud (Tort-Like Claims)**
   If a nonprofit institution **solicits donations or tuition under promises of financial stewardship** and then behaves recklessly with debt, some courts may allow claims of:
   o **Misrepresentation**
   o **Constructive fraud**
   o **Breach of implied contract**

**Government Oversight (for Nonprofits)**

· The **IRS** monitors 501(c)(3) institutions for private inurement or misuse of funds.
· State **Attorneys General** may investigate nonprofits for:
   o Financial waste
   o Self-dealing
   o Violating charitable trust obligations

**99. Whistleblower Regarding Use of a Minor in Campus Event: Potential Violations of Safety, Labor, and University Compliance Standards**

As a whistleblower acting in good faith under applicable state and federal protection laws, the plaintiff respectfully brings to light observations that may raise serious legal and compliance issues concerning child labor and event oversight on the University of Chicago campus.

The plaintiff recalls that during the summer of 2024, on a bright and sunny afternoon, a university-hosted event occurred in the small quad outside the Regenstein Library. At this event, a minor child, whose identity is unknown was observed handing out ice cream sticks to attendees. It is unclear whether the child was employed by the University of Chicago, affiliated with a third-party vendor, or connected to a university proxy. The date and official name of the event are not known but can be checked, but event was sponsored and facilitated by the University.

Additionally, the plaintiff recalls that, at a separate event held near the John Crerar Library quad, another minor was possibly observed working at a food stall. Although the identity and employment relationship of this second child are not clear, it is possible that he was assisting a parent. However, due to the limited context and lack of formal verification, this observation is noted here only as a potential concern.

If either or both instances involved the employment or participation of minors in university-affiliated events without proper supervision, clearance, or legal compliance, the University may be in violation of several applicable laws and standards. These include:

- **Illinois Child Labor Law (820 ILCS 205/1 et seq.)**, which restricts employment of minors and imposes conditions on their participation in public and commercial activities;

- **Fair Labor Standards Act (FLSA, 29 U.S.C. § 212)**, which imposes federal restrictions on the employment of minors, including permissible duties, required work permits, and hours;

- **Illinois Department of Public Health Food Code**, which governs who may handle or distribute food at public events, particularly in regard to unlicensed or untrained individuals;

- **University of Chicago's Youth Program and Campus Safety Guidelines**, which are presumed to require clearance, training, and adult supervision for any minor participating in campus programming;

- **Illinois Whistleblower Act (740 ILCS 174/)** and federal whistleblower laws, which protect individuals reporting potential legal or regulatory violations in good faith. Federal Whistleblower Protection Act (5 U.S.C. § 2302(b)(8)) — if federal funds or programs were involved.

- **Sarbanes-Oxley and Dodd-Frank protections**, if tied to misuse of university financial systems, grant funds, or misreporting.

The plaintiff raises these concerns to ensure that children are not being placed at risk and that the University of Chicago adheres to applicable labor, safety, and institutional compliance obligations. An investigation into these incidents is respectfully urged, and the plaintiff seeks protection under

applicable whistleblower statutes for submitting this disclosure in the public and institutional interest.

**Relief Requested:**

- **Immediate investigation** into the identity of the minor and affiliation with the University.
- Review of event authorization procedures and compliance with child labor, safety, and food handling regulations.
- **Preservation of whistleblower protections** and assurance against retaliation for raising these concerns in good faith.

### 100. Disability Discrimination, Retaliation, and Whistleblower Retaliation Against Plaintiff by SSCS (Social Sciences Computing Services), Including Hostile Work Environment, Tax Misconduct Concerns, and Improper Employment Practices

Plaintiff brings forth this complaint to outline a pattern of disability discrimination, retaliation for protected disclosures, and systemic workplace misconduct perpetrated and tolerated by the Social Sciences Computing Services (SSCS) department. These violations occurred during the Plaintiff's employment in a small, open office environment where staff and management including individuals such as Kerry and Scott were well aware of Plaintiff's disability. Specifically, Plaintiff suffers from a medical condition necessitating frequent restroom use and also disclosed having short-term memory loss. These conditions were not only known but mocked, with Plaintiff being subjected to derogatory comments and ridicule, creating a hostile and humiliating workplace atmosphere.

Beyond disability-related misconduct, Plaintiff was part of regular workplace discussions involving hours worked, overtime policies, and payroll practices, which revealed potentially widespread violations of federal labour laws. In particular, Plaintiff observed student workers exceeding federally permitted hours, often without corresponding benefits or overtime compensation, which may violate the Fair Labor Standards Act (FLSA). These concerns were raised internally with Scott, a full-time administrative employee often stationed at the SSCS basement office in Kelly/Green Hall but were ignored or dismissed without appropriate review.

Further exacerbating the situation, Plaintiff raised ethical and legal concerns regarding potential abuse of the University's nonprofit and tax-exempt status. Conversations within the office, often heard by all due to its small size, revealed troubling statements encouraging the use of university systems for tax-free purchases for personal use. Plaintiff openly questioned these practices including the informal label of "taxless" associated with university-issued maroon dollars believing they constituted unethical or unlawful conduct, possibly defrauding state and federal tax authorities. Despite expressing good-faith concerns about these practices, Plaintiff was met with increased hostility, marginalization, and fear of employer retaliation.

These combined actions by SSCS amount to a breach of Plaintiff's rights under multiple state and federal statutes designed to protect workers from discrimination, ensure fair labor practices, and safeguard whistleblowers who expose unethical or illegal conduct. The cumulative impact has caused significant emotional distress and professional harm and warrants investigation and accountability.

**Legal Citations (Federal and Illinois Law)**

· **Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.** Requires employers to provide reasonable accommodations and prohibits discrimination or retaliation based on disability.

· **Rehabilitation Act of 1973, 29 U.S.C. § 794** Prohibits disability discrimination by programs receiving federal financial assistance.

· **Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.** Regulates wage, hour, and overtime requirements; prohibits wage theft or exceeding permitted hours for student workers without due compensation.

· **Internal Revenue Code (IRC), 26 U.S.C. § 7201** Criminalizes willful attempts to evade or defeat any tax; misuse of tax-exempt status for personal gain may fall under this statute.

· **Illinois Human Rights Act (775 ILCS 5/)** Prohibits workplace discrimination and harassment based on disability; includes provisions against retaliatory conduct.

· **Illinois Whistleblower Act (740 ILCS 174/)** Protects employees who disclose, or refuse to participate in, activities they reasonably believe violate laws or regulations.

· **Illinois Wage Payment and Collection Act (820 ILCS 115/)** Protects employee wage rights, including payment for all earned time, overtime, and prohibitions against wage misrepresentation.

· **Tort Law – Intentional Infliction of Emotional Distress (IIED)** Applies where conduct is so outrageous in character and extreme in degree as to exceed all possible bounds of decency.

· **Negligent Supervision and Retention** Legal claim applicable when an employer fails to manage or discipline known problematic conduct by staff resulting in harm to others.

## 101. Wage Withholding, Retaliatory Termination, and Institutional Misconduct Involving the Mansueto and SSCS Roles

In addition to the issues previously stated, Plaintiff believes that also suffered wage theft, retaliatory discharge, and systemic payroll manipulation through the University's handling of his positions at both the Logan Centre and Social Sciences Computing Services (SSCS).

Plaintiff was assigned work at the Logan Centre but was never compensated for it. In addition, hours logged in the University's official time-tracking system (Workday) from the prior academic year were marked as "approved" yet remained unpaid. While University Human Resources (HR) eventually acknowledged these discrepancies and claimed they had been repaired, no clear documentation, including exact dates, dollar amounts, or confirmation of overtime compensation, was ever provided. This lack of transparency alone raises serious red flags under wage and hour laws.

The situation escalated further during Plaintiff's assignment to the Mansueto role, a union-eligible position. Shortly after starting, there were delays and objections related to the payment of hours. Within just two days of raising concerns about the Mansueto hours, Plaintiff's separate SSCS role distinct and unrelated was terminated without notice. This temporal proximity, paired with inconsistent justifications provided by SSCS management (first blaming HR, then citing budgetary issues and past overtime hours), indicates retaliation.

Despite Plaintiff's repeated inquiries, hours from both Mansueto and SSCS roles were cancelled out of a sudden. In an effort to maintain peace, Plaintiff even stated **they could forgo payment, if necessary,** yet SSCS still failed to pay in full and proceeded to terminate Plaintiff within around 48 hours of Mansueto role issues raised. It was further revealed the same SSCS job was reposted shortly thereafter on job boards such as Grad Gargoyle and likely internal listservs, undermining their stated justification of budgetary constraints or inability to pay.

Simultaneously, Plaintiff observed that other student workers, including international students, were receiving full hours and in some cases exceeding the federally permitted 20 hours/week, creating a pattern of disparate treatment. This disparity, when juxtaposed with the abrupt and selective termination of Plaintiff, supports a claim of discriminatory and retaliatory action.

Making matters worse, after the SSCS termination, payroll deductions for taxes were made against an internship that concluded in 2024, months in advance. These deductions effectively reduced Plaintiff's immediate income despite already being financially penalized through termination. This coordinated payroll adjustment, in the wake of job removal, further illustrates malicious conduct by the employer, and retaliation short after, however it's **not yet known that those taxes are actually paid to government or had been kept with themselves** since it happened short after SSCS termination on around June 15 when they deducted money from the same payroll, since they knew they'll make conditions that Plaintiff will not be able to work much hours anymore and if they delay the tax they will have to ask money from plaintiff instead of cutting it from payroll, since payroll can't ever be equal or more than taxes amount because of defendant actions.

Although Plaintiff subsequently filed a grievance with the union on February 1 concerning the wrongful termination from SSCS (non-union but stemming from union-related events), the University responded with a counter-complaint by February 12 and expelled Plaintiff from the University by February 25. The grievance was never substantively reviewed or heard by the union, and Plaintiff was never reinstated or properly compensated.

The cumulative sequence of events from unpaid wages, retaliatory job termination, discriminatory treatment, and pre-emptive tax deductions, to procedural denial of grievance rights demonstrates a broader pattern of institutional abuse and suppression of lawful employee advocacy.

**Legal Citations (Federal and Illinois Law)**

- **Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.**
Requires full and timely payment of wages for approved work; protects against wage theft and retaliation for asserting wage rights.

- **Illinois Wage Payment and Collection Act, 820 ILCS 115/**
Mandates that all earned compensation be paid promptly, including overtime, and prohibits unilateral withholding or delayed payments.

- **Illinois Human Rights Act (775 ILCS 5/)**
Protects employees from retaliation related to complaints about discriminatory or unfair employment practices.

- **Illinois Whistleblower Act, 740 ILCS 174/**
Protects individuals who disclose or attempt to address violations of law or misconduct, including within a university or employer context.

- **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3)**
Prohibits retaliation against employees for participating in proceedings or opposing discriminatory practices.

- **Tort Law – Retaliatory Discharge**
Under Illinois common law, an employee cannot be fired in retaliation for reporting misconduct or asserting legal rights.

- **Tort Law – Conversion or Misappropriation of Wages**
If wages or lawful compensation were wrongfully withheld or diverted, legal claims may arise for misappropriation or theft of property.


## 102. Suspected Retaliatory Interference with Plaintiff's Job Applications – Potential Digital Tampering and Administrative Misconduct

Plaintiff respectfully submits that there is reasonable cause to believe that previously submitted job applications through university-affiliated platforms including, but not limited to, **Grad Gargoyle**, the **Harris School portal**, and **Workday**, were improperly cancelled, withdrawn, or made inactive **without Plaintiff's knowledge or consent**. Plaintiff suspects this may have been done through:

- **Backend administrative actions**, or
- **Unauthorized internal communications** instructing system administrators or HR representatives to suppress or remove Plaintiff's applications.

Such tampering or obstruction may constitute a violation of multiple legal standards and protections, including:

- **Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e)** – which prohibits retaliation against individuals who engage in protected activities, including whistleblower disclosures or complaints about discriminatory practices.
- **42 U.S.C. § 1981** – which guarantees equal rights to make and enforce contracts, including job applications and employment opportunities, regardless of race or national origin. Retaliatory interference may constitute a deprivation of this federally protected right.

- **Computer Fraud and Abuse Act (18 U.S.C. § 1030)** – if Plaintiff's access or digital records were intentionally altered or deleted by internal personnel with unauthorized or abusive administrative access, such conduct may give rise to a federal claim under this statute.

- **Illinois Whistleblower Act (740 ILCS 174/)** – protects individuals who report violations of law or public policy from retaliatory action, including employment-based retaliation, whether overt or covert.

- **Illinois Human Rights Act (775 ILCS 5/)** – which prohibits employment discrimination and retaliation by educational institutions and affiliated entities.

- **Common Law Tort of Interference with Prospective Economic Advantage** – Under Illinois law, knowingly and unjustifiably interfering with an individual's legitimate expectation of employment or contract opportunities can form the basis of a civil claim (see *Fellhauer v. City of Geneva*, 142 Ill. 2d 495 (1991)).

- **Digital Records Retention Laws** – Institutions of higher education may be required to preserve application data, especially when relevant to ongoing disputes or when the applicant is engaged in protected activities (see also *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) regarding digital evidence preservation).

Plaintiff respectfully requests that the Court permit limited discovery or forensic investigation into the University's job application management systems, including user access logs and administrative action histories, to determine whether unlawful suppression or retaliation occurred in violation of the laws cited above.

### 103. Suspected Lack of Equal Access to Student Profile Features on Harris School Platform

Plaintiff further asserts that the **Harris School of Public Policy's official website and associated platforms** failed to provide **equal opportunity** to all enrolled students for participation in or publication of **student profiles**, which are publicly visible and often used to showcase academic and professional credentials.

At no point during Plaintiff's enrolment was there a formal announcement, call for submissions, or standardized process made available to all students for inclusion in this profile directory. This lack of transparency and equal access may amount to **viewpoint discrimination** or **unequal treatment** in violation of:

- **Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)** – prohibiting exclusion from or denial of benefits in any program receiving federal financial assistance based on race, national origin, or related protected categories.

- **Equal Protection Clause of the Fourteenth Amendment** – when applied to public or federally funded educational institutions, ensuring all students are treated with equal regard under school policies.

- **Illinois Human Rights Act (775 ILCS 5/1-101 et seq.)** – which protects against differential treatment in education and access to school-related resources.

·  **Basic principles of academic fairness and non-discrimination** – which require that access to professional visibility tools such as student profile listings be made equitably available to avoid favouritism, systemic exclusion, or adverse impact on underrepresented students.

Plaintiff respectfully requests the Court to recognize this as part of a broader pattern of **administrative bias, opacity, and procedural inequality**, and to permit discovery into criteria, communications, or policies governing inclusion on the public student profile page during the relevant academic period.

## 104. Legal Authorities, Doctrines, and Statutory Provisions Implicated by the University of Chicago's Failure to Timely Initiate Disciplinary Action Under Statute 21 and the Disciplinary System for Disruptive Conduct

University of Chicago's failure to adhere to its own Statutes and Disciplinary System for Disruptive Conduct, specifically in relation to the handling of a complaint involving alleged criminal conduct by an individual (hereinafter "the Assailant") and the **improper disciplinary actions taken against the plaintiff.** The University's actions, or lack thereof, violate Statute 21 and the Disciplinary System for Disruptive Conduct, as outlined in the Statutes of the University of Chicago (last amended May 30, 2018) and the associated disciplinary procedures.

**Violation of Statute 21: Disruptive Conduct**

Statute 21 of the *Statutes of the University of Chicago* defines disruptive conduct as any behavior by a member of the University community that substantially obstructs, impairs, or interferes with teaching, study, research, administration, or the rights and privileges of other members of the University community. Specifically, disruptive conduct includes:

1. Obstruction, impairment, or interference with University-sponsored or authorized activities or facilities in a manner that deprives others of the benefit or enjoyment of the activity or facility.

2. Use or threatened use of force against any member of the University community or their family that substantially and directly bears upon the member's functions within the University.

The alleged conduct by the Assailant, involving criminal behavior such as assault, clearly falls within the scope of Statute 21, as it constitutes the use or threatened use of force against a member of the University community (the plaintiff). Such conduct directly interferes with the plaintiff's rights and privileges as a member of the University community. Despite this, the University failed to take disciplinary action against the Assailant, thereby neglecting its obligation to address disruptive conduct as mandated by Statute 21. This inaction constitutes a direct violation of the University's own policies.

**Violation of Disciplinary System for Disruptive Conduct: 60-Day Rule**

The University's *Disciplinary System for Disruptive Conduct* mandates that complaints alleging violations of Statute 21 must be made in writing and brought to the attention of the Associate Dean of Students in the University for Disciplinary Affairs no later than 60 days after the alleged

misconduct occurred. The complaint must include the name(s) of the person(s) involved, a specific description of the misconduct, and the circumstances under which it was committed. Upon receipt of a complaint, the University is required to conduct a prompt and thorough investigation, which may include interviews, information-gathering, and documentation of evidence. If warranted, the Associate Dean is required to summon the respondent (the accused individual) to a meeting as soon as possible to review the allegations and the disciplinary process.

In this case, the University failed to adhere to the 60-day rule in two significant ways:

1. **Failure to Investigate the Assailant Promptly**: The University did not take any disciplinary action against the Assailant, despite the alleged criminal conduct (assault) being reported. This failure to initiate a prompt and thorough investigation, as required by the Disciplinary System, constitutes a breach of the University's own procedures. The lack of action against the Assailant allowed the violation of Statute 21 to go unaddressed, further compounding the harm to the plaintiff.

2. **Improper Disciplinary Action Against the Plaintiff**: The University initiated disciplinary actions against the plaintiff for multiple issues, in violation of the 60-day rule. According to the Disciplinary System, complaints must be filed within 60 days of the alleged misconduct. However, the University issued summons and pursued disciplinary measures against the plaintiff months, and in some instances, over a year after the alleged incidents. This delay violates the explicit requirement that complaints be brought promptly within the 60-day timeframe, rendering the disciplinary actions against the plaintiff procedurally invalid.

3. The University of Chicago's handling of the matter involving the Assailant and the plaintiff constitutes multiple violations of its own policies. First, by failing to take disciplinary action against the Assailant for conduct that clearly violates Statute 21 (Disruptive Conduct), the University neglected its responsibility to protect the rights and privileges of its community members. Second, by pursuing disciplinary actions against the plaintiff outside the 60-day timeframe mandated by the *Disciplinary System for Disruptive Conduct*, the University acted in direct contravention of its own procedures. These failures not only undermine the integrity of the University's disciplinary process but also expose the institution to potential legal and reputational consequences.

As a result, any disciplinary findings or sanctions imposed upon Plaintiff arising from complaints submitted beyond the University's prescribed 60-day window should be deemed procedurally improper, substantively prejudiced, biased, pretextual, and therefore subject to reversal or nullification under both contractual obligations and principles of administrative fairness. Interpretation of plain English like " I didn't went to" was done as "I went to" especially by Dean Kate, and discipline committee member Dr. Don (However no idea how they further influenced after the discipline meeting since they're the authority for everything there, and they seems to be no abide by laws, but one who file complaint is abide by their own made rules, and some no officially made rules.

The University's failure to apply its own disciplinary time limits in good faith, particularly in a case where the Plaintiff was the reporting victim of a criminal assault, while simultaneously initiating disciplinary actions against the Plaintiff for unrelated or resolved matters, constitutes an egregious deviation from equitable standards. It further implies that alleged perpetrators of serious misconduct face no timely accountability, while the reporting victim is subjected to retroactive punishment, thereby chilling the exercise of grievance rights and retaliation protections.

Plaintiff contends that the timing and volume of six complaints initiated against him by the University immediately following his union-related grievance activity and protected reporting is not coincidental, but rather intentional, retaliatory, and unlawful. Had Plaintiff not engaged in protected conduct, the University would have had no procedural basis to reopen or reassert those issues many of which were either resolved or abandoned.

The decision to reinvigorate settled or resolved issues (e.g., internship matters) only after the filing of a formal grievance reflects retaliatory animus, administrative bad faith, and an impermissible omission of exculpatory evidence during internal proceedings. Such acts, whether committed deliberately or with reckless disregard for fairness, constitute an illegal adverse action under Title IX, retaliation doctrines, and basic procedural equity.

In essence, the University has afforded the alleged assailant de facto immunity, while unjustly targeting the victim of said misconduct through administrative process abuse creating a scenario in which an **individual credibly reporting assault is subjected to institutional punishment,** while the alleged offender remains uninvestigated and unpenalized like no one can touch that assailant. This conduct, by both omission and action, is incompatible with the principles of fair disciplinary governance and the University's own publicly binding Statute 21 and disciplinary code. The denial of effective union representation and the demonstrable bias in handling that process strongly indicate that other cited issues were pretextual, designed to fabricate a pattern of alleged misconduct. Furthermore, the employer's reliance on the Mansueto role to support this purported pattern while simultaneously denying the plaintiff equivalent access to union representation as guaranteed under Weingarten rights highlights a selective, prejudged, and prejudicial application of procedural protections.

The University's failure to offer an informal resolution after plaintiff ask as a first step as mentioned in the rules, as contemplated under its disciplinary policy, further evidence procedural unfairness and retaliatory intent. In matters of non-severe allegations especially where prior resolution or mitigation existed informal resolution serves as a standard, equitable remedy. The deliberate exclusion of this option in Plaintiff's case reinforces the pretextual nature of the proceedings and supports the broader inference that disciplinary mechanisms were used punitively in response to protected activity, rather than for legitimate educational or administrative purposes. Further lifetime ban for a non-crime matter, but not for crime matter by assailant raises violations further.

**Link Statue 21:** https://biologicalsciences.uchicago.edu/sites/biologicalsciences/files/2019-06/Statutes%20of%20the%20University%20-%20BSD%20Annotated.pdf

## STATUTES OF THE UNIVERSITY OF CHICAGO

*Enacted by the Board of Trustees*
*Last amended: May 30, 2018*

STATUTE 1. The University includes the Schools, the Divisions, the College, the Oriental Institute, the Institute for Molecular Engineering, the Rockefeller Memorial Chapel, the University Library, the University Press, the David and Alfred Smart Museum of Art, the Court Theatre, the William B. and Catherine V. Graham School of Continuing Liberal and Professional Studies, and the Laboratory Schools.

STATUTE 2. The Divisions and Schools

    2.1. The Divisions include: The Division of the Humanities, the Division of the Social Sciences, the Division of the Physical Sciences, and the Division of the Biological Sciences.

    2.2. The Schools include: The Divinity School; the Pritzker School of Medicine in the Division of the Biological Sciences; the Law School; the Booth School of Business; the School of Social Service Administration; and the Irving B. Harris Graduate School of Public Policy Studies.

The University of Chicago: Articles of In...    22 / 22    —    105%    +    ▯    ↺

Technology and Intellectual Property under the direction of the President or his or her designee.

STATUTE 19. Use of University's Name. The University will not permit its name or other trademarks to be used to endorse or support a commercial firm, product or service. Any uses of the University's name or other trademarks not precluded by the preceding sentence require the approval of the President or his or her designee.

STATUTE 21. Disruptive Conduct. Disruptive conduct is conduct by any member of the University community that substantially obstructs, impairs, or interferes with: (i) teaching, study, research, or administration of the University, including UCMC's clinical mission; (ii) the authorized and other permissible use of University facilities, including meetings of University students, faculty, staff, administrators and/or guests; or (iii) the rights and privileges of other members of the University community. Any member of the University who engages in disruptive conduct will be subject to disciplinary action. Disruptive conduct includes but is not limited to (1) obstruction, impairment, or interference with University sponsored or authorized activities or facilities in a manner that is likely to or does deprive others of the benefit or enjoyment of the activity or facility and (2) use or threatened use of force against any member of the University community or his or her family that substantially and directly bears upon the member's functions within the University.

https://studentmanual.uchicago.edu/disciplinary-system-for-disruptive-conduct/

## Non-Students

Staff employees, academic appointees, visiting academics, postdoctoral researchers, employees of affiliates and volunteers who violate Statute 21 are not covered by this system and will be subject to discipline using the disciplinary processes applicable to each category. Employees of affiliates, volunteers, visitors or guests who violate Statute 21 will be subject to the University's Ban (No-Trespass) Policy, which governs the process by which the University denies access to some or all University property after reaching a reasoned determination that a person has engaged in, among other things, threatening, disruptive or violent conduct. Persons who are not guests and have no affiliation with the University are also subject to the Ban / No-Trespass \ Policy, which may result in permanent prohibition from University property. In addition, because some conduct that violates this policy may also constitute a crime, any person who engages in disruptive conduct that constitutes a criminal act may be arrested and prosecuted.

## Initial Fact-Gathering and Notification

Anyone may make a complaint under this system. All complaints that a student has engaged in conduct that violates Statute 21 should be made in writing and brought promptly to the attention of the Associate Dean of Students in the University for Disciplinary Affairs, and in any event no later than 60 days after the alleged misconduct occurred. The complaint should identify the name(s) of the person(s) involved, and state with specificity the nature of the misconduct, and the circumstances under which it may have been committed. A complainant should make every effort to include all relevant facts known at that time and provide all available supporting



a prompt and thorough investigation as detailed below and will do so notwithstanding

## Initial Fact-Gathering and Notification

Anyone may make a complaint under this system. All complaints that a student has engaged in conduct that violates Statute 21 should be made in writing and brought promptly to the attention of the Associate Dean of Students in the University for Disciplinary Affairs, and in any event no later than 60 days after the alleged misconduct occurred. The complaint should identify the name(s) of the person(s) involved, and state with specificity the nature of the misconduct, and the circumstances under which it may have been committed. A complainant should make every effort to include all relevant facts known at that time and provide all available supporting materials. In response, the University will conduct a prompt and thorough investigation as detailed below and will do so notwithstanding any external process, such as a law enforcement investigation or criminal prosecution.

Generally, the complainant first will discuss the allegation with the Associate Dean of Students in the University for Disciplinary Affairs (or designee).[7] The Associate Dean of Students in the University for Disciplinary Affairs will conduct an expeditious inquiry into the facts, which may include but is not limited to interviews, information-gathering, and documentation of evidence. If warranted by the complaint and/or any other preliminary information gathered, the Associate Dean of Students in the University for Disciplinary Affairs will summon the respondent (the accused individual) to a meeting as soon as possible, review this policy and its processes (including the respondent's right to have a support person's assistance throughout the process), and provide a brief written summary of the allegation. If a respondent declines to participate in the initial information-gathering process, this decision may foreclose participation during later phases of the disciplinary process, including any proceeding before the Committee.

In the meeting, the Associate Dean of Students in the University for Disciplinary Affairs will inform the respondent of the alleged misconduct and will discuss the allegation and applicable investigatory and adjudicatory processes. Following the meeting, the



THE UNIVERSITY OF CHICAGO

**THE UNIVERSITY OF CHICAGO**

**OFFICE OF THE PROVOST**

HANDBOOK FOR ACADEMICS          DEANS & CHAIRS          REPORT

## Page not found

The requested page could not be found.

**Laws Violated (But not limited to):**

1. **U.S. Constitution – Fourteenth Amendment (Due Process Clause)**
   o Applies where a private university functions as a state actor (e.g., receives federal funding, performs public functions).
   o Failure to follow established internal procedure can trigger a **due process violation** in the academic context (*Goss v. Lopez*, 419 U.S. 565 (1975)).

2. **42 U.S.C. § 1983 – Civil Action for Deprivation of Rights**
   o May apply if the University is acting under color of state law (e.g., state-supported programs or Title IX enforcement) and fails to provide fair process.

3. **Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681)**
   o Ensures fairness and due process in handling complaints of harassment or misconduct involving gender.
   o Delayed or procedurally defective investigations may violate OCR due process guidance.

**State Law – Illinois**

5. **Illinois Constitution, Article I, Section 2 – Due Process Clause**
   o Guarantees procedural fairness in all legal and quasi-legal actions affecting individual rights within Illinois.

6. **Illinois Contract Law – Duldulao v. St. Mary of Nazareth Hospital Center, 505 N.E.2d 314 (Ill. 1987)**
   o A university's student handbook and policies can form an **implied contract** with students.
   o Failure to follow its own procedures constitutes **breach of contract** under Illinois law.

**Common Law Torts and Doctrines**

8. **Tort of Negligent or Intentional Infliction of Emotional Distress**
   o Causing foreseeable harm through arbitrary or retaliatory disciplinary action (*McGrath v. Fahey*, 533 N.E.2d 806 (Ill. 1988)).

9. **Doctrine of Estoppel**
   o Prevents the University from enforcing untimely or unwritten requirements it previously failed to communicate or enforce.

10. **Doctrine of Arbitrary and Capricious Action**
    · Recognized in academic discipline law where decisions violate **reasonableness and fairness standards**.

11. **Breach of Contract (Implied Terms of Fair Process)**
    · Student-university relationship governed by written policies, handbooks, and implied standards of procedural justice.

12. **Violation of Good Faith and Fair Dealing**
    · Implied in all contracts, including student agreements—requires institutions to act honestly and fairly.

**Case Law Examples Supporting These Principles**

- **Doe v. Brandeis Univ., 177 F. Supp. 3d 561 (D. Mass. 2016)** – University process violated fairness by failing to follow its own stated procedures.
- **Furey v. Temple Univ., 884 F. Supp. 2d 223 (E.D. Pa. 2012)** – Due process applies when school acts in disciplinary capacity with public character.
- **Goss v. Lopez**, 419 U.S. 565 (1975) – Due process applies to students facing serious discipline.


## 105. Declaration of Threat, Surveillance, and Anticipated Harm by University Officials – Allegations of Retaliatory Intimidation and Institutional Abuse

Plaintiff hereby places on formal record a declaration of severe emotional distress and fear for personal safety stemming from the ongoing retaliatory conduct and surveillance allegedly orchestrated by the University of Chicago and its senior leadership. Following Plaintiff's protected activities and grievance filings, University Police vehicles previously unseen in Plaintiff's vicinity began appearing near Plaintiff's place of residence, a development that Plaintiff reasonably interprets as an act of intimidation, psychological coercion, and extrajudicial surveillance.

In light of these events and considering the University's access to institutional resources and authority, Plaintiff is increasingly concerned that University officials may escalate retaliatory measures, including potential acts of violence or fatal harm, even if Plaintiff resides or travels outside the United States. Accordingly, Plaintiff respectfully and solemnly declares before the Court that, should Plaintiff suffer unexplained death or serious injury during the pendency of this case or thereafter, Plaintiff attributes direct or indirect responsibility to the following parties (But not limited to these):

- **Board of Trustees,** At the University of Chicago

- **University of Chicago Police Department (UCPD)**

- **Katherine Baicker**, and Provost Office, University of Chicago

- **Paul Alivisatos**, and President office, University of Chicago

- **Dean Kate Biddle, and Ethan Bueno de Mesquita,** Dean at Harris School of Public Policy, John Burrows Professor at Harris School.

- **Dean Bahareh Lampert**, Physical Science Division

- **Michael Hayes, Interim Dean,** University of Chicago

- **Kerry Sharkey, Scott, Brian** manager/staff's at SSCS Uchicago

- **Administrative Staff and Supervisors of Social Sciences computing services, Mansueto Institute of Urban Innovation**

- **Uchicago Medicine, Uchicago Hospitals.**

· **Board of Trustees, University Senate**

· **The University of Chicago, as a whole**

· **Shrivatsa Thulasiram, Staff and student at UChicago**

This declaration is made not for theatrical or speculative purposes, but in acknowledgment of the gravity and pattern of retaliatory conduct, mental harm, and institutional suppression that Plaintiff has documented across prior factual allegations. Plaintiff asserts this statement under the doctrine of anticipatory harm and seeks to preserve this declaration as part of the official court record. Should the Plaintiff be unable to participate in future proceedings due to fatal or incapacitating events, this record shall serve as a basis for further inquiry into possible criminal, civil, or institutional liability on the part of the aforementioned actors and their agents.

Plaintiff respectfully reserves the right to seek protective measures, including injunctive relief or third-party security assessment, and calls upon the Court to take note of the systemic abuse of power that underpins this declaration.

## Consequences

As a direct and proximate result of the Defendant University's repeated and unlawful actions, Plaintiff has suffered severe and continuing harm, including but not limited to emotional distress, academic disruption, irreparable damage to his educational and professional trajectory, and loss of research and career opportunities and temperament. Plaintiff experienced extreme mental trauma, and entered a state of clinical depression, requiring immediate psychiatric care. In addition, retaliatory actions, systemic suppression, and prolonged psychological harm inflicted by the University, Plaintiff exhibits and believes multiple clinically recognized symptoms consistent with Major Depressive Disorder (MDD). These include but are not limited to persistent feelings of depression and hopelessness, significant loss of interest in daily activities, sleep disturbances, fatigue, poor concentration, feelings of worthlessness, changes in appetite, and recurring thoughts of self-harm. These symptoms severely impair Plaintiff's ability to work, function socially, and maintain daily responsibilities, thereby necessitating long-term mental health care and legal redress.

Plaintiff has experienced repeated panic attacks fainting on at least six occasions. Lacking any employment due to Defendant's actions, Plaintiff was forced to seek treatment at under-resourced public hospitals, where care was inadequate and symptoms persisted. Plaintiff alleges that due to the loss of income and removal from university-affiliated roles, he was unable to afford necessary medications, which in turn prohibited him from seeking continued or effective medical treatment. Plaintiff's inability to obtain prescribed medication or engage in proper therapeutic care reflects ongoing and actionable harm that is both foreseeable and directly traceable to the Defendant's actions. The failure to address Plaintiff's whistleblower complaints, expulsion, grant education, and the retaliatory termination of both union and non-union roles resulted in the deprivation of basic health necessities. Plaintiff seeks full help for future mental health, and other related full care from best and top hospital in USA, including access to private psychological and psychiatric treatment, as equitable relief to redress ongoing harm caused by Defendant's conduct. According

to the evaluation by a treating physician, Plaintiff has been prescribed ongoing medication, with a treatment plan that includes bi-weekly medical visits and an expected duration of at least one year of continued therapy and pharmacological management, but due to financial condition plaintiff is unable to continue getting care in a good hospital.

Plaintiff had dedicated over eight years to meticulously preparing his academic profile, aiming for admission to his top-choice institution, Harvard (Multiple School's (not limited to): Medical School, Business, Law Schools), and few other top institutions. This preparation included active engagement in healthcare research during undergraduate studies in computer science, resulting in multiple publications that were in progress prior to his enrolment at Defendant University. However, upon joining Defendant University, Plaintiff encountered significant obstacles that hindered his ability to research, in addition after getting interviewed from Harvard Medical School plaintiff was unable to focus properly during a critical interview with Harvard Medical School, John's Hopkins University, leading to an unsuccessful application. Despite Defendant University's reputation as a research-centric institution, Plaintiff was unable to publish his pending papers or engage in meaningful research activities, thereby derailing his academic and professional trajectory. As a result of the conduct described throughout this complaint, serious doubt is cast upon the University's advertised reputation as a prestigious research institution. The glaring disconnect between its public image and its internal practices suggests that such branding may be largely illusory, if not entirely misleading. Plaintiff also strongly suspects that transcripts to top schools especially HMS and other top schools that were applied to be sent out to schools before the discipline still sent after the discipline and universities allegedly might have notified about the discipline action as followed by pattern of abuse of authority.

This request aims not only to address the Plaintiff's specific injustice but also to establish a precedent that enhances fairness and legal access for all student employees nationwide.

**[Data Redacted]**

**PHQ-9**



**DSM-5**





**Interviewed for HMS, JHU**

[Data Redacted]

[Data Redacted]

[Data Redacted]

In addition to the mental health deterioration, Plaintiff suffers from daily headaches, frequent panic attacks, and episodes of involuntary dozing all of which significantly impair his ability to function academically and socially. These injuries are not only immediate but are also of a long-lasting and potentially permanent nature. The cumulative effects of the University's discriminatory, retaliatory, and negligent conduct have inflicted irreparable harm on Plaintiff's well-being, reputation, academic record, and future potential.

**Because of this Plaintiff wants to define a term: -**

**Educational Terrorism Context and Definition:**

Plaintiff, having endured sustained institutional retaliation, repeated regulatory violations, and systemic abuse of authority, respectfully introduces the term **"Educational Terrorism"** as a conceptual framework to describe a dangerous pattern of conduct perpetrated by elite, privately governed academic institutions such as the University of Chicago. This term is intended to encapsulate the calculated misuse of educational infrastructure, public reputation, and federal protections to violate civil rights, subvert democratic norms, retaliate against dissenters, and shield unlawful behaviour under the guise of academic autonomy.

These institutions often operate on what Plaintiff terms an **"Oppress–Suppress Model"**, wherein political convenience, institutional loyalty, and financial self-interest are prioritized over genuine education, student welfare, and public accountability. Through political lobbying, alignment with ideologically extreme actors, and suppression of lawful grievances, such universities erode not only the purpose of education but the moral and legal fabric underpinning the American higher education system.

This system, as Plaintiff observes, "has everything **except boon of education**" offering prestige, bureaucracy, and funding pipelines, while actively undermining the basic mission of learning and integrity. This system provides the **education that disables** and education that have everything apart from education itself.

**Educational Terrorism** can be calculated and sustained abuse of educational authority and institutional autonomy to commit or conceal actions that amount to (Not limited to):

- **Retaliation** against whistleblowers and complainants;

- **Suppression of legal grievances**, union protections, and regulatory compliance;

- **Willful noncompliance with state and federal laws**;

- **Misuse of taxpayer funding and federal grants**;

- **Toleration or indirect funding of foreign-influenced or terror-promoting causes**;

- **Disrespect or desecration of national symbols (e.g., the Great American flag)**;

- **Misrepresentation of institutional intent to government agencies**;

- **Systematic discrimination against students**;

- **Using staff, and office as a weapon to shield**;

- **Endangerment of public health and safety** through:

  o Mishandling of chemicals and hazardous materials,

  o Food safety violations,

  o Plastic and environmental negligence.

It is **a hybrid form of academic corruption, regulatory evasion, and authoritarian institutional conduct**, masked under the pretext of educational independence and tax-exempt status.

Plaintiff asserts that the actions of the University of Chicago, as alleged throughout this complaint including retaliatory expulsion, suppression of union rights, manipulation of federal visa regulations, and silence in the face of potential funding of radical activities **embody the core elements of "Educational Terrorism"**.

This term is proposed not merely as rhetoric, but as a **framework for regulatory agencies and courts to understand how educational institutions may evolve into structurally abusive, politically shielded entities**. It urges Congress, the Department of Education, IRS, and DOJ to treat such patterns with the same seriousness as corporate fraud or civil rights violations.

**Supporting Legal Concepts (Tied to This Framework) (And laws mentioned in this document above, but not limited to)**

- **Public Policy Exception to At-Will Employment**

- **Institutional Negligence** (Restatement (Second) of Torts § 317, § 315)

- **Whistleblower Retaliation** (740 ILCS 174/, 29 U.S.C. § 660(c))

- **False Claims Act Violations** (31 U.S.C. § 3729)

- **Civil Rights Deprivation** (42 U.S.C. § 1983)

- **Foreign Agent Registration Act** (for undeclared influence/funding, if applicable)

Using these oppress-suppress models authoritarian institutes like the one we discussed in this document they deteriorate the educational image of American Education system.

Plaintiff respectfully urges that this framework **Educational Terrorism** be taken under consideration by Congress, the U.S. Department of Education, the Department of Justice, and the IRS, to re-evaluate how such institutions are permitted to operate under the protections of federal funding, tax exemption, and academic independence. Such models **do not educate, they dominate, retaliate, and shield wrongdoers**. This is not merely a private matter it is a public crisis masked in scholarly robes.

**Proposal for Constitutional Consideration: Request for Safeguards Against Educational Terrorism**

Considering the alarming patterns identified and detailed throughout this complaint including institutional retaliation, regulatory abuse, political alignment, and misuse of federal protections under the guise of academic freedom. **Plaintiff respectfully submits that these practices expose a critical constitutional gap requiring national dialogue and potential legislative and constitutional reform**.

While current statutes such as the **False Claims Act**, **Title VI**, **Title IX**, and **whistleblower protection laws** provide partial remedies, they are often insufficient in practice to address the **entrenched and politically shielded misconduct** perpetrated by elite academic institutions operating with vast autonomy and minimal transparency.

Just as the U.S. Constitution evolved to confront slavery, segregation, and corporate overreach, **there now exists a pressing need to address unchecked institutional abuse within the private education sector**, particularly when such institutions receive substantial federal support yet operate beyond meaningful public accountability.

**Constitutional Principles at Stake (Not limited to):**

- **Equal Protection and Due Process** (Fourteenth Amendment): When universities acting as quasi-governmental entities deny rights based on political views, race, caste, or national origin, they may undermine constitutional protections.

- **First Amendment Rights**: Suppression of dissent, whistleblower retaliation, and viewpoint discrimination by tax-exempt academic bodies distort the purpose of freedom of speech and association.

- **Spending Clause Protections** (Art. I, Sec. 8): Congress must ensure that taxpayer dollars are not used to fund institutions that violate public policy and constitutional norms.

**Constitutional Questions**

1. Does the removal of the accused student from a disciplinary committee meeting prior to the vote violate the student's constitutional right to **procedural due process**, as guaranteed by the **Fourteenth Amendment**, particularly where the student is deprived of knowledge of how votes were cast, how decisions were made on each individual charge, and whether bias or falsification influenced the outcome? How can the fairness and impartiality of such a disciplinary process be verified if the student has no direct access to the voting records or communication with the committee or even the actual outcome of the meeting?

2. Where universities exercise quasi-judicial authority including drafting their own rules, interpreting them, and rendering final disciplinary judgments should such institutions be subjected to greater judicial scrutiny under the **Due Process Clause**, similar to administrative agencies or courts? Given the imbalance of power and a historical pattern of retaliation or discrimination within higher education institutions, should **access to**

**judicial remedies** against universities be expanded or simplified under constitutional law to prevent abandonment and ensure protection of individual rights?

3. Whether it constitutes a violation of the Due Process Clause of the Fourteenth Amendment for one party in a legal or disciplinary dispute, such as a university, to unilaterally investigate, adjudicate, and impose sanctions against the other party, when the university itself is a direct party to the conflict or accusation, thereby acting as prosecutor, judge, and enforcer without independent oversight, neutral adjudication, or access to meaningful appeal by the accused. Especially in case of non-profit and federally funded institutions, and those exercises public-delegated authority. Plaintiff further contends that the institutional control exercised by Defendants over internal witnesses, adjudicative procedures, and disciplinary systems introduces a structural bias conducive to the fabrication or suppression of evidence. This imbalance combined with the prohibitive cost of legal representation, filing fees, and procedural complexity—functions as a de facto bar to judicial access. Moreover, under settled tort principles, faculty and staff acting as witnesses may inherently favor the institution to avoid internal consequences or reputational harm, thereby compounding the unfairness and denying Plaintiff a meaningful opportunity to obtain redress.

4. Why does the Equal Protection Clause of the Fourteenth Amendment not appear to result in consistent enforcement of student rights across academic levels, especially when graduate and professional students often face unique vulnerabilities such as coerced loans, less funding compared to college/undergraduate level students, or less opportunities and more academic retaliation for often being minority as compared to college students? Should courts adopt a heightened standard of review when evaluating claims by graduate students, given the documented pattern of abuse and lack of meaningful reform despite repeated litigation at the undergraduate level? Are existing protections under federal laws like Title IV, ADA, and antitrust regulations adequate to ensure equal protection for graduate-level students in financial and academic disciplinary matters?

5. Whether, in a nation with over 6,000 post-secondary institutions many of which are financially distressed or facing closure there exists a constitutional or compelling public policy need for the judiciary to facilitate fast-track or specialized adjudication of academic and disciplinary disputes, particularly where such disputes involve expulsion, denial of due process, or civil rights violations, and affect both U.S. citizens and international students. Further, whether the Court has the authority or duty to develop or direct the establishment of a judicially reviewable protocol to determine whether a student actually received meaningful or quality education commensurate with tuition paid and promises made particularly in non-degree and degree programs so as to prevent deceptive practices and protect educational consumers from irreparable academic, professional, or financial harm arising from substandard instruction or institutional misrepresentation, even at institutions ranked highly by external entities.

6. Should courts be constitutionally or statutorily required to **expedite educational disputes**, particularly where students face imminent harm such as expulsion, funding loss, or visa cancellation in a country with thousands of higher education institutions? In cases where

university unions, grievance bodies, or ombudsmen fail to protect the rights of a student, what constitutional mechanism exists to prevent total abandonment of the individual? Should the **rule of law** not serve as the final safeguard when all institutional actors fail?

7.  Is allowing universities to establish and operate their own disciplinary tribunals without judicial oversight or accountability a **de facto transfer of judicial authority** from public courts to **private entities**, thereby raising **constitutional concerns** under the **non-delegation doctrine**, **due process clause**, and **equal protection clause**? In light of the **power imbalance** between students and institutions, does this privatized adjudication process **violate the constitutional principle** that justice must be delivered by impartial and accountable courts rather than by entities with vested interests in the outcome?

8.  Does the American flag constitute a constitutionally protected symbol of national sovereignty, unity, and security, and is its desecration or unauthorized removal subject to heightened constitutional scrutiny under the First Amendment or national security interests?

9.  Should courts have the authority to **mandate that the maximum penalty imposed in non-criminal, academic disciplinary cases be limited to educational or volunteer-based consequences**, such as mandatory community service or academic probation, thereby allowing students to continue their studies and preserve their educational futures? Could such a framework, reserving expulsion or permanent sanctions **only for serious misconduct such as violence or sexual assault**, serve the dual purpose of **protecting due process**, **reducing judicial and institutional caseloads**, and ensuring that students are treated with fairness rather than criminalization when their primary intent was to learn, not to harm?

10. Does the selection of jurors from a specific or limited subset of the population violate the Sixth Amendment guarantee of an impartial jury, thereby creating an unconstitutional risk of bias in judicial proceedings?

11. Does a university that accepts federal funding have a constitutional or statutory duty to act as a quasi-caretaker for international students under the Due Process Clause or Equal Protection Clause of the Fourteenth Amendment?

12. Does the refusal of a labor union to represent a member in disciplinary proceedings related to employment, particularly where the issue arises tangentially from protected activity, constitute a violation of the member's constitutional right to association and due process under the First and Fourteenth Amendments?

13. Should the right to collective bargaining under the First Amendment's freedom of association clause be interpreted to mandate union eligibility for all employment roles and require expedited union certification processes to protect emerging labor categories?

14. Is the denial of disability accommodations during disciplinary or adjudicative proceedings a violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment

and statutory rights under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act?

15. Do constitutional principles of access to justice and procedural fairness, as embedded in the First, Fifth, and Fourteenth Amendments, guarantee individuals multiple avenues to pursue redress, even beyond strictly codified legal mechanisms?

**Constitutional Consideration**

Plaintiff submits that these issues raise questions **worthy of national legislative and constitutional dialogue**, and may merit **amendments to the U.S. Constitution** or the drafting of new federal statutes to:

1. **Codify explicit educational integrity standards** for tax-exempt academic institutions receiving public funding; making it easier to forfeit funding so that institutes doesn't do such unconstitutional things;

2. **Establish enforceable constitutional protections** for students, employees, and whistleblowers within educational environments akin to workplace protections; including superfast redressal of student complaints keeping academic time and limited flexibility in mind;

3. **Create a constitutional duty of transparency and non-retaliation** for federally funded institutions engaged in public education; enforce to the highest standards of the law;

4. **Restrict the use of federal and tax-exempt resources** for lobbying, foreign influence, or politically motivated suppression of lawful dissent;

5. **Define misuse of educational authority, and educational terrorism** as a constitutional violation where it results in systemic discrimination, suppression of speech, or obstruction of due process. Plaintiff proposes that such misuse be recognized as a **constitutional violation** when institutions receiving federal funds engage in acts that:

   1. Retaliate against whistleblowers or students for protected speech or reporting violations;

   2. Suppress union rights, grievance filings, or academic freedom;

   3. Discriminate based on protected characteristics under the guise of policy enforcement;

   4. Manipulate disciplinary processes to conceal misconduct or avoid accountability;

   5. Misrepresent educational services while benefiting from taxpayer funding.

Such conduct undermines the core constitutional protections of **due process under the Fourteenth Amendment** and **freedom of speech under the First Amendment**, and

should warrant **heightened constitutional scrutiny**, especially when committed by institutions that function as **quasi-public actors** through their acceptance of federal or state funding.

However, these protections **should not be limited solely to public institutions**. In a democracy rooted in equality, **all individuals must be treated fairly and consistently**, regardless of whether they attend public or private institutions. Private universities, especially those that serve the public, receive public funds, or benefit from tax-exempt status, must be held to **the same fundamental accountability standards**. They perform a public function and operate within a public-facing capacity, and therefore must not be permitted to retaliate against students, suppress lawful grievances, or bypass constitutional safeguards simply by virtue of their private governance structure.

6. **Guaranteed Legal Counsel and Expedited Justice for Students**

To ensure fair process and deter institutional abuse, **Plaintiff proposes a constitutional amendment or federal statute** establishing the following right for all students enrolled in federally funded academic institutions:

"The Right to Prompt Educational Justice and Legal Representation"

**Key Elements:**

1. **Expedited                              Due                              Process**

    All students facing academic, disciplinary, or retaliatory proceedings with civil or liberty implications shall be entitled to **an expedited adjudicative process**, ensuring timely redress to avoid long-term academic, mental health, or career harm.

2. **Guaranteed        Access        to        Legal        Counsel**

    In any case where a student alleges:

    - o  Whistleblower retaliation,
    - o  Civil rights violations,
    - o  Disability or mental health discrimination,
    - o  Academic expulsion or employment termination tied to protected activity,

    the institution must **guarantee access to independent legal counsel at no cost** to the student. This mirrors the principles of **Gideon v. Wainwright**, extending the right to representation beyond criminal contexts into serious educational and civil matters.

3. **Accountability                                                        Incentive**

    Institutions found to have violated student rights may face:

    - o  Sanctions on federal funding,
    - o  Mandated third-party audits,
    - o  Public disclosure of internal disciplinary records, and
    - o  Individual liability for administrators under **42 U.S.C. § 1983**.

    Plaintiff urges that Congress, and constitutional scholars explore these frameworks to restore balance between institutional power and individual rights in education. Guaranteeing timely legal counsel and recognizing the misuse of educational authority as a constitutional violation would significantly reduce abuse, promote accountability, and protect the core values of justice and education.

**Framework for Legislative Reform**

To ensure that abuse under the guise of "educational autonomy" is not immune from oversight or consequence, Plaintiff encourages the U.S. Congress to explore:

- A **"Higher Education Accountability and Civil Rights Act"**,

- Amendments to the **First and Fourteenth Amendments** ensuring **due process, academic neutrality, and whistleblower protection** in all universities and not only federally funded universities,

- A new **constitutional doctrine recognizing public-serving educational institutions as quasi-governmental actors** when receiving federal funds, thereby binding them to constitutional standards.

The abuse of federal resources, suppression of lawful reporting, political weaponization of campuses, and institutional retaliation described in this case illustrate a profound **constitutional blind spot**. These actions if left unchecked pose a direct threat to the integrity of American education, the rule of law, and democratic norms.

Therefore, Plaintiff respectfully proposes that **Congress and constitutional scholars** consider drafting and adopting additional provisions or amendments to ensure that **educational institutions are held accountable under the Constitution** in the same manner as public bodies and federal contractors.

**Request for Governmental and Judicial Investigation into the University of Chicago Based on Established Legal Standards for Inquiry**

Plaintiff respectfully requests that the appropriate regulatory, law enforcement, and judicial authorities initiate a formal investigation into the University of Chicago's practices and financial conduct in light of serious allegations concerning potential:

- Misuse of federal funds;
- Violations of federal civil rights statutes;
- Noncompliance with mandatory foreign funding disclosure laws;
- Religious discrimination and dietary accommodation failures;
- Discriminatory or retaliatory behaviour against whistleblowers and marginalized students;
- Improper influence or bias in protests support or suppression.
- And other things mentioned in complaint above

**Legal Standards Justifying Investigation in case some points without direct proof:**

1. **"Reason to Believe" Standard – 31 U.S.C. § 3733:**
   The Department of Justice may issue Civil Investigative Demands (CIDs) upon developing a "reason to believe" that an entity holds material relevant to a False Claims Act violation.

This threshold does not demand hard evidence but permits investigation based on a plausible suspicion of misconduct, particularly in federally funded institutions.

2. **Plausibility and Good Faith Allegation – Fed. R. Civ. P. 11(b):** Courts may permit discovery or inquiry based on factual contentions that are currently supported or will likely gain support following investigation. Courts recognize that plaintiffs are often at an informational disadvantage prior to accessing institutional records, thus allowing complaints to proceed based on credible allegations.

**Relevant Precedents Supporting Investigative Action Without Direct Proof:**

· **Mississippi Welfare Funds Scandal (2020):** Investigations were launched and arrests made based on internal inconsistencies and whistleblower disclosures without initial hard proof, reinforcing that patterns of suspicious conduct can justify deeper scrutiny.

· **Melendres v. Arpaio:** The Department of Justice launched a civil rights investigation into law enforcement discrimination under Title VI of the Civil Rights Act based on patterns of complaints and systemic misconduct, again, without concrete initial evidence.


**Justification in the Context of the University of Chicago:**

Plaintiff has submitted extensive specific allegations supported by factual detail and public documentation, including:

· Multiple confirmed cases of research misconduct involving federally funded grants (see ORI reports);

· Historical involvement in antitrust litigation involving financial aid collusion;

· Accepting undisclosed or underreported foreign funding, including from China, in potential violation of Section 117 of the Higher Education Act;

· Ignoring or violating dietary and religious accommodation requests of minority students, especially those of [Data Redacted] faith;

· Potential material support or facilitation of international protest-related fundraising without financial transparency or federal reporting;

· Favouritism or discrimination in student organization approvals and event support.


**Conclusion and Prayer for Relief**

In accordance with established legal standards and constitutional protections, Plaintiff respectfully petitions this Court and all relevant federal agencies, including the U.S. Department of Justice, the U.S. Department of Education, and the Internal Revenue Service, to:

1. Issue a formal Civil Investigative Demand or launch a joint agency inquiry into the above-referenced conduct;

2. Compel the University of Chicago to produce financial records, communications, and internal policies relevant to the allegations;

3. Impose appropriate sanctions or administrative remedies if violations are confirmed.

This request is submitted in good faith, consistent with Rule 11, and supported by extensive public records and personal experience indicative of systemic institutional noncompliance.

**Final Section: Legal Demands, Discovery Requests, and Relief**

Plaintiff respectfully submits this request in good faith, and pursuant to Plaintiff's protected activity and whistleblower status under federal and state law. This filing is made solely for the purpose of seeking redress for instances of retaliation, due process violations, and institutional misconduct.

Plaintiff respectfully submits the following legal demands, discovery motions, and proposed remedies, either as part of negotiated settlement or through formal relief issued by the Court or relevant regulatory authorities. These requests are grounded in alleged retaliatory practices, procedural unfairness, fraud, discriminatory conduct, and violations of constitutional, labour, and consumer protection laws.

**1. Defamation and Reputational Harm**

Plaintiff seeks compensatory and punitive damages arising from the University's internal and external communication of false, defamatory, and misleading statements which severely harmed Plaintiff's academic and professional standing. Jury/Court/Expert consultation is requested to quantify reputational loss, defamation, false claim, special damages, enhanced damages, keeping inflation in consideration.

**2. Injunctive Relief Against Retaliation and Abuse of Authority**

Plaintiff requests permanent injunctive relief restraining University officials and agents from engaging in any further retaliatory conduct, abuse of power, pretextual disciplinary actions, demands, or surveillance of Plaintiff.

**3. Preservation and Judicial Control of Digital Evidence**

Plaintiff moves for an emergency court order seizing control over all University digital assets, including but not limited to servers, email records, meeting logs, surveillance footage, internal chats, and Workday system entries, to prevent spoliation and destruction of evidence.

**4. Investigation into Anti-Governmental or Misconduct Activities**

Plaintiff calls for federal oversight, including but not limited to DOJ, DOE, IRS, and DHS review, into potential activities by the University that may be unlawful or contrary to national interests, including discriminatory targeting, suppression of dissent, or misuse of federal infrastructure.

- Endowment allocations, loan practices, and overstated debt burdens.
- False claims for federal student funding or CARES Act relief.
- Discrepancies between worker hours, overtime pay, and employment justifications.

**5. Financial Oversight and IRS Audit Request**

Plaintiff requests in good faith that the IRS, Department of Education, and appropriate state authorities investigate the University's financial activities for:

· **Falsification or Misrepresentation of Employment Records**, including inaccurate reporting of student worker hours, overtime compensation, and job responsibilities in connection with federally funded roles or grant-supported employment programs;

· **Improper or Fraudulent Management of Endowment and Loan Resources**, including the misallocation of endowment funds, issuance of unjustified institutional debt, or potential manipulation of debt positions whether through excessive or bad-faith borrowing practices designed to artificially inflate financial need for increased public or private funding;

· **Potential Misuse of Federal Relief and Education Funds**, including, but not limited to, improper application or reporting under the CARES Act, misappropriation of federal student aid, and misuse of federally allocated financial assistance programs.

### 6. Review of Employment Termination Practices

Plaintiff makes this request in good faith and in light of Plaintiff's status as a whistleblower" is legally appropriate and often advisable, A comprehensive audit is requested of all employment terminations over the past 20 years, including positions that fall outside of collective bargaining protection, to assess patterns of arbitrary, discriminatory, or retaliatory dismissal.

### 7. Inquiry into GSU-UChicago Collusion and Procedural Breach

Plaintiff seeks investigation into the Graduate Student Union's failure to advance Plaintiff's grievance and its alleged collusion with the University. The invocation of a "full member vote" standard not found in the CBA constitutes a breach of duty and obstruction of fair representation.

### 8. Transparency in Policy Changes and Public Notices

Plaintiff requests full disclosure of all policy changes made within HR, financial aid, academic, employment, or disciplinary systems, including silent updates made to official websites, manuals, or portals without student notification.

### 9. Discovery and Comparative Disciplinary Analysis

Plaintiff requests discovery into disciplinary outcomes of other similarly situated student-employees to demonstrate discriminatory and retaliatory disparities. Illinois law recognizes temporal proximity and pattern disparities as evidence of retaliation. Such discovery is essential to demonstrate a pattern of disparate treatment, thereby solidifying the claims of discriminatory and retaliatory intent. Illinois courts have recognized in similar cases that when an adverse employment action follows closely on the heels of a protected activity, it is sufficient to infer that the grievance was the but-for cause of that action. Moreover, doctrines underpinning employment due process and public policy in Illinois require that adverse actions be supported by objective, non-retaliatory justifications, which are conspicuously absent in this case.

**10. Investigation into Institutional Rankings and Promotional Misconduct**

Plaintiff calls for external audit of university practices related to rankings manipulation (Artificial Ranking), including payment for promotional placement, suppression of adverse/negative student data, or inflated career placement statistics.

**11. Internal Communications and Entrapment Allegations**

Plaintiff seeks court-ordered production of communications involving University officials including Provost, President, Harris School, SSCS, UChicago HR, Mansueto, and Title IX staff that discuss Plaintiff's termination, grievance, and any retaliatory plans. Plaintiff alleges that such communications reveal intent to entrap and discredit him post-complaint, apart from the on call/in person/off record entrapment practices including written/printed letters if any. Plaintiff contends these communications show intent to orchestrate a retaliatory process and falsify documents or records to create a pretext for disciplinary action.

**12. Procedural Irregularities and Pre-Decisional Bias**

Plaintiff challenges the imposition of administrative leave and access denial prior to final adjudication, constituting a violation of due process. The timeline and sudden imposition indicate premeditated action and failure to engage in fair procedure.

**13. Verification of Equal Treatment of Student Funding and Labor**

Plaintiff requests evidence of work product or output from other students who received funding, to evaluate whether Plaintiff was subject to disparate scrutiny or treated unfairly compared to peers.

**14. Sanctions and Accountability for Retaliatory Actors**

Plaintiff seeks court-directed or administrative sanctions against individuals implicated in orchestrating retaliation, including but not limited to arrest and academic credential revocation for individuals proven to have engaged in harassment or fraudulent academic practices.

**15. Investigation of Anti-National or Unlawful Activities**

Plaintiff requests that the Court/ or agencies refer for federal investigation whether the University was involved in anti-national or terrorist-linked activities, including the alleged use or transfer of unrecorded cash.

**16. Audit of Federal Funding Compliance**

Plaintiff demands that the IRS, Department of Education, NIH, and other relevant agencies review the University's use of federal funds, including worker compensation records, scholarship disbursement, endowment handling, and loan management.

**17. Declaration and Relief Based on NIH Research Participation**

Plaintiff seeks declaratory relief and compensation related to participation in NIH-funded medical research at UChicago Medical Center involving the collection of six test tubes of blood, asserting that proper federal protections and informed consent protocols were not observed.

**18. Damages for New Findings and Full Restitution**

Plaintiff requests that compensatory and punitive damages be expanded to include harm arising from newly discovered misconduct, with jury discretion to determine full salary-based compensation, reimbursement for fees, and all appropriate penalties to make Plaintiff whole and deter future whistleblower retaliation.

**Declaratory and equitable relief requested:**

- A judicial declaration that retaliatory use of Plaintiff's grievance communications, denial of process, and entrapment efforts violated federal and state rights.

- Injunctive relief prohibiting future entrapment tactics and mandating institutional reforms in grievance handling.

- Arrest and removal of academic record, mention of records of Shrivatsa, and notification of crime and removal of records to his university in India.

- Arrest of all staff who was involved in this matter bias(if proved), staff, professors, dean, president, provost, board of trustees.

- Expedited placement in a full-time, visa-sponsored position matching qualifications and prior responsibilities and at higher salary level with all benefits.

- **Forfeiture of Federal Funding and Grants etc:** If a university is found to have unlawfully suppressed complaints, failed to investigate or report criminal or civil violations, or otherwise violated federal regulations or constitutional protections (e.g., under Title IX, Title VI, or the Clery Act), it may be subject to enforcement action by the U.S. Department of Education or other federal agencies. Such violations may result in:
  - The suspension or **termination of eligibility for all federal financial assistance**, including but not limited to student financial aid, research funding, and educational program grants.
  - **Repayment or forfeiture of previously awarded federal grants** if the violations are found to have compromised the terms of grant conditions.
  - **Placement on a federal watchlist or ineligibility for future grants across all departments and agencies until compliance is restored.**
- **Revocation of Tax-Exempt (Nonprofit) Status:**
  - If a university operates as a 501(c)(3) nonprofit and is found to have engaged in systemic suppression of cases that violates public policy or federal law, the Internal Revenue Service (IRS) has the authority to revoke its tax-exempt status under the Internal Revenue Code. Grounds for revocation may include:

§ Repeated or wilful violations of civil rights laws.

§ Engagement in conduct inconsistent with the charitable, educational, or scientific purposes required for exemption under Section 501(c)(3).

§ Failure to operate in a manner consistent with public interest or public policy.

- **Revocation of F-1 Sponsorship and I-20 Issuing Eligibility**

  o Repeated employment of students (including international) in violation of the 20-hour-per-week limitation under 8 C.F.R. § 214.2(f)(9)(i) constitutes a material breach of its obligations under the Student and Exchange Visitor Program (SEVP), and that such conduct warrants revocation of the institution's certification to issue Forms I-20, pursuant to the authority of Immigration and Nationality Act (INA) § 101(a)(15)(F) and applicable SEVP compliance regulations.

**Compensatory relief and restorative actions**

- **Public Apology** co-signed by the University Provost and all relevant officials, professors, staff (along with respective designations), subject to Plaintiff's approval, and circulated to all institutions, universities, employers, and personal contacts affected and a public apology published on official website.

- Declaratory Relief: A formal ruling that the university violated the student's rights, useful for reputation and future education.

- Injunctive Relief: Court orders forcing the university to change policies.

- Formal Acknowledgment of Persecuted Status: Plaintiff respectfully requests that, where permissible under federal law (including Title VII of the Civil Rights Act, Equal Protection Clause, or public policy), the Court formally recognize Plaintiff's identity as a member of a persecuted or marginalized minority group and/or economically disadvantaged class, as a relevant context in assessing the harm and relief due.

- Recognition of Socioeconomic Vulnerability: Plaintiff requests the Court consider Plaintiff's low/zero-income and deprived status in assessing equitable relief, procedural accommodations, and judicial understanding of power imbalance between Plaintiff and institutional Defendant.

- Failure to Issue No-Contact Directive: Despite written requests to the University of Chicago Human Resources and administrative offices, no "no-contact order" or protective communication policy was issued to mitigate harm or avoid further psychological trauma from hostile or retaliatory actors. Plaintiff asks the Court to take note of this omission and provide any appropriate remedial or injunctive relief.

- **Compensatory Damages for Defamation and Reputational Harm (Jury Determination Request)**

o Plaintiff requests to ask for Jury to determine monetary damages for defamation resulting from the University's actions, which severely injured Plaintiff's professional reputation. Plaintiff further requests that the jury be permitted to determine a fair and reasonable amount of compensation (After taxes, keeping increased costs, and inflation in consideration) based on sum of:

- § Sum of Compensatory Damages
- § Economic Damages
- § Punitive damages
- § Lost wages and opportunity costs
- § Loss of educational, research, career advancement, and professional opportunities
- § Defamation Damages
- § Reputational Damages
- § Emotional Damages
- § Financial Damages
- § Garden-Variety Emotional Distress
- § Intentional Infliction of Emotional Distress (IIED)
- § Medical/Healthcare Costs
- § Education and Research Disruption
- § Mental Harassment
- § Current and future opportunity damages
- § Tuition Damages
- § Restitution or damages to compensate for the diminished academic value and the harm suffered as a result of these deceptive practices.
- § Legal Costs and long litigation time compensation
- § Reinstatement and compensation for the internship and employment opportunity
- § Full damages payment through legal channels.
- § Relocation
- § Isolation
- § Back and Front Pay
- § Whistleblowing
- § All employee, whistleblower etc loke benefit

**In addition, consider following, not limited to these (but sum of)**:

- § Some damages mentioned above
- § The cumulative hourly wages for **all** student roles terminated or ended from the beginning of degree program, calculated at 40 hours per week from the date of acceptance of each role plaintiff for until three years after graduation date (Overlapping hours should pay as per 150% as per the university own rules).

§ The total tuition fees paid by Plaintiff, with a request for a full refund along with scholarship due to the context in which the educational experience was disrupted;

§ Monetary compensation equivalent to at least ten years of salary at the highest compensation level offered for any full-time role at the University of Chicago or highest student graduate salary at an outside institution, whichever is more, along with other benefits (Loke).

§ Additional general and special enhanced damages as the jury deems necessary to make Plaintiff whole academically, professionally, mentally, reputationally, and emotionally.

§ Enhanced punitive damages designed to deter the University and other institutions from engaging in similar retaliatory conduct against whistleblowers or grievance filers in the future.

§ 5000 Manually written apology letters and manually signed by university and relevant staff been provided to Plaintiff.

**Past examples of cases for damages that can be considered by jury and court**

This matter involves multiple violations so Jury/Court can consider sum of these, or some case that may have been missed here, Plaintiff kindly requests Jury to consider these too:

**Note:** Help of LLM taken for these, kindly ignore repeated entries if any:

1. **Corinthian Colleges**: This for-profit college chain faced multiple lawsuits for predatory lending and deceptive practices. The Consumer Financial Protection Bureau (CFPB) secured a judgment of **$531 million** against Corinthian Colleges.

2. **ITT Technical Institute**: Another for-profit institution, ITT Tech, was sued for fraudulent practices, including misleading students about job placement rates. The lawsuit led to significant financial penalties and the eventual bankruptcy of the institution.

3. **College Board Price-Fixing Antitrust Case**: A class-action lawsuit accused 40 private colleges and universities of conspiring to increase tuition costs through financial aid price-fixing. The alleged scheme raised tuition by approximately **$6,200** per student.

4. **Antitrust Lawsuit Against Ivy League Schools**: Sixteen major universities, including Yale and MIT, were sued for allegedly colluding to limit financial aid awards. The lawsuit claimed that these practices unfairly disadvantaged students and sought damages for up to **170,000 former students**.

5. **University of Phoenix Settlement**: The University of Phoenix agreed to a **$191 million settlement** in 2019 over allegations of deceptive advertising practices that misled students about job opportunities.

Link whistle-blower: https://www.zuckermanlaw.com/sp_faq/whistleblower-retaliation-verdicts-and-settlements-under-federal-and-state-whistleblower-protection-laws/

# Whistleblower Retaliation Verdicts and Settlements Under Federal and State Whistleblower Protection Laws

By Jason Zuckerman | Last updated: August 20th, 2024

## Whistleblower Retaliation Verdicts and Settlements

| Verdict or Settlement | Case Name, Court, and Year | Claim/Statute | Summary |
|---|---|---|---|
| $75M | Jacobs v. Las Vegas Sands Corp., A-10-627691-B (Nev.Dist.Ct. 2012) | Wrongful termination | Former CEO of Las Vegas Sands Corp, Steve Jacobs, was terminated for brining to light "improprieties" in the way the Macau business conducted its affairs. |
| $34.5M | Carlos Domenech Zornoza v. Terraform Global Inc. et al. | Sarbanes-Oxley whistleblower retaliation | Mr. Domenech, the former President and CEO of Terraform Global, Inc. (Global) and Terraform Power, Inc. (TERP), and Executive Vice President of SunEdison, Inc. (SunEdison) in May 2016 filed a whistleblower retaliation lawsuit under the Sarbanes-Oxley Act (SOX) after TERP, Global, and SunEdison terminated him on November 20, 2015. Weeks before his termination, Mr. Domenech began informing the SunEdison Board of Directors that the then CEO and CFO of SunEdison were misrepresenting to the investing public the true liquidity and financial condition of SunEdison, |
| $25M | Babyak v. Cardiovascular Systems, Inc., Case No. BC601259 (Super. Ct. Cal. 2017) | Whistleblower retaliation | Cardiovascular Systems (NSDQ:CSII) was found liable for approximately $25.1 million in damages in a whistleblower retaliation suit involving a former regional sales manager, Steven Babyak. According to the court filings, Babyak alleged the company terminated him after he raised concerns about issues relating to patient safety and violations of state and federal laws. Babyak worked for the company for 3 years, and was fired on June 1, 2015.\n\nOn April 24, 2017, the jury awarded Babyak $2.7 in compensatory damages and an additional $22.4 million in punitive damages. Cardiovascular Systems' SEC filing disclosing the verdict be found here. |
| $20M | Williams v. Wyndham Vacation Ownership., No. CGC-12-526187 (Cal.Super. Ct. 2016) | Wrongful termination | Sales representative, Trish Williams, was terminated after reporting that Wyndham salespeople were preying on older time-share owners to get them to increase their holdings and were falsely telling customers that Wyndham would buy back their ownership stakes if they no longer wanted them. |
| $13M | Dennis Bruke v. MGH | Wrongful termination | Retaliation for internal whistleblowing about double-booking of surgeons, which increased the amount of time patients spent under anesthesia and increased a patient's risk of complications. |
| $13M | Brovont v. Overland Park Regional Medical Center | Kansas whistleblower claim litigated in | A jury found that Dr. Brovont was fired for raising concerns about inadequate ER staffing that he believed endangered patient safety. |

| $11.1M | Kingston v. IBM | Washington wrongful discharge and retaliation claims | Federal jury found that IBM unlawfully fired sales manager who complained that race discrimination accounted for the significant difference between a Black salesman's commission and a White salesman's commission after both closed similar deals. |
|---|---|---|---|
| $10M | Dr. David Fintan Garavan v. Miami Dade County | Florida Whistleblower's Act (Fla. Stat. Ann. § 112.3187) | Assistant medical examiner alleged that he was fired for raising concern about co-worker running private business through a county lab. |
| $10M | Pedowitz, M.D., v. The Regents of the University of California, et al., 2014 WL 1661270 (Cal.Super. 2014) | California Whistleblower Protection Act | Dr. Robert Pedowitz, former chairman of UCLA's orthopedic surgery department, was terminated after raising concerns about colleagues who had financial ties to medical-device makers or other companies that could unduly influence their care of patients or taint important medical research. |
| $9.4M | Don Sanders v. BNSF Railway Company | FRSA whistleblower retaliation claim | A jury found that Sanders was retaliated against in violation of the FRSA after he reported hazardous safety conditions on the railroad and reported harassment and retaliation to BNSF's HR Department. |
| $8.6M | Elliot Zibli and David Doors v. LAPD | California retaliation claim | Retaliation for reporting sexual harassment and abuse of authority. According to a Los Angeles Times article, they "suffered backlash so severe that they feared for their safety. They said they were denied tactical bloodhound training, and weren't given adequate equipment and support during searches for violent suspects." |
| $8.4M | Denise Bertone v. Los Angeles County | California whistleblower retaliation claim | Bertone was forced into early retirement in retaliation for raising suspicions about the death of an 8-year-old disabled boy. |
| $8M | Brian Gruzalski, Stanley Langevin and Mark Collins v FedEx | California retaliation claim | A jury found that FedEx wrongfully disciplined three employees after coming forward to report that FedEx put profits ahead of safety by not maintaining its aircraft consistent with FAA safety requirements. Read more about it here. |
| $8M | Wadler v. Bio-Rad Labs., Inc., , No. 15-CV-02356-JCS (N.D. Cal. 2017) | Sarbanes-Oxley whistleblower retaliation | Bio-Rad Laboratories Inc. terminated Sanford Walder, the company's GC of nearly 25 years, after he reported potential violations of the Foreign Corrupt Practices Act ("FCPA"). Bio-Rad claimed it terminated Walder's employment due to poor work performance and behavior. However, it took a jury only three hours of deliberation to conclude that Bio-Rad retaliated against Walder for his disclosures. |
| $7.7M | Easley v. N.J. Dept. of Corrections, et al., No. L-000094-13, complaint (N.J. Super. Ct., Burlington Co., Jan. 10, 2013) | New Jersey Whistleblower Protection Law | Lisa Easley, a prison official at the Alfred C. Wagner Youth Correctional Facility, was terminated after assisting the FBI with an investigation of a higher-ranking prison official who was soliciting bribes from employees. Easley's termination came just before she would have qualified for full retirement benefits. A jury awarded Easley $6.5 million in punitive damages, $1 million for emotional distress, and more than $265,000 in back pay as a result of the retaliation. |
| $7.4M | Juarez v. RadioShack Corporation ,IVR | California Whistleblower Protection Act | RadioShack terminated former Store Manager, Jose Juarez, after he reported fraudulent, illegal and unethical practices taking place in the store. |

| $7.1M | Zirpel v. Alki David Prods., Inc., 93 Cal. App. 5th 563 (2023) | California Labor Code §§ 232.5 and 1102.5 | Court Affirms $7.1 Million Whistleblower Verdict |
|---|---|---|---|
| $7M | Peiter Zatko v. Twitter | whistleblower claims | Twitter Agreed to Pay Whistleblower Roughly $7 Million in June Settlement |
| $6M | Laurie Simpson v. Bayer | False Claims Act retaliation claim | Simpson alleged that she suffered retaliation for raising concerns about a series of unlawful acts, including paying kickbacks to doctors and hospitals, marketing them off-label, and downplaying their safety risks. Click here to view the settlement |
| $6M | Zulfer v. Playboy Enterprises Inc.,JVR No. 1405010041, 2014 WL 1891246 (C.D.Cal. 2014) | Sarbanes-Oxley whistleblower retaliation | Playboy terminated Zulfer shortly after she opposed paying bonuses to senior executives that were not authorized by the Board. |
| $5M | McQueary v. Pa. St. Univ., No. 2012-1804, (Ct. C.P. Centre County 2016) | Wrongful termination | McQueary was terminated by Penn State University as a result of his testimony against officials who failed to act on his February 2001 report of a sex abuse incident involving Jerry Sandusky. |
| $4.6M | Brent Bullis vs Consulting | Minnesota Whistleblower Act | Radiologist to collect $4.6M jury verdict in whistleblower case against former practice |

**Retaliation**:

| Plaintiff | Defendant | Award Amount | Description |
|---|---|---|---|
| **Biogen Inc. Whistleblower** | Biogen Inc. | $250 million | A former employee alleged Biogen paid kickbacks to physicians to promote multiple sclerosis drugs. The whistleblower received a record-breaking award under the False Claims Act. Source |
| **Cardiovascular Systems Inc. Employee** | Cardiovascular Systems Inc. | $25.1 million | A sales manager was terminated after reporting potential Anti-Kickback Law violations. The jury awarded $2.7 million in compensatory and $22.4 million in punitive damages. Source |
| **Dr. Lauren Pinter-Brown** | University California | of $14 million | Dr. Pinter-Brown faced gender discrimination and retaliation at UCLA, leading to a substantial jury award. Source |

| Plaintiff | Defendant | Award Amount | Description |
|---|---|---|---|
| **University of Rochester Plaintiffs** | University of Rochester | $9.4 million | Nine former professors and students settled claims of retaliation after reporting sexual misconduct by a professor. Source |
| **Dr. Carol A. Warfield** | Beth Israel Deaconess Medical Center | $7 million | Dr. Warfield alleged gender-based discrimination and retaliation, resulting in a significant settlement. Source |
| **Matthew Garrett** | Kern Community College District | $2.4 million | A professor claimed retaliation for questioning grant fund usage, leading to a multimillion-dollar settlement. Source |
| **Dr. Rachel Tudor** | Southeastern Oklahoma State University | $1.165 million | Dr. Tudor, a transgender professor, won a jury verdict for discrimination and retaliation after being denied tenure. Source |
| **Grace Kuo** | Oregon State University | $600,000 | The former dean alleged retaliation after reporting discrimination and harassment, resulting in a jury award. Source |
| **Bruce Smith** | University of Texas at San Antonio | $325,000 | A professor claimed retaliation after publishing an op-ed criticizing university policies, leading to a settlement. Source |
| **Jane Turner** | Federal Bureau of Investigation | $360,000 | An FBI whistleblower faced retaliation after reporting misconduct, resulting in a jury award. Source |

| Case Name | Institute | Claim | Settlement Amount |
|---|---|---|---|
| Pedowitz v. Regents of the University of California | University of California | Whistleblower Protection Act | $10M |
| Crowley v. Watson | Chicago State University | Illinois State Officials and Employees Ethics Act | $4.3M |
| Crawley v. Chicago State University | Chicago State University | Illinois wrongful termination | $3M |
| Zimmerman v. University of Utah | University of Utah | Utah Whistleblower Act | $760,000 |

| Case | Plaintiff | Defendant | Award/Settlement | Notes |
|---|---|---|---|---|
| Dr. Lauren Pinter-Brown v. Regents of the University of California | Dr. Lauren Pinter-Brown | University of California | $13 million | Jury found sex discrimination and retaliation. Source |
| Janet Conney v. The Regents of the University of California | Dr. Janet Conney | University of California | $4.06 million | Sex discrimination and retaliation case. Source |
| University of Rochester Settlement | Multiple plaintiffs | University of Rochester | $9.4 million | Retaliation after sexual misconduct claims. Source |
| Keyzer v. Regents of Univ. of California | University of California | University of California | Whistleblower Protection Act | $730,000 |

| Plaintiff | Defendant | Award Amount | Description |
|---|---|---|---|
| **EEOC on behalf of 32 workers** | Hill County Farms (Henry's Turkey Service) | $241.3 million | 32 intellectually disabled men were subjected to severe abuse and discrimination over years. The jury awarded $5.5 million in compensatory and $2 million in punitive damages per individual. Source |
| **Marlo Spaeth** | Walmart Stores East LP | $125 million | A woman with Down syndrome was fired after Walmart changed her schedule, ignoring her disability-related needs. The jury awarded $125 million in punitive damages and $150,000 in compensatory damages. Source |
| **Unnamed Deaf Employee** | Walmart | $5.2 million | A longtime deaf and visually impaired employee was suspended and effectively terminated after Walmart refused to accommodate his disabilities. The jury awarded $200,000 in compensatory and $5 million in punitive damages. Source |

**Denial of Disability Accommodations**

| Case | Defendant | Award Amount | Description |
|---|---|---|---|
| **Marlo Spaeth v. Walmart** | Walmart Stores East LP | $125 million (punitive), | A woman with Down syndrome was fired after Walmart changed her schedule, |

| Case | Defendant | Award Amount | Description |
|---|---|---|---|
| | | $150,000 (compensatory) | ignoring her disability-related needs. Source |
| EEOC v. Hill County Farms | Hill County Farms (Henry's Turkey Service) | $241.3 million | 32 intellectually disabled men were subjected to severe abuse and discrimination over years. The jury awarded $5.5 million in compensatory and $2 million in punitive damages per individual. Source |
| EEOC v. McLane Northeast | McLane Northeast | $1.675 million | A qualified deaf applicant was denied employment after requesting an ASL interpreter for the interview. Source |
| EEOC v. Walmart | Walmart | $5.2 million | A longtime deaf and visually impaired employee was suspended and effectively terminated after Walmart refused to accommodate his disabilities. Source |
| Aleeha Dudley v. Miami University | Miami University | $285,000 | A blind student faced discrimination due to inaccessible course materials. Source |
| David Papandrea v. City of Bridgeport | City of Bridgeport | $52,500 | A former data analyst claimed wrongful termination under the ADA after the city failed to provide reasonable accommodations following a car accident. Source |
| Clarence Muse v. Howard University | Howard University | $35,000 | Muse, who has diabetes, was denied a security officer position despite his qualifications. Source |
| Natasha Abrahart's Family v. University of Bristol | University of Bristol | Undisclosed | The university was found to have contributed to the suicide of a student with chronic social anxiety by failing to make reasonable adjustments. Source |
| Jacob Meagher v. University of Cambridge | University of Cambridge | Ongoing | A PhD student alleges disability discrimination after a job offer was withdrawn following his failure in an oral exam, claiming the university did not accommodate his disability. Source |
| Sarah Hernandez v. Enfield Board of Education | Enfield Board of Education | $1.3 million (attorney fees) | Although awarded only $10 in damages, the court mandated the town to pay $1.3 million in attorney fees after failing to |

| Case | Defendant | Award Amount | Description |
|---|---|---|---|
| Enfield Board of Education | | | provide equal access to a board member with disabilities. Source |

**Misuse of Federal Funding**

| Case | Defendant | Award Amount | Description |
|---|---|---|---|
| U.S. v. Biogen Inc. | Biogen Inc. | $900 million | Biogen agreed to pay to settle a lawsuit alleging the company paid kickbacks to physicians to prescribe its multiple sclerosis drugs. Source |
| TAP Pharmaceuticals | TAP Pharmaceuticals Inc. | $875 million | Settled allegations of Medicare and Medicaid fraud, including paying kickbacks to doctors. Source |
| Amgen | Amgen Inc. | $762 million | Settled allegations of illegal marketing and kickbacks related to its anemia drug Aranesp. Source |
| HCA Inc. | HCA Inc. | $631 million | Settled Medicare fraud charges involving inflated expenses for reimbursement. Source |
| Johnson & Johnson | Johnson & Johnson | $2.2 billion | Settled allegations of illegal marketing and kickbacks related to several drugs. Source |
| Pfizer | Pfizer Inc. | $2.3 billion | Settled allegations of illegal promotion of drugs for non-FDA approved uses. Source |
| Merck | Merck & Co. | $650 million | Settled allegations of overcharging Medicaid for drugs. Source |
| Abbott Laboratories | Abbott Laboratories | $1.6 billion | Settled allegations of illegal marketing of the drug Depakote. Source |
| Louis Berger Group | Louis Berger Group | $69.3 million | Settled allegations of overbilling the U.S. government for reconstruction contracts in Iraq and Afghanistan. Source |
| Office Depot | Office Depot | $68.5 million | Settled allegations of overcharging government entities for office supplies. Source |

**Defamation**

| Case | Defendant | Award Amount | Description |
|---|---|---|---|
| Dominion Voting Systems v. Fox News Network | Fox News Network | $787.5 million | Fox News agreed to pay to settle a defamation lawsuit alleging the network made false claims about Dominion's voting machines. Source |
| Gibson's Bakery v. Oberlin College | Oberlin College | $36.59 million | The college was found liable for defamation and other claims after supporting protests accusing the bakery of racism. Source |
| Depp v. Heard | Amber Heard | $10 million (compensatory), $350,000 (punitive) | Johnny Depp was awarded damages in a defamation lawsuit against Amber Heard. Source |
| WFAA-TV v. Vic Feazell | WFAA-TV | $58 million | A jury awarded damages to a former district attorney over a series of broadcasts accusing him of misconduct. Source |
| The Wall Street Journal v. MMAR Group Inc. | The Wall Street Journal | $22.7 million | A brokerage firm sued over an article alleging business malpractices. Source |

**Whistleblower Retaliation**

| Case | Defendant | Award Amount | Description |
|---|---|---|---|
| U.S. v. Biogen Inc. | Biogen Inc. | $250 million (whistleblower award) | A former employee received a record-shattering award for exposing kickbacks to physicians. Source |
| J.P. Morgan Chase | J.P. Morgan Chase | $63.9 million (whistleblower award) | A former vice president received a reward for reporting fraudulent mortgage practices. Source |
| Johnson & Johnson | Johnson & Johnson | $167.7 million (whistleblower awards) | Whistleblowers exposed illegal marketing and kickback schemes. Source |
| Abbott Laboratories | Abbott Laboratories | $84 million (whistleblower awards) | Whistleblowers exposed illegal marketing of Depakote. Source |

| Case | Defendant | Award Amount | Description |
|------|-----------|--------------|-------------|
| **Pfizer** | Pfizer Inc. | $102 million (whistleblower awards) | Whistleblowers exposed illegal promotion of drugs. Source |
| **Merck** | Merck & Co. | $69 million (whistleblower award) | A whistleblower exposed overcharging Medicaid for drugs. Source |
| **Jane Turner v. FBI** | FBI | $360,000 (capped) | An FBI whistleblower was awarded damages for retaliation after reporting misconduct. Source |
| **John Barnett's Family v. Boeing** | Boeing | Undisclosed | The family of a whistleblower who raised safety concerns settled with Boeing after his death. Source |

| Case | Institution | Amount | Details |
|------|-------------|--------|---------|
| McQueary v. Pennsylvania State University | Pennsylvania State University | $5 million | Wrongful termination after the plaintiff testified against university officials in a high-profile abuse case. |
| James Crowley v. Chicago State University | Chicago State University | $4.3 million | Retaliation after reporting misconduct by university officials; jury awarded damages for wrongful termination. |

**Mental Harassment (continued and related examples)**

| Case | Institution | Amount | Details |
|------|-------------|--------|---------|
| Dr. Carol Warfield v. Beth Israel Deaconess Medical Center (Harvard-affiliated) | Harvard Medical (Beth Israel) | $7 million | Dr. Warfield, an anesthesiologist, sued for gender discrimination and harassment, including mental anguish from being excluded and silenced. |
| University of Southern California – Multiple Title IX Harassment Cases | USC | Over $1.1 billion total (multiple cases) | Series of sexual harassment lawsuits involving campus gynecologist George Tyndall; included extensive emotional harm and mental health damages. |
| Dartmouth College Title IX Class Action | Dartmouth College | $14 million | Settled with nine female students alleging sexual harassment, gender discrimination, and emotional trauma by faculty in the psychological sciences department. |

| Violation Category | Top University/College Case | Amount |
|---|---|---|
| Retaliation | Dr. Lauren Pinter-Brown v. UCLA | $14 million |
| Disability Discrimination | EEOC v. Hill County Farms (not university) | $241.3 million |
| Denial of Disability | Marlo Spaeth v. Walmart (for context) | $125 million |
| Misuse of Federal Funding | Xavier University of Louisiana | $12.3 million |
| Defamation | Gibson's Bakery v. Oberlin College | $36.59 million |
| Whistleblower Retaliation | McQueary v. Penn State | $5 million |
| Mental Harassment | USC Sexual Abuse Scandal | Over $1.1 billion (total settlements) |

| Case | Plaintiff | Defendant | Award/Settlement | Notes |
|---|---|---|---|---|
| Law School Admission Council Settlement | DOJ | LSAC | $7.73 million | Disability discrimination in LSAT accommodations. Source |
| University of Denver Settlement | EEOC | University of Denver | $2.66 million | Pay discrimination against female professors. Source |
| Howard University Settlement | EEOC | Howard University | $35,000 | Refusal to hire due to applicant's diabetes. Source |

| Case | Defendant | Action Taken | Notes | |
|---|---|---|---|---|
| Harvard University | Federal Government | $2.65 billion in grant cuts | Alleged failure to address discrimination and antisemitism. Source | |

| Case | Plaintiff | Defendant | Award/Settlement | Notes |
|---|---|---|---|---|
| Gibson's Bakery v. Oberlin College | Gibson's Bakery | Oberlin College | $36.59 million | Defamation and tortious interference. Source |

**More Related to University**

**Civil Rights / Title IX (Sexual Harassment, Assault, or Gender Discrimination)**
- **$14.5 Million** – **University of Oregon** (2018) to a student athlete who reported sexual assault and alleged the school failed to protect her (Title IX violation).
- **$10.3 Million** – **University of California, Berkeley** (2022) to a student sexually assaulted by a staff member (Title IX negligence).
- **$6.5 Million** – **University of Colorado** (2007) to a student raped by football players (Title IX failure).

**2. Racial Discrimination**
- **$4.5 Million** – **Clemson University** (2023) to a Black professor in a racial discrimination and retaliation lawsuit.
- **$1.5 Million** – **University of Illinois** (2019) to a Black former employee in a racial harassment case.

**3. Disability Discrimination**
- **$10 Million** – **Liberty University** (2023) to a deaf student denied proper accommodations (settlement included policy changes).
- **$1.75 Million** – **University of California, San Francisco** (2018) to a medical resident with ADHD who faced discrimination.

**4. Retaliation (Whistleblowers, Faculty, Employees)**
- **$3.5 Million** – **Penn State University** (2021) to a whistleblower who exposed misuse of federal research funds.
- **$1.2 Million** – **University of Minnesota** (2017) to a professor retaliated against for reporting misconduct.

**5. Employment Discrimination (Gender, Age, Tenure Denial)**
- **$2.5 Million** – **Harvard University** (2022) to a female professor denied tenure in a gender bias lawsuit.
- **$1.1 Million** – **University of North Carolina** (2019) to an older employee in an age discrimination case.

**1. Civil Rights / Title IX (Sexual Harassment, Assault, or Gender Discrimination)**
- **$14.5 Million** – **University of Oregon** (2018) to a student athlete who reported sexual assault and alleged the school failed to protect her (Title IX violation).
- **$10.3 Million** – **University of California, Berkeley** (2022) to a student sexually assaulted by a staff member (Title IX negligence).

- **$6.5 Million** – **University of Colorado** (2007) to a student raped by football players (Title IX failure).

## 2. Racial Discrimination

- **$4.5 Million** – **Clemson University** (2023) to a Black professor in a racial discrimination and retaliation lawsuit.
- **$1.5 Million** – **University of Illinois** (2019) to a Black former employee in a racial harassment case.

## 3. Disability Discrimination

- **$10 Million** – **Liberty University** (2023) to a deaf student denied proper accommodations (settlement included policy changes).
- **$1.75 Million** – **University of California, San Francisco** (2018) to a medical resident with ADHD who faced discrimination.

## 4. Retaliation (Whistleblowers, Faculty, Employees)

- **$3.5 Million** – **Penn State University** (2021) to a whistleblower who exposed misuse of federal research funds.
- **$1.2 Million** – **University of Minnesota** (2017) to a professor retaliated against for reporting misconduct.

## 5. Employment Discrimination (Gender, Age, Tenure Denial)

- **$2.5 Million** – **Harvard University** (2022) to a female professor denied tenure in a gender bias lawsuit.
- **$1.1 Million** – **University of North Carolina** (2019) to an older employee in an age discrimination case.

**Notable Retaliation Cases Involving Educational Institutions**

Here are some significant cases where plaintiffs received substantial awards due to retaliation by universities or non-profit institutions:

**1. Dr. Kevin Murphy v. University of California, San Diego**

- **Award**: Over $39 million
- **Details**: Dr. Murphy alleged retaliation after reporting misuse of a $10 million donation intended for cancer research. The jury found in his favor, awarding significant damages.

**2. Gibson's Bakery v. Oberlin College**

- **Award**: $36.59 million
- **Details**: The bakery sued Oberlin College for defamation and tortious interference after the college supported student protests accusing the bakery of racism. The jury awarded substantial damages, later reduced due to state caps.

**3. University of Rochester Settlement**

- **Award**: $9.4 million

- **Details**: Nine plaintiffs alleged that the university retaliated against them after they reported sexual harassment by a professor. The case settled for $9.4 million.

**4. Dr. Lauren Pinter-Brown v. Regents of the University of California**

- **Award**: $13 million
- **Details**: Dr. Pinter-Brown claimed gender discrimination and retaliation after reporting harassment. The jury awarded her $13 million in damages.

**5. Dr. Jeannie Lochhead and Dr. Michele Nelson v. UC Riverside**

- **Award**: $6.1 million
- **Details**: The plaintiffs alleged whistleblower retaliation after reporting misuse of funds. The jury awarded them $6.1 million.

**Constitutional amendments Draft**

**Proposed Constitutional Amendments** (Note: through relevant channels if not Hon'ble Court/agencies due to separation of powers)

**U.S. Constitution**

1. **Educational Due Process Amendment**

   o "No private educational institution receiving federal funds shall deprive any person of life, liberty, or property without due process of law, including fair notice, an impartial hearing, the right to confront evidence, and access to legal counsel."

   o **Purpose**: Extends Fifth and Fourteenth Amendment protections to private universities to address arbitrary expulsions and terminations (Complaint, Claims 1, 8, 46). Addresses gaps in the "state action" doctrine (*Rendell-Baker v. Kohn*, 457 U.S. 830, 1982).

2. **Academic Freedom and Free Expression Amendment**

   o "The rights of academic freedom, free speech, association, and petition shall not be abridged by any public or private educational institution receiving federal funds, through censorship, retaliation, surveillance, or discriminatory policies."

   o **Purpose**: Protects against viewpoint discrimination, whistleblower retaliation, and suppression of dissent (Claims 13, 27, 32). Expands *Tinker v. Des Moines*, 393 U.S. 503 (1969), to private institutions.

3. **Educational Privacy and Digital Security Amendment**

   o "The right of students and employees in educational institutions to be secure in their personal data and communications against unreasonable searches and seizures shall not be violated, absent judicial oversight and individualized suspicion."

   o **Purpose**: Addresses unauthorized surveillance and data breaches (Claims 2, 18, 81). Extends *Carpenter v. United States*, 138 S. Ct. 2206 (2018), to educational contexts.

4. **Academic Whistleblower Protection Amendment**

   o "Congress shall enforce, by appropriate legislation, the right of students and employees to report institutional misconduct without retaliation, including immunity from academic or professional penalties and access to remedies."

   o **Purpose**: Shields whistleblowers from retaliation (Claims 9, 30, 97). Provides constitutional backing beyond statutes like the False Claims Act (31 U.S.C. § 3730(h)).

5. **Educational Integrity and Equity Amendment**

- "No institution receiving federal funds shall engage in misrepresentation, discriminatory practices, or arbitrary denial of educational opportunities, ensuring equal protection and transparency in academic operations."

- **Purpose**: Addresses deceptive practices, discrimination, and unequal treatment (Claims 20, 28, 36). Extends Equal Protection Clause principles (*Brown v. Board of Education*, 347 U.S. 483, 1954) to private institutions.

6. **Higher Education Accountability Amendment**

- "Congress shall establish oversight mechanisms for private educational institutions receiving federal funds to ensure compliance with constitutional standards, including due process, non-discrimination, and anti-retaliation mandates."

- **Purpose**: Addresses governance failures and financial misconduct (Claims 14, 24, 55). Creates a federal framework for accountability under the Spending Clause (Art. I, § 8).

7. **Educational Justice and Right to Counsel Amendment**

- "Individuals facing academic or disciplinary proceedings in federally funded institutions shall have the right to legal counsel, akin to protections in civil judicial proceedings, to ensure fairness and access to justice."

- **Purpose**: Ensures representation in disciplinary hearings (Claims 15, 43). Inspired by *Gideon v. Wainwright*, 372 U.S. 335 (1963), for civil academic contexts.

8. **Retaliation Protections for Students**

- Does the First Amendment adequately protect students in educational institutions public or private from retaliatory actions for whistleblowing, dissent, or filing complaints against authority figures?
- Should a new constitutional doctrine be developed to recognize retaliation in academic settings as a civil rights violation, regardless of whether the actor is a state or private entity receiving public funds?
- **Text:** "No student or academic participant in an institution of higher education shall suffer retaliation for reporting misconduct, expressing dissent, or participating in lawful grievance processes. This right shall apply in both public and private institutions receiving federal funding or tax-exempt status."
- **Purpose:** Codifies protection against retaliation beyond current First Amendment and Title IX doctrines, recognizing the power imbalance in academia.

9. **Distinction Between Educational Institutions and Corporations**

- **Should private educational institutions that receive significant public funding or tax-exempt status be constitutionally distinguished from for-profit corporations in terms of duties of transparency, due process, and student rights?**

- o **Can Congress constitutionally create a hybrid legal classification for such institutions neither purely private nor fully public akin to "quasi-public fiduciary institutions" with heightened responsibility to protect civil liberties?**
- o **Text:** "Educational institutions receiving public funds, federal grants, or tax-exempt benefits shall not be treated solely as private entities under the law. They shall be subject to enhanced standards of transparency, fairness, and accountability to the public and students."
- o **Purpose:** Prevents institutions from evading constitutional scrutiny by claiming private status while receiving public benefit.

**10. Student Rights as Future Citizens**

- o Should the Constitution explicitly recognize students especially those in higher education as a protected class deserving of affirmative rights to education, expression, safety, and fair process?
- o Does the absence of robust student protections in private institutions undermine national interest in cultivating informed, empowered citizens, thereby justifying a federal constitutional amendment?
- o **Text**: "All students in the United States shall have the constitutional right to fair treatment, protection from abuse, and access to due process in educational institutions. Given their role in shaping the future of the nation, students shall be accorded enhanced legal protection against institutional overreach or neglect."
- o **Purpose:** Elevates student protections to a national interest, recognizing their foundational role in democracy and innovation.

**11. Educational Terrorism Doctrine Amendment**

- o "Systemic suppression of speech, retaliation, or obstruction of due process in educational institutions shall be deemed a constitutional violation, subject to federal remedies."
- o **Purpose**: Codifies "educational terrorism" as a harm (Claim 105), addressing systemic abuses like coordinated retaliation and surveillance (Claims 31, 33).

**Illinois Constitution**

1. **Educational Quality and Consumer Protection Amendment**

   - o "All persons shall have a right to a quality education in public and private institutions, with the State empowered to enforce standards of academic integrity, transparency, and protection against deceptive practices."
   - o **Purpose**: Addresses misrepresentation and inadequate educational delivery (Claims 20, 21, 50). Enhances Ill. Const. art. X, § 1.

2. **Student and Employee Whistleblower Protection Amendment**

- "No person shall face retaliation for reporting violations of law or policy in educational institutions, with the State ensuring protections and remedies, including compensatory damages."

- **Purpose**: Strengthens protections against retaliation (Claims 17, 30). Reinforces Illinois Whistleblower Act (740 ILCS 174/).

3. **Student Labor Rights Amendment**

- "Student workers in educational institutions shall have the right to legal representation in all employment disputes, regardless of union status, with state enforcement mechanisms."

- **Purpose**: Addresses inadequate union representation (Claims 4, 6). Expands Ill. Const. art. I, § 18.

4. **Nonprofit Accountability and Tax-Exemption Amendment**

- "Tax-exempt educational institutions engaging in discriminatory, retaliatory, or fraudulent conduct shall forfeit their exemption status, subject to state oversight."

- **Purpose**: Addresses misuse of tax-exempt status (Claims 15, 16, 55). Aligns with Ill. Const. art. IX, § 6.

5. **Educational Equity and Disability Protections Amendment**

- "The State shall ensure equitable access to education, including proportionate funding for disability accommodations, in all educational institutions."

- **Purpose**: Addresses failure to provide accommodations (Claims 11, 48). Enhances Ill. Const. art. X, § 1.

6. **International Student Protection Amendment**

- "International students in educational institutions shall be protected from administrative abuses tied to their visa status, with state remedies for discrimination or retaliation."

- **Purpose**: Addresses SEVIS misconduct and discrimination (Claims 41, ~~73~~).

## University of Chicago Governing Documents

1. **Student Bill of Rights**

- "Students shall have the right to due process, free expression, equal treatment, and access to independent grievance processes, with transparent appeal mechanisms."

- **Purpose**: Addresses procedural violations (Claims 8, 45, 46).

2. **Institutional Accountability and Transparency**

- "The University shall maintain a transparent governance structure with student and faculty representation, subject to external audits, and publish all policies affecting rights."

- o **Purpose**: Addresses governance manipulation and lack of transparency (Claims 24, 49).

3. **Whistleblower Protection Clause**

   - o "No student or employee shall face retaliation for reporting misconduct, with guarantees of anonymous reporting, independent counsel, and remedies for violations."

   - o **Purpose**: Prevents whistleblower retaliation (Claims 9, 97).

4. **Surveillance Transparency Policy**

   - o "Electronic monitoring of students or employees requires individualized suspicion, advance notice, and disclosure of evidence, except in exigent circumstances."

   - o **Purpose**: Addresses unauthorized surveillance (Claims 32, 34).

5. **Disability Rights Framework**

   - o "The University shall provide mandatory disability accommodations, with clear compliance mechanisms and remedies for neglect."

   - o **Purpose**: Addresses accommodation failures (Claims 11, 100).

6. **International Student Protections**

   - o "International students shall be protected from retaliatory actions affecting visa status, with transparent SEVIS reporting processes."

   - o **Purpose**: Addresses SEVIS abuses (Claims 40, 41).

7. **Disciplinary Evidence Disclosure Requirement**

   - o "All disciplinary proceedings shall include full disclosure of evidence, including metadata and logs, to ensure fairness and transparency."

   - o **Purpose**: Addresses falsification and biased proceedings (Claims 7, 8).

**Procedural Due Process**

1. Does the Fifth and Fourteenth Amendments' Due Process Clause, as interpreted in *Mathews v. Eldridge*, 424 U.S. 319 (1976), adequately protect students in private institutions receiving federal funds, or should Congress amend the Constitution to mandate uniform procedural safeguards? (*Novel* since Not extended to private universities; *Rendell-Baker v. Kohn*, 457 U.S. 830, 1982, limits state action.)

2. Should the U.S. Constitution explicitly require private educational institutions to adhere to due process standards akin to those for state actors under *Board of Regents v. Roth*, 408 U.S. 564 (1972)? (No case extends *Roth* to private entities.)

3. Is the Illinois Constitution's due process provision (Ill. Const. art. I, § 2) sufficient to address arbitrary disciplinary actions in private universities, or does it require amendment? (No Illinois case applies this to private institutions.)

4. Does excluding a student from their own disciplinary vote without transparency violate the Fourteenth Amendment's Due Process Clause, particularly when voting records and decision-making processes are withheld? (Unaddressed for private universities.)

5. Should universities exercising quasi-judicial authority in disciplinary proceedings be subject to greater judicial scrutiny under the Due Process Clause, akin to administrative agencies? (No precedent mandates this for private institutions.)

6. Should courts be constitutionally required to expedite educational disputes involving imminent harm, such as expulsion or visa cancellation, to ensure timely due process? (No constitutional mandate exists.)

**Free Speech and Academic Freedom**

7. Should the First Amendment be amended to explicitly protect academic freedom in private institutions, balancing institutional autonomy with individual rights, given *Tinker v. Des Moines*, 393 U.S. 503 (1969)? (*Tinker* applies to public schools.)

8. Does the University of Chicago's Kalven Report commitment to free expression create a contractual obligation enforceable under the First Amendment or state law? (No case addresses this.)

9. Should the Illinois Constitution include a provision protecting academic speech to prevent viewpoint discrimination? (No state provision exists.)

10. Does retaliatory expulsion for whistleblowing or grievance filing violate the First Amendment's Petition Clause, even at private institutions? (Unaddressed for private entities.)

11. Should universities be barred from viewpoint discrimination in student elections under the Free Speech Clause? (No precedent applies this to private university elections.)

12. To what extent does systematic surveillance by a university police department (e.g., UCPD) infringe on First Amendment rights to free speech and association in activism contexts? (No case addresses private university police.)

**Equal Protection and Discrimination**

13. Does the Equal Protection Clause (U.S. Const. amend. XIV, § 1), as applied in *Brown v. Board of Education*, 347 U.S. 483 (1954), require extension to private institutions to address systemic discrimination based on disability, religion, or national origin? (Since *Brown* applies to public entities.)

14. Are federal statutes like Title VI and Title IX sufficient, or should the U.S. Constitution impose direct equal protection obligations on private universities receiving public funds? (No constitutional provision exists.)

15. Should the Illinois Constitution's equal protection clause (Ill. Const. art. I, § 2) explicitly prohibit discrimination in private educational settings? (No state case extends this.)

16. Does disparate treatment of international students (e.g., SEVIS misuse) violate the Equal Protection Clause under a "class of one" theory? (Unaddressed in this context.)

17. Why does the Equal Protection Clause not consistently protect graduate students, who face unique vulnerabilities like coerced loans and academic retaliation? (No case addresses graduate-specific protections.)

**Privacy Rights**

18. Should the Fourth Amendment be amended to address privacy violations from institutional surveillance in educational contexts, given *Carpenter v. United States*, 138 S. Ct. 2206 (2018)? (*Carpenter* does not cover educational settings.)

19. Does the Illinois Constitution's privacy provision (Ill. Const. art. I, § 6) adequately protect students from unauthorized data collection, or is an educational privacy amendment needed? (No case applies this to private universities.)

20. Should the University of Chicago's governing documents include a privacy charter to prevent data breaches? (No such policy exists.)

21. Does Ill. Const. art. I, § 6 prohibit universities from warrantless student surveillance on private property? (Unaddressed in this context.)

22. Should the U.S. Constitution include a right to digital security in educational institutions to prevent unauthorized data access? (No provision exists.)

**Labor and Employment Rights**

23. Does the National Labor Relations Act (29 U.S.C. § 151 et seq.) require constitutional backing to ensure fair union representation for student workers in private universities? (*NLRB v. Yeshiva University*, 444 U.S. 672, 1980, does not cover students.)

24. Should the U.S. Constitution include a right to fair labor practices in educational institutions to address autocratic employment actions? (*No* constitutional provision exists.)

25. Is the Illinois Constitution's labor provision (Ill. Const. art. I, § 19) sufficient to protect student employees, or does it need amendment for private universities? ( No case extends this.)

26. Should Ill. Const. art. I, § 18 mandate legal representation for student workers in grievances? ( No such mandate exists.)

27. Can a labor union's refusal to represent a whistleblower in academic discipline violate constitutional rights to association or due process? ( Unaddressed in this context.)

**Educational Rights**

28. Should the U.S. Constitution recognize a fundamental right to education, extending *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), to include quality standards in private institutions? (~~*Rodriguez* rejected this.~~)

29. Does the Illinois Constitution's education article (Ill. Const. art. X, § 1) imply a right to equitable educational delivery in private universities, or should it be amended? ( No case clarifies this.)

30. Should the University of Chicago's governing documents guarantee an enforceable minimum standard of educational quality? ( No such guarantee exists.)

**31.** Should Ill. Const. art. X, § 1 require proportional funding for disability accommodations in education. ( No provision mandates this.)

**Whistleblower Protections**

32. Should the U.S. Constitution include a whistleblower protection amendment to shield students and employees from retaliation in educational institutions? ( No constitutional provision exists.)

33. Does the Illinois Whistleblower Act (740 ILCS 174/) require constitutional reinforcement for private university contexts? ( No state constitutional provision exists.)

34. Should the University of Chicago adopt a legally enforceable whistleblower policy? (No such policy exists.)

**35.** Should the 13th Amendment (anti-coercion) or Fifth Amendment (self-incrimination) protect student whistleblowers from institutional retaliation? ( Unaddressed in this context.)**Institutional Accountability**

36. Should Congress amend the U.S. Constitution to create a federal oversight mechanism for private universities receiving public funds? (No constitutional provision exists.)

37. Does the Illinois Constitution need a provision to hold private educational institutions accountable for fiduciary and legal violations? (No state provision exists.)

38. Should the University of Chicago mandate external audits for legal compliance? (No such requirement exists.)

39. Does Ill. Const. art. IX, § 6 permit revocation of tax-exempt status for universities engaging in discriminatory or retaliatory conduct? ( Unaddressed in this context.)

40. Should the IRS, DOJ, and Congress investigate private universities for misuse of federal funds under the Spending Clause (Art. I, § 8)? ( No constitutional mandate exists.)

41. Should UChicago's disciplinary procedures be subject to external judicial review if they receive public funds? ( No such requirement exists.)

42. Should UChicago be required to publish all silent policy changes affecting rights? ( No such policy exists.)

**Disability Rights**

43. Does the ADA (42 U.S.C. § 12101 et seq.) require constitutional support to enforce accommodations in private universities? ( *Tennessee v. Lane*, 541 U.S. 509, 2004, applies to public contexts.)

44. Should the Illinois Constitution guarantee disability accommodations in educational settings? ( No state provision exists.)

45. Should the University of Chicago include a mandatory disability rights framework? ( No such framework exists.)

**International Students and Immigration**

46. Should the U.S. Constitution address the intersection of immigration status and educational rights to prevent discriminatory treatment of international students? (No provision exists.)

47. Does the Illinois Constitution need an amendment to protect international students from visa-related administrative abuses? (No state provision exists.)

48. Should the University of Chicago include protections for international students against retaliatory immigration actions? (No such policy exists.)

**49.** Is there a constitutional duty for universities to act as caretakers for international students under the Fourteenth Amendment? (Unaddressed in this context.)

**Deep and Fundamental Questions**

50. Should the U.S. Constitution include a right to transparency in private university disciplinary proceedings to prevent pretextual justifications? ( No provision exists.)

51. Does the First Amendment's Free Exercise Clause require amendment to protect religious minorities in private universities from discrimination? (No case extends this to private institutions.)

52. Should the Illinois Constitution establish a right to equitable funding for student organizations to prevent discrimination? (No state provision exists.)

53. Should universities function as democracies, granting students governance rights to align with their democratic mission (*Healy v. James*, 408 U.S. 169, 1972)? (Unaddressed in constitutional law.)

54. Is academic freedom incompatible with autocratic university governance (e.g., unelected trustees), despite principles like the Kalven Report? (No case addresses this tension.)

55. When state labor laws (e.g., Illinois Whistleblower Act) and federal statutes (e.g., Title IX) conflict, which sovereignty prevails in campus civil rights disputes? ( Unresolved in federalism context.)

56. Can student-handbook contracts override constitutional rights, or are such policies unconscionable? (No case clarifies this.)

57. Is "educational terrorism" (systemic retaliation, surveillance) a constitutional harm under the 13th Amendment's anti-coercion principle? ( No such concept exists.)

58. Should there be a constitutional right to legal counsel for students in disciplinary hearings affecting academic or civil rights? ( No constitutional mandate exists.)

59. Does a student's expulsion for whistleblower or political conduct create a civil rights deprivation under 42 U.S.C. § 1983? ( Unaddressed for private institutions.)

60. Can academic institutions be investigated under the False Claims Act for misrepresenting services or misusing grants? ( Limited precedent in this context.)

61. Does the Kalven Report's neutrality principle conflict with federal obligations to investigate discrimination (e.g., Title IX)? (No case addresses this.)

62. Should private university police departments (e.g., UCPD) be subject to Fourth Amendment constraints, given their public-like powers? (No precedent exists.)

63. Should the U.S. Constitution mandate public accountability for non-profit educational institutions receiving tax benefits? (No provision exists.)

64. Do breaches of university grievance policies constitute due process violations, even in private institutions? (Unaddressed in this context.)

65. Should constitutional principles prevent the "chilling effect" on whistleblower activity in academia? (No specific constitutional provision exists.)

66. Do university governance structures require checks and balances akin to separation of powers to prevent abuses? (No precedent mandates this.)

**Statutory and Legislative Proposals**

1. **Higher Education Accountability and Civil Rights Act**

   o **Purpose**: Imposes uniform civil rights, due process, transparency, and anti-retaliation standards on federally funded universities, with audit frameworks.

   o **Details**: Requires transparency in disciplinary proceedings, whistleblower protections, and compliance with Title VI, Title IX, and ADA.

2. **Restriction on Federal Funds for Non-Compliant Institutions**

   o Prohibits federal or tax-exempt resources from being used for lobbying, foreign influence, or suppression of dissent.

   o Mandates loss of funding for violations under the Spending Clause (Art. I, § 8).

3. **Illinois Educational Consumer Protection Act**

   o Strengthens consumer protections against deceptive practices, misrepresentation, and arbitrary actions in education.

   o Provides remedies for breaches of academic contracts and fraud (Claims 19, ~~71~~).