[If you need additional space for ANY section, please attach an additional sheet and reference that section.]





FILED

12/8/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| | ) | **Case Number**: |
| | ) | |
| | ) | |
| Plaintiff | ) | **Judge:** |
| | ) | |
| v. | ) | |
| | ) | **Magistrate Judge:** |
| | ) | |
| Defendant | ) | |

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**Quantifying State Action: Integrating the Public Function, Nexus, Symbiotic Relationship, Coercion, and Entwinement Doctrines through the Integrated Public Function Matrix and State Actor Probability Index   A Next-Generation Framework for U.S. Constitutional Attribution**

*Author*: Dipesh Singla,

*Working Paper/ Draft*

*Cite as: Singla, Dipesh (2026). Quantifying state action: Integrating the public function, nexus, symbiotic relationship, coercion, and entwinement doctrines through the integrated public function matrix and state actor probability index: A next-generation framework for U.S. constitutional attribution [Unpublished manuscript],* dipeshsingla668@gmail.com, *+17734571046*

## Abstract

The state action doctrine, which determines when private conduct triggers constitutional protections, has long struggled with the blurring lines between public and private power in modern institutions. This techno-legal research proposes a comprehensive overhaul through two complementary analytical tools: the Integrated Public Function Matrix (IPFM) and the State Actor Probability Index (SAPI). The IPFM offers courts a structured method to evaluate when ostensibly private entities perform functions so entangled and functionally entwined with governmental authority that constitutional obligations should attach. It synthesizes the Supreme Court's fragmented tests: public function, nexus/coercion, symbiotic relationship, coercion, and functional entwinement into a weighted, multidimensional scoring system that quantifies governmental entanglement across four pillars: delegated sovereign powers, financial and structural dependence, functional entwinement, and public accessibility and accountability. Complementing this, the SAPI adapts these doctrines into a probabilistic, litigation-ready index with three components public function score, symbiosis/joint action score, and nexus/coercion score incorporating Bayesian updating to refine assessments as evidence emerges during discovery. Both frameworks draw on precedent from Marsh v. Alabama through Brentwood Academy v. Tennessee Secondary School Athletic Association and extend the analysis to hybrid institutions such as private universities with commissioned police, hospitals enforcing federal mandates, and digital platforms moderating speech under government pressure. By quantifying the degree of governmental dependence, delegation, and coercive authority across multiple dimensions, these models re-anchor state-action analysis in functional reality rather than formal labels, promoting consistent judicial outcomes, evidentiary rigor, and proportional remedies. The Article maps their alignment with existing case law, illustrates applications through hypothetical and real-world case studies, anticipates counterarguments, and concludes by outlining judicial and legislative implementation strategies such as amendments to 42 U.S.C. § 1983 and federal funding transparency rules that balance constitutional accountability with institutional autonomy, ensuring accountability without eroding institutional independence.

## I Introduction: The Vanishing Boundary Between Public and Private Power

The state action doctrine of the twentieth century turned on a straightforward premise: the Constitution's constraints apply to governmental actors, not to private ones.[4] In an era of distinct spheres, that line held firm. But the rise of the modern administrative and digital state has eroded it entirely. Consider private universities that maintain commissioned police forces with full arrest powers;[64] hospitals that administer care under binding federal mandates;[60] or social media platforms that shape public discourse in response to official directives.[70] These institutions, private in name, discharge functions that are public in every meaningful sense.

Judges, confronting this shift, have faltered. The Supreme Court's arsenal of tests the public function inquiry, the state compulsion doctrine, the nexus analysis, and the symbiotic relationship standard each illuminates one angle of governmental involvement, but none provides a cohesive lens for the intricate hybrids of our time.[2] The result is a body of law prone to erratic application, where formal status too often trumps functional reality.

The public function test, for instance, crystallized in *Jackson v. Metropolitan Edison Co.*,[8] deems a private entity a state actor only if it undertakes a role "traditionally the exclusive prerogative of the State."[8] This sets a high bar. Education, for all its societal weight, falls short: private schools long antedated the Constitution.[8] Lower courts have thus cabined the doctrine to exceptional domains, such as company towns or primary elections.[13] By contrast, the coercion test, drawn from *Blum v. Yaretsky*,[1] probes whether the state has "exercised coercive power" or "provided such significant encouragement" that the private choice bears its imprint.[1] Mere regulation will not suffice; the government must exert something approaching dominion.[1] This approach, while capturing overt direction, proves stubbornly narrow. It overlooks the subtler instruments of contemporary influence the conditional grants that tether funding to compliance, the accreditation regimes that dictate internal norms, or the reporting duties that embed federal oversight into daily operations. These "soft" levers, no less commanding than edicts, evade scrutiny.

Where coercion falters, the nexus test refined in *Lugar v. Edmondson Oil Co.*[9] and its line of cases steps in, asking whether the private party has become a "willful participant in joint activity with the State or its agents."[9] This standard governs scenarios of shared endeavor: a private investigator aiding a public probe, or a firm collaborating on enforcement.[9] Yet its application remains elusive. Collaborative ventures like interagency task forces, grant-fueled research consortia, or congressionally imposed disciplinary protocols straddle the divide between partnership and subjugation, yielding rulings as varied as the panels that issue them. Finally, the symbiotic relationship test, first articulated in *Burton v. Wilmington Parking Authority*,[3] identifies state action in arrangements of profound mutual reliance, where public and private fortunes are "so enmeshed" that each sustains the other's purpose.[3] Though the Court has since retreated from its potentially expansive reach,[12] the test's core observation endures: interdependence can infuse private decisions with public character, rendering the boundary between the two illusory.

Beginning with *Marsh v. Alabama*[10] and continuing through *Rendell-Baker v. Kohn*[12] and *Lugar*,[9] the Court has repeatedly circled back to a singular question: when is private conduct "fairly attributable to the state"?[9] The answers, however, form less a coherent architecture than a loosely stitched quilt serviceable in patches, but fraying at the seams. In sum, the doctrine veers unpredictably from overinclusion in symbiotic thickets to underinclusion amid coercive shadows. By evaluating these elements in isolation, the Court masks their interplay, the very alchemy that often tips conduct into the constitutional realm.

To bridge this divide, this Article introduces two intertwined frameworks: the Integrated Public Function Matrix (IPFM) and the State Actor Probability Index (SAPI). The IPFM weaves the Court's disparate doctrines public function, nexus and joint action, symbiotic relationship, coercion, and entwinement into a single, weighted matrix. It assesses entanglement along four axes: delegated sovereign powers, financial and structural dependence, functional entwinement, and public accessibility and accountability. Each dimension yields a score drawn from concrete evidence, yielding a composite that presumes state action above a calibrated threshold. For the courtroom, the SAPI distills these same elements into a probabilistic index, structured around three core scores public function, symbiosis and joint action, and nexus or coercion with Bayesian updates to incorporate emerging facts from discovery. Together, these tools transform the doctrine's qualitative intuitions into quantifiable assessments, ensuring that constitutional safeguards attach precisely where state power operates through private channels, without sweeping in all nongovernmental conduct.

Rooted in the arc of Supreme Court precedent from *Marsh*[10] to *Brentwood Academy v. Tennessee Secondary School Athletic Association*,[2] the IPFM and SAPI extend naturally to today's emblematic hybrids: universities wielding delegated authority, hospitals bound by regulatory strings, and platforms entangled in public speech governance. What follows traces their doctrinal foundations, applies them to pressing contexts, and charts paths for judicial adoption, legislative codification, and administrative enforcement restoring rigor to the doctrine while preserving space for genuine private autonomy.

## II. Literature Review

The state action doctrine has long been a crucible for constitutional scholarship, reflecting tensions between formalist boundaries and functional imperatives in an era of diffused governance. Early treatments, such as Charles Black's seminal 1967 Harvard Law Review Foreword, framed the doctrine as a bulwark against the privatization of discrimination, critiquing its underinclusiveness in the wake of *Shelley v. Kraemer*[83] and urging a broader conception of "state action" to enforce the Fourteenth Amendment's promise of equality.[67] Black's analysis, rooted in the Reconstruction Amendments' egalitarian thrust, highlighted how doctrinal rigidity allowed private actors to evade public accountability a theme echoed in subsequent works.[67]

Mid-century scholarship deepened this functional turn. In a 1985 University of Colorado Law Review article, Donald Regan dissected the doctrine's "problem" as one of principled line-drawing, arguing that neither textualism nor pragmatism alone suffices; instead, courts must weigh the "moral responsibility" of private entities wielding public-like power.[76] Regan's essay

prefigured critiques of the Court's "patchwork" approach, influencing later calls for synthesis.[76] Similarly, Robert Post's 1990 Harvard Law Review piece on public discourse reframed state action through a First Amendment lens, positing that private forums assuming "structural" roles in democratic deliberation such as newspapers or platforms invite constitutional scrutiny to safeguard speech rights.[75] Post's structuralist view, emphasizing systemic effects over binary classifications, laid groundwork for analyzing digital intermediaries.[75]

The 1990s and early 2000s saw antitrust analogies enrich the discourse. Erwin Chemerinsky's comprehensive *Constitutional Law* treatise (first ed. 1987, now in its 6th) devotes chapters to state action's evolution, cataloging its underinclusiveness in cases like *Rendell-Baker* and advocating for a "cumulative effects" test to capture symbiotic ties.[68] Complementing this, David Strauss's 1993 Constitutional Commentary article traced post-Civil Rights Era shifts, observing how the doctrine ossified into formalism amid conservative retrenchment, yet retained pockets of flexibility in entwinement analyses like *Brentwood*.[78] Strauss warned of an "accountability gap," where privatization evades due process a gap widened by administrative delegation.[78]

Privatization's rise prompted policy-oriented interventions. Jody Freeman's landmark 2003 Harvard Law Review article, *Extending Public Law Norms Through Privatization*, interrogated how outsourcing erodes democratic controls, proposing "embedded" norms to import constitutional values into private contracts.[71] Freeman's framework, blending public law with contract theory, influenced empirical turns in the field.[71] Her earlier 2000 New York University Law Review essay on the "private role in public governance" extended this to hybrid entities, arguing that symbiotic relationships demand reciprocal accountability.[72]

Recent literature grapples with digital and administrative complexities. Evelyn Douek's 2020 Harvard Law Review note recasts content moderation as "administrative law," applying state action principles to "jawboning" by officials on platforms, where coercion manifests through informal pressure rather than fiat.[70] Douek's work bridges doctrine with tech governance, echoing Cass Sunstein's 2020 Virginia Law Review critique of the "state action principle" as overly neutralist, failing to address baseline manipulations in algorithmic regimes.[79] In the Texas Law Review, Shelley Ross Saxer (2017) and an anonymous 2020 contributor explored public function extensions to private takings and social responsibility, urging doctrinal expansion for corporate "quasi-municipalities."[7781]

Global and theoretical horizons appear in Adrian Vermeule's 2016 book *The Administrative State*, which views state action as a network problem in hierarchical diffusion, aligning with Katerina Linos's 2012 American Journal of International Law piece on regulatory legitimacy advocating horizontal rights effects against privatized enforcers.[8074] Peter Lake's 2001 Idaho Law Review article, focused on university-student relations, applies these to higher education, highlighting Title IX's entwinement without full constitutionalization.[73]

This survey reveals a trajectory from doctrinal critique to functional reform, with scholars converging on quantification and proportionality. Yet gaps persist: few integrate mathematical models like Bayesian inference for evidentiary dynamism, as proposed here in the SAPI. The

IPFM and SAPI thus build on this foundation, operationalizing cumulative insights for hybrid-era adjudication.


### III. Case Study: Private Universities, Policing, and Federal Program Entanglement

Few institutions capture the paradoxes of modern hybridity as vividly as the private university. Formally incorporated as nonprofit entities, these schools routinely exercise authority once thought the sole province of the state: commissioning armed officers with plenary arrest powers,[17] administering congressionally dictated disciplinary processes under Title IX,[18] and functioning as de facto agents in federal immigration enforcement via the Student and Exchange Visitor Information System (SEVIS).[19] Layered atop substantial public subsidies, these roles place universities squarely at the fault line between institutional independence and civic obligation a terrain where the state action doctrine's traditional tools falter most acutely.

#### A. Delegated Police Power

Campus police forces offer the starkest illustration of outsourced sovereign authority. Statutes in more than two dozen states empower private colleges to deputize sworn officers,[20] equipping them with sidearms, warrantless arrest authority, and seamless integration into local law enforcement networks. In practice, these units operate as indistinguishable extensions of the public peace responding to calls, issuing citations, and patrolling adjacent neighbourhoods. The Sixth Circuit acknowledged as much in *Flagg v. City of Detroit*,[21] deeming private guards state actors when vested with such delegated might. Echoing this, a federal court in Indiana recently found Notre Dame's commissioned department plausibly subject to constitutional scrutiny.[22]

Even so, outcomes diverge sharply across dockets. Too often, judges privilege the university's corporate veil over the unvarnished mechanics of enforcement,[23] allowing form to eclipse function. Here, the IPFM and SAPI intervene with precision: by scoring the breadth of statutory delegation against operational autonomy, they elevate empirical indicators such as jurisdictional reach or coordination protocols above abstract labels, yielding a threshold that better tracks the reality of state power in private hands.

#### B. Federal Program Enforcement

Universities extend this pattern beyond the badge, serving as frontline outposts for federal bureaucracy. SEVIS regulations cast designated school officials as proxies for the Department of Homeland Security, tasking them with monitoring enrolment and flagging visa infractions that can trigger deportation.[24] Immigration adjudication, a hallmark of national sovereignty,[25] thus flows through academic channels. Compounding this, Title IV eligibility strings federal dollars to rigorous compliance in admissions, aid distribution, and non-discrimination regimes that permeate core operations.[26] Precedent cautions that funding ties alone do not transmute private acts into public ones,[27] yet the SAPI's nexus/coercion component illuminates how layered mandates and data exchanges quantified as regulatory conditionality can cumulatively forge an unbreakable chain of attribution.

#### C. Academic Governance and Quasi-Public Functions

No less telling are the universities' internal fora, where ad hoc tribunals resolve disputes over student and faculty misconduct in proceedings that ape administrative due process.[28] These quasi-judicial rituals complete with investigations, hearings, and sanctions wield consequences akin to those of public agencies, from transcript notations to expulsion. Yet because the host remains "private," affected parties forfeit baseline constitutional safeguards like impartial factfinding or appeal rights. This lopsided bargain unfettered authority unmoored from accountability exposes the doctrine's blind spots, where symbiosis and entwinement blur without clear doctrinal guardrails. The IPFM addresses this asymmetry head-on, assigning weights to adjudicative mimicry within its functional entwinement pillar, while the SAPI's public function score probes the parallels to state-exclusive roles, ensuring that such shadow governance invites constitutional light where it most matters.


## IV. Comparative Contexts: Health Systems, Digital Platforms, and Quasi-Municipal Entities

The challenges of discerning state action in hybrid forms transcend the academy, manifesting across sectors where private entities assume roles indistinguishable from those of public sovereigns. Private health systems, digital intermediaries, and corporate enclaves each exemplify how doctrinal fragmentation obscures functional realities, inviting a more integrated approach like the IPFM and SAPI to calibrate accountability.

### A. Private Hospitals and Public Funding

Consider the private hospital: a nominally independent operator that delivers emergency stabilization under the Emergency Medical Treatment and Active Labor Act (EMTALA),[61] upholds federal patient-rights standards as a Medicare condition,[60] and frequently partners with state agencies in public-private ventures. The Supreme Court confronted a cognate delegation in *West v. Atkins*,[14] holding a contracted prison physician liable as a state actor on the rationale that governments cannot evade constitutional duties through outsourcing.[14] Yet circuit courts have balked at extrapolating this logic to general hospitals, notwithstanding their profound reliance on Medicare and Medicaid reimbursements programs that infuse billions while imposing granular oversight.[1] This reticence, often anchored in *Blum v. Yaretsky*'s insistence on direct compulsion,[1] ignores the cumulative pull of funding-conditioned protocols and joint care delivery. The IPFM's financial dependence and functional entwinement pillars would quantify this interplay, scoring high where regulatory strings evolve into de facto control, thus bridging the gap between prison-specific holdings and broader public health entanglements.

### B. Digital Platforms as Modern Public Forums

Digital platforms present an analogous frontier, where algorithmic gatekeeping intersects with state speech interests. When officials leverage these sites for official announcements, moderation choices such as content demotions or removals can implicate constitutional bounds, transforming private tools into public conduits.[38] The circuits remain divided: the Fifth has rebuffed state actor claims against platforms heeding government content requests,[46] while the Eleventh has entertained them amid evidence of coercive coordination.[45] This schism

underscores the nexus test's indeterminacy in "jawboning" scenarios, where informal suasion blurs into compulsion.[70] Absent a metric for entanglement's depth, outcomes hinge on anecdotal proof of intent. The IPFM resolves this by tabulating policy sway across its coercion and entwinement axes weighting documented directives, shared data flows, and deference to official input yielding a threshold that discerns attributable moderation from autonomous curation, without presuming all platform acts public.

## C. Quasi-Municipal and Corporate Towns

The archetype endures in *Marsh v. Alabama*,[10] where a company town's mimicry of municipal services compelled First Amendment protections against expressive exclusions.[10] Contemporary analogs abound: sprawling private campuses, gated developments, and experimental charter cities that furnish utilities, security, and governance to captive populations.[77] These "functional municipalizations" replicate public infrastructure without electoral checks, evading accountability through corporate form.[10] Lower courts, bound by *Marsh*'s narrow public function rubric, rarely extend its logic beyond literal towns,[35] even as symbiosis proliferates in tax-abated zones or developer-led planning.[77] A modernized framework demands as much: the SAPI's symbiosis score, probing mutual reliance and joint operations, would flag such entities above the presumption line, enforcing proportional duties say, access rights in common areas while sparing proprietary decisions.

## V. The Integrated Public Function Matrix (IPFM): A Quantitative-Analytical Framework

The IPFM consolidates the doctrine's disparate strands into a unified, multidimensional instrument, grounded in three animating commitments: fidelity to functional substance over formal designation, empirical quantifiability to foster replicability, and doctrinal proportionality to tailor remedies to entanglement's scope.

**A. Structure of the Matrix** At its core, the IPFM appraises four interdependent pillars, each tethered to established tests and calibrated by evidentiary proxies. The ensuing table delineates these elements, with the detailed scoring rubric provided in Appendix A:

| Pillar | Doctrinal Source | Weight |
| --- | --- | --- |
| Pillar 1: Delegated Sovereign Powers | Public Function / Nexus Tests | 0.30 |
| Pillar 2: Financial and Structural Dependence | Rendell-Baker Line12 | 0.30 |
| Pillar 3: Functional Entwinement | Brentwood Acad.2; Burton v. Wilmington Parking Auth.3 | 0.20 |

| Pillar | Doctrinal Source | Weight |
|--------|------------------|--------|
| Pillar 4: Public Accessibility and Accountability | Jackson v. Metro. Edison Co.[8]; Lugar v. Edmondson Oil Co.[9] | 0.20 |

While the standard weights provided above offer a baseline framework, courts may apply contextual adjustments for high-stakes sovereign powers. For example, when the entity exercises arrest authority or other significant sovereign powers, a multiplier of 1.2 may be applied to Pillar 1 (Delegated Sovereign Powers) to reflect the heightened constitutional significance of such powers.

Each pillar is scored on a 0–5 point scale based on discoverable evidence. The final IPFM score is a weighted sum of these four pillars. A score of **≥ 3.0** (on the 5-point scale) creates a rebuttable presumption of state action. This tiered continuum eschews binary fiat for graduated attribution, with the detailed formula and application explored in the next section.

## B. Theoretical Justification

The framework operationalizes *Brentwood Academy*'s seminal recognition of "pervasive entwinement" as a state action trigger,[2] elevating the phrase from rhetorical flourish to operational metric.[2] By disaggregating entwinement into scored components, the IPFM injects methodological transparency into fact-bound inquiries, mitigating the ad hoc variability that plagues lower courts.[78] It honors the doctrine's prudential core extending safeguards only where state power effectively animates private form while drawing on empirical governance studies to validate weights, ensuring robustness under *Daubert*-style review.[5]

## C. Application Example

To illustrate, envision a private university sustaining a deputized police detail, executing SEVIS visa protocols,[58] and drawing thirty percent of its budget from Title IV grants.[59] The IPFM would assign elevated marks (4–5) to delegated authority for statutory commissioning[64] and coercion for funding-contingent mandates; middling values (2–3) to interdependence via joint patrols and accountability through Clery Act disclosures.[65] The resultant composite exceeding 15 presumes constitutional applicability to enforcement acts, while insulating curricular choices. This methodical progression demystifies judgment, rendering it auditable and appellate-ready.

## VI. The Integrated Public Function Matrix (IPFM): A Proposed Test

Conceiving state action as a spectrum of integration, rather than an all-or-nothing verdict, the IPFM augments canonical doctrine's public function, nexus, symbiotic relationship, and entwinement with verifiable metrics and calibrated weights. It probes not mere affiliation, but the quantum of publicness infusing private conduct.

**Structure**

The test comprises four pillars, each evaluated on a 0–5 continuum and ponderated by precedential heft. Transgression of the entwinement threshold (computed via weighted sum) erects a rebuttable presumption of state action.

## Pillar 1 Delegated Sovereign Powers (Weight: 0.30)

*Basis: Marsh v. Alabama*[10]; *Flagg v. City of Detroit*[25]; *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*[2].

***Inquiry*:** Does the entity wield traditionally sovereign prerogatives, such as policing, immigration adjudication, or municipal oversight? *Evidence Variables:*

- Number and scope of government-delegated enforcement authorities.
- Statutory or regulatory mandates conferring public power.
- Instances of acting "under color of state law."
- ***Scoring Logic:***
    - 0 = none;
    - 1–2 = regulatory compliance only;
    - 3–4 = delegated or joint enforcement;
    - 5 = independent exercise of sovereign authority.

## Pillar 2 Financial and Structural Dependence (Weight: 0.30)

*Basis: Rendell-Baker v. Kohn*[12] (funding pertinent, though insufficient alone).

*Inquiry:* How reliant is the entity's solvency, infrastructure, or oversight on public resources?

***Evidence Variables:***

- Percentage of total operating revenue derived from public sources.
- Proportion of governance or trustees appointed or approved by government.
- Dependency ratio of physical infrastructure (public land, utilities, or tax-exempt bonds). *Scoring Logic:*
- 0–2 = marginal funding;
- 3–5 = pervasive reliance and oversight.

## Pillar 3 Functional Entwinement (Weight: 0.20)

*Legal Basis: Brentwood Acad.*[2]; *Burton v. Wilmington Parking Auth.*[3].

*Inquiry:* To what degree do daily operations interlace with governmental functions?

*Evidence Variables:*

- Joint task forces, investigations, or disciplinary coordination with public agencies.
- Shared facilities, personnel, or resources.
- Institutional decision-making that includes or defers to public officials. *Scoring Logic:*
- 0–2 = minimal interaction;
- 3–5 = operational integration.

## Pillar 4: Public Accessibility and Accountability (Weight: 0.20)

*Legal Basis: Jackson v. Metro. Edison Co.[8]; Lugar v. Edmondson Oil Co.[9].*

*Inquiry:* Does the entity function as a de facto public forum, affording civic access and scrutiny?

*Evidence Variables:*

- Whether it controls public spaces or infrastructure used by the general public.
- Public rights of access, benefits, and reliance.
- Transparency obligations (FOIA-like rules, audits).

***Scoring Logic:***

- 0–2 = private sphere;
- 3–5 = public interface.

**Composite Formula**

A score is calculated for each pillar (0-5). The final IPFM score is the weighted sum of these four pillar scores.

**IPFM Score = (Pillar 1 Score × 0.30) + (Pillar 2 Score × 0.30) + (Pillar 3 Score × 0.20) + (Pillar 4 Score × 0.20)**

A score ≥ **3.0** (on the 5-point scale) signals a rebuttable presumption of state action.

**Rationale**

This architecture equips adjudicators and legislators with a disciplined, fact-grounded heuristic for state action claims. It reveres constitutional lineage while adapting to an age of quasi-sovereign privates, where delegation begets duty. Blum and Rendell-Baker. It reveres constitutional lineage while adapting to an age of quasi-sovereign privates, where delegation begets duty and coercion demands accountability. This four-pillar architecture equips adjudicators and legislators with a disciplined, focused approach to addressing complex legal challenges

**VII. Judicial Application: Mapping IPFM to Supreme Court Precedent**

The IPFM does not supplant landmark holdings but distills their essence, serving as an exegetical scaffold to harness discretion within evidentiary bounds. By retrofitting the matrix to canonical decisions, this Part elucidates its fidelity to precedent while illuminating pathways for hybrid-age deployment.

**A. From *Marsh* to *Brentwood*: Evolving Standards**

*Marsh v. Alabama*[10] intuited state action in a company town's wholesale emulation of municipal writ, a verdict based on functional equivalence. The IPFM now formalizes this functional analysis into a quantitative framework, encoding the same principles through maximal tallies in delegated powers, interdependence, and accessibility.[10] Conversely, Rendell-Baker v. Kohn12 and Blum v. Yaretsky1 exemplify isolation's perils: a subsidized school's discharge

policy evaded scrutiny because the link to state coercion was deemed too attenuated, demonstrating that receipt of public funds, without more, is insufficient to establish state action.[12] The matrix replicates this transparently elevated funding scores offset by deficits in coercion and delegation affirming nonaction below threshold.[112] *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*,[2] the Court's boldest multidirectional foray, discerned entwinement across unarticulated axes; the IPFM nominates and systematizes them, arming trial benches with a *Brentwood*-compliant template.[2]

## B. Clarifying Marginal Cases

The matrix excels in penumbral disputes universities probing under federal edict or platforms yielding to takedown bids eschewing absolutism for spectral placement.[6] Rather than dichotomous labels, courts might decree a conduct's positional vector, fostering remedies attuned to variance.[6]

## C. Remedies and Proportionality

Partial scores invite modular impositions: Fourth Amendment strictures on a university patrol, sans intrusion into pedagogy.[78] This granularity echoing *Evans v. Newton*'s contextualism[6] curbs overreach, confining constitutional incidence to empowered domains.[78]

For consistency across frameworks, it is important to note that the IPFM threshold of $\geq 3.0$ corresponds to a SAPI score of $\geq 60$ (since SAPI = IPFM × 20). Both thresholds establish a rebuttable presumption of state action, while a SAPI score of $\geq 75$ creates a conclusive presumption requiring extraordinary evidence to rebut.

## VII. Policy Implications: Transparency, Accountability, and Incentive Design

State action's constitutional valence entwines with policy architecture, where governments devolve functions to elude encumbrances.[71] Lacking integrative tools, such maneuvers attenuate democratic oversight; the IPFM counters by tethering duties to delegation's footprint.

## A. The Accountability Gap

Private veneers shield hybrid wielders from constitutional glare, spurring coercive privatization.[71] The matrix mitigates this disequilibrium, mandating safeguards wherever public potency resides, irrespective of incorporation.[71]

## B. Incentivizing Compliance

IPFM metrics lend themselves to administrative adaptation: grantors could mandate self-audits of funding ratios, delegations, and surveillances, culminating in "accountability indices."[69] Such disclosures, blending compulsion with stigma, amplify judicial deterrence.[69]

## C. Legislative Adoption

Congressional inscription via 42 U.S.C. § 1983 amendment[62] deeming threshold-crossers presumptive actors for due process and equality claims[11] would streamline dockets and circuit harmony.[6211]

## VIII. Implementation Pathways: Judicial, Legislative, and Administrative

Realizing the IPFM demands institutional synergy, harmonizing precedent with praxis.

### A. Judicial Integration

Courts might embed the matrix via judicial notice, soliciting pillar-specific proffers to discipline proof.[66] Akin to *Daubert*'s gatekeeping,[5] Federal Judicial Center advisories could standardize its deployment, elevating constitutional factfinding.[5]

### B. Legislative and Agency Support

Committees and agencies could infuse IPFM criteria into appropriations: the Department of Education exacting oversight disclosures for Title IV,[59] paralleled by Health and Human Services analogs for Medicare conduits.[63]

### C. Academic and Civil Society Role

Scholarship and advocacy propel dissemination, with algorithmic rankings of "entwinement indices" empowering exposés and claims unmasking governance's concealed interstices.[74]

## IX. Relation to Federal Civil Rights Laws

Even if the entity does not qualify as a state actor under this model, its conduct remains subject to federal civil rights statutes (Title IX, Title VI, ADA, etc.).[658485] Those statutes operate independently of the Constitution and require compliance by all entities that receive federal financial assistance.[68] Constitutional claims under 42 U.S.C. § 1983 are thus complementary, not exclusive one governs public accountability, the other enforces statutory equality.[62]

## X. Broader Theoretical Implications

The IPFM reflects a broader shift in constitutional thought: from formal sovereignty to functional governance.[80] In a complex administrative state, public power diffuses through networks rather than hierarchies.[80] The state-action doctrine must evolve accordingly.

By re-grounding state action in measurable governance realities, the IPFM aligns constitutional law with empirical governance studies and systems theory.[69] It also harmonizes with global trends recognizing "horizontal effect" of fundamental rights against private entities performing public tasks seen in European and Commonwealth jurisprudence.[82]

## XI. Building a Logical, Legally Strong, Mathematical, and Scientific Test for Proving a University as a State Actor

The State Action Doctrine lacks a single formulaic test; the Supreme Court uses a fact-intensive, multi-factor analysis emphasizing whether private conduct is "fairly attributable to the state" (*Lugar v. Edmondson Oil Co.*, 1982).[9] Hon'ble Courts apply three primary tests (public function, symbiosis/joint action, nexus/coercion), but these are qualitative.[2] No canonical quantitative model/framework exists, but we can build a hybrid State Actor Probability Index

(SAPI) a logical, evidence-based scoring system to quantify entwinement. This draws from legal factors (*Brentwood*, 2001)[2] and adapts structured analytical methods from social network analysis (scientific) and Bayesian probability (mathematical) for hon'ble court's admissibility (e.g., as expert evidence under *Daubert* standards).[5]

The State Actor Probability Index (SAPI) is directly related to the Integrated Public Function Matrix (IPFM) through a simple conversion: SAPI = IPFM Score × 20.

For example, an IPFM score of 3.5 would correspond to a SAPI score of 70. This conversion allows for consistent application across both frameworks.

**Logical Framework**

**Premise:** State action exists if private-university-state nexus exceeds a "fair attribution" threshold (e.g., 60% on index, per empirical benchmarks from case law).[9] **Hypotheses:** $H_0$ (no state action: independent private entity) vs. $H_1$ (state actor: entangled). **Falsifiability:** Use discovery data; if index < threshold, concede dismissal.

**Key Tests Integrated**

| Test | Description | Evidence Examples for Anonymous University |
|---|---|---|
| Public Function (*Jackson v. Metro. Edison Co.*, 1974)[8] | Private entity performs traditionally exclusive state role (narrow: e.g., not education).[8] | Rare success; argue research grants make it a de facto public lab (but courts reject). |
| Symbiosis/Joint Action (*Burton v. Wilmington Parking Auth.*, 1961)[3] | Mutual dependence; state profits from private misconduct.[3] | Joint CPD patrols; state funding subsidizes private ops.[25] |
| Nexus/Coercion (*Moose Lodge No. 107 v. Irvis*, 1972)[86] | State encourages/controls specific conduct.[86] | Federal funds condition policies (e.g., FERPA enforcement).[87] |

**Mathematical/Scientific Test: State Actor Probability Index (SAPI)**

Construct SAPI as a weighted composite score (0–100), using Bayesian updating for probabilistic strength. Gather data via discovery (financials, contracts). This is "scientific" (empirical metrics) and "mathematical" (statistical aggregation).

**Step 1: Component Scoring (0–100 scale per component)**

Each of the three key legal tests is translated into a quantifiable component score.

**A. Public Function Score (PFS)** *Inquiry:* To what extent does the university perform functions traditionally and exclusively reserved to the state? *Metrics & Evidence:*

- **Law Enforcement Powers (Weight: 50%):** Does the university operate a commissioned police force with arrest powers? (Score 0–100 based on statutory authority, jurisdiction, and operational independence).[25]

- **Adjudicative Functions (Weight: 30%):** Do its internal disciplinary panels (e.g., for Title IX) have the force of law, mandated by federal/state statutes, with outcomes affecting legal status? (Score 0–100 based on statutory mandate and due process parallels).[65]

- **Immigration Enforcement (Weight: 20%):** Does it act as a designated agent for SEVIS, making determinations that affect visa status? (Score 0–100 based on the scope of SEVIS authority).[58]

*Calculation:* PFS = $(0.5 \times LE) + (0.3 \times ADJ) + (0.2 \times IMM)$

**B. Symbiosis/Joint Action Score (SJAS)** *Inquiry:* What is the degree of mutual benefit, interdependence, and joint operations between the university and the state? *Metrics & Evidence:*

- ** Shared Resources (Weight: 40%):** Evidence of shared facilities (e.g., public libraries on campus), joint task forces, shared personnel, or integrated data systems with government agencies. (Score 0–100 based on the depth and breadth of resource sharing).[25]

- **Financial Interdependence (Weight: 30%):** Percentage of operating budget from public sources (grants, aid, state appropriations) AND the extent to which the university's existence supports state economic or policy goals. (Score 0–100 based on funding percentage and documented state reliance on the university).[12]

- **Governance Integration (Weight: 30%):** Number of board members appointed by the governor or other public bodies; formal government roles in university committees. (Score 0–100 based on the proportion of public appointees and their influence).[2]

*Calculation:* SJAS = $(0.4 \times SR) + (0.3 \times FI) + (0.3 \times GI)$

**C. Nexus/Coercion Score (NCS)** *Inquiry:* To what extent does the state coerce or significantly encourage the specific conduct at issue? *Metrics & Evidence:*

- **Regulatory Conditionality (Weight: 60%):** Are the specific actions (e.g., a student expulsion, a speech restriction) a direct result of complying with a federal or state mandate to receive funding? (Score 0–100 based on the directness and stringency of the regulatory link).[65]

- **State Coordination/Pressure (Weight: 40%):** Evidence of direct communication, requests, or pressure from government officials regarding the specific conduct (e.g., "jawboning" for content moderation, guidance on disciplinary outcomes). (Score 0–100 based on the frequency and intensity of documented interactions).[70]

$$NCS = (0.6 \times RC) + (0.4 \times SCP)$$

**Step 2: Composite SAPI Calculation**

The final SAPI score is a weighted average of the three component scores. The weights reflect their relative importance in modern jurisprudence, where functional delegation and coercion are often seen as more probative than symbiosis alone.

$$SAPI = (PFS \times 0.40) + (NCS \times 0.35) + (SJAS \times 0.25)$$

**Explanation of Values:**

- **PFS Weight (0.40):** Highest weight, as performing a traditional state function is the most direct path to a state action finding.[8]

- **NCS Weight (0.35):** High weight, reflecting the Supreme Court's focus on state compulsion and control.[1]

- **SJAS Weight (0.25):** Moderate weight, as symbiosis alone is often insufficient but is a powerful indicator when combined with other factors.[3]

**Interpretation of Final Score:**

This work proposes the following thresholds based on a preliminary review of entanglement cases, which we recommend for validation through future empirical study:

- **SAPI ≥ 75:** Conclusive presumption of state action. The entity is functionally a part of the state for the purposes of the challenged conduct, and extraordinary evidence would be required to rebut this presumption.

- **SAPI 60–74:** Grey area. Creates a strong inference of state action, requiring the entity to produce significant evidence to rebut the presumption. The court may apply constitutional scrutiny to the specific "entangled" function.

- **SAPI < 50:** Presumption of private status. A state action claim is unlikely to succeed absent extraordinary circumstances.

These benchmarks are intended to provide a starting point for consistent application and should be refined as courts adopt the framework and more data becomes available.

**Step 3: Bayesian Updating for Litigation Dynamics**

The SAPI is not static. As litigation proceeds and new evidence is uncovered during discovery, the probability of state action can be updated.

- **Prior Probability:** The initial SAPI score calculated from publicly available information serves as the prior probability, $P(H_1)$.

- **New Evidence (E):** A newly discovered email, a contract, or a testimony is introduced.

- **Likelihood:** An expert assesses the probability of seeing this evidence if the university is a state actor, $P(E \mid H_1)$, versus if it is not, $P(E \mid H_0)$.

- **Example:** An email from a state official to the university president directing the outcome of a disciplinary hearing would have a very high $P(E \mid H_1)$ and a very low $P(E \mid H_0)$.

- **Posterior Probability:** The updated SAPI score is calculated using Bayes' Theorem. First, the total probability of the evidence, P(E), must be calculated:

- $P(H_1 \mid E) = \frac{P(E|H_1) \cdot P(H_1)}{P(E|H_1) \cdot P(H_1) + P(E|H_0) \cdot P(H_0)}$

- In Simple terms: Let $P_0$ = SAPI_initial / 100 (e.g., SAPI=70 → $P_0$=0.70).

- Posterior Probability: $P_1$ = [P(E|$H_1$) × $P_0$] / [P(E|$H_1$) × $P_0$ + P(E|$H_0$) × (1 - $P_0$)]

## XII. Appendix A: The Integrated Public Function Matrix (IPFM) Detailed Scoring Rubric

This appendix provides a comprehensive guide for applying the Integrated Public Function Matrix (IPFM). For each of the four pillars, it details the evidence variables to be considered and provides a granular scoring logic on a 0–5 point scale. The goal is to ensure consistency and transparency in assessing the degree of governmental entwinement.

**Pillar 1 Delegated Sovereign Powers (Weight: 0.30)**

*Inquiry:* Does the entity exercise powers that are traditionally sovereign (e.g., law enforcement, immigration compliance, public adjudication, municipal governance)?[10]

| Score | Scoring Logic & Evidentiary Thresholds |
|---|---|
| 0 | **None.** The entity has no statutory, regulatory, or contractual authority to exercise sovereign power. Its activities are entirely commercial or private.[8] |
| 1 | **Minimal Regulatory Compliance.** The entity is subject to general industry regulations (e.g., zoning, health codes) but is not delegated any specific enforcement or adjudicative authority. Compliance is passive.[12] |
| 2 | **Specific Regulatory Mandate.** The entity is required to implement specific government regulations within its own operations (e.g., a university complying with Title IX reporting,[65] a hospital following EMTALA patient-stabilization rules).[61] The power is administrative, not coercive or sovereign.[1] |
| 3 | **Delegated Enforcement Authority.** The entity is granted the power to enforce specific laws or regulations, but this power is limited, joint, or subject to significant state oversight. Examples: A private security firm with limited citizen's arrest powers; a university designated to report immigration status violations to DHS, but without adjudicative power.[58] |
| 4 | **Joint Exercise of Sovereign Authority.** The entity and a government agency exercise sovereign power concurrently or through integrated operations. Examples: A joint task force where private agents have full arrest powers alongside police;[25] a private utility |

| Score | Scoring Logic & Evidentiary Thresholds |
|---|---|
| | company with eminent domain authority exercised in concert with a municipal government.[77] |
| 5 | **Independent Exercise of Sovereign Authority.** The entity is statutorily empowered to exercise a core sovereign function with a degree of autonomy comparable to a public agency. Examples: A private university police department commissioned by the state with full arrest powers and primary jurisdiction over campus;[64] a private entity administering a state's election.[13] |

## Pillar 2 Financial and Structural Dependence (Weight: 0.30)

*Inquiry:* To what extent does the entity's financial viability, infrastructure, or governance depend on state or federal resources?[12]

| Score | Scoring Logic & Evidentiary Thresholds |
|---|---|
| 0 | **No Dependence.** Virtually no funding or support from government sources. The entity is entirely privately funded and governed.[12] |
| 1 | **Marginal Funding.** A small percentage of total operating revenue (e.g., <5%) comes from public sources, often in the form of passive grants or contracts for services with no performance-based conditions related to core governance.[12] |
| 2 | **Significant but Non-Critical Funding.** A moderate percentage of revenue (e.g., 5–20%) is derived from public sources. While important, the entity could remain financially viable without this funding. Governance is structurally independent.[12] |
| 3 | **Pervasive Reliance.** A large percentage of revenue (e.g., 20–50%) is from public sources, often tied to compliance with extensive regulatory regimes (e.g., Medicare/Medicaid for a hospital,[60] Title IV aid for a university).[59] The entity's financial health is significantly intertwined with government policy.[71] |
| 4 | **Structural Integration.** High public funding (e.g., >50%) combined with significant government influence over governance. Examples: A minority of board members are appointed by the governor; the state has approval rights over major decisions or bylaws.[2] |
| 5 | **De Facto Public Instrumentality.** Governance controlled by public appointees (e.g., majority board appointed by governor). The entity is almost entirely dependent on public funds and is so structurally integrated with the government that it functions as an administrative arm. The government effectively controls the entity's budget and key personnel decisions.[3] |

**Pillar 3 Functional Entwinement (Weight: 0.20)**

*Inquiry:* How extensively does the entity cooperate or overlap with governmental functions in daily operations?[2]

**Score Scoring Logic & Evidentiary Thresholds**

| | |
|---|---|
| 0 | **No Interaction.** The entity operates entirely independently of any government agency in its daily functions.[12] |
| 1 | **Minimal Interaction.** Occasional, transactional contact with government agencies (e.g., filing required reports, standard inspections). No operational overlap.[1] |
| 2 | **Programmatic Coordination.** Regular coordination on specific programs or initiatives. Examples: A university coordinating with the public health department on vaccination clinics; a hospital participating in a regional disaster preparedness plan.[60] |
| 3 | **Operational Integration.** Daily operations are intertwined with government functions. Examples: Joint task forces or investigations; shared facilities or IT systems; government employees embedded within the private entity's decision-making processes.[25] |
| 4 | **Co-Governance.** The entity and government agencies share decision-making authority over core functions. Examples: A public-private partnership where a private entity manages a public utility with joint oversight; a university disciplinary committee that must defer to or consult with a federal agency on specific cases.[65] |
| 5 | **Indistinguishable Operations.** The entity's operations are so deeply merged with governmental functions that it is practically impossible to distinguish where the private entity ends and the state begins. Examples: A company town where the company provides all municipal services;[10] a digital platform that has been formally co-opted to administer a federal program.[70] |

**Pillar 4 Public Accessibility and Accountability (Weight: 0.20)**

*Inquiry:* Does the entity operate as a de facto public institution open to the public and performing civic roles?[8]

| Score | Scoring Logic & Evidentiary Thresholds |
|---|---|
| 0 | **Private Sphere.** The entity is clearly private, serving a limited membership or clientele (e.g., a private club, a selective corporation). No public access or accountability obligations.[12] |

| Score | Scoring Logic & Evidentiary Thresholds |
|---|---|
| 1 | **Limited Public Interface.** The entity has some public-facing aspects but is not generally open or accessible. Examples: A private office building that is not open to the public; a private university with a closed campus.[35] |
| 2 | **Public Access, Private Governance.** The entity is open to the public or controls a space that the public uses, but it operates under private rules with no special transparency obligations. Examples: A private shopping mall; a private university that allows the public to use its library but is not subject to open records laws.[41] |
| 3 | **Quasi-Public Function.** The entity performs a civic role and serves the general public, creating a public reliance. Examples: A private utility or transportation company; a private hospital operating the only emergency room in a region.[60] |
| 4 | **Public Accountability Obligations.** In addition to serving the public, the entity is subject to statutory transparency or audit requirements analogous to public bodies, but governance remains under private control[88, 66]. Examples: An entity subject to the Clery Act (campus safety statistics); a private entity receiving large federal grants that must comply with FOIA-like audit provisions. |
| 5 | **De Facto Public Institution**. The entity is functionally indistinguishable from a public body in its accessibility and accountability, with governance significantly controlled by public appointees[10]. Example: The company town in Marsh v. Alabama or a university where a majority of board members are appointed by the governor10. |

## XIII. Appendix B: The State Actor Probability Index (SAPI) Detailed Component Metrics

This appendix provides a detailed guide for calculating the State Actor Probability Index (SAPI), a practical tool for litigation. It breaks down each component into measurable metrics and provides guidance for scoring on a 0–100 scale.

## A. Public Function Score (PFS)

| Metric | Weight | Scoring Guidance (0–100) |
|---|---|---|
| **Law Enforcement Powers** | 50% | 0: No police/security force. 25: Unarmed private security with no special authority. 50: Armed security with limited powers (e.g., citizen's arrest). 75: A commissioned police force with full arrest powers, but with significant state oversight or shared jurisdiction.[25] 100: A fully commissioned, independent police force with primary jurisdiction, as authorized by state statute.[64] |
| **Adjudicative Functions** | 30% | 0: No internal adjudication. 25: Internal disciplinary processes for purely private rules (e.g., honor code violations). 50: Adjudication |

| Metric | Weight | Scoring Guidance (0–100) |
|---|---|---|
| | | required by federal/state statute, but with minimal due process parallels (e.g., Title IX hearings under pre-2020 rules).[65] 75: Adjudication of conduct that has direct legal consequences, with procedures mandated by law to mirror administrative hearings. 100: The entity operates a quasi-judicial tribunal with binding authority over matters typically handled by state courts (e.g., adjudicating professional licenses). |
| **Immigration Enforcement** | 20% | 0: No role in immigration. 50: The entity is a designated SEVIS school, required to report basic student status information.[58] 75: The entity has significant authority to make determinations that affect visa status (e.g., certifying eligibility for practical training) under strict federal guidance. 100: The entity's officials have de facto decision-making power that can directly lead to visa revocation or deportation, akin to an immigration agent. |

## B. Nexus/Coercion Score (NCS)

| Metric | Weight | Scoring Guidance (0–100) |
|---|---|---|
| **Regulatory Conditionality** | 60% | 0: The challenged conduct is entirely voluntary and unrelated to any funding. 25: General compliance with broad regulations is a condition of funding, but not tied to the specific outcome. 50: The specific outcome is incentivized by funding conditions (e.g., "to receive this grant, you must adopt this policy"). 75: The specific outcome is mandated by a federal or state regulation as a condition of receiving essential funding (e.g., "you must expel any student found responsible for sexual assault under Title IX to remain eligible for Title IV funds").[65] 100: The government dictates the specific outcome in the specific case through a direct order or regulatory fiat.[1] |
| **State Coordination/Pressure** | 40% | 0: No communication. 25: General guidance or newsletters from a government agency. 50: Informal inquiries or requests for information from officials regarding the specific matter. 75: Sustained pressure or "jawboning" from government officials urging a specific outcome.[70] 100: An explicit directive or threat from a government |

| Metric | Weight | Scoring Guidance (0–100) |
|---|---|---|
| | | official (e.g., "if you don't take this action, we will audit/defund/investigate you").[70] |

## C. Symbiosis/Joint Action Score (SJAS)

| Metric | Weight | Scoring Guidance (0–100) |
|---|---|---|
| Shared Resources | 40% | 0: No sharing. 25: Incidental sharing (e.g., renting a public facility for an event). 50: Formal agreements for shared use of non-core resources (e.g., a shared parking lot). 75: Deep integration of core resources (e.g., shared IT infrastructure, joint task forces with shared personnel and equipment).[25] 100: Operations are fully co-located and integrated, with shared personnel and command structures.[3] |
| Financial Interdependence | 30% | 0: No public funding. 25: <10% of budget from public sources. 50: 10–30% of budget from public sources. 75: 30–60% of budget from public sources, and the state relies on the entity to deliver a critical public service.[12] 100: >60% of budget from public sources, and the entity is a critical component of the state's infrastructure or policy goals.[71] |
| Governance Integration | 30% | 0: No public officials in governance. 25: An ex officio, non-voting government liaison on a board. 50: One or more voting members on the board are appointed by the government. 75: A significant minority (e.g., >25%) of the board is appointed by the government, and they hold key committee chairs.[2] 100: The government has a majority of appointments or veto power over board decisions.[2] |

## XIV. Appendix C: Practical Application A Hypothetical Case Study of "State-Entwined University"

To illustrate the practical application and comparative strengths of the Integrated Public Function Matrix (IPFM) and the State Actor Probability Index (SAPI), this appendix applies both models to a single set of hypothetical facts for a fictional institution, "State-Entwined University" (SEU).

### Hypothetical Facts for State-Entwined University (SEU)

- **Governance & Funding:** SEU is a private, non-profit university. 40% of its annual operating budget comes from federal Title IV student aid programs[59] and research

grants from the National Institutes of Health (NIH) and National Science Foundation (NSF). The state governor appoints two of the 25 members of its Board of Trustees, who sit on the key Governance and Student Life committees.[2]

- **Police Power:** SEU operates a campus police department of 50 sworn officers. Under state law (the "Private University Police Act"), SEU's police chief is commissioned by the state's Department of Public Safety. Officers have full arrest powers, issue state citations, and are the primary first responders for all crimes on campus, which is a geographically contiguous area of 200 acres in a major city. They have a formal mutual aid agreement with the city police department.[25]

- **Federal Program Enforcement:** SEU is a designated school official under the Student and Exchange Visitor Information System (SEVIS).[58] Its international student office is responsible for verifying student enrollment, which directly impacts students' F-1 visa statuses. Furthermore, its Title IX office is responsible for investigating and adjudicating all sexual misconduct allegations, with procedures mandated in detail by the U.S. Department of Education to maintain Title IV funding.[65]

- **Public Interface & Operations:** The university library and its performing arts center are open to the public. The campus is a designated voting precinct. SEU's athletic facilities are used by a local public high school for its home games under a formal joint use agreement. The university is subject to the Clery Act, requiring it to publish an annual security report and maintain a daily crime log.[88]

### Application of the Integrated Public Function Matrix (IPFM)

We now score SEU on each of the four pillars using the rubric from Appendix A.

### Pillar 1 Delegated Sovereign Powers (Weight: 0.35)

*Analysis:* SEU exercises core sovereign powers. Its police department is a classic example of delegated law enforcement authority, operating under state commission.[25] Its role in SEVIS directly impacts federal immigration status, a quintessential sovereign function.[58] Its Title IX adjudications, while administrative, are mandated by the federal government and carry significant consequences.[65]

*Score:* 4.5 / 5. This reflects a high degree of delegated authority, falling just short of a "5" because the police department, while powerful, still operates within a university context and has a mutual aid agreement with the city police, suggesting some level of shared jurisdiction rather than complete independence.

### Pillar 2 Financial and Structural Dependence (Weight: 0.25)

*Analysis:* 40% of SEU's budget is from public sources, which is significant. The presence of two governor-appointed trustees on key committees indicates structural integration, though not control.[2]

*Score:* 3.5 / 5. This falls squarely in the "Pervasive Reliance" category due to the high funding percentage and is elevated by the "Structural Integration" from the board appointments.

**Pillar 3 Functional Entwinement (Weight: 0.25)**

*Analysis:* SEU's operations are deeply intertwined with government functions. The mutual aid agreement with city police, the joint use of athletic facilities, and the mandated, day-to-day administration of federal programs (SEVIS, Title IX) demonstrate operational integration and co-governance.[2565]

*Score:* 4.0 / 5. This reflects "Co-Governance" and "Operational Integration" across multiple core functions.

**Pillar 4 Public Accessibility and Accountability (Weight: 0.15)**

*Analysis:* SEU serves a clear civic role. It is a voting precinct, opens key facilities to the public, and is subject to a federal transparency law (Clery Act) that makes it accountable to the public for its safety operations.[88]

*Score:* 3.5 / 5. This places it in the "Quasi-Public Function" category, elevated by the "Public Accountability Obligations" of the Clery Act.

**IPFM Composite Score Calculation**

$$\text{Score} = (0.35 \times 4.5) + (0.25 \times 3.5) + (0.25 \times 4.0) + (0.15 \times 3.5)$$
$$= 1.575 + 0.875 + 1.0 + 0.525 = 3.975$$

**IPFM Conclusion:** With a composite score of 3.975, which is well above the 3.5 "entwinement threshold," SEU's conduct is presumptively "state action." The presumption is rebuttable, but the entity would bear a heavy burden to prove otherwise, particularly concerning its police and Title IX functions.

**Application of the State Actor Probability Index (SAPI)**

We now calculate the SAPI score for SEU using the metrics from Appendix B.

**A. Public Function Score (PFS)**

- *Law Enforcement (50%):* SEU has a commissioned police force with full arrest powers. This is a high degree of authority. Score: 75/100.[25]

- *Adjudicative Functions (30%):* SEU's Title IX office adjudicates conduct with legal consequences under federal mandate. Score: 75/100.[65]

- *Immigration Enforcement (20%):* SEU's SEVIS role is significant and impacts visa status. Score: 75/100.[58]

*Calculation:* PFS = $(0.5 \times 75) + (0.3 \times 75) + (0.2 \times 75) = 37.5 + 22.5 + 15 = 75$

**B. Nexus/Coercion Score (NCS)**

- *Regulatory Conditionality (60%):* SEU's ability to receive Title IV funds is mandated by its compliance with detailed Title IX procedures. This is a direct link between funding and a specific adjudicative outcome. Score: 75/100.[65]

- *State Coordination/Pressure (40%):* The facts do not show direct pressure in a specific case, but the formal mutual aid agreement and state commissioning of the police chief imply ongoing, formal coordination. Score: 50/100.[25]

*Calculation:* NCS = $(0.6 \times 75) + (0.4 \times 50) = 45 + 20 = 65$

## C. Symbiosis/Joint Action Score (SJAS)

- *Shared Resources (40%):* Joint use of athletic facilities and a mutual aid police agreement demonstrate deep integration. Score: 75/100.[25]

- *Financial Interdependence (30%):* 40% funding is high, and the state relies on SEU for education and research. Score: 75/100.[12]

- *Governance Integration (30%):* Two governor-appointed trustees on a 25-member board is a meaningful, but not controlling, integration. Score: 50/100.[2]

*Calculation:* SJAS = $(0.4 \times 75) + (0.3 \times 75) + (0.3 \times 50) = 30 + 22.5 + 15 = 67.5$

### SAPI Composite Score Calculation

SAPI = $(0.40 \times 75) + (0.35 \times 65) + (0.25 \times 67.5) = 30 + 22.75 + 16.875 = 69.625$

**SAPI Conclusion:** With a final score of 69.6, SEU falls squarely in the "Grey Area" (50–74). This creates a strong inference of state action, requiring SEU to produce significant evidence to rebut the presumption. A court would be highly likely to find that SEU's police and Title IX functions are subject to constitutional scrutiny, even if other university functions remain private.

### Comparative Analysis of the Results

| Model | Final Score | Interpretation | Strengths in this Application |
|-------|-------------|----------------|-------------------------------|
| **IPFM** | 3.975 / 5.0 | Presumptive State Action (above 3.5 threshold) | Provides a clear, categorical result based on a weighted average. The four pillars offer a holistic view of the institution's relationship with the state, capturing the full spectrum of entanglement from policing to public access.[2] |
| **SAPI** | 69.6 / 100 | Strong Inference / Grey Area (between 50–74) | Designed for litigation, its "grey area" outcome accurately reflects the nuanced arguments a court would face. It focuses more intensely on the legal tests (Public Function, Nexus, Symbiosis) and the directness of government control, making it ideal for targeting specific conduct (e.g., a Title IX hearing).[65] |

Both models lead to the same practical conclusion: SEU is sufficiently entwined with the state to be considered a state actor for its core delegated functions. The IPFM provides a broader, more academic assessment of the institution's overall "publicness," while the SAPI offers a more focused, litigation-ready probabilistic analysis of the legal vulnerabilities. Together, they provide a powerful, complementary toolkit for analyzing state action in the modern era.

## XV. Appendix D: Real-World Application State Action Analysis of Anonymous University

To demonstrate the practical utility of the Integrated Public Function Matrix (IPFM) and the State Actor Probability Index (SAPI), this appendix applies both frameworks to a real-world institution: Anonymous University. This analysis is based on publicly available information. A formal litigation investigation would require extensive discovery to fill factual gaps and verify assumptions.

### Publicly Available Facts on Anonymous University

- **Police Power:** Anonymous University operates one of the largest private police forces in the country, the Anonymous University Police Department (AUPD). The AUPD is a fully state-commissioned law enforcement agency under Illinois law (225 ILCS 605/).[64] Its officers have the same arrest powers and authority as any other police officer in Illinois, with jurisdiction extending beyond the campus into a large swath of the surrounding neighborhoods.[25]

- **Funding:** Anonymous University is a major recipient of federal research funding. In 2022, it received over $700 million in federal research awards, primarily from agencies like the Department of Energy, the National Institutes of Health (NIH), and the National Science Foundation (NSF). It also participates heavily in federal student aid programs under Title IV of the Higher Education Act.[59]

- **Federal Program Enforcement:** As a major research university, Anonymous University is a designated participant in SEVIS,[58] responsible for maintaining the visa status of thousands of international students and scholars. It is also subject to and enforces Title IX regulations for handling sexual misconduct,[65] and it complies with the Clery Act, publishing annual security and fire safety reports.[88]

- **Public Interface & Operations:** The university is deeply integrated into the fabric of the City of Chicago. It operates public-facing institutions like the Smart Museum of Art and the Oriental Institute, hosts numerous public events, and its urban campus is not physically separated from the city. It engages in numerous community partnership initiatives.[41]

- **Governance:** The Board of Trustees consists of prominent business, academic, and civic leaders. A review of public trustee lists does not immediately reveal ex officio appointments by the Governor or other government officials, but this specific point would require targeted discovery.[2]

### Application of the Integrated Public Function Matrix (IPFM) to Anonymous University

### Pillar 1 Delegated Sovereign Powers (Weight: 0.35)

*Analysis:* The AUPD is the paramount example of delegated sovereign power. It is not merely a security force; it is a state-commissioned police department with expansive authority, operating with a high degree of autonomy.[64] This is a clear "5" on the scoring rubric. The university's role in SEVIS and Title IX adjudications further solidifies this high score.[58][65]

*Score:* 5.0 / 5. The independent exercise of sovereign police authority places Anonymous University at the highest level of this pillar.

**Pillar 2 Financial and Structural Dependence (Weight: 0.25)**

*Analysis:* Over $700 million in federal research funding is a substantial sum, likely representing a significant portion of the university's overall budget, though not a majority. This dependence is pervasive and comes with extensive regulatory conditions. The lack of obvious public appointees to the board keeps the score from reaching the highest levels.[59]

*Score:* 3.5 / 5. This reflects "Pervasive Reliance" due to the massive, condition-laden federal funding stream.

**Pillar 3 Functional Entwinement (Weight: 0.25)**

*Analysis:* The AUPD's jurisdictional overlap with the Chicago Police Department (CPD) and its role as the primary law enforcement agency for a large urban area is a textbook example of "Operational Integration." The university's administration of major federal programs (SEVIS, Title IX) on a daily basis further demonstrates deep entwinement.[2565]

*Score:* 4.0 / 5. This reflects "Co-Governance" and "Operational Integration," particularly in the public safety domain.

**Pillar 4 Public Accessibility and Accountability (Weight: 0.15)**

*Analysis:* Anonymous University is a major civic institution in Chicago. Its museums, public events, and urban campus make it highly accessible. Its compliance with the Clery Act imposes specific public accountability measures related to safety.[88]

*Score:* 3.0 / 5. This places it in the "Quasi-Public Function" category, with its accountability obligations (Clery Act) solidifying this score.

**IPFM Composite Score Calculation for Anonymous University**

$$Score = (0.35 \times 5.0) + (0.25 \times 3.5) + (0.25 \times 4.0) + (0.15 \times 3.0)$$
$$= 1.75 + 0.875 + 1.0 + 0.45 = 4.075$$

**IPFM Conclusion:** With a composite score of 4.075, Anonymous University is far above the 3.5 "entwinement threshold." Under the IPFM, its conduct, particularly that of the AUPD and its federally mandated administrative offices, is presumptively "state action."

**Application of the State Actor Probability Index (SAPI) to Anonymous University**

**A. Public Function Score (PFS)**

- *Law Enforcement (50%):* The AUPD is a state-commissioned police force with expansive jurisdiction. This is the highest level of delegated authority. Score: 100/100.[64]

- *Adjudicative Functions (30%):* Anonymous University's Title IX office operates under federal mandate. Score: 75/100.[65]

- *Immigration Enforcement (20%):* Its SEVIS role is significant for a large international student population. Score: 75/100.[58]

*Calculation:* PFS = $(0.5 \times 100) + (0.3 \times 75) + (0.2 \times 75) = 50 + 22.5 + 15 = 87.5$

## B. Nexus/Coercion Score (NCS)

- *Regulatory Conditionality (60%):* The university's receipt of hundreds of millions in federal research and student aid is explicitly conditioned on compliance with a vast web of regulations, including Title IX. This is a powerful, direct link. Score: 75/100.[65]

- *State Coordination/Pressure (40%):* The AUPD's operations are formally coordinated with the CPD. This represents a high degree of formal, ongoing integration. Score: 75/100.[25]

*Calculation:* NCS = $(0.6 \times 75) + (0.4 \times 75) = 45 + 30 = 75$

## C. Symbiosis/Joint Action Score (SJAS)

- *Shared Resources (40%):* The AUPD and CPD share jurisdiction and likely coordinate resources. The university's public-facing institutions serve the city. Score: 75/100.[25]

- *Financial Interdependence (30%):* With over $700M in federal funding, the interdependence is immense. The federal government relies on Anonymous University as a key research partner. Score: 75/100.[59]

- *Governance Integration (30%):* Based on public information, there are no obvious public appointees to the board. This score reflects a lack of formal governance integration, though discovery could reveal informal influence. Score: 25/100.[2]

*Calculation:* SJAS = $(0.4 \times 75) + (0.3 \times 75) + (0.3 \times 25) = 30 + 22.5 + 7.5 = 60$

## SAPI Composite Score Calculation for Anonymous University

SAPI = $(0.40 \times 87.5) + (0.35 \times 75) + (0.25 \times 60) = 35 + 26.25 + 15 = 76.25$

**SAPI Conclusion:** With a final score of 76.25, Anonymous University crosses the 75-point threshold into the "Strong Presumption of State Action" category. This indicates that, based on public facts, a court would be highly likely to find that the university is a state actor, at least with respect to its police and federally mandated administrative functions.

## Synthesis and Litigation Strategy

Both the IPFM and SAPI models converge on a powerful conclusion: Anonymous University exhibits a profound degree of entanglement with the state, primarily through its exercise of delegated sovereign police power and its deep financial and operational integration with the federal government.[64]

## Key Findings for a Potential Litigant:

1. **Strongest Argument:** The AUPD is the single strongest basis for a state action claim. Its status as a full, state-commissioned police force makes it a textbook example of a

private entity performing a "traditionally exclusive" public function.[8] Any claim involving AUPD conduct (e.g., an excessive force or unlawful search claim under § 1983)[62] would have a very high probability of success.

2. **Secondary Arguments:** Claims related to Title IX adjudications or SEVIS administration are also strong. The SAPI model highlights that the "Nexus/Coercion" is potent here; the university's actions are not merely influenced by federal funding, they are mandated by it as a condition of receiving essential funds.[65]

3. **Areas for Discovery:** While the public case is strong, discovery would be crucial to:

   o Quantify the exact percentage of the university's budget derived from public sources.[59]

   o Uncover any informal communications or "jawboning" from government agencies regarding specific disciplinary or administrative cases.[70]

   o Investigate the full extent of operational coordination between the AUPD and CPD, including shared command structures or resources.[25]

   o Confirm or deny the existence of any government influence over the Board of Trustees.[2]

This analysis demonstrates that the IPFM and SAPI are not merely academic exercises. They are practical tools that can structure a complex factual inquiry, identify the most potent legal arguments, and provide a clear, evidence-based roadmap for litigating challenging state action claims against modern hybrid institutions.

## XVI. Appendix E: Anticipating Counterarguments And Structuring Rebuttals

Any robust legal analysis must anticipate and preempt the opposing party's arguments. A university facing a state action claim, particularly one as well-entwined as Anonymous University (AU), would rely on a well-established line of Supreme Court precedent to argue for its private status. This appendix outlines those likely counterarguments and provides a structured rebuttal using the logic of the Integrated Public Function Matrix (IPFM) and State Actor Probability Index (SAPI) frameworks.

### A. Counterargument 1: The "Mere Funding" Defense (*Rendell-Baker v. Kohn*)

**The Argument:** The university will argue that, as held in *Rendell-Baker v. Kohn*, "the school's fiscal relationship with the State is not different from that of many contractors performing services for the government."[1] They will contend that receiving federal research grants and student aid funds does not transform a private institution into a state actor. The core of their argument is that funding, even if substantial, is not enough.

**Rebuttal Using IPFM/SAPI:**

- **Isolating a Single Factor:** The *Rendell-Baker* defense is powerful only when the court is forced to analyze factors in isolation. The IPFM and SAPI are specifically designed to defeat this by showing the cumulative effect of multiple, interlocking factors.[2]

- **Beyond Funding:** The rebuttal would concede that funding alone may be insufficient under a narrow reading of *Rendell-Baker*, but then pivot to the other pillars. "Your Honor, while we acknowledge the principle from *Rendell-Baker*, that case did not involve an entity exercising independent sovereign police power or one so pervasively integrated with the state's regulatory framework. Here, the funding is just one piece of a much larger puzzle."

- **Quantifying the Difference:** The SAPI model allows the plaintiff to argue that the *nature* of the funding here is different. It is not a simple contract for services; it is a pervasive, condition-laden web of federal programs (Title IV, NIH, NSF) that dictate core institutional functions.[3] The SAPI's "Regulatory Conditionality" metric (Score: 75) quantifies this, showing it is not "mere funding" but a system of coercive conditioning that shapes institutional conduct.

- **The Decisive Factor:** The rebuttal would conclude by emphasizing Pillar 1 (Delegated Sovereign Powers). "Even if the court were to find the financial dependence insufficient standing alone, the university's exercise of a state-commissioned police force is a function 'traditionally exclusively reserved to the state' under *Jackson* and is an independent basis for finding state action."[4]

## B. Counterargument 2: The "Education is Not a Public Function" Defense (*Jackson v. Metropolitan Edison Co.*)

**The Argument:** The university will argue that its core function is education, which the Supreme Court explicitly stated in *Jackson v. Metropolitan Edison Co.* is not a function "traditionally exclusively reserved to the state."[5] They will attempt to frame the entire lawsuit as an attack on their core, private educational mission.

**Rebuttal Using IPFM/SAPI:**

- **Distinguishing the Conduct:** The rebuttal must be precise. "Your Honor, we are not challenging the university's curriculum, its grading, or its admissions standards. We are challenging the conduct of its police department, which is a law enforcement agency, and its Title IX tribunal, which is an administrative adjudication. The specific functions at issue are distinct from the overall educational mission."[6]

- **Functional, Not Formal, Analysis:** This is the heart of the IPFM. The rebuttal argues for a functional analysis of the specific act, not a formal categorization of the entire institution. "While the entity as a whole is a university, the specific conduct at issue making an arrest, adjudicating a disciplinary case under federal mandates is a public function."

- **Applying the Matrix:** The IPFM score of 4.075 is not an indictment of the university's academic mission; it is a measurement of its public-facing, power-wielding functions.

The high score is driven by policing and regulatory enforcement (Pillars 1 and 3), not by teaching calculus or conducting private research.

- **Targeted Remedy:** The rebuttal can propose a proportional remedy. "We are not asking the court to make the entire university subject to the Constitution for all purposes. We are asking the court to recognize that its police department is subject to the Fourth Amendment and its Title IX office is subject to due process guarantees, because those *specific functions* constitute state action."[7]

## C. Counterargument 3: The "No Significant Encouragement" Defense (*Blum v. Yaretsky*)

**The Argument:** The university will argue, following *Blum v. Yaretsky*, that the government has not coerced or significantly encouraged the *specific conduct* at issue.[8] They will claim that their disciplinary and policing policies are their own, developed independently, even if they happen to comply with federal regulations.

**Rebuttal Using IPFM/SAPI:**

- **Modern Coercion is Subtle:** The rebuttal must educate the court that modern government coercion is rarely a direct order. It is exercised through the power of the purse and detailed regulatory regimes.[9] "The 'significant encouragement' in *Blum* is present here in the form of hundreds of millions of dollars in conditional funding. The message is clear: comply with these federal mandates, or the financial lifeblood of the institution is cut off. This is not mere acquiescence; it is compelled compliance."

- **Evidence of Direct Coordination:** The SAPI framework directs discovery to find evidence of more direct pressure. The rebuttal would highlight any evidence of communications between the Department of Education and the university's Title IX office, or between the state's police licensing body and the AUPD chief, demonstrating that the state's encouragement is both significant and specific.

- **Delegation as Coercion:** The very act of delegating sovereign police power is a profound form of state authorization and encouragement. By granting the university a police commission, the state has not merely permitted but has actively encouraged and empowered it to perform a core state function.[10] This is a far more direct link than the peripheral regulatory scheme at issue in *Blum*.

By systematically anticipating and refuting these classic defences, a litigant can use the IPFM and SAPI not just as scoring tools, but as strategic guides for framing the entire legal argument, forcing the court to confront the totality of the university's integration with the state rather than analysing the relationship through outdated, formalistic distinctions.

## XVII. Appendix F: Toward A Legislative And Regulatory Framework For The 21st Century

The judicial process is inherently reactive. While courts can and should adapt the state action doctrine, a more proactive and comprehensive solution requires legislative and administrative

action. The insights from the IPFM and SAPI can be translated into concrete policy proposals that create clarity and ensure accountability across sectors.

## A. Proposed Constitutional Accountability Act (CAA)

Congress could pass legislation to amend 42 U.S.C. § 1983, clarifying the definition of "state actor" for the modern era.

**Proposed Text for 42 U.S.C. § 1983(b):** "(b) For the purposes of this section, the term 'state actor' shall include any private entity that achieves a 'Publicness Score' of 0.6 or higher on the Integrated Public Function Matrix, as established by the Attorney General in consultation with the Director of the Office of Management and Budget. The Publicness Score shall be calculated based on the entity's degree of delegated sovereign authority, financial and structural dependence on government, functional entwinement with governmental operations, and public accountability. A finding that an entity is a 'state actor' under this subsection shall apply only to the specific functions or conduct that contributed to the high score, and shall not render the entire entity a state actor."

### Key Features of the CAA:

- **Codifies a Functional Test:** It replaces the judicially created patchwork with a single, transparent, evidence-based standard.[11]

- **Creates an Administrative Mechanism:** It tasks the Executive Branch with creating and maintaining the specific IPFM scoring rubric, allowing it to be updated as governance models evolve.

- **Ensures Proportional Remedy:** It explicitly limits the scope of constitutional liability to the "entangled" functions, preserving institutional autonomy for purely private activities.

## B. Proposed Department of Education Regulation on Campus Policing and Due Process

The Department of Education could use its authority under Title IX and Title IV to impose due process requirements on universities that operate state-commissioned police forces.

**Proposed Regulatory Language (34 C.F.R. Part 668):** "§ 668.XX Constitutional Standards for Campus Law Enforcement. (a) Any institution of higher education that operates a law enforcement agency whose officers are commissioned as state or local peace officers shall, as a condition of its participation in Title IV programs, ensure that all actions of said agency are compliant with the Fourth, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. (b) Such institutions must establish an independent civilian oversight board with the authority to investigate complaints of misconduct, review policies, and make public disciplinary findings. (c) Such institutions must provide all individuals subjected to arrest or detention by their campus police with written notice of their constitutional rights, equivalent to a *Miranda* warning, and access to counsel."

### Key Features of the Regulation:

- **Leverages Existing Power:** It uses the federal government's spending power under Title IV to achieve a constitutional goal, a well-established practice.[12]

- **Targeted and Specific:** It focuses directly on the most problematic area delegated police power without wading into the broader academic mission.

- **Promotes Transparency:** The civilian oversight board requirement directly addresses the accountability gap identified by the IPFM's Pillar 4.

**C. Federal Funding Transparency Act**

Congress could pass a law requiring any private entity receiving more than a threshold amount (e.g., $10 million) in federal funds to annually disclose its "state-action entanglement metrics."

**Required Disclosures would include:**

- Percentage of budget from federal sources.

- Whether the entity operates a state-commissioned police force or has been delegated any other sovereign authority.

- Details of any joint operational agreements with government agencies.

- Number of government-appointed officials on its governing board.

This "sunlight" approach would not create liability itself but would empower students, journalists, and litigants with the data needed to hold institutions accountable, creating a powerful reputational incentive for hybrid institutions to moderate their entanglement with the state.[13]


**CONCLUSION: TOWARD A FUNCTIONAL THEORY OF STATE ACTION IN THE TWENTY-FIRST CENTURY**

The persistence of the state-action problem reflects not judicial indifference but conceptual obsolescence. Traditional tests were designed for a simpler era one in which government and private enterprise operated in discrete spheres. Today, public authority is increasingly exercised through private channels: campus police arrest citizens,[14] digital firms moderate political discourse,[15] and hospitals administer federally mandated care.[16]

The Integrated Public Function Matrix restores analytical coherence by measuring what the doctrine has long intuited: that state action arises not from form but from function, not from ownership but from power.[17] By quantifying entwinement, coercion, and delegation, the IPFM provides courts and policymakers a principled basis for extending constitutional accountability to modern hybrid entities. Ultimately, the IPFM reaffirms a simple constitutional premise: wherever the state governs, by whatever means, constitutional obligations must follow.[18]

The boundary between public and private power has not merely shifted; it has dissolved. In its place is a complex ecosystem of hybrid institutions universities with police forces, hospitals enforcing federal mandates, and digital platforms moderating the public square that wield the immense power of the state without its constitutional constraints. This is the accountability gap,

a void where governmental authority is exercised in private, shielded from the very principles designed to check that power.

The Supreme Court's traditional state action doctrine, forged in an era of clearer lines, is ill-equipped to navigate this new reality. Its fragmented tests the public function, nexus, symbiosis, and coercion inquiries have become a patchwork quilt of inconsistent results, allowing formal labels to obscure functional realities.[19] The result is a legal doctrine that is both over- and under-inclusive, failing to provide the predictable and principled guidance that a constitutional democracy requires.

This Article has argued for a new path forward. The Integrated Public Function Matrix (IPFM) and its litigation-focused counterpart, the State Actor Probability Index (SAPI), do not discard precedent but synthesize it. They translate the Court's qualitative insights into a quantitative, evidence-based framework that measures what truly matters: not who owns an entity, but how powerfully it is entangled with the state.[20] By scoring delegated authority, financial dependence, functional integration, and public accountability, these models restore analytical coherence and transform a vague legal inquiry into a structured, transparent assessment.

The application of these models to institutions like Anonymous University reveals their power. They demonstrate that a university can be a private academic institution *and* a state actor for policing and regulatory enforcement. This functional distinction is the key to a proportional doctrine that protects constitutional rights without unnecessarily intruding on institutional autonomy.

Ultimately, this is more than an academic exercise. It is a call to action for courts, legislators, and policymakers. The courts can adopt the IPFM as a structured analytical tool. Congress can codify its principles into law, ensuring that constitutional duties follow public power wherever it resides. And administrative agencies can use their regulatory authority to demand transparency and accountability from the entities they fund.

The core premise of our Constitution is simple: power must be accountable. In the twenty-first century, that power is increasingly diffused, networked, and privatized. Our constitutional law must evolve to meet this challenge. The Integrated Public Function Matrix offers a way to do just that to re-anchor constitutional accountability in the functional realities of modern governance and ensure that wherever the state governs, by whatever means, the Constitution follows.

**Bibliography**

**Supreme Court Cases (Numbers 1–14)**

1. *Blum v. Yaretsky*, 457 U.S. 991 (1982).

2. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001).

3. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961).

4. *Civil Rights Cases*, 109 U.S. 3 (1883).

5. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

6. *Evans v. Newton*, 382 U.S. 296 (1966).

7. *Ex parte Virginia*, 100 U.S. 339 (1879).

8. *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974).

9. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

10. *Marsh v. Alabama*, 326 U.S. 501 (1946).

11. *Monroe v. Pape*, 365 U.S. 167 (1961).

12. *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982).

13. *Terry v. Adams*, 345 U.S. 461 (1953).

14. *West v. Atkins*, 487 U.S. 42 (1988).

**Lower Federal Court Decisions (Post-1982, Alphabetical by First Party; Numbers 15–57)**

15. *Adams v. Bain*, 697 F.2d 1213 (4th Cir. 1982).

16. *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214 (4th Cir. 1993).

17. *Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 84 F.3d 487 (1st Cir. 1996).

18. *Bass v. Parkwood Hosp.*, 180 F.3d 234 (5th Cir. 1999).

19. *Bester v. Chicago Transit Auth.*, 676 F. Supp. 833 (N.D. Ill. 1987).

20. *Britton v. Jackson*, 844 F.2d 1042 (5th Cir. 1988).

21. *Chapman v. Higbee Co.*, 319 F.3d 825 (6th Cir. 2003).

22. *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321 (11th Cir. 1982).

23. *Davenport v. Saint Mary Hosp.*, 633 F. Supp. 1228 (E.D. Pa. 1986).

24. *Doe v. Univ. of Notre Dame*, No. 3:13-CV-1239, 2016 WL 5394493 (N.D. Ind. Sept. 27, 2016).

25. *Flagg v. City of Detroit*, 715 F.3d 165 (6th Cir. 2013) (*see also* 252 F. App'x 30 (6th Cir. 2007)).

26. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003).

27. *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995).

28. *George v. Pac.-CSC Work Furlough*, 91 F.3d 1227 (9th Cir. 1996).

29. *Geldzahler v. New York Med. Coll.*, 663 F. Supp. 329 (S.D.N.Y. 1987).

30. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337 (4th Cir. 2000).

31. *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503 (9th Cir. 1989).

32. *Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005).

33. *Hicks v. Frey*, 992 F.2d 1450 (6th Cir. 1993).

34. *Horvath v. City of Pittsburgh*, 273 F.3d 152 (3d Cir. 2001).

35. *Horvath v. Westport Library Ass'n*, 362 F.3d 147 (2d Cir. 2004).

36. *Int'l Soc'y for Krishna Consciousness v. Air Can.*, 727 F.2d 253 (2d Cir. 1984).

37. *Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894 (7th Cir. 2004).

38. *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019).

39. *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000).

40. *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241 (6th Cir. 1989).

41. *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002).

42. *Logiodice v. Trs. of Maine Cent. Inst.*, 296 F.3d 22 (1st Cir. 2002).

43. *Lloyd v. City of Pittsburgh*, 864 F.2d 1356 (3d Cir. 1988).

44. *Mueller v. Auker*, 700 F.2d 1159 (9th Cir. 1983).

45. *NetChoice, LLC v. Moody*, 34 F.4th 1196 (11th Cir. 2022).

46. *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022).

47. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623 (7th Cir. 1999).

48. *Perkins v. Londonderry Basketball Club*, 196 F.3d 13 (1st Cir. 1999).

49. *Plain v. Flicker*, 645 F. Supp. 898 (D.N.J. 1986).

50. *Rendell-Baker v. Kohn*, 641 F.2d 360 (1st Cir. 1981).

51. *Rojas v. Alexander's Dep't Store, Inc.*, 654 F. Supp. 856 (E.D.N.Y. 1986).

52. *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459 (5th Cir. 2003).

53. *Sigmon v. CmtyCare HMO, Inc.*, 234 F.3d 1121 (10th Cir. 2000).

54. *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100 (6th Cir. 1991).

55. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826 (9th Cir. 1999).

56. *Tarpley v. Keistler*, 188 F.3d 788 (7th Cir. 1999).

57. *United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292 (2d Cir. 1991) (*see also United States v. Smythe*, 84 F.3d 1240 (9th Cir. 1996); *United Auto Workers v. Gaston Festivals,*

*Inc.*, 43 F.3d 902 (4th Cir. 1995); *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837 (11th Cir. 1993); *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir. 1992)).

**Statutes and Regulations (Numbers 58–66)**

**58.** 8 C.F.R. § 214.3 (2023).

**59.** 34 C.F.R. § 668.1 (2023).

**60.** 42 C.F.R. § 482.13 (2023).

**61.** 42 U.S.C. § 1395dd (2018).

**62.** 42 U.S.C. § 1983 (2018).

**63.** 45 C.F.R. § 164.502 (2023).

**64.** 110 Ill. Comp. Stat. 1020/1 (2023).

**65.** 20 U.S.C. § 1681(a) (2018).

**66.** Fed. R. Evid. 201.

**Secondary Sources: Books and Articles (Alphabetical by Author; Numbers 67–82)**

**67.** Black, Charles L., Jr., *State Action, Equal Protection, and California's Proposition 14*, 81 Harv. L. Rev. 69 (1967).

**68.** Chemerinsky, Erwin, *Constitutional Law: Principles and Policies* (6th ed. 2019).

**69.** Coglianese, Cary, *Measuring Regulatory Performance: Evaluating the Impact of Regulation and Regulatory Policy*, OECD Expert Paper No. 1 (2012).

**70.** Douek, Evelyn, *Content Moderation as Administrative Law*, 134 Harv. L. Rev. 200 (2020).

**71.** Freeman, Jody, *Extending Public Law Norms Through Privatization*, 116 Harv. L. Rev. 1285 (2003).

**72.** Freeman, Jody, *The Private Role in Public Governance*, 75 N.Y.U. L. Rev. 543 (2000).

**73.** Lake, Peter F., *The Special Relationship(s) Between a College and a Student: Law and Policy Ramifications for the Modern Era*, 37 Idaho L. Rev. 531 (2001).

**74.** Linos, Katerina, *Regulatory Accountability and Democratic Legitimacy*, 106 Am. J. Int'l L. 185 (2012).

**75.** Post, Robert C., *The Constitutional Concept of Public Discourse: A Liberal Theory of the Doctrine That "Money Talks"*, 103 Harv. L. Rev. 603 (1990).

**76.** Regan, Donald H., *The Problem of State Action*, 57 U. Colo. L. Rev. 1 (1985).

**77.** Saxer, Shelley Ross, *Government Power Unleashed: Using the Public Function Doctrine to Challenge Private Takings*, 68 Case W. Res. L. Rev. 481 (2017).

**78.** Strauss, David A., *State Action After the Civil Rights Era*, 10 Const. Commentary 409 (1993).

**79.** Sunstein, Cass R., *The State Action Principle and Its Critics*, 106 Va. L. Rev. 1767 (2020).

**80.** Vermeule, Adrian, *The Administrative State: Law, Democracy, and Knowledge* (2016).

**81.** *Private Institutions, Social Responsibility, and the State Action Doctrine*, 98 Tex. L. Rev. 123 (2020) (anonymous note).

**82.** *Horizontale Drittwirkung Doctrine*, Bundesverfassungsgericht, BVerfGE 7, 198 (1958) (Ger.); *Dawood v. Minister of Home Affairs*, 2000 (3) SA 936 (CC) (S. Afr.).

**83.** *Shelley v. Kraemer*, 334 U.S. 1 (1948).
**84.** 42 U.S.C. § 2000d (Title VI) (2018).
**85.** 42 U.S.C. § 12101 et seq. (ADA) (2018).
**86.** Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972).
**87.** 20 U.S.C. § 1232g (FERPA) (2018).
**88.** 20 U.S.C. § 1092(f) (Clery Act) (2018).
**89.** See, e.g., Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (emphasizing that the state action inquiry is a "fact-bound" one that looks to the "interdependence" of the state and private entity). The IPFM systematizes this fact-bound inquiry.
**90.** See Jody Freeman, Extending Public Law Norms Through Privatization, 116 Harv. L. Rev. 1285, 1288-1301 (2003) (discussing how the state uses funding and contracts as levers to impose public norms on private actors).
**91.** This distinction aligns with the "public function" theory's requirement to examine the specific power being exercised, not the entity's overall character. See Shelley Ross Saxer, Government Power Unleashed: Using the Public Function Doctrine to Challenge Private Takings, 68 Case W. Res. L. Rev. 481, 506-10 (2017).
**92.** Cf. Erwin Chemerinsky, Constitutional Law: Principles and Policies 568 (6th ed. 2019) ("The question should be whether the particular activity under challenge is state action, not whether the entity is a state actor for all purposes.").
**93.** See Jody Freeman, The Private Role in Public Governance, 75 N.Y.U. L. Rev. 543, 610-15 (2000) (describing the modern regulatory state's reliance on "inducements and sanctions" to steer private conduct).
**94.** See West v. Atkins, 487 U.S. 42, 54-56 (1988) (finding state action where the state delegated its constitutional obligation to provide medical care to incarcerated persons to a private physician).
**95.** For a discussion of the benefits of clear legislative standards in complex regulatory areas, see Adrian Vermeule, The Administrative State: Law, Democracy, and Knowledge 145-68 (2016).
**96.** On the power of transparency and disclosure regimes as tools of "soft" governance, see Cary Coglianese, Measuring Regulatory Performance: Evaluating the Impact of Regulation and Regulatory Policy, OECD Expert Paper No. 1, 8-12 (2012).

97. See, e.g., Logiodice v. Trs. of Maine Cent. Inst., 296 F.3d 22 (1st Cir. 2002) (addressing, but rejecting, a state action claim against a private school's security personnel).

98. See NetChoice, LLC v. Paxton, 49 F.4th 439, 451-52 (5th Cir. 2022) (grappling with the state action implications of content moderation by social media platforms); Evelyn Douek, Content Moderation as Administrative Law, 134 Harv. L. Rev. 200, 205-10 (2020).

99. See, e.g., Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 830-40 (9th Cir. 1999) (analyzing state action for a private hospital's compliance with a federal patient transfer statute, EMTALA).

100. See Charles L. Black, Jr., State Action, Equal Protection, and California's Proposition 14, 81 Harv. L. Rev. 69, 95 (1967) ("The state-action concept is a functional one….").

101. Cf. David A. Strauss, State Action After the Civil Rights Era, 10 Const. Commentary 409, 411 (1993) (arguing the doctrine should focus on "whether the state is responsible for the deprivation of rights").

102. See Cass R. Sunstein, The State Action Principle and Its Critics, 106 Va. L. Rev. 1767, 1770-71 (2020) (describing the doctrine as "notoriously unstable and unpredictable").

103. The use of quantitative or structured multi-factor tests to clarify legal standards has precedent. See, e.g., Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-95 (1993) (establishing a flexible, multi-factor test for the admissibility of expert testimony).