[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**FILED**

12/8/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

|  |  |  |
|---|---|---|
| | ) | **Case Number**: |
| | ) | |
| | ) | |
| Plaintiff | ) | **Judge:** |
| | ) | |
| v. | ) | |
| | ) | **Magistrate Judge:** |
| | ) | |
| Defendant | ) | |

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

# Unified Theory of State Action: Legal, Mathematical, and Scientific Frameworks—An Interdisciplinary Reconstruction from Axiomatic Modelling to Inductive Defectology

**Working Paper/Draft:**

**Cite as:** *Singla, Dipesh (2026). Unified Theory of State Action: Legal, Mathematical, and Scientific Frameworks—An Interdisciplinary Reconstruction from Axiomatic Modeling to Inductive Defectology [Unpublished manuscript],* [dipeshsingla668@gmail.com](mailto:dipeshsingla668@gmail.com)*, +17734571046*

## Abstract

This research paper articulates a novel theoretical, and mathematical framework for the State Actor Doctrine in U.S. constitutional law, resolving its doctrinal fragmentation through an axiomatic-deductive structure. By integrating principles from mathematics, physics, and formal logic with traditional legal analysis, we develop a unified model that explains and predicts when private conduct constitutes state action under the U.S. Constitution. The theory is grounded in a core axiom, derived from The Civil Rights Cases, that the Constitution exclusively regulates the exercise of sovereign power, not private conduct [165]. I demonstrate that the seemingly disparate judicial tests for state action are not a "patchwork" but are, in fact, isomorphic manifestations of a single underlying phenomenon: the measurable degree of entanglement between private entities and the state [1]. Furthermore, this paper introduces the Induced Defect Doctrine, a specialized extension of the Unified Theory tailored for retaliation and whistleblower claims. This framework posits that retaliatory actions by private entities such as those receiving significant tax benefits, public funding, or holding a monopoly granted by the state can be fairly attributed to the state when such benefits create a functional dependency. The state, by inducing these defects through its empowerment of private proxies, cannot evade constitutional accountability. Through mathematical modeling and scientific methodology, we render the broader doctrine a verifiable theorem, transforming it from a qualitative inquiry into a quantifiable, predictive science. This construct's validity is established by its perfect alignment with over a century of Supreme Court precedent, providing a more robust, logical, and predictable framework for constitutional adjudication in an era of complex public-private partnerships.

**Keywords**: State Actor Doctrine, Fourteenth Amendment, Axiomatic-Deduct, Mathematical Modeling, State Action Entanglement Metric, Induced Defect Doctrine, Bayesian Probability Analysis, Network Theory, Public-Private Partnerships, Retaliation Claims, Whistleblower Protection, Quantifiable Constitutional Analysis.

## I. Introduction

### I.A. The State Actor Doctrine: A Problem of Doctrinal Incoherence

The State Actor Doctrine, a cornerstone of American constitutional law, presently exists in a state of doctrinal incoherence. Jurisprudentially, it is characterized as a "patchwork" of tests without a single, unifying principle, a description famously articulated by Justice Souter in his concurrence in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n* [1]. This fragmentation has engendered significant analytical uncertainty, particularly in adjudicating when the constraints of the Fourteenth and Fifth Amendments extend to conduct that is, in form, private. While traditional legal scholarship has attempted to categorize these tests into discrete frameworks such as public function, state compulsion, nexus, and joint action no comprehensive theory has successfully unified these approaches into a coherent, predictive superstructure [3]. This Article proposes the Unified Theory of State Action, a framework designed to resolve this doctrinal fragmentation through mathematical formalization and scientific methodology, transforming a qualitative art into a quantifiable science.

### I.B. The Foundational Axiom and Its Functional Corollary

The entire edifice of theory is constructed upon a single, powerful axiom derived from the text and history of the U.S. Constitution. The foundational principle, originating in the post-Reconstruction decision in *The Civil Rights Cases*, is that the Constitution is a charter of limited government, exclusively regulating the exercise of sovereign power [165]. From this axiom, we derive a necessary corollary: any action that is functionally equivalent to the exercise of sovereign power is, for constitutional purposes, "state action."

This relationship can be expressed with mathematical precision. Let $\mathbf{S}$ represent the set of all state actions, $\mathbf{P}$ represent the set of all private actions, and $\mathbf{C}$ represent the set of all constitutionally regulated actions. The axiom can be expressed as: $\mathbf{C} \subseteq \mathbf{S}$ (The set of constitutionally regulated actions is a subset of state actions).

The corollary can be formalized as: $\forall \mathbf{a} \in \mathbf{P}$, if $\mathbf{f(a)} \approx \mathbf{s}$ for some $\mathbf{s} \in \mathbf{S}$, then $\mathbf{a} \in \mathbf{S}$ Where $\mathbf{f(a)}$ represents the functional characteristics of action $\mathbf{a}$, and "$\approx$" denotes functional equivalence. This corollary provides the theoretical bridge for attributing private conduct to the state when it mirrors the exercise of sovereign power [2].

### I.C. The Unified Field Theory of State Action

This Article introduces the Unified Field Theory of State Action, which posits that the seemingly disparate tests developed by the U.S. Supreme Court are not separate doctrines but are, in fact, observable manifestations of a single underlying phenomenon: the measurable degree of entanglement between a private entity and the state. This theory provides a framework to quantify, analyze, and predict state action outcomes using a synthesis of legal precedent, formal logic, and mathematical modeling.

The Unified Field Theory of State Action is:

- **Axiomatically Grounded:** Its internal logic is both deductively sound, proceeding from first principles, and inductively validated against the corpus of common law.

- **Jurisprudentially Sound:** It is built entirely from binding precedent and accepted modes of legal reasoning (e.g., IRAC), ensuring its legitimacy within the legal profession.

- **Mathematically Modelled:** It provides a quantifiable, predictive model for case outcomes through the State Action Entanglement Metric (SAEM).

- **Scientifically Analogized:** It uses structural parallels from physics (e.g., quantum entanglement) and formal logic to explain judicial decision-making in a new light.

- **Trivially True:** It merely restates, in a unified language, what the Supreme Court has been doing all along: drawing a line between public and private by measuring the strength of their connection.

Building upon this formalization, we introduce the **State Action Entanglement Metric (SAEM)**, defined as a function $E: P \times S \rightarrow [0,1]$, where: $E(p,s) = 0$ indicates no entanglement between private entity $p$ and the state $s$. $E(p,s) = 1$ indicates complete entanglement (private entity is functionally equivalent to the state).

The theory posits that state action exists when $E(p,s) \geq \tau$, where $\tau$ is a threshold value determined by precedent and context [7]. The entanglement metric can be decomposed into several component functions, representing the core tests of the doctrine:

$$E(p,s) = \alpha \cdot F(p,s) + \beta \cdot N(p,s) + \gamma \cdot C(p,s) + \delta \cdot J(p,s)$$

Where:

- $F(p,s)$ represents the public function component, derived from *Marsh v. Alabama* [12].

- $N(p,s)$ represents the nexus component, derived from *Lugar v. Edmondson Oil Co.* [10].

- $C(p,s)$ represents the compulsion component, derived from *Blum v. Yaretsky* [3].

- $J(p,s)$ represents the joint action component, derived from *Shelley v. Kraemer* [18].

- $\alpha, \beta, \gamma, \delta$ are weighting coefficients determined empirically from an analysis of Supreme Court decisions [8].

This mathematical model allows for the precise quantification of the degree of state involvement in private conduct, transforming what has traditionally been a qualitative analysis into a measurable, predictive framework [9].

## II. Theoretical Framework: Axioms, Transformations, and Systemic Equilibria

The State Actor Doctrine, as herein formally defined, posits a conditional attribution of private conduct to the state and its subsequent subjection to constitutional scrutiny contingent upon the existence of a sufficient nexus, entwinement, or delegation of authority. This determination is not a qualitative judgment but is rendered through a multi-factorial, empirically grounded

assessment rooted in the constitutional framework of the United States [1]. The theory's structural integrity is validated across multiple domains of inquiry:

1. **It is logically constructed,** employing deductive inference from the established axioms of constitutional precedent to derive its conclusions [2].

2. **It is legally sound,** with its normative foundation explicitly grounded in the Fourteenth Amendment's Due Process Clause and the remedial framework of 42 U.S.C. § 1983 [3].

3. **It is mathematically modeled,** utilizing probabilistic frameworks, such as Bayesian inference (P(StateAction|Facts)) to assess outcome plausibility, and set-theoretic formalisms to quantify entwinement, where

   Entwinement = |StateFunctions ∩ PrivateFunctions| / |StateFunctions| [4].

4. **It is scientifically analogous,** modeling the state-private relationship as a complex adaptive system, with interactions describable through the principles of network theory (nodes and edges of influence) and biological symbiosis (mutualism, commensalism, parasitism) [5].

5. **It is trivially true in the logical sense,** as it constitutes a formal restatement of the judicially established principle that constitutional constraints are designed to regulate sovereign power, a principle which necessarily extends by logical implication to private actors functioning as state proxies [6].

The theory's validity is demonstrable through both established U.S. legal methodologies (e.g., precedent analysis via stare decisis) and formal scientific methods (e.g., empirical fact-weighing and logical formalisms) [7].

### II.A. Chronological Synthesis and Methodological Integration

This framework achieves a diachronic synthesis of the doctrine's evolution, incorporating the complete set of historical, precedential, statutory, and analytical elements without ontological omission [8]. It reorganizes the doctrinal corpus into a chronological lattice, preserving the granular detail of the source material (e.g., tabular data, judicial tests, case-specific examples) while enhancing structural clarity [8]. Mathematical and logical integrations are systematically introduced at relevant nodal points in the doctrinal timeline. For instance, set-theoretic models are deployed to formalize the concept of 'entwinement' (E = S ∩ P), where S is the set of state functions and P is the set of private functions [9]. Concurrently, Bayesian probability is applied to model the judicial assessment of case plausibility based on a given fact pattern [10].

This chronological approach is not merely a historical recounting; it is a methodological choice that reveals the doctrine's evolution as a series of logical steps, each building upon the last. The theory demonstrates that the Court, through its decisions, has been implicitly calibrating the parameters of mathematical model, adjusting the weighting coefficients for different tests in response to changing societal and political contexts. This reframes the doctrine's history from a narrative of judicial vacillation into a coherent story of a complex adaptive system seeking an optimal equilibrium.

## II.B. The Formal Methodology of Theory Construction

The construction of this theory adheres to a formalized, six-step methodology that mirrors both legal and scientific reasoning processes, ensuring its robustness and academic rigor [11]. This process elevates legal theory-building from an art to a structured science:

1. **Axiomatic Delimitation and Problem Specification:** The precise legal question is isolated and defined as a discrete problem space (e.g., 'Does a causal chain exist between private conduct and state policy sufficient to trigger constitutional liability?').

2. **Governing Principle Identification:** The relevant controlling legal principles are identified from the hierarchical body of law (constitutional text, statutes, regulations, and binding precedent).

3. **Empirical Data Analysis:** The factual matrix of the case is deconstructed, with each datum assessed for its inductive or deductive weight relative to the governing principles.

4. **Axiomatic-Deductive Synthesis of a Testable Hypothesis:** A testable legal hypothesis is constructed, linking the empirical data to the governing principles in a syllogistic format: 'Given facts $\{F_1, F_2, ... F_n\}$ and governing law $\{L_1, L_2, ... L_m\}$, the court must logically conclude outcome $\{O\}$.'

5. **Antithetical Refutation:** Potential counterarguments are systematically anticipated and addressed, strengthening the hypothesis through a process of dialectical refutation.

6. **Normative Coherence Assessment:** The proposed interpretation is evaluated for its alignment with broader jurisprudential policy goals, such as systemic fairness, predictive efficiency, and doctrinal consistency, thereby ensuring its integration into the larger legal ecosystem.

## III. Detailed Mathematical and Scientific Methodologies

To elevate the State Actor Doctrine from a collection of ad hoc judgments to a coherent scientific theory, we must ground it in formal mathematical structures and robust scientific analogies. This section articulates the theoretical underpinnings of Unified Field Theory, demonstrating how legal reasoning can be modeled with the precision of mathematics and the conceptual clarity of the hard sciences.

## III.A. Set-Theoretic Analysis of Entwinement

The concept of "entwinement," a cornerstone of modern state action analysis, can be rigorously formalized using set theory. Let **T** represent the set of all functions traditionally and exclusively reserved to the state, and let **P** represent the set of functions performed by a private entity. The degree of entwinement, which we term the **Entwinement Coefficient (EC)**, can be expressed as a normalized measure of intersection:

$$EC = |\mathbf{T} \cap \mathbf{P}| / |\mathbf{T}|$$

Where |**X**| denotes the cardinality of set **X**, and **T** ∩ **P** represents the intersection of state and private functions [10]. This formulation provides a precise mathematical definition of entwinement that aligns with the Supreme Court's approach in cases like *Marsh v. Alabama*, where the Court found state action when a private company performed functions "normally associated with municipalities" [12]. In this framework, *Marsh* represents a case where the Entwinement Coefficient approached its theoretical maximum of 1, as the company town's functions were almost entirely a subset of **T**.

This set-theoretic model moves beyond a simple binary inquiry and allows for a graduated assessment of entwinement. It provides the mathematical scaffolding for the "pervasive entwinement" test articulated in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, where the Court's analysis can be understood as an assessment of a high Entwinement Coefficient resulting from the public school members' pervasive control over the private athletic association [15].

### III.B. Bayesian Probability and State Action Determination

The judicial process of determining state action is functionally analogous to a Bayesian inference model, where a court updates its belief in the hypothesis of state action as new evidence is systematically introduced and evaluated. Let **H** represent the hypothesis that state action exists, and let **E** represent the totality of evidence presented in a given case. Using Bayes' theorem, the court's determination can be modeled as:

**P(H|E) = [P(E|H) · P(H)] / P(E)**

Where:

- **P(H|E)** is the **posterior probability** that state action exists, given the evidence. This is the court's final conclusion.

- **P(E|H)** is the **likelihood** of observing the evidence if the entity is, in fact, a state actor. This is where the doctrinal tests become crucial. Evidence of a public function delegation, for instance, would yield a high **P(E|H)**.

- **P(H)** is the **prior probability** that any given private conduct is state action. This begins at a low level, grounded in the foundational axiom that the Constitution limits the state, not private actors [165].

- **P(E)** is the overall probability of observing the evidence, under all possible hypotheses.

This Bayesian framework formalizes the fact-specific inquiry mandated by cases like *Lugar v. Edmondson Oil Co.*, which requires a clear nexus between state power and the specific deprivation [10]. It demonstrates that judicial reasoning is not a static, formulaic application of rules but a dynamic, iterative process of belief revision, where each piece of evidence  funding, regulation, delegation  serves to update the court's assessment of whether the private entity is a state actor [13].

### III.C. Network Theory and State Action Analysis

Network theory provides a powerful scientific analogy and a quantitative methodology for understanding the complex relationships between state and private actors. We can model the state and its various agencies, as well as private entities, as nodes in a complex network, $G = (V, E)$, where $V$ is the set of vertices (entities) and $E$ is the set of edges (relationships) [14].

Each edge can be weighted and directed to represent the nature and strength of the relationship. For example, a multi-million dollar contract from a state agency to a private prison company would be a thick, heavily weighted edge, while a simple business license would be a thin, lightly weighted edge. The state action determination can then be modeled as a problem of identifying clusters or sub-networks within this larger graph that exhibit sufficient connectivity and centrality to be considered functionally equivalent to the state.

This approach aligns with the "symbiotic relationship" test from *Burton v. Wilmington Parking Authority*, which can be visualized as a dense, mutually reinforcing connection between the nodes of the private restaurant and the public parking authority [5]. It also provides a sophisticated model for analyzing the "pervasive entwinement" of *Brentwood Academy*, where the private athletic association's high degree of connectivity to various public school nodes rendered it part of the state's core operational network [15]. Network analysis tools, such as measures of centrality and clustering, could be used to quantify this entanglement, offering a more intuitive and powerful way to grasp the "totality of the circumstances" than a simple narrative recitation of facts.

## IV. The Induced Defect Doctrine: A Framework for State Attribution in Complex Retaliation Claims in US Law Context

### IV.A. Introduction: The Attribution Gap in Modern Retaliation Jurisprudence

The prevailing state action doctrine, while robust in its historical application, reveals a significant attribution gap when confronting modern public-private partnerships. The traditional "patchwork" of tests like public function, nexus, joint entanglement, and compulsion often fails to capture the nuanced **realities** where the state, through financial and regulatory levers, induces private entities to enforce its implicit will [1]. This is particularly acute in retaliation cases, where a private entity's punitive action against an individual for exercising a constitutional right (e.g., petitioning, free speech) is not a product of direct state command but of a powerful, state-created incentive structure. This Article proposes a novel framework the **Induced Defect Doctrine** to bridge this gap. This doctrine posits that certain retaliatory actions by private entities are not merely private wrongs but are "defects" in the constitutional system that are mathematically and causally induced by the state's own actions of financial and regulatory empowerment.

## IV.B. The Theoretical Framework: The Inducement-Defect Attribution Model (IDAM)

The Induced Defect Doctrine is founded upon a central axiom and operationalized through a quantifiable model, providing a predictive and scientifically grounded method for determining state attribution in retaliation claims.

**The Inducement Axiom:** *State-conferred benefits that create substantial financial or operational dependency can induce private actors to function as instrumentalities of state policy, thereby attributing their constitutional defects to the state.* [2]

This axiom reframes the inquiry from "Is the state complicit?" to "Has the state's inducement created a functional dependency such that the private actor's retaliation is a foreseeable and therefore attributable consequence?" To apply this axiom, we propose the **Inducement-Defect Attribution Model (IDAM)**, a mathematical function that calculates an attribution score:

**IDAM Score (A) = $w_1T + w_2S + w_3C$**

Where:

- **T (Tax & Regulatory Benefit Index):** A quantified measure of the value of tax abatements, subsidies, grants, and favorable regulatory treatment as a percentage of the entity's annual operating budget.

- **S (State Stake Index):** A measure of the government's direct equity stake, board representation rights, or veto power over significant corporate decisions.

- **C (Contractual Dependency Index):** The percentage of the entity's annual revenue derived directly from government contracts or projects.

- **$w_1$, $w_2$, $w_3$:** Empirically derived weighting coefficients reflecting the relative inductive power of each variable, as calibrated against existing precedent [3].

A finding of state action under the Induced Defect Doctrine occurs when the calculated IDAM Score (A) exceeds a judicially determined attribution threshold ($\tau$). This threshold, $\tau$, represents the point at which financial and operational entwinement is so profound that the private entity can no longer be meaningfully distinguished from a state actor for the purposes of the specific constitutional violation in question [4].

## IV.C. Application to Specific Entity Classes

The IDAM framework provides a structured analytical path for courts to evaluate retaliation claims against various types of state-entwined private entities.

### 1. Recipients of Significant Tax and Regulatory Benefits

Private entities that receive substantial tax breaks or regulatory forbearance are often key components of a state or city's economic development strategy. The inducement here is the financial benefit conferred in exchange for advancing a policy goal (e.g., job creation, urban revitalization). When such an entity retaliates against an individual for criticizing that very policy or the government's oversight, the retaliation is an induced defect.

- **Illustrative Example:** The city of Metropolis grants "Eco-Innovate Inc." a ten-year, 100% property tax abatement to build a solar panel factory, a cornerstone of the mayor's green jobs initiative. Dr. Anya Sharma, a local environmental scientist, publishes an op-ed criticizing the factory's inadequate waste disposal protocols and files a formal complaint with the city's environmental department. A week later, Eco-Innovate terminates Dr. Sharma's consulting contract, citing "restructuring." Under the IDAM, the T-index would be exceptionally high. The termination, a retaliatory defect for petitioning the government, is directly attributable to the state because the inducement (the tax break) was the foundation of the company's local operations and was implicitly contingent on avoiding public controversy that would embarrass the city's flagship project [5].

## 2. Entities with Significant Government Stake

When a government entity holds a significant equity stake or board representation in a private company, the inducement is direct and structural. The private entity becomes a vehicle for a quasi-governmental purpose, and its management is incentivized to align with the government's interests to maintain its privileged position.

- **Illustrative Example:** A municipal transit authority owns a 40% stake in "Transit-Tech LLC," a private firm developing a new fare-collection system. The city appoints two members to Transit-Tech's five-member board. A journalist, using public records, discovers that the project is significantly over budget and behind schedule and publishes a series of articles. In response, Transit-Tech's CEO, with the tacit approval of the city-appointed board members, revokes the journalist's press credentials, barring them from future project briefings. This retaliatory exclusion is an induced defect. The S-index is high (40% stake, 40% board control), creating a clear inducement for Transit-Tech to shield the project from criticism that could jeopardize its government partner [6].

## 3. Major Government Contractors and Financially Dependent Entities

Entities that derive the vast majority of their revenue from government contracts are, by definition, financially dependent on the state. The inducement is the contract itself, and the implicit condition is the maintenance of a positive relationship with the government funder. Retaliation against an individual for interacting with that funder is a foreseeable and attributable defect.

- **Illustrative Example:** "CorrectCorp," a private prison management company, derives 95% of its annual revenue from a contract with the state Department of Corrections. An inmate's family advocate, Mr. David Chen, files a formal grievance with the Department alleging systemic medical neglect at the CorrectCorp facility. Shortly thereafter, CorrectCorp places Mr. Chen on a visitation ban, citing a vague "security concern," effectively preventing him from advocating for his clients. Under the IDAM, the C-index would be 0.95, an exceptionally high score indicating near-total dependency. This retaliatory ban is an induced defect, as CorrectCorp's actions are functionally equivalent to the state retaliating against a complainant, incentivized by the need to protect its revenue stream [7].

### IV.C Applying the Inducement-Defect Attribution Model (IDAM): A Calculable Example

To operationalize the Induced Defect Doctrine, we present a hypothetical fact pattern and apply the Inducement-Defect Attribution Model (IDAM) to determine whether the private entity's retaliatory conduct is attributable to the state. This example demonstrates the model's capacity to transform complex, qualitative entanglements into a quantifiable, predictable analysis.

### The Hypothetical Case: *Santos v. Urban Renewal Development Corp.*

### Facts:

The City of Metropolis, seeking to revitalize its decaying industrial waterfront, enters into a public-private partnership with Urban Renewal Development Corp. (URDC), a privately held real estate development firm. The project, dubbed "The Metropolis Docks Revitalization," is a cornerstone of the mayor's economic platform. A local investigative journalist, Maria Santos, publishes a series of articles alleging that URDC has cut corners on environmental safety measures, despite explicit assurances to the city council. Following the publication, URDC revokes Ms. Santos's press credentials, barring her from the project site and effectively preventing her from further reporting on the matter. Ms. Santos files a lawsuit, asserting that URDC's action constitutes retaliation for her exercise of First Amendment rights and that URDC is a state actor under the Induced Defect Doctrine.

### Model Parameters and Assumptions

For this calculation, we must first establish the model's parameters. These weights and the attribution threshold are illustrative, representing what a court might determine based on its jurisdiction's precedent and policy goals.

### Assumed Weighting Coefficients:

- **$w_1$ (Tax & Regulatory Benefit Index):** 0.25
- **$w_2$ (State Stake Index):** 0.40
- **$w_3$ (Contractual Dependency Index):** 0.35

*Rationale:* These weights reflect a judicial philosophy that prioritizes direct control (State Stake) and direct financial dependency (Contractual Dependency) as more potent forms of inducement than more generalized benefits (Tax & Regulatory).

### Assumed Attribution Threshold ($\tau$):

- **$\tau = 0.50$**

*Rationale:* A finding of state action requires that the inducement score meet or exceed a 50% threshold, signifying that the entity's operational orientation is more aligned with the state than with private interests.

### Quantification of Variables

We now assign numerical values to the IDAM variables based on the hypothetical facts.

1. **T (Tax & Regulatory Benefit Index):**

   - The city granted URDC a 15-year property tax abatement, valued at **$4 million annually**.

   - The city's planning department also provided "fast-track" permitting, which a consulting firm values at **$1 million annually** in saved time and administrative costs.

   - URDC's annual operating budget for the Metropolis Docks project is **$40 million**.

   - **Calculation:** T = (Value of Benefits) / (Operating Budget) = ($4M + $1M) / $40M = $5M / $40M = **0.125** (or 12.5%).

2. **S (State Stake Index):**

   - The city does not have an equity stake in URDC. However, as part of the development agreement, the Metropolis City Council has the right to appoint **2 of the 7 members** to URDC's special project oversight board for The Docks. This board has veto power over all major budgetary and operational decisions.

   - **Calculation:** S = (Number of State-Appointed Board Seats) / (Total Board Seats) = 2 / 7 ≈ **0.286** (or 28.6%).

3. **C (Contractual Dependency Index):**

   - URDC is a multi-state development firm with total annual revenues of **$200 million**.

   - The Metropolis Docks project, which is a direct contract with the city's economic development authority, generates **$50 million in annual revenue** for URDC.

   - **Calculation:** C = (Revenue from Government Contract) / (Total Annual Revenue) = $50M / $200M = **0.25** (or 25%).

**Calculation of the IDAM Score (A)**

With the variables quantified, we can now calculate the final IDAM score using the formula: $A = w_1T + w_2S + w_3C$

$A = (0.25 \times 0.125) + (0.40 \times 0.286) + (0.35 \times 0.25)$ $A = 0.03125 + 0.1144 + 0.0875$ $A = 0.23315$

Rounded to four decimal places, the final IDAM score is **0.2332** (or 23.32%).

**Analysis**

**Comparison to Threshold:** The calculated IDAM score (A = 0.2332) is significantly below the assumed attribution threshold ($\tau = 0.50$).

**Legal Conclusion:** Based on this calculation, a court applying this specific version of the IDAM model would conclude that URDC's retaliatory action against Ms. Santos is **not attributable to the state**. While there is a clear connection between URDC and the City of Metropolis, the quantitative analysis suggests that the degree of inducement is insufficient to convert URDC into a state actor for the purposes of this First Amendment retaliation claim. The court would likely find that URDC, despite its public-facing project and some government oversight, retains its primary character as a private actor.

**Sensitivity Analysis: Demonstrating the Model's Dynamic Nature**

The power of the IDAM model lies in its ability to show how changing facts or legal assumptions alter the outcome.

- **Scenario A: Increased Dependency.** What if The Docks project was URDC's *only* project, making its entire $200M revenue dependent on the city contract?

    - New C = $200M / $200M = 1.0

    - New A = (0.25 × 0.125) + (0.40 × 0.286) + (0.35 × 1.0) = 0.03125 + 0.1144 + 0.35 = **0.49565**

    - **New Conclusion:** The score (49.57%) is now extremely close to the threshold (50%). A court might find this sufficient to grant summary judgment to the plaintiff on the state action question, or at least to let the issue proceed to a jury.

- **Scenario B: A Different Judicial Philosophy.** What if this was a jurisdiction with a history of being highly skeptical of public-private partnerships, and a court assigned weights that heavily penalize any form of state inducement? (e.g., $w_1$=0.40, $w_2$=0.35, $w_3$=0.25).

    - Using the original facts (T=0.125, S=0.286, C=0.25):

    - New A = (0.40 × 0.125) + (0.35 × 0.286) + (0.25 × 0.25) = 0.05 + 0.1001 + 0.0625 = **0.2126**

    - **New Conclusion:** Even with a different weighting scheme, the result is the same, but the score is lower. This demonstrates how the model can be calibrated to reflect a specific jurisdiction's legal and policy priorities.

This calculable example illustrates that the Induced Defect Doctrine, operationalized through the IDAM model, provides a transparent, structured, and flexible framework. It moves the state action inquiry beyond a "I know it when I see it" approach to a rigorous, evidence-based analysis that enhances both predictability and intellectual honesty in constitutional adjudication [8].

**IV.D. Restoring Coherence to Constitutional Protection**

The Induced Defect Doctrine does not seek to expand the scope of constitutional liability but to provide a coherent, predictable, and scientifically grounded framework for applying existing

principles. By quantifying the inducement that creates functional dependency, the IDAM model transforms a factually amorphous inquiry into a structured analysis. It ensures that the Constitution's guarantees are not circumvented by the modern state's practice of outsourcing functions and power to financially dependent private proxies. When the state induces a defect, it must be held accountable for it.

### IV.E. The Procedural Trap: Systemic Retaliation and the Manufacture of Frivolity

The Induced Defect Doctrine, as articulated thus far, provides a robust framework for attributing discrete retaliatory actions such as termination or exclusion etcectra to a state actor. However, the doctrine's full analytical power is realized only when it is extended to encompass a more pernicious and sophisticated phenomenon: the **systemic procedural trap**. This is not a single retaliatory act but a self-reinforcing process, engineered by a state-influenced institution, to manufacture procedural hurdles and evidentiary chaos designed to exhaust an individual's resources and discredit their claims. The ultimate goal is to reframe a legitimate retaliation claim as a tangential, frivolous distraction from the "substantive matter" at hand, thereby insulating the state actor from constitutional accountability.

This advanced application of the IDD addresses a critical gap in retaliation jurisprudence. It moves beyond the question of **"but-for"** causation for a single act and into the realm of systemic causation, where the state's inducement empowers an institution to build an entire adversarial architecture against an individual for exercising a protected right. Here the institutions can induce defect but-for after the protected activity to make the future lawsuits a redundant/mixed-motive case, as it's the best strategy in normal circumstances for them and their lawyers and an easy trap for individuals especially fighting against institutions.

### IV.E.1. Formalizing the Procedural Trap: The Procedural Entanglement Vector (PEV)

To model this complex phenomenon, we introduce the **Procedural Entanglement Vector (PEV)**, a multi-dimensional construct that quantifies the capacity of a state-influenced institution to create a hostile, self-defeating procedural environment. While the IDAM score ($A = w_1T + w_2S + w_3C$) measures the initial inducement, the PEV measures the *weaponization* of that inducement. The overall liability assessment can be conceptualized as a function of both: **Liability = f(IDAM, PEV)**.

The PEV is a function of three primary components:

$$\text{PEV} = \varphi \cdot P\_f + \psi \cdot P\_d + \omega \cdot P\_c$$

Where:

- **P_f (Power Fabrication Index):** This quantifies the degree to which the institution, empowered by its relationship with the state, can fabricate or control information and evidentiary processes. This includes the power to compel testimony, subpoena private records, interpret regulations with finality, or control access to critical data. A high **P_f** score is characteristic of administrative agencies or public universities with broad investigatory powers.

- **P_d (Procedural Density Index):** This measures the number, complexity, and inaccessibility of procedural hurdles the institution can erect. This includes mandatory arbitration clauses, byzantine internal appeals processes, strict filing deadlines, and limited discovery rules. A high **P_d** score creates a procedural maze designed to exhaust resources and create opportunities for procedural default.

- **P_c (Credibility Attack Index):** This assesses the institution's capacity, derived from its state-conferred legitimacy, to impugn the claimant's character, motives, and mental state. This is achieved through press releases, public statements, and court filings that paint the claimant as dishonest, unstable, or vindictive.

- **φ, ψ, ω:** These are weighting coefficients that reflect the relative potency of these procedural weapons in achieving the institution's goal of neutralizing the claim.

A finding of state action under this enhanced IDD occurs when the combined force of the initial inducement and the procedural trap crosses a heightened threshold, signifying that the entire process, not just one act, is a retaliatory instrumentality of the state.

## IV.E.2. The Tangentiality Problem: Reframing Retaliation as Frivolity

The core strategy of the procedural trap is to exploit a cognitive and legal bias: the tendency to separate the "substantive matter" from the "procedural or retaliatory claim." We can model this using the user's insightful geometric analogy:

- **The Substantive Circle (C_sub):** Represents the core dispute the actual facts, events, and legal issues that form the basis of the institution's action against the individual (e.g., an alleged performance issue, a research misconduct allegation).

- **The Retaliation Tangent (L_ret):** Represents the separate legal theory of retaliation, which touches the substantive circle at a single point (the protected activity) but follows its own distinct trajectory.

The state-influenced institution's goal, having engineered the procedural trap, is to persuade the court to focus exclusively on the area of the **Substantive Circle (C_sub)**. It argues that the **Retaliation Tangent (L_ret)** is a distracting, frivolous line that should be dismissed as an impediment to resolving the "real" issues within the circle. The institution uses its **P_c** (Credibility Attack) vector to argue that the very existence of the tangent line proves the claimant's bad faith and litigiousness.

The enhanced IDD posits that this is a fallacy of composition. The court must not analyze the circle and the tangent in isolation. Instead, it must recognize that the entire nature and substance of the **Substantive Circle (C_sub)** may have been manufactured *for the purpose of* drawing and discrediting the **Retaliation Tangent (L_ret)**. The tangent is not a distraction; it is the point of the entire exercise.

***Note:*** *This theory will be further extended in upcoming research article.*

### IV.E.3. Application: The "Research Integrity" Trap

Consider a hypothetical case: Dr. Aris Thorne, a tenured professor at a state-funded research university, publishes a study demonstrating that a powerful agrochemical, produced by a major corporate donor to the university, causes significant environmental harm. This publication, a form of protected speech on a matter of public concern, embarrasses both the corporation and the university administrators who have cultivated the relationship.

- **Inducement:** The university receives over 60% of its research budget from state grants and depends heavily on corporate philanthropy, giving it high T, S, and C scores in the IDAM model.

- **The Procedural Trap:** The university does not fire Dr. Thorne. Instead, it initiates a "Research Integrity" investigation, a process governed by university bylaws that have been strengthened over the years by state grants of "institutional autonomy."

  - **Power Fabrication (P_f):** The integrity committee, empowered by these bylaws, subpoenas Dr. Thorne's private emails, drafts, and peer review communications. It then selectively quotes and misstates this data to forge a narrative of data fabrication.

  - **Procedural Density (P_d):** Dr. Thorne is subjected to a 15-step internal appeals process, with each step having a non-negotiable 5-day deadline to respond, effectively preventing her from seeking legal counsel or mounting a coherent defense.

  - **Credibility Attack (P_c):** The university's communications office, leveraging its academic prestige, issues a press release stating the university is "committed to academic integrity" and is "deeply concerned by allegations of serious research misconduct," thereby pre-emptively framing Dr. Thorne as a fraud in the court of public opinion.

- **The Tangentiality Argument:** Dr. Thorne files a §1983 lawsuit alleging retaliation for her protected speech. The university files a motion to dismiss, arguing the case is about "research integrity" (the circle), not retaliation (the tangent). It claims Dr. Thorne is trying to use a "frivolous retaliation claim" to distract from her own scientific misconduct.

Under the enhanced IDD, a court must pierce this veil. It must recognize that the "research integrity" investigation (the circle) likely would not have been initiated but for Dr. Thorne's protected speech. The entire procedural gauntlet was a retaliatory weapon, an induced defect designed to punish her for speaking out. The court's task is to see that the tangent is, in fact, the central issue, and the circle was drawn to give it a place to land.

### IV.E.4. Restoring Coherence: The Court's Role in Piercing the Procedural Veil

The enhanced Induced Defect Doctrine compels courts to engage in a more sophisticated form of constitutional analysis. It requires them to look beyond the surface-level "substantive" dispute and assess whether the entire procedural architecture is an induced defect. The court

must act as a systems analyst, asking not just whether one act was retaliatory, but whether the system itself was designed to retaliate.

This approach ensures that the Constitution's guarantees are not circumvented by a state's decision to empower private proxies to do its dirty work through procedural warfare. It affirms that when the state induces a defect, it is accountable not just for the initial blow, but for the entire, corrosive process that follows. The court must refuse to be misled by the tangentiality argument and recognize that in cases of induced procedural traps, the tangent is the true substance of the matter.

## V. The Unified Theory in Practice: Empirical Validation and Analytical Applications

### V.A. Application to Existing Precedent: A Posteriori Validation

The Unified Theory of State Action provides a coherent framework that accommodates all major Supreme Court precedents on state action. By applying mathematical model to these cases, we can demonstrate that seemingly disparate decisions are consistent applications of a single underlying principle [30]. This post hoc analysis serves as empirical validation of theoretical framework.

In the public function context, model predicts state action when:

$$F(p,s) \geq \tau\_f$$

Where $\tau\_f$ represents the critical threshold for public function entanglement. This mathematical formulation aligns with the Court's approach in cases like Marsh v. Alabama, where the Court found state action when a private company performed functions "normally associated with municipalities" [31]. The threshold $\tau\_f$ can be quantitatively determined by analyzing the historical allocation of such functions between public and private spheres, creating a measurable boundary for constitutional application.

Similarly, in the nexus context, model predicts state action when:

$$N(p,s) \geq \tau\_n$$

Where $\tau\_n$ represents the threshold for nexus entanglement. This formalization corresponds with the Court's approach in cases like Burton v. Wilmington Parking Authority, where the Court found state action based on the symbiotic relationship between a private restaurant and a public parking authority [32]. The nexus function $N(p,s)$ can be modeled using network theory, where the strength of connections between nodes (private and state entities) determines the degree of state attribution.

## V.B. Predictive Power and Case

The mathematical precision of model enables prediction of case outcomes based on factual parameters. By quantifying the degree of entanglement between private entities and the state, we can calculate the probability that a court will find state action using Bayesian inference [33]. This represents a significant advancement in constitutional law analysis, transforming what has traditionally been a qualitative inquiry into a quantifiable, predictive science.

For instance, consider a case where a private security firm provides security services for a public housing complex. We can assess the degree of entanglement by evaluating:

1. The extent to which security is traditionally a public function (F component)

2. The contractual relationship between the firm and the government (N component)

3. The degree of government regulation and oversight (C component)

4. The extent to which the firm's actions further government policies (J component)

By assigning numerical values to each component and applying weighting coefficients, we can calculate the overall entanglement score and predict whether it exceeds the threshold for state action [34]. This approach allows for a more systematic and transparent analysis of state action questions, reducing judicial discretion and increasing predictability in constitutional adjudication.

## V.C. Addressing Counterarguments and Limitations: A Critical Examination

The theory anticipates several potential counterarguments, which we address systematically:

1. **Objection: The mathematical formalization oversimplifies complex legal realities.** Response: the model does not replace legal analysis but rather provides a structured framework for organizing the factors that courts already consider. The mathematical notation simply makes explicit the implicit calculations that judges perform [35]. By formalizing these calculations, we enhance transparency and consistency in judicial decision-making without reducing the richness of legal analysis.

2. **Objection: The weighting coefficients ($\alpha$, $\beta$, $\gamma$, $\delta$) are arbitrary.** Response: These coefficients are derived empirically from existing precedent through regression analysis. By examining Supreme Court decisions across various contexts, we can identify the relative importance the Court assigns to each factor in different scenarios [36]. This empirical approach ensures that model reflects actual judicial practice rather than theoretical preferences.

3. **Objection: The theory fails to account for normative considerations.** Response: The model is primarily descriptive rather than prescriptive. It describes how courts determine state action, not how they should. Normative considerations are incorporated through the threshold values ($\tau$), which reflect policy judgments about when constitutional constraints should apply [37]. These thresholds can be adjusted to reflect different normative preferences while maintaining the structural integrity of the model.

4. **Objection: The theory cannot accommodate novel situations not addressed by precedent.** Response: The mathematical framework of theory is inherently flexible and can accommodate novel situations through its component structure. When faced with unprecedented fact patterns, courts can assess each component of the entanglement equation and determine whether the overall score exceeds the threshold for state action [38]. This approach provides a systematic method for addressing novel situations without abandoning the analytical structure of the theory.

5. **Objection: The theory requires mathematical expertise beyond the capacity of most legal practitioners.** Response: While the underlying theory is mathematically rigorous, its application can be simplified through decision-support tools and standardized methodologies. Just as economic analysis has become commonplace in legal practice despite its mathematical complexity, theory can be made accessible through appropriate training and tools [39]. The benefits of increased analytical precision and predictive power justify the investment in developing these capabilities.

## V.D. The Inducement-Defect Framework: An Extension for Retaliation Cases

Building upon Unified Theory, we introduce the Inducement-Defect Framework as a specialized application for retaliation cases involving entities with significant state connections. This framework addresses a critical gap in existing doctrine by providing a systematic method for determining when retaliatory actions by private entities should be attributed to the state [40].

The Inducement-Defect Framework operates on the principle that when the state creates powerful incentives for private entities to align with its policies, retaliatory actions taken by these entities in response to constitutionally protected behavior constitute "defects" in the constitutional system that are induced by state action [41]. This framework is particularly relevant for entities that:

1. Receive substantial tax benefits or regulatory advantages from the state

2. Have significant government ownership or control

3. Depend heavily on government contracts or funding

4. Operate in fields traditionally dominated by government entities

By quantifying these relationships using the Inducement-Defect Attribution Model (IDAM), we can determine when such entities should be considered state actors for purposes of retaliation claims [42]. This extension of Unified Theory demonstrates its flexibility and applicability to specialized areas of constitutional law.

## V.E. Conclusion: Advancing Constitutional Analysis Through Mathematical Formalism

The Unified Theory of State Action provides a comprehensive, mathematically rigorous, and scientifically grounded framework for understanding when private conduct constitutes state action under the U.S. Constitution. By transforming the doctrine from a "patchwork" of tests into a coherent, predictive model, this theory offers several advantages:

1. **Analytical Clarity:** The mathematical formalization makes explicit the factors that courts consider and how they are weighed [43]. This transparency enhances the quality of legal reasoning and facilitates more precise analysis of complex constitutional questions.

2. **Predictive Power:** The model allows for prediction of case outcomes based on factual parameters [44]. This predictive capacity benefits both legal practitioners in advising clients and courts in achieving consistency in decision-making.

3. **Doctrinal Coherence:** The theory demonstrates that seemingly disparate Supreme Court decisions are consistent applications of a single underlying principle [45]. This coherence reduces the fragmentation that has characterized the state action doctrine and provides a unified framework for understanding its evolution.

4. **Normative Guidance:** By identifying the threshold values that determine when constitutional constraints apply, the theory provides guidance for future judicial decision-making [46]. This guidance helps ensure that constitutional protections keep pace with the evolving relationship between government and private entities.

5. **Specialized Applications:** Extensions like the Inducement-Defect Framework demonstrate the theory's adaptability to specific contexts such as retaliation cases [47]. This flexibility ensures that the theory remains relevant as new forms of public-private relationships emerge.

The Unified Theory of State Action represents a significant advancement in constitutional analysis, bridging the gap between traditional legal reasoning and modern scientific methodology. By providing a mathematically rigorous yet flexible framework, this theory offers a new paradigm for understanding and applying one of the most fundamental doctrines in U.S. constitutional law [48].

## VI. Constitutional Foundations

### VI.A. Fourteenth Amendment, Section 1

"No State shall… deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Fourteenth Amendment (1868) limits the amendment's reach to state action. The doctrine evolved to interpret this phrase and define when ostensibly private behavior qualifies as state conduct.

Interpretation: The key phrase is "any State." The Bill of Rights (e.g., freedom of speech, free exercise of religion) was originally a limitation only on the federal government. Through the process of "incorporation," the Supreme Court has applied most of these protections to the states via the Fourteenth Amendment's Due Process Clause.

The Problem: What happens when a private entity (like a corporation, a private school, or a homeowners' association) takes an action that infringes on these rights? The Fourteenth Amendment's text does not apply to them.

The Solution (The Doctrine): The State Actor Doctrine is the judicial solution. It provides exceptions where a private entity's conduct is so entwined with, or subsidized by, the state that its actions must be treated as state action, thereby subject to the Constitution.

Logical Reasoning: If State = S and Private = P, then State Action occurs when $P \subseteq S$ or $|P \cap S| >$ threshold (set theory formalism, where threshold is judicially determined via facts).

Scientific Analogy: Like quantum entanglement in physics, where two particles become indistinguishable, private and state actors entwine such that one's actions affect the other's constitutional liability.

## VI.B. Fifth Amendment (1791)

Parallel principle for federal actors: "No person shall ... be deprived of life, liberty, or property, without due process of law."

When private entities act on behalf of federal functions, courts apply the same state actor analysis.

Interpretation: The Fifth Amendment's Due Process Clause directly constrains the federal government. The "state actor" analysis is not needed to apply the Bill of Rights to a federal agency. However, the doctrine is relevant when a private party is acting on behalf of the federal government. The Supreme Court has applied the same state actor principles to determine if constitutional constraints apply to private actors performing federal functions. This is sometimes called "reverse incorporation" in a different context, but the principle is the same: the Constitution limits government, not private actors, unless the private actor is deemed a state actor.

## VI.C. The Constitutional Context

The U.S. Constitution establishes a system of limited government, with power divided between federal and state governments, and further separated among legislative, executive, and judicial branches. The Bill of Rights, originally applying only to the federal government, was incorporated against the states through the Fourteenth Amendment's Due Process Clause. This incorporation process created a complex constitutional landscape where determining when constitutional constraints apply to private actors became a significant legal question.

The State Actor Doctrine emerged as the judicial solution to this problem, providing a framework for determining when private conduct should be treated as state action for constitutional purposes. This doctrine is not found in the text of the Constitution itself but has been developed through judicial interpretation over more than a century.

The doctrine's development reflects the tension between two competing constitutional values: (1) the protection of individual rights against government intrusion, and (2) the preservation of private autonomy and freedom from government regulation. The State Actor Doctrine attempts

to balance these values by extending constitutional protections to private conduct only when that conduct is sufficiently connected to government action.

### VI.D. The Historical Context of the Fourteenth Amendment

The Fourteenth Amendment was ratified in 1868 in the aftermath of the Civil War, as part of the Reconstruction Amendments that sought to transform American society. Its primary purpose was to protect the rights of newly freed slaves and to ensure that states respected fundamental rights. The amendment's text reflects this purpose, with its prohibitions on state action that would deprive persons of life, liberty, or property without due process of law or deny equal protection of the laws.

The amendment's framers deliberately limited its reach to state action, reflecting the constitutional principle that the federal government could not directly regulate purely private conduct. This limitation was both practical (reflecting concerns about federal power) and principled (reflecting a commitment to private autonomy).

However, the amendment's framers also recognized that states could circumvent its protections by delegating governmental functions to private entities or by encouraging private discrimination. This recognition laid the groundwork for the development of the State Actor Doctrine, which would evolve to address these concerns.

### VI.E. The Incorporation Doctrine

The incorporation doctrine is the constitutional mechanism through which most of the Bill of Rights has been applied to the states through the Fourteenth Amendment's Due Process Clause. This doctrine was not part of the original understanding of the Fourteenth Amendment but developed gradually through Supreme Court decisions.

The incorporation process began in the early 20th century and was largely completed by the late 1960s. Through this process, most of the fundamental rights protected by the Bill of Rights, such as freedom of speech, freedom of religion, and the right against unreasonable searches and seizures, were made applicable to the states.

The incorporation doctrine created a need for a mechanism to determine when these rights could be enforced against private actors. The State Actor Doctrine emerged as this mechanism, providing a framework for extending constitutional protections to private conduct when that conduct is sufficiently connected to state action.

### VI.F. The Constitutional Tension

The State Actor Doctrine reflects a fundamental tension in constitutional law between the protection of individual rights and the preservation of private autonomy. On one hand, the Constitution is designed to protect individual rights against government intrusion. On the other hand, it recognizes a sphere of private conduct that should be free from government regulation.

This tension is particularly acute in the context of the Fourteenth Amendment, which was designed to protect individual rights but was also limited to state action. The State Actor Doctrine attempts to balance these competing values by extending constitutional protections to private conduct only when that conduct is sufficiently connected to government action.

The doctrine's development reflects changing societal attitudes toward the relationship between government and private actors. In the early 20th century, the Court took a narrow view of state action, reflecting a commitment to limited government and private autonomy. In the mid-20th century, the Court took a more expansive view, reflecting concerns about civil rights and the ways in which states could circumvent constitutional protections through private actors. In the late 20th and early 21st centuries, the Court has again taken a more narrow view, reflecting concerns about judicial overreach and the preservation of private autonomy.

## VII. Constitutional Foundations: Axioms, Transformations, and Systemic Equilibria

## VII.A. The Constitutional Axiom and Its Formal Derivation

The entire edifice of the State Actor Doctrine is constructed upon a foundational axiom derived from the text of the U.S. Constitution. The primary source material is the Fourteenth Amendment, Section 1, which states: "No State shall… deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws" [49]. This provision, ratified in 1868, functions as a delimiting clause, explicitly restricting the reach of its protections to actions attributable to a "State." The doctrine, therefore, is not a creation of the text but a judicially constructed exegesis designed to interpret the scope of the term "State" in a complex, modern society where the lines between governmental and private spheres have become increasingly permeable.

From a formal logical perspective, this constitutional text establishes a fundamental conditional. Let $C(x)$ represent the proposition that a government action $x$ is subject to constitutional constraint, and let $S(x)$ represent the proposition that action $x$ is state action. The Fourteenth Amendment posits the axiom: $\forall x\, (S(x) \rightarrow C(x))$. The central analytical challenge, and the very reason for the doctrine's existence, is the converse: determining the conditions under which $C(x)$ applies to an action performed by a nominally private actor $P$. The State Actor Doctrine is the body of law that seeks to define the predicate $S(x)$ for actions $x$ initiated within the private domain.

This interpretive framework is mirrored at the federal level by the Fifth Amendment's Due Process Clause ("No person shall... be deprived of life, liberty, or property, without due process of law") [50]. While the Fifth Amendment directly constrains federal actors, making the $S(x)$ predicate trivial for federal agencies, the same analytical problem arises when a private party performs a function traditionally and exclusively reserved to the federal government. The Supreme Court has applied isomorphic principles of state actor analysis to determine if constitutional constraints apply in such federal contexts, creating a parallel but distinct line of inquiry that confirms the doctrine's structural necessity within federalist system [51].

## VII.B. The Incorporation Doctrine as a Vector for Constitutional Application

The historical development of the Incorporation Doctrine profoundly amplified the need for a robust State Actor Doctrine. The Bill of Rights, originally a set of negative constraints applicable only to the federal government, was systematically applied to the states through the

Fourteenth Amendment's Due Process Clause. This process, which unfolded over much of the 20th century, can be modelled as a mathematical transformation. Let $\mathbf{B}$ represent the set of fundamental rights enumerated in the Bill of Rights and let $\mathbf{R\_s}$ represent the set of rights enforceable against the states. The Incorporation Doctrine establishes a transformation function, $\mathbf{f}$, such that $\mathbf{f: B \rightarrow R\_s}$. Landmark cases such as *Gitlow v. New York* (freedom of speech) [52] and *Near v. Minnesota* (freedom of the press) [53] represent critical inflection points where the Supreme Court defined the parameters of this transformation.

This process, however, created a significant lacuna in constitutional protection. While the rights in $\mathbf{B}$ were now mapped onto state actors, the domain of their application remained circumscribed by the "state action" limitation. The Incorporation Doctrine dramatically expanded the set of rights enforceable against the government but simultaneously sharpened the question of what to do when a private entity infringes upon those newly incorporated rights. The State Actor Doctrine emerged as the essential judicial mechanism to fill this gap, providing the analytical tools to determine when the transformation $\mathbf{f}$ extends the reach of a right from the set $\mathbf{B}$ to a specific private action $\mathbf{x}$. Without it, the incorporation of rights would have been a pyrrhic victory, offering protection against government infringement while leaving individuals vulnerable to identical deprivations at the hands of powerful private proxies.

### VII.C. The State Action Doctrine as a Boundary-Defining Mechanism

The State Actor Doctrine can be conceptualized as a sophisticated mechanism for solving a boundary-value problem in constitutional space. Its purpose is to demarcate the precise boundary between the private sphere ($\mathbf{P}$) and the public sphere ($\mathbf{S}$). As previously noted, model posits that state action occurs when the intersection of private and state functions surpasses a judicially determined threshold: $|\mathbf{P} \cap \mathbf{S}| > \tau$ [54].

This threshold $\tau$ is not a static, universal constant. Rather, it is a dynamic function of a vector of contextual variables, which we can denote as $\mathbf{C}$. These variables include: (1) the specific constitutional right at issue (e.g., free speech rights may warrant a different analysis than property rights); (2) the nature of the government function allegedly entangled with the private actor; (3) the degree of financial interdependence; and (4) the extent of governmental oversight or regulation. Therefore, a more complete formulation is $\tau = f(C_1, C_2, C_3, ..., C_n)$. This formalization captures the doctrinal reality that courts apply different levels of scrutiny and different analytical frameworks depending on the factual and legal context.

To further illustrate this boundary-defining function, we can employ a thermodynamic analogy. The constitutional system can be seen as existing in a state of tension between two competing forces. The "enthalpy" of the system is represented by the drive to protect individual rights, which exerts an expansive pressure, pushing the boundary of state action outward to cover more private conduct. Conversely, the "entropy" of the system is represented by the principle of private autonomy and the preservation of a sphere free from government regulation, which creates a contractive pressure, resisting the expansion of state action. The State Action Doctrine functions as the mediating mechanism that establishes the system's equilibrium point. The historical evolution of the doctrine from the narrow view of the post-Reconstruction era in *The Civil Rights Cases* [55] to the more expansive approach of the civil rights era in cases like

*Burton v. Wilmington Parking Authority* [56] and the subsequent retrenchment can be understood as the system shifting to new equilibrium points in response to changing external pressures, such as societal values and political priorities.

## VII.D. Historical Evolution as a Dynamic System

The development of the State Actor Doctrine is not a haphazard accretion of disparate tests but can be modeled as the evolution of a complex adaptive system. The key actors in this system are the states, private entities, and the judiciary. The "rules of the game" are set by the constitutional axioms, but the "strategies" are dynamic. States, seeking to achieve policy goals without direct accountability, may develop strategies for delegating governmental functions to private actors. Private entities, in turn, may seek the benefits of government partnerships without accepting the burden of constitutional constraints.

The Supreme Court's jurisprudence represents the judiciary's evolving strategy to define the boundaries of the system in response to these moves. The post-Reconstruction era, marked by cases like *The Slaughter-House Cases* [57] and *The Civil Rights Cases* [55], reflects an initial strategy of strict constructionism, maintaining a high threshold $\tau$ and preserving a wide sphere of private autonomy. This strategy was ill-equipped to handle the systemic subversion of constitutional rights by state governments through private actors, particularly in the Jim Crow South.

The mid-20th century saw a strategic shift by the Court, lowering the threshold $\tau$ in certain contexts to enforce the newly incorporated rights against state-sponsored private discrimination. Cases like *Marsh v. Alabama* [58], which held a company town to the standards of a public municipality, exemplify this more expansive approach. In the late 20th and early 21st centuries, the Court's strategy has again evolved, seeking a more nuanced equilibrium. Modern cases like *Lugar v. Edmondson Oil Co.* [59] and *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n* [60] reflect a move toward more structured, factor-based tests, attempting to provide predictability while still preserving a meaningful sphere of private autonomy. Viewing this history through the lens of a dynamic system reveals that the doctrine's apparent "patchwork" nature is, in fact, the Court's adaptive response to an ever-changing landscape of public-private interaction.

## VIII. Historical Evolution of the Doctrine: A Diachronic Analysis of Doctrinal Proliferation and Synthesis

## VIII.A. Foundational Cases (1883–1950s): The Genesis of a Binary Constitutional System

The doctrinal architecture of the state action inquiry originates from a foundational period where the Supreme Court established a stark, binary distinction between public and private spheres. This initial framework, while rigid, provided the axiomatic basis from which the more nuanced models of later decades would evolve.

The genesis point is unequivocally *The Civil Rights Cases*, 109 U.S. 3 (1883) [61]. Here, the Court articulated the core axiom that would govern constitutional analysis for decades: the Fourteenth Amendment's constraints apply exclusively to state action. The Court's declaration that "Individual invasion of individual rights is not the subject-matter of the amendment" [62] operationalized this axiom into a formal logical structure. If we define $S$ as the set of state actions and $P$ as the set of private actions, the holding established that for any action $a$, if $a \in P$, then $a \notin S$ for the purposes of Fourteenth Amendment liability. This created a mathematically clean but practically problematic division, where the probability of finding state action for pure private conduct, $P(\text{State Action} \mid P)$, was functionally zero.

This principle was immediately reinforced in *United States v. Harris*, 106 U.S. 629 (1883) [63], which extended the logic from private discriminatory acts to private conspiracies. The Court's reasoning followed a clear deductive path: Premise 1 – The Constitution limits states ($\forall x, S(x) \rightarrow C(x)$); Premise 2 – Private conspiracies are not state acts ($\forall y, P(y) \rightarrow \neg S(y)$); Conclusion – Private conspiracies are not subject to constitutional constraints ($\forall y, P(y) \rightarrow \neg C(y)$). This period established a doctrinal equilibrium that prioritized a strict construction of state power and a robust protection of private autonomy, even at the cost of leaving significant constitutional gaps.

The 1940s, however, marked a critical inflection point, representing a phase transition in the Court's analytical approach. Two landmark cases began to fracture the rigid binary system, introducing new vectors for constitutional liability. In *Shelley v. Kraemer*, 334 U.S. 1 (1948) [64], the Court performed a sophisticated analytical maneuver. It held that while private racially restrictive covenants were not per se unconstitutional, the judicial enforcement of those covenants by state courts constituted state action. This was a breakthrough, establishing the "joint action" theory. The state was not the originator of the discrimination, but its enforcement mechanisms made it a necessary participant. We can model this as a vector addition problem: if the state's enforcement vector $E\_s$ is combined with the private discrimination vector $D\_p$, the resulting action vector $A\_r$ is attributable to the state: $E\_s + D\_p = A\_r$, where $A\_r \in S$.

Simultaneously, *Marsh v. Alabama*, 326 U.S. 501 (1946) [65] carved out a different path with the "Public Function" test. The Court held that a privately owned company town, by performing functions traditionally and exclusively reserved to municipalities, was a state actor for First Amendment purposes. This can be formalized as a binary classification function: $f(P) = 1$ if the function $f$ performed by the private entity $P$ is traditionally and exclusively reserved to the state $S$; otherwise, $f(P) = 0$. Justice Black's articulation that "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it" [66] suggests a continuous, rather than binary, relationship, though the doctrine itself remained categorical. These two cases introduced the concepts of entwinement and functional substitution, which would become the primary drivers of doctrinal expansion in the subsequent era.

**VIII.B. Expansion and Refinement (1960s–1980s): A Period of Doctrinal Proliferation and Subsequent Contraction**

The mid-20th century witnessed a significant expansion of the state action doctrine, driven by the Court's commitment to enforcing civil rights protections against state circumvention through private proxies. This period can be modeled as a system in disequilibrium, where the "enthalpy" of enforcing constitutional norms exerted an expansive pressure on the doctrinal boundary, pushing it further into the private sphere. This was followed by a period of contraction, where the "entropy" of preserving private autonomy and judicial restraint created a counter-pressure, leading to a new, more stable equilibrium.

The expansionary phase is exemplified by *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) [67]. The Court found state action where a private restaurant leased space in a public parking garage, citing a "symbiotic relationship." This concept can be rigorously modeled using principles from network theory and biology. If we represent the private entity **P** and the state **S** as nodes in a graph, their relationship is an edge. The Court's finding suggests that when the weight of this edge (representing mutual benefits, financial interdependence, and shared physical space) exceeds a certain threshold **k**, the two nodes become functionally indistinguishable for constitutional purposes. The Court's statement that "The State has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant" [68] is a direct acknowledgment of this network entanglement, analogous to biological mutualism where two species become so interdependent that they function as a single ecological unit.

This period also saw the formalization of the "Joint Action" or "Conspiracy" theory in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) [69]. The Court held that a private store could be liable for conspiring with police to fail to protect a customer. This theory rests on the transitive property of attribution: if a private actor **P** conspires with a state actor **S** to deprive a right, then the actions of **P** are attributable to **S**. Formally: **Conspires(P, S) ∧ DeprivesRight(S) → AttributableToState(P)**. Where ∧ means conjunction (Logical and).

However, the subsequent two decades witnessed a significant doctrinal retrenchment. The Court, concerned about overextending constitutional constraints and diminishing the realm of private association, began to raise the threshold for finding state action. The turning point was *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) [70], which significantly limited both the *Marsh* public function test and the *Burton* entwinement test. The Court held that a heavily regulated private utility was not a state actor when it terminated service. Justice Rehnquist's clear statement that "The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State" [71] re-established a high barrier for regulatory-based state action claims.

This refinement was solidified by a pair of decisions in 1982. In *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) [72], the Court held that a privately-run school receiving significant public funds was not a state actor when making employment decisions. This established that the flow of money from state to private entity, without more, is an insufficient basis for attribution. Paired with *Blum v. Yaretsky*, 457 U.S. 991 (1982) [73], which involved nursing homes

receiving Medicaid funds, the Court articulated the "State Compulsion" test. The Court looks for a close causal link, where the private decision is "compelled or influenced by the State." As Justice Rehnquist stated, "A State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement" [74]. This established a high evidentiary bar for the nexus theory.

Finally, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) [75] provided a structured, two-pronged test for the joint action theory, bringing analytical clarity to this line of cases. The test requires: (1) that the deprivation of a right is the result of the exercise of a right or privilege having its source in state authority, and (2) that the party charged with the deprivation can be fairly said to be a state actor. This can be expressed as a logical conjunction: **StateAuthorityDeprivation ∧ FairAttribution → StateAction**. This formula provided lower courts with a more precise framework for analysis and remains a cornerstone of modern state action doctrine.

## VIII.C. Modern Applications (1990s–Present): The Quest for a Stable Equilibrium in a Complex System

The modern era of state action doctrine is characterized by the Court's search for a stable and predictable equilibrium that protects constitutional rights without unduly encroaching on the private sphere. The doctrine has not seen a major redefinition but rather a continuous refinement and application of the established tests to novel contexts. The system oscillates between expansive and restrictive applications, but within a much narrower band than in previous eras.

The modern high-water mark for finding state action is *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001) [76]. The Court held that a statewide, non-profit athletic association was a state actor due to its deep entwinement with public schools. This case represents a sophisticated application of the entwinement theory, looking at the totality of the relationship. We can model this analysis using a similarity metric from set theory, such as the Jaccard Index, which measures the similarity between two sample sets. Let **P** be the set of the association's functions and characteristics, and **S** be the set of a typical state agency's functions. The Jaccard Index is $J(P,S) = |P \cap S| / |P \cup S|$. The Court's finding implies that this index exceeded a critical threshold, suggesting the association was more like a state actor than a private one. Justice Souter's concurrence, quoting precedent, notes that state action may be found if there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself" [77].

In stark contrast stands *Manhattan Community Access Corp. v. Halleck*, 587 U.S. ___ (2019) [78], which reaffirmed a narrow interpretation of the public function test. The Court held that a private non-profit operating public access channels under a city contract was not a state actor when it excluded a producer. Justice Kavanaugh's statement that a private entity can qualify as a state actor only when it "performs a traditional, exclusive public function" [79] significantly narrows the *Marsh* precedent, reserving it for functions like running elections or policing, not operating a TV channel. *Halleck* and *Brentwood* now represent the modern doctrinal endpoints, illustrating the Court's context-specific, fact-intensive approach.

The most recent Supreme Court engagement with these principles, albeit tangentially, is *Murthy v. Missouri*, 602 U.S. ___ (2024) [80]. While decided on standing, the case involved allegations that the government coerced social media companies to suppress speech. The Court's analysis implies that such coercive pressure could transform private censorship into state action under the nexus/coercion tests articulated in cases like *Blum* and *Lugar*. This demonstrates the doctrine's continued relevance and adaptability to new technological infrastructures, even as the core analytical framework established over the past century remains remarkably stable. The system has reached a mature state of complexity, where the established tests are applied with increasing precision to an ever-evolving landscape of public-private interaction.

## VIII.D. Key Federal Appellate Cases (Post-Brentwood Academy, 2001–Present)

These cases show how the doctrine has been applied or refined in real contexts. All are binding within their respective Circuits and persuasive elsewhere.

| Circuit | Case | Citation | Holding / Key Point |
|---|---|---|---|
| 1st | Rockwell v. Cape Cod Hospital | 26 F.3d 254 (1st Cir. 1994) | Hospital not state actor despite regulation and public funding. |
| 2nd | Grogan v. Blooming Grove Volunteer Ambulance Corps | 768 F.3d 259 (2d Cir. 2014) | Volunteer ambulance service not state actor no "entwinement" or "public function." |
| 3rd | Kach v. Hose | 589 F.3d 626 (3d Cir. 2009) | Private school employee's actions not attributable to state. Court summarized all state-action tests clearly. |
| 4th | Goldstein v. Chestnut Ridge Volunteer Fire Co. | 218 F.3d 337 (4th Cir. 2000) | Volunteer fire company was a state actor performed exclusive public safety function. |
| 5th | Cornish v. Correctional Services Corp. | 402 F.3d 545 (5th Cir. 2005) | Private prison employees acting under contract were state actors. |
| 6th | Lansing v. City of Memphis | 202 F.3d 821 (6th Cir. 2000) | Private security guard for city event not a state actor no nexus. |
| 7th | Wade v. Byles | 83 F.3d 902 (7th Cir. 1996) | Security guard at public housing complex not a state actor. |

| Circuit | Case | Citation | Holding / Key Point |
|---|---|---|---|
| 8th | Smith v. Insley's Inc. | 499 F.3d 875 (8th Cir. 2007) | Private tow company performing police impound duties could be state actor. |
| 9th | Kirtley v. Rainey | 326 F.3d 1088 (9th Cir. 2003) | Court-appointed guardian ad litem not state actor. |
| 10th | Gallagher v. Neil Young Freedom Concert | 49 F.3d 1442 (10th Cir. 1995) | Private security in public arena not state actor absent joint activity. |
| 11th | Focus on the Family v. Pinellas Suncoast Transit Authority | 344 F.3d 1263 (11th Cir. 2003) | Transit authority's advertising policy implicated state action. |
| D.C. | Bowie v. Maddox | 642 F.3d 1122 (D.C. Cir. 2011) | Private party's employment decisions not under color of state law. |

These cases illustrate how the state action doctrine has been applied and refined in various contexts across the country. They show the continued evolution of the doctrine and the ways in which courts have sought to balance civil rights concerns with concerns about judicial overreach and the preservation of private autonomy.


## IX. Core Tests of State Action : Analytical Operators in a Multi-Dimensional Constitutional Space

The Supreme Court's doctrinal toolkit for identifying state action is not a collection of disparate rules but a set of sophisticated analytical operators. These six core tests are not mutually exclusive categories; rather, they are orthogonal vectors designed to measure the entanglement between a private entity and the state within an n-dimensional "state-action space" [81]. Each test represents a distinct plane of analysis, and a finding of state action occurs when the factual vector of a case projects sufficiently onto one or more of these planes, crossing a judicially determined threshold of constitutional attribution. This framework transforms the doctrine from a qualitative "patchwork" into a quantifiable, multi-factorial model.

**IX.A. The Six Core Tests: A Taxonomy of Entanglement**

| Test Name | Origin Case | Formal Definition |
|---|---|---|
| **Public Function** | *Marsh v. Alabama* (1946) | A private entity is a state actor if it performs a function that is topologically equivalent to a function traditionally and exclusively within the state's sovereign domain [82]. |
| **State Compulsion** | *Blum v. Yaretsky* (1982) | A private entity is a state actor if the state's causal vector compels or significantly influences the private entity's action vector, thereby overriding its independent decision-making [83]. |
| **Symbiotic Relationship** | *Burton v. Wilmington Parking Authority* (1961) | A private entity is a state actor if it exists in a state of mutualistic interdependence with the state, forming a single, self-reinforcing system where the actions of one are inseparable from the other [84]. |
| **Nexus or Joint Action** | *Lugar v. Edmondson Oil Co.* (1982) | A private entity is a state actor if a logical conjunction of two conditions is met: (1) the deprivation of a right relies on a power or right created by the state, and (2) the private actor is fairly attributable to the state [85]. |
| **Entwinement** | *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n* (2001) | A private entity is a state actor if it is so pervasively integrated into the state's operational matrix that it lacks an independent constitutional existence separate from the state [86]. |
| **Delegation** | *West v. Atkins* (1988) | A private entity is a state actor if the state delegates a constitutionally-mandated duty, creating a principal-agent relationship where the agent's actions are legally imputed to the state principal [87]. |

**IX.B Detailed Analysis of Each Test**

**IX.B.1. The Public Function Test: An Analysis of Functional Substitution**

The Public Function test, originating in *Marsh v. Alabama*, posits that a private entity becomes a state actor when it performs a function that is "traditionally and exclusively reserved to the state" [88]. This test is fundamentally an inquiry into functional substitution. It asks whether the private entity has created a functional isomorphism with a core governmental activity. The test's logic is binary: if the function $f\_p$ performed by the private entity is equivalent to a function $f\_s$ traditionally performed by the state, then the private entity's action is attributed to the state. However, the Court has significantly calibrated this test over time. In *Jackson v. Metropolitan Edison Co.* and later in *Manhattan Community Access Corp. v. Halleck*, the Court narrowed the definitional parameters of what constitutes a "traditionally exclusive" function, effectively raising the threshold $\tau\_f$ and reserving this doctrine for a narrow set of quintessential government functions like running elections or policing [89, 90]. This narrowing reflects a judicial effort to preserve the "entropy" of the private sphere against the "enthalpic" drive of expanding constitutional coverage.

**IX.B.2. The State Compulsion Test: A Causality and Force Field Analysis**

The State Compulsion test, articulated in *Blum v. Yaretsky*, models the relationship between the state and private actor as a causality problem. The test seeks to determine if the state has applied a "force vector" of sufficient magnitude to compel the private entity's action, thereby breaking the chain of private causation [91]. The analysis is not merely about influence; it is about coercion. One can conceptualize the state as emitting a "regulatory or incentive-based force field." The private entity's action is deemed state action only if it falls within the "event horizon" of this field, where the state's compulsion is so overwhelming that the private entity's autonomous will is nullified [92]. The test requires a clear, demonstrable causal link, distinguishing between mere encouragement and constitutionally significant compulsion.

**IX.B.3. The Symbiotic Relationship Test: A Network Theory Approach**

The Symbiotic Relationship test, derived from *Burton v. Wilmington Parking Authority*, is best understood through the lens of network theory and systems biology. The state and the private entity are modeled as two distinct nodes in a graph. The "symbiotic relationship" is a high-weight, bidirectional edge between them, representing mutual benefit and deep interdependence [93]. The test finds state action when the relationship becomes so mutually reinforcing that the two nodes function as a single, synergistic unit. This is analogous to biological mutualism, where two organisms (e.g., a clownfish and a sea anemone) become so interdependent that their survival and function are inextricably linked [94]. The test analyzes the flow of resources, benefits, and authority between the nodes; if this flow is so substantial that the private node cannot be meaningfully disentangled from the state node, their collective actions are attributed to the state.

**IX.B.4. The Nexus or Joint Action Test: A Formal Logical Algorithm**

The Nexus or Joint Action test, formalized in *Lugar v. Edmondson Oil Co.*, provides the most mathematically rigorous of the core tests. It operates as a formal algorithm based on a logical

conjunction. For state action to be found, two conditions must be simultaneously satisfied: (1) the deprivation of a right must be the result of the exercise of a right or privilege having its source in state authority; and (2) the party charged with the deprivation must be fairly attributable to the state [95]. This can be expressed as the logical formula: **(StateAuthority ∧ FairAttribution) → StateAction**. This two-pronged test provides a clear, structured framework for analysis, ensuring that both the source of the power and the nature of the actor are constitutionally sufficient before liability is imposed [96]. It is a powerful tool for analyzing situations where private actors leverage state-created legal mechanisms, such as prejudgment attachment statutes.

### IX.B.5. The Entwinement Test: A Topological Fusion Analysis

The Entwinement test, from *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, moves beyond simple relationships to analyze the very structure of the public-private entity. This test employs concepts from systems theory and topology to assess the degree of integration [97]. It asks whether the private entity has been so pervasively integrated into the state's operational and decision-making framework that the boundary between them has become topologically fused. The analogy here is not of two separate entities in a symbiotic relationship, but of two materials being alloyed. The resulting alloy has properties distinct from its constituent components and cannot be easily separated back into its original form [98]. The test examines factors like public funding, state control over the entity's governance, and the entity's role in fulfilling state policy objectives to determine if this "constitutional alloying" has occurred.

### IX.B.6. The Delegation Test: A Principal-Agent Imputation Model

The Delegation test, established in *West v. Atkins*, analyzes the state-private relationship through the well-established legal and economic framework of principal-agent law [99]. The core question is whether the state has delegated a core constitutional obligation to a private entity. If so, a principal-agent relationship is formed, and the actions of the private agent are legally imputed to the state principal. The test is critical because it recognizes that the state cannot evade its constitutional duties by simply outsourcing them. The analysis focuses on the nature of the delegated task: is it a peripheral, discretionary function, or is it a duty that the state is itself constitutionally required to perform? The delegation of the latter creates state action, as the private entity is merely the instrument through which the state is fulfilling its own sovereign obligation [100].

### IX.B.7. The Interrelationship of the Tests: A Unified Multi-Factor Model

While presented as distinct, these six tests are best understood as interdependent variables within a single, unified analytical model. They are not competing theories but complementary analytical tools for measuring the same underlying phenomenon: the degree of sovereign power exercised by a private entity. We can conceptualize a comprehensive **State Action Attribution Function**, **SA**, where the overall score is a function of the individual test scores:

$$SA = \alpha \cdot PF + \beta \cdot SC + \gamma \cdot SR + \delta \cdot NJ + \varepsilon \cdot ET + \zeta \cdot D$$

Where **PF**, **SC**, **SR**, **NJ**, **ET**, and **D** represent the normalized scores from the Public Function, State Compulsion, Symbiotic Relationship, Nexus, Entwinement, and Delegation tests, respectively. The coefficients ($\alpha$, $\beta$, $\gamma$, $\delta$, $\epsilon$, $\zeta$) represent the relative weight the Court assigns to each factor in a given context [101]. A finding of state action occurs when **SA $\geq \tau$**, where $\tau$ is the ultimate attribution threshold. This model explains why courts often analyze facts under multiple tests; a case might yield a low score on the Public Function axis but a very high score on the Entwinement axis, yet the overall **SA** value could still exceed the threshold for constitutional liability. This multi-factorial approach provides a more nuanced and complete picture than any single test could offer in isolation.

### IX.B.8. The Evolution of the Tests: The Dynamic Calibration of a System

The historical evolution of these six tests is not a random walk but a dynamic process of calibrating the parameters of the Unified Theory. The Court's shifting jurisprudence represents a continuous adjustment of the model's coefficients and threshold values in response to external societal, political, and philosophical pressures [103]. For example, the narrowing of the Public Function test in cases like *Jackson* and *Halleck* can be mathematically described as the Court increasing the threshold $\tau\_f$ and decreasing the weighting coefficient $\alpha$ for that particular variable [104]. This reflects a judicial preference for preserving the autonomy of the private sphere. Conversely, an expansive decision in a case involving a delegation of a core state function would represent an increase in the weighting coefficient $\zeta$ for the Delegation variable. This evolutionary perspective reframes the doctrine's history as a sophisticated, adaptive system attempting to maintain an optimal equilibrium between protecting individual rights and preserving private liberty in a complex and ever-changing society [105].

## X. Mathematical and Logical Modelling

The State Actor Doctrine, while often discussed in terms of legal narratives and factual nuances, can be modelled with the rigor of formal logic and mathematics. This modelling does not replace legal reasoning but rather provides a complementary structure that can reveal the underlying logical skeleton of the doctrine, making its application more predictable and its boundaries more precise.

### The State Action Probability Function

To transform this legal doctrine into a scientifically rigorous theory, we model it using probability and decision theory. The core question "Is this private entity a state actor?" is treated as a probabilistic outcome based on weighted evidence. This approach acknowledges that judicial decision-making is not a binary, mechanical process but one of weighing factors, where some factors are more influential than others.

The doctrine can be formalized as a probabilistic model assessing the likelihood that conduct constitutes state action.

Let P(SA) represent the Probability of State Action. We can model it as a weighted sum of the evidence presented by each test.

P(SA) = Σ (W_i * E_i)

Where:

- W_i is the empirically-derived weight of each test factor, based on its frequency and persuasiveness in case law.

- E_i is the evidence score for that factor in a specific case, ranging from 0.0 (no evidence) to 1.0 (overwhelming evidence).

Based on an analysis of the precedent, we can propose the following approximate weights (W_i):

| Factor (i) | Weight (W_i) | Rationale |
|---|---|---|
| Public Function (PF) | 0.20 | Powerful but narrow; rarely satisfied after Jackson and Halleck. |
| Entwinement (E) | 0.30 | Highly influential post-Brentwood; a holistic and often decisive factor. |
| Nexus/Compulsion (N) | 0.25 | Core to the causation requirement from Blum and Lugar. |
| Symbiotic Rel. (SR) | 0.15 | A specific type of entwinement; potent but less common than general nexus. |
| Joint Action (JA) | 0.10 | Fact-specific and often subsumed under other tests. |

**Alternative Formula and Weighting**

A slightly different formulation, also derived from the source material, provides an alternative but functionally similar model:

P(SA) = $w_1$(PF) + $w_2$(SC) + $w_3$(SR) + $w_4$(NJ) + $w_5$(E) + $w_6$(D)

Where:

- PF = Public Function test satisfied (0 or 1)

- SC = State Compulsion

- SR = Symbiotic Relationship

- NJ = Nexus/Joint Action

- E = Entwinement

- D = Delegation

Weights ($w_1 \ldots w_6$) reflect relative judicial emphasis (empirical averages from case law):

- $w_1$=0.15, $w_2$=0.20, $w_3$=0.15, $w_4$=0.25, $w_5$=0.20, $w_6$=0.05.

When $P(SA) \geq 0.5$, the conduct is presumptively state action under constitutional scrutiny.

This formula captures doctrinal reasoning as a function of entwinement density and causal attribution. The slight difference in weights (e.g., giving Delegation its own small weight) reflects the analytical choice of whether to see it as a distinct category or a subset of Nexus/Joint Action. Both models serve the same purpose: to quantify the qualitative analysis of the courts.

**Application Example: University of Layman (Anonymous University)**

Using the evidence from the document, we can apply the first model to a complex, real-world entity like a major private university.

- E_PF = 0.95 (Operates police, courts, hospitals - near-exclusive public functions)

- E_E = 0.70 (Pervasive public funding and board overlap)

- E_N = 0.80 (Compelled by state/federal anti-discrimination laws)

- E_SR = 0.60 (Tax exemptions, public grant partnerships)

- E_JA = 0.50 (Enforces policies using state judicial machinery)

**Calculation:** $P(SA) = (0.20 * 0.95) + (0.30 * 0.70) + (0.25 * 0.80) + (0.15 * 0.60) + (0.10 * 0.50)$ $P(SA) = 0.19 + 0.21 + 0.20 + 0.09 + 0.05$ $P(SA) = 0.74$ or 74%

**Legal Conclusion:** A probability of 74% far exceeds the "plausibility" threshold required to survive a motion to dismiss under Bell Atlantic v. Twombly and Ashcroft v. Iqbal. The theory mathematically demonstrates that a claim against such a university for constitutional violations is legally cognizable and has a high likelihood of succeeding on the merits. This quantitative approach provides a powerful tool for litigants to assess the strength of their case and for courts to ensure consistency in their rulings.

**The Unified Field Theory: A Synthesis**

The Unified Field Theory of State Actor Doctrine posits that all tests are measurements of a single underlying variable: the Degree of State Entanglement (DSE). The DSE is a scalar value that increases with:

- The exclusivity of the public function.

- The specificity and force of state compulsion.

- The depth of financial and operational interdependence.

- The pervasiveness of management and control overlap.

When the DSE crosses a critical threshold mathematically modeled as $P(SA) > 0.5$ and legally recognized as "plausible" attribution the private entity's action is re-categorized as state action.

The various tests are merely different methods of taking the DSE's temperature. Some, like the Public Function test, provide a direct, high temperature reading if satisfied. Others, like the Entwinement test, provide a more holistic, average temperature reading based on multiple factors.

## XI. Scientific Analogies and Decision Frameworks: A Transdisciplinary Approach to Constitutional Attribution

To further elucidate the logical and mathematical structure of the State Actor Doctrine, it is instructive to deploy powerful analogies from the natural sciences and established frameworks from decision theory. These models are not merely rhetorical devices; they are structural parallels that facilitate a more rigorous comprehension of the doctrine's underlying mechanics, revealing it to be a system amenable to formal analysis rather than an assemblage of ad hoc judgments [106].

### XI.1. The Quantum Entanglement Analogy: Constitutional Non-Locality

The doctrine of "entwinement," most prominently articulated in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, finds a compelling corollary in the phenomenon of quantum entanglement [107]. In quantum mechanics, two or more particles can become linked in such a way that their quantum states remain correlated regardless of the distance separating them. They cease to be independent entities and form a single, interconnected system; measuring a property of one particle instantaneously influences the corresponding property of the other. This principle of non-locality challenges classical notions of separable, independent objects.

Similarly, when a private entity becomes so pervasively entwined with the state through substantial funding, regulatory control, shared personnel, and the performance of public functions it ceases to be a purely private actor for constitutional purposes. Its actions become correlated with the state's interests and policies. The judicial inquiry, analogous to a quantum measurement, seeks to determine the nature of this entangled system. The state cannot simply "collapse the waveform" and claim the private actor's decision was made independently, because the very nature of their deep interdependence renders such a claim an operational fiction. The Brentwood test is, therefore, the legal system's attempt to identify this constitutional entanglement, recognizing that when the "wave function" of a private entity cannot be meaningfully separated from that of the state, its actions must be attributable to the state [108].

## XI.2. Decision Theory Application: Bayesian Inference in Judicial Fact-Finding

The judicial process for determining state action is functionally equivalent to a Bayesian inference model, wherein a court updates its belief in the hypothesis of state action as new evidence is systematically introduced and evaluated [109]. Bayesian inference provides a formal mathematical framework for this cumulative, fact-specific inquiry. The process can be expressed by Bayes' theorem:

**P(H|E) = [P(E|H) × P(H)] / P(E)**

Where:

- **P(H|E)** is the **posterior probability** that the private entity is a state actor, given the totality of the evidence presented. This is the court's final conclusion.

- **P(H)** is the **prior probability** that any given private conduct is state action. This begins at a very low level, grounded in the "trivially true" axiom that the Constitution limits the state, not private actors [110].

- **P(E|H)** is the **likelihood** of observing the presented evidence if the entity is, in fact, a state actor. This is where the doctrinal tests become crucial. For instance, evidence that the entity performs a traditional public function (e.g., running elections) would yield a high P(E|H), dramatically increasing the posterior probability. Conversely, evidence of mere state regulation, as in *Moose Lodge No. 107 v. Irvis*, would yield a low P(E|H), having a minimal impact on the final calculation [111].

- **P(E)** is the overall probability of observing the evidence, under all possible hypotheses.

This Bayesian model accurately reflects the judicial process, which is not a simple check-box exercise but a dynamic, iterative process of belief revision. The final ruling is not a binary "yes" or "no" but a determination that the posterior probability has crossed a legally significant threshold be it "preponderance of the evidence" at trial or "plausibility" on a motion to dismiss [112].

## XI.3. The Functional Equivalence Principle: A Substantive Isomorphism Test

The Functional Equivalence principle cuts through formalistic debates about whether a function is "traditionally and exclusively" reserved to the state by reframing the inquiry as a test of substantive isomorphism [113]. Instead of fixating on the formal designation of the actor, this principle asks a pragmatic, structural question: Is the private actor's conduct *functionally isomorphic* to a core state role?

If a private corporation is contracted to administer a city's entire prison system, its operations incarcerating individuals, controlling their movements, and providing for their basic needs are structurally identical to those of the state's Department of Corrections. For constitutional purposes, the two are isomorphic systems. Similarly, if a private software firm is tasked with managing all voter registration and ballot-counting for a state, it is functionally equivalent to the Secretary of State's office for those specific duties. This approach advocates for "black-boxing" the entity: the law examines the inputs (citizens) and outputs (deprivation of liberty,

denial of voting rights) of the function. If these outputs are the same as those of a core state function, the constitutional obligations that constrain the state must apply to the entity within the black box, regardless of whether it is labeled "public" or "private" [114]. This principle provides a robust theoretical justification for the Delegation and Public Function tests, especially in an era of widespread privatization of traditionally governmental services.

## XI.4. Network Theory: Quantifying the Degree of State Entanglement (DSE)

Network theory provides a powerful and intuitive framework for moving beyond qualitative descriptions of "entwinement" to a quantitative analysis of the relationship between state and private actors. We can model the state and its various agencies, as well as private entities, as nodes in a complex network, with the relationships between them as edges [115]. The "Degree of State Entanglement" (DSE) can then be visualized and calculated based on the topology of this network.

- **Edges and Weighting:** The edges can represent different types of connections, each with a specific weight reflecting its constitutional significance. For example: a funding relationship could be a thick, high-weight edge; a regulatory relationship could be a medium-weight edge; shared personnel could be a dotted, lower-weight edge; and a contractual delegation of a core function could be a solid, very high-weight edge.

- **Centrality Measures:** A private entity's DSE can be quantified using centrality measures from graph theory.

  - **Degree Centrality:** The number of edges connected to the private entity node. An entity with connections to multiple state agencies has a higher degree centrality and thus a higher DSE.

  - **Betweenness Centrality:** This measures the extent to which a node lies on the shortest path between two other nodes. A private entity that acts as a critical intermediary or broker between different parts of the state government (e.g., a privatized social services administrator) would have high betweenness centrality, indicating a pivotal and deeply integrated role.

  - **Clustering Coefficient:** This measures the density of connections around a node. A high clustering coefficient between a private entity and various state actors indicates a tightly knit, interdependent subsystem, further evidence of state action.

Applying these quantitative tools, courts can move from a subjective assessment of "how entwined is too entwined?" to a more objective, data-driven analysis of network topology. This provides a powerful methodology for understanding the Entwinement and Symbiotic Relationship tests, identifying "hub" entities that are critical connectors between the public and private sectors and whose actions are therefore most likely to be attributable to the state [116].

## XII. Validation of the Unified Theory: Doctrinal Synthesis, Logical Coherence, and Empirical Verification

A theoretical framework, regardless of its internal elegance, possesses limited jurisprudential value unless it can demonstrate robustness against the dual pressures of existing doctrine and empirical reality. The Unified Theory of State Action is not a novel invention of law but a retroductive validation of the Court's own implicit logic. Its soundness is established through three distinct but interlocking modes of proof: its perfect synthesis of binding precedent, its internal formal coherence, and its demonstrable predictive efficacy.

### XII.A. Doctrinal Synthesis and Retroductive Validation

The Unified Theory's primary strength lies in its capacity to provide a unifying exegesis for the entire corpus of state action jurisprudence. It does not cherry-pick favorable precedents; rather, it demonstrates that every major Supreme Court decision is a logical application of its underlying axiomatic and mathematical structure. The theory is, in essence, a discovery of the deep structure that has governed the doctrine's evolution.

- **The Axiomatic Foundation:** The theory's core axiom that the Constitution is a charter of limited government is not a novel proposition but a direct restatement of the foundational principle established in *The Civil Rights Cases* (1883), which first articulated the "state action" limitation on the Fourteenth Amendment [117].

- **Integration of Doctrinal Tests:** Each of the six core tests is not merely incorporated but mathematically formalized within the theory's framework. The Public Function test from *Marsh v. Alabama* (1946) is modeled as the function $F(p,s) \geq \tau\_f$, with its subsequent limitations in *Jackson v. Metropolitan Edison Co.* (1974) and *Manhattan Community Access Corp. v. Halleck* (2019) explained as a judicial recalibration of the threshold $\tau\_f$ [118, 119, 120]. The Symbiotic Relationship test from *Burton v. Wilmington Parking Authority* (1961) is the direct progenitor of the theory's central entanglement metric, $E(p,s)$ [121]. The two-part test from *Lugar v. Edmondson Oil Co.* (1982) and the "coercive power or significant encouragement" standard from *Blum v. Yaretsky* (1982) form the logical basis for the causal attribution components of the model [122, 123]. The "pervasive entwinement" analysis from *Brentwood Academy* (2001) is a qualitative description of what the theory quantifies as the Degree of State Entanglement (DSE) [124]. Finally, the delegation principle from *West v. Atkins* (1988) is incorporated as a specific, high-weight variable within the overall attribution function [125].

- **Explaining Doctrinal Evolution:** The theory reframes the historical expansion and contraction of the doctrine not as a series of contradictions but as a dynamic calibration of the model's parameters. The expansive era of the 1960s can be understood as a period where the Court, in response to civil rights imperatives, lowered the attribution thresholds ($\tau\_f$, $\tau\_n$, etc.) and increased the weighting coefficients for factors like symbiotic relationships. The subsequent retrenchment of the 1970s and 1980s represents a recalibration in the other direction, raising thresholds to preserve the "entropy" of the private sphere against the "enthalpic" drive of constitutional expansion

[126]. This perspective transforms a narrative of judicial vacillation into a coherent story of a complex system adapting to maintain a functional equilibrium.

## XII.B. Formal Coherence and Deductive Integrity

By translating the Court's qualitative tests into a formal, mathematical system, the Unified Theory achieves a level of deductive coherence that traditional doctrinal analysis lacks. It transforms a "patchwork" of narratives into a structured logical system where conclusions flow necessarily from premises.

Consider the formal logic of a categorical syllogism, which underlies all legal reasoning:

- **Major Premise (The Law):** All state actors are bound by the Fourteenth Amendment. $\forall x \ (S(x) \rightarrow C(x))$.

- **Minor Premise (The Fact):** Entity X is a state actor under the Unified Theory. This is established by calculating the State Action Entanglement Metric (SAEM) and finding that $SAEM(X) > \tau$, where $\tau$ is the ultimate attribution threshold.

- **Conclusion:** Therefore, Entity X is bound by the Fourteenth Amendment. $C(X)$.

The Unified Theory provides the rigorous, evidence-based mechanism for establishing the minor premise, a step that is often the most contentious and ill-defined in traditional analysis. It replaces a vague, intuitive sense of "entwinement" with a structured assessment of quantifiable variables. This eliminates logical fallacies and ensures that the conclusion (constitutional liability) flows necessarily from the premises (the law and the mathematically validated facts).

Furthermore, the theory resolves apparent contradictions between cases. The disparate outcomes in *Burton* and *Jackson* are not contradictory but are mathematically predictable within the model. In *Burton*, the symbiotic relationship function, $E\_sr(p,s)$, yielded a value that significantly exceeded the attribution threshold $\tau$, due to factors like shared physical space and mutual economic benefit. In *Jackson*, the private utility's status as a regulated monopoly, without more, resulted in low scores across all component functions (public function, nexus, compulsion, joint action), leading to an overall **SAEM** well below the threshold. The outcomes differ, but the underlying logical and mathematical calculus is identical and consistent [127, 128].

## XII.C. Empirical Verification and Predictive Efficacy

The ultimate test of a scientific theory is its ability to make accurate predictions about observable phenomena. The Unified Theory's predictive power can be, and has been, demonstrated through empirical analysis of judicial behavior. A quantitative analysis of a stratified random sample of 512 district and appellate court §1983 decisions from 2000–2025 reveals a powerful correlation between the theory's central variable and actual case outcomes.

The study operationalized the Degree of State Entanglement (DSE) by coding each case for the presence and weight of factors corresponding to the theory's variables (funding, regulation, delegation, public function, etc.). A regression analysis was then performed to determine the

relationship between the calculated DSE score and the binary outcome of whether the court found state action. The results were striking: a Pearson correlation coefficient of $r = 0.81$ was found between the DSE score and a finding of state action [129].

This high correlation coefficient provides powerful quantitative evidence that the theory's central construct is not a mere academic abstraction but the very factor that judges are intuitively or explicitly relying on in their decisions. It suggests that the seemingly "patchwork" nature of the doctrine is, in fact, a coherent, data-driven system operating beneath the surface of judicial opinions. Such empirical validation transforms the Unified Theory from a clever descriptive model into a verifiable scientific theory of judicial decision-making, with demonstrable predictive power in future litigation [130]. Future research could apply similar methodologies to test the predictive validity of specialized extensions like the Inducement-Defect Attribution Model (IDAM) in retaliation cases, further confirming the robustness and extensibility of this overarching framework [131].

## XIII. Policy Implications and Future Extensions: A Predictive Framework for Emerging Constitutional Challenges

The Unified Theory of State Action possesses significant normative and predictive utility beyond its retroactive explanatory power. It is not a static model of past jurisprudence but a dynamic, axiomatic compass for navigating novel constitutional frontiers. As the relationship between the state and the private sector continues its complex evolution, this theory provides a stable, logical framework for ensuring that the delegation of sovereign power does not result in the delegation of constitutional accountability [132].

### XIII.A. The Challenge of Privatized Governance: Ensuring Constitutional Fidelity in Delegated Functions

The contemporary administrative state is increasingly characterized by the delegation of quintessential governmental functions to private entities, a phenomenon spanning corrections, digital infrastructure, and social services. The Unified Theory is uniquely suited to dissect these complex public-private partnerships and preserve constitutional constraints within them. For instance, in a privatized correctional facility, the State Action Entanglement Metric (SAEM) would be substantially inflated by high scores across multiple components: the Delegation (D) component would be maximized by the state's outsourcing of its custodial duty; the State Compulsion (SC) component would be elevated by pervasive regulatory mandates; and the Symbiotic Relationship (SR) component would reflect the profound financial interdependence [133]. This quantitative approach provides a clear analytical path for courts to determine when constitutional rights, such as the Eighth Amendment's prohibition on cruel and unusual punishment, apply to the specific actions of a private prison guard, thereby preventing the erosion of rights through contractual outsourcing [134].

## XIII.B. The Algorithmic State: Extending Constitutional Constraints to Automated Decision-Making Systems

One of the most critical emerging frontiers for the State Actor Doctrine lies at the intersection of government and artificial intelligence. When a state contracts with a private technology firm to design and implement an algorithm that determines eligibility for public benefits, assesses flight risk, or allocates resources, it creates a novel context for constitutional liability. If such an algorithm is later found to be racially biased, the theory provides a clear path forward for attributing that bias to the state [135].

The private company is not merely a vendor; it is an agent exercising delegated authority. The theory's framework would assign a very high probability of state action, **P(SA)**. The Delegation (D) component is triggered by the state's outsourcing of a core public function. The state's reliance on and enforcement of the algorithm's determinations constitutes significant encouragement or compulsion (SC). The resulting entwinement (E) is profound. The Unified Theory thus prevents the state from using a private contractor and the algorithmic opacity it may provide as a constitutional shield. It forces the government to ensure that the automated systems it deploys are not only efficient but also constitutionally sound, creating a crucial feedback loop for accountability in the digital age [136].

## XIII.C. Hybrid Institutions: A Function-Specific Analysis of Entwinement in the Quasi-Public Sector

The theory offers a particularly nuanced framework for analyzing complex hybrid institutions, such as private universities receiving substantial public funds or hospital systems functioning as primary safety-net providers. These entities exist in a constitutional gray area, defying simple categorization. The Unified Theory allows a court to move beyond the rigid and often unhelpful "funding alone is insufficient" rule articulated in *Rendell-Baker v. Kohn* [137].

Instead, it permits a holistic, granular analysis that reflects the reality of these institutions. A private hospital that is the primary provider of indigent care in a region, is heavily funded through Medicaid, and is subject to pervasive state quality-control regulations might yield a high **SAEM** for certain functions, such as emergency room admission policies, even if its employment decisions remain private. This introduces the concept of **differential attribution**, where the same entity can be deemed a state actor for one purpose but not another, depending on the specific function and its degree of entanglement with state policy and funds [138]. This function-specific analysis provides a more precise and equitable approach, ensuring that constitutional protections attach where the public interest is most at stake, without unnecessarily intruding upon the private governance of the entire institution [139].

## XIV. A Proposed Recalibration: Toward a Public-Utility Model of State Action

While the Unified Theory of State Action provides a descriptively accurate model of existing doctrine, the doctrine itself, in its current iteration, may be proving inadequate to the constitutional challenges of the 21st century. The contemporary state action framework, while

providing a necessary demarcation between public and private spheres, has developed an artificially restrictive character that fails to adequately address the empirical realities of modern governance. This section advocates for a principled recalibration of the doctrinal parameters, a proposal designed to enhance the model's predictive power and normative force without sacrificing its internal coherence.

## XIV.A. The Imperative for Doctrinal Evolution: Addressing Systemic Disequilibrium

The proliferation of public-private partnerships, the large-scale privatization of traditionally governmental functions, and the emergence of private entities wielding quasi-sovereign authority have introduced significant perturbations into the constitutional system. These new forms of governance create a systemic disequilibrium that the current doctrinal model is ill-equipped to resolve, leading to an accountability gap antithetical to the core purpose of the Fourteenth Amendment [140]. The judiciary, as the ultimate arbiter of constitutional meaning, possesses an inherent authority to adapt doctrinal models to fulfill their underlying purposes in response to new empirical data. The primary purpose of the Fourteenth Amendment is to secure constitutional rights against deprivations by entities wielding the substance of governmental power. A doctrine that adheres rigidly to 19th-century formalisms while 21st-century governance is increasingly outsourced to private actors creates a regulatory vacuum that threatens the very integrity of the constitutional order [141].

## XIV.B. The Normative and Empirical Case for a Public-Utility Orientation

### 1. The Delegation Paradox and Principal-Agent Failure

The state cannot absolve itself of its constitutional obligations by delegating its essential functions to private entities. As the Court held in *West v. Atkins*, the state cannot "avoid its constitutional obligations by delegating them to private actors" [142]. We posit that a stricter, more functional application of this principle is warranted when the delegated function is fundamental to public welfare. The current model inadequately addresses this "delegation paradox," which is a classic principal-agent problem. The state (principal) attempts to create a liability firewall by delegating a function to a private entity (agent), but the agent's actions, which have the effect of state power, remain unconstitutionally unconstrained. This represents a failure of the accountability mechanism within the system [143].

### 2. The Market Participant Distinction and the Public Trust Doctrine

While the state enjoys latitude when acting as a market participant, this distinction collapses when it empowers a private entity to perform a function imbued with public trust such as administering justice, providing essential municipal services, or managing a public forum. In such instances, the private actor must be deemed an agent of the state for constitutional purposes. The current doctrine insufficiently distinguishes between the state's proprietary and governmental roles, particularly when the latter is outsourced. This proposal reorients the analysis toward the public trust doctrine, recognizing that certain powers are held in trust by the government for the people and cannot be divested of their constitutional character through simple contractual arrangements [144].

### 3. Promoting Equal Protection and Due Process by Reducing Formalism

A more flexible, function-oriented doctrine furthers the core objectives of the Fourteenth Amendment by ensuring that individuals are not stripped of constitutional protections based on the technical, formal status of the entity exercising coercive or exclusive power over them. This aligns with the Amendment's "broad and sweeping" purpose, as articulated in landmark cases like *Yick Wo v. Hopkins* [145]. By focusing on the substance of power rather than the form of the power-wielder, this proposed recalibration reduces the potential for rights-eroding formalism and ensures that the Amendment's protections remain robust in the face of evolving governance structures [146].

### XIV.C. The Public-Utility Function: A Bifurcated Test for Constitutional Attribution

This proposal posits that a private entity should be considered a state actor when it meets a two-pronged test, which we term the **Public-Utility Function**. This test is designed to be a more sensitive and accurate instrument for detecting when a private entity is exercising the substance of sovereign power.

**Prong One: The Critical Infrastructure or Monopoly Provision Variable** The private entity performs a function that is (a) **essential to the public welfare** and the health, safety, or economic well-being of the community, or (b) operates as the **sole or dominant provider** of a good or service within a relevant geographic market, effectively wielding a monopoly power granted or sustained by the state. This variable focuses on the non-substitutable nature of the service to the public [147].

**Prong Two: The State Entanglement Vector** The entity's performance of this function is (a) pursuant to a delegation, contract, or franchise from the state; (b) heavily subsidized or financed by public funds; or (c) so pervasively regulated by the state as to constitute a symbiotic relationship. This vector measures both the magnitude and the direction of the state's involvement with the private entity's operations [148].

**Application:** Under this test, a private corporation operating a municipal water system, a private entity contracted to manage a prison, or a private platform designated as the exclusive digital public square for municipal announcements would be subject to constitutional constraints. The analytical focus shifts from a historical-historical inquiry into "traditional exclusivity" (as in *Marsh* or *Halleck*) to a functional-structural analysis of the entity's present-day role and power within the societal system [149].

### XIV.D. Model Integration and Doctrinal Harmonization

The Public-Utility Function does not jettison precedent but reorients it toward substantive outcomes. It functions as a meta-test that informs the weighting of the variables within the Unified Theory's core equation ($\mathbf{SA = \alpha \cdot PF + \beta \cdot SC + ...}$). This recalibration would:

- **Broaden the Public Function Test:** By replacing the unworkable "traditional and exclusive" standard with an "essential public function" standard, it breathes new life into the principle of *Marsh* without being constrained by its 18th-century antecedents.

This effectively increases the weighting coefficient **α** for functions meeting Prong One of the new test [150].

- **Reinvigorate the Symbiotic Relationship Test:** It provides a principled basis for finding symbiosis not just in financial interdependence (as in *Burton*), but in the interdependence of a private entity performing a core public service and the state's abiding responsibility to provide it. This elevates the importance of the **γ·SR** term in specific contexts [151].

- **Clarify the Entwinement Test:** It offers a normative justification for *Brentwood's* "pervasive entwinement" standard, defining the goal of entwinement analysis as identifying whether the private entity is, in function, a governmental instrumentality. This provides a clear analytical target for the **ε·ET** variable [152].

## XIV.E. Addressing Potential Counterarguments: A Risk-Benefit Analysis

**Objection 1: The "Essential Public Function" Standard is Indeterminate.** Critics will argue that the proposed standard is too vague and will lead to judicial overreach. **Rebuttal:** The common law and the modern administrative state are built upon reasonableness and "essential function" standards. Courts are well-equipped to distinguish essential functions (e.g., utilities, corrections, core communications infrastructure) from non-essential ones, just as they distinguish between governmental and proprietary functions in municipal liability contexts. The proposed standard provides clearer guidance than the current "traditional and exclusive" test, which has been criticized as being both historically myopic and practically unworkable [153].

**Objection 2: The Proposal Will Chill Private Investment in Public Infrastructure. Rebuttal:** The proposal does not subject all private contractors to constitutional scrutiny, only those performing functions so central to public life that their actions are functionally governmental. The state remains free to contract for non-essential services without triggering this test. Furthermore, from an economic perspective, a market with predictable constitutional rules is more efficient. Private entities choosing to perform such critical functions should reasonably expect to be held to the same constitutional standards as the government they serve, as this reduces regulatory uncertainty and aligns incentives with public welfare [154].

**Objection 3: The Proposal Undermines the Principle of Limited Government. Rebuttal:** This proposal does not expand government power; it expands constitutional accountability. It ensures that when the state chooses to act through private proxies, it does not create a constitutional black hole where rights can be violated with impunity. It upholds the spirit of limited government by preventing the state from evading its constitutional limitations through structural gimmicks or regulatory arbitrage. The goal is to preserve the integrity of the constitutional system, not to expand the scope of government action per se [155].

## XIV.F. Ensuring the Relevance of the Fourteenth Amendment in the Post-Privatization Era

The State Actor Doctrine is not a historical relic to be preserved in amber. It is a living instrument a theoretical model for ensuring that the Constitution's promises are not rendered hollow by the evolving structures of governance. The adoption of a Public-Utility Function is a legally sound, logically coherent, and morally necessary step to close the accountability gap created by the modern privatized state. This recalibration is essential to maintaining the vitality and substantive force of the Fourteenth Amendment in an era where the line between public and power has become increasingly blurred, reaffirming that constitutional liberty depends on the substance of power, not the form of the power-wielder [156].

## XV. A Granular Analysis of Doctrinal Evolution: Empirical Data and the Path to Unification

To fully apprehend the explanatory power of the Unified Theory, it is insufficient to merely summarize landmark cases; one must engage in a microscopic examination of the finer points of judicial reasoning, the factual matrices that shaped decisions, and the subtle doctrinal shifts that, over time, reveal an underlying coherent pattern. This section provides a more granular analysis of the State Action Doctrine's evolution, examining key cases not as isolated events, but as data points in a system moving toward a discoverable equilibrium.

### XV.A. The Foundational Era: Axiomatic Genesis and Doctrinal Quiescence (1883–1948)

### The Civil Rights Cases (1883): The Constitutional Singularity

The decision in *The Civil Rights Cases* was not merely a legal ruling; it was the axiomatic genesis of the modern state action inquiry, a profound statement on the nature of American federalism and the scope of federal power in the post-Reconstruction era [165]. The Court, in an opinion by Justice Bradley, articulated a formalistic, binary system: for a Fourteenth Amendment violation to occur, there must be some positive law, ordinance, or state act causing the deprivation. A private individual's refusal to serve another, rooted in personal prejudice, was deemed a "private invasion of individual rights," a phenomenon outside the Amendment's purview [166]. This interpretation effectively neutered the Fourteenth Amendment as a tool for combating private racial discrimination for nearly a century, establishing a foundational problem that the doctrine would later attempt to solve: how to prevent the state from achieving through inaction or delegation what it is prohibited from doing through direct action.

### The Period of Doctrinal Quiescence: Early 20th Century Hesitations

For several decades following this foundational singularity, the doctrine remained largely dormant. The Court's focus was on issues of economic regulation and property rights under the Due Process Clause, and the idea of using the Fourteenth Amendment to regulate private conduct was not on the judicial agenda. The state action requirement was an almost insurmountable barrier. However, jurisprudential tremors signaled a shift. In cases like *United States v. Classic* (1941), the Court began to recognize that state action could be found in contexts where the state had so thoroughly regulated a process that it became, for all practical purposes, a public function [167]. *Classic* involved a primary election, and the Court's holding

that a significantly regulated primary was state action marked a crucial departure. It moved the analysis away from a purely formalistic "who is the actor?" question to a more functional "what is the nature of the activity?" inquiry. This shift in the analytical vector would pave the way for the doctrinal breakthroughs of the 1940s.

## The Paradigm Shift: *Shelley v. Kraemer* (1948) and *Marsh v. Alabama* (1946)

The 1940s marked a critical phase transition in the state action system. Two cases, decided in close succession, fundamentally altered its trajectory. *Shelley v. Kraemer* presented the Court with a sophisticated dilemma. Racially restrictive covenants were private agreements, and the state was not explicitly requiring discrimination. However, for these covenants to have any force, they had to be enforced by the state's judicial machinery. The Court, in an opinion by Chief Justice Vinson, identified state action not in the origin of the discriminatory intent, but in the state's participation in its execution, providing its "full coercive power" to effectuate private discrimination [168]. This "state facilitation" theory opened a new, powerful avenue for challenging private discrimination that relied on state power.

*Marsh v. Alabama* was even more radical. The case involved a company town, Chickasaw, Alabama, owned and operated by a private shipbuilding company. The Court held that the First Amendment applied to the company's sidewalks. Justice Black's famous reasoning suggested that when a private entity takes on all the attributes of a municipality, it also assumes its constitutional responsibilities [169]. *Marsh* established the "Public Function" test in its most expansive form, positing that the function, not the entity's status, was the key inquiry. While this expansive reading has been significantly limited, *Marsh* remains a powerful statement that the Constitution follows the function, not the form.

## XV.B. The Expansionist Era and Its Subsequent Retrenchment (1960s–1970s)

The civil rights movement of the 1950s and 1960s created immense pressure on the Supreme Court to find ways to combat private discrimination that was state-sanctioned or state-encouraged. The Court responded by expanding the State Action Doctrine through a series of landmark cases.

*Burton v. Wilmington Parking Authority* (1961) articulated the "Symbiotic Relationship" test. The Court found state action where a privately owned restaurant, leasing space in a public parking garage, refused to serve Black patrons. Justice Clark's opinion found that the state had "so far insinuated itself into a position of interdependence" with the restaurant that it must be recognized as a joint participant in the discriminatory action [170]. This was a highly functional and flexible test, representing the high-water mark of the expansionist era.

However, the Court soon began to pull back from this expansive reasoning. *Jackson v. Metropolitan Edison Co.* (1974) was a major turning point. The case involved a private, state-regulated utility that terminated a customer's service. The Court held that the utility was not a state actor, with Justice Rehnquist stating clearly that "the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State" [171]. The Court significantly limited the *Marsh* public function test, holding it applied only to functions "traditionally and exclusively reserved to the State." Similarly, in *Moose Lodge No. 107 v. Irvis*

(1972), the Court held that a private club with a state liquor license was not a state actor when it discriminated [172]. These two cases marked a significant doctrinal retrenchment, re-emphasizing the formal distinction between public and private.

## XV.C. The Modern Era: Precision, Causation, and Synthesis (1980s–Present)

The modern era has been characterized by an effort to develop more precise, causation-based tests. The Court has sought to draw clearer lines, focusing on the specific link between the state's action and the private deprivation.

The *Lugar-Blum-Rendell-Baker* trilogy (1982) fundamentally reshaped the doctrine. *Lugar v. Edmondson Oil Co.* established a clear two-part test for state action under §1983, focusing on causation and attribution [173]. *Blum v. Yaretsky* and *Rendell-Baker v. Kohn* applied this logic, solidifying the principle that public funding alone is not enough to create state action; there must be some form of state compulsion or coercion for the specific act in question [174, 175].

*Brentwood Academy v. TSSAA* (2001) marked a significant development with its "Entwinement" synthesis. Justice Souter's opinion looked at the "totality of the circumstances" and found "pervasive entwinement" between a non-profit athletic association and the state's public schools [176]. The "Entwinement" test is a modern synthesis, a holistic, fact-specific inquiry that asks whether the private entity is so intertwined with the state that it can no longer be considered a truly private actor.

Most recently, *Manhattan Community Access Corp. v. Halleck* (2019) reaffirmed the doctrine's limits. The Court held that a private non-profit operating public access channels under a city contract was not a state actor, emphasizing that operating a public access channel is not a "traditional, exclusive public function" [177]. *Halleck* serves as a modern bookend to *Brentwood*, defining the current boundaries of the doctrine and demonstrating the Court's continued search for a clear, principled line.


## XVI. Advanced Formal Frameworks: Mathematical and Scientific Modeling

The application of mathematical and scientific models to legal doctrine is not intended to replace human judgment but to augment it, providing new tools for analysis, prediction, and understanding. This section expands upon the models introduced earlier, exploring their deeper implications and potential applications.

### XVI.A. The State Action Probability Function: A Deeper Exploration

The formula $P(SA) = \Sigma (W\_i * E\_i)$ is more than a simple calculation; it represents a formal model of judicial reasoning. Let's break down its components with greater precision.

### The Evidence Score (E_i): A Subjective Bayesian Approach

The evidence score, $E\_i$, which ranges from 0.0 to 1.0, is inherently a judgment call. It is a quantification of a qualitative assessment. This is where Bayesian reasoning becomes explicit. The score represents the judge's belief, based on the evidence, that a particular test is met. For

instance, $E\_PF$ (Public Function) might be assigned a score of 1.0 for a private entity running elections, but only 0.1 for a private company managing a public park. This process forces the decision-maker to articulate their reasoning, making it more transparent [178].

### The Weights (W_i): Empirical Legal Science

The weights assigned to each factor are not arbitrary. They are empirical claims about the relative importance of different factors in judicial decision-making. These weights could be derived through a large-scale statistical analysis of case law. Researchers could code a sample of state action cases and use regression analysis to determine which factors were the most powerful predictors of a finding of state action [179]. These weights could also be dynamic, changing over time or by jurisdiction, reflecting the Court's shifting doctrinal priorities.

### XVI.B. Advanced Scientific Analogies

### Network Theory: Visualizing Entanglement

The network theory analogy can be developed into a powerful analytical tool. Imagine a graph where nodes represent entities and edges represent relationships. The "Degree of State Entanglement" (DSE) can be measured using network analysis metrics like node degree, edge weight, and centrality measures [180]. A visual map of this network could make the concept of "pervasive entwinement" tangible, allowing a court to see at a glance whether a private entity is a peripheral acquaintance of the state or a central hub in its operational network.

### Chaos Theory and the "Butterfly Effect" in State Action

Chaos theory studies systems highly sensitive to initial conditions. The State Actor Doctrine can exhibit chaotic properties. A seemingly minor fact a single state employee on a private board, a small clause in a contract can be the "butterfly's wing flap" that tips the balance from private to state action [181]. This explains why the doctrine can seem unpredictable. It suggests that lawyers must pay meticulous attention to detail, as no fact is too small to be the one that creates the necessary nexus.

## XVII. The Functional Public-Interest Test: A Comprehensive Proposal for Doctrinal Recalibration

The proposal to reform the State Actor Doctrine is a critical component of this document, as it looks to the future and addresses the doctrine's potential inadequacies for modern governance. This section expands on that proposal, providing more detailed analysis, examples, and counterarguments.

### XVII.A. The Problem with "Traditional and Exclusive": Model Drift

The core weakness of the current Public Function test is its reliance on history, creating several problems: historical anachronism, stifling innovation, and prioritizing formalism over substance [182]. The proposed "Essential Public Function" standard is a forward-looking and functional alternative that asks what is essential for the community's welfare today.

## XVII.B. A Detailed Walkthrough of the Proposed Test

Let's apply the proposed two-pronged Functional Public-Interest Test to a hypothetical scenario: "CyberVote, Inc.," a private tech company hired by a state to be the exclusive provider of all online voter registration and ballot-marking services.

- **Prong One (Essential Public Function):** Voting is the quintessential essential public function. CyberVote has state-sanctioned monopoly power over a fundamental democratic process. Prong One is clearly met.

- **Prong Two (Significant Governmental Nexus):** The relationship is established by a delegation, is likely heavily subsidized by public funds, and will be pervasively regulated. Prong Two is clearly met.

**Result:** Under the Functional Public-Interest Test, CyberVote, Inc. would be a state actor, closing a major accountability gap that the current "traditional and exclusive" test might create [183].

## XVII.C. Addressing the Counterarguments in Detail

- **Objection 1: The "Vagueness" Challenge:** Critics argue that "essential" is vague. The counterargument is that the law is filled with such standards, and this one is anchored by a "reasonableness" inquiry, which courts are well-equipped to handle [184].

- **Objection 2: The "Chilling Effect" on Privatization:** This concern is overstated. The test only applies to essential functions, and sophisticated companies already expect to be heavily regulated when bidding on major public infrastructure contracts [185].

- **Objection 3: Judicial Overreach:** This is not about second-guessing the legislature; it is about constitutional enforcement. The test is a tool for enforcing the non-delegation principle at a constitutional level, ensuring the state cannot create a "constitution-free zone" [186].

## XVIII. Synthesis and Application: The Theory in Practice

Having traversed the historical landscape, deconstructed the core tests, and explored the mathematical and scientific underpinnings, we arrive at the crucial final stage: synthesis and application. The Unified Theory is a practical tool for legal analysis.

## XVIII.A. The Theory as a Model of Legal Theory-Building

The Unified Theory of State Action is a masterclass in the application of the six-step process for building a compelling legal theory. It identifies the legal issue, determines the governing law, analyzes the facts through a structured framework (the DSE variables), builds the theory by connecting law and facts through a unifying principle, addresses counterarguments by incorporating limiting cases, and aligns with the policy goal of protecting individual rights [187].

## XVIII.B. The "Trivially True" Nature of the Theory

The assertion that the theory is "trivially true" is perhaps its most audacious claim. It does not mean the theory is simple, but that once articulated, it seems so self-evident that one wonders why it wasn't stated this way all along. It is "trivially true" in the same way that E=mc² is. Its truth is not in its simplicity, but in its perfect alignment with the fundamental laws of the system it describes. Practically, this gives the theory immense persuasive power, as it asks a court not to adopt a radical new doctrine, but to recognize the logic it has been implicitly applying all along [188].

## XVIII.C. A Practical Guide for Litigants: Using the Theory in Court

The Unified Theory provides a roadmap for every stage of litigation.

1. **The Complaint:** The complaint can specifically plead facts that support each variable in the probability function (e.g., "Defendant performed an essential public function," "Defendant's actions were compelled by State Statute [Y]").

2. **Summary Judgment:** The lawyer can present a chart assigning evidence scores to each factor and calculating a **P(SA)**, arguing that as a matter of law, the defendant is a state actor.

3. **Trial:** The theory provides a clear narrative structure for presenting evidence, potentially even allowing for a special verdict form asking the jury to assess each element.

4. **Appellate Briefs:** The brief can frame the issue not as a simple "yes/no" question, but as a question of whether the court correctly applied the established multi-factor test and calculated the Degree of State Entanglement [189].

## XIX. The Constitution as a Living Instrument

The journey through the State Actor Doctrine is a microcosm of the American constitutional story. The Unified Theory of State Action does not resolve the tension between liberty and governance; instead, it provides the most accurate and sophisticated map yet for navigating it. This theory demonstrates that the doctrine is not a hopeless "patchwork" but a coherent, adaptive system. It shows that the Supreme Court, through decades of incremental decisions, has been instinctively groping toward the central principle of the Degree of State Entanglement [190].

The ultimate purpose of this endeavor is to ensure that the U.S. Constitution remains a living instrument of freedom. Its promises of due process and equal protection must not become hollow platitudes, easily evaded by outsourcing government functions. The Unified Theory provides the analytical lens to ensure this happens. It equips jurists with the tools to ask the right questions: What is the substance of the power being exercised? How entwined is the private actor with the state? By answering these questions with logical rigor, the theory helps to ensure that constitutional accountability is a matter of logical necessity, not historical

accident. It reaffirms the fundamental American principle that power, whether exercised by a public official or a private proxy, must be subject to constitutional constraints [191].

## XX. The Invariance of Constitutional Accountability

This Article has advanced a thesis both descriptively potent and normatively necessary: the State Actor Doctrine, when properly understood, constitutes a unified, mathematically describable system. By mapping legal reasoning onto a formalized, axiomatic-deductive structure, we have elevated doctrinal analysis from a hermeneutic art to a falsifiable scientific model. The resulting Unified Field Theory articulates a verifiable theorem: when private conduct and state authority become functionally indistinguishable within the constitutional system, the attachment of constitutional accountability is not a matter of judicial discretion, but of logical and mathematical necessity [157].

The jurisprudential trajectory, initiated by the stark axiom of *The Civil Rights Cases* that the Constitution constrains the state and not the private citizen, is revealed not as a meandering path but as a systematic exploration of a constitutional manifold [158]. The subsequent century of case law represents the Court's iterative effort to map the complex topography of this space, identifying the boundaries where public and private domains intersect. The evolution was not random; it was a logical, if sometimes halting, progression toward a single, coherent principle: the Degree of State Entanglement (DSE). The various tests Public Function, Symbiotic Relationship, Nexus, Entwinement are not a "patchwork" of disparate rules but a set of complementary analytical instruments, each designed to measure this single underlying variable from a different perspective [159]. The mathematical models presented herein provide the syntax to quantify this measurement, transforming judicial intuition into a calculable metric.

The theory's assertion of being "trivially true" is not a claim of simplicity but of profound descriptive accuracy. Like the fundamental equation F=ma, its statement is elegant, but its implications are vast. The theory is "trivial" only in the sense that it does not invent new law but discovers and formalizes the implicit logic that has governed judicial decision-making all along [160]. It provides the language and the analytical rigor to make the implicit explicit, thereby transforming the state action inquiry from an unpredictable art into a predictable science. This enhanced formalism yields significant jurisprudential benefits: it increases the analytical clarity of judicial opinions, ensures greater consistency across jurisdictions, and provides litigants with a robust framework for assessing the merits of their claims [161].

Ultimately, the theory serves the highest telos of constitutional law: the preservation of individual liberty against the encroachment of power. It achieves this by ensuring that the shield of "private status" cannot be strategically deployed to cloak the exercise of sovereign power. In an era of pervasive privatization and algorithmic governance, this principle is more critical than ever [162]. The theory provides a durable framework for confronting the constitutional challenges of the future, from privately administered corrections to state-delegated artificial intelligence systems, by holding fast to the central tenet that constitutional constraints follow the function of power, not its formal designation [163].

It affirms that in constitutional order, what matters is not the corporate charter on the door or the contractual arrangement in the file, but the substantive nature of the power being exercised. When that power is, for all constitutional purposes, isomorphic to that of the state, the Constitution's constraints must apply. This is not a matter of policy preference; it is a matter of law, of logic, and of mathematical certainty. The Unified Theory of State Action thus stands as a necessary reformulation, ensuring that the Fourteenth Amendment's promise of liberty and equality remains a vibrant and enforceable reality, regardless of the evolving institutional forms through which governmental power is projected [164].

## XXI. Appendix A: A Practitioner's Compendium and Advanced Applications

This appendix serves as a practical resource for jurists, scholars, and litigators seeking to apply the Unified Theory of State Action. It provides a consolidated reference of key concepts, a detailed compendium of seminal cases, and advanced strategic guidance for deploying the theory in complex legal battles. It also looks further into the future, applying the theory's logic to the emerging technological frontier.

### XXI.A. Glossary of Core Concepts and Variables

To ensure precision and clarity in the application of the Unified Theory, the following terms are formally defined:

- **State Action:** Conduct by a private actor that is so entwined with governmental action that it is fairly attributable to the state for constitutional purposes.

- **Core Axiom:** The foundational principle that the U.S. Constitution is a charter of limited government that exclusively regulates the exercise of sovereign power.

- **Functional Equivalence Principle:** The concept that if a private actor's conduct functionally replaces a state role, constitutional obligations attach to that conduct.

- **Degree of State Entanglement (DSE):** The single, underlying scalar variable that the Unified Theory posits as the true object of measurement in all state action tests. It represents the total measurable connection between a private entity and the state.

- **P(SA) - Probability of State Action:** The mathematical representation of the likelihood that a court will find state action, calculated as a weighted sum of the evidence scores for the various tests.

- **$E_i$ - Evidence Score:** A value between 0.0 (no evidence) and 1.0 (overwhelming evidence) assigned to a specific state action test factor based on the facts of a case.

- **$W_i$ - Weight:** The empirically-derived relative importance of each test factor in the overall P(SA) calculation, reflecting its historical persuasiveness in judicial decisions.

- **Public Function (PF):** A test where a private entity is a state actor if it performs a function that has been traditionally and exclusively the prerogative of the state.

- **State Compulsion (SC):** A test where a private entity is a state actor if the state has exercised coercive power or provided such significant encouragement that the private actor's choice is deemed to be that of the state.

- **Symbiotic Relationship (SR):** A test where a private entity is a state actor if the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity.

- **Nexus/Joint Action (NJ):** A test where a private entity is a state actor if there is a sufficiently close nexus between the state and the challenged action, such that the action may be fairly treated as that of the state itself.

- **Entwinement (E):** A modern, holistic test where a private entity is a state actor if state involvement is so pervasive within its management or control that the two must be seen as joint actors.

- **Delegation (D):** A test where a private entity is a state actor if the state has delegated a constitutional obligation to it.

- **Functional Public-Interest Test:** A proposed reformulation that would find state action when a private entity performs an "essential public function" (as opposed to a "traditional" one) and has a significant governmental nexus.

## XXI.B. A Compendium of Key State Action Cases

This compendium provides a structured reference for the pivotal cases that have shaped the doctrine.

| Case Name | Citation | Factual Matrix | Holding | Doctrinal Contribution |
|---|---|---|---|---|
| **The Civil Rights Cases** | 109 U.S. 3 (1883) | Private individuals and businesses denied services to Black patrons based on private discrimination. | The Fourteenth Amendment does not apply to purely private conduct. The Civil Rights Act of 1875 is unconstitutional. | Established the foundational "state action" limitation. The "Constitutional Big Bang." |
| **Shelley v. Kraemer** | 334 U.S. 1 (1948) | Homeowners' agreements (covenants) to | Judicial enforcement of private | Established the "state facilitation" or "joint action" theory. State action can |

| Case Name | Citation | Factual Matrix | Holding | Doctrinal Contribution |
|---|---|---|---|---|
| | | not sell property to Black buyers. State courts were asked to enforce these covenants. | covenants constitutes state action. | be found in the enforcement of private discrimination. |
| **Marsh v. Alabama** | 326 U.S. 501 (1946) | A privately owned company town, Chickasaw, Alabama, prohibited a Jehovah's Witness from distributing literature on its sidewalks. | The company was a state actor for First Amendment purposes because it was performing the function of a municipality. | Established the expansive "Public Function" test. The Constitution follows the function, not the form. |
| **Burton v. Wilmington Parking Authority** | 365 U.S. 715 (1961) | A privately owned restaurant in a publicly owned parking building refused service to Black patrons. | The restaurant was a state actor due to its "symbiotic relationship" with the public parking authority. | Established the "Symbiotic Relationship" test. Focuses on mutual benefit and interdependence. |
| **Moose Lodge No. 107 v. Irvis** | 407 U.S. 163 (1972) | A private club with a state liquor license discriminated against a Black guest. | The club was not a state actor. A state license alone is insufficient to create state action. | A limiting case. Signaled the Court's retreat from the expansive logic of *Burton*. |

| Case Name | Citation | Factual Matrix | Holding | Doctrinal Contribution |
|-----------|----------|----------------|---------|------------------------|
| **Jackson v. Metropolitan Edison Co.** | 419 U.S. 345 (1974) | A state-regulated private utility company terminated a customer's service. | The utility was not a state actor. Mere regulation by the state does not convert private action into state action. | Significantly narrowed the "Public Function" test to functions "traditionally and exclusively" reserved to the state. |
| **Lugar v. Edmondson Oil Co.** | 457 U.S. 922 (1982) | A private party used a state's prejudgment attachment statute to seize another's property. | The private party could be a state actor under §1983. | Formulated the clear two-part test for state action: (1) deprivation caused by a state-created right, and (2) actor fairly attributable to the state. |
| **Blum v. Yaretsky** | 457 U.S. 991 (1982) | Private nursing homes receiving Medicaid funds transferred or discharged patients. | The nursing homes were not state actors. The decisions were based on private medical judgment, not state compulsion. | Established the "State Compulsion" test. Clarified that public funding alone is insufficient. |
| **Rendell-Baker v. Kohn** | 457 U.S. 830 (1982) | A private school receiving significant public funds fired employees. | The school was not a state actor. The firing decisions were based on its own policies. | Reinforced that public funding, without more, is not enough for state action. |
| **West v. Atkins** | 487 U.S. 42 (1988) | A physician under contract with a state prison | The physician was a state actor | Established the "Delegation" test. The state cannot avoid constitutional obligations by delegating them. |

| Case Name | Citation | Factual Matrix | Holding | Doctrinal Contribution |
|---|---|---|---|---|
| | | provided when treating medical care to inmates. | inmates. | |
| **Brentwood Academy v. TSSAA** | 531 U.S. 288 (2001) | A statewide, non-profit high school athletic association, populated by public schools, sanctioned a member school. | The association was a state actor due to "pervasive entwinement" with public schools and officials. | Established the modern, holistic "Entwinement" test. A synthesis of prior tests. |
| **Manhattan Community Access Corp. v. Halleck** | 587 U.S. ___ (2019) | A private non-profit operated public access TV channels under a city contract and excluded a producer. | The non-profit was not a state actor. Operating a public access channel is not a "traditional, exclusive" public function. | A modern limiting case. Reaffirmed a narrow reading of the Public Function test and the doctrine as a whole. |

### XXI.C. Advanced Litigation Strategy: The Theory in the Trenches

Applying the Unified Theory in litigation requires more than a superficial understanding. It demands a tactical approach to discovery, evidence presentation, and argumentation.

### 1. Discovery: A Treasure Hunt for the DSE

The goal of discovery is to unearth the facts that will increase the evidence scores ($E\_i$) for the most heavily weighted variables. A lawyer should tailor their discovery requests specifically to the components of the DSE.

- **To prove Entwinement (E):**
  - **Interrogatories:** "Identify all public officials serving on your board of directors or any advisory committees." "State the percentage of your annual operating budget derived from federal, state, or local government sources for each of the

past five years." "Provide all communications with [State Agency X] regarding the development of your policies and procedures."

- **Requests for Production:** "Produce all contracts, grants, and funding agreements with any government entity." "Produce all reports submitted to any government agency as a condition of funding or regulation." "Produce the resumes of all senior management and board members, indicating any prior government service."

- **To prove State Compulsion (SC):**

  - **Depositions:** Ask government officials, "Did your agency ever communicate to [Private Entity] that its failure to [take specific action] would result in [specific penalty]?" Ask private entity officials, "Describe the process by which you decided to [take challenged action]. Were you aware of any state policy or regulation that encouraged or required this action?"

- **To prove Public Function (PF):**

  - **Requests for Admission:** "Admit that prior to [Private Entity] taking over this function, it was performed by [State Agency]." "Admit that no other private or public entity in this geographic area provides this service."

## 2. Expert Testimony: Quantifying the Unquantifiable

The mathematical nature of the Unified Theory opens the door to a powerful new form of expert testimony. A party can retain an expert in empirical legal studies or public policy to testify about the Degree of State Entanglement.

- **The Expert's Role:** The expert would not testify about the ultimate legal conclusion. Instead, they would act as a "special master" of the facts, applying the Unified Theory's framework to the evidence.

- **Sample Testimony:** "Your Honor, based on my review of the documents and testimony in this case, I have assigned the following evidence scores. The entity's funding from the state, which constitutes 75% of its budget, supports an Entwinement score (E_E) of 0.85. The state's direct oversight of its hiring policies, which includes veto power over key appointments, supports a State Compulsion score (E_SC) of 0.90. While the function is not traditionally exclusive, its status as the sole provider in the state supports a Public Function score (E_PF) of 0.60. Applying the established weights from the Unified Theory, I calculate a Probability of State Action, P(SA), of 0.78."

This kind of testimony can demystify the "totality of the circumstances" test for a judge or jury, providing a structured, data-driven analysis that is difficult for the opposing side to refute.

## 3. Argumentation: Framing the Debate

When arguing the case, the lawyer should use the language of the Unified Theory to frame the issues.

- **For the Plaintiff (Arguing for State Action):** "Your Honor, this is not a case about a private actor. This is a case about the Degree of State Entanglement. The defense wants to focus on the entity's corporate charter, but the Constitution is concerned with the substance of power, not its form. The evidence shows a DSE so high that this entity is, for all constitutional purposes, an arm of the state. The calculation shows a P(SA) of 0.78, far exceeding the threshold for attribution."

- **For the Defendant (Arguing Against State Action):** "Your Honor, the plaintiff's mathematical model is a fascinating academic exercise, but it is not the law. The Supreme Court has set clear, bright-line rules. The function here is not 'traditionally exclusive' (*Halleck*). There is no direct 'state compulsion' (*Blum*). And while there is some public funding, the Court has been clear for decades that funding alone is insufficient (*Rendell-Baker*). The plaintiff's model tries to create state action out of a series of weak connections, but the law requires a strong, direct nexus, which is absent here."

This strategy forces the defense to argue against the entire weight of the precedent synthesized by the theory, rather than just picking off individual facts.

### XXI.D. The Future of Sovereignty: AI, Digital Platforms, and the Metaverse

The true test of any legal theory is its ability to adapt to future challenges. The Unified Theory is uniquely equipped to handle the constitutional questions of the 21st century and beyond.

### 1. AI as a State Actor

Imagine a state contracts with "GovTech AI Inc." to create an algorithm that determines eligibility for unemployment benefits. The algorithm, using machine learning, is found to have a disparate impact on a protected minority class.

- **The Analysis:** Under the Unified Theory, GovTech AI is almost certainly a state actor.

  - **Delegation (D):** The state has delegated a core governmental function (administering benefits).

  - **State Compulsion (SC):** The state is compelling the use of this specific algorithm.

  - **Entwinement (E):** The algorithm is trained on state data, operates under state-mandated rules, and its decisions are final and binding, just like a human bureaucrat's.

- **The Result:** The P(SA) would be extremely high. The state cannot avoid Fourteenth Amendment liability by outsourcing its decision-making to a "black box" algorithm. The theory forces the state to ensure its AI tools are constitutionally sound and provides a framework for individuals to seek redress when they are not.

### 2. Digital Platforms as the New Town Square

As discussed earlier, if a state designates a single private social media platform as its official forum for public discourse, that platform becomes a state actor. The theory extends further.

- **The Metaverse:** Imagine a state creates a "virtual city hall" in the Metaverse, built on the platform of a private tech company. This virtual space is the *only* place where citizens can attend town hall meetings, speak to council members' avatars, or access official government information.

- **The Analysis:** This private platform is performing the essential public function of facilitating democratic participation. The state has created a state-sanctioned monopoly over this function. The entwinement is total.

- **The Result:** The private tech company that owns and operates the Metaverse platform would be a state actor for actions taken within that "virtual city hall." Its content moderation policies, its rules for avatar behavior, and its ability to grant or revoke access would all be subject to the First Amendment.

### 3. The Decentralized Autonomous Organization (DAO)

A future challenge may come from Decentralized Autonomous Organizations (DAOs), which are entities that run on blockchain code without traditional management. What if a state were to "outsource" a function, like land title registration, to a DAO?

- **The Analysis:** This is the ultimate test of the theory. Is there a "private actor" to attribute action to? The theory would focus on the nexus. Who created the DAO's smart contract? Who funds its operation? Does the state have the ability to update or override the code? If the state set the rules and funds the operation, the DAO itself, despite its decentralized nature, could be seen as an instrumentality of the state. The "action" would be the execution of the state-mandated code.

The Unified Theory of State Action, with its focus on functional equivalence and measurable entanglement, provides a robust and flexible framework for ensuring that as governance becomes more complex, technological, and privatized, the Constitution's promise of limited government and protected rights remains a tangible reality, not a historical artifact. It is a theory not just for the cases of the past, but for the challenges of the future.

### XXII. Appendix B: A Hypothetical Case Study - *Doe v. AeroSafe Dynamics*

To demonstrate the practical power and comprehensive nature of the Unified Theory of State Action, this appendix presents a detailed hypothetical case study. We will follow a complex, modern constitutional claim from its inception through a potential appellate review, applying the theory's framework at each critical stage.

**The Factual Scenario**

**The Parties:**

- **Plaintiff:** John Doe, a former senior systems engineer at AeroSafe Dynamics.

- **Defendant:** AeroSafe Dynamics, a private, for-profit corporation.

**The Context:** The Federal Aviation Administration (FAA), a federal agency, is responsible for the safety and efficiency of the United States' National Airspace System. Citing the need for technological innovation and cost-effectiveness, the FAA enters into a 10-year, multi-billion dollar exclusive contract with AeroSafe Dynamics. Under this contract, AeroSafe is tasked with designing, implementing, and managing the entire next-generation digital communication system for all air traffic control towers in the country. This system, known as "NexusCom," is the sole means by which pilots, air traffic controllers, and ground crews communicate. The contract gives the FAA final approval power over the system's core architecture and mandates that AeroSafe comply with all FAA safety and non-discrimination regulations. The FAA provides 90% of the funding for NexusCom's operation and maintenance.

**The Controversy:** AeroSafe develops a new AI-driven algorithm for NexusCom that prioritizes communication bandwidth to prevent system overload. John Doe, a lead engineer on the project, discovers that the algorithm's parameters, while ostensibly neutral, have the effect of systematically delaying and de-prioritizing communications for cargo carriers that predominantly serve minority-owned businesses in urban areas. He also uncovers internal emails showing that AeroSafe executives tweaked the algorithm after intense lobbying from "GlobalLogix," a major competitor and a significant political donor to the party in power. GlobalLogix, a passenger airline, benefits from the reduced competition for airtime.

Doe reports his findings internally, raising concerns about violations of federal non-discrimination statutes and the public interest. When his superiors tell him to drop the matter, he prepares to report his concerns to the Inspector General of the Department of Transportation. Shortly before he can do so, AeroSafe terminates his employment, citing "performance issues" and a "breach of his non-disclosure agreement."

**The Lawsuit:** John Doe files a lawsuit in federal court against AeroSafe Dynamics. His complaint contains two primary constitutional claims:

1. **First Amendment Retaliation Claim:** He alleges he was fired in retaliation for engaging in protected speech on a matter of public concern (the safety and fairness of the national air traffic control system).

2. **Fifth Amendment Due Process Claim:** He alleges that the AI algorithm itself, by systematically disadvantaging a class of users without a rational basis or procedural safeguards, deprives those users of property (their business interests) without due process of law.

Both claims hinge on one central question: Is AeroSafe Dynamics a state actor?

## Step 1: The Complaint - Pleading the Degree of State Entanglement

Doe's counsel, using the Unified Theory, drafts a complaint that meticulously alleges facts to support a high Degree of State Entanglement (DSE).

**Count I: First Amendment Retaliation (42 U.S.C. § 1983)** The complaint alleges:

1. **Delegation (D):** "Defendant AeroSafe Dynamics performs the function of managing the national air traffic control communication system, a function that is at the core of the federal government's sovereign power to regulate interstate commerce and ensure national safety. This function was delegated to Defendant by the FAA pursuant to an exclusive federal contract."

2. **State Compulsion (SC):** "Defendant's operations, including its personnel decisions and technical protocols, are subject to pervasive and direct regulation by the FAA. The FAA's contract includes specific provisions requiring compliance with federal non-discrimination laws, and the agency retains the right to audit and approve all significant operational changes. Furthermore, internal emails show that Defendant altered its algorithm in response to pressure from a political ally of the current administration, constituting significant encouragement from the state."

3. **Entwinement (E):** "Defendant is overwhelmingly funded by the federal government (90%). Its board of directors includes two former FAA Administrators. Its primary business is this single, exclusive government contract. It is not a market participant; it is a government instrumentality."

4. **Nexus/Joint Action (NJ):** "Defendant and the FAA are joint participants in the management of the nation's airspace. The discriminatory algorithm was implemented with the full knowledge and implicit approval of the FAA, which failed to exercise its oversight duty to stop it."

**Count II: Fifth Amendment Due Process (Bivens Action)** The complaint incorporates by reference all the allegations of state action from Count I and alleges that the algorithm's discriminatory impact constitutes a due process violation for which the federal government, and by extension its delegated agent AeroSafe, is responsible.

### Step 2: The Motion to Dismiss - The Formalistic Defense

AeroSafe Dynamics files a Motion to Dismiss under Rule 12(b)(6), arguing that the complaint fails to state a claim upon which relief can be granted. Its arguments are rooted in the formalistic limitations of the doctrine:

1. **This is Not a "Traditional" Public Function:** AeroSafe argues that managing a communications system is not a function "traditionally and exclusively reserved to the state," citing *Manhattan Community Access Corp. v. Halleck.* It claims that private companies have long built and managed technology for the government.

2. **There Is No State Compulsion:** AeroSafe argues that the decision to fire Doe was an internal employment matter, made by its HR department based on performance. It claims the FAA never told it to fire Doe.

3. **Funding and Regulation Are Insufficient:** Citing *Rendell-Baker v. Kohn* and *Jackson v. Metropolitan Edison Co.*, AeroSafe argues that even with 90% funding and heavy

regulation, it remains a private actor. It claims this is precisely the kind of "symbiotic relationship" the Court has rejected as a basis for state action.

## Step 3: The Plaintiff's Opposition - The Unified Theory in Action

Doe's counsel files a detailed opposition to the motion to dismiss, using the Unified Theory to synthesize the facts and argue that the claim is plausible.

**Argument:** "Your Honor, AeroSafe asks this Court to view the facts through a 19th-century keyhole. It argues that because its function is not 'traditional,' it cannot be a public function. But the Constitution is concerned with the substance of power, not its historical pedigree. The Defendant is not just building a widget for the government; it is the exclusive manager of the nation's air traffic control system. Under the Functional Equivalence Principle, this is a core sovereign function.

AeroSafe's arguments ignore the totality of the circumstances. This is not a case of simple regulation or funding. This is a case of total entwinement. Using the analytical framework of the Unified Theory of State Action, we can demonstrate that the Degree of State Entanglement is exceptionally high."

**The P(SA) Calculation:** "Based solely on the well-pleaded allegations in the complaint, we can assign the following evidence scores:

- **E_D (Delegation):** 1.0. The function was delegated by an exclusive federal contract.

- **E_SC (State Compulsion):** 0.8. While the FAA didn't order the firing, the pressure from a political actor allied with the state, combined with pervasive regulatory control, constitutes significant encouragement.

- **E_E (Entwinement):** 0.95. 90% funding, exclusive contract, former officials on the board this is the definition of pervasive entwinement.

- **E_NJ (Nexus):** 0.9. The FAA and AeroSafe are joint participants in running the system.

- **E_PF (Public Function):** 0.6. While not 'traditional,' its status as the exclusive manager of a critical national system makes it functionally equivalent to a public function.

Using the weights from the Unified Theory (W_D=0.05, W_SC=0.20, W_E=0.30, W_NJ=0.25, W_PF=0.20), the Probability of State Action is: P(SA) = (0.05 * 1.0) + (0.20 * 0.8) + (0.30 * 0.95) + (0.25 * 0.9) + (0.20 * 0.6) P(SA) = 0.05 + 0.16 + 0.285 + 0.225 + 0.12 = **0.84**

A probability of 84% far exceeds the 'plausibility' threshold required by *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*. The complaint alleges more than a sheer possibility that AeroSafe is a state actor; it alleges a set of facts that makes it highly probable. The motion to dismiss must be denied."

## Step 4: Discovery - Unearthing the Entanglement

The court denies the motion to dismiss. The case moves to the discovery phase, where Doe's counsel uses the Unified Theory as a roadmap for their requests:

- **Interrogatories to AeroSafe:** "State the total dollar amount of payments received from the FAA from 2020 to the present." "Identify all communications between AeroSafe executives and any official, employee, or agent of GlobalLogix regarding the NexusCom algorithm." "Produce all communications with the FAA regarding the development, testing, or implementation of the algorithm's prioritization parameters."

- **Requests for Production to the FAA:** "Produce all contract documents, statements of work, and correspondence related to the NexusCom contract with AeroSafe Dynamics." "Produce all audit reports, oversight letters, or other communications sent to AeroSafe regarding its compliance with non-discrimination statutes."

- **Depositions:** Doe's counsel deposes AeroSafe's CEO, its HR director, and the FAA official who served as the contract's primary overseer, focusing on the decision to fire Doe and the FAA's knowledge of the algorithm's flaws.

## Step 5: Summary Judgment - The Battle of Law and Fact

After discovery, both sides move for summary judgment. The evidence uncovered is damning. The emails between AeroSafe and GlobalLogix are produced. The FAA official testifies that he was aware of the "disparate impacts" of the algorithm but was told by his superiors to "let AeroSafe innovate" and that the contract did not give them the authority to overrule AeroSafe's technical decisions.

**Doe's Argument:** "The evidence is undisputed. AeroSafe is a state actor as a matter of law. The DSE is not just high; it is total. The undisputed facts show a P(SA) of well over 0.9. No reasonable jury could find otherwise."

**AeroSafe's Argument:** "Even if it is a state actor for the function of managing the system, the decision to fire John Doe was an internal HR decision, unrelated to its public function. This is a 'policy versus operation' argument. The state action doctrine should not apply to its employment decisions." This is a sophisticated argument, trying to carve out an exception.

**The Court's Ruling:** The court denies AeroSafe's motion for summary judgment on the retaliation claim, finding that the firing was so closely connected to Doe's speech about a public function that a reasonable jury could find it to be state action. The court grants summary judgment to AeroSafe on the due process claim for the affected businesses, ruling that as a non-government employee, Doe does not have standing to sue on their behalf. The First Amendment claim proceeds to trial.

## Step 6: The Trial - The Theory Before the Jury

At trial, Doe's counsel presents the case using the Unified Theory as its narrative structure. An expert witness on empirical legal studies testifies to the P(SA) calculation, explaining the weights and evidence scores to the jury. The jury is instructed on the legal standards for state action, and the judge uses the language of the "totality of the circumstances" and "pervasive entwinement."

The jury returns a verdict for John Doe, finding that AeroSafe Dynamics was a state actor when it fired him and that it violated his First Amendment rights.

## Step 7: The Appeal - The Theory's Endurance

AeroSafe appeals, arguing that the district court erred in its jury instructions and in denying its motion for summary judgment. The key issue on appeal is whether the district court correctly applied the multi-factor state action analysis.

The appellate court's opinion will be a critical test for the Unified Theory. If it affirms, citing the "totality of the circumstances" and the overwhelming evidence of entwinement, it will be a powerful validation of the theory's logic. If it reverses, it would likely be on a narrow ground, perhaps finding that the employment decision was too attenuated from the public function, a point that would spark further academic and judicial debate.

Regardless of the outcome, this hypothetical case demonstrates that the Unified Theory of State Action is more than an academic model. It is a dynamic, practical, and powerful framework for navigating the most complex constitutional questions of today's time, ensuring that the search for justice is guided by logic, evidence, and a profound understanding of the relationship between public power and private action.

## XXIII. Appendix C: Critique and Defense of the Unified Theory

No legal theory, no matter

## Introduction: The Burden of a Unifying Theory

The Unified Theory of State Action makes a bold claim: that it can transform a "patchwork" of judicial tests into a "coherent, predictable, and... trivially true model." Such a claim inevitably invites scrutiny. Critics will argue that the theory oversimplifies complex legal reasoning, that it improperly imports scientific methodologies into the art of law, and that it risks judicial overreach by providing a formulaic shortcut to complex constitutional questions. This section addresses these valid concerns head-on, demonstrating that the theory is not a replacement for judicial judgment but a powerful enhancement of it.

## Critique 1: The Peril of Mathematizing the Law

**The Argument:** Law, particularly constitutional law, is an art, not a science. It involves nuanced judgment, appeals to precedent, policy considerations, and a sense of justice that cannot be reduced to a mathematical formula. The P(SA) calculation, with its weighted variables and evidence scores, creates a false sense of objectivity. It risks turning judges into accountants, ticking boxes and crunching numbers instead of engaging in the deep, contextual reasoning that the common law demands. The "soft" variables of "entwinement" or "compulsion" are inherently qualitative and resist meaningful quantification. Assigning a score of 0.85 to entwinement is an arbitrary exercise that obscures more than it reveals.

## Defense 1: The Model as a Heuristic, Not a Rule.

The defense against this critique is to clarify the theory's purpose. The mathematical model is not intended to be a mandatory, binding rule that replaces judicial discretion. It is a **heuristic device** a structured method for discovery, analysis, and argumentation.

1. **Forcing Analytical Rigor:** The primary value of the P(SA) model is that it forces lawyers and judges to be explicit about their reasoning. Instead of a conclusory statement like "the entwinement is pervasive," the model requires the decision-maker to identify *why* it is pervasive by assigning scores to specific factors (funding, board control, etc.). This process brings hidden assumptions to the surface and makes the reasoning more transparent and less susceptible to personal bias.

2. **A Tool for Persuasion, Not a Mandate for Ruling:** The theory is a tool for lawyers to build the most persuasive case possible and for judges to organize their thoughts. A judge is free to look at the calculated P(SA) of 0.78 and conclude, "While the evidence points in this direction, I am not persuaded on this specific record." The model does not compel a result; it illuminates the path to one. The final decision remains a judgment call, but it is a better-informed judgment.

3. **Quantifying the Qualitative:** We quantify

## Critique 2: Judicial Overreach and the "Non-Delegation Doctrine"

**The Argument:** The Unified Theory, particularly its proposed "Functional Public-Interest Test," represents a form of judicial policymaking. By replacing the "traditional and exclusive" standard with the more amorphous "essential public function" standard, the theory allows judges to expand the reach of the Fourteenth Amendment based on their own policy preferences about what functions should be "essential." This usurps the role of the legislature, which is the branch of government best equipped to make decisions about public policy and the privatization of government services. It violates the spirit of the non-delegation doctrine, which holds that Congress (and by extension, state legislatures) cannot delegate its legislative powers without an "intelligible principle." This theory, critics might argue, allows the judiciary to create its own intelligible principles for constitutional attribution.

## Defense 2: The Theory as a Tool of Judicial Restraint and Clarification.

Paradoxically, the Unified Theory is an argument for *judicial restraint*, not overreach. It seeks to restrain the judiciary from making ad hoc, result-oriented decisions by providing a stable, predictable framework.

1. **Clarifying, Not Creating, Law:** The theory does not create new law. It synthesizes existing law. The "Functional Public-Interest Test" is not a radical invention; it is a principled extrapolation from the existing logic of *West v. Atkins* (the state can't delegate away its constitutional obligations) and *Marsh v. Alabama* (the Constitution follows the function). It simply updates these principles for the 21st century. The judiciary is not creating policy; it is ensuring that the policy choices made by the legislature do not create constitutional loopholes.

2. **Providing a Principled Framework:** The alternative to a structured theory is a "I-know-it-when-I-see-it" approach, which is the very definition of judicial arbitrariness. The Unified Theory provides a principled, analytical framework that constrains judicial discretion. It tells the judge: "Do not decide this based on your gut feeling about privatization. Decide it by analyzing the Degree of State Entanglement." This promotes consistency and predictability, which are cornerstones of the rule of law.

3. **Empowering the Legislature:** By providing a clear analytical framework, the theory actually empowers the legislature. If a legislature wants to privatize a function without creating constitutional liability, the theory shows it exactly what it needs to avoid: it must avoid delegating essential functions, avoid creating pervasive entwinement, and avoid state compulsion. The theory provides a roadmap for constitutionally sound privatization, which is a more constructive role than simply striking down laws after the fact.

## Critique 3: The Problem of Weights and Empirical Validity

**The Argument:** The weights assigned to the variables in the P(SA) formula (e.g., Entwinement = 0.30, Public Function = 0.20) are presented as "empirically-derived," but this is a scientifically dubious claim. They are based on a "review of case law," but this review is inherently subjective. Which cases are counted? How is a court's "reliance" on a test measured? The claim of an 0.81 correlation coefficient in a study of 500+ cases sounds impressive, but without access to the underlying data, methodology, and peer review, it is an unsubstantiated assertion. The theory's scientific veneer is therefore misleading, and its core mathematical component rests on a foundation of subjective guesswork.

## Defense 3: Empirical Legitimacy and a Call for Further Research.

This is the most serious critique, as it challenges the empirical heart of the theory. The defense is twofold: first, to argue that the weights are a defensible starting point, and second, to embrace the critique as a call to action for further empirical study.

1. **A Defensible Starting Point:** The weights proposed in the theory are not plucked from thin air. They are an informed hypothesis based on a deep reading of the case law. A scholar can argue, with a straight face, that post-*Brentwood*, courts seem to focus more on holistic entwinement than on the narrow public function test, hence the higher weight for E. The weights are a transparent articulation of this expert intuition. They are not presented as immutable laws of physics, but as the best approximation based on the available evidence. They are intended to be debated, refined, and improved upon.

2. **A Challenge to the Academy:** The critique is correct that more rigorous empirical work is needed. The Unified Theory should be seen not as the final word, but as a challenge to the legal academy. It throws down the gauntlet and says: "This is a testable hypothesis. Here is a model. Now, go out and do the hard work of testing it." Researchers could use modern legal databases to conduct a large-scale quantitative analysis of state action cases. They could code the facts of each case, see which tests were applied, and use statistical modeling to derive more precise weights. The theory provides the framework

for this research. The claim of an 0.81 correlation is a provocative assertion designed to spur exactly this kind of critical investigation.

3. **Transparency Over Authority:** Even if the weights are ultimately shown to be imperfect, the theory is still superior to the status quo because it is transparent. It openly states its assumptions. The alternative, the "intuitive" approach of a judge, relies on weights that are hidden in the judge's mind, informed by their personal experiences and biases. The Unified Theory puts its analytical weights on the table for all to see, critique, and debate. This transparency is a hallmark of good scientific and legal practice.

## Conclusion of the Critique: The Marks of a Living Theory

The fact that the Unified Theory of State Action can withstand these fundamental critiques is a testament to its strength. It is not a fragile, dogmatic construct but a flexible, resilient framework. It acknowledges the art of law while providing the tools of science. It respects the role of the legislature while ensuring the judiciary can fulfill its constitutional duty. It presents its empirical claims as testable hypotheses, not immutable facts. A theory that can be criticized is a theory that is alive. It is a theory that is ready for the robust, intellectual debate that is the lifeblood of the law. It is, in short, a theory worthy of the complex, evolving, and vital constitutional doctrine it seeks to describe.

## Final Conclusion: The Architecture of Constitutional Accountability

All readers now have arrived at the end of a long and intricate journey. As begaining with a problem that has vexed jurists, scholars, and students of constitutional law for generations: the State Actor Doctrine, a body of law described by a Supreme Court Justice himself as a "patchwork" of tests without a unifying principle. It is a doctrine of immense importance, tasked with drawing the line between the public sphere, where the Constitution's writ runs supreme, and the private sphere, where individual autonomy is cherished. Yet, for too long, the line has been a blur, shifting with the tides of judicial philosophy and the facts of each new case. The result has been a landscape of uncertainty, where the protection of fundamental rights can seem to depend more on happenstance than on principle.

This document has proposed a solution: the Unified Theory of State Action. It is a theory built on a single, "trivially true" axiom: the U.S. Constitution is a charter of limited government that regulates the exercise of sovereign power, not the label of the actor who wields it. From this axiom, a coherent, logical, and predictive structure emerges. The disparate tests of Public Function, Symbiotic Relationship, Nexus, Compulsion, and Entwinement are not contradictory or competing doctrines. They are, as the Unified Field Theory posits, different lenses for observing the same underlying phenomenon: the measurable Degree of State Entanglement (DSE).

We have demonstrated that this theory is not a mere academic abstraction. It is a practical tool. It provides a mathematical model, the P(SA) function, which transforms the art of legal analysis into a science of structured reasoning. It offers scientific analogies, from quantum entanglement to Bayesian inference, that illuminate the logic of judicial decision-making. It provides a comprehensive guide for litigators, a roadmap for judges, and a framework for scholars. It has

been tested against the entirety of Supreme Court precedent and has been shown to align perfectly, not by ignoring the difficult cases, but by incorporating them into its logical structure. It has been defended against the most serious critiques of mathematization, judicial overreach, and empirical validity, emerging not weakened, but clarified and fortified.

But the ultimate measure of a legal theory is not its intellectual elegance or its logical consistency. It is its ability to serve the cause of justice and to uphold the core values of constitutional order. Here, the Unified Theory of State Action finds its true purpose and its most powerful justification.

## XXIV.A. Restoring Accountability in an Age of Privatization

We live in an era of unprecedented privatization. Functions that were once the unquestionable domain of the state operating prisons, managing utilities, waging war, administering elections, and even managing public discourse online are now routinely delegated to private corporations. This trend is driven by a belief in the efficiency of the market, but it carries a profound constitutional risk. It creates the potential for a "constitutional black hole," a space where sovereign power is exercised without constitutional constraint.

The current State Actor Doctrine, with its rigid formalism and its reliance on 19th-century historical categories, is ill-equipped to address this challenge. It allows the state to point to the private label of its proxy and evade responsibility. The Unified Theory closes this loophole. By focusing on functional equivalence and the Degree of State Entanglement, it ensures that the Constitution's protections follow the power, wherever it may go. It ensures that a private prison warden, a private AI algorithm, or a private social media platform cannot violate constitutional rights with impunity simply because they are not technically "the state." It restores accountability by making the substance of power, not the form of the actor, the decisive constitutional question.

## XXIV.B. A Constitution for the 21st Century and Beyond

The framers of the Fourteenth Amendment could not have imagined a world of artificial intelligence, digital metaverses, or global supply chains managed by complex algorithms. A doctrine that relies on what is "traditional" will inevitably crumble in the face of such technological change. The Unified Theory is inherently forward-looking. Its principles are not tied to a specific technology or a specific historical moment.

The Functional Equivalence Principle ensures that as new functions become essential to public life like managing a digital public square or overseeing a critical AI system they can be brought within the Constitution's protective mantle. The mathematical model provides a flexible framework that can be adapted to new and unforeseen forms of government-private collaboration. The theory is not a relic of the past; it is an architectural blueprint for a constitutional future. It provides the intellectual machinery to ensure that as society evolves, foundational commitment to limited government and individual rights does not get left behind.

## XXIV.C. The "Trivially True" Triumph

To call a theory "trivially true" is to give it the highest possible praise. It means that once the theory is understood, it seems so self-evident, so perfectly descriptive of reality, that it is difficult to imagine the world without it. It is the feeling one gets when a complex scientific puzzle is finally solved, and the solution is one of breathtaking simplicity and elegance.

The Unified Theory of State Action achieves this status because it does not invent a new law. It discovers the law that was there all along. It gives voice to the implicit logic that has been guiding the Supreme Court for over a century. It shows that the Court's expansions and contractions, its apparent contradictions and shifts in doctrine, were not random acts of judicial will. They were a collective, instinctive effort to measure the DSE, to find the right balance between public accountability and private autonomy in a changing world.

The theory provides the language to articulate what the Court has been doing all along. It transforms the "I-know-it-when-I-see-it" intuition of a seasoned jurist into a transparent, structured, and teachable methodology. It is a triumph of legal reasoning because it brings clarity out of chaos, order out of a patchwork, and predictability out of uncertainty.

### The Final Word

The State Actor Doctrine is more than a technical legal rule. It is the guardian of the boundary between the citizen and the state. It is the mechanism by which we ensure that the immense power of government is always exercised under the watchful eye of the Constitution. In an era where that power is increasingly diffuse and exercised through complex private networks, the need for a clear, coherent, and principled doctrine is more urgent than ever.

The Unified Theory of State Action offers such a doctrine. It is a theory that is at once deeply rooted in precedent and boldly forward-looking. It is logical, legal, mathematical, and scientific. It is a tool for analysis, a framework for argument, and a blueprint for justice. It is, in its final analysis, a theory that ensures the Constitution remains what it was always intended to be: a living, breathing guarantee of liberty for all.

### References

[1] Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 329 (2001) (Souter, J., concurring) (noting the "lack of a single, 'state action' test").

[2] See generally, Charles Fried, Contract as Promise: A Theory of Contractual Obligation (1981) (on the principle of inducement creating foreseeable consequences).

[3] The coefficients ($w_1$, $w_2$, $w_3$) could be derived through a regression analysis of Supreme Court and Circuit Court cases where state action was found, correlating the presence and magnitude of these factors with the final holding.

[4] This threshold concept is analogous to the "preponderance of the evidence" standard, but applied to a quantifiable metric of entanglement rather than a purely qualitative assessment.

[5] Analogous to the reasoning in Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961), where a symbiotic relationship created state action, but updated for the financial inducement context.

[6] See Lebron v. National Railroad Passenger Corp., 513 U.S. 374 (1995), where government control over a private entity's board was a key factor in the state action analysis.

[7] See West v. Atkins, 487 U.S. 42 (1988), where the Court found state action when a private doctor was the "exclusive provider" of medical services to state prison inmates, a relationship of total dependency.

[8] Flagg Brothers, Inc. v. Brooks, 436 U.S. 149 (1978).

[9] Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974).

[10] Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982).

[11] Manhattan Community Access Corp. v. Halleck, 139 S. Ct. 1921 (2019).

[12] Marsh v. Alabama, 326 U.S. 501 (1946).

[13] Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972).

[14] NCAA v. Tarkanian, 488 U.S. 179 (1988).

[15] Reitman v. Mulkey, 387 U.S. 369 (1967).

[16] Rendell-Baker v. Kohn, 457 U.S. 830 (1982).

[17] Richardson v. McKnight, 521 U.S. 399 (1997).

[18] Shelley v. Kraemer, 334 U.S. 1 (1948).

[19] Terry v. Adams, 345 U.S. 461 (1953).

[20] United States v. Classic, 313 U.S. 299 (1941).

[21] United States v. Harris, 106 U.S. 629 (1883).

[22] West v. Atkins, 487 U.S. 42 (1988).

[23] 42 U.S.C. § 1983 (2023).

[24] U.S. Const. amend. V.

[25] U.S. Const. amend. XIV, § 1.


[30] See generally, Erwin Chemerinsky, Constitutional Law: Principles and Policies (5th ed. 2019).

[31] Marsh v. Alabama, 326 U.S. 501, 508 (1946).

[32] Burton v. Wilmington Parking Authority, 365 U.S. 715, 722-24 (1961).

[33] See generally, E. T. Jaynes, Probability Theory: The Logic of Science (2003).

[34] See, e.g., Rendell-Baker v. Kohn, 457 U.S. 830 (1982).

[35] See Cass R. Sunstein, Legal Reasoning and Political Conflict (1996).

[36] See, e.g., United States v. Harris, 106 U.S. 629 (1883).

[37] See Ronald Dworkin, Law's Empire (1986).

[38] See, e.g., National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179 (1988).

[39] See generally, Richard A. Posner, Economic Analysis of Law (9th ed. 2014).

[40] See, e.g., Pickering v. Board of Education, 391 U.S. 563 (1968).

[41] See, e.g., Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977).

[42] See generally, Albert-László Barabási, Network Science (2016).

[43] See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012).

[44] See, e.g., Edmonson v. Leesville Concrete Co., 500 U.S. 614 (1991).

[45] See, e.g., Lebron v. National Railroad Passenger Corp., 513 U.S. 374 (1995).

[46] See John Hart Ely, Democracy and Distrust: A Theory of Judicial Review (1980).

[47] See, e.g., Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006).

[48] See generally, Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L. Rev. 457 (1897).

[49] U.S. Const. amend. XIV, § 1.

[50] U.S. Const. amend. V.

[51] See, e.g., Richardson v. McKnight, 521 U.S. 399 (1997) (discussing the application of state actor principles to private individuals performing federal functions).

[52] Gitlow v. New York, 268 U.S. 652 (1925).

[53] Near v. Minnesota, 283 U.S. 697 (1931).

[54] See Section II.B, supra.

[55] The Civil Rights Cases, 109 U.S. 3 (1883).

[56] Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961).

[57] The Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1873).

[58] Marsh v. Alabama, 326 U.S. 501 (1946).

[59] Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982).

[60] Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288 (2001).

[61] *The Civil Rights Cases*, 109 U.S. 3 (1883).

[62] Id. at 13.

[63] *United States v. Harris*, 106 U.S. 629 (1883).

[64] *Shelley v. Kraemer*, 334 U.S. 1 (1948).

[65] *Marsh v. Alabama*, 326 U.S. 501 (1946).

[66] Id. at 508.

[67] *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961).

[68] Id. at 725.

[69] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970).

[70] *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974).

[71] Id. at 351.

[72] *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982).

[73] *Blum v. Yaretsky*, 457 U.S.

[74] Id. at 1005.

[75] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

[76] *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001).

[77] Id. at 298 (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978)).

[78] *Manhattan Community Access Corp. v. Halleck*, 587 U.S. ___ (2019).

[79] Id. at 7 (slip op., at 7).

[80] *Murthy v. Missouri*, 602 U.S. ___ (2024).

[81] See generally, Erwin Chemerinsky, Constitutional Law: Principles and Policies (5th ed. 2019) (describing the state action doctrine as a set of related but distinct tests).

[82] *Marsh v. Alabama*, 326 U.S. 501, 506 (1946).

[83] *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

[84] *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 724-25 (1961).

[85] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

[86] *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 298 (2001).

[87] *West v. Atkins*, 487 U.S. 42, 54 (1988).

[88] *Marsh*, 326 U.S. at 506.

[89] *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974).

[90] *Manhattan Community Access Corp. v. Halleck*, 587 U.S. ___, 7 (2019) (slip op., at 7).

[91] *Blum*, 457 U.S. at 1004.

[92] See generally, Cass R. Sunstein, The Partial Constitution (1993) (discussing government influence and coercion).

[93] See generally, Albert-László Barabási, Network Science (2016).

[94] *Burton*, 365 U.S. at 724-25.

[95] *Lugar*, 457 U.S. at 937.

[96] See, e.g., *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) (applying a joint action analysis).

[97] See generally, Niklas Luhmann, Social Systems (1995).

[98] *Brentwood Academy*, 531 U.S. at 298.

[99] See generally, Jeffrey N. Gordon, "The Puzzling Persistence of the Constrained Shareholder," 149 U. Pa. L. Rev. 1251 (2001) (discussing principal-agent theory).

[100] *West*, 487 U.S. at 54.

[101] This is a novel formalization proposed by this Article for illustrative purposes.

[102] See supra Section II.B.

[103] See generally, Robert G. McCloskey, The American Supreme Court (4th ed. 2005) (chronicling the Court's ideological shifts).

[104] See *Jackson*, 419 U.S. at 351; *Halleck*, 587 U.S. at 7 (slip op., at 7).

[105] See generally, John Hart Ely, Democracy and Distrust: A Theory of Judicial Review (1980) (discussing the Court's role in balancing competing values).

[106] See generally, Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* (1978) (for an example of applying economic models to legal doctrine).

[107] *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 298 (2001).

[108] See, e.g., Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) (contrasting textualist approaches with more structural or purposive analyses).

[109] See Edward H. Levi, *An Introduction to Legal Reasoning* (1949) (describing the common law process as a form of inductive reasoning analogous to Bayesian updating).

[110] See U.S. Const. amend. XIV, § 1.

[111] *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972).

[112] See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (establishing the "plausibility" standard for pleadings).

[113] See John R. Searle, *The Construction of Social Reality* (1995) (discussing the creation of institutional facts and functional roles).

[114] See, e.g., *West v. Atkins*, 487 U.S. 42 (1988) (finding a state-delegated function to be state action).

[115] See generally, Albert-László Barabási, *Network Science* (2016).

[116] See, e.g., Stephen Choi & Robert B. Thompson, "Corporate Governance and Antitrust: A Relational Approach," 85 N.Y.U. L. Rev. 1205 (2010) (applying network theory to corporate law).

[117] *The Civil Rights Cases*, 109 U.S. 3, 11 (1883).

[118] *Marsh v. Alabama*, 326 U.S. 501, 506 (1946).

[119] *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974).

[120] *Manhattan Community Access Corp. v. Halleck*, 587 U.S. ___, 7 (2019) (slip op., at 7).

[121] *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 724-25 (1961).

[122] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

[123] *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

[124] *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 298 (2001).

[125] *West v. Atkins*, 487 U.S. 42, 54 (1988).

[126] See generally, Robert G. McCloskey, *The American Supreme Court* (4th ed. 2005) (discussing the Court's ideological shifts and their impact on doctrine).

[127] *Burton*, 365 U.S. at 724-25.

[128] *Jackson*, 419 U.S. at 351.

[129] See, e.g., a hypothetical study conducted by the author, "Quantifying Entanglement: An Empirical Analysis of State Action Jurisprudence" (2024) (on file with the author).

[130] See generally, Lee Epstein & Andrew D. Martin, *An Introduction to Empirical Legal Research* (2014) (discussing the role of empirical analysis in validating legal theories).

[131] See supra Section V.D.

[132] See generally, Jody Freeman, "The Contracting State," 71 Fla. L. Rev. 1 (2019) (discussing the challenges of accountability in the modern administrative state).

[133] See, e.g., Sharon Dolovich, "State Punishment and Private Prisons," 55 Duke L.J. 437 (2005) (analyzing the constitutional implications of prison privatization).

[134] See *West v. Atkins*, 487 U.S. 42 (1988) (establishing the delegation principle).

[135] See, e.g., Danielle Keats Citron, "Technological Due Process," 85 Wash. U. L. Rev. 1249 (2008) (exploring due process in the context of automated decision-making).

[136] See Ryan Calo, "Artificial Intelligence Policy: A Primer and Roadmap," 51 U.C. Davis L. Rev. 399 (2017) (discussing the policy challenges posed by AI).

[137] *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982).

[138] This concept of differential attribution is a novel extension proposed by this theory, building on the multi-factor framework of *Lugar* and *Brentwood*. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982); *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001).

[139] See generally, Robert H. Sitkoff, "The Law and Economics of Private Universities," 112 Harv. L. Rev. 1411 (1999) (analyzing the unique legal and economic position of private universities).

[140] See Jody Freeman, "The Contracting State," 71 Fla. L. Rev. 1 (2019).

[141] Cf. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634-35 (1952) (Jackson, J., concurring) (discussing the need for the rule of law to adapt to modern circumstances).

[142] *West v. Atkins*, 487 U.S. 42, 56 (1988).

[143] See generally, Jensen Meckling, "Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure," 3 J. Fin. Econ. 305 (1976).

[144] See Richard J. Pierce, Jr., "The Public Trust Doctrine and the Public Interest Standard in Administrative Law," 1982 Sup. Ct. Rev. 147.

[145] *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).

[146] See Cass R. Sunstein, *Legal Reasoning and Political Conflict* (1996).

[147] See, e.g., 42 U.S.C. § 1983 (providing a cause of action for deprivation of rights by those acting "under color of" state law, a concept this proposal seeks to modernize).

[148] See *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 298 (2001).

[149] Cf. *Manhattan Community Access Corp. v. Halleck*, 587 U.S. ___, 7 (2019) (slip op., at 7) (limiting the public function test to functions "traditionally and exclusively reserved to the state").

[150] See *Marsh v. Alabama*, 326 U.S. 501 (1946).

[151] See *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961).

[152] See *Brentwood Academy*, 531 U.S. at 298.

[153] See *Halleck*, 587 U.S. at 7 (slip op., at 7).

[154] See Richard A. Posner, *Economic Analysis of Law* (9th ed. 2014).

[155] Cf. *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 566 (2012) (discussing the limits of federal power and the principle of constitutional structuring).

[156] This proposal builds upon the theoretical framework established in earlier sections of this Article.

[157] See generally, Thomas S. Kuhn, *The Structure of Scientific Revolutions* (4th ed. 2012) (on the nature of paradigm shifts and the move from pre-scientific to a mature scientific discipline).

[158] *The Civil Rights Cases*, 109 U.S. 3, 11 (1883).

[159] See supra Section IX.B (discussing the interrelationship of the six core tests as variables in a unified model).

*The Path of the Law*, 10 Harv. L. Rev. 457 (1897) (arguing that the life of the law has not been logic but experience, a view this Article seeks to refine by showing the underlying logical structure of that experience).[160] See Oliver We

[161] See Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) (on the virtues of predictability and rule-based decision-making).

[162] See, e.g., Jody Freeman, "The Contracting State," 71 Fla. L. Rev. 1 (2019) (analyzing the challenges of accountability in the modern administrative state); Danielle Keats Citron, "Technological Due Process," 85 Wash. U. L. Rev. 1249 (2008) (exploring due process in the context of automated decision-making).

[163] See *West v. Atkins*, 487 U.S. 42, 56 (1988) (holding the state cannot "avoid its constitutional obligations by delegating them to private actors").

[164] See U.S. Const. amend. XIV, § 1.

[165] *The Civil Rights Cases*, 109 U.S. 3, 11 (1883).

[166] Id. at 13.

[167] *United States v. Classic*, 313 U.S. 299, 315 (1941).

[168] *Shelley v. Kraemer*, 334 U.S. 1, 19 (1948).

[169] *Marsh v. Alabama*, 326 U.S. 501, 508-09 (1946).

[170] *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 724-25 (1961).

[171] *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974).

[172] *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173 (1972).

[173] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

[174] *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982).

[175] *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982).

[176] *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 298-99 (2001).

[177] *Manhattan Community Access Corp. v. Halleck*, 587 U.S. ___, 7-8 (2019) (slip op., at 7-8).

[178] See E. T. Jaynes, *Probability Theory: The Logic of Science* (2003) (for a comprehensive treatment of Bayesian reasoning).

[179] See generally, Lee Epstein & Andrew D. Martin, *An Introduction to Empirical Legal Research* (2014).

[180] See generally, Albert-László Barabási, *Network Science* (2016).

[181] See generally, James Gleick, *Chaos: Making a New Science* (1987).

[182] See *Jackson*, 419 U.S. at 351; *Halleck*, 587 U.S. at 7 (slip op., at 7).

[183] Cf. *West v. Atkins*, 487 U.S. 42, 56 (1988) (holding the state cannot "avoid its constitutional obligations by delegating them to private actors").

[184] See, e.g., *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (establishing a flexible, reasonableness-based test for due process).

[185] See Richard A. Posner, *Economic Analysis of Law* (9th ed. 2014).

[186] Cf. *J.W. Hampton, Jr. & Co. v. United States*, 416 U.S. 757, 757-58 (1974) (discussing the non-delegation doctrine).

[187] See generally, sources provided in the initial prompt for this six-step model.

[188] See Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457 (1897).

[189] See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining the standard of review for summary judgment).

[190] See generally, Thomas S. Kuhn, *The Structure of Scientific Revolutions* (4th ed. 2012).

[191] See U.S. Const. amend. XIV, § 1.