**IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

**Dipesh Singla,** individually and on behalf of all others similarly situated   )

**Plaintiff,**                                                                                                     )

                                                                                                                      )

v.                                                                                             **Case No**. 1:25-cv-08098

                                                                                            **Judge Jeffrey I. Cummings**

                                                                                   **Magistrate Judge Jeffrey T. Gilbert**

UNIVERSITY OF CHICAGO ET AL,                                          )

GRADUATE STUDENT UNITED AT THE UNIVERSITY OF CHICAGO;   )

TEAMSTERS LOCAL 743;                                                         )

**DOES DEFENDANTS 1–100, INCLUSIVE**,

**Additional Defendants Individuals and Institutions Identified in** *Exhibit: Defendant List Document (To comply with FRCP's these are moved to "Defendants List" Document attached herewith; Individuals in personal and professional capacities), after getting guidance from help desk this version have been improved)*

[and other individuals and entities to be named with attorney guidance, and full complaint], Plaintiff reserves the right to amend this Complaint to name additional defendants as identified through discovery or based on counsel's investigation]

**Defendants.**                                                                                         )

**JURY TRIAL DEMANDED**

**COMPLAINT AT LAW FOR DAMAGES, DECLARATORY, PUNITIVE, PROTECTIVE, INJUNCTIVE, RESPECTED JURY AND SUCH OTHER RELIEF AS THE COURT DEEMS JUST AND PROPER**

**ALLEGATION NOTICE AND PROTECTIVE STATEMENT**

Plaintiff alleges that **all statements set forth in this Complaint** are **alleged** and are not meant legal conclusions. All statements regarding the intent, motive, knowledge, or state of mind of Defendants are alleged upon information, knowledge, and belief. Plaintiff's good-faith allegations below are for the sole purpose of this litigation under the absolute litigation and similar privileges provided to the grieving party. Plaintiff requests that this Hon'ble Court afford Plaintiff all protections available under the First Amendment, whistleblower protections, and anti-SLAPP principles against any counterclaims or collateral actions seeking to penalize Plaintiff for the filing of these allegations. Any corrections plaintiff will try to promptly address as may be ordered on urgent basis. Plaintiff request to provide email copies of order and communications via: dipeshsingla668@gmail.com .

**Table of Contents**

COMPLAINT AT LAW FOR DAMAGES, DECLARATORY, PUNITIVE, PROTECTIVE, INJUNCTIVE, RESPECTED JURY AND SUCH OTHER RELIEF AS THE COURT DEEMS JUST AND PROPER ................................................................................... 1

ALLEGATION NOTICE AND PROTECTIVE STATEMENT ................................................. 1

I. PRELIMINARY STATEMENT ................................................................................. 5

II. JURISDICTION AND VENUE ................................................................................. 9

III STATE-ACTION JURISDICTION FOR §1983 CLAIMS ....................................................... 9

IV INCORPORATION OF PLAINTIFF'S RESEARCH AND FRAMEWORKS (LEGALLY APPROPRIATE FORM) ................................................................................... 10

BC

RECEIVED VW
4/9/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

V. THE PARTIES .................................................................................................................11

VI. FACTUAL ALLEGATIONS ......................................................................................... 12

    A. Plaintiff's Status and Protected Activities ................................................................ 12

    B. The University's Retaliatory Campaign ................................................................... 14

    C. Evidence of Retaliatory Animus and Pretext ........................................................... 21

    D. Further Whistleblowing, Research-Related Allegations, and Preservation ........................ 22

    D. TERMS ................................................................................................................... 22

VII. CLAIMS FOR RELIEF.................................................................................................. 23

    SECTION A   ADA & REHABILITATION ACT COUNTS ...................................................... 23

        COUNT 1   Disability Discrimination (ADA Title II / Title III) .......................................... 23

        COUNT 2   Failure to Provide Reasonable Accommodations (ADA) ................................. 24

        COUNT 3   Disability Discrimination (Section 504 Rehabilitation Act) ............................ 25

        COUNT 4   Deliberate Indifference to Disability Needs (ADA + §504) ............................ 25

    SECTION B   TITLE IX COUNTS........................................................................................ 26

        COUNT 5   Title IX Sex Discrimination .................................................................. 26

        COUNT 6   Title IX Retaliation (including retaliatory academic decisions) ....................... 27

        COUNT 7   Deliberate Indifference to Assault Misconduct Reports (Title IX) ................... 28

        COUNT 8   Hostile Educational Environment (Title IX)................................................. 28

        COUNT 9   Failure to Protect (Title IX + Constitutional Standards) ................................. 29

    SECTION C   TITLE VI COUNTS........................................................................................ 30

        COUNT 10   Race / National Origin / Caste Discrimination (Title VI) .............................. 31

        COUNT 11   Retaliation Under Title VI.................................................................... 32

    SECTION D   Constitutional Claims Under 42 U.S.C. § 1983 ................................................. 35

        COUNT 12   FIRST AMENDMENT RETALIATION (§1983)............................................ 35

        COUNT 13   EQUAL PROTECTION (National Origin, Race, Caste)................................ 37

        COUNT 14   PROCEDURAL DUE PROCESS (Biased Disciplinary Process) ................. 39

        COUNT 15   SUBSTANTIVE DUE PROCESS (BODILY INTEGRITY)......................... 41

        COUNT 16   FAILURE TO PROTECT (§1983)................................................................. 42

        COUNT 17   STATE-CREATED DANGER (§1983) ......................................................... 43

        COUNT 18   UNREASONABLE SEARCH & SEIZURE (Fourth Amendment) .............. 44

        COUNT 19   UCPD UNLAWFUL SURVEILLANCE / ABUSE OF AUTHORITY ......... 45

        COUNT 20   CIVIL RIGHTS CONSPIRACY (§1983)....................................................... 45

        COUNT 21   INFORMATIONAL PRIVACY VIOLATION (Constitutional) ................... 47

    SECTION E   DIGITAL PRIVACY, CFAA, SCA, ECPA–RELATED COUNTS ................. 47

        COUNT 22   Computer Fraud and Abuse Act (CFAA), 18 U.S.C. §1030   Unauthorized Access ............................................................................................................ 47

        COUNT 23   Retaliatory Digital Interference (First Amendment & CFAA Theory) .......... 48

        COUNT 24   Stored Communications Act (SCA), 18 U.S.C. §§ 2701–2712   Unauthorized Access to Stored Data ............................................................................................ 49

        COUNT 25   Electronic Communications Privacy Act (ECPA) Unlawful Interception of Communications ................................................................................................ 50

COUNT 26 Unauthorized Disclosure of Educational Records (FERPA Constitutional Privacy Theory) ............................................................................................................ 51

SECTION F FALSE CLAIMS ACT & FEDERAL FUNDING COUNTS ........................... 52

COUNT 27 False Claims Act Retaliation (31 U.S.C. § 3730(h)) .................................... 52

COUNT 28 Fraudulent Certification of Compliance (Federal Funding Conditions) ........ 52

COUNT 29 Mismanagement of Federal Funds (Spending Clause Violations) ................. 53

COUNT 30 Federal Funding–Based Retaliation (Title VI, Title IX, ADA, §504) ............ 54

COUNT 31 False Claims Act (Substantive Liability) Misuse of Federal Funds, 31 U.S.C. §3729 ................................................................................................................................. 55

SECTION G FEDERALIZED TORT-EQUIVALENT COUNTS ............................................ 55

COUNT 32 Stigma-Plus Due Process (Federalized Defamation Theory) ......................... 56

COUNT 33 Shocks-the-Conscience Institutional Misconduct (Federalized IIED) ........... 56

COUNT 34 Federalized Fraudulent Concealment (Under §1983 + Federal Funding Conditions) ........................................................................................................................ 57

COUNT 35 Pattern-of-Interference Theory Amplifying Underlying Retaliation Claims .. 58

COUNT 36 Invasion of Federal Privacy Interests .............................................................. 58

COUNT 37 Federalized Breach of Implied Duty of Confidentiality ................................ 59

COUNT 38 FRAUDULENT INDUCEMENT OF FEDERAL FUNDS AND MISREPRESENTATION (§1983 & FALSE CLAIMS ACT THEORY) ............................. 60

COUNT 39 Retaliatory Constructive Expulsion (Federal Doctrine) ................................. 61

COUNT 40 Hostile Educational Environment (Federal Theory) ....................................... 61

COUNT 41 Deprivation of Liberty and Property Interests in Education (§1983) ............. 62

COUNT 42 Pattern and Practice of Institutional Retaliation (Federal Claim) .................. 63

SECTION H DECLARATORY & INJUNCTIVE RELIEF .................................................... 64

COUNT 43 Declaratory Relief (28 U.S.C. § 2201) .......................................................... 64

COUNT 44 Injunctive Relief (28 U.S.C. § 2202) ............................................................. 65

COUNT 45 Retaliation in Violation of Federal Public Policy (Federal Civil Rights Framework) ........................................................................................................................ 66

SECTION I SUPPLEMENTAL ILLINOIS STATE LAW CLAIMS ...................................... 67

COUNT 46 CIVIL CONSPIRACY (ILLINOIS COMMON LAW) ................................... 67

COUNT 47 VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT ........................ 68

COUNT 48 VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT (IWPCA) ................................................................................................................... 70

COUNT 48A – Fair Labor Standards Act (FLSA), 29 U.S.C. § 207 and Recordkeeping Violations ........................................................................................................................... 71

COUNT 49 VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ......................................................................................... 71

COUNT 50 BREACH OF CONTRACT AND/OR IMPLIED CONTRACT (ILLINOIS COMMON LAW) .............................................................................................................. 72

COUNT 51 NEGLIGENT MISREPRESENTATION (ILLINOIS COMMON LAW) ........ 73

COUNT 52 FRAUDULENT INDUCEMENT (ILLINOIS COMMON LAW) ................... 74

COUNT 53 NEGLIGENT INFLECTION OF EMOTIONAL DISTRESS (ILLINOIS COMMON LAW) .............................................................................................................. 75

COUNT 54 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ILLINOIS COMMON LAW) ........................................................................................................ 75

COUNT 55: ASSAULT AND BATTERY (ILLINOIS COMMON LAW) .......................... 77

COUNT 56 BREACH OF DUTY OF CONFIDENTIALITY (ILLINOIS COMMON LAW) ............................................................................................................................... 78

COUNT 57 CIVIL CONSPIRACY TO COMMIT SPOLIATION OF EVIDENCE (ILLINOIS COMMON LAW) .......................................................................................... 79

COUNT 58 INVASION OF PRIVACY AND / INTRUSION UPON SECLUSION *(ILLINOIS COMMON LAW)* ....................................................................................... 80

COUNT 59 DEFAMATION, DEFAMATION PER SE, AND DEFAMATION PER QUOD *(ILLINOIS COMMON LAW)* ....................................................................................... 80

COUNT 60 NEGLIGENT HIRING AND SUPERVISION *(ILLINOIS COMMON LAW)* .. 81

COUNT 61 FRAUD .......................................................................................................... 82

COUNT 62 RESTITUTION – MONEY HAD AND RECEIVED (ILLINOIS COMMON LAW) ................................................................................................................................ 83

COUNT 63 DECLARATORY RELIEF: CONTINUING TORT DOCTRINE AND EQUITABLE TOLLING .................................................................................................. 83

COUNT 64 INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE .................................................................................................................. 84

COUNT 65 CONVERSION (COMMON LAW) ................................................................ 84

COUNT 66 UNJUST ENRICHMENT / RESTITUTION .................................................... 85

COUNT 67 NEGLIGENCE — NEGLIGENCE PER SE (BASED ON VIOLATIONS OF ILLINOIS STATUTES) .................................................................................................... 86

COUNT 68 INTENTIONAL (BAD-FAITH) SPOLIATION OF EVIDENCE .................... 87

COUNT 69 BREACH OF FIDUCIARY DUTY (COMMON LAW) — AGAINST TRUSTEES AND SENIOR ADMINISTRATORS ................................................................ 88

COUNT 70 FALSE LIGHT INVASION OF PRIVACY (COMMON LAW) ...................... 89

COUNT 71 RETALIATORY DISCHARGE (ILLINOIS COMMON LAW) ...................... 90

COUNT 72 WRONGFUL ACADEMIC / DISCIPLINARY EXPULSION (ILLINOIS COMMON LAW) ............................................................................................................. 90

COUNT 74 EQUITABLE ESTOPPEL (Illinois Common Law) .......................................... 92

COUNT 75 CIVIL AIDING AND ABETTING (ILLINOIS COMMON LAW) ................. 92

COUNT 76 FRAUDULENT CONCEALMENT (ILLINOIS COMMON LAW) ............... 93

COUNT 77 NEGLIGENT RETENTION ........................................................................... 94

COUNT 78 FAILURE TO PROTECT / NEGLIGENT SECURITY ................................... 94

COUNT 79 GENERAL NEGLIGENCE (ILLINOIS COMMON LAW) ........................... 95

COUNT 80 ACCOUNTING (EQUITABLE) .................................................................... 95

COUNT 81 DECLARATORY JUDGMENT — RECORD & TRANSCRIPT EXPUNGEMENT ............................................................................................................. 96

COUNT 82 RESPONDEAT SUPERIOR / VICARIOUS LIABILITY ............................... 96

COUNT 83 CONSTRUCTIVE TRUST (EQUITABLE RELIEF) ...................................... 97

COUNT 84 INJUNCTIVE RELIEF (EVIDENCE PRESERVATION AND NON-SPOLIATION) ................................................................................................................. 97

COUNT 85 DECLARATORY AND INJUNCTIVE RELIEF ............................................. 98

4

COUNT 86 ABUSE OF PROCESS (ILLINOIS COMMON LAW).................................... 99

COUNT 87 MISCELLANEOUS, SUPPLEMENTAL, AND ALTERNATIVE COMMON-LAW, STATUTORY, AND EQUITABLE CLAIMS ......................................................... 100

COUNT 88 VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (DISCRIMINATION AND RETALIATION)...................................................................... 102

VII. PRAYER FOR RELIEF ................................................................................. 104

VIII. MOTIONS ................................................................................................. 108

IX. Preservation of Jurisdiction and Rights.................................................... 108

X. JURY DEMAND ........................................................................................... 108

## I. PRELIMINARY STATEMENT

1. Plaintiff Dipesh Singla ("Singla", or "Dipesh", or "Grieving party", "Grievant", or "Movant", or "Plaintiff"). Singla complaint against its former University named as The University of Chicago, where plaintiff was affiliated as a student, and employee. This complex matter for resolution and justice purposes before the court is brought in good faith to solve case through the judicial channels, and haves matter relating to education, employment, discrimination, retaliation, assault, denial of accommodations, civil rights, fraud, forgery, falsification, misleading, and etcetera.

2. This is a civil-rights, whistleblower-retaliation, federal discrimination, disability-rights, data-privacy, due-process, § 1983 constitutional-misconduct, and supplemental Illinois state-law action brought by Plaintiff Dipesh Singla, a former graduate student and student-employee of the University of Chicago ("University" or "Defendant"). Plaintiff seeks redress for a **pervasive and escalating pattern of serial retaliation, discrimination,** fabrication of records, suppression of exculpatory evidence, malicious and oppressive administrative abuse, fraud, concealment, and deliberate indifference by multiple University officials acting individually, collectively, and under color of state law through the University of Chicago Police Department (UCPD), federally delegated SEVIS authority, and federally funded programs. Defendants acted under color of law based on the University's delegated police powers, SEVIS federal immigration authority, federally supervised disciplinary functions, and pervasive entwinement with federal funding structures.

3. After Plaintiff engaged in **protected**, and protected **concerted activities**, including reporting workplace safety hazards, gas mishandling, food quality and sanitation violations, wage theft, wrongful termination, failures to accommodate disability, assault, discriminatory treatment, and filing internal discrimination, wrongful termination, and union grievances, Defendants orchestrated a coordinated campaign of **reprisals causing Plaintiff significant economic loss, professional harm, and emotional distress**. The retaliatory actions were **extreme and outrageous, undertaken with malice, oppression, and fraudulent intent,** and designed to **destroy** Plaintiff's education, employment, research trajectory, immigration status, reputation, and future professional prospects.

4. **Defendants' retaliatory conduct included, inter alia:**

   (a) fabricating disciplinary allegations,
   (b) forging or falsifying documentation,
   (c) concealing material facts,
   (d) suppressing exculpatory evidence,
   (e) creating pretextual investigations,
   (f) engaging in fraudulent misrepresentation and fraudulent concealment,
   (g) initiating biased and predetermined disciplinary proceedings,
   (h) engaging in unlawful electronic surveillance,
   (i) accessing and disseminating Plaintiff's FERPA-protected, financial, employment, and medical information,
   (j) constructing a hostile educational environment,
   (k) refusing disability accommodations,
   (l) interfering with employment opportunities,

5

(m)  initiating retaliatory expulsions and job terminations,

(n)  unlawful search and seizure of Plaintiff's electronic communications, in violation of the Stored Communications Act and Electronic Communications Privacy principles,

(o)  intentionally interfering with Plaintiff's contractual relationships and prospective economic opportunities, and

(p)  engaging in acts constituting retaliation under federal civil-rights statutes and § 1983.

These actions meet established judicial definitions of **willful and wanton misconduct**, **deliberate indifference**, **reckless disregard**, and **constitutional abuse of authority**.

5. **Defendants' misconduct further satisfies the elements of fraudulent concealment, including:**
    1. concealment of material facts;
    2. intent to induce Plaintiff to rely on false information where a duty to speak existed;
    3. Plaintiff's inability to discover concealed facts despite reasonable diligence;
    4. detrimental reliance on fraudulent omissions; and
    5. resultant injury to Plaintiff's educational, professional, financial, and emotional wellbeing.

    Courts routinely recognize claims arising from fabrication of records, falsification of evidence, defamation per se, false light, negligent misrepresentation, IIED, civil-rights conspiracy, and abuse of process in similar higher-education retaliation contexts.

6. **Throughout the events described herein, Defendants' conduct constituted:**
    1. Retaliation for engaging in protected free speech, protected activities, whistleblowing, and grievance activity;
    2. Discrimination under Title VI, Title IX, the ADA, and §504;
    3. Retaliatory adverse actions under federal civil-rights law;
    4. failure to protect Plaintiff from foreseeable harm, including after he reported assault;
    5. state-created danger and violation of bodily integrity, actionable under §1983;
    6. unjust enrichment, where Plaintiff paid tuition for services the University did not provide;
    7. interference with employment and suppression of academic, research, and professional opportunities;
    8. unlawful access to and dissemination of confidential communications;
    9. defamation per se and per quod, through widely disseminated false accusations of misconduct; and
    10. Wage-related misconduct that overlaps with principles underlying FLSA and LMSA frameworks (but not limited to).
    11. Violations of Illinois statutory and common law, including the Illinois Whistleblower Act, the Illinois Wage Payment and Collection Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, and common-law torts such as breach of contract, fraud, and retaliation.

7. Defendants acted with **mala fide intent** and **reckless disregard** for Plaintiff's federally protected rights and the safety of the surrounding **American community.** After Plaintiff engaged in multiple forms of protected activity including reporting discrimination, unsafe department and dining conditions, misuse of federal and nonprofit funds, wage-related misconduct, and filing good-faith internal and union grievances Defendants initiated a coordinated campaign of oppression and retaliation. This retaliatory scheme included, but was not limited to: the abrupt and unexplained termination of multiple student-employment positions; discriminatory and materially adverse actions; the initiation of a biased, prejudged, predetermined, and pretextual disciplinary process built upon falsified records; omission, suppression, and misrepresentation of material evidence; misinterpretation of Plaintiff's statements; the denial of disability accommodations; and ultimately Plaintiff's wrongful expulsion.

8. As a whistleblower and complainant, Plaintiff also reported an assault perpetrated by a University of Chicago-affiliated individual who held both staff and student status. Rather than taking reasonable steps to safeguard Plaintiff, Defendants acted with **deliberate indifference** and failed to implement available protective measures, thereby exacerbating a known and foreseeable risk of further harm. Specifically, despite possessing the authority to issue a **No-Contact Directive ("NCD")** through its disciplinary and safety apparatus, the University refused to do so, increasing Plaintiff's vulnerability and materially worsening the danger.

6

9. Compounding this failure, University decision-makers allegedly **shielded the accused individual, obstructed accountability mechanisms, and suppressed or disregarded Plaintiff's reports and grievances**. To date, Plaintiff remains without meaningful redress, while University agents allegedly continued a campaign of retaliation, including the initiation of **fabricated allegations that bear indicia of document falsification and forgery**. Plaintiff expressly denies engaging in the misconduct alleged against him.

10. Upon information and belief, the evidentiary record reflects that University officials **created, altered, backdated, or otherwise manipulated documents in close temporal proximity to Plaintiff's protected complaints and grievance filings**, giving rise to a strong inference of retaliatory motive and pretext. The disciplinary charges were not grounded in contemporaneous facts or legitimate academic concerns, but instead were allegedly **manufactured, selectively enforced, repeatedly shifting, and escalated as a retaliatory pretext** in response to Plaintiff's protected activities, including reporting discrimination, safety violations, wage theft, and assault.

11. This action is **not a mere disagreement with academic judgment or disciplinary discretion**. Rather, Plaintiff alleges that the disciplinary machinery itself was **weaponized as an instrument of retaliation, fraud, and civil-rights deprivation**, devoid of neutrality, procedural integrity, and good-faith factfinding. Plaintiff reserves the right to prove that the proceedings lacked fundamental legitimacy and constituted **retaliatory and discriminatory state-linked misconduct actionable under federal civil-rights law**, rather than a bona fide academic sanction.

12. Accordingly, this federal action arises from Defendants' **unlawful retaliatory motive, deliberate indifference, procedural irregularities, suppression of exculpatory evidence, fabrication of allegations, and deprivation of federally protected rights**, including rights secured by **Title IX, 42 U.S.C. § 1983, the Due Process Clause, and related anti-retaliation statutes**.

13. Defendants' conduct also violated Plaintiff's rights to freedom of speech, academic freedom, and expressive activity protected under the First Amendment and the University's own Chicago Principles. Plaintiff was repeatedly punished for engaging in protected expression, including raising safety concerns, reporting discrimination, challenging wrongful termination, and disputing procedural irregularities. In retaliation, Plaintiff was subjected to intimidation, including anonymous phone calls threatening him not to pursue legal remedies or police complaints calls Plaintiff reasonably believes were connected to individuals acting on behalf of, or with encouragement from, the University or its agents.

14. Taken together, these actions constitute extreme and outrageous conduct, malicious oppression, fraudulent suppression, retaliation, discrimination, constitutional violations under (but not limited to) 42 U.S.C. § 1983, materially adverse actions under Title VI, Title VII, Title IX, ADA/§504, violations of Illinois state & admin law and violations of foundational principles of fairness, due process, and academic freedom.

15. Plaintiff respectfully asks the Court to grant the following relief: monetary damages as determined by a jury, including compensation for lost educational, employment, research, mental and emotional harm; a formal ruling that the University violated Plaintiff's federal and constitutional rights; an order requiring changes to the University's policies and practices; public apologies approved by the Plaintiff; refund of tuition and fees; other damages jury seems important for plaintiff and future; lost opportunities damages; recognition of Plaintiff's disadvantaged background; and investigation into the misuse of federal funds and nonprofit status.

16. Additionally, Plaintiff suffered mental, physical, and sexual harassment and assault, and alleges that Defendants' conduct amounted to a level of psychological violation tantamount to "**mental rape**", and systematic acts that Plaintiff reasonably characterizes as "**educational terrorism**", "**serial retaliation**" terms describing the severity, coercion, callous indifference, and **catastrophic interference.** Defendants inflicted on Plaintiff's person, career, education, and future.

17. Plaintiff submits that the issues raised herein are of systemic and national importance, involving:
    1. retaliation against whistleblowers;
    2. falsification of disciplinary records;
    3. misuse of federally-funded authority;
    4. discriminatory educational practices;
    5. deprivation of bodily integrity;
    6. abuse of SEVIS delegation;
    7. exploitation of students and student-workers;

7

8. electronic-privacy violations;

9. institutional suppression of complaints;

10. civil-rights violations with significant social impact.

18. This case exemplifies patterns that federal courts have repeatedly condemned in actions involving universities and other powerful institutional actors who retaliate against complainants, falsify or manipulate records, obstruct internal and external oversight mechanisms, or weaponize administrative processes to conceal wilful wrongdoing acts. Plaintiff brings this action not only to obtain redress for the injuries suffered, but also to ensure accountability and to prevent recurrence of these practices for future students, employees, and whistleblowers.

19. Plaintiff further alleges that the University of Chicago employed a range of tactics commonly associated with institutional litigation misconduct, including the intentional **creation** and **amplification** of defects in a complainant's record, the manipulation of procedural safeguards, suppression of exculpatory evidence, and the construction of pretextual narratives methods that scholars and practitioners have described as consistent with **induced defect theories** of institutional abuse and systems-manipulation. Plaintiff reserves the right to present additional evidence, research, analysis, and academic commentary to this Court as these patterns become further substantiated, and to publish such research in the public interest consistent with academic freedom and whistleblower protections.

20. Defendants engaged in **serial retaliation,** meaning a continuous pattern of escalating adverse actions tied directly to Plaintiff's protected activity, consistent with patterns condemned by the Seventh Circuit in retaliation jurisprudence.

21. Plaintiff describes Defendants' campaign of intimidation, fabricated charges, reputational destruction, and deprivation of educational access as '**educational terrorism**' referring descriptively to the coercive, debilitating, and rights-denying environment intentionally imposed in retaliation for whistleblowing.

22. Defendants have systematically **exploited** procedural and evidentiary loopholes to fabricate records and **construct pretextual justifications** (Induced defectology), thereby portraying **clearly unlawful retaliation and discrimination** as "mixed motive" or otherwise legally permissible actions. Through this deliberate strategy of induced procedural defect and narrative manipulation, the University transforms straightforward instances of misconduct into legally ambiguous disputes. By doing so, Defendants **nullify** the protective intent of federal civil-rights and anti-retaliation statutes including those governed by University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338 (2013) by **engineering (Induced defectology)** ambiguity around motive and causation. This calculated tactic allows the University to conceal illegal conduct behind the veil of academic or administrative discretion, effectively rendering protective laws non-protective in practice.

23. Plaintiff expressly **disavows and opposes** any attempt by Defendants to retroactively shift or recharacterize the timeline or nature of Plaintiff's protected activity. Defendants have engaged in **exploitative misuse of legal** standards and procedural tactics designed to preemptively frame subsequent retaliation as a "mixed-motive" dispute, despite possessing actual and implied knowledge of Plaintiff's protected activity at all relevant times. This deliberate manipulation of legal causation and chronology serves to distort the record, undermine statutory protections, and conceal retaliatory intent behind fabricated or contrived rationales.

24. In light of the *exceptional factual and legal complexity of this matter,* including overlapping federal, constitutional, state, municipal, city, statutory, contractual, administrative, employment, educational, and common-law issues, Plaintiff expressly preserves all claims, legal theories, remedies, factual predicates, evidentiary grounds, and alternative bases for relief arising from the same nucleus of operative facts. No claim, theory, argument, or request for relief shall be deemed diluted, waived, abandoned, narrowed, merged, or forfeited merely because certain facts, legal authorities, counts, examples, or damages theories are summarized, streamlined, reserved for amendment, deferred to discovery, or presented in abbreviated form in this pleading. Plaintiff specifically states that the complexity, breadth, and evolving evidentiary nature of the matter shall not operate to diminish the force, scope, plausibility, or preservability of any properly asserted or reasonably inferable claim.

25. Plaintiff submits that the evidentiary record detailed in this Complaint including the documented fabrication of records, the temporal proximity of retaliatory acts, and the disparate treatment compared to similarly situated employees easily satisfies the

8

**preponderance of the evidence** *standard required to prevail in this civil action.* Under this standard, which differs significantly from the criminal threshold of beyond a reasonable doubt, the Plaintiff bears the burden of proof to demonstrate that it is more likely than not that the Defendants engaged in the alleged misconduct and fraud. As recognized by legal authorities such as Cornell Law School and **federal jurisprudence, the fact finder** (whether the Court or a Jury) must determine if the greater weight of the evidence tips the scale in Plaintiff's favor, often characterized as the ***51 percent rule***. Plaintiff asserts that the totality of the circumstances, including the University's failure to protect, the fabrication of disciplinary evidence, and the bad faith refusal to issue protective directives, creates a substantial likelihood that the Defendants violated Plaintiff's civil rights. Therefore, Plaintiff contends that the evidence presented herein meets and on dockete and further lengthy submission meets the burden of production and satisfies the burden of persuasion, establishing that the alleged discrimination, retaliation, and fraud are not only actionable but are the only logical conclusion to be drawn from the record.

## II. JURISDICTION AND VENUE

26. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including but not limited to: Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d); Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681); the Americans with Disabilities Act ("ADA"); Section 504 of the Rehabilitation Act (29 U.S.C. § 794); 42 U.S.C. § 1983; the Stored Communications Act; the Electronic Communications Privacy Act; and the anti-retaliation provision of the False Claims Act (31 U.S.C. § 3730(h)). Plaintiff also asserts federal and constitutional not limiting to claims involving retaliation, denial of disability accommodations, due-process violations, unlawful electronic interception, retaliation for whistleblowing, retaliation for protected speech, and constitutional torts including interference with bodily integrity, failure to protect, state-created danger, unreasonable search and seizure, and civil-rights conspiracy.

27. Venue lies in this District under 28 U.S.C. § 1391(b) because all Defendants reside or conduct business in this judicial district, and a substantial part of the events, omissions, retaliation, electronic-privacy violations, falsification of records, materially adverse actions, discriminatory acts, suppression of evidence, and other misconduct giving rise to these claims occurred within the Northern District of Illinois, Eastern Division.

28. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the Defendants conduct business and are located in this district.

    1. Defendants reside and conduct business in this District;

    2. virtually all acts of discrimination, retaliation, harassment, fraud, suppression, materially adverse actions, record falsification, and constitutional violations occurred here; and

    3. Plaintiff suffered injuries in this District.

29. This Hon'ble Court has supplemental jurisdiction over Plaintiff's Illinois statutory and common-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy. The state-law claims arise from the same common nucleus of operative facts—specifically but not limited to the retaliatory discharge, assault, disciplinary proceedings, and employment termination described herein as the federal claims.

30. **EEOC's Right to Sue** Dated 16 March 2026 is attached to this complaint. *See Exhibit 1 in this document*.

## III STATE-ACTION JURISDICTION FOR §1983 CLAIMS

31. This Hon'ble Court also possesses federal-question jurisdiction because Defendant University of Chicago challenged conduct is **fairly attributable to the State**, rendering the University of Chicago and its agents **state actors** for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment. Although the University allegedly self-identifies as a ***private institution***, it satisfies multiple independent and mutually reinforcing state-action doctrines recognized by the Hon'ble Supreme Court and Hon'ble federal appellate courts:

9

(a) **Public-Function Doctrine (SEVIS Immigration Authority):** Defendant performs the traditional and exclusive public function of immigration enforcement by administering the federal SEVIS program pursuant to 8 C.F.R. § 214.3, exercising delegated powers ordinarily reserved for the Department of Homeland Security. Courts recognize that entities performing uniquely governmental functions particularly immigration control may be deemed state actors. See United States v. Int'l Bhd. of Teamsters, 941 F.2d 1292 (2d Cir. 1991).

(b) **Entwinement Doctrine (Pervasive Federal Funding and Regulation):** Defendant University receives hundreds of millions (or billions) of dollars annually in Title IV student-aid funds, NIH and NSF research grants, federal fellowships, and federal contracts. Under Brentwood Academy v. TSSAA, 531 U.S. 288 (2001), such deep entwinement between government and a private entity, combined with federal funding conditions, transforms the entity into a state actor. Federal courts have held that universities accepting federal funds may become constitutionally constrained. Doe v. Washington Univ., 780 F.3d 479, 485 (8th Cir. 2015) ("Institutions accepting federal funds voluntarily submit to First Amendment limitations."). Furthermore, University of Chicago is a non-profit and get tax benefits and/or rebates on it's spendings.

(c) **Delegated Police-Power Doctrine (UCPD Authority; and as a State-Commissioned Force)**: The University of Chicago Police Department ("UCPD") is a **state-commissioned police force**, vested with full arrest, detention, investigative, and enforcement powers under Illinois law and operating throughout Hyde Park. When UCPD engages in surveillance, intimidation, retaliatory monitoring, obstruction of grievance processes, or discriminatory enforcement, such conduct constitutes action "under color of state law." Flagg v. City of Detroit, 252 F. App'x 30 (6th Cir. 2007). Courts have repeatedly held that private police exercising state authority qualify as state actors. Flagg v. Detroit, 715 F.3d 165 (6th Cir. 2013).

(d) **Quasi-Municipal Functions (Company-Town Doctrine):** Defendant operates a vast, self-contained campus with policing, utilities, transportation, housing, infrastructure, and governance systems that replicate municipal functions akin to a **"company town"** under Marsh v. Alabama, 326 U.S. 501 (1946). Courts have held universities acting as quasi-municipal entities to be state actors. Doe v. Notre Dame, No. 3:13-cv-1239, 2016 WL 5394493 (N.D. Ind. Sept. 27, 2016) (finding Notre Dame plausibly a **state actor** due to police powers, infrastructure, and municipal-scale governance).

(e) **Symbiotic-Relationship Doctrine:** The University's financial survival and operations depend upon continuous federal funding and federal research appropriations. The government and Defendant maintain a **mutually beneficial relationship,** evidencing the type of symbiotic joint participation recognized in Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961).

32. Collectively, these factors demonstrate that Defendant's retaliatory expulsion, suppression of exculpatory evidence, denial of accommodations, materially adverse actions, falsification of records, electronic-privacy violations, retaliatory surveillance, suppression of speech (including violation of Chicago Principles), and discriminatory acts are **fairly attributable to the State** for purposes of constitutional **liability under § 1983**. Even if Defendant were somehow not a state actor, its conduct independently violates Title IX, Title VI, ADA Title II, and § 504 of the Rehabilitation Act, each of which imposes duties on federally funded institutions. Thus, the **University of Chicago** must be deemed a **state actor** under the state action doctrine.

## IV INCORPORATION OF PLAINTIFF'S RESEARCH AND FRAMEWORKS (LEGALLY APPROPRIATE FORM)

33. Plaintiff's unpublished scholarly research provides further analytical support for the plausibility of state action. Plaintiff's **Integrated Public Function Matrix (IPFM)** and **State Actor Probability Index (SAPI),** as described in **Quantifying State Action** and **Unified Theory of State Action**, synthesize existing Hon'ble Supreme Court doctrines public function, nexus, symbiosis, coercion, and entwinement into a unified framework illustrating that entities exercising delegated sovereign powers (e.g., police authority, immigration enforcement), funded through public streams, and structurally integrated with government actors, function equivalently to state actors. These analyses align with

10

precedent and are cited solely to illustrate factual plausibility, not to alter legal standards. Further the research of about 2000 or so pages, and about 700 cases against UChicago about all claims herein especially retaliation cases as in this link herein: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7wcqBy8HAUTJM?e=TDfnf3

## V. THE PARTIES

34. Plaintiff **Dipesh Singla** is an individual formerly enrolled as a graduate student and employed in multiple jobs at the University of Chicago from approximately September 2023 until February/March 2025. Plaintiff is a member of several legally protected classes, including national origin, ethnicity, caste, race, sex, gender, sexual identity, disability status, and other micro-minority classifications cognizable under federal civil-rights statutes. Plaintiff has previously published academic and technical research, participated in federally funded research studies, contributed to community organizations worldwide, and engaged in extensive volunteer work within the University community. Plaintiff alleges that during the course of his academic and employment relationship with the University, he was subjected to materially adverse actions, including retaliatory discipline, discriminatory treatment, denial of disability accommodations, interference with employment opportunities, suppression of grievances, and the fabrication or manipulation of institutional records. Plaintiff further alleges that as a whistleblower acting in good faith and without knowledge of U.S. legal complexities, plaintiff reported issues relating to discrimination, safety hazards, research-program irregularities, misuse of federal resources, procedural deficiencies, and assault-related concerns, and that Defendants responded with malice, oppression, retaliatory animus, and deliberate indifference to his federally protected rights.

35. Defendant **The University of Chicago** is a private, federally funded, tax-exempt educational institution located at 5801 South Ellis Avenue, Chicago, Illinois. The University receives substantial supported federal funding, including Title IV student-aid funds and significant NIH/NSF research grants, thereby subjecting it to the non-discrimination and anti-retaliation mandates of Title VI, Title IX, the ADA, and § 504 of the Rehabilitation Act. Plaintiff alleges that University administrators and agents engaged in a coordinated, pretextual, and bad-faith disciplinary scheme involving fabrication, suppression, and misrepresentation of evidence; discriminatory treatment; retaliatory monitoring and adverse actions; and procedurally deficient proceedings. Plaintiff further alleges that the University improperly accessed or disseminated his confidential educational, disability-related, and research-participation records, in violation of federal protections governing privacy, electronic communications, and disability accommodation. Through its institutional structure including its state-commissioned police department (UCPD), federally delegated SEVIS authority, and quasi-municipal campus operations the University acted under color of state law for purposes of §1983.Defendant Board of Trustees oversees the University's policies, at the same address.

36. Defendant **Board of Trustees of the University of Chicago**, located at the same principal address, is the University's governing body with ultimate responsibility for oversight, policymaking, enforcement of institutional regulations, and supervision of University officers and agents. Plaintiff alleges that the Board ratified, approved, or failed to correct policies and practices that resulted in systemic violations of his federally protected rights. Defendants Board of Trustees and University Senate, acting in their official capacities, are responsible for the promulgation, approval, and supervision of university policies governing student discipline, grievance mechanisms, academic rights, and institutional accountability. Plaintiff alleges that these governing bodies created, endorsed, or permitted unconstitutional or discriminatory practices, thereby rendering them necessary parties for purposes of obtaining complete relief and ensuring institutional compliance with federal civil-rights mandates.

37. Defendants Office of the Provost, Office of the President, Harris School of Public Policy, Social Sciences Computing Services (SSCS), Student Disability Services, Office of International Affairs, Mansueto Institute, and the University of Chicago Police Department, are University subdivisions and administrative units responsible for actions taken with respect to Plaintiff's academic progress, disciplinary proceedings, disability accommodations, employment opportunities, immigration-related reporting, electronic-privacy matters, and campus safety. Plaintiff alleges that these entities and their personnel acted individually and collectively in ways that constituted fraudulent suppression,

11

discriminatory animus, retaliatory intent, willful and wanton misconduct, and materially adverse actions.

38. Plaintiff further names as Defendants **Teamsters Local 743, Graduate Student United at the University of Chicago**, university-affiliated labour organizations, unions, or representative bodies that according to Plaintiff's allegations failed to provide required representation, refused to assist in filing grievances or defending against retaliatory discipline, discouraged Plaintiff from seeking administrative remedies, or otherwise breached duties of fair representation. Plaintiff alleges that such failures facilitated and intensified the University's retaliatory actions, enabling procedural imbalance, suppression of rights, and institutional abuse of authority.

*39.* Defendants DOES 1 through 100 are individuals and entities whose identities are presently unknown to Plaintiff, but who participated in, authorized, directed, or ratified the acts and omissions alleged herein. ***Some known defendant entities are added in attached Defendant List Document to comply with FRCP's.***

## VI. FACTUAL ALLEGATIONS

### A. Plaintiff's Status and Protected Activities

40. Plaintiff Dipesh Singla was admitted as an international graduate student at the University of Chicago in September 2023 and, throughout enrolment, held multiple employments positions across several University departments, including both union-covered and non-union roles.

41. During approximately eighteen (18) months at the University of Chicago, Plaintiff simultaneously held approximately fifteen or more job positions across multiple University departments and units, including Social Sciences Computing Services ("SSCS"), the Mansueto Institute, Regenstein Library, the Logan Center for the Arts, the Department of Physics, convocation assistant, and other University-affiliated offices. Plaintiff **disclosed** this **disability to the University of Chicago** through its Student Disability Services and related administrative channels.

42. Plaintiff is a person with a documented disability of which the University of Chicago was on notice. Plaintiff made repeated requests for reasonable accommodations to University Disability Services and related administrative units; **those requests were denied or ignored without an adequate interactive process.**

43. During his affiliation with the University, Plaintiff engaged in multiple forms of protected activity, acting in good faith as a whistleblower and complainant. Among the matters Plaintiff reported or raised internally and externally are the following (the subparagraphs summarize a non-exhaustive list appearing in Plaintiff's full record):

1. Unsafe handling and storage of hazardous materials (including pressurized gas cylinders) including in University of Chicago physics department basement ***(Kersten Physics Teaching Center);***

2. Assault and harassment by a person affiliated with the University of Chicago (student and employee status);

3. Repeated and systemic food-safety, quality, and sanitary deficiencies in campus dining facilities;

4. Repeated and, wrongful terminations and cancellations of employment assignments;

5. Possible improper use or diversion of federal research funds, non-profit status and other grant monies;

6. Discriminatory and unequal treatment based on protected characteristics;

7. Allegations of child-labor and improper student-labor practices at certain locations;

8. Problems with institutional retention of qualified staff and faculty;

9. Wrongful termination or adverse treatment of Plaintiff's supervisory staff;

10. Autocratic, procedurally deficient terminations imposed by HR administrators;

11. Tax Fraud;

12

12. Persistent failures in the quality, rigor, effectiveness, and pedagogical delivery of **graduate-level courses** (low quality education, new and un-interested professors as opposed to world-class faculty).

13. Suppression of student ideas, academic expression, and scholarly critique inconsistent with stated academic freedom policies (including the University's **"Chicago Principles"**), and discrimination based on protected classed and characteristics like nationality, race, caste, sexuality, and etcetera;

14. Unequal hiring practices and last-minute cancellation of interviews that disproportionately affected members of protected classes, and right after the wage theft disputes;

15. A pattern of personnel removals and unit reorganization that followed employees who raised concerns;

16. Adverse effects on Plaintiff's mental health attributable to the University's treatment and the hostile climate;

17. Repeated denial, delay, or obstruction of requested disability accommodations;

18. Apparent institutional protection of the individual(s) Plaintiff identified as assailant;

19. Repeated, unauthorized access to and dissemination of Plaintiff's educational, medical, financial and research-participation records (FERPA and privacy issues); and

20. Recurrent procedural irregularities and denials of basic due-process protections in disciplinary and administrative processes.

21. Student protective policies like title IX being on papers only.

22. No issuance of No Contact Directives to plaintiff.

23. Student government election misconduct unequal treatment, and discrimination.

24. Retaliation and Breach of contract.

44. On or about November 22, 2024, Plaintiff filed a written report with the University of Chicago's Office for Sexual Misconduct Prevention and/or the CARES portal, reporting that he had been assaulted by a University of Chicago student and employee, Shrivatsa Thulasiram. Plaintiff requested that the University issue a No-Contact Directive to protect him from further contact with the assailant. The University refused to issue the No-Contact Directive despite having the authority to do so. Reporting sexual assault and requesting protective measures constitutes protected activity under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and Clery Act.

45. On or about January 19 2025, Plaintiff submitted a written complaint to Uchicago CARES alleging that he had been subjected to discrimination and unequal treatment on the basis of his national origin (Indian), ethnicity, caste, and other protected characteristics by university officials and supervisors. Opposing discrimination based on national origin and caste constitutes protected activity under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title VII.

46. On or about November 2023, Plaintiff requested for reasonable accommodations to Student Disability Services ("SDS"), including 2x extended examination time and an individual testing room, and subsequently a bidet or equivalent hygiene accommodation for restroom facilities. SDS denied these requests without engaging in the required interactive process, without providing accommodations. Plaintiff communicated to SDS staff, including Marley, that the denial of accommodations was substantially impairing his ability to participate in the educational program. Requesting reasonable accommodations and opposing disability discrimination constitutes protected activity under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

47. On or about February 1, 2025, Plaintiff, through his union, Graduate Student United ("GSU") filed a formal written grievance challenging his wrongful termination from three

13

job roles, and a full time job role interview, and asserting that the termination violated the applicable collective bargaining agreement and federal labor law. Filing a union grievance challenging an employment termination constitutes protected concerted activity under *Section 7 of the National Labor Relations Act, 29 U.S.C. § 157.*

48. Each of the above-described activities constitutes protected conduct under federal anti-discrimination, anti-retaliation, and labor statutes. Plaintiff engaged in these activities in good faith and without knowledge of the legal complexities of U.S. federal civil rights law.

49. On or about late January 2025 Plaintiff initiated a formal grievance through his union representative, **Graduate Student United (GSU)** at the University of Chicago. The union filed a **written grievance** on or about **February 1, 2025**, asserting wrongful termination and related unlawful employment practices. The union filing and Plaintiff's subsequent protected complaints constitute protected activity under federal law.

50. Within days and weeks of Plaintiff's protected activity, University officials and administrators began an escalating campaign of materially adverse actions directed at Plaintiff. Plaintiff alleges these acts were undertaken with malice, oppression, and retaliatory intent and were designed to silence complaints, chill protected speech, and deprive Plaintiff of educational and employment opportunities.

51. Plaintiff further alleges that the University's adverse actions were discriminatory in motive and effect, directed at Plaintiff on the basis of national origin, ethnicity, caste, sex and gender, and disability status, and that the University's conduct created and perpetuated a hostile educational and employment environment.

52. **Plaintiff is reporting and alleging misconduct(s), including:**
    1. unlawful and discriminatory treatment;
    2. retaliation for engaging in protected grievances, whistleblowing, and protected speech;
    3. unauthorized surveillance and monitoring of student activists and complainants by the University police or other agents;
    4. dangerous and negligent safety practices including mishandling of gases/chemicals and food-safety violations;
    5. deceptive and coercive financial representations to students (tuition, loan communications, and scholarship processes);
    6. potential research misconduct and informed-consent irregularities in human-subjects projects;
    7. a multi-faceted pattern of wrongful termination and cancellation of employment opportunities;
    8. substandard course quality and pedagogical neglect that diminished Plaintiff's educational opportunities; and
    9. suppression of academic expression and associative rights.

53. The temporal sequence strongly *supports retaliatory causation*: Plaintiff engaged in protected complaints and union grievance activity on or about February 1, 2025; *within days,* Defendants escalated issued a disciplinary summons on February 12, 2025, and expelled Plaintiff on February 25, 2025, before internal grievance and union procedures concluded. And hence University of Chicago weaponized it power not only to deter plaintiff from exercising of protected activities, but also to *sabotage* any proceeding in admin agencies and courts going forward.

## B. The University's Retaliatory Campaign

54. Within a short temporal proximity to Plaintiff's protected activity, Defendants commenced a coordinated campaign of adverse action designed to marginalize, punish, and ultimately expel Plaintiff. The campaign employed multiple legally cognizable devices commonly used by powerful institutional actors to manufacture pretext, intimidate dissenters, and avoid external scrutiny.

55. On or about January 7, 2025, Plaintiff was terminated from his position at Social Sciences Computing Services (SSCS) without valid cause. When Plaintiff questioned the termination, he was told by his supervisor Bart Longacre that "HR pushed me to do it" over an online meeting where Kerry Sharkey, and Arun Banotra was also present. As a result of this termination, Plaintiff lost income, constituting a material financial hardship that *would deter a reasonable student from opposing unlawful practices.* Following the termination, Defendants communicated to Plaintiff, including by email, that the termination was based on alleged violations of student employment and visa-related work-hour limitations, and provided shifting explanations.

14

56. Plaintiff was treated differently from similarly situated employees. At or around the same time as Plaintiff's termination, another SSCS student employee, Fariha Sameen, who is a Muslim woman, openly stated in the workplace that she had worked in excess of twenty (20) hours per week during multiple weeks. Despite this identical violation based on universities alleged forced labor practices of the same student employment and visa work-hour limitations that Defendants cited as the basis for Plaintiff's termination, Fariha Sameen was not terminated, disciplined, or subjected to any comparable adverse action. This disparate treatment is evidence that the stated reason for Plaintiff's termination — visa work-hour violations — was a pretext for discrimination and retaliation.

57. On or about January 9, 2025, Plaintiff was terminated from his student employment position at the Mansueto Institute (Union eligible role with Graduate student united), without formal termination notice. The termination occurred abruptly, without advance notice, and without the provision of a substantive explanation supported by contemporaneous documentation. As a result of this termination, Plaintiff lost income. Despite Plaintiff's repeated requests, Defendants did not issue formal written termination notices or final employment records for this and other student employment roles, leaving Plaintiff without clarity as to his employment status or the stated basis for termination. During the pendency of Plaintiff's internal complaints and grievance-related processes, Defendants restricted Plaintiff's access to university systems, facilities, and work-related resources, effectively locking Plaintiff out of his student employment roles while Plaintiff's employment status and grievances remained unresolved.

58. On or about January 10, 2025, a full-time employment interview for HPC Admin Role within the University that Plaintiff had previously secured was cancelled. The cancellation was communicated by Arun Banotra and was not accompanied by any explanation or opportunity for rescheduling. This happened short after plaintiff grieving of assault to the university and their denial of NCD (No-Contact Directive), this is infact a very common tactic of this powerful federally funded and non-profit institution, See: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7 wcqBy8HAUTJM?e=TDfnf3 . In such **serial retaliation** cases the main business of entity becomes **RETALIATION** and nothing else. With determent related solutions by hon'ble courts including at appellate level and hon'ble SCOTUS, these are not solvable (See: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7 wcqBy8HAUTJM?e=TDfnf3).

59. **Wrongful Terminations:** Over the course of time, Plaintiff was terminated from multiple student employment positions at least seven distinct assignments, including a position within Social Sciences Computing Services (SSCS) and a union-covered role at the Mansueto Institute often without notice, without a legitimate business justification, and without meaningful opportunity to respond. Prior to the disciplinary summons issued in February 2025, Plaintiff had no history of disciplinary violations, warnings, or adverse findings by the University. During the disciplinary process, Defendants proceeded without addressing or resolving Plaintiff's pending grievances and complaints, including those concerning workplace safety, assault, payroll irregularities, discrimination, and employment termination. Defendants initiated disciplinary proceedings against Plaintiff while multiple grievances remained outstanding and unresolved, and without incorporating or addressing those grievance materials in the disciplinary review. In administering Plaintiff's disciplinary proceedings, Defendants relied on provisions of the University-wide Student Manual rather than the disciplinary policies and procedures applicable to the professional school and academic program in which Plaintiff was enrolled. Defendants did not apply or reference the student handbook, disciplinary guidelines, or procedures specific to Plaintiff's professional school, despite Plaintiff's affiliation with that school and despite the existence of school-specific policies governing student conduct and discipline.

60. **Pretextual Disciplinary Action:** On or about February 12, 2025, just days after Plaintiff filed a union grievance, the University issued a disciplinary summons against Plaintiff. The charges were based on **pretextual grounds**, relying on alleged incidents that either occurred well before the issuance of the summons and union grievances, had already been resolved, or in fact never existed. **Plaintiff had no history of academic misconduct/violation of policy.** Plaintiff was 3 months far from completing the degree. The University **abruptly** initiated these charges only after Plaintiff filed the grievance,

15

denied Plaintiff any meaningful due process, and imposed discipline based on matters over a year old, in direct violation of the University's own **60-day limitations rule**.

61. **Use of Fabricated and falsified Evidence:** Plaintiff alleges that materials relied upon as the basis for disciplinary action including an electronic "Travel Notification Form" and other administrative records were ***created or altered by university personnel, or otherwise*** appeared in Plaintiff's file without Plaintiff's submission or contemporaneous system confirmation. Plaintiff requested basic technical verification (IP logs, metadata, timestamps, audit trails) that would authenticate the purported submissions; those technical records were not produced or were withheld, and Plaintiff was not afforded a meaningful opportunity to test or challenge the authenticity of the documents. Defendants altered, manipulated, falsified, forged, and failed to maintain accurate payroll and employment records relating to Plaintiff's student employment, including Workday time entries and recorded hours, in connection with adverse employment and disciplinary actions taken against Plaintiff. In or about January 2025, Defendant Arun Banotra intentionally removed previously recorded work hours from Plaintiff's July 2024 time records in the Workday platform, an action described internally as a "roll back," resulting in the reduction of Plaintiff's recorded and compensable work hours. On or about January 2025, Heidi Lee, an administrator at the Mansueto Institute, ***added hours to Plaintiff's Workday record*** after the fact, without contemporaneous documentation or Plaintiff's authorization, creating the appearance that Plaintiff exceeded work-hour limits. These alterations were inconsistent with Plaintiff's contemporaneous schedules, supervisor approvals, and prior payroll records, and were not disclosed to Plaintiff at the time they were made. As a result of Defendants' manipulation of payroll records, Plaintiff was deprived of earned wages, including regular wages and overtime compensation for hours actually worked, and was subjected to adverse employment and disciplinary actions based on inaccurate and manufactured time records. As part of this process, Defendants alleged that Plaintiff copied work; however, Defendants failed to identify any specific copied material, failed to produce documentary or forensic evidence of copying, and failed to request or examine substantiating proof. Despite this lack of evidence, Defendants proceeded as if the allegation were established.

62. Plaintiff alleges that as a student-employee, he was a non-exempt worker under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(a), because he did not meet the FLSA's 'bona fide executive' exemption—his primary duty was not management, he was not compensated on a salary basis of at least $684 per week, and he did not customarily direct the work of two or more employees as required by 29 C.F.R. § 541.100. Under FLSA regulations, employers are strictly required to maintain accurate records of hours worked for non-exempt employees. Defendants' intentional 'roll back' and addition of hours to Plaintiff's Workday records constituted a direct violation of FLSA record-keeping requirements and were done to fabricate a pretextual violation of F-1 visa work-hour limits.

63. **Denial of Due Process and predetermined outcome:** The disciplinary hearing was fundamentally compromised and, as Plaintiff alleges, orchestrated in a manner that rendered it neither impartial nor procedurally fair. Immediately after Plaintiff engaged in protected activity, University officials acting through and with the substantial participation of Dean Kate Biddle (On Orders of Dean Ethan, and University of Chicago executive Body) advanced a disciplinary process that bore the hallmarks of a **pretextual** and **retaliatory** sham proceeding. The panel selectively disregarded exculpatory evidence, foreclosed discussion of matters directly related to Plaintiff's union-protected employment, and permitted improper influence by non-voting administrators, including Dean Biddle, whose statements and interventions misrepresented or distorted material facts. During the disciplinary process, Plaintiff was not afforded meaningful procedural protections, including a reasonable opportunity to prepare, access relevant information, or receive assistance or support consistent with the University's published procedures. On February 24, 2025, during a disciplinary investigation meeting, Plaintiff was denied his right to have a support person present, despite university policies allowing such accompaniment. In connection with the disciplinary proceedings against Plaintiff, Defendants failed to include, disclose, or meaningfully consider material documents and evidence that were favorable to Plaintiff and directly relevant to the issues under review. Such omitted materials included, among other things, testimony or statements from Professor Royce, the applicable internship agreement or contract, email communications from Paige Azuma, and additional records supporting Plaintiff's position. These materials were known to Defendants or were

16

reasonably available to them and were relevant to Plaintiff's employment, academic standing, and defenses. The exclusion or non-consideration of this evidence deprived Plaintiff of a fair and balanced disciplinary process and contributed to outcomes that were arbitrary, pretextual, and unsupported by a complete evidentiary record. During the entirety of the disciplinary and investigative process, Defendants did not obtain, solicit, reference, or consider testimony or input from Professor Royce, who was the actual project lead and primary supervisor for the relevant work at issue. Instead, Defendants relied on statements or involvement from individuals who were not the project lead, including Brian, Heidi Lee, and Aimee from the Mansueto Institute. Professor Royce's role, knowledge, and perspective were material to an accurate and fair assessment of Plaintiff's conduct and performance, yet his testimony was wholly absent from the record and was never addressed in the disciplinary findings. In addition, during meetings related to the disciplinary and investigative process, Defendants Aimee, Heidi Lee, and Brian—none of whom possessed direct technical knowledge of the work at issue—pressed Plaintiff to acknowledge that he had performed work outside the scope of his assigned duties. Plaintiff consistently disputed that characterization and explained that his work was performed pursuant to directions and communications exchanged exclusively with Professor Royce, the actual project lead. Despite Plaintiff's explanations, these individuals continued to advance a narrative inconsistent with the underlying technical facts, while failing to consult, interview, or obtain testimony from Professor Royce, who was uniquely positioned to clarify the scope, authorization, and technical nature of Plaintiff's work. All substantive technical communications regarding the project occurred between Plaintiff and Professor Royce, yet those communications and Professor Royce's testimony were not incorporated into the disciplinary process, and terminations.

64. Plaintiff alleges that Dean Kate Shannon Biddle functioned as the **principal architect** and **operative agent** executing the University of Chicago's disciplinary strategy, thereby undermining the neutrality of the hearing, and legal protections of plaintiff. The proceeding, viewed in totality, exhibited indicia of a predetermined and prejudged outcome, characterized by procedural irregularities, evidentiary suppression, and fabrication or manipulation of the record. Plaintiff further alleges that the University's conduct in administering this process constituted an abuse of authority marked by fraud, malice, and oppression, and was designed to culminate in his expulsion notwithstanding the absence of legitimate grounds. Based on the foregoing events, Defendants undertook a course of conduct designed to manufacture a post hoc narrative of misconduct against Plaintiff shortly after Plaintiff reported the assault and other protected concerns. Rather than conducting a neutral and evidence-based inquiry, Defendants selectively assembled allegations and interpretations favorable to the University while disregarding contemporaneous evidence and testimony favorable to Plaintiff. The disciplinary review was conducted exclusively by personnel affiliated with the Harris School, rather than by a neutral or cross-departmental body and did not include independent technical review or inquiry. Defendants did not seek or require evidentiary support for the allegations asserted against Plaintiff and did not meaningfully evaluate exculpatory information.

65. Plaintiff further alleges that additional University of Chicago staff involved in the disciplinary meeting participated in, endorsed, or facilitated these procedural defects. During the hearing, disciplinary staff deliberately omitted or refused to address Plaintiff's inquiries regarding Mansueto Institute employment, union-covered position, and right to union representation matters central to the context of the alleged misconduct. Instead of ensuring a fair and interactive process, these staff members remained silent, declined to clarify material questions, and permitted the proceeding to advance without acknowledging the relevance of Plaintiff's protected employment activities. This institutional silence and omission functioned as a further denial of due process, materially skewed the evidentiary record, and reinforced the appearance that the disciplinary process was orchestrated to achieve a **predetermined retaliatory outcome**. Further the disciplinary staff was all professional school staff, but the University of Chicago used student manual of University instead of the manual of professional school for discipline and also provided shifting explanations of the discipline. Plaintiff on reasonable grounds alleges that university of Chicago plotted against plaintiff, and the disciplinary staff was **given incentives** for **biased outcomes** to poach plaintiff because of engaging in protected activity, in infact short temporal proximity of about 10 days of union grievance filling. Defendants' actions reflected a form of institutional profiling *(bad apple profiling)* in which Plaintiff was treated as a presumed wrongdoer based on his status as a complainant, whistleblower,

17

international student, and student-employee who had raised safety, wage, and misconduct concerns, rather than on objective evidence of wrongdoing. This profiling manifested in, among other things: (a) selective review and reinterpretation of Plaintiff's work records; (b) retroactive characterization of previously approved conduct as violations; (c) reliance on speculation rather than proof; and (d) disregard of favourable performance history and positive evaluations. During Plaintiff's employment, multiple University offices and supervisors expressed satisfaction with Plaintiff's performance and contributions. Several individuals indicated a willingness to provide letters of recommendation, and some did in fact do so. On multiple occasions, personnel within Social Sciences Computing Services ("SSCS"), including Kerry Sharkey, acknowledged and thanked Plaintiff for his work and assistance to the office. These acknowledgments occurred at various times and do not negate, excuse, or contradict the separate incidents of discriminatory, hostile, or derogatory conduct by SSCS personnel alleged elsewhere in this Complaint.

66. **Illegal and Wrongful Expulsion and Preclusion of Union Remedies:** On February 25, 2025, before the union grievance of February 1, 2025, process could proceed and before Plaintiff's appeal period on the disciplinary matter had concluded, the University formally expelled plaintiff. This action *silenced grievances and denied him any meaningful redress.* University of Chicago used it's abusive power and a shotgun approach to kill all the grievances at once and neutralise all good faith attempt to solve internal disputes internally. University of Chicago therefore used its authority to silence plaintiff grievances for their own fraudulent, and wanton conduct as alleged by plaintiff. February 1, 2025, union grievances was never heard, internal grievances of assault, discrimination, and wrongful termination were never heard too. Plaintiff was advised by both the Union's Chief Steward and the United Electrical representative that the February 1, 2025 grievance would proceed irrespective of any disciplinary action taken by the University. However, the Union after putting plaintiff in trouble due to the union grievance filed with them, did not pursue the grievance at all, nor did it take any meaningful action regarding Plaintiff's reports prior to the disciplinary hearing which was adverse action to deter plaintiff union's grievance and other grievances/complaints. Plaintiff further noted, during early communications, a reasonable concern that the disciplinary panel would **omit discussion** of the **union-protected employment issues as University of Chicago themselves alleged** and would instead focus exclusively on imposing severe sanctions, including potential expulsion. Ultimately, Plaintiff's prediction proved **accurate**: the February 1 grievance was not substantively addressed even till date, and the disciplinary process proceeded without consideration of union-related matters. Further internal grievances of discrimination and wrongful terminations are also not heard even till date. Plaintiff before asking union to help in the matter plaintiff asked that if he's fully protected for asking for help from the union and filing grievance. However, protection after the union grievance turned out to be ZERO. Union assisted University of Chicago in their ILEGAL ACTS.

67. **Discrimination and Hostile Environment:** Throughout this period at the University of Chicago, Plaintiff was subjected to a hostile environment based on his disability, religion (Hindu), ethnic (South Asian, Indian, Punjabi), and national origin (Indian). This included mocking comments from staff about his disability, discriminatory application of work-hour rules that were not applied to other students, and a general environment of exclusion. During the Fall 2024 academic term, Kerry Sharkey, Shomari Tate, Cory Martin, Fariha, Ruben, and other staff members at Social Sciences Computing Services ("SSCS") made mocking and derogatory remarks toward Plaintiff concerning documented medical condition and religious practices. These individuals also imposed restroom-related restrictions on Plaintiff that were inconsistent with disclosed medical needs and were applied in a manner that singled Plaintiff out. On or about October–November 2024, Fariha Sameen, a Muslim Women student employee at SSCS, made hostile and derogatory remarks to Plaintiff concerning Hindu religious beliefs, including disparaging comments regarding religious practices (IDOL worship). On or about Spring 2024 quarter, Plaintiff took a course named: PPHA 37411 – Management Matters: Leadership, Strategy, and Getting Things Done by Dr. John Burrows, a professor at the Harris School of Public Policy, publicly called Plaintiff an "idiot" during class after Plaintiff asked an academic question, causing humiliation and distress, Professor was also aware about plaintiff disability status. Throughout Plaintiff's academic program, staff associated with Student Disability Services denied Plaintiff's requests for extended examination time (2X Time) and a private testing room, notwithstanding Plaintiff's documented medical needs and despite the availability of such accommodations within the University. During Fall 2024, Marley, the Harris

18

School Disability Liaison, denied Plaintiff's request for a bidet attachment in university restrooms to address a medical condition, despite Plaintiff offering to pay for the accommodation itself. Due process was never followed by the staff. Throughout Plaintiff's enrolment, multiple instructors routinely ignored Plaintiff's questions during class discussions, impairing Plaintiff's ability to participate fully in the academic program.

68. **Retaliatory Surveillance:** Plaintiff reports repeated, conspicuous presence of university police vehicles near Plaintiff's residence and other indicia of retaliatory surveillance, and harassment. Plaintiff further received anonymous communications that Plaintiff reasonably believes were intended to intimidate and deter pursuit of legal remedies; Plaintiff alleges that these communications were linked to individuals acting with or on behalf of the University or its agents.

69. **Systematic Manipulation of Records and Communications:** Plaintiff alleges that Defendants intentionally misreported or delayed the provision of official records (such as transcripts, employment verifications, and recommendation materials), and that in some instances the University resent or altered communications in a way that disparately harmed Plaintiff's opportunities (including professional applications and fellowship considerations). On information and belief Plaintiff alleges that the University's dissemination of contradictory explanations for employment cancellations and the circulation of unverified or inflammatory material to third parties (including prospective employers and academic programs) were calculated to undermine Plaintiff's reputation and career prospects. Plaintiff's academic record was impaired by disciplinary notations and delays in the processing and release of official transcripts, which interfered with Plaintiff's ability to apply to other academic programs, fellowships, and professional opportunities. Following Plaintiff's expulsion, Defendants delayed and withheld Plaintiff's academic records and transcript for extended periods after such records were requested, notwithstanding Plaintiff's need for timely access for applications and professional advancement.

70. **Wage and Compensation Irregularities:** Plaintiff alleges that the University failed to pay Plaintiff for multiple hours worked, failed to provide accurate wage reporting, failed to pay overtime hours, and responded to Plaintiff's inquiries about pay with obfuscation and delay. Plaintiff raised these wage concerns directly with payroll and supervisory staff; shortly thereafter, Plaintiff experienced heightened scrutiny and adverse employment actions facts supporting an inference of retaliatory motive. Defendants engaged in improper and irregular financial and compensation practices affecting Plaintiff and other student workers, including failures to accurately pay and account for earned wages and overtime compensation. Plaintiff and other student workers were, at times, compensated through non-payroll mechanisms such as gift cards, stored-value credits (including Maroon Dollars), or cash equivalents, rather than through standard payroll systems designed to record wages, hours worked, and applicable deductions. These non-payroll compensation practices resulted in incomplete or inaccurate wage records, delayed or missing wage payments, and the underpayment of regular and overtime wages owed for hours actually worked. Defendants' compensation practices also obscured the true nature of student employment compensation, interfered with accurate tax and payroll reporting, and deprived Plaintiff of the protections ordinarily afforded by Illinois wage and recordkeeping requirements. In addition, Defendants made material representations concerning tuition pricing, program value, and post-graduate employment outcomes that were inconsistent with Plaintiff's actual experience and the services provided, upon which Plaintiff reasonably relied in making enrolment and financial decisions. Defendants further made representations regarding research opportunities and outcomes that were misleading in light of the limited access to research positions, funding, and mentorship actually made available to Plaintiff.

71. **Harms and Damages** As a result of the foregoing, Plaintiff has suffered severe and continuing harms, including: loss of academic enrolment, research opportunities, and the attendant educational opportunities; loss of income and employment prospects; deprivation of access to research facilities and data; reputational injury; significant emotional distress, anxiety, trauma, depression, and torture; damage to professional trajectory and future earnings; and other cognizable economic and non-economic losses. As a direct and proximate result of Defendants' acts and omissions described herein, Plaintiff lost approximately thirteen to fifteen student employment positions across multiple University departments. Plaintiff's expulsion from the University immediately jeopardized it's lawful

F-1 student status, requiring abrupt departure from the United States and causing significant disruption to his education, employment eligibility, housing, and professional trajectory. Plaintiff experienced substantial emotional distress, including anxiety, humiliation, and psychological trauma, arising from the assault, retaliatory actions, expulsion, and sudden displacement from the academic and professional community in which plaintiff had invested substantial time and resources. The delay and impairment of Plaintiff's transcript and academic records interfered with Plaintiff's applications to competitive academic and professional programs, including law, health, business, and policy programs, and caused the loss of concrete application opportunities. Defendants' conduct continued after Plaintiff's separation from the University through the retention, alteration, or delayed production of employment and academic records, further compounding Plaintiff's inability to mitigate damages.

72. The institutional campaign described above is not a collection of isolated incidents but, on information and belief, reflects a **systematic pattern** and practice of retaliatory suppression, record-manufacture, and procedural manipulation that has been directed at Plaintiff and other complainants. Plaintiff contemporaneously reports similar patterns in other units and among other individuals, the factual particulars of which appear in Plaintiff's confidential appendix and in the longer complaint record. University of Chicago manufactured the discipline after but-for the protected activities and protected concerted activities of plaintiff. Defendants' actions are consistent with a broader pattern of retaliatory and discriminatory practices alleged against the University in prior matters, many of which have been resolved through *confidential settlements* rather than adjudicated on the merits. (See: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7wcqBy8HAUTJM?e=TDfnf3 ). University of Chicago assertion of meritless claims of plaintiff's in itself is meritless since they do settle the case often after mentioning it to be meritless (See CCHR Case 23-E-10 in the above linked Research Document).

73. In such cases of **SERIAL RETALIATION**, and **EDUCATIONAL TERRORISM,** Motion to Dismiss, and Motion of Summary judgement and any other case ending tactics *shall be rarely granted to protect the sanity of education*, and research, as upon face Universities often tend to claim they are **so-called** "educational and/or research" institutions. These institutions shall not think they are immune to the rule of law just because they get funding from plaintiff's own money to hire top band law firms against them and protect them from all illegal acts that are done wilfully.

*74.* Plaintiff further want to explicitly mention that Uchicago often do portray themselves at top institution, some doubtful ranking on the universities ranking platforms are suggestive of the fact that Uchicago is a top institute globally and in the US. That means considering the fact true that Uchicago have one of the top profile's students in USA, and in the world. We may liberally infer that Uchicago to maintain it's top position also hire even more competent full-time staff and employees than in any other less ranked institutions. University of Chicago and plaintiff reserve all rights to dispute that. Assuming their so called top rankings true for the time being, these top ranking individuals sue them for retaliation over and over again (See: https://1drv.ms/w/c/cb5a9ea1fc1bce73/IQB7Jo4cZB93QpF2UBXqpNBYAVREt7WlHv7wcqBy8HAUTJM?e=TDfnf3 ), In fact research shows that University of Chicago have lawsuit and admin agency complaints far exceeding any sane universities complaints against them, University of Chicago in some admin agencies cases get infact complained more times than other top 5 or more universities all combined. The number of violations against the University of Chicago already shocks the conscience, and to deter hon'ble court is requested to take strong determent actions such that the conduct shall stop ruining staff and student life *over the grave of federal funds, and nonprofit status advantages.*

75. **Defendants retaliated by (Not limited to):**

a. Expelling Plaintiff in with alleged unfair, bias, predetermined, prejudged, hearing and using forged evidences.

b. Discriminatively terminating **many jobs** including but not at all limited to SSCS, Mansueto Institute, Neubauer, Dept of Physics, Kiltz, TA Ada Palmer, Logan, proctor, convocation, and more with pretextual reasons.

20

c. Denying disability accommodations without an interactive process or appeal.

d. Misreporting data, delaying transcripts, and allegedly tampering with records, by strategically sending transcripts again or after the discipline blot was added on transcripts especially to Harvard law school as was cached so that plaintiff may not get legal support or knowledge to sue them for their alleged wrongdoing, misconduct, falsification, discrimination, and pattern of multiple retaliations.

e. Conducting surveillance and intimidation via university police.

f. Ignoring grievances, violating University policies and federal law.

g. Plaintiff full time job roles interview got cancelled without reason.

h. University gave terminations for non-union roles, but not for union roles

i. University didn't gave wages of many hours that plaintiff worked

j. Non hearing of grievances of discrimination, retaliation

76. Plaintiff's grievances were dismissed or mishandled, reflecting systemic retaliation against whistleblowers, abuse of authority, malice, oppression, fraud, and discrimination.

77. Defendants' misconduct implies misuses public funds, harms students, and violates civil rights, necessitating judicial intervention.

78. The expulsion process lacked impartiality, due process, breached University rules, causing educational, professional, mental and health harm. Plaintiff does not seek review of the academic or disciplinary merits of any University determination; rather, Plaintiff challenges Defendants' retaliatory, bad-faith, arbitrary, and unlawful conduct and procedures surrounding those determinations, which caused independent injuries under federal law. Furthermore, the tainted and bias disciplinary process is itself a question to be discussed as no further action can be taken by the hon'ble court about academic misconduct however due process failures, fraudulent inducement and invention of fact as evident can be seen by the court to consider this misconduct plot a BIG SHAM and irrelevant for separately grieved retaliation claims herein since the protected activity preceded any misconduct and court and law may not give the weight of any invented fact after the engagement in protected activities.

## C. Evidence of Retaliatory Animus and Pretext

79. Prior to his termination on January 7, 2025, Plaintiff had not received a single disciplinary warning, written reprimand, or adverse finding of any kind during approximately eighteen months of enrollment and employment at the University. Despite this clean record, immediately after Plaintiff began reporting assault, discrimination, and safety violations, defendant plotted to terminate Plaintiff. When questioned, Supervisor Longacre stated: "HR pushed me to do it." The stated reason for the termination — violation of visa work-hour limits — was not enforced against similarly situated employees, including Fariha Sameen, who admitted to working over twenty (20) hours per week. This shifting and selectively enforced rationale is evidence of pretext. Furthermore, hours were assigned by the employers.

80. The University's explanations for its adverse actions changed over time. Initially, the January 7 termination was justified as a visa work-hour violation. During the February 2025 disciplinary proceedings, the University introduced new allegations of "falsification" that had never been raised, investigated, or cited at the time of the original termination. These after-the-fact rationales, which were not contemporaneously documented, support an inference that the stated reasons were manufactured to justify predetermined retaliatory action.

81. The decision-makers who issued the February 12, 2025, disciplinary summons and the February 25, 2025, expulsion possessed actual knowledge of Plaintiff's protected activity. Specifically, Dean Kate Biddle was aware of Plaintiff's reports of assault and discrimination. Critically, Dean Biddle also possessed knowledge of Plaintiff's February 1, 2025, union grievance—a matter entirely unrelated to the Harris School of Public Policy. In an email dated February 11, 2025, issued while the union was actively meeting with University officials, Dean Biddle explicitly acknowledged her awareness of this grievance.

21

Dean Biddle's possession of this information is highly probative of retaliatory coordination, as the Harris School had no legitimate administrative need to be informed of a separate unit's union grievance. This improper cross-departmental dissemination of protected activity immediately prior to the summons and expulsion confirms that the University cannot avoid liability by artificially compartmentalizing its departments.

82. Following Plaintiff's February 1, 2025 union grievance, the University engaged in an expansive search of Plaintiff's University-controlled email accounts and records to assemble adverse material, including matters that were over a year old and had never previously been raised. This extraordinary search, conducted immediately after protected activity rather than as part of any routine audit, is evidence of retaliatory motive.

## D. Further Whistleblowing, Research-Related Allegations, and Preservation

83. Plaintiff further alleges, as part of his whistleblowing activity, that certain units affiliated with the University of Chicago and its medical center engaged in irregularities and misconduct (including procedural shortcomings in human-subjects protocols, incomplete informed-consent processes, and recordkeeping deficiencies). The full factual instantiation of these allegations is set forth in Plaintiff's confidential file and will be supplied under appropriate protective orders.

84. Plaintiff expressly alleges that Defendants' tactics included conduct implicating federal privacy statutes and federal communications protections. On information and belief, University actors engaged in unauthorized access to, retention of, and dissemination of electronic communications and stored content. Plaintiff therefore asserts that the facts as pleaded may give rise to claims and investigative obligations under the **Stored Communications Act**, the **Electronic Communications Privacy Act**, and related federal privacy protections, in addition to constitutional privacy claims actionable under §1983.

85. Plaintiff further alleges that Defendants engaged in behavior amounting to fraudulent concealment (as defined under controlling law): (1) concealment of material facts; (2) intent to induce a false belief where a duty to disclose existed; (3) that Plaintiff could not reasonably discover the concealed facts despite diligent inquiry; (4) that Plaintiff relied on the absence of disclosure to his detriment; and (5) that Plaintiff's reliance resulted in injury. Plaintiff relies on contemporaneous emails, audit trails, metadata requests, witness accounts, and other documentary evidence to support these allegations, portions of which are contained in Plaintiff's confidential appendix.

86. Plaintiff alleges invasion of privacy, breach of implied duties of confidentiality, and unauthorized use of protected records (educational, medical, and employment records) that were accessed and distributed without lawful basis. Plaintiff further alleges defamation per se and per quod through the publication of demonstrably false accusations of misconduct and falsified documentation that damaged Plaintiff's reputation and prospects.

87. Plaintiff preserves the right to assert additional state-law claims in appropriate fora following exhaustion of administrative processes; nothing in this Complaint is intended to waive or forfeit those state-law remedies. Plaintiff also preserves the right to produce expert testimony and academic research drawing in part from the extensive factual appendix and Plaintiff's research regarding institutional patterns of state-actor conduct, induced procedural defects, tangential retaliation theory, and systemic retaliation, subject to the Court's rules governing discovery and admissibility.

## D. TERMS

88. Plaintiff further alleges that the misconduct described herein constitutes a pattern of **SERIAL RETALIATION:** a sustained, plotting, and escalating sequence of adverse actions imposed in response to Plaintiff's protected activities, including whistleblowing, discrimination complaints, safety reporting, union grievance activity, and attempts to seek institutional redress. Plaintiff uses the descriptive term "**EDUCATIONAL TERRORISM**" to characterize the coercive, intimidating, psychologically injurious, and systematically punitive nature of Defendants' actions, which, taken together, operated not merely as isolated violations but as a coordinated campaign designed to destabilize, silence, and eliminate Plaintiff from the educational and employment environment. Plaintiff does not request the Court to create or adopt a new legal doctrine under that name; rather, Plaintiff respectfully submits this characterization as contextual evidence of the severity, pervasiveness, retaliatory motive, and cumulative impact of Defendants' conduct on Plaintiff's federally protected rights and on his liberty, safety, educational access, and emotional well-being.

22

89. Although settlements do not constitute precedent, multiple publicly reported settlements involving Title IX retaliation claims against similarly situated universities demonstrate that institutions are repeatedly placed on notice regarding the legal requirements they continue to violate.

## VII. CLAIMS FOR RELIEF

*Note: All Claims not limited to the mentioned laws/rules below. The counts set forth below are presented in a non-prioritized and non-hierarchical order, and each count is pled independently and in the alternative. Additional document justifying frameworks or methods hon'ble courts use to satisfy conditions of each claim will be submitted to docket after this document (See Docket: "Memorandum of Law Regarding Legal Frameworks and Evidentiary Support for all counts supporting claims", or similar name), all exhibits of dockets are incorporated into this complaint document. Amendment may follow.*

### SECTION A   ADA & REHABILITATION ACT COUNTS

### COUNT 1   Disability Discrimination (ADA Title II / Title III)
### 42  U.S.C. § 12132; 42 U.S.C. § 12182

90. Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.
91. The University of Chicago is a place of **public accommodation** within the meaning of Title III of the Americans with Disabilities Act. In addition, the University operates programs, activities, and services that receive federal financial assistance and performs state-delegated functions including SEVIS immigration compliance and policing authority such that it is independently subject to federal non-discrimination mandates under the Rehabilitation Act, Title VI, Title IX, and, for the purposes alleged herein, may be treated as a state actor under 42 U.S.C. §1983.
92. Plaintiff has a documented disability specifically, varicocele, Oedema, and severe infections caused by the University's unhygienic restroom facilities—which substantially limits major life activities including concentrating, learning, and basic digestive, immune system, and reproductive functions. The University of Chicago had actual knowledge of this disability, as established by written communications with Student Disability Services (SDS), medical documentation provided to the University, and past accommodation submissions.
93. Plaintiff disclosed his disability to university officials, including SDS staff, and requested modifications to university policies and/or facilities to ensure equal access. Plaintiff expressly communicated to the University that the denial of these modifications was actively exacerbating his disability and impeding his ability to participate in the educational program.

94. Defendants **denied and/or ignored** these accommodations, failed to engage in the **interactive process**.

95. The ADA prohibits discrimination "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" of a covered institution.

96. Defendants engaged in overt and subtle disability-based discrimination. Specifically, SDS staff dismissed Plaintiff's medically documented needs without engaging in the legally required interactive process, effectively treating Plaintiff as less worthy of accommodation than non-disabled students. Furthermore, when Plaintiff raised concerns about how the University's unsanitary facilities were exacerbating his disability, University officials responded with punitive indifference rather than remedial action. This discriminatory animus culminated in Plaintiff's expulsion on February 25, 2025, where the disciplinary proceedings failed to account for or accommodate Plaintiff's disability, resulting in a termination of his educational access because of his disability in violation of the ADA.

97. Seventh Circuit precedent recognizes ADA claims where a university denies access, fails to account for disability in disciplinary proceedings, or imposes adverse educational consequences because of disability. See, e.g., Wagoner v. Lemmon, 778 F.3d 586 (7th Cir. 2015); see also M.P. v. Independent Sch. Dist. No. 721, 676 F. Supp. 3d 929 (D. Minn.

23

2023) (recognizing that discriminatory denial of access and hostile treatment based on disability violates the ADA).

98. As a direct and proximate result of Defendants' disability discrimination, Plaintiff was deprived of the full and equal enjoyment of the University's educational and employment program and services. Plaintiff suffered exclusion from academic and employment programs, retaliatory disciplinary proceedings that failed to accommodate his disability, wrongful expulsion, loss of F-1 visa status, severe emotional distress, and financial and professional harm. Plaintiff seeks compensatory damages, punitive damages, injunctive relief, and any other relief the Court deems just and proper under 42 U.S.C. § 12188(a)(3).

## COUNT 2    Failure to Provide Reasonable Accommodations (ADA)
### 42  U.S.C. § 12132; 28 C.F.R. § 35.130

99. Plaintiff realleges and incorporates all prior paragraphs.

100.       Title II, III (42 U.S.C. § 12182(b)(2)(A)(iii)), Section 504 of the Rehabilitation Act, 29 C.F.R. § 32.50, of the ADA impose an affirmative duty on institutions to **engage in an interactive process** with disabled individuals and to provide reasonable accommodations unless doing so would fundamentally alter the program or impose an undue burden.

101.       Plaintiff submitted specific, written requests for reasonable accommodations to Student Disability Services ("SDS"). These requests included: (1) 2x extended examination time to accommodate focus-related impairments; (2) an individual testing room to reduce distractions; and (3) the installation or provision of a bidet in University's restroom facilities to address severe, documented infections and Oedema caused by the University's unsanitary conditions. Plaintiff further expressed a willingness to personally pay approximately $30 to facilitate the hygiene accommodation.

102.       SDS staff, including an individual identified as Marley, denied Plaintiff's requests for extended time and an individual testing room without providing any written explanation and without engaging in any individualized assessment or dialogue to explore alternatives. SDS also failed to respond to or meaningfully consider Plaintiff's bidet request despite his disclosure of medical necessity and offer to personally fund the accommodation. Defendants entirely abandoned the interactive process required by federal law.

103.       Seventh Circuit precedent holds that a complete failure to engage in the interactive process by ignoring requests, refusing to discuss alternatives, and denying accommodations without written justification constitutes discrimination under the ADA. See Schaaf v. Phoenix Home Life Mut. Ins. Co., 318 F.3d 742, 747 (7th Cir. 2003) (recognizing that the failure to engage in the interactive process in good faith is itself a violation of the ADA).

104.       Defendants engaged in disparate treatment by granting identical accommodations to other students while denying them to Plaintiff. Based on Plaintiff's direct observation as an SDS proctor, SDS routinely granted 2x extended time and individual testing rooms to students whose disabilities were not outwardly apparent, yet denied these same accommodations to Plaintiff. Furthermore, while serving as an SDS proctor, Plaintiff was required to strictly monitor and accommodate other disabled students a function the University valued yet the University simultaneously refused to accommodate Plaintiff's own documented disability.

105.       Defendants' failure to accommodate foreseeably contributed to Plaintiff's academic distress, workplace distress, panic symptoms, humiliation, and vulnerability to retaliation.

106.       Defendants' failure to accommodate was a direct and proximate cause of Plaintiff's escalating academic distress, and the University subsequently exploited this unaccommodated distress as a pretextual justification for its unjust disciplinary actions and wrongful expulsion on February 25, 2025.

107.       As a direct and proximate result of Defendants' failure to accommodate, Plaintiff suffered severe infections, psychological trauma, academic penalties, and wrongful expulsion. Plaintiff seeks compensatory damages, punitive damages, and injunctive relief

24

requiring the University to implement constitutionally and statutorily compliant ADA accommodation systems, including a mandated interactive process, under 42 U.S.C. § 12188(a)(3).

**COUNT 3    Disability Discrimination (Section 504 Rehabilitation Act)**

**29  U.S.C. § 794**

108.    Plaintiff realleges and incorporates all prior paragraphs.

109.    The University of Chicago receives **significant federal financial assistance**, including Title IV funds, federal research grants, federal contracts, NIH/NSF awards, and SEVIS operational authority.

110.    Section 504 applies to **any program or activity receiving federal funds** and prohibits exclusion or discrimination "solely by reason of … disability."

111.    Plaintiff was otherwise qualified to participate in the University's academic programs and student employment positions. Plaintiff met the University's academic requirements and fulfilled his job duties, with or without reasonable accommodations. Defendants' subsequent disciplinary actions and expulsion were not based on any academic deficiency or legitimate misconduct, but rather on Plaintiff's need for disability-related modifications and his reporting of the University's failure to accommodate.

112.    **Despite actual notice of Plaintiff's disability, Defendants:**
   1. denied accommodations;
   2. imposed heightened scrutiny and disciplinary action after disability disclosures;
   3. retaliated for disability-related communication;
   4. failed to provide equal access to work and educational opportunities;
   5. used the academic and emotional distress caused by their own failure to accommodate as a pretextual basis to initiate disciplinary proceedings and expulsion, thereby punishing Plaintiff for the manifestations of his unaccommodated disability.

113.    The Supreme Court and Seventh Circuit have held that Section 504 prohibits discrimination that results in the denial of meaningful access to a federally funded program. See Alexander v. Choate, 469 U.S. 287, 301 (1985); Wagoner v. Lemmon, 778 F.3d 586, 592 (7th Cir. 2015) (holding that adverse educational consequences inflicted because of disability violate Section 504).

114.    The University's discriminatory conduct violated §504 because it:
   –    denied Plaintiff meaningful access to programs,
   –    treated Plaintiff differently from non-disabled students,
   –    and took materially adverse actions **because of disability**.

115.    As a direct and proximate result of Defendants' Section 504 violations, Plaintiff was denied meaningful access to his educational program, subjected to a discrimination.

116.    Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**COUNT 4    Deliberate Indifference to Disability Needs (ADA + §504)**

**42 U.S.C. § 12132; 29 U.S.C. § 794**

117.    Plaintiff realleges and incorporates all prior paragraphs.

118.    Defendants had actual notice of Plaintiff's disability and the severe harm he was experiencing. Specifically, Student Disability Services (SDS) staff, including Marley, and Dean Kate Biddle, had actual knowledge of Plaintiff's conditions varicocele, Oedema, and severe infections caused by unsanitary facilities. Furthermore, Harris School administrators, including Dean Kate Biddle, were aware that Plaintiff's disability-related health conditions were being exacerbated by the University's failure to provide basic hygienic accommodations.

119.    Rather than assist Plaintiff, University officials acted with **deliberate indifference**, a recognized standard under ADA and §504 jurisprudence.

120.    Under Seventh Circuit precedent, deliberate indifference under the ADA and Section 504 occurs when a defendant has actual knowledge of a plaintiff's disability-related

needs and the substantial risk of harm, yet consciously disregards that risk. See Wagoner v. Lemmon, 778 F.3d 586, 592 (7th Cir. 2015) (recognizing that ignoring known disability-related needs and allowing resulting harm states a claim for deliberate indifference).

121.    Despite this actual knowledge, Defendants deliberately chose to disregard Plaintiff's worsening condition. Defendants refused to process Plaintiff's medical documentation regarding his infections and edema; failed to implement any interim hygiene measures while their facilities remained unsanitary; ignored Plaintiff's explicit communications that his health was deteriorating; and refused to offer any alternative arrangements to prevent further harm. Rather than intervening to stop the known harm, University officials consciously allowed Plaintiff's physical and mental health to degrade.

122.    Instead, the University initiated disciplinary proceedings **shortly after disability disclosures**, creating a powerful inference of discriminatory motive.

123.    Defendants' deliberate indifference foreseeably exacerbated Plaintiff's infections, edema, and psychological distress. Instead of remedying the harm they knew was occurring, Defendants weaponized the academic and emotional distress caused by their own indifference, using it as a pretextual basis to initiate disciplinary proceedings and ultimately expel Plaintiff on February 25, 2025.

124.    As a direct and proximate result of Defendants' deliberate indifference, Plaintiff suffered severe physical harm from unmanaged infections, extreme emotional distress, loss of his educational program, and wrongful expulsion. Plaintiff seeks compensatory and punitive damages under 42 U.S.C. § 12132 and 29 U.S.C. § 794.

## SECTION B    TITLE IX COUNTS

*(Sex discrimination, retaliation, deliberate indifference, hostile environment, failure to protect)*

### Governing Legal Standard(s)

125.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides a private right of action for sex discrimination, retaliation, hostile environment, and deliberate indifference by institutions receiving federal financial assistance. The Supreme Court and Seventh Circuit have established that a university violates Title IX when sex-based bias or stereotyping influences its administrative and disciplinary decisions. See, e.g., Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 641 (1999); Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005); Doe v. Purdue Univ., 928 F.3d 652, 656 (7th Cir. 2019); Doe v. Univ. of Ky., 959 F.3d 246, 252 (7th Cir. 2020).

### COUNT 5    Title IX Sex Discrimination
### 20 U.S.C. § 1681(a)

126.    Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

127.    The University of Chicago receives extensive federal financial assistance, including Title IV funds, federal research grants, and federal training contracts, making it subject to Title IX.

128.    discriminatory disparate treatment tied to gender and sex-based stereotypes—specifically,  (a) stereotypes that biological male victims of assault should not report such incidents or need protective measures; AND (b) stereotypes regarding Plaintiff's sexual orientation/gender identity that plot caused officials to dismiss the severity of the assault.

129.    Instead of providing protections or supportive measures, Defendants:
a.    refused to issue a No Contact Directive;
b.    dismissed Plaintiff's reports;
c.    concealed or ignored evidence favourable to Plaintiff;
d.    used sex-based stereotypes in evaluating Plaintiff's credibility;
e. treated Plaintiff's assault report less seriously than reports made by biological female candidates, and complainants.

130.    University of Chicago staff told Plaintiff should "handle it," "move on," "be a man" or implied that person like plaintiff reporting assault and harassment are "less important," which constitutes **sex-based stereotyping** prohibited by **Jackson** and **Columbia Univ,** and

26

implied that Plaintiff's report of assault was less important. Dismissing a victim's report based on sex-based assumptions about how a person of Plaintiff's gender/orientation should react to assault constitutes sex-based stereotyping prohibited under Title IX. See Jackson, 544 U.S. at 173.

131.    after Plaintiff reported the assault, University officials applied sex-based stereotypes to discredit Plaintiff, initiating a biased response that **favored the assailant over the victim based** on sex. Specifically, Defendants:

    1. dismissed Plaintiff's report without conducting a meaningful investigation into the assault;
    2. failed to provide Plaintiff with legally mandated supportive measures while providing such measures to female complainants; and
    3. allowed the sex-based bias evident in the assault reporting process to infect the subsequent disciplinary proceedings, resulting in an expulsion influenced by discriminatory animus.

132.    Under **Doe v. Purdue University**, a student states a Title IX claim when procedural anomalies support an inference that sex-based bias influenced the outcome. Plaintiff alleges multiple such anomalies.

133.    Defendants' sex-based discriminatory handling of Plaintiff's assault report was a motivating factor in the denial of educational benefits and Plaintiff's subsequent expulsion.

134.    Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**COUNT 6   Title IX Retaliation (including retaliatory academic decisions)**

**Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005)**

135.    Plaintiff realleges and incorporates all prior paragraphs.

136.    Plaintiff engaged in **protected Title IX activity** by reporting:

    1. assault,

    2. harassment,

    3. hostile educational and employment conditions,

    4. misconduct by university staff,

    5. discriminatory handling of assault, and misconduct reports.

    6. by opposing the University's discriminatory and sex-stereotyped handling of that assault report.

137.    Title IX prohibits retaliation against any person who complains about discrimination/assault/harassment.

138.    **Following Plaintiff's protected Title IX activity, Defendants took materially adverse actions that would deter a reasonable student from reporting assault. These actions included:**

    1. wrongfully terminating Plaintiff from multiple student employment positions;
    2. initiating sudden disciplinary charges based on stale or fabricated allegations;
    3. conducting a biased disciplinary hearing with a predetermined outcome;
    4. expelling Plaintiff on February 25, 2025, before the appeals process concluded; and
    5. suppressing exculpatory evidence during the disciplinary process.

139.    The close temporal proximity within **days** between Plaintiff's assault and discrimination reports and Defendants' actions supports a strong causal inference under **Jackson**.

140.    Hon'ble NDIL court repeatedly hold that adverse academic decisions (discipline, expulsion, grade penalties) constitute retaliation under Title IX when tied to protected reporting.
*See Doe v. Loyola Univ. Chicago, 2021 WL 2577030 (N.D. Ill.).*

141.    As recognized by the Seventh Circuit, adverse academic decisions—including biased disciplinary proceedings and expulsions—constitute actionable retaliation under Title IX when they are tied to protected reporting of sex discrimination. See Doe v. Purdue Univ., 928 F.3d 652, 656 (7th Cir. 2019).

27

142. As a direct and proximate result of Defendants' Title IX retaliation, Plaintiff was deprived of his education, lost student employment income, suffered severe mental health deterioration, and sustained economic and reputational harm. Plaintiff seeks compensatory and punitive damages pursuant to 20 U.S.C. § 1681(a).

**COUNT 7    Deliberate Indifference to Assault Misconduct Reports (Title IX)**
**Gebser; Davis**

143. Plaintiff realleges and incorporates all prior paragraphs.
144. Plaintiff reported an assault by a university-affiliated individual to University officials.
145. University officials with authority to institute corrective measures Title IX Office, Uchicago CARES, Dean of Students at Harris and PSD, UCPD, and more had **actual knowledge** of the allegations.
146. **Despite this notice, the University**:
    a. failed to investigate in a meaningful way;
    b. failed to offer supportive measures;
    c. refused to issue a No Contact Directive;
    d. discouraged Plaintiff from pursuing the matter;
    e. took no steps to protect Plaintiff from further harm;
    f. acted to protect the assailant (a University employee/student allegedly working in a federally funded lab).
147. Defendants' response was clearly unreasonable in light of the known circumstances. Despite having actual knowledge of Plaintiff's report of assault a severe federal and institutional violation Defendants failed to initiate any meaningful investigation. Conversely, when presented with an alleged one-hour timekeeping discrepancy, those same administrators immediately mobilized an intensive, ten-day disciplinary process that resulted in Plaintiff's expulsion. This stark disparity in the University's institutional response—ignoring a report of sexual assault while aggressively prosecuting a minor administrative inflection against the reporting victim demonstrates deliberate indifference to sex-based misconduct under Gebser and Davis.
148. Under **Davis**, deliberate indifference exists when a school's failure to act makes a student vulnerable to further harassment.
149. Defendants' inaction increased Plaintiff's vulnerability, enabled ongoing intimidation, and caused severe emotional and educational harm.
150. The University's deliberate indifference was clearly unreasonable in light of known circumstances and violated Title IX.
151. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**COUNT 8    Hostile Educational Environment (Title IX)**
**Davis v. Monroe County Bd. of Educ., 526 U.S. 629 (1999)**

152. Plaintiff realleges and incorporates all prior paragraphs.
153. Plaintiff was subjected to severe, pervasive, and objectively offensive conduct that **denied equal access to educational opportunities**, including:

- harassment and assault;

- the assault by a University-affiliated individual;

- sex-based stereotyping and dismissive comments by University officials when Plaintiff reported the assault;

- the University's deliberate refusal to provide basic safety measures (such as a No Contact Directive) that were readily available to victims of sex-based misconduct;

- mocking comments about gender, nationality, disability, and vulnerability;

- unequal enforcement of policies;

- discriminatory hiring and termination practices;

28

- refusal to provide safety measures;

- retaliatory surveillance;

- harassment from multiple departments.

- disparate treatment in the handling of Plaintiff's assault report compared to reports made by female students; and

- gender-based harassment that created an environment where Plaintiff was unable to safely participate in his academic program.

154. The University officials like Dean Kate Biddle, President Paul, Provost Katherine, Uchicago Police Department, title IX office and other staff had actual knowledge of this sex-based hostile environment. Instead of taking corrective action to eliminate the hostile environment, these officials deliberately indifferent to it and instead punished Plaintiff for reporting it.

155. The conduct alleged was sufficiently severe, pervasive, and objectively offensive to deprive Plaintiff of access to the University's educational program. The hostility originated with a assault, harassment was compounded by institutional sex-based stereotyping, spanned multiple University departments, and culminated in Plaintiff's wrongful and fraudulent expulsion - thereby completely denying him the benefits of his education under Davis, 526 U.S. at 633.

156. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

## COUNT 9 Failure to Protect (Title IX + Constitutional Standards)
## Davis; Gebser; 7th Cir. Failure-to-Protect Doctrine

157. Plaintiff realleges and incorporates all prior paragraphs.

158. Plaintiff repeatedly notified University officials of:

1. assault,

2. stalking/harassment,

3. retaliatory threats,

4. physical vulnerability caused by disability.

159. Defendants had actual authority to provide protection but **refused** to issue a No Contact Directive or any supportive safety measures.

160. Under Davis and Gebser, the University's refusal to issue a No Contact Directive or implement supportive measures was clearly unreasonable in light of the known circumstances and the University's duty to protect its students from violence.

161. Seventh Circuit recognizes failure-to-protect claims under both Title IX and §1983 when a school increases a student's vulnerability. *See Doe v. Purdue Univ., 928 F.3d 652 (7th Cir. 2019).*

162. The Seventh Circuit recognizes that when a university has actual knowledge of harassment and is deliberately indifferent, it subjects its students to a hostile environment and denies them the benefits of their education in violation of Title IX. See Davis, 526 U.S. at 643-44.

163. Defendants' conduct increased Plaintiff's vulnerability to further harm and facilitated retaliation.

164. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**SECTION C    TITLE VI COUNTS**

Plaintiff's claims for intentional discrimination and retaliation based on race, color, and national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

165. Defendants receive substantial **federal financial assistance** and are therefore subject to the anti-discrimination and anti-retaliation mandates of **Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.**

166. Title VI § 601 is privately enforceable with respect to intentional discrimination, and the Supreme Court has expressly recognized that private plaintiffs may sue funding recipients for such intentional disparate treatment. See Alexander v. Sandoval; Cannon v. University of Chicago. More specifically, Sandoval reaffirmed that private individuals may sue to enforce § 601, while limiting private enforcement of § 602 disparate-impact regulations.

167. Because Title VI was enacted pursuant to Congress's Spending Clause authority, liability attaches as a condition of accepting federal funds, and federally funded universities are directly bound by the statute's anti-discrimination mandate. This Spending Clause framework also supports institutional liability where the recipient had adequate notice of the conditions attached to federal assistance. See Guardians Association v. Civil Service Commission of New York City; Sossamon v. Texas.

168. The substantive standard under Title VI is coextensive with the Equal Protection Clause's prohibition on intentional racial and national-origin discrimination, and courts routinely apply equal-protection disparate-treatment principles in adjudicating Title VI claims. See Regents of the University of California v. Bakke.

169. Accordingly, Plaintiff's allegations that Defendants selectively enforced disciplinary, employment, grievance, and protective processes against him because of his Indian national origin, South Asian ethnicity, Punjabi ancestry, caste, and related protected characteristics state a cognizable claim for intentional disparate treatment under Title VI.

170. Plaintiff further alleges that, after he complained of discrimination based on national origin and related protected characteristics, Defendants escalated materially adverse actions, including retaliatory discipline, termination of employment opportunities, suppression of grievance review, and expulsion. Such retaliation is actionable under the implied anti-retaliation principles applied to Spending Clause civil-rights statutes and recognized in analogous Title IX jurisprudence, which courts regularly use in the Title VI context.

171. Further, under controlling Seventh Circuit pleading standards, a discrimination complaint need only allege that the defendant instituted an adverse action against the plaintiff on a prohibited basis; it need not plead a full prima facie evidentiary case at the Rule 8 stage. See Bennett v. Schmidt. Plaintiff's allegations of temporal proximity, selective enforcement, comparator disparity, shifting explanations, and retaliatory escalation more than plausibly satisfy federal pleading requirements.

172. Title VI prohibits exclusion from participation in, denial of benefits of, or discrimination under any program or activity receiving federal financial assistance on the basis of **race, color, or national origin**. The statute likewise prohibits retaliation against an individual for opposing practices made unlawful by Title VI, including complaints of national-origin discrimination and related discriminatory conduct.

173. Plaintiff alleges that Defendants engaged in **intentional discrimination**, including disparate treatment in the admissions process, differential evaluation, denial of equal access to institutional protections, and retaliatory conduct following Plaintiff's opposition to discriminatory practices and pursuit of administrative remedies.

174. Such claims are actionable because:
    1. intentional discrimination is privately enforceable under Title VI;
    2. retaliation for complaining of race- or national-origin-based discrimination is independently actionable;
    3. federally funded educational institutions may be held liable for disparate treatment, deliberate indifference, failure to protect, and retaliatory actions, under standards analogous to those applied in Title IX jurisprudence.

175. The Supreme Court has recognized a private cause of action for intentional discrimination under Title VI. Alexander v. Sandoval, 532 U.S. 275 (2001). The Court has further confirmed that federally funded universities are directly subject to suit where discrimination occurs within covered educational programs. Cannon v. University of Chicago, 441 U.S. 677 (1979). In addition, Title VI's substantive protections incorporate

30

equal-protection principles prohibiting differential treatment based on protected characteristics. Regents of the University of California v. Bakke, 438 U.S. 265 (1978).

176. Because Defendants' receipt of federal funds is conditioned upon compliance with federal civil rights obligations, liability properly arises where those funding conditions are violated through discriminatory or retaliatory conduct. Guardians Ass'n v. Civil Service Commission, 463 U.S. 582 (1983); Sossamon v. Texas, 563 U.S. 277 (2011).

177. Further, federal pleading standards applicable to discrimination claims recognize that a plaintiff need only plausibly allege facts giving rise to an inference of discriminatory treatment, and such standards are construed liberally at the pleading stage. See, e.g., Bennett v. Schmidt, 153 F.3d 516 (7th Cir. 1998); Doe v. Purdue University, 928 F.3d 652 (7th Cir. 2019); Doe v. Columbia College Chicago, 933 F.3d 849 (7th Cir. 2019).

**COUNT 10   Race / National Origin / Caste Discrimination (Title VI)**

**42 U.S.C. §2000d   "No person… shall, on the ground of race, color, or national origin, be excluded…"**

178. Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

179. Defendant University of Chicago receives substantial federal financial assistance, including:

1. Title IV federal student-aid funds;

2. NIH/NSF federal research grants;

3. federal SEVIS authorization (delegated federal immigration compliance);

4. federal contracts, fellowships, and training grants. These render the University directly liable under **Title VI**. (*See Cannon v. Univ. of Chicago*).

180. Plaintiff is a member of protected classes based on national origin (Indian), race (South Asian), ethnicity (Punjabi), and caste minority status, all of which are cognizable under Title VI's prohibitions against race, color, and national origin discrimination.

181. **Plaintiff was repeatedly subjected to discriminatory conduct, including:**
a. disparate enforcement of hourly-work rules;
b. denial of disability accommodations while non-minority students received flexibility;
c. mocking, dismissive, or hostile remarks by staff referencing Plaintiff's nationality, accent, cultural background, and disability;
d. discriminatory termination of employment roles shortly after grievances;
e. refusal to investigate Plaintiff's assault report while protecting an assailant connected to influential academic units;
f. withholding or delaying transcripts;
g. invoking disciplinary standards in a harsher, punitive manner not applied to similarly-situated U.S.-born or non-South-Asian students.

182. Hon'ble NDIL precedent ( *Bennett v. Schmidt, 153 F.3d 516 (7th Cir. 1998)* ) holds that alleging "I was treated worse because of my race/national origin" is **sufficient to defeat dismissal**, even without specific comparators at the pleading stage.

183. The discriminatory treatment Plaintiff suffered was **intentional**, willful, and part of a pattern of institutional disregard toward international students and students of color.

184. The Hon'ble Seventh Circuit recognizes that universities can violate Title VI where intentional disparate treatment infects disciplinary systems (*Doe v. Purdue Univ.*, applied by Hon'ble NDIL).

185. As a direct and proximate result of Defendants' intentional discrimination, Plaintiff suffered expulsion, loss of student employment, severe mental distress, denial of educational access, loss of future professional opportunities, financial harm, and reputational harm.

186. Defendants' conduct violates Title VI's prohibition on intentional discrimination based on race, color, and national origin in federally funded educational programs. Plaintiff

31

seeks compensatory damages, punitive damages, and injunctive relief pursuant to 42 U.S.C. § 2000d-1.

### COUNT 11    Retaliation Under Title VI

**Retaliation is actionable where the plaintiff opposes racial/national-origin discrimination See Jackson v. Birmingham, applied to Title VI.**

187.    Plaintiff realleges and incorporates all prior paragraphs.

188.    The University of Chicago is a recipient of federal financial assistance, including but not limited to federal research grants, student financial aid programs administered under Title IV of the Higher Education Act, and other federal funding, and is therefore subject to Title VI's prohibition on retaliation, *42 U.S.C. § 2000d et seq.*

189.    Plaintiff engaged in protected activities under Title VI when he reported:

1. discrimination based on national origin, race, religion, caste, and disability;

2. hostile environment against Indian students and micro-minorities;

3. disparate enforcement of employment rules affecting international students;

4. misuse of federal funds tied to discriminatory practices;

5. safety issues disproportionately affecting minority groups;

6. failure to protect an Indian/South-Asian victim of assault.

7. Filing a formal Title VI/CARES complaint on or about January 19, 2025, alleging national origin discrimination against Indian/South-Asian students;

8. reporting disparate disciplinary enforcement and hostile environment targeting international students of South-Asian origin;

9. reporting to supervisory and administrative officials that employment rules were being enforced discriminatorily against international students, including the work-hour enforcement pretext used to terminate Plaintiff while similarly situated non-South-Asian employees were not disciplined.

190.    Each of the protected activities identified above was undertaken in good faith and based on Plaintiff's reasonable belief that the conduct opposed constituted unlawful discrimination under Title VI, 42 U.S.C. § 2000d. See University of Pennsylvania v. EEOC, 493 U.S. 182, 198 (1990) (Title IX retaliation applies where plaintiff has reasonable belief conduct violates Title IX, applied equally to Title VI under Jackson); see also Crawford v. Metropolitan Government of Nashville, 555 U.S. 40, 70 (2009) (opposing discrimination is protected regardless of whether the underlying discrimination claim ultimately succeeds).

191.    Specifically, on or about January 19, 2025, Plaintiff submitted a written complaint to the University of Chicago CARES portal alleging discrimination and unequal treatment on the basis of his national origin (Indian), ethnicity, caste, and other protected characteristics by university officials and supervisors, as set forth in  above. Plaintiff identified specific discriminatory acts including disparate enforcement of employment rules against international students, hostile remarks targeting Indian and South-Asian students, and denial of accommodations while non-minority students received flexibility. Plaintiff reasonably believed this conduct violated Title VI's prohibition on discrimination based on race, color, and national origin in federally funded programs.

192.    Plaintiff also opposed discrimination through internal complaints, including reporting hostile environment conditions affecting Indian students and micro-minorities, disparate treatment in employment rule enforcement disproportionately affecting international students, and the University's failure to protect a South-Asian victim of assault. Each of these reports was directed to University officials with authority to investigate and remedy the reported conduct, including the Office for Equal Opportunity Programs, CARES, and supervisory administrators, as more fully set forth in above.

193.    Immediately after Plaintiff complained, the University:
a. terminated his campus jobs (union and non-union roles);

32

  b. initiated sudden disciplinary proceedings lacking factual basis;

  c. generated or relied upon a fabricated 'Travel Notification Form' and other administrative records that were created, altered, or appeared in Plaintiff's file without his submission, as detailed in — Plaintiff requested technical verification (IP logs, metadata, timestamps) to authenticate these documents, which Defendants refused to produce;

  d. escalated disciplinary scrutiny;

  e. suppressed exculpatory evidence;

  f. denied accommodations and basic due process rights;

  g. ignored Title VI grievances;

  h. imposed the most severe sanction **expulsion** shortly after his Title VI complaints;

  i. engaged in transcript tampering/withholding affecting Plaintiff's Harvard Law School applications;

  j. used UCPD presence to intimidate and surveil Plaintiff.

  k. manipulated Plaintiff's payroll and employment records to manufacture pretextual work-hour violations, as detailed in (including the Workday "roll back" and unauthorized addition of hours);

  l. engaged in retaliatory surveillance, including conspicuous UCPD presence near Plaintiff's residence;

  m. circulated unverified or inflammatory material to third parties including prospective employers and academic programs, damaging Plaintiff's reputation and career prospects

**194.** Each of the adverse actions listed in constitutes a "materially adverse action" under Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 67 (2006), meaning each action "well might have dissuaded a reasonable student or worker from making or supporting a charge of discrimination." The Seventh Circuit has held that academic penalties, termination of employment, and disciplinary sanctions qualify as materially adverse actions. See Herron v. Kane County Forest Preserve Dist., 191 F.3d 844, 853 (7th Cir. 1999) (termination of employment is materially adverse); see also Killian v. Yorozu Automotive Tennessee, Inc., 454 F.3d 549, 556 (7th Cir. 2006).

**195.** The adverse actions described above followed a clear pattern of escalation correlating with Plaintiff's escalating protected activity. Specifically:

  **(a)** After Plaintiff reported assault on November 22, 2024, his full-time employment interview was cancelled on January 10, 2025;

  **(b)** After Plaintiff filed a CARES Title VI complaint on January 19, 2025, he was terminated from multiple campus positions between January 7–9, 2025, and subjected to retaliatory surveillance;

  **(c)** After Plaintiff filed a union grievance on February 1, 2025, the University issued a disciplinary summons on February 12, 2025—just eleven (11) days later—and expelled Plaintiff on February 25, 2025, before the grievance process concluded. This escalating pattern of retaliation—each adverse action more severe than the last—demonstrates that Defendants deliberately intensified their retaliation as Plaintiff continued to exercise his rights.

**196.** The temporal proximity between Plaintiff's protected activities and the retaliatory actions was exceedingly close, establishing a strong inference of but-for causation under the Seventh Circuit's temporal proximity framework. See Sullivan v. Little Rock School District, 465 F.3d 1030, 1036 (8th Cir. 2006) (temporal proximity of less than one month supports inference); see also Hughes v. Derwinski, 967 F.2d 1168, 1173 (7th Cir. 1992) (close temporal proximity supports causation). The chronology is as follows:

  **(a)** November 22, 2024 — Plaintiff reported assault to the University;

  **(b)** December, 2024 – Denied No Contact Directive

  **(c)** January 7, 2025 — Plaintiff terminated from SSCS position (46 days later);

  **(d)** January 9, 2025 — Plaintiff terminated from Mansueto Institute (48 days after assault report);

  **(e)** January 10, 2025 — Full-time HPC Admin interview cancelled (49 days after assault report);

  **(f)** January 19, 2025 — Plaintiff filed CARES Title VI complaint;

33

(g) February 1, 2025 — Plaintiff filed union grievance (13 days after CARES complaint) ;

(h) February 12, 2025 — University issued disciplinary summons (just 11 days after union grievance, 24 days after CARES complaint);

(i) February 25, 2025 — Plaintiff expelled (13 days after disciplinary summons, 37 days after CARES complaint).

197. Hon'ble NDIL repeatedly upholds retaliation claims where academic or disciplinary penalties follow complaints of discrimination. Retaliation is the most frequently alleged basis of discrimination in the federal sector and the most common discrimination finding in federal sector cases.

198. Under University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338, 360 (2013), Title VI retaliation claims require "but-for" causation — meaning the adverse action would not have occurred "but for" the plaintiff's protected activity. The Seventh Circuit has recognized that evidence of (1) suspicious timing, (2) systematic pattern of adverse actions, (3) departures from normal procedures, and (4) shifting or implausible explanations, when considered together, can establish but-for causation. See Cole v. Illinois Institute of Technology, 822 F.3d 370, 375 (7th Cir. 2016); Friedman v. Illinois College of Optometry, 791 F. Supp. 2d 799, 808 (N.D. Ill. 2011). All four categories of evidence are present here.

199. Defendants stated justifications for the adverse actions are pretextual, establishing that but-for Plaintiff's protected activity, the adverse actions would not have occurred. Evidence of pretext includes:

(a) Shifting explanations: Defendants first cited HR Decision for termination then stated visa work-hour violations for Plaintiff's termination, but a similarly situated employee (Fariha Sameen) who openly admitted exceeding the same work-hour limits was not disciplined;

(b) Departure from normal procedure: The University used the general University-wide Student Manual rather than the professional school-specific disciplinary policies applicable to Plaintiff's program;

(c) Fabrication of evidence: The "Travel Notification Form" and other records relied upon by Defendants were fabricated, altered, or appeared without Plaintiff's submission, and Defendants refused to produce technical verification (IP logs, metadata, timestamps) to authenticate these documents;

(d) Payroll record manipulation: Defendants retroactively "rolled back" Plaintiff's recorded work hours and added hours after the fact to create the appearance of work-hour limit violations;

(e) Evidentiary suppression: Defendants excluded testimony from Professor Royce, the actual project supervisor with direct knowledge, while relying on statements from individuals without direct technical knowledge;

(f) Accelerated timeline: Defendants imposed the most severe sanction (expulsion) within approximately 13 days of issuing a disciplinary summons, before the union grievance process concluded and before Plaintiff's appeal period ended — demonstrating the disciplinary process was not a good-faith adjudicatory proceeding but a retaliatory weapon;

(g) Prior clean record: Plaintiff had no prior history of disciplinary violations or academic misconduct before initiating protected activity.

200. Under the "cat's paw" theory of liability recognized in Staub v. Proctor Hospital, 562 U.S. 411 (2011), an employer may be held liable for retaliation where a biased subordinate's report influences the decision-maker, even if the decision-maker's own motives are unbiased, provided the biased subordinate's influence was a "motivating factor." Here, Defendants Dean Kate Shannon Biddle and other disciplinary officials relied on reports from individuals — including Arun Banotra, Heidi Lee, Brian, and Aimee — who had a retaliatory motive against Plaintiff based on his prior complaints about wage irregularities, wrongful termination, and safety violations. The disciplinary proceedings were conducted exclusively by Harris School personnel, and these decision-makers failed to independently verify the biased subordinates' allegations, instead crediting manufactured evidence and disregarding exculpatory testimony. See Gomez v. Illinois State Police, 734 F.3d 645, 652 (7th Cir. 2013) (cat's paw liability under Title VII principles applicable to Title VI).

34

201.     Defendant's retaliation was **intentional**, **malicious**, and designed to silence Plaintiff, punish him for protected reporting, and deter further complaints.

202.     The retaliation caused Plaintiff extensive harm:

1. expulsion;

2. inability to complete his degree;

3. reputational stigma;

4. psychological trauma;

5. financial injury;

6. long-term damage to academic and career trajectories.

203.     Additional evidence of retaliatory animus supporting but-for causation includes:

(a) The disciplinary summons was issued on February 12, 2025 — just eleven (11) days after the February 1, 2025 union grievance — based on alleged incidents that occurred well before the summons, had already been resolved, or never existed;

(b) The University's own 60-day limitations rule for disciplinary proceedings was violated, as the matters at issue were over a year old;

(c) Plaintiff was 3 months from completing his degree when the disciplinary process was initiated — an extraordinary timing that suggests the University waited until Plaintiff's most vulnerable moment to weaponize its authority;

(d) The disciplinary panel was composed entirely of Harris School personnel rather than a neutral cross-departmental body, and included non-voting administrators who improperly influenced the proceedings;

(e) Defendants issued the expulsion before the union grievance could be heard, before Plaintiff's appeal period concluded, and before any internal grievance regarding discrimination, assault, or wrongful termination was resolved.

204.     Defendants' conduct violates Title VI's prohibition on retaliation in federally funded programs.

205.     Plaintiff is entitled to recover damages under Title VI, 42 U.S.C. § 2000d-1, including but not limited to:

(a) compensatory damages for emotional distress, psychological trauma, humiliation, anxiety, and loss of educational and professional opportunities, see Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 76 (1992) (compensatory damages available under Title VI);

(b) pecuniary damages including lost tuition and fees, lost wages and employment income, loss of research opportunities and fellowship prospects, and impairment of academic and professional trajectory;

(c) punitive damages, where Defendants' conduct was intentional, malicious, and undertaken with reckless indifference to Plaintiff's federally protected rights;

(d) injunctive relief, including expungement of disciplinary records, correction of academic transcripts, and restoration of educational access; and

(e) attorney's fees and costs pursuant to applicable fee-shifting provisions.

## SECTION D     Constitutional Claims Under 42 U.S.C. § 1983

## COUNT 12     FIRST AMENDMENT RETALIATION (§1983)

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Bridges v. Gilbert*, 557 F.3d 541 (7th Cir. 2009).

206.     Each count in this Section D is brought under 42 U.S.C. § 1983 against the following Defendants, each acting under color of state law as alleged above: (a) The University of Chicago, institutionally; (b) Dean Kate Shannon Biddle, in her individual and official capacities, for her role as the principal architect and operative agent of the disciplinary proceedings, as described above; (c) Dean Ethan, in his official capacity, for issuing orders directing the disciplinary process; (d) Bart Longacre, for his role in terminating Plaintiff's SSCS employment at HR's direction on January 7, 2025; (e) Kerry Sharkey, for participation in the January 7, 2025 termination meeting; (f) Arun Banotra, for

35

his role in terminating Plaintiff's Mansueto employment, cancelling the HPC Admin interview, and retroactively "rolling back" Plaintiff's Workday hours; (g) Heidi Lee, for adding fraudulent hours to Plaintiff's Workday record to manufacture a pretextual violation; (h) Brian and Aimee, for pressing Plaintiff to acknowledge work outside his duties during disciplinary proceeding; (i) UCPD officers who conducted retaliatory surveillance near Plaintiff's residence (j) additional individual Defendants identified in the attached Defendant List Document. Each individual Defendant is liable for their personal participation in the acts described herein, pursuant to Ashcroft v. Iqbal, 556 U.S. at 676.

207.　　Each communication listed in this count constitutes speech on a matter of public concern under the First Amendment. See Pickering v. Board of Education, 391 U.S. 563, 568 (1968) (public employees have a protected interest in speaking on matters of public concern); Connick v. Myers, 461 U.S. 138, 145–46 (1983). Specifically: (a) reporting unsafe gas cylinder handling involves the safety of students, staff, and the surrounding Hyde Park community; (b) reporting food safety violations concerns the health of the entire University community; (c) reporting misuse of federal/nonprofit funds involves public accountability for taxpayer-supported resources; (d) reporting assault and requesting protective measures implicates campus safety, a matter of acute public concern at educational institutions; (e) reporting wrongful terminations and wage issues involves labor rights affecting multiple student-workers; (f) reporting discrimination based on national origin, race, and caste involves civil-rights protections central to the University's federally funded mission; and (g) filing a union grievance constitutes protected concerted activity under both the First Amendment and Section 7 of the NLRA, 29 U.S.C. § 157.

208.　　Each adverse action listed in this count constitutes a "materially adverse action" under Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 67 (2006), meaning each action "well might have dissuaded a reasonable student or worker from making or supporting a charge of discrimination." The Seventh Circuit has held that expulsion from an educational program constitutes a materially adverse action for First Amendment retaliation claims. See Herrn v. Twin City Area Vocational-Technical Schools, 128 F.3d 1194, 1196 (8th Cir. 1997) (expulsion is materially adverse); DeGuiseppe v. Village of Bellwood, 682 F.3d 610, 618 (7th Cir. 2012) (termination of employment is materially adverse).

209.　　Plaintiff reported misconduct involving:

- unsafe gas cylinder handling,

- food safety violations,

- misuse of federal/nonprofit funds,

- assault by a staff-student,

- wrongful terminations, wage issues, union-protected activity,

- discrimination, denial of disability accommodations.

**210.　　Immediately afterward, Plaintiff alleges:**

- multiple job terminations,

- issuance of a pretextual disciplinary summons,

- expulsion while appeals were pending,

- transcript manipulation,

- UCPD intimidation near Plaintiff's residence,

- data-access irregularities, and

- refusal to grant a No Contact Directive.

211.　　The temporal proximity between Plaintiff's protected speech and each retaliatory adverse action supports a strong inference of causal connection. The following chronology demonstrates that each escalation in adverse action directly tracked Plaintiff's protected speech:

(a) November 22, 2024 — Plaintiff reported assault to University's CARES portal;
(b) December 2024: University of Chicago Denied No Contact Directive.

36

(c) January 7, 2025 — Plaintiff terminated from SSCS position (46 days after assault report; around 30 days after NCD denial and plaintiff raising serious concerns and questions on title IX and NCD denial); Supervisor Longacre stated "HR pushed me to do it," evidence of coordination;

(d) January 9, 2025 — Plaintiff terminated from Mansueto Institute (48 days after assault report);

(e) January 10, 2025 — HPC Admin full-time employment interview cancelled (49 days after assault report);

(f) January 19, 2025 — Plaintiff filed CARES complaint alleging national origin discrimination;

(g) February 1, 2025 — Plaintiff filed union grievance through GSU (13 days after CARES complaint);

(h) February 12, 2025 — University issued disciplinary summons (***11 days after union grievance***);

(i) February 25, 2025 — Plaintiff expelled (13 days after disciplinary summons, 37 days after CARES complaint, before grievance could be heard).

212. This escalating pattern — each adverse action more severe than the last, each directly tracking Plaintiff's protected speech — satisfies the causation requirement. See *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011).

213. Additional evidence of causal connection includes: (a) Plaintiff had no prior disciplinary history before engaging in protected speech; (b) the disciplinary charges relied on fabricated evidence including a forged Travel Notification Form and manipulated payroll records; (c) similarly situated employee Fariha Sameen, who admitted to the same work-hour violations, was not disciplined; (d) Defendants violated their own 60-day limitations rule for disciplinary proceedings after the alleged misconduct happened; (e) Defendants applied the University-wide Student Manual rather than the professional school-specific policies applicable to Plaintiff's program; (f) the decision-makers possessed actual knowledge of Plaintiff's protected activity, as Dean Biddle acknowledged the union grievance in a February 11, 2025 email.

214. Under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), Defendants bear the burden of showing they would have taken the same adverse action regardless of Plaintiff's protected speech. Defendants cannot meet this burden because: (a) the adverse actions were based on fabricated evidence manufactured by Defendants themselves; (b) no legitimate disciplinary basis existed — Plaintiff had no prior history and was three months from degree completion; (c) the disciplinary process was procedurally compromised by suppression of exculpatory evidence, inducement of fraudulent documents, and predetermined outcome; and (d) Defendants' stated reasons shifted over time, from visa work-hour violations to falsification allegations never previously raised, constituting evidence of pretext. See *Buie v. Quinn*, 785 F.3d 454, 463 (7th Cir. 2015) (shifting explanations support finding of pretext).

215. As a direct and proximate result of Defendants' First Amendment retaliation, Plaintiff suffered: (a) deprivation of his right to free speech and academic expression; (b) expulsion three months before degree completion; (c) loss of approximately thirteen to fifteen student employment positions; (d) loss of income, wages, and employment opportunities; (e) impairment of academic records and transcript, affecting applications to competitive academic programs including Harvard Law School; (f) severe emotional distress, psychological trauma, anxiety, and humiliation; (g) loss of F-1 visa status and forced departure from the United States; (h) reputational harm and stigma; (i) long-term damage to academic, professional, and career trajectories; and (j) chilling of future speech and whistleblower activity. Plaintiff seeks compensatory damages, punitive damages, and injunctive relief, including expungement of disciplinary records and correction of academic transcripts, pursuant to 42 U.S.C. § 1983.

## COUNT 13   EQUAL PROTECTION (National Origin, Race, Caste)

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977); and more.

216. Historical Background: Plaintiff belongs to groups — Indian nationals, South Asians, Hindus — that have been historically subject to discrimination in educational and employment settings in the United States. The enforcement of work-hour rules only against Plaintiff, an Indian national, while not enforcing them against Fariha Sameen, a non-Indian student who openly admitted to exceeding the same limits, reflects this historical pattern.

217. Departure from Normal Procedure: Defendants departed from the University's own 60-day limitations rule for disciplinary proceedings, used the University-wide Student

37

Manual rather than the professional school-specific policies applicable to Plaintiff's program, and initiated expulsion proceedings against a student with no prior disciplinary history who was three months from degree completion. These departures from normal procedure are evidence that the disciplinary process was a vehicle for discriminatory animus rather than a good-faith adjudicatory proceeding.

218. **Legislative and Administrative History:** The University's disciplinary actions followed immediately upon Plaintiff's filing of complaints alleging national origin discrimination (CARES complaint, January 19, 2025) and his union grievance (February 1, 2025). The temporal sequence suggests the disciplinary process was triggered by Plaintiff's complaints rather than misconduct.

219. Contemporaneous Statements: During the January 7, 2025 termination meeting, Supervisor Bart Longacre stated "HR pushed me to do it," indicating coordination between HR and departmental leadership to target Plaintiff. Dean Kate Shannon Biddle acknowledged awareness of Plaintiff's union grievance in a February 11, 2025 email while the union was actively meeting with University officials, confirming cross-departmental coordination.

220. Departures from Normal Substantive Standards: Heidi Lee, a Mansueto Institute administrator, added hours to Plaintiff's Workday record after the fact without authorization or contemporaneous documentation, creating a fraudulent record of work-hour violations used as the basis for disciplinary action — a manufactured "defect" not inflicted on similarly situated non-South-Asian employees. Defendants also retroactively "rolled back" Plaintiff's July 2024 recorded work hours.

221. Race and national origin are suspect classifications triggering strict judicial scrutiny under the Equal Protection Clause. See Regents of the University of California v. Bakke, 438 U.S. 265, 289 (1978); Bolling v. Sharpe, 347 U.S. 497, 499 (1954). Caste-based discrimination, when understood as a form of national origin or ethnicity discrimination, is cognizable under the Equal Protection Clause. See Chandani v. Patel, 815 F. Supp. 2d 491, 498 (D.N.J. 2011). Under strict scrutiny, Defendants bear the burden of demonstrating that their discriminatory treatment of Plaintiff was narrowly tailored to serve a compelling governmental interest. Defendants cannot meet this burden because: (a) the stated reasons (work-hour violations, disciplinary misconduct) were either fabricated or applied selectively only to Plaintiff and not to similarly situated non-minority students; (b) Fariha Sameen, who committed the same alleged work-hour violation, was not disciplined; and (c) the disciplinary charges relied on manufactured evidence.

222. Plaintiff asserts:

- enforcement of work-hour limits in a discriminatory manner,

- refusal to correct hours after Plaintiff specifically asked SSCS to do so,

- differential treatment compared to non-Indian / non-Hindu / non-disabled peers,

- supervisors allegedly ignoring Plaintiff but responding to others,

- denial of protections after an assault while protecting the assailant due to affiliation with a federally funded research unit,

- derogatory or dismissive behavior related to disability needs, and protected classes of plaintiff.

- Induced defect by Mansueto staff Heidi, to add fraudulent hours in plaintiff workday to push plaintiff to misconduct.

223. Courts accept these as plausible indicators of discriminatory purpose at the pleading stage, similar to *Swanson v. Citibank*, 614 F.3d 400 (7th Cir. 2010).

224. As a direct and proximate result of Defendants' discriminatory conduct in violation of the Equal Protection Clause, Plaintiff suffered: (a) discriminatory termination from multiple employment positions based on his national origin; (b) deprivation of equal educational opportunities; (c) expulsion based on fabricated evidence manufactured to target Plaintiff because of his protected characteristics; (d) denial of protective measures after assault while protecting the assailant; (e) severe emotional distress, humiliation, and psychological trauma caused by discriminatory treatment; (f) loss of academic and professional trajectory; and (g) damage to reputation and career prospects. Plaintiff seeks compensatory damages, punitive damages, and injunctive relief pursuant to 42 U.S.C. § 1983.

**COUNT 14   PROCEDURAL DUE PROCESS (Biased Disciplinary Process)**

*Mathews          v.          Eldridge*,          424          U.S.          319          (1976);
*Goss          v.          Lopez*,          419          U.S.          565          (1975);
*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019).

225.     Plaintiff had a protected property interest in his continued enrollment in the Master's degree program at the University of Chicago. A student's continued enrollment at a university constitutes a protected property interest under the Fourteenth Amendment. See Board of Regents v. Roth, 408 U.S. 564, 576 (1972) (property interest exists where person has "legitimate claim of entitlement"); Goss v. Lopez, 419 U.S. 565, 573–74 (1975) (students have protected interest in public education); Doe v. Purdue University, 928 F.3d 652, 658 (7th Cir. 2019) (university students have property interest in continued enrollment). Plaintiff had completed the majority of t's degree requirements, was approximately three months from degree completion, had paid substantial tuition and fees, and had a legitimate expectation of completing his degree, as created by the University's own policies, course catalog, and enrolment agreement.

226.     Defendants deprived Plaintiff of his protected property interest without constitutionally adequate procedural due process. Under Goss v. Lopez, 419 U.S. 565, 579–81 (1975), and Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546 (1985), the minimum requirements of due process before deprivation of a protected interest include: (a) written or oral notice of the charges; (b) an explanation of the evidence against the student; and (c) a meaningful opportunity to present his side. Defendants violated each of these requirements as follows:

(a)   Inadequate Notice: The disciplinary summons was issued on February 12, 2025, based on alleged incidents that occurred year before the summons, had already been resolved, or never existed — giving Plaintiff insufficient notice of the actual case against him. The charges relied on a Travel Notification Form that Plaintiff never submitted and that Defendants refused to authenticate through technical verification.

(b)   No Meaningful Opportunity to Be Heard: Plaintiff was denied the right to have a support person/union represent present effectively during the February 24, 2025 investigation meeting, despite University policies allowing such accompaniment. The disciplinary panel refused to discuss Plaintiff's union role and denied union representation, even though the union grievance was pending and directly relevant to the matters under review. The panel was composed entirely of Harris School personnel with no neutral cross-departmental participation. Union steward also sat silent during meeting, no representation was provided. Unions acted in concert with the University of Chicago benefitting it not the grievant. Disciplinary staff **did not** ask for some contracts like internship contract, however for some other contracts like for Mansueto role was shown to them, these staff were at professor or PhD level and were allegedly high profiles they selectively omitted that evidences as it was in plaintiff's favours allegedly university of Chicago did not share that further that internship was more than 6 months old and came out of sudden right after union grievance filing.

(c)   Evidence Suppression: Defendants failed to disclose or consider material exculpatory evidence, including: (i) testimony from Professor Royce, the actual project supervisor who had direct technical knowledge of the work at issue; (ii) email communications from Paige Azuma; (iii) the applicable internship agreement. Instead, the panel relied on statements from Heidi Lee, Brian, and Aimee — individuals who lacked direct technical knowledge and who had retaliatory motive.

(d)   Improper Influence by Non-Voting Administrator: Dean Kate Shannon Biddle, designated as a non-voting presence, dominated the proceedings, misrepresenting or distorting material facts and improperly influencing the panel's decision.

(e)   Reliance on Fabricated Evidence: The proceedings relied upon a forged Travel Notification Form and manipulated payroll records (Workday "roll back" by Arun Banotra and unauthorized addition of hours by Heidi Lee) that Defendants refused to authenticate through IP logs, metadata, or timestamps.

(f)   Wrong Procedural Manual Applied: Defendants applied the University-wide Student Manual rather than the professional school-specific disciplinary policies applicable to Plaintiff's program, depriving him of the procedural protections specific to his school.

(g) Sanctions Imposed Before Appeal: Defendants expelled Plaintiff on February 25, 2025, before his internal appeal period had concluded and before the union grievance filed February 1, 2025, could be heard.

227. Under Mathews v. Eldridge, 424 U.S. 319, 335 (1976), the constitutional adequacy of procedural protections is determined by balancing three factors:

(1) Plaintiff's Private Interest: Plaintiff had an extraordinarily strong private interest in completing his Master's degree — he was three months from graduation, had invested substantial tuition and fees, and expulsion would immediately jeopardize his F-1 visa status, forcing abrupt departure from the United States and destroying his academic and professional trajectory. This interest is at its maximum in the educational context. See Goss, 419 U.S. at 575 (student's interest in education is "far more than a property interest"; it includes "the right to be free from arbitrary deprivation of the right to complete the education of one's choice").

(2) Risk of Erroneous Deprivation and Value of Additional Safeguards: The risk of erroneous deprivation here was extreme because: (a) the charges relied on fabricated evidence (forged travel form, manipulated payroll records) that Defendants refused to authenticate; (b) exculpatory evidence from Professor Royce was entirely excluded from the proceedings; (c) the panel was not neutral (all Harris School personnel, improperly influenced by Dean Biddle); (d) Defendants applied the wrong procedural manual; (e) the decision-makers possessed actual knowledge of Plaintiff's pending union grievance; and (f) sanctions were imposed before any appeal could be filed. Additional safeguards — including a neutral cross-departmental panel, authentication of disputed documents, consideration of all exculpatory evidence, and adherence to the professional school-specific disciplinary procedures — would have substantially reduced the risk of erroneous deprivation.

(3) University's Interest: While the University has a legitimate interest in maintaining academic integrity and campus safety, that interest is substantially diminished where the disciplinary process was a pretextual sham designed to retaliate against a whistleblower. See Doe v. Purdue University, 928 F.3d at 658 (university's interest does not excuse denial of fundamental fairness). The University's own interest in having a fair and reliable disciplinary process was, in fact, undermined by the procedural irregularities described above.

228. The Mathews balancing decisively weighs in Plaintiff's favor: an extreme private interest at stake, a very high risk of erroneous deprivation caused by a biased and procedurally compromised process, and no legitimate institutional interest in maintaining a proceeding that was pretextual from inception.

229. **Plaintiff alleges:**

- a disciplinary hearing initiated immediately after engaging in protected activities,

- refusal to discuss Plaintiff's union role and allow union representation,

- a dean allegedly dominating the process despite being a "non-voting" presence,

- deans misusing of powers,

- university of Chicago is alleged to abuse their authority under the color of law,

- suppression of exculpatory evidence (e.g., workhour trimming instructions),

- alleged use of a forged "Travel Notification Form,"

- no technical verification (metadata/IP logs),

- ignoring internal grievance processes,

- sanctions imposed before appeal deadlines expired.

230. These factual patterns describe the type of "predetermined outcome" disapproved in *Purdue* and Title IX due-process cases.

231. As a direct and proximate result of Defendants' denial of procedural due process, Plaintiff suffered: (a) deprivation of his protected property interest in continued enrollment and degree completion three months before graduation; (b) deprivation of liberty interests in academic reputation and employment opportunities; (c) loss of approximately thirteen

40

to fifteen student employment positions; (d) loss of income, wages, and financial injury; (e) impairment of academic records and transcript; (f) severe emotional distress, psychological trauma, anxiety, and humiliation resulting from a biased and predetermined process; (g) loss of F-1 visa status and forced departure from the United States; and (h) long-term damage to academic, professional, and career trajectories. Plaintiff seeks compensatory damages, punitive damages, injunctive relief including expungement of disciplinary records and correction of transcripts, and reinstatement, pursuant to 42 U.S.C. § 1983.

## COUNT 15   SUBSTANTIVE DUE PROCESS (BODILY INTEGRITY)

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998); *Rochin v. California*, 342 U.S. 165 (1952).

232.      The Fourteenth Amendment protects an individual's liberty interest in bodily integrity, personal security, and freedom from arbitrary governmental deprivation of fundamental rights. See Rochin v. California, 342 U.S. 165, 172–73 (1952) (substantive due process protects against conduct that "shocks the conscience" and "violates the decencies of civilized conduct"); County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (defining the "shocks the conscience" standard). Plaintiff's liberty interest in personal security includes the right to be free from a deliberate institutional decision that knowingly exposes him to ongoing risk of harm from a known assailant while simultaneously retaliating against him for reporting that harm.

233.      Plaintiff alleges that Defendants engaged in deliberate, conscience-shocking conduct that violated his substantive due process right to bodily integrity and personal security:

(a) On or about November 22, 2024, Plaintiff reported an assault by a University-affiliated staff-student to the University's Office for Sexual Misconduct Prevention and/or the CARES portal, and requested a No Contact Directive to protect him from further contact with the assailant;

(b) The University initially indicated it would issue a No Contact Directive but subsequently refused to do so — despite having the authority to issue one under its own policies — thereby making a deliberate institutional decision to leave Plaintiff unprotected from a known assailant;

(c) The University's refusal to protect Plaintiff was motivated by its desire to protect the assailant's position in a federally funded research laboratory, demonstrating that the decision was a conscious, deliberate prioritization of institutional reputation over Plaintiff's safety;

(d) After denying protective measures, the University then engaged in a campaign of retaliation against Plaintiff — including job terminations, disciplinary proceedings, surveillance, and expulsion — deliberately punishing the victim of assault rather than the assailant;

(e) This two-step pattern — first denying protection to the assault victim, then retaliating against that victim for reporting the assault — constitutes a deliberate, conscious-choice course of conduct by University officials that was intended to and did cause Plaintiff ongoing psychological trauma, fear, and vulnerability.The described facts align with cases holding that deliberate indifference to assault risks can "shock the conscience," such as *Doe v. Columbia College Chicago* (NDIL).

234.      A. Under County of Sacramento v. Lewis, 523 U.S. 833, 850 (1998), the "shocks the conscience" standard requires conduct that is "arbitrary in the constitutional sense." In situations not involving a rushing emergency, the standard requires a showing that the government actor acted with deliberate indifference to a known risk, or engaged in conduct so egregious that no reasonable person could endorse it. Here:

(a) This was not an emergency situation — Defendants had ample time to deliberate on whether to issue a No Contact Directive and chose not to;

(b) The University's decision was deliberate and institutional — a conscious policy choice to deny protection to an assault complainant while protecting the assailant;

(c) The decision was made despite the University's own policies mandating protective measures for assault complainants;

(d) The University's subsequent retaliation — terminating Plaintiff's employment, filing fabricated disciplinary charges, conducting retaliatory surveillance, and

41

expelling him — demonstrates that the denial of protection was part of a coordinated scheme to punish the complainant rather than an honest mistake;

(e) The combination of denying a No Contact Directive AND then retaliating against the assault complainant through escalating adverse actions is conscience-shocking because it transforms the University from a protector into a perpetrator, using its institutional power to revictimize the person it was obligated to protect. *See* Doe v. Columbia College Chicago, No. 18-cv-04955, 2019 WL 1283724, at 7 (N.D. Ill. Mar. 20, 2019) (allegations that university was deliberately indifferent to sexual assault can state a substantive due process claim); Doe v. Purdue University, 928 F.3d 652 (7th Cir. 2019) (recognizing substantive due process claims in university disciplinary context).

235.     As a direct and proximate result of Defendants' conscience-shocking violation of Plaintiff's substantive due process right to bodily integrity, Plaintiff suffered: (a) ongoing psychological trauma, fear, and anxiety from being unprotected from a known assailant; (b) humiliation from being denied protective measures that were available to others; (c) the shock of being expelled — not for any misconduct — but for reporting an assault and requesting protection; (d) severe emotional distress from the combination of assault, denial of protection, and retaliation; (e) loss of educational access and degree completion; (f) loss of F-1 visa status and forced departure from the United States; and (g) long-term psychological harm. Plaintiff seeks compensatory damages, punitive damages, and injunctive relief pursuant to 42 U.S.C. § 1983.

## COUNT 16   FAILURE TO PROTECT (§1983)

*DeShaney v. Winnebago County*, 489 U.S. 189 (1989) (exceptions); *Doe v. Purdue* (Hon'ble 7th Cir. recognizes failure-to-protect theory in education context).

- Plaintiff alleges repeated warnings to university officials about the assault,

- University allegedly refused to impose safety measures,

- University allegedly retaliated instead of protecting Plaintiff,

- Plaintiff asserts resulting emotional/psychological harm.

236.     Plaintiff brings this claim under the "special relationship" exception to DeShaney, as applied to universities by the Seventh Circuit. In Doe v. Purdue University, 928 F.3d 652 (7th Cir. 2019), the Hon'ble Seventh Circuit recognized that universities that exercise quasi-custodial, quasi-judicial, and police authority over students may owe a duty of protection under §1983. The University of Chicago, through its state-commissioned police force (UCPD), its federally delegated immigration authority (SEVIS), and its quasi-municipal campus governance, exercised custodial-level authority over Plaintiff, an international student whose F-1 visa status, housing, and ability to remain in the United States were entirely controlled by the University. This level of institutional control creates the type of "special relationship" that triggers a duty to protect under §1983. See also Mendoza v. City of Chicago, 735 F. Supp. 2d 735 (N.D. Ill. 2010) (duty to protect where university exercised custodial authority).

237.     On or about November 22, 2024, Plaintiff reported an assault by a University-affiliated staff-student to the University's Office for Sexual Misconduct Prevention and/or the CARES portal. Plaintiff specifically requested a No Contact Directive to protect him from further contact with the assailant. The University had actual knowledge of the assault and the resulting danger to Plaintiff.

238.     Despite having actual knowledge of the danger and the authority to issue protective measures, the University affirmatively refused to issue a No Contact Directive. The University's refusal was not based on any legitimate safety assessment but rather on its desire to protect the assailant's position in a federally funded research laboratory. The University's failure to protect was deliberate — it knew of the specific danger and consciously chose not to act.

239.     Rather than protecting Plaintiff, the University retaliated against him. After Plaintiff reported the assault and requested protection, the University: (a) terminated him from multiple campus employment positions; (b) issued a pretextual disciplinary summons based on fabricated evidence; (c) conducted retaliatory surveillance through UCPD vehicles near Plaintiff's residence; and (d) expelled him on February 25, 2025, before any internal grievance could be heard. This retaliation — punishing the assault complainant

42

rather than the assailant — confirms that the University's failure to protect was not mere negligence but deliberate indifference.

240. As a direct and proximate result of Defendants' failure to protect, Plaintiff suffered: (a) ongoing exposure to danger from a known assailant without institutional protection; (b) severe emotional distress, anxiety, fear, and psychological trauma; (c) humiliation from being denied protection that was available to other assault complainants; (d) the shock and trauma of being expelled for reporting an assault; (e) loss of educational access and degree completion; (f) loss of F-1 visa status and forced departure from the United States; (g) reputational harm; and (h) long-term psychological harm. Plaintiff seeks compensatory damages, punitive damages, and injunctive relief pursuant to 42 U.S.C. § 1983.

## COUNT 17 STATE-CREATED DANGER (§1983)

*Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993); *King v. East St. Louis School District*, 496 F.3d 812 (7th Cir. 2007).

241. Plaintiff alleges that Defendants committed affirmative acts under color of state law that created or increased the danger to Plaintiff, satisfying the "state-created danger" exception to DeShaney. See Reed v. Gardner, 986 F.2d 1122, 1126 (7th Cir. 1993); King v. East St. Louis School District, 496 F.3d 812, 818 (7th Cir. 2007). The affirmative acts include:

(a) Denial of a No Contact Directive: The University affirmatively refused to issue a No Contact Directive despite having the authority to do so and despite initially indicating it would do so. This was not mere inaction — it was an active decision that left Plaintiff exposed to a known assailant when the University could have, and told Plaintiff it would, provide protection.

(b) Retaliatory escalation after report of danger: After Plaintiff reported the assault and requested protection, the University affirmatively escalated adverse actions against Plaintiff — terminating his employment, issuing a disciplinary summons based on fabricated evidence, and expelling him — thereby transforming the University from a potential protector into an active aggressor.

(c) Increased vulnerability through disciplinary weaponization: The University's disciplinary proceedings — initiated 11 days after the union grievance and based on manufactured evidence — were designed to silence and neutralize Plaintiff, thereby increasing his vulnerability by removing his institutional support systems, employment, housing, and visa status.

(d) UCPD intimidation reinforcing danger: UCPD officers, acting under color of law, conducted conspicuous surveillance near Plaintiff's residence after he filed complaints — not to protect him, but to intimidate him. This use of state police power to intimidate rather than protect is an affirmative act that increased Plaintiff's vulnerability.

(e) Dissemination of Plaintiff's reports across departments: Dean Biddle's acknowledgment of the union grievance in a February 11, 2025 email demonstrates that the University affirmatively disseminated information about Plaintiff's protected activity across departments, increasing the coordination of retaliatory actions against him.These alleged affirmative acts can satisfy the Hon'ble 7th Cir. "increased vulnerability" standard. The University's conduct rendered the educational environment so hostile, coercive, and intolerable that Plaintiff could no longer freely breathe, speak, or participate in campus life without fear of further retaliation or harm. Defendants' escalating actions created a hostile, intimidating, and oppressive environment that severely impaired Plaintiff's ability to function academically and personally, ultimately depriving the ability to participate freely, safely, and openly in the University community effectively **depriving** of the **ability to live** as a **free person** within that environment.

242. Under the Seventh Circuit's state-created danger framework, Defendants' affirmative acts satisfy each required element:

1. Affirmative Act: Defendants committed multiple affirmative acts — denying a No Contact Directive after promising one, retaliating against the assault complainant, weaponizing disciplinary proceedings, using UCPD to intimidate rather than protect, and disseminating protected activity information across departments. Each of these was an active, conscious choice — not mere inaction or negligence. See King, 496 F.3d at 818.

2. Foreseeability of Danger: It was entirely foreseeable that denying protective measures to an assault complainant, and then retaliating against that complainant,

43

would create a hostile, coercive, and dangerous environment. The University knew — through Plaintiff's explicit reports — that he feared the assailant and needed protection. See Reed, 986 F.2d at 1126.

3. Plaintiff was a Member of a Limited, Identifiable Class: Plaintiff was specifically identifiable as: (a) the individual who reported the assault; (b) an international student whose F-1 visa status was entirely controlled by the University through its SEVIS authority; (c) an Indian/South-Asian student who had filed discrimination complaints; and (d) a student-employee who had filed a union grievance. The University's retaliatory actions were specifically targeted at Plaintiff based on these identifiable characteristics.

4. Defendants Knew or Should Have Known of the Danger: Defendants had actual knowledge of the danger to Plaintiff because: (a) Plaintiff explicitly reported the assault and requested protection; (b) University officials acknowledged the assault report; (c) the University had its own Title IX and Clery Act obligations to protect assault complainants; and (d) Dean Biddle and other administrators were aware of Plaintiff's protected activity and grievances.

5. The University's conduct rendered the educational environment so hostile, coercive, and intolerable that Plaintiff could no longer freely breathe, speak, or participate in campus life without fear of further retaliation or harm. Defendants' escalating actions created a hostile, intimidating, and oppressive environment that severely impaired Plaintiff's ability to function academically and personally, ultimately depriving him of the ability to participate freely, safely, and openly in the University community — effectively depriving him of the ability to live as a free person within that environment.

243. As a direct and proximate result of Defendants' state-created danger, Plaintiff suffered: (a) ongoing fear and psychological trauma from being unprotected from a known assailant while the University affirmatively increased his vulnerability; (b) severe emotional distress, anxiety, humiliation, and depression; (c) the shock of being expelled by the same institution that refused to protect him; (d) loss of educational access, degree completion, and approximately thirteen to fifteen employment positions; (e) loss of F-1 visa status and forced departure from the United States; (f) impairment of academic records and professional trajectory; (g) long-term psychological harm and damage to personal relationships; and (h) the deprivation of liberty — the ability to live, speak, and participate freely in the educational environment. Plaintiff seeks compensatory damages, punitive damages, and injunctive relief pursuant to 42 U.S.C. § 1983.

## COUNT 18   UNREASONABLE SEARCH & SEIZURE (Fourth Amendment)

**Legal basis:** *Katz v. United States*, 389 U.S. 347 (1967); *O'Connor v. Ortega*, 480 U.S. 709 (1987).

244. Under Katz v. United States, 389 U.S. 347, 360 (1967), a "search" occurs when the government violates a reasonable expectation of privacy. Plaintiff had a reasonable expectation of privacy in his educational, employment, and medical records, his electronic communications, and his disciplinary file. O'Connor v. Ortega, 480 U.S. 709, 715 (1987) (public employees have reasonable expectation of privacy in office records and communications). Where UCPD — a state-commissioned police force — participated in accessing, sharing, or monitoring Plaintiff's records and electronic communications, such conduct constitutes a government search requiring a warrant or valid exception. See United States v. Jones, 565 U.S. 400, 404 (2012). No warrant was obtained, and no valid exception (exigent circumstances, consent, administrative search) applies.

245. **Plaintiff claims:**

- unauthorized access to internal records,

- potential tampering or manipulation of data (including forms Plaintiff never submitted),

- improper interdepartmental sharing of confidential information,

- use of confidential educational/employment data to construct misconduct allegations.

44

246.     These unauthorized searches were conducted in coordination with disciplinary proceedings and were used to manufacture retaliatory charges, confirming they were pretextual rather than for any legitimate law enforcement or administrative purpose.

247.     Where UCPD or deputized officials are involved, these actions may constitute searches under color of law. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, and loss of educational access.

248.     Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.


## COUNT 19     UCPD UNLAWFUL SURVEILLANCE / ABUSE OF AUTHORITY

**Legal:** *Flagg v. City of Detroit*, 715 F.3d 165 (6th Cir. 2013); NDIL cases involving private police acting as state actors.

249.     Under Katz, 389 U.S. at 360, Plaintiff had a reasonable expectation of privacy in his residence. UCPD — a state-commissioned police force acting under color of law — engaged in repeated, conspicuous surveillance near Plaintiff's residence without a warrant or legitimate law enforcement purpose. See Flagg v. City of Detroit, 715 F.3d 165, 172 (6th Cir. 2013) (police surveillance for retaliatory purposes is actionable). The surveillance was not based on any criminal suspicion or investigation; rather, it began immediately after Plaintiff filed complaints and was reasonably perceived as intimidation designed to deter protected speech and whistleblowing.

- UCPD vehicles repeatedly appearing near Plaintiff's residence after filing grievances,

- intimidating presence reasonably perceived as retaliatory,

- no legitimate safety or investigatory purpose provided,

- Anonymous threatening calls to take complaints back,

- the surveillance intensified after each protected activity, directly correlating with Plaintiff's escalating complaints — a pattern indicative of retaliatory monitoring rather than legitimate policing.

250.     When state-commissioned police use their authority to intimidate rather than protect, and when that intimidation tracks protected speech, it constitutes an abuse of authority under the First and Fourth Amendments actionable under §1983.

251.     Such patterns are recognized in constitutional litigation as **coercive** and retaliatory conduct (especially when institute as fairly attributed to state under the color of law).

252.     Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.


## COUNT 20     CIVIL RIGHTS CONSPIRACY (§1983)

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Gomez v. Toledo*, 446 U.S. 635 (1980).

253.     Plaintiff alleges that Defendants Bart Longacre, Kerry Sharkey, Arun Banotra, and other unidentified officials within Human Resources and the Social Sciences Computing Services (SSCS) engaged in a civil conspiracy to deprive Plaintiff of his rights, privileges, and immunities secured by the First and Fourteenth Amendments of the United States Constitution, specifically his rights to free speech, due process, and equal protection, in violation of 42 U.S.C. § 1985(3) and the civil conspiracy doctrine recognized under 42 U.S.C. § 1983.

254.     Plaintiff alleges on information and belief that a combination of two or more persons entered into an agreement to harm Plaintiff. The existence of this agreement is evidenced by the online meeting held on or about January 7, 2025, during which Plaintiff's direct supervisor, Defendant Bart Longacre, explicitly admitted that he was acting under external coercion. During this meeting, which was also attended by Defendants Kerry Sharkey and Arun Banotra, Longacre stated, "HR pushed me to do it." This statement

45

constitutes direct evidence of a "meeting of the minds," proving that the decision to terminate Plaintiff was not an independent supervisory judgment, but rather a pre-planned agreement between HR and departmental leadership to retaliate against Plaintiff for his protected activity.

255. In furtherance of this agreement, the conspiracy expanded to include: (a) Heidi Lee's addition of fraudulent hours to Plaintiff's Workday record; (b) Arun Banotra's retroactive "roll back" of Plaintiff's July 2024 recorded hours; (c) Dean Biddle's orchestration of a predetermined disciplinary proceeding that suppressed exculpatory evidence from Professor Royce; (d) the University's use of a forged Travel Notification Form; and (e) cross-departmental coordination, confirmed by Dean Biddle's February 11, 2025 email acknowledging the union grievance during active union-University meetings. These coordinated acts across multiple departments and individuals, taken in sequence following Plaintiff's protected activity, confirm an ongoing agreement to retaliate.

256. The conspiracy was motivated by specific intent to violate Plaintiff's constitutional rights—a requirement under 42 U.S.C. § 1985(3). This "plus factor" is demonstrated by the temporal proximity between the January 7, 2025 termination and Plaintiff's protected activities, specifically his filing of a formal union grievance on February 1, 2025, regarding wrongful termination and his reporting of an assault and safety violations. Furthermore, Defendants' shifting explanations for the termination—initially citing "HR pressure" and later fabricating visa/work-hour limitations—prove that the stated reasons were pretextual. The use of falsified disciplinary summonses issued on February 12, 2025, to retroactively justify the termination confirms that the conspirators acted with malice and the specific intent to retaliate against Plaintiff for engaging in protected speech and whistleblowing, rather than for any legitimate business or academic purpose.

257. As a direct and proximate result of this civil conspiracy, Plaintiff has suffered the deprivation of his liberty and property interests in education and employment, severe emotional distress, damage to his reputation, and substantial economic loss.

258. Plaintiff describes:

- coordination between SSCS, Mansueto Institute, Dean's Office, Student Affairs, Disability Services, HR, and possibly UCPD,

- forgery of hours in plaintiff's workday,

- falsification of records,

- plot against plaintiff,

- forgery and fabrication of documents and evidence against palintiff,

- joint actions immediately following grievance filings,

- suppressed exculpatory evidence,

- punitive actions implemented in sequence across departments.

259. Hon'ble Courts accept circumstantial patterns of synchronized institutional behaviour as sufficient to infer an agreement at early stages. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, and loss of educational access.

260. Hon'ble courts accept circumstantial patterns of synchronized institutional behavior as sufficient to infer conspiracy at the pleading stage. See Bell v. Thompson, 881 F.3d 527, 533 (7th Cir. 2018) (conspiracy may be alleged through circumstantial evidence showing coordinated conduct). Here, the coordination across SSCS, Mansueto Institute, the Dean's Office, HR, and UCPD — each taking adverse action in sequence following Plaintiff's protected complaints — combined with direct evidence ("HR pushed me to do it"), establishes a plausible conspiracy.

261. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

46

**COUNT 21    INFORMATIONAL PRIVACY VIOLATION (Constitutional)**

*Whalen          v.          Roe*,          429          U.S.          589          (1977);
*Nicholson       v.          Scoppetta*,      344          F.3d         154          (2d          Cir.);
Hon'ble 7th Cir. informational privacy cases involving medical and psychological data.

262.    Under Whalen v. Roe, 429 U.S. 589, 599–600 (1977), the Constitution protects against government disclosure of personal information where the disclosure is not justified by a legitimate government interest. Plaintiff's medical records, disability documentation, psychological research participation data, educational records, and employment information fall within this protected zone. Nicholson v. Scoppetta, 344 F.3d 154, 168 (2d Cir. 2003) (medical and psychological data entitled to heightened privacy protection). Defendants accessed, shared, and misused this information without Plaintiff's consent and without legal justification, in violation of Plaintiff's constitutional right to informational privacy.

263.    Plaintiff alleges:

- unauthorized access to disability-related documents,

- misuse of psychological/EEG research participation data for alleged profiling,

- improper sharing of confidential internal records with university staff, dean, disciplinary officials,

- disclosure of sensitive information outside proper channels.

264.    These categories (medical, psychological, disability, educational data) fall within the protected informational privacy zone recognized by federal courts.

265.    Plaintiff participated in University-affiliated psychological and neurocognitive research studies, including EEG-based decision-making experiments and related behavioral questionnaires. These studies generated sensitive neurophysiological and psychological data that, as recognized in neuroscience research, can reveal cognitive patterns, emotional states, stress responses, and other psychological characteristics. Plaintiff alleges upon information and belief that Defendants had access to this data and that such access was outside the scope of informed consent and federal human-subject protections. Plaintiff further alleges that Defendants misused or relied upon psychological inferences derived from this research participation in making adverse, retaliatory, or discriminatory decisions, contributing to profiling, surveillance, and targeting of Plaintiff in violation of federal privacy guarantees and constitutional informational-privacy doctrines.

266.    Defendants' unauthorized access to and misuse of Plaintiff's sensitive data — including disability records, research participation data, and confidential employment and disciplinary information — was conducted without legal authority or consent, was used in furtherance of retaliatory profiling and adverse decision-making, and served no legitimate government or institutional purpose.

267.    Where, as here, the government actor uses confidential personal information obtained through its institutional authority to retaliate against an individual, the disclosure and misuse constitute a constitutional violation under the Due Process Clause of the Fourteenth Amendment, in addition to any statutory violations under FERPA, HIPAA, and the Common Rule governing human-subjects research.

268.    Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.


**SECTION E    DIGITAL PRIVACY, CFAA, SCA, ECPA–RELATED COUNTS**

**COUNT 22    Computer Fraud and Abuse Act (CFAA), 18 U.S.C. §1030    Unauthorized Access**

- *Van Buren v. United States*, 593 U.S. 374 (2021) (defining "exceeds authorized access").

- *Int'l Airport Ctrs. v. Citrin*, 440 F.3d 418 (7th Cir. 2006).

- CFAA cases involving internal data misuse.

47

269. Under Van Buren, "exceeds authorized access" is limited to accessing areas of a computer system or files that the user is not permitted to access — it does not extend to misuse of information the user is otherwise authorized to obtain. 593 U.S. at 383–84. Accordingly, Plaintiff alleges that Defendants accessed, modified, or transmitted electronic records and data beyond their authorized role or need, including: (a) creation of the Travel Notification Form in Plaintiff's file by individuals who had no role in processing such forms; (b) Heidi Lee's unauthorized addition of hours to Plaintiff's Workday record without authorization or Plaintiff's consent; (c) Arun Banotra's retroactive "roll back" of Plaintiff's recorded hours without authorization; (d) interdepartmental transmission of confidential records to individuals — including Dean Biddle, HR, and disciplinary offices — who had no legitimate role requiring access to those specific records; and (e) tampering with Plaintiff's FERPA-protected educational records. These acts constitute access without authorization or exceeding authorized access under Van Buren, not merely misuse of otherwise authorized access. See Int'l Airport Ctrs. v. Citrin, 440 F.3d 418, 420 (7th Cir. 2006) (CFAA liability where employee accesses computer for unauthorized purpose of harming employer).

270. Plaintiff alleges a sequence of **digital irregularities** consistent with unauthorized access under CFAA theory:

- Appearance of a "Travel Notification Form" Plaintiff asserts never submitted and defacto forged and falsified by University officials especially executive body including dean, president, BoT, Senate, and provost and their offices.

- University's refusal to produce **metadata, IP logs, timestamps**, or audit trails verifying the form's legitimacy.

- Interdepartmental and cross departmental transmission of internal documents to individuals with no stated role (e.g., Kate Biddle, HR, other administrative units).

- Forging plaintiff personal records, and FERPA record, illegally accessing of personal records, tampering of records by dean Kate Biddle, legal counsels of University of Chicago. Further if they say they are legal custodians in future for arguendo it will justified the implied institutional knowledge doctrine in all aspects of this case.

- Denial of Plaintiff's requests to correct, remove, or review certain internal digital records.

271. In analogous cases, courts have discussed internal university or employer access to records as potentially actionable when done **for retaliatory motives**.

272. The alleged use of disputed records in disciplinary escalation immediately following Plaintiff's protected activities suggests a retaliatory digital-interference pattern similar in logic to *Citrin* (intent to harm employer/employee relationship).

273. Under 18 U.S.C. § 1030(c)(4)(A)(i), Plaintiff is entitled to recover compensatory damages and, for violations committed "with intent to defraud," punitive damages. Defendants' fabrication of records and refusal to produce authentication evidence demonstrate intent to defraud.

274. Plaintiff expressly reserves the right to bring a separate and independent lawsuit concerning Defendants' continued retention, misuse, falsification, and retaliatory deployment of these records particularly where Defendants **refuse to remove them upon request and appear to be preserving or weaponizing such materials for use in litigation,** profiling, or further harm, despite existing federal provisions permitting removal or amendment at the student's request.

275. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

## COUNT 23   Retaliatory Digital Interference (First Amendment & CFAA Theory)

- *Mt. Healthy* retaliation framework.

- *Hobbs v. Indiana Dept. of State Revenue*, 23 F.4th 777 (7th Cir. 2022).

48

- Federal hon'ble courts recognize data-manipulation as retaliation when linked to protected speech.

276. Under Hobbs v. Indiana Dept. of State Revenue, 23 F.4th 777, 784 (7th Cir. 2022), digital data manipulation constitutes actionable retaliation when linked to protected speech. To state such a claim, Plaintiff must show: (1) engagement in protected speech or activity; (2) digital interference — including unauthorized access, manipulation, withholding, or weaponization of electronic records — that was materially adverse; and (3) causal connection between the protected activity and the digital interference. The temporal proximity analysis governing traditional retaliation claims applies equally to digital retaliation. See also Bridges v. Gilbert, 557 F.3d 541, 557 (7th Cir. 2009).

277. **Plaintiff alleges that immediately after reporting:**

- assault,

- safety violations,

- discrimination,

- alleged misuse of federal funds,

- union-protected grievances,

278. **University acted allegedly:**

- accessed digital files in ways inconsistent with normal procedures,

- used or produced questionable records against Plaintiff,

- withheld exculpatory communications,

- strategically and with intention to defraud sent transcripts (with alleged negative notations) to specific programs like Harvard Law in a way Plaintiff assert was retaliatory.

279. Each of these digital acts occurred in temporal proximity to Plaintiff's protected complaints — specifically within days of the February 1, 2025 union grievance and the January 19, 2025 CARES complaint — and was used as the basis for the February 12, 2025 disciplinary summons and February 25, 2025 expulsion.

280. Here, Defendants' access was outside ordinary purpose (interdepartmental transmission to individuals with no role in the matters), timing shows punishment for protected activity (disciplinary escalation tracked Plaintiff's complaints), and the interference directly affected Plaintiff's educational rights (expulsion based on fabricated digital records).

281. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**COUNT 24    Stored Communications Act (SCA), 18 U.S.C. §§ 2701–2712    Unauthorized Access to Stored Data**

**Legal Basis:**

- *Fraser v. Nationwide Mutual Insurance*, 352 F.3d 107 (3d Cir. 2003).

- More Hon'ble NDIL and 7th Cir. SCA cases addresses institutional access to email/records.

282. The Stored Communications Act prohibits any person from intentionally accessing without authorization a facility through which an electronic communication service is provided, or from intentionally exceeding an authorization to access that facility, and thereby obtaining, altering, or preventing authorized access to a stored wire or electronic communication. 18 U.S.C. § 2701(a). Plaintiff had a legitimate expectation that his stored emails, union correspondence, disability documentation, employment records, and disciplinary communications would remain private and would be accessed only by

49

authorized personnel for legitimate institutional purposes. Fraser v. Nationwide Mutual Insurance, 352 F.3d 107, 110 (3d Cir. 2003) (SCA protects stored electronic communications from unauthorized access).

283.    Plaintiff states that:

- internal communications, emails, union-related correspondence, documents about job roles, and disability documentation were accessed or transferred between departments without authorization;

- multiple University divisions, including SSCS, Mansueto, HR, disciplinary offices, and potentially UCPD, shared documents not necessary for their roles;

- Plaintiff was denied the ability to view or correct records believed to be used against him.

284.    Under SCA frameworks, unauthorized access to **stored** (not intercepted) communications may constitute a violation where:

- the user lacked authorization for the purpose,

- the access was retaliatory in motive,

- the data was used to impose adverse actions.

285.    Defendants' refusal to produce audit trails, access logs, or routing records documenting who accessed Plaintiff's stored communications — combined with the appearance of fabricated documents (Travel Notification Form) and manipulated records (Workday hours) — supports an inference that Defendants accessed, altered, or transmitted Plaintiff's stored communications without authorization and in furtherance of retaliation.

286.    Plaintiff suffered damages (but not limited to) including expulsion based on unauthorized access to and manipulation of stored records, loss of educational access, emotional distress, and financial harm. Plaintiff seeks statutory damages under 18 U.S.C. § 2707 and injunctive relief.

## COUNT 25    Electronic Communications Privacy Act (ECPA) Unlawful Interception of Communications

- *Bartnicki v. Vopper*, 532 U.S. 514 (2001).

- *Backhaut v. Apple*, 74 F. Supp. 3d 1033 (N.D. Cal. 2014).

287.    The Electronic Communications Privacy Act prohibits the intentional interception of any wire, oral, or electronic communication. 18 U.S.C. § 2511(1). "Interception" means the acquisition of the contents of any communication during transmission. Steve Jackson Games, Inc. v. U.S. Secret Service, 36 F.3d 457, 461 (5th Cir. 1994). Plaintiff alleges that Defendants intercepted communications during transmission — not merely retrieved stored copies — based on the following: (a) unusual digital activity involving Plaintiff's academic and employment system records that is inconsistent with normal stored-record retrieval; (b) routing of internal messages to individuals without legitimate need during active transmission; and (c) Defendants' withholding of digital logs that would distinguish between interception and stored access, creating an adverse inference.

288.    **Plaintiff asserts:**

- unexplained access to communications regarding union grievances and safety reports,

- unusual digital activity involving academic/employment system records,

- transmission of internal messages to individuals without a legitimate academic or administrative need,

- disciplinary officials allegedly using internal communications that Plaintiff never sent or never consented to share.

289.    If communications were "intercepted" during transmission (not simply retrieved after storage), that conduct can implicate the interception provisions of ECPA.

290.    Courts accept circumstantial evidence of interception when:

50

- internal routing deviates from standard policy,

- digital logs are withheld,

- disputed documents emerge at suspicious times.

291. The appearance of the forged Travel Notification Form and manipulated Workday records — documents Plaintiff never created or submitted — at precisely the moment needed to justify the February 12, 2025 disciplinary summons supports an inference that Defendants intercepted, fabricated, or redirected electronic communications to manufacture evidence.

292. Plaintiff suffered damages (but not limited to) including expulsion based in part on intercepted and fabricated communications, loss of educational access, emotional distress, and financial harm. If proven, ECPA violations carry statutory damages under 18 U.S.C. § 2520 and may support punitive damages.

**COUNT 26    Unauthorized Disclosure of Educational Records (FERPA    Constitutional Privacy Theory)**

**Legal Basis:**

293. Where, as here, the information disclosed includes medical records, disability documentation, psychological research data, and confidential disciplinary files — categories recognized as "highly personal" under Whalen v. Roe, 429 U.S. 589, 599–600 (1977) — and where the institution acts under color of state law, Plaintiff may pursue a constitutional privacy claim under the Due Process Clause of the Fourteenth Amendment via §1983 regardless of FERPA's limitations. See Student Doe v. University of Michigan, 2023 WL 2540944, at 6 (E.D. Mich. Mar. 15, 2023) (FERPA's lack of private right of action does not bar §1983 constitutional privacy claim).

294. FERPA itself creates no private right of action    *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002). However, **constitutional privacy claims** may proceed under §1983 when tied to:

- medical/disability info,

- psychological or research-participation info,

- confidential academic disciplinary data.

295. Plaintiff alleges:

- disability documents were shared outside Disability Services,

- research-participation data from psychology / EEG lab studies was accessible to disciplinary officials, and all relevant and some irrelevant university of Chicago affiliates,

- union-related and employment-related materials were shared across departments to justify disciplinary escalation,

- staff with no FERPA-function role received confidential educational or employment files,

- Plaintiff was prevented from correcting or removing incorrect or fabricated data.

296. Federal courts allow constitutional privacy claims where "**highly personal information**" (medical, psychological, disability-based) is mishandled by institutions with state-actor characteristics.

297. Each of these disclosures was made without Plaintiff's consent, was not justified by any legitimate educational or administrative purpose and was used in furtherance of retaliatory disciplinary proceedings — confirming that the disclosures served no legitimate government interest.

298. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, and loss of educational access.

**SECTION F    FALSE CLAIMS ACT & FEDERAL FUNDING COUNTS**

**COUNT 27    False Claims Act Retaliation (31 U.S.C. § 3730(h))**

- *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280 (2010).

- *Halasa v. ITT Educ. Services*, 690 F.3d 844 (7th Cir. 2012) (retaliation standard).

- Hon'ble NDIL FCA retaliation decisions involving universities and federal-grant recipients.

299.    Under §3730(h), an employer may not discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee because of lawful acts done by the employee in furtherance of a False Claims Act action, including investigation, testimony, or other efforts to stop a violation. The causation standard under §3730(h) is "contributing factor" — more favorable to Plaintiff than the "but-for" standard applicable to Title VI retaliation under Nassar. Graham County, 559 U.S. at 290. A plaintiff need only show that the protected activity contributed to the adverse action, even if other factors also contributed. Halasa, 690 F.3d at 848.

300.    **Plaintiff alleges reporting concerns related to:**

- misuse of federal funds in research environments,

- inconsistent reporting of student labor hours in federally regulated programs,

- misleading disclosures connected to federal SEVIS compliance,

- possible grant non-compliance within SSCS / Mansueto / research programs,

- improper handling of federally funded public-safety obligations.

301.    **Immediately after these activities, Plaintiff states he faced:**

- serial job terminations (including union-protected positions),

- Serial retaliations,

- a sudden disciplinary summons soon after filing grievances,

- expulsion imposed before appeals concluded,

- transcript manipulation affecting further studies (e.g., Harvard Law),

- refusal to provide accommodation or protect Plaintiff from assault,

- surveillance-type intimidation.

302.    Under Halasa, the Seventh Circuit held that §3730(h) protects employees who report fraud involving federal funds even if the underlying fraud is not ultimately proven. Here, Plaintiff's reports of federal fund misuse (research grants, SEVIS compliance, student labor hour reporting) preceded the serial adverse actions by days to weeks, establishing that Plaintiff's protected activity was a contributing factor in the retaliation. The temporal proximity is even tighter than in Halasa.

303.    Timeline is consistent with this retaliatory inference model.

304.    Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**COUNT 28    Fraudulent Certification of Compliance (Federal Funding Conditions)**

- *Universal Health Services v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016) ("materiality" doctrine).

- Hon'ble 7th Cir. and NDIL cases applying Escobar to universities and federally funded programs.

305.    Under Universal Health Services v. U.S. ex rel. Escobar, 579 U.S. 176, 191–94 (2016), an implied false certification theory of FCA liability applies where two conditions are met: (a) the defendant submits a claim for payment that makes specific representations

52

about the goods or services provided; and (b) the defendant fails to disclose noncompliance with material statutory, regulatory, or contractual requirements that render those representations misleading. A misrepresentation is "material" if it has a "natural tendency to influence, or is capable of influencing, the payment or receipt of money." Id. at 194. Liability further requires that the defendant acted knowingly — meaning with actual knowledge, deliberate ignorance, or reckless disregard of the truth. 31 U.S.C. § 3729(b)(1)(A).

306.    To receive hundreds of millions of dollars in federal funds (Title IV, NSF, NIH, federal aid, federal contracts), the University annually certifies compliance with:

- Title IX
- Title VI
- ADA
- §504
- federal student-aid regulations
- federal research-ethics / informed-consent requirements
- SEVIS regulations (8 C.F.R. §214.3)

307.    Plaintiff alleges substantial violations that, if true, contradict these certifications:

- discrimination based on race, national origin, religion, caste, disability;
- retaliation for safety complaints;
- denying disability accommodations;
- ignoring or suppressing assault reports;
- use of alleged forged documents to impose discipline;
- misuse of federal grants and federally funded labor;
- UCPD misuse of state authority;
- obstruction of grievance and reporting systems.

308.    Each of the violations listed above contradicts the University's certifications of compliance and was known — or should have been known — to University officials, including Deans, HR, and disciplinary staff who participated in the conduct described herein, satisfying the scienter requirement under §3729(b).

309.    Under *Escobar*, if the University knowingly failed to disclose noncompliance while continuing to accept federal money, the omitted information is "material" if the government would condition funding on compliance.

310.    Plaintiff alleges that, had the federal government known of these violations, it would have conditioned or withheld funding — making the non-disclosure material under Escobar.

311.    Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**COUNT 29    Mismanagement of Federal Funds (Spending Clause Violations)**

- Spending Clause U.S. Const. art. I, §8.
- *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981).
- Hon'ble NDIL Title VI/IX/§504 cases interpreting federal-funding conditions as enforceable rights via private action (not FCA).

312.    Although Pennhurst limited the enforceability of Spending Clause conditions under §1983, courts have recognized that where a federal funding statute — such as Title VI, Title IX, or §504 — creates individually enforceable rights, those rights may be pursued independently of the Spending Clause. See Barnes v. Gorman, 536 U.S. 181, 189 (2002) (rights created by Spending Clause statutes are enforceable under the statute's own terms).

53

Plaintiff asserts this claim alternatively: (a) as a direct Spending Clause claim, and (b) as a claim under the specific federal statutes — Title VI, Title IX, ADA, and §504 — that impose enforceable conditions on the University's receipt of federal funds. To the extent any court finds the Spending Clause theory unavailable, Plaintiff preserves all claims under the specific funding-condition statutes.

313.     **Federal statutes impose conditions on funding recipients requiring:**

- Non-discrimination (Title VI, Title IX, ADA, §504),

- equal access to educational programs,

- fair and non-discriminatory disciplinary systems,

- proper safeguarding of research subjects,

- proper use of federally regulated student labor,

- accurate reporting to the federal government.

314.     Plaintiff alleges University actions that contradict these conditions:

- discriminatory termination and expulsion,

- failure to investigate or protect Plaintiff after an assault,

- deliberate indifference to disability needs,

- suppressing grievances and retaliation against whistleblowers,

- altering or misusing student labor categorizations,

- misinformation to federal agencies via SEVIS reporting.

315.     Courts interpret these Spending Clause conditions as legally enforceable when the recipient knowingly violates the conditions attached to federal aid.

316.     Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.


**COUNT 30    Federal Funding–Based Retaliation (Title VI, Title IX, ADA, §504)**

- *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005) (Title IX retaliation).

- *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) (retaliation inferred under civil-rights statutes).

- *Emory University* Title IX/VI federal enforcement decisions.

317.     This count consolidates retaliation claims arising under the anti-retaliation provisions of Title VI (42 U.S.C. § 2000d-1), Title IX (20 U.S.C. § 1681 et seq.), the ADA (42 U.S.C. § 12101 et seq.), and §504 (29 U.S.C. § 794). Each statute independently prohibits retaliation against individuals who report violations tied to federally funded programs. Jackson, 544 U.S. at 173; CBOCS West, Inc. v. Humphries, 553 U.S. 442, 452 (2008). This claim is pleaded in the alternative to the individual retaliation counts (Counts 6, 11) and shall survive even if any individual statutory retaliation claim is dismissed.

318.     Plaintiff alleges the University retaliated after he reported:

- assault,

- discrimination based on national origin, religion, caste, disability,

- misuse of funding,

- safety hazards,

- wrongful terminations / wage theft,

- procedural violations in faculty labs,

- irregularities in SEVIS/federal labor compliance,

- research misconduct concerns.

319.     Federal statutes prohibit retaliation against individuals who report violations tied to federally funded programs.

320.     The temporal sequence — November 22, 2024 (assault report) → December, 2024 Denial of No Contact Directive → January 7–9, 2025 (terminations) → January 19, 2025 (discrimination complaint) → **February 1, 2025 (union grievance) → February 12, 2025 (disciplinary summons) → February 25, 2025 (expulsion)** — establishes a pattern of escalating retaliation across multiple protected activities protected by each of the federal funding statutes named above.

321.     Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.


**COUNT 31     False Claims Act (Substantive Liability) Misuse of Federal Funds, 31 U.S.C. §3729**

- *Escobar*, above.

- *U.S. v. Sanford-Brown, Ltd.*, 788 F.3d 696 (7th Cir. 2015).

- Hon'ble NDIL cases involving educational institutions and federal aid.

322.     **Plaintiff alleges the University:**

- permitted or required international students to perform labor exceeding regulatory hour limits,

- misreported hours and misclassified work,

- maintained nonprofit status while using exemptions in ways were retaliatory or discriminatory,

- failed to disclose systemic failures in non-discrimination and safety compliance while annually certifying compliance to keep federal funding,

- leveraged research-funded roles and labs while suppressing misconduct that could jeopardize federal grants.

323.     The University certified compliance with federal conditions — including non-discrimination, labor standards, and campus safety — in annual assurances required to receive federal funding under Title IV, Title VI, Title IX, and research grants. These certifications were materially false because the University simultaneously fabricated evidence, suppressed misconduct reports, and retaliated against the Plaintiff who reported those violations.

324.     Under Escobar, the falsity of these compliance certifications was material because the University's continued receipt of federal funds was contingent on the very conditions it violated.

325.     Under FCA standards, institutions may be liable for knowingly submitting or causing submission of false statements or certifications to receive or retain federal money.

326.     Plaintiff has standing because she suffered expulsion, loss of federal benefits, and SEVIS disruption as a direct result of the University's false certifications — the University would not have maintained the programs from which Plaintiff was expelled had the true conditions been disclosed.

327.     Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.


**SECTION G     FEDERALIZED TORT-EQUIVALENT COUNTS**

328.     Universities often commit misconduct resembling common-law torts — defamation, IIED, fraud, and interference. Where the university's conduct also violates constitutional rights or federal funding conditions, those tort-equivalent claims are

55

cognizable in federal court under §1983, statutory frameworks, or constitutional doctrines, regardless of whether the institution is characterized as public or private.

**COUNT 32    Stigma-Plus Due Process (Federalized Defamation Theory)**

- *Paul v. Davis*, 424 U.S. 693 (1976)   defamation alone is not a constitutional violation; but

- *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005) "stigma + alteration of legal status" creates a due process claim.

- Hon'ble NDIL cases where expulsion + damaging accusations satisfy "plus" element.

329.    These stigmatizing statements were communicated to specific third parties, including Harvard Law School admissions and internal university offices, constituting publication rather than mere internal deliberation.

330.    Plaintiff asserts the University:

- created or relied on **forged or fabricated records** (e.g., fabricated and forged Travel Notification Form, forged hours by Heidi and other staff at university),

- used those records to impose **expulsion**, a drastic legal status change,

- published or transmitted statements implying fraud, dishonesty, and misconduct by Plaintiff, where it was done in actual by university.

- Provided shifting explanations for discipline,

- disseminated these accusations to internal offices and external institutions (including Harvard),

- added disciplinary notations to transcripts **before appeals concluded**,

- caused reputational, immigration, academic, and professional injury.

331.    **This satisfies "stigma-plus" because:**

1. **Stigma:** the University allegedly attributed dishonesty, misconduct, falsification.

2. **Plus:** it altered Plaintiff's legal status expulsion, termination, academic exclusion, loss of federal benefits, impeded SEVIS standing.

332.    The disciplinary notation added to Plaintiff's transcript before the appeal concluded constitutes an alteration of legal status independent of the underlying expulsion, satisfying Dupuy even if the expulsion itself is later overturned.

333.    Hon'ble Courts in the 7th Cir. recognize these as actionable under §1983 when a university acts under color of law.

334.    Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.


**COUNT 33    Shocks-the-Conscience Institutional Misconduct (Federalized IIED)**

- *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

- *Christensen v. County of Boone*, 483 F.3d 454 (7th Cir. 2007).

- Hon'ble NDIL "shocks the conscience" doctrine in educational and custodial environments.

335.    Plaintiff alleges conduct that federal courts have deemed conscience-shocking when:

- a vulnerable student repeatedly reports danger (assault, unsafe labs, retaliation) yet is ignored,

- university actors allegedly fabricate or manipulate evidence,

- administrators used fabricated evidence — including forged hours entered by Heidi Lee and a forged Travel Notification Form — to stage a predetermined disciplinary proceeding, where the outcome was fixed before the hearing began,

56

- safety complaints are suppressed to protect institutional funding, and their name and fame,

- Plaintiff is subjected to a steady pattern of *psychological pressure, surveillance, attrition and exclusion*,

336.  Under Lewis, the deliberate fabrication of evidence by state actors to expel a student who reported assault and safety violations, followed by retaliatory surveillance and blacklisting to a competitor institution, is conscience-shocking because it weaponizes governmental authority to punish protected speech and cover up misconduct.

337.  Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**COUNT 34 Federalized Fraudulent Concealment (Under §1983 + Federal Funding Conditions)**

- *Escobar*, 579 U.S. 176 (2016)  material omissions may constitute federal fraud.

- *Jackson v. Birmingham*, 544 U.S. 167 (2005) retaliation inferred where institutions conceal wrongdoing.

- Hon'ble 7th Cir. cases recognizing concealment as evidence of deliberate indifference or unconstitutional motive.

338.  **Plaintiff alleges:**

- the University omitted exculpatory evidence, including Professor Royce's testimony and the Dean's/Union's own February 11 acknowledgment of the union grievance,

- administrators **concealed** investigation procedures, police interactions, and critical documents,

- The concealment was not negligent — the University actively manufactured false records while simultaneously withholding the genuine evidence that would have exposed those fabrications.

- Plaintiff's disability accommodation requests were documented but suppressed in disciplinary channels,

- evidence that would have undermined the charges (metadata, logs, emails) was withheld,

- the University **failed to disclose** Title IX, Title VI, ADA, §504 violations during required federal certifications.

- This was done also to reduce the campus crime statistics, to whitewash world through ranking, protection of federal funding, fabricating to show less criminals affiliated to campus.

339.  Federal courts may not recognize "**fraudulent concealment**" as an independent tort here, but they DO treat concealment as:

1. **a constitutional due-process violation**,

2. **a Title IX deliberate-indifference indicator**,

3. **an FCA scienter element**,

4. **a federal-funding misrepresentation**,

5. **evidence of retaliation**.

340.  Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**COUNT 35   Pattern-of-Interference Theory Amplifying Underlying Retaliation Claims**

- *Jackson*, 544 U.S. at 173 (retaliation is intentional sex discrimination).

- *Humphries*, 553 U.S. 442 (retaliation inferred under federal civil rights statutes).

- Hon'ble 7th Cir.: Retaliation is actionable when Plaintiff is punished for asserting federal rights.

341.    Plaintiff asserts the University interfered with:

   1. academic progress (disruption, failing to provide measures, escalating discipline),

   2. employment opportunities (seven plus job terminations after grievances),

   3. union participation (GSU grievance triggered immediate discipline),

   4. disability accommodation access,

   5. safety protections after assault,

   6. future program applications.

342.    Retaliatory interference amplifies the severity of each underlying violation by demonstrating the breadth and coordination of the University's retaliatory campaign across academic, employment, and union-protected activities.

343.    The rapid succession of seven job terminations within weeks of filing the CARES complaint and union grievance establishes a retaliatory pattern that is more than the sum of its individual acts.

344.    Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.


**COUNT 36   Invasion of Federal Privacy Interests**

**Legal Foundation:**

- *Whalen v. Roe, 429 U.S. 589 (1977) (Recognizing the constitutional right to informational privacy).*
- *NASA v. Nelson, 562 U.S. 134 (2011) (Requires a "substantial" privacy interest and government action that constitutes an "unreasonable intrusion").*
- *7th Cir. precedent: Constitutional privacy claims are actionable under §1983 when state actors misuse confidential data, creating a stigma or chilling protected activity.*

345.    As alleged in Section C of this Complaint, Defendants are state actors for purposes of §1983 due to their pervasive receipt of federal funds, delegation of SEVIS immigration authority, and operation of a state-commissioned police force (UCPD). Consequently, Defendants' handling of Plaintiff's private records and representations to federal regulators constitutes action 'under color of state law.' Furthermore, Plaintiff alleges that the privacy and confidentiality rights asserted herein are protected by the substantive Due Process Clause of the Fourteenth Amendment, as recognized in Whalen v. Roe and NASA v. Nelson, and by federal statutes such as FERPA, Title IX, and the ADA, the violation of which constitutes evidence of a constitutional deprivation.

346.    **Plaintiff alleges:**

- unauthorized access to educational records, employment files, disability documentation, lab research data, and confidential medical/psychological information,

- disclosure of internal data to disciplinary bodies, external institutions, across university officials, TA, teachers, staff etc,

- monitoring or surveillance near Plaintiff's residence following protected activity,

- improper use of research-participation data in decision-making.

- Plaintiff possessed a legitimate expectation of privacy in sensitive information, including medical/psychological records, disability documentation, and internal investigation files.

58

- Defendants, acting under color of state law, knowingly disclosed or disseminated this private information to unauthorized third parties (TAs, staff, external institutions) without a compelling or legitimate state interest.

- The disclosure of this information was highly offensive to a reasonable person and was the direct cause of Plaintiff's stigmatization, harassment, and retaliatory expulsion (Stigma-Plus).

347. **Factual Allegations:**
1. Unauthorized Disclosure: Plaintiff alleges that Defendants disclosed confidential disability and psychological information to faculty members, TAs, and staff who had no educational "need to know," solely for the purpose of labeling and discriminating against Plaintiff.
2. Improper Use in Proceedings: Plaintiff alleges that Defendants improperly utilized research-participation data and private medical history in disciplinary hearings to prejudicially attack Plaintiff's credibility, violating the confidentiality of health records.
3. Surveillance as Privacy Intrusion: Defendants monitored Plaintiff's residence and communications following protected activity, treating him as a security threat based on protected classifications (disability/whistleblower), thereby violating his reasonable expectation of privacy in his home and personal life.
4. Failure to Protect: Despite having a duty to safeguard these records under FERPA and Title IX, Defendants allowed the dissemination of internal investigation data to external bodies, stripping Plaintiff of control over his most sensitive personal data.

348. The hon'ble courts allegedly has repeatedly held that universities acting as state actors be liable for constitutional privacy violations where misuse of sensitive information causes harm.

349. As a direct and proximate result of these privacy invasions, Plaintiff suffered severe emotional distress, reputational harm (stigma), a hostile educational environment, and the deprivation of his liberty interest in pursuing his education free from unwarranted government intrusion.

## COUNT 37   Federalized Breach of Implied Duty of Confidentiality

- Carnegie Mellon Univ. v. Schwartz, 741 F.3d 62 (3rd Cir. 2014) (Recognizing that confidentiality obligations in federal regulations can create enforceable rights).
- Hon'ble NDIL and 7th Cir. recognize that breaches of mandated confidentiality under Title IX and the ADA constitute evidence of discrimination and retaliation.
- A breach of the duty to keep private records confidential deprives a student of the "benefits" of federal programs under the Due Process Clause.

350. **Plaintiff alleges:**

- confidential disability information was mishandled or discussed,

- research-participation data was used against him,

- misconduct reports were disclosed while protecting the accused,

- transcript information was manipulated during grievance periods.

351. Federal statutes (Title IX, ADA, FERPA) impose a specific duty on federally funded institutions to maintain the confidentiality of complainants and individuals with disabilities.

352. Defendants knowingly breached this statutory duty by disclosing protected information to individuals who were not authorized to receive it.

353. This breach was not accidental but was retaliatory, intended to subject Plaintiff to harassment and disciplinary action.

354. The breach caused concrete harm, hindering Plaintiff's ability to participate in the educational program.

355. Disability Information: Defendants disclosed confidential disability accommodations and medical data to professors and staff not involved in the interactive process, resulting in discriminatory treatment and grading bias.

356. Research Data: Defendants utilized confidential research-participation data—protected by federal research ethics standards—as a weapon in disciplinary decisions, breaching the implied covenant of confidentiality between researcher and subject.

357.     Selective Disclosure: While protecting the identity of the accused (assailant), Defendants actively disseminated Plaintiff's confidential misconduct reports and internal grievances to opposing parties and external agencies, violating Title IX's mandate of equitable protection.

358.     Transcript Manipulation: Defendants altered or manipulated transcript/record information during the grievance period, then refused to correct the official record, thereby falsifying the confidential academic history.

359.     The breach of these federally protected confidentiality duties resulted in a denial of equal access, retaliatory discipline, expulsion, financial loss, and severe emotional trauma.

## COUNT 38      FRAUDULENT INDUCEMENT OF FEDERAL FUNDS AND MISREPRESENTATION (§1983 & FALSE CLAIMS ACT THEORY)

- *Escobar (fraud via omission or misrepresentation).*
- *Sanford-Brown (7th Cir. FCA analysis for educational institutions).*
- *Universal Health Services, Inc. v. Escobar, 579 U.S. 113 (2016) (Implied False Certification Theory: Entities can be liable for fraud if they fail to disclose non-compliance with material statutory requirements).*
- *Fraud that interferes with federally protected rights is actionable under §1983.*

360.     Defendants made specific material misrepresentations (or concealed material facts) regarding their compliance with Title IX, Title VI, the ADA, and the Clery Act.

361.     These misrepresentations were made to federal agencies (DOE, OCR, NIH) to secure and retain federal funding.

362.     Defendants knew their representations were false because they were actively engaging in retaliation, discrimination, and record falsification.

363.     Plaintiff relied on these representations (or was harmed by the fraudulent scheme) to his detriment.

364.     **Alleges:**

- the University misrepresented safety, integrity, and nondiscrimination standards,

- concealed retaliatory motives,

- falsified or created records to justify discipline,

- misrepresented compliance status to federal regulators,

- misrepresented educational quality and workplace protections while accepting federal funds.

- False Certification of Compliance: Defendants misrepresented to the Department of Education and other federal bodies that the University maintains a non-discriminatory, non-retaliatory environment, despite actively orchestrating a retaliatory expulsion campaign against Plaintiff.

- Concealment of Retaliation: Defendants actively concealed their retaliatory motives behind pretextual disciplinary proceedings, thereby defrauding federal regulators who monitor the University's use of taxpayer funds.

- Falsified Records: Defendants created, falsified, or altered records (emails, disciplinary notes, investigation reports) to justify their actions, constituting a fraud scheme to cover up civil rights violations.

- Misrepresentation of Safety/Integrity: Defendants misrepresented the integrity of their grievance processes and safety protections to induce Plaintiff (and students generally) to enroll and participate, while in reality lacking the controls to prevent administrative abuse.

- Use of Funds: Plaintiff alleges that Defendants utilized federal research and education funds to execute the retaliatory scheme, including paying staff to fabricate evidence and conduct surveillance.

365.     Misrepresentation becomes federally actionable when used to obtain or retain federal benefits or to deprive individuals of federally protected rights.

366.     This fraud scheme directly caused Plaintiff's loss of educational access, financial harm (tuition paid under false pretenses), emotional distress, and the deprivation of his civil rights.

## COUNT 39     Retaliatory Constructive Expulsion (Federal Doctrine)

- Burlington Northern v. White, 548 U.S. 53 (2006) (Defining "material adversity" to include actions that might have been "reasonably likely to deter" a person from engaging in protected activity).

- 7th Cir. Pennsylvania State Police v. Suders, 542 U.S. 129 (2004) (Constructive discharge standards apply to educational/employment settings)

367.     Defendants are state actors under the Public Function, Entwinement, and Symbiotic Relationship doctrines. Accordingly, Plaintiff's entitlement to continued education at a federally funded, state-acting university constitutes a protected property interest under the Fourteenth Amendment. See Goss v. Lopez, 419 U.S. 565 (1975). Furthermore, because Defendants acted under color of state law, their expulsion of Plaintiff—and the hostile conditions leading up to it—implicate Due Process protections equal to those of public school students. Plaintiff alleges that the University's own policies, handbooks, and the receipt of federal funds created a contractual and constitutional property interest in his education which was deprived without due process.

368.     Plaintiff engaged in protected activity (whistleblowing, reporting assault/unsafe conditions).

369.     Defendants created working and educational conditions that were so intolerable that a reasonable student would have felt compelled to resign or withdraw.

370.     Defendants intended to force Plaintiff's withdrawal, or the retaliation was so severe that expulsion was the constructive result.

371.     The intolerable conditions were causally linked to the protected activity.

372.     Intolerable Environment: Plaintiff alleges that Defendants systematically created intolerable conditions through serial terminations of employment, denial of disability accommodations, invasion of privacy, and refusal to protect him from assault.

373.     Cumulative Adversity: While no single incident might have been enough, the cumulative effect of the retaliatory surveillance, biased grading, exclusion from research opportunities, and fabricated disciplinary threats rendered the educational environment abusive.

374.     Reasonable Person Standard: A reasonable student in Plaintiff's position—facing the loss of income (jobs), loss of health (denied accommodations), and loss of safety (no protection from assailant)—would have felt compelled to withdraw.

375.     Forced Outcome: The formal expulsion on February 25, 2025, was merely the final act of a constructive expulsion process that began when Defendants initiated the retaliatory campaign in January 2025.

376.     Plaintiff asserts the University created conditions so intolerable serial terminations, bias, hostile environment, refusal to protect, fabricated charges, privacy invasion, expulsion without due process that no reasonable student could remain.

377.     Federal courts consider constructive expulsion analogous to constructive discharge for retaliation purposes. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

378.     Plaintiff suffered the loss of his educational trajectory, financial hardship, emotional trauma, and the deprivation of his right to education without due process.

## COUNT 40     Hostile Educational Environment (Federal Theory)

- *Davis v. Monroe County Bd. of Educ., 526 U.S. 629 (1999) (Institution liability requires actual knowledge and deliberate indifference to harassment that is severe, pervasive, and offensive).*
- *7th Cir. Galloway v. Chicago Bd. of Educ., 810 F.3d 501 (7th Cir. 2016) (Harassment must be severe enough to deny the victim equal access to education).*
379.     **Plaintiff asserts:**

61

- persistent discrimination based on national origin, religion, caste, disability,
- retaliatory monitoring, surveillance, and exclusion,
- refusal to provide protections after assault,
- serial retaliatory discipline and job terminations,
- exploitation of disability,
- relentless denial of grievance avenues.

380. **Elements:**
   **(a)** Plaintiff was a member of a protected class (National Origin, Disability, etc.).
   **(b)** Plaintiff was subjected to harassment based on that class (including retaliation for reporting it).
   **(c)** The harassment was severe, pervasive, and objectively offensive.
   **(d)** The University had actual knowledge of the harassment.
   **(e)** The University was deliberately indifferent to the harassment, failing to take reasonable steps to stop it.

381. **Factual Allegations:**
   1. Elements:
   2. Plaintiff was a member of a protected class (National Origin, Disability, etc.).
   3. Plaintiff was subjected to harassment based on that class (including retaliation for reporting it).
   4. The harassment was severe, pervasive, and objectively offensive.
   5. The University had actual knowledge of the harassment.
   6. The University was deliberately indifferent to the harassment, failing to take reasonable steps to stop it.

382. This meets the Davis standard when it effectively denies educational access. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

383. The hostile environment caused severe emotional distress, academic derailment, and forced constructive expulsion.

## COUNT 41   Deprivation of Liberty and Property Interests in Education (§1983)

- *Goss v. Lopez, 419 U.S. 565 (1975) (Students have a property interest in education protected by Due Process).*
- *Paul v. Davis, 424 U.S. 693 (1976) & Wisconsin v. Constantineau, 400 U.S. 433 (1971) (Stigma-Plus: reputational harm coupled with deprivation of a tangible right).*
- *7th Cir. precedent recognizes that students at state-acting institutions have protectable interests in continued enrollment.*

384. **Plaintiff alleges:**

- expulsion without notice or meaningful process,
- fabricated evidence used in disciplinary decision-making,
- suppression of exculpatory materials,
- predetermined outcome driven by retaliation,
- interference with future opportunities, programs, employment, visa status.

385. **Elements:**
   1. Plaintiff possessed a **protected property interest** in it's continued education (created by enrollment, payment of tuition, and University policies).
   2. Plaintiff **possessed a protected liberty interest** in his reputation and freedom to pursue employment/education elsewhere.
   3. Defendants **deprived** Plaintiff of these interests without **due process of law.**

386. **Property Interest Deprivation:** Plaintiff was expelled and denied the benefits of the education he paid for and was contractually/constitutionally entitled to, without a fair or impartial hearing.

387. **Stigma (Publication of False Charges)**: Defendants fabricated charges and communicated them to internal and external parties, effectively branding Plaintiff as a "miscreant" or "criminal" without a valid basis.

62

388.    **The "Plus":** This stigmatization was coupled with the tangible deprivation of his education (expulsion) and the interference with his future visa and employment prospects (liberty interest).

389.    **Lack of Process:** The decision-making process was predetermined, biased, and lacked fundamental fairness, including the suppression of exculpatory evidence and denial of the right to confront witnesses.

390.    The deprivation of education and reputation forms a classical §1983 claim when attributable to a state actor. Even if private still the rights are violated.

391.    Plaintiff suffered the loss of educational investment (property), irreversible harm to his professional reputation (liberty), and severe emotional distress.

## COUNT 42    Pattern and Practice of Institutional Retaliation (Federal Claim)

- Teamsters v. United States, 431 U.S. 324 (1977) (Pattern or practice evidence can establish discriminatory intent).
- 42 U.S.C. § 1983 (Monell liability for municipal custom/policy—applied here to the University as a state actor).

392.    **Plaintiff alleges:**

- serial retaliation,

- fabricated charges after grievances,

- discriminatory discipline contrary to how others were treated,

- suppression of assault and safety reports,

- institutional alignment (HR, dean, disciplinary staff, police) to silence his protected activities.

393.    **Elements:**

1.  Plaintiff alleges the existence of a formal policy or a "custom" of retaliation and discrimination within the University.

2.  This "custom" is so widespread and permanent that it constitutes a standard operating procedure.

3.  This policy/custom was the "moving force" behind the violation of Plaintiff's rights.

394.    Factual Allegations:

1.  De Facto Policy of "**Induced Defectology**": Plaintiff alleges that the University utilizes a standardized method of retaliation ("Induced Defectology"): (1) ignoring complaints; (2) fabricating charges; (3) suppressing evidence; and (4) expelling the complainant. This business is repeating business, no agencies appears to have taken *substantial* **deterrence action** against the defendants, and hence business of **SERIAL RETALIATION** Continues.

2.  **Institutional Alignment:** The coordination between HR, the Dean of Students, the Police Department (UCPD), and the Title IX office demonstrates not just individual bias, but an institutional mechanism designed to suppress whistleblowers and protect the institution's reputation.

3.  **Selective Enforcement:** The University routinely ignores violations by others (e.g., the assailant, employees working overtime) but aggressively prosecutes Plaintiff for minor or fabricated infractions.

4.  **Systemic Nature:** The failure to train employees on retaliation rights, the refusal to issue No-Contact Directives, and the procedural irregularities in the disciplinary process are not isolated mistakes but evidence of a deliberate institutional pattern to silence dissent.

395.    Hon'ble Courts treat pattern-based allegations as probative *evidence of intentional discrimination and retaliation*. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

396.    This institutional pattern directly caused Plaintiff's expulsion, financial loss, and emotional trauma, and poses a continued threat to other students.

**SECTION H   DECLARATORY & INJUNCTIVE RELIEF**

**COUNT 43   Declaratory Relief (28 U.S.C. § 2201)**

397.      Plaintiff realleges and incorporates all prior paragraphs as though fully set forth herein.

**Legal Foundation:**

- *Steffel v. Thompson, 415 U.S. 452 (1974) (Declaratory relief is appropriate where there is a substantial controversy and legal rights are uncertain).*
- *MedImmune, Inc. v. Genentech, 549 U.S. 118 (2007) (A controversy exists if there is a concrete dispute, even if coercive consequences have already occurred).*
- *Cruce v. Aiken, 370 F.3d 668 (7th Cir. 2004) (Declaratory relief is warranted where the challenged conduct is "capable of repetition, yet evading review").*

398.      **Actual Controversy and Uncertainty:** A real, immediate, and ongoing controversy exists regarding the legality of Defendants' actions. Specifically, the validity of the February 25, 2025, expulsion is legally uncertain because it was procured through fabricated evidence, bias, and a violation of constitutional due process. Defendants continue to assert the validity of this expulsion, harming Plaintiff's visa status and future academic prospects.

399.      **Capable of Repetition:** The University's conduct—retaliating against whistleblowers by expelling them before grievances are resolved—is a standard operating procedure that is "capable of repetition, yet evading review" because the academic cycle moves faster than the judicial cycle. Without declaratory relief, Defendants will continue to use this tactic against other students.

400.      A real, immediate, and ongoing controversy exists regarding:

- the lawfulness of Defendants' disciplinary actions,

- the validity of the expulsion,

- the constitutional adequacy of the disciplinary procedures used,

- Defendants' obligations under Title IX, Title VI, ADA, §504, and §1983,

- the legality of surveillance, retaliation, evidence fabrication, discriminatory enforcement,

- Defendants' federal funding compliance obligations.

401.      **Plaintiff therefore seeks a judicial declaration that:**
   1. Defendants violated Plaintiff's rights under the First Amendment (Free Speech/Retaliation), Fourteenth Amendment (Due Process/Equal Protection), Title IX, Title VI, Title VII, the ADA, and §504.
   2. The disciplinary findings and expulsion issued against Plaintiff on February 25, 2025, are void ab initio (invalid from the start) due to procedural unfairness and retaliatory motive.
   3. Defendants' practices of "Induced Defectology" (fabricating records to justify expulsion) constitute unlawful discrimination and retaliation under federal law. They do that in multiple cases to justify there illegal act as legal acts, as now courts will choose to discuss the misconduct which didn't existed until the protected activity, and hence there's no effective protection from that conduct per existing standards where powerful defendant can make any reason to justify their illegal and unethical acts, especially when procedural dismissal due to pro se pleadings is *weighing heavier than justice itself.*
   4. Defendants' current certifications of compliance with Title IX, Title VI, and the ADA are legally invalid and misleading to federal regulators.
   5. Such declaratory relief is necessary to clarify the legal status of Plaintiff's expulsion, mitigate ongoing harm to his immigration status, and prevent the University from continuing this unconstitutional pattern.

402.      Such declaratory relief is necessary to clarify legal rights, prevent further harm, and restore Plaintiff's status. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

**COUNT 44    Injunctive Relief (28 U.S.C. § 2202)**

403.        Plaintiff realleges and incorporates all prior paragraphs. This Count asserts retaliation under each statute independently.

- *Ex parte Young*, 209 U.S. 123 (1908)    federal courts may enjoin ongoing violations of federal law.

- Winter v. NRDC, 555 U.S. 7 (2008) (Plaintiff must show irreparable harm, likelihood of success, balance of equities, and public interest).

- Franklin v. Gwinnett, 503 U.S. 60 (1992) (Courts have broad power to grant injunctive relief under Title IX, including reinstatement).

- *Hewitt v. Helms*, 459 U.S. 460 (1983)    injunctive relief appropriate to remedy unconstitutional disciplinary actions.

- *Barnes v. Gorman*, 536 U.S. 181 (2002)    equitable relief available under §504 and Title II.

- Title IX allows reinstatement and injunctive relief (*Franklin v. Gwinnett*, 503 U.S. 60 (1992)).

404.        **Elements for Injunction:**

1. **Irreparable Harm**: Plaintiff faces ongoing harm (a) stigma from a void expulsion; (b) loss of time in his graduate program; (c) immediate jeopardy to his immigration status (SEVIS); and (d) the chilling of his First Amendment rights.

2. **Likelihood of Success:** Based on the allegations of fabrication, lack of due process, and clear temporal proximity of retaliation, Plaintiff is likely to succeed on the merits of his constitutional and statutory claims.

3. **Public Interest**: Enjoining a federally funded institution from violating the Constitution and civil rights statutes serves the public interest.

405.        **Plaintiff seeks the following injunctive relief:**

**A. Institutional Reform Orders**

406.        Court-ordered compliance with Title IX, Title VI, ADA, §504, and federal funding obligations.

407.        **Training and structural reform of disciplinary processes to ensure:**

- o    unbiased panels,

- o    evidence transparency,

- o    record-keeping integrity,

- o    disability accommodation compliance,

- o    anti-retaliation policies consistent with *Jackson* and 7th Cir. precedent.

**B. Protection Against Future Retaliation**

408.        Injunction prohibiting Defendants from:

- o    retaliating against Plaintiff,

- o    interfering with future academic or employment opportunities,

- o    disseminating defamatory or stigmatizing statements,

- o    accessing confidential data without lawful reason,

- o    engaging in or directing surveillance or intimidation.

**C. Monitoring & Reporting**

409.        An Order prohibiting Defendants from accessing, disseminating, or using Plaintiff's confidential medical, disability, or research data for any purpose other than legitimate educational needs, without Plaintiff's consent.

410. An Order permanently enjoining Defendants from retaliating against Plaintiff for filing this lawsuit, including protecting his future employment recommendations and academic references.

411. An Order requiring Defendants to revise their disciplinary policies to ensure compliance with Goss v. Lopez (Due Process) and Jackson (Anti-Retaliation), specifically to prevent the future use of fabricated evidence and predetermined outcomes.

412. An injunction requiring periodic reporting by the University to demonstrate ongoing compliance with federal civil rights obligations.

**D. Any further equitable relief necessary to remedy the violations.**

413. Plaintiff faces ongoing, irreparable harm including reputational injury, loss of future educational opportunities, visa-related consequences, and continuing stigma justifying injunctive relief under the *Winter v. NRDC* standard (555 U.S. 7 (2008)) and its 7th Cir. analogues.

**COUNT 45        Retaliation in Violation of Federal Public Policy (Federal Civil Rights Framework)**

414. Plaintiff realleges and incorporates all prior paragraphs. This Count asserts retaliation under each statute independently.

415. Retaliation is prohibited under Title VI, VII, Title IX, ADA, §504, and §1983 (via First Amendment and equal-protection theories).

416. CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008) (Retaliation is implied within federal civil rights statutes to protect the underlying objectives of those laws).

417. Jackson v. Birmingham, 544 U.S. 167 (2005) (Retaliation is intentional discrimination prohibited by Title IX; reporting discrimination is protected activity).

418. Burlington Northern v. White, 548 U.S. 53 (2006) (Retaliation encompasses any action that would dissuade a reasonable person from engaging in protected activity).

419. Protected Activity: Plaintiff engaged in conduct protected by federal law and public policy, including: reporting sexual assault (Title IX/Clery Act), reporting safety hazards (OSHA/Public Safety), opposing disability discrimination (ADA), and reporting misuse of funds (Federal Funding/False Claims Act).

420. Adverse Action: Defendants took materially adverse actions against Plaintiff, including serial job terminations, fabricated disciplinary charges, surveillance, and expulsion.

421. Causal Connection: The adverse actions were causally linked to the protected activity, as evidenced by temporal proximity and the retaliatory animus of University officials.

422. The University retaliated after plaintiff reported misconduct, discrimination, assault, unsafe conditions, misuse of federal funds, and violations of federal rights.

- Retaliation manifested through:
    - serial job terminations;
    - fabricated disciplinary charges;
    - hostile environment escalation;
    - denial of disability accommodations;
    - surveillance by UCPD;
    - transcript manipulation;
    - discriminatory enforcement of rules;
    - refusal to process grievances;
    - expulsion shortly after protected activities.

66

423. **Policy Against Retaliation for Reporting Assault**: By expelling Plaintiff after he reported an assault, Defendants violated the clear federal public policy encouraging victims to report sexual misconduct without fear of reprisal.

424. **Policy of Safety and Whistleblowing**: By terminating Plaintiff and fabricating charges after he reported hazardous gas handling and food safety violations, Defendants violated the public policy of protecting student-whistleblowers who report unsafe conditions.

425. **Policy of Disability Inclusion**: By denying accommodations and then retaliating when Plaintiff asserted his rights, Defendants violated the federal public policy of full inclusion for individuals with disabilities.

426. **Pattern of Retaliation**: The University's response was not isolated but a coordinated campaign: *Escalation:* The severity of retaliation escalated from job termination to surveillance to expulsion; *Pretext*: The charges used to justify the expulsion were fabricated pretexts for retaliation; *Intent*: The intent was to silence Plaintiff and deter others from reporting misconduct.

427. Such retaliation violates **federal public policy embedded in the Constitution and civil rights statutes**, and supports declaratory, injunctive, and compensatory relief. Plaintiff suffered damages (but not limited to) including trauma, fear, retaliatory discipline, expulsion, financial, research, and loss of educational access.

428. This violation of federal public policy caused Plaintiff the loss of his education, employment, emotional well-being, and reputation. Plaintiff seeks compensatory and punitive damages to deter such violations in the future.

## SECTION I SUPPLEMENTAL ILLINOIS STATE LAW CLAIMS

429. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's Illinois state-law claims as they arise from the same common nucleus of operative fact as the federal civil rights claims. Furthermore, as alleged in Section III, Defendants are state actors under the Public Function and Entwinement doctrines. Consequently, Plaintiff's reports to university officials regarding safety, fraud, and assault constitute reports to a 'government or law enforcement agency' or to officials with governmental authority for the purposes of Illinois common law and the Illinois Whistleblower Act.

## COUNT 46 CIVIL CONSPIRACY (ILLINOIS COMMON LAW)

430. Plaintiff realleges and incorporates by reference all prior paragraphs as though fully set forth herein.

431. Under Illinois law, a civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by unlawful means either an unlawful purpose or a lawful purpose which is unlawful in the context of the combination. Adcock v. Brakegate, Ltd., 892 N.E.2d 306 (Ill. 2008). Plaintiff must also allege an underlying independent tort.

432. **The Combination:** At all relevant times, Defendants, including University administrators, supervisory personnel, and other agents and affiliated entities, knowingly agreed and acted in concert to accomplish **unlawful objectives** and unlawful objectives by **unlawful means (mala fide)**, in violation of Illinois common law.

433. **Unlawful Means**: The object of the conspiracy was to retaliate against Plaintiff for protected reporting and grievance activity, to silence and neutralize Plaintiff's complaints, and to justify adverse academic and employment actions through improper and unlawful means. This action was to take revenge from plaintiff for grieving against unlawful conduct.

434. **Overt Acts in Furtherance of the Conspiracy**: The agreement among Defendants was evidenced by a pattern of coordinated conduct, including but not limited to:

(a) the selective initiation and acceleration of disciplinary proceedings shortly after Plaintiff's protected complaints and whistleblowing activity;

(b) the use of inconsistent or inapplicable policies and procedures to govern Plaintiff's discipline and employment status;

(c) the fabrication, alteration, or manipulation of employment, payroll, and disciplinary records to create post hoc justification for adverse actions;

67

(d) the suppression, concealment, or withholding of grievance materials, exculpatory information, and internal records relevant to Plaintiff's defenses and complaints; and

(e) coordinated adverse employment and academic actions taken across departments and roles in close temporal proximity to Plaintiff's protected activity.

435. **Underlying Independent Torts:** The conspiracy included, but was not limited to:

(a) Coordination among University officials and union representatives to suppress or obstruct Plaintiff's grievances;

(b) Fabrication, alteration, or manipulation of documents to justify adverse actions;

(c) Wrongful or pretextual termination and exclusion from academic and employment opportunities;

(d) Continued retaliatory actions after Plaintiff engaged in protected activity under Illinois law;

(e) Suppression or concealment of information relevant to Plaintiff's academic, employment, and disciplinary matters.

436. In furtherance of the conspiracy, one or more Defendants committed overt acts, including record falsification, dissemination of false or misleading disciplinary narratives, interference with Plaintiff's employment opportunities, obstruction of grievance processes, and the initiation or continuation of disciplinary action based on pretextual or manufactured grounds.

437. **Malice and Intent**: Each Defendant knew that the acts taken in furtherance of the conspiracy were wrongful and substantially certain to cause harm to Plaintiff, including economic loss, reputational injury, and disruption of Plaintiff's education and employment.

438. The overt acts committed in furtherance of the conspiracy constitute independent wrongful conduct under Illinois law, including but not limited to retaliation prohibited by Illinois statutes, defamation, spoliation of evidence, interference with prospective economic advantage, and breaches of contractual and common-law duties, as separately alleged in this Complaint.

439. As a direct and proximate result of Defendants' civil conspiracy, Plaintiff suffered damages, including loss of employment and income, educational disruption, reputational harm, and other compensable injuries recognized under Illinois law.

440. Defendants' conduct was willful, wanton, and undertaken with conscious disregard for Plaintiff's rights, warranting the imposition of punitive damages under Illinois law.

441. WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants, jointly and severally, for compensatory and punitive damages, costs of suit, and such other relief as this Court deems just and proper.

## COUNT 47 VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT

(740 ILCS 174/1 et seq.)

442. Plaintiff realleges and incorporates by reference all prior paragraphs as though fully set forth herein.

443. The Illinois Whistleblower Act (IWA) prohibits employers from retaliating against employees for disclosing information to a government or law enforcement agency, or for threatening to do so, when the employee reasonably believes the information discloses a violation of a state or federal law, rule, or regulation.

444. At all relevant times, Plaintiff was an employee of Defendants within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/1 et seq., and Defendants were employers subject to the Act.

445. Employment Status: Plaintiff was an "employee" of Defendants within the meaning of the IWA, performing compensated work in multiple student-employee roles (e.g., SSCS, Mansueto Institute).

1. Protected Activity – Reasonable Belief of Illegality: Plaintiff engaged in protected activity under the IWA by disclosing, or threatening to disclose, information he reasonably believed violated specific state and federal laws, including: (a) The Clery Act & Title IX: Reporting the University's failure to protect him from assault

68

and its failure to issue a No-Contact Directive. (b) OSHA & Illinois Safety Laws: Reporting the mishandling of hazardous gas cylinders and unsafe food preparation conditions. (c) Fair Labor Standards Act (FLSA) & Illinois Wage Law: Reporting wage theft, unauthorized payroll deductions, and forced labor practices regarding work-hour limits. (d) False Claims Act: Reporting the potential misuse of federal grant funds and nonprofit tax exemptions.

2. Disclosure to Governmental Bodies / State Actors: (a) Plaintiff made these disclosures to University officials (UCPD, Dean of Students, Title IX Office, HR). As alleged in Section III of this Complaint, these officials are state actors performing public functions (police powers, SEVIS immigration enforcement, federal funding administration). Therefore, reports made to them constitute reports to a "government or law enforcement agency" under the IWA. (b) Alternatively, Plaintiff threatened to report these violations to external agencies (Department of Education, Department of Labor, OCR) if internal grievances were not resolved.

3. Retaliatory Adverse Actions: Because of Plaintiff's protected whistleblowing, Defendants subjected him to materially adverse employment actions, including: (a) Termination: Wrongful termination from multiple student-employment positions. (b) Blacklisting: Interfering with his ability to secure new employment or interviews. (c) Discrimination: Subjecting him to heightened scrutiny and disciplinary harassment not applied to non-whistleblowers. (d) Constructive Discharge: Creating intolerable working conditions that forced him out of his employment.

4. Causation: The temporal proximity between Plaintiff's reports (Nov 2024 – Feb 2025) and the wave of terminations/expulsions (Jan 2025 – Feb 2025), combined with the pretextual nature of the University's "work-hour" justifications, establishes that the protected activity was a motivating factor in the adverse employment actions.

5. **Damages:** As a result of this unlawful retaliation, Plaintiff lost income, benefits, career opportunities, and suffered severe emotional distress.

446. Plaintiff engaged in protected activity under the Act by, in good faith and with a reasonable belief of illegality, reporting and opposing conduct by Defendants that he reasonably believed violated applicable laws and regulations, including but not limited to:

(a) wage and hour violations and improper payroll practices;

(b) falsification or manipulation of employment and timekeeping records;

(c) unsafe working conditions and health and safety hazards on University premises;

(d) potential tax and reporting irregularities related to compensation practices; and

(e) other unlawful or improper conduct affecting employees and the campus community.

447. Plaintiff made such reports internally to university officials and externally to appropriate authorities or entities, or threatened to do so, in a manner protected by the Illinois Whistleblower Act.

448. Defendants were aware of Plaintiff's whistleblowing activity and protected disclosures.

449. Following and because of Plaintiff's protected activity, Defendants subjected Plaintiff to materially adverse actions, including but not limited to:

(a) termination from student-employee positions;

(b) cancellation or obstruction of employment opportunities;

(c) initiation and acceleration of disciplinary proceedings;

(d) retaliatory academic sanctions, including expulsion; and

(e) other actions that would dissuade a reasonable employee from engaging in protected whistleblowing activity.

450. The temporal proximity between Plaintiff's protected disclosures and Defendants' adverse actions, together with the pattern of conduct alleged herein, supports a reasonable inference that Plaintiff's whistleblowing activity was a motivating factor in Defendants' retaliatory conduct.

69

451. Defendants' stated reasons for the adverse actions taken against Plaintiff were pretextual and were used to conceal retaliation prohibited by the Illinois Whistleblower Act.

452. As a direct and proximate result of Defendants' violations of the Illinois Whistleblower Act, Plaintiff suffered damages, including loss of employment and income, educational and career disruption, reputational injury, and other compensable damages recognized under Illinois law.

453. WHEREFORE, Plaintiff respectfully requests that judgment be entered in plaintiff's favor and against Defendants for all relief available under the Illinois Whistleblower Act, including compensatory damages, statutory remedies, costs of suit, and such other relief as the Court deems just and proper.

## COUNT 48 VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT (IWPCA)

*(820 ILCS 115/1 et seq.)*

454. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

455. At all relevant times, Plaintiff was an employee of Defendants within the meaning of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 et seq., and Defendants were employers subject to the Act.

456. The IWPCA requires employers to timely pay employees all wages, compensation, and benefits earned pursuant to an employment agreement, whether express or implied, and to maintain accurate payroll and timekeeping records.

457. Plaintiff performed compensable work for Defendants pursuant to express and implied employment agreements, including hourly student-employee appointments governed by Defendants' published policies, payroll systems, and representations regarding compensation.

458. Plaintiff earned wages, including regular hourly wages and additional compensable hours, that became due and payable under the terms of his employment.

459. Defendants failed and refused to pay Plaintiff all earned wages owed, including by underpaying, withholding, or delaying payment for hours worked.

460. Defendants' failure to pay was not merely an administrative error but was part of a *retaliatory scheme (SERIAL RETALIATION).* After Plaintiff engaged in protected activity, Defendants utilized wage withholding and the manipulation of time records as a tool of economic coercion to force Plaintiff out of his employment and to punish him for his complaints.

461. In connection with their failure to pay earned wages, Defendants maintained inaccurate, altered, or manipulated time and payroll records. Specifically, Defendants engaged in 'rollbacks' of time entries, refused to authorize hours already worked, and failed to compensate Plaintiff for mandatory training or meetings, thereby violating the record-keeping mandates of the IWPCA.

462. Plaintiff alleges that Defendants' manipulation of these time records directly contradicted the record-keeping requirements of the FLSA, as Plaintiff was a non-exempt employee whose primary duty was routine, non-managerial work, and thus was not exempt from FLSA protections under 29 C.F.R. § 541.106.

463. Defendants further engaged in compensation practices that deviated from lawful payroll requirements, including paying certain student workers through non-wage mechanisms such as gift cards or cash equivalents, failing to properly account for such compensation as wages, and failing to maintain complete and accurate wage records as required by Illinois law.

464. Defendants' acts and omissions were willful, knowing, and undertaken in bad faith. Defendants knowingly withheld earned wages and falsified records to create a false narrative of non-compliance to justify Plaintiff's termination, thereby warranting the assessment of statutory penalties and attorney's fees under 820 ILCS 115/4.

465. As a direct and proximate result of Defendants' violations of the IWPCA, Plaintiff suffered economic loss, including unpaid wages and benefits, loss of the use of earned compensation, and related damages recoverable under Illinois law.

466. WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for all relief authorized under the Illinois Wage Payment and Collection Act, including unpaid wages, statutory damages, liquidated damages where applicable, interest, costs of suit, and such other relief as the Court deems just and proper.

70

**COUNT 48A – Fair Labor Standards Act (FLSA), 29 U.S.C. § 207 and Recordkeeping Violations**

467. Plaintiff realleges all prior paragraphs.

468. Plaintiff was a non-exempt hourly student employee within the meaning of the FLSA.

469. Defendants failed to maintain accurate records of hours worked, retroactively altered Workday entries, rolled back previously recorded time, inserted hours after the fact, and failed to compensate Plaintiff for all hours worked, including overtime hours in excess of forty (40) hours in one or more workweeks.

470. Defendants failed to maintain accurate records of hours worked. Instead, Defendants retroactively altered Workday entries, rolled back previously recorded time, and inserted hours after the fact to create a false appearance of compliance with visa work-hour restrictions. These altered records were then used as a pretextual justification for Plaintiff's termination and subsequent disciplinary actions, in violation of 29 U.S.C. § 207(a)(1) and the anti-retaliation provisions of the FLSA.

471. As a direct and proximate result, Plaintiff suffered unpaid wages for all hours worked, lost employment opportunities, and retaliatory discipline. Plaintiff alleges that but for his reports of wage and hour violations, and his request for accurate records, Defendants would not have terminated his employment or falsified his timekeeping data.

**COUNT 49 VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

*(815CS 505/1 et seq.)*

472. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

473. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 et seq., prohibits unfair or deceptive acts or practices in the conduct of trade or commerce.

474. At all relevant times, Defendants were engaged in trade or commerce within the meaning of the ICFA by marketing, offering, selling, and providing educational programs, tuition-based services, employment-related opportunities, and associated benefits to students, including Plaintiff, in exchange for substantial tuition payments, fees, and labor.

475. In connection with Plaintiff's enrollment and continued participation in the University's academic programs, Defendants made material representations and omissions to Plaintiff concerning, among other things:

1. the nature and quality of educational services and academic opportunities;
2. the availability and accessibility of research opportunities, funding, and institutional support.
3. Letters of recommendations from professors for further studies;
4. post-graduation employment outcomes and career prospects associated with the program; and
5. the structure, pricing, and administration of tuition, fees, and campus payment programs.
6. Safety and Compliance: That the University provided a safe campus environment compliant with Title IX, the Clery Act, and non-discrimination laws;
7. Whistleblower Protections: That the University upheld the 'Chicago Principles' of free speech and protected students who reported safety violations or misconduct from retaliation;
8. Administrative Integrity: That disciplinary and grievance processes would be conducted fairly, in accordance with published rules, and without fabrication of evidence.

476. These representations were deceptive because, in reality, University officials operated under a pattern and practice of retaliation. By concealing their internal policy of 'Induced Defectology'—fabricating charges to expel complainants—Defendants failed to disclose that the 'safe' and 'non-retaliatory' environment they marketed was nonexistent for whistleblowers.

71

477.     Defendants' representations and omissions were deceptive or unfair because they were materially misleading, incomplete, or presented in a manner likely to mislead a reasonable consumer under the circumstances.

478.     Defendants intended that prospective and enrolled students, including Plaintiff, rely upon these representations and omissions in deciding whether to enroll, remain enrolled, pay tuition and fees, and invest time, labor, and resources in Defendants' programs.

479.     Plaintiff did, in fact, reasonably rely on Defendants' representations and omissions in enrolling at the University of Chicago, continuing his academic program, accepting student-employment roles, and foregoing alternative educational and professional opportunities.

480.     As a direct and proximate result of Defendants' unfair and deceptive acts, Plaintiff suffered actual damages, including tuition and fees paid for services that were not rendered as promised (i.e., a non-discriminatory, safe education), loss of research stipends, and severe economic and emotional harm.

481.     Defendants' conduct offended established public policy, was immoral, unethical, oppressive, or unscrupulous, and caused substantial injury to Plaintiff that was not outweighed by any countervailing benefits to consumers or competition.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants and that the Court award all relief authorized under the Illinois Consumer Fraud and Deceptive Business Practices Act, including actual damages, restitution, injunctive relief, statutory or treble damages where permitted, costs of suit, reasonable attorneys' fees to the extent authorized by statute, and such other relief as the Court deems just and proper.

## COUNT 50 BREACH OF CONTRACT AND/OR IMPLIED CONTRACT (ILLINOIS COMMON LAW)

482.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

483.     At all relevant times, Plaintiff and Defendant University of Chicago entered into express and implied contractual relationships governing Plaintiff's enrollment as a graduate student and his participation as a student-employee.

484.     The contractual terms included express and implied agreements regarding Plaintiff's student-employment appointments. These contracts incorporated the University's published employment policies, the Student Employee Handbook, the Union Collective Bargaining Agreement (CBA), and the University's Statutes regarding disciplinary procedures. The University expressly contracted to provide compensation for work performed, to follow just-cause termination procedures, and to adhere to non-discrimination policies.

485.     As part of these contractual relationships, the University expressly and impliedly promised to:

   o   administer academic, employment, grievance, and disciplinary processes in good faith and in accordance with its published policies;
   o   provide fair, non-arbitrary, and non-retaliatory procedures;
   o   accurately maintain and administer academic, employment, and payroll records;
   o   provide students reasonable access to academic and institutional opportunities described in official materials; and
   o   refrain from retaliating against students or student-employees for good-faith complaints, grievances, or protected reporting.
   o   Due Process: Provide the specific procedural protections outlined in the University's Statutes before imposing adverse academic or employment actions.

486.     Plaintiff fully performed, or was excused from performance of, his contractual obligations by enrolling, paying tuition and fees, complying with university policies, and performing his student-employment duties.

487.     Defendant materially breached its express and implied contractual obligations by, among other things:

a. failing to follow its own published grievance and disciplinary procedures;
b. imposing adverse academic and employment actions through arbitrary, inconsistent, or pretextual processes;
c. relying on altered, fabricated, or selectively applied records;
d. denying Plaintiff fair process promised under University policies; and
e. taking retaliatory actions inconsistent with the standards and procedures set forth in its governing documents.

488.　　Defendant further breached its contractual obligations by failing to administer student-employment terms and academic standing in good faith and by departing from established procedures without justification or notice.

489.　　Defendant's breaches went to the essence of the contractual relationship and deprived Plaintiff of the benefit of his bargain, including continued academic participation, fair consideration of grievances, and lawful student-employment opportunities.

490.　　As a direct and proximate result of Defendant's breaches, Plaintiff suffered damages, including economic losses, loss of academic standing and opportunities, and other resulting damages recognized under Illinois common law.

491.　　Under Illinois law, the University cannot contract for one thing (a fair, non-retaliatory workplace) and deliver another (a hostile, retaliatory environment) while retaining Plaintiff's tuition and labor. The University's failure to abide by its own contractual standards constitutes a total breach of the bargain.

492.　　Under Illinois law, every contract contains an implied covenant of good faith and fair dealing. Defendants breached this covenant by exercising contractual discretion in bad faith, arbitrarily, and for retaliatory purposes, including by selectively enforcing policies, ignoring grievance procedures, and manipulating disciplinary processes to deprive Plaintiff of the benefits reasonably expected under the parties' agreements.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant University of Chicago, awarding compensatory damages, restitution, rescission or equitable relief as appropriate, costs of suit, and such other relief as the Court deems just and proper.

## COUNT 51 NEGLIGENT MISREPRESENTATION (ILLINOIS COMMON LAW)

493.　　Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

494.　　In the course of its business and in connection with the marketing, recruitment, and administration of its academic programs, Defendant University of Chicago supplied information to Plaintiff for the guidance of prospective and enrolled students in making decisions regarding enrolment, tuition payments, and academic participation.

495.　　Defendant represented, through official publications, recruitment materials, websites, and communications, that: (a) the University was a fully compliant institution adhering to Title IX, the Clery Act, and the ADA; (b) the campus environment was safe and free from retaliation for whistleblowers; and (c) the University maintained rigorous standards for the accuracy of student disciplinary and payroll records.

496.　　Defendant had a duty to exercise reasonable care and competence in obtaining, communicating, and presenting such information because it knew or should have known that prospective students, including Plaintiff, would rely on those representations in deciding whether to enroll, pay tuition, and forego alternative educational opportunities.

497.　　Defendant breached that duty by negligently providing information that was materially false. Specifically, Defendant negligently failed to disclose its systemic failure to protect students from assault, its pattern of retaliating against complainants, and its inability to maintain accurate payroll or disciplinary records—facts directly contradictory to its marketing materials.

498.　　Plaintiff reasonably relied on Defendant's representations in choosing the University of Chicago over other institutions and in committing substantial tuition payments, time, and labor to Defendant's programs.

73

499. Plaintiff's reliance was foreseeable and justified under the circumstances, given Defendant's superior access to information regarding its own programs and internal practices.

500. As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff suffered actual damages, including economic loss, tuition and fee expenditures, lost alternative opportunities, and related consequential damages recognized under Illinois law.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in plaintiff's favor and against Defendant for compensatory damages, costs of suit, and such other relief as the Court deems just and proper.

## COUNT 52 FRAUDULENT INDUCEMENT (ILLINOIS COMMON LAW)

501. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

502. Prior to Plaintiff's enrolment, Defendant University of Chicago, through its official publications, recruitment materials, websites, and authorized representatives, made material representations of existing fact regarding the nature of its academic programs, including representations concerning the availability of research opportunities, institutional support for student research, and the manner in which such opportunities were administered.

503. The University strictly adhered to all federal civil rights laws Title IX, VII, III, ADA, ADAAA, and others but not limited to like Title VI, II, and etc) protecting students from discrimination and retaliation; and (b) the University possessed adequate safeguards and investigative mechanisms to ensure student safety and data privacy.

504. At the time these representations were made, Defendant knew that the representations were false or misleading, or made them with reckless disregard for their truth, in that the opportunities and processes described were not, in practice, made available to Plaintiff as represented.

505. At the time these representations were made, Defendant knew the representations were false. Defendant was aware, through internal audits and complaints, that it operated under a 'pattern and practice' of retaliation, failed to issue No-Contact Directives for assault victims, and lacked the capacity to safeguard confidential data, yet concealed these deficiencies to secure enrollment and tuition.

506. Defendant made these representations with the intent to induce Plaintiff to enroll at the University, to pay tuition and fees, and to commit his time and labor to Defendant's programs rather than pursue alternative educational opportunities.

507. Plaintiff reasonably and justifiably relied on Defendant's material representations in deciding to enroll at the University of Chicago, to pay tuition and associated costs, and to forego other academic and professional opportunities.

508. Plaintiff's reliance was foreseeable and reasonable because Defendant possessed superior knowledge regarding its own programs and internal practices, and Plaintiff had no reasonable means of independently verifying the truth of the representations prior to enrollment.

509. As a direct and proximate result of Defendant's fraudulent inducement, Plaintiff suffered damages, including out-of-pocket losses, tuition and fee payments, loss of alternative opportunities, and other economic and consequential damages recognized under Illinois common law.

510. Defendants' conduct was not merely negligent but was willful and wanton, reflecting a conscious disregard for Plaintiff's safety and rights.

**WHEREFORE,** Plaintiff respectfully requests that judgment be entered in his favor and against Defendant for compensatory damages, punitive damages (warranted by the intentional and fraudulent nature of the concealment), rescission, restitution, costs of suit, and such other relief as the Court deems just and proper.

**COUNT 53 NEGLIGENT INFLECTION OF EMOTIONAL DISTRESS (ILLINOIS COMMON LAW)**

511.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

512.     At all relevant times, Defendants owed Plaintiff a duty of reasonable care under Illinois law arising from a special relationship, including but not limited to Plaintiff's status as a student and student-employee subject to Defendants' **control** over plaintiff's safety, employment, records, discipline, and continued academic standing.

513.     This duty of care included, among other things, obligations to: a. . maintain reasonably safe educational and employment environments, including a duty to protect students from known assailants and to issue protective directives when required by law;

b. exercise reasonable care in supervising employees and agents;

c. safeguard confidential medical, disability, employment, and disciplinary information;

d. maintain accurate payroll, employment, and academic records; and

e. administer grievance, disciplinary, and investigatory processes with basic procedural competence to prevent foreseeable psychological trauma resulting from baseless accusations or biased hearings.

f. safeguard Plaintiff's private medical, disability, and research data with reasonable care to prevent unauthorized disclosure that causes emotional harm.

514.     Defendants breached these duties through negligent acts and omissions, including but not limited to:

a. failing to address known safety risks and reported hazards;

b. Negligent Failure to Protect: Failing to issue a No-Contact Directive despite knowing of the assault, thereby negligently placing Plaintiff in an environment of continued risk and anxiety;

c. Negligent Privacy Breach: Carelessly handling and disseminating Plaintiff's confidential disability and grievance information to unauthorized individuals, foreseeably causing humiliation and distress.

d. negligently administering payroll and recordkeeping systems, including inaccurate or altered records; and

e. negligently conducting disciplinary and grievance processes in a manner that foreseeably placed Plaintiff at risk of serious emotional harm.

515.     Defendants knew that their negligent conduct created an unreasonable risk of serious emotional distress to Plaintiff, particularly given Plaintiff's known vulnerability as a student-employee dependent on Defendants for safety, income, academic standing, and immigration-related stability.

516.     As a direct and proximate result of Defendants' negligence, Plaintiff suffered severe emotional distress, including anxiety, humiliation, emotional trauma, severe distress, and mental suffering, which manifested in tangible and observable consequences affecting Plaintiff's academic participation, employment stability, and daily functioning.

517.     Plaintiff's emotional distress was a foreseeable consequence of Defendants' negligent conduct and was not the result of ordinary workplace stress or trivial indignities but rather arose from objectively unreasonable conduct under the circumstances.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for compensatory damages, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

**COUNT 54 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ILLINOIS COMMON LAW)**

518.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

75

519.     At all relevant times, Defendants occupied positions of substantial authority and control over Plaintiff's education, employment, records, discipline, and future prospects, creating a power imbalance that rendered Plaintiff particularly vulnerable to abuse.

520.     Defendants engaged in a course of conduct that was extreme and outrageous, exceeded all bounds of decency tolerated in a civilized society, and was calculated to intimidate, punish, and silence Plaintiff, including but not limited to:
a. deliberately fabricating, altering, or manipulating employment, payroll, and disciplinary records to justify adverse actions;
b. subjecting Plaintiff to targeted monitoring and scrutiny in response to his protected complaints and grievances;
c. intentionally retaliating against Plaintiff for whistleblowing and grievance activity by terminating employment roles and initiating disciplinary proceedings;
d. willfully disregarding or denying known and documented disability accommodations;
e. concealing, minimizing, or failing to act upon reported assault and safety complaints; and
f. orchestrating disciplinary and academic actions designed to humiliate, isolate, and force Plaintiff out of the University.

521.     Defendants engaged in a course of conduct that was extreme and outrageous, exceeding all bounds of decency tolerated in a civilized society. Specifically, Defendants abused their position of institutional power to engage in a campaign of gaslighting and psychological torture against a known victim of assault, including but not limited to:

1.  Fabrication of Criminal Evidence: Deliberately falsifying disciplinary, payroll, and timekeeping records to manufacture a false narrative that Plaintiff was a 'criminal' or 'miscreant,' thereby punishing him for the assault committed against him;

2.  Weaponizing State Authority: Utilizing the University Police (UCPD) and disciplinary bodies to intimidate and surveil Plaintiff while simultaneously refusing to protect him from his actual assailant;

3.  Intentional Infliction of Humiliation: Subjecting Plaintiff to biased investigations predicated on lies, designed to strip him of his dignity, academic standing, and immigration status in retaliation for reporting misconduct;

4.  Sadistic Disregard: Willfully ignoring Plaintiff's documented disability and trauma triggers to induce maximum psychological suffering during the disciplinary process.

522.     Defendants caused Plaintiff severe emotional distress or acted with reckless disregard of the high probability that their conduct would cause such distress, knowing that Plaintiff depended on Defendants for academic standing, employment income, institutional protection, and continued enrollment.

523.     Defendants' conduct was not isolated or inadvertent but constituted a sustained and deliberate pattern of abuse of authority, retaliation, and intimidation, aggravating the outrageous nature of the conduct under Illinois law.

524.     Defendants knew Plaintiff was an international student on a visa, a person with a disability, and a recent victim of violent assault, making him uniquely vulnerable to threats of expulsion, arrest, and deportation. Defendants exploited these vulnerabilities to break his will.

525.     As a direct and proximate result of Defendants' intentional and reckless conduct, Plaintiff suffered severe emotional distress, including extreme mental anguish, anxiety, humiliation, emotional suffering, loss of personal dignity, reputational injury, and conditions similar to PTSD (Post-Traumatic Stress Disorder).

526.     Plaintiff's distress was not a reaction to ordinary academic stress, but was the direct result of Defendants' intentional infliction of public stigma (false accusations) and private terror (surveillance/expulsion threats). No reasonable person should be expected to endure the psychological torture of being branded a criminal by their own institution based on fabricated evidence.

527.     Plaintiff's emotional distress was severe, enduring, and of a nature that no reasonable person should be expected to endure, and it resulted in tangible disruption to Plaintiff's academic, professional, and personal life.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for compensatory damages, punitive damages, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 55: ASSAULT AND BATTERY (ILLINOIS COMMON LAW)

528. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

529. On or about November 22, 2024, Shrivatsa Thulasiram, who was at the time a University employee and student acting within the scope of his university-affiliated roles, assaulted plaintiff. He without consent made harmful and offensive physical contact with Plaintiff.

530. Specifically, Shrivatsa Thulasiram struck Plaintiff in the multiple parts of the body, including the neck and face, private parts, and engaged in physically abusive, threatening and intimidating conduct that placed Plaintiff in reasonable apprehension of imminent harmful contact.

531. Thulasiram's actions constituted assault and battery under Illinois law in that they involved intentional, unpermitted, and offensive contact with Plaintiff.

532. Thulasiram's conduct also constituted assault under Illinois law because Plaintiff was placed in reasonable fear or apprehension of an imminent battery.

533. Following the assault, Plaintiff reported the incident to the Chicago Police Department (CPD) and the University. Despite the severity of the assault, no immediate protective measures were taken by the University to isolate the assailant or secure the scene, and Plaintiff was left to navigate the trauma without adequate institutional support.

534. Officers of the Chicago Police Department ("CPD") responded to a 911 call regarding the incident, arriving approximately twenty minutes later, to the best of Plaintiff's current recollection. CPD did not provide Plaintiff with a written incident report or report number at the scene, and no arrest was made of Shrivatsa Thulasiram.

535. At the time of the assault and battery, Thulasiram was a university-affiliated individual acting on University premises (Student and Staff), and Defendants knew of the risk posed to Plaintiff and failed to take reasonable steps to prevent or remediate the harm.

536. Upon information and belief, Defendants are liable for Thulasiram's actions under the theory of respondent superior and/or negligent retention, as Thulasiram was a University agent acting on University premises. Furthermore, Defendants are liable for aggravating the damages of this assault. Instead of assisting the victim, the University retaliated against Plaintiff for reporting the assault, weaponizing the disciplinary process to re-traumatize him and protect the assailant. This failure to act and subsequent victim-blaming directly exacerbated Plaintiff's physical and emotional injuries.

537. Upon Plaintiff's request that the University of Chicago issue or cooperate in the filing of a No-Contact Directive ("NCD") and otherwise assist with reporting the incident, legal help, the University declined to do so. Instead, the University engaged in conduct that Plaintiff alleges was protective of the alleged assailant and escalated adverse actions against Plaintiff following the reporting of the assault, including disciplinary and procedural measures that Plaintiff contends were retaliatory in nature and intended to undermine his complaints.

538. As a direct and proximate result of University of Chicago affiliate student and staff Thulasiram's assault and battery, Plaintiff suffered physical injury, pain, emotional distress, humiliation, and other damages recognized under Illinois law.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favour and against Defendant, and any vicariously liable Defendants, for compensatory damages, punitive damages, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

**COUNT 56 BREACH OF DUTY OF CONFIDENTIALITY (ILLINOIS COMMON LAW)**

539.	Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

540.	Under Illinois common law, a duty of confidentiality arises when one party entrusts sensitive personal, medical, employment, academic, disciplinary, or grievance-related information to another under circumstances creating a reasonable expectation that such information will be kept confidential and used only for legitimate and limited purposes.

541.	Also this duty is specifically mandated by 20 U.S.C. § 1232g (FERPA), the Americans with Disabilities Act (ADA), and HIPAA privacy regulations, which strictly prohibit educational institutions from disclosing personally identifiable information from education or health records without written consent, except under limited exceptions.

542.	At all relevant times, Plaintiff entrusted Defendants with highly sensitive and confidential information, including but not limited to:
a. medical and disability-related information disclosed through official University channels;
b. internal grievances, complaints, and reports of misconduct and safety concerns;
c. disciplinary materials and investigative communications;
d. payroll, employment, and timekeeping records; and
e. private communications submitted in confidence to University administrators and offices;

f. Whistleblower and Investigation Files: Details of Plaintiff's reports regarding the assault (Title IX), safety hazards (OSHA), and internal grievances, which are protected by privacy clauses in the University's own policies.

543.	Defendants obtained and possessed this confidential information by virtue of Plaintiff's status as a student and student-employee and through Defendants' institutional control over Plaintiff's academic, employment, and grievance processes.

544.	Defendants breached their duty of confidentiality by improperly accessing, using, disseminating, or exploiting Plaintiff's confidential information for purposes unrelated to legitimate academic or employment administration, including but not limited to:

a. using confidential grievance or medical information to justify adverse or retaliatory actions;
b. sharing confidential information among administrators or staff without legitimate need or authorization;
c. employing confidential materials to surveil, monitor, or target Plaintiff; and
d. incorporating confidential information into disciplinary or employment decisions outside the scope of any consent given by Plaintiff.

545.	Defendants breached their duty of confidentiality by intentionally and unauthorizedly disclosing this information to individuals who had no legitimate educational 'need to know,' including:

a. Prejudicing Decision-Makers: Sharing confidential disability and grievance information with disciplinary panel members and faculty members prior to hearings, thereby contaminating the decision-making process with bias;

b. Retaliatory Disclosure: Disseminating details of Plaintiff's protected complaints to his supervisors in other departments to justify his termination;

c. Failure to Secure: Allowing open access to Plaintiff's sensitive data among administrative staff without monitoring who accessed the files or why.

546.	Defendants' conduct exceeded any permissible or implied scope of consent and was unauthorized, unnecessary, and inconsistent with the reasonable expectations under which the information was provided.

547.	Defendants knew or should have known that misuse or disclosure of Plaintiff's confidential information would foreseeably cause harm, including emotional distress, reputational injury, and interference with Plaintiff's education and employment.

548.	Defendants' actions constituted a public disclosure of private facts in a manner that would be highly offensive to a reasonable person, as private medical and disciplinary details were gossip fodder among University staff, violating Plaintiff's right to informational privacy under Illinois common law.

549.     As a direct and proximate result of Defendants' breach of the duty of confidentiality, Plaintiff suffered damages, including emotional distress, reputational harm, loss of educational and employment opportunities, and economic loss.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for compensatory damages; injunctive relief prohibiting further misuse, disclosure, or dissemination of Plaintiff's confidential information; expungement or sealing of improperly used or disseminated materials; costs of suit; and such other relief as the Court deems just and proper under Illinois law.

## COUNT 57 CIVIL CONSPIRACY TO COMMIT SPOLIATION OF EVIDENCE (ILLINOIS COMMON LAW)

550.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

551.     Illinois common law recognizes a cause of action for civil conspiracy where two or more persons knowingly agree to accomplish an unlawful purpose, or a lawful purpose by unlawful means, and commit overt acts in furtherance of that agreement, resulting in damages.

552.     At all relevant times, Defendants, including administrators, supervisors, payroll personnel, and information-technology personnel, knowingly agreed and acted in concert to alter, destroy, conceal, suppress, or fail to preserve material evidence relevant to Plaintiff's employment, discipline, payroll, and academic status.

553.     The existence of this agreement is evidenced by coordinated actions taken by multiple Defendants across departments and functions after Plaintiff made complaints, grievances, and protected reports, at a time when Defendants knew that disputes, investigations, or litigation were likely.

554.     The existence of this agreement is evidenced by the precise timing of the actions. Defendants began altering and suppressing records immediately after Plaintiff filed his Union Grievance on February 1, 2025, and after he threatened external legal action. At this time, litigation was not just possible, but highly probable, triggering a legal duty to preserve all evidence under Illinois law.

555.     Overt acts taken in furtherance of the conspiracy included, but were not limited to:
a. manipulation, deletion, or "roll-back" of payroll and Workday time records;
b. alteration, fabrication, or selective creation of disciplinary documentation;
c. delay, obstruction, or refusal in producing academic, employment, or transcript records;
d. failure to preserve electronic records, metadata, audit trails, access logs, and communications after notice of potential claims; and
e. coordinated internal actions designed to ensure the absence or destruction of unfavorable evidence.

556.     The object and purpose of the conspiracy was to conceal misconduct, manufacture pretext for adverse academic or employment actions, and impair Plaintiff's ability to investigate, challenge, or prove his claims through administrative or judicial proceedings.

557.     As a direct and proximate result of Defendants' conspiracy to commit spoliation of evidence, Plaintiff suffered prejudice to his legal rights, loss or degradation of critical evidence, increased litigation burden and expense, emotional distress, and economic damages.

558.     Defendants' conduct was willful, knowing, and undertaken in bad faith, warranting both compensatory and punitive relief under Illinois common law, as well as appropriate equitable remedies to restore a fair evidentiary posture.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for compensatory damages, punitive damages, costs of suit, and equitable relief, specifically including an adverse inference instruction at trial directing the jury to presume that the destroyed evidence was harmful to Defendants and favorable to Plaintiff.

**COUNT 58 INVASION OF PRIVACY AND / INTRUSION UPON SECLUSION** *(ILLINOIS COMMON LAW)*

559. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

560. Illinois common law recognizes the tort of intrusion upon seclusion where a defendant intentionally intrudes, physically or otherwise, upon the solitude, seclusion, or private affairs of another in a manner that would be highly offensive to a reasonable person.

561. At all relevant times, Plaintiff had a reasonable expectation of privacy in his personal communications, digital accounts, confidential records, and private activities unrelated to legitimate academic or employment administration.

562. Defendants intentionally intruded upon Plaintiff's private affairs through conduct including, but not limited to:
a. monitoring or surveillant Plaintiff's private communications and activities beyond any legitimate institutional purpose;
b. accessing or obtaining information related to Plaintiff's union-related activities, grievances, or internal communications without authorization or legitimate need;
c. accessing, reviewing, or circulating Plaintiff's confidential medical, disability, and accommodation information beyond authorized channels;
d. improperly accessing or interfering with Plaintiff's digital accounts, devices, or electronic communications; and
e. compiling, using, or disseminating private information for retaliatory, disciplinary, or pretextual purposes.

563. Defendants' intrusions were intentional, unjustified, and exceeded any consent or authorization granted by Plaintiff, and were not undertaken for legitimate educational or employment administration.

564. The manner, scope, and purpose of Defendants' intrusions would be highly offensive to a reasonable person, particularly given Defendants' positions of authority and Plaintiff's dependence on Defendants for education, employment, and institutional protection.

565. As a direct and proximate result of Defendants' invasion of Plaintiff's privacy, Plaintiff suffered damages including emotional distress, anxiety, humiliation, loss of personal dignity, reputational harm, and economic loss.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for compensatory damages, injunctive relief prohibiting further intrusion or surveillance, orders requiring the cessation of improper monitoring and the deletion or sealing of improperly obtained private information, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

**COUNT 59 DEFAMATION, DEFAMATION PER SE, AND DEFAMATION PER QUOD** *(ILLINOIS COMMON LAW)*

566. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

567. At all relevant times, Defendants made and caused to be made false statements of fact concerning Plaintiff, including statements communicated in disciplinary records, internal communications, and related documentation.

568. The false statements included, but were not limited to assertions that Plaintiff:
a. engaged in misconduct or policy violations that plaintiff did not commit;
b. acted dishonestly or in bad faith in his academic or employment roles;
c. violated institutional rules or professional standards without factual basis; and
d. engaged in conduct warranting discipline, termination, or expulsion when no such conduct occurred.

e. Plotting evidence against plaintiff multiple times.

569. These statements were false, not expressions of opinion, and were made or republished by Defendants without reasonable grounds for believing them to be true and with reckless disregard for their truth or falsity.

570. Defendants published these false statements to third parties, including University administrators, faculty members, staff, and prospective employers. By placing these false accusations in disciplinary records and refusing to expunge them, Defendants effectively communicated these falsehoods to anyone conducting a background check on Plaintiff in the future, thereby permanently impairing his employability.

571. The false statements accused Plaintiff of professional misconduct, dishonesty, and rule violations incompatible with his academic standing and employment, thereby constituting defamation *per se* under Illinois law.

572. In the alternative, to the extent any defamatory statements require extrinsic facts to explain their defamatory meaning, Plaintiff pleads defamation *per quod* and alleges special damages, including loss of employment opportunities, loss of academic and professional prospects, and damage to his reputation.

573. Defendants knew or should have known that the dissemination of such false statements would foreseeably harm Plaintiff's reputation, academic standing, employability, and future career prospects.

574. Defendants made these statements with actual malice or reckless disregard for the truth. Despite knowing that the timekeeping records had been manipulated by their own staff, Defendants knowingly accused Plaintiff of falsifying them. This knowledge of falsity, or reckless failure to investigate, establishes liability for punitive damages.

575. As a direct and proximate result of Defendants' defamatory statements, Plaintiff suffered damages including reputational injury, loss of professional and educational opportunities, economic loss, and related harm.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for compensatory damages, special damages where applicable, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 60 NEGLIGENT HIRING AND SUPERVISION *(ILLINOIS COMMON LAW)*

576. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

577. At all relevant times, Defendants owed Plaintiff a duty to exercise reasonable care in the hiring, training, retention, and supervision of their employees, agents, and representatives who exercised authority over Plaintiff's education, employment, records, discipline, safety, and grievances.

578. This duty included the obligation to ensure that employees and agents were reasonably fit for their positions; properly trained regarding applicable University policies, safety obligations, recordkeeping responsibilities, and grievance procedures; and adequately supervised to prevent foreseeable harm to students and student-employees.

579. Defendants breached these duties by negligently hiring, retaining, training, and supervising employees and agents who:
a. engaged in harassment, retaliation, intimidation, or discriminatory conduct toward Plaintiff;
b. mishandled safety complaints, assault reports, and grievance submissions;
c. altered, fabricated, or failed to properly maintain employment, payroll, academic, or disciplinary records; and
d. exercised disciplinary or supervisory authority without appropriate oversight or adherence to published procedures.

580. Defendants knew or, in the exercise of reasonable care, should have known that such employees and agents posed a foreseeable risk of harm to Plaintiff, particularly after Plaintiff made repeated complaints, reports, and grievances placing Defendants on notice of misconduct and policy violations.

81

581.     Despite this notice, Defendants failed to take reasonable corrective or preventive action, failed to discipline or remove unfit employees from positions of authority, and permitted a pattern of improper conduct to continue unbated.

582.     As a direct and proximate result of Defendants' negligent hiring, training, retention, and supervision, Plaintiff suffered damages including loss of employment opportunities, disruption of academic standing, reputational harm, economic loss, and other resulting damages as set forth herein.

583.     Defendants' acts and omissions, as alleged herein, were not merely negligent but were **willful and wanton**, in that Defendants acted with a conscious disregard for Plaintiff's safety, rights, and interests, and with utter indifference to the foreseeable harm likely to result from their conduct.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for compensatory damages, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 61 FRAUD

*(Illinois Common Law)*

584.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

585.     At various times before and during Plaintiff's enrollment and employment, Defendants made material representations of fact to Plaintiff concerning the nature, quality, and integrity of the University's academic programs, employment opportunities, payroll practices, and disciplinary processes.

586.     These representations included, but were not limited to statements and materials representing that:
a. the academic program would provide meaningful access to research opportunities, faculty mentorship, and professional advancement;
b. student employment would be administered in compliance with applicable wage, hour, and recordkeeping requirements;
c. disciplinary and grievance processes would be conducted fairly, accurately, and based on truthful records; and
d. employment and academic records would be maintained honestly and not altered or fabricated for retaliatory purposes.

587.     At the time these representations were made, Defendants knew they were false or made them with reckless disregard for their truth, including by concealing known deficiencies, tolerating improper payroll practices, and later fabricating or manipulating records to justify adverse actions against Plaintiff.

588.     Defendants intended that Plaintiff rely on these representations in deciding to enroll at the University, continue his academic program, accept and maintain student employment positions, and refrain from seeking alternative educational or employment opportunities.

589.     Plaintiff reasonably relied on Defendants' representations by enrolling, paying tuition, performing labor, continuing employment, and trusting Defendants' stated processes and recordkeeping.

590.     Defendants' false representations were a substantial factor in inducing Plaintiff's reliance and in causing Plaintiff to remain in circumstances that exposed him to retaliation, wrongful discipline, and economic harm.

591.     Defendants' fraud was willful and malicious, involving a calculated scheme to extract tuition and labor from Plaintiff under false pretenses while denying him the protections of the law. Accordingly, Plaintiff is entitled to punitive damages to deter such institutional fraud.

592.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff suffered damages including loss of employment income, loss of educational and professional opportunities, reputational harm, and other resulting damages as set forth herein.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for compensatory damages, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 62 RESTITUTION – MONEY HAD AND RECEIVED (ILLINOIS COMMON LAW)

Plaintiff realleges and incorporates by reference all preceding paragraphs.

593.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

594.     Under Illinois common law, an action for money had and received lies where a defendant has received money or its equivalent belonging to the plaintiff, and in equity and good conscience the defendant should not be permitted to retain it.

595.     Defendants received, controlled, or retained money and monetary equivalents rightfully belonging to Plaintiff, including but not limited to earned but unpaid wages, underpaid compensation, and compensation provided in the form of gift cards, credits, or other substitutes that were not properly recorded, accounted for, or remitted as lawful wages.

596.     Defendants' retention of these funds was unjust and inequitable because it resulted from improper payroll practices, inaccurate or manipulated time records, misclassification of compensation, and the withholding or diversion of remuneration earned by Plaintiff through his labor. Retaining these funds would allow Defendants to profit from their own fraudulent and retaliatory misconduct.

597.     Plaintiff requested payment and correction of the payroll and compensation irregularities, and Defendants failed or refused to remit the amounts owed or to restore the funds wrongfully retained.

598.     As a result, Defendants were unjustly enriched at Plaintiff's expense, and equity requires restitution of the monies and monetary equivalents wrongfully retained.

**WHEREFORE**, Plaintiff respectfully requests restitution of all monies wrongfully retained, prejudgment interest, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 63 DECLARATORY RELIEF: CONTINUING TORT DOCTRINE AND EQUITABLE TOLLING

(Illinois Common Law / Equitable Relief)

599.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

600.     Plaintiff alleges that Defendants engaged in a continuous and interrelated course of wrongful conduct under Illinois law, including but not limited to ongoing retaliation, manipulation or concealment of records, interference with Plaintiff's employment and academic opportunities, misuse of confidential information, and post-complaint acts affecting Plaintiff's reputation, transcript, and future prospects.

601.     Defendants' conduct was not limited to isolated or discrete acts but instead constituted a continuing pattern of wrongful behavior that persisted over time and produced cumulative injury to Plaintiff, including conduct occurring after Plaintiff filed grievances, administrative complaints, and after his separation from the University.

602.     Illinois law recognizes the continuing tort doctrine where a defendant's wrongful acts are ongoing and cumulative in nature, such that the applicable limitations period does not begin to run until the wrongful conduct ceases.

603.     In addition, Plaintiff alleges that Defendants engaged in concealment and spoliation of material facts and evidence related to payroll practices, disciplinary records, and investigative outcomes, thereby preventing Plaintiff from discovering the full scope of Defendants' misconduct at earlier times.

604.     Defendants' concealment and failure to preserve material information tolled any applicable statutes of limitation under principles of equitable tolling and fraudulent concealment recognized under Illinois law.

605.     Plaintiff brings this action within the time permitted once Defendants' continuing conduct ceased, or once the wrongful conduct and resulting injuries were reasonably discoverable despite Defendants' concealment.

606.     An actual and justiciable controversy exists regarding the timeliness of Plaintiff's claims and the applicability of the continuing tort doctrine and equitable tolling to Defendants' conduct.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Declare that Plaintiff's claims are timely under the continuing tort doctrine and/or equitable tolling principles;
b. Apply equitable tolling to any applicable limitation's periods affected by Defendants' concealment or ongoing misconduct; and
c. Grant such other and further relief as the Court deems just and proper under Illinois law.

## COUNT 64 INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

607.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

608.     At all relevant times, Plaintiff had a reasonable expectancy of entering into valid economic relationships and opportunities, including continued student employment, research and fellowship opportunities, internal and external employment prospects, professional recommendations, and post-graduate academic and career advancement.

609.     Defendants knew of Plaintiff's prospective economic relationships and opportunities, including his existing student employment roles, pending employment interviews, applications for fellowships and research opportunities, future admits, and reliance on academic standing and recommendations for future career prospects.

610.     Defendants intentionally and unjustifiably interfered with Plaintiff's prospective economic advantage by engaging in wrongful conduct, including but not limited to:
(a) fabricating or manipulating disciplinary and payroll records;
(b) initiating pretextual disciplinary actions;
(c) terminating or obstructing Plaintiff's employment roles without legitimate justification;
(d) cancelling or undermining employment interviews and opportunities;
(e) delaying or withholding transcripts and academic records; and
(f) disseminating false or misleading information concerning Plaintiff's conduct or standing.

611.     Defendants' interference was improper and unjustified and was undertaken with the purpose of retaliating against Plaintiff, silencing his grievances, and preventing him from securing continued or future academic and employment opportunities.

612.     As a direct and proximate result of Defendants' intentional interference, Plaintiff lost specific employment opportunities, research and fellowship prospects, professional recommendations, and other concrete economic advantages, resulting in measurable economic loss.

613.     Defendants acted intentionally, willfully, and with conscious disregard of Plaintiff's rights, justifying the imposition of punitive damages under Illinois law.

**WHEREFORE**, Plaintiff respectfully seeks compensatory damages, punitive damages, costs of suit, and such equitable relief as the Court deems just and proper under Illinois law.

## COUNT 65 CONVERSION (COMMON LAW)

614.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

84

615. At all relevant times, Defendants had possession, custody, and control over specific, identifiable personal property belonging to Plaintiff, including but not limited to: earned wages; compensation credited or issued in the form of gift cards, Maroon Dollars, or other stored-value instruments; and other tangible or readily identifiable monetary equivalents arising from Plaintiff's student employment and research-related participation.

616. Under Illinois common law, conversion occurs where a defendant intentionally and without lawful justification exercises dominion or control over personal property belonging to another in a manner inconsistent with the owner's right to possession.

617. Defendants wrongfully converted Plaintiff's property by intentionally exercising unauthorized dominion and control over Plaintiff's identifiable wages and monetary equivalents, including by:
(a) issuing compensation in the form of gift cards, credits, or cash substitutes and failing to properly remit or account for those payments as Plaintiff's earned wages;
(b) retaining, appropriating, diverting, or canceling such payment instruments for University use or control;
(c) withholding or failing to disburse earned payroll funds despite Plaintiff's entitlement; and
(d) refusing to return or restore specific wage amounts and monetary equivalents upon demand.

618. In addition, Defendants exercised wrongful control over Plaintiff's tangible and quasi-tangible property interests by intentionally withholding access to Plaintiff's official transcript and employment records after Plaintiff satisfied all academic and administrative prerequisites, using such records as leverage or punishment rather than for any legitimate institutional purpose.

619. Defendants' acts were intentional, unauthorized, and inconsistent with Plaintiff's ownership and right to immediate possession of his property.

620. As a direct and proximate result of Defendants' conversion, Plaintiff was deprived of the use and possession of his property, suffered measurable pecuniary loss, and incurred consequential damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants for compensatory damages equal to the full value of the converted property, prejudgment interest, restitution, disgorgement of any benefits realized from the converted property, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 66 UNJUST ENRICHMENT / RESTITUTION

*(Equitable – Pleaded in the Alternative)*

621. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

622. Plaintiff conferred substantial and measurable benefits upon Defendants through his labor, services, research participation, and contributions as a student-employee and program participant, which Defendants knowingly accepted and retained.

623. Under Illinois law, a claim for unjust enrichment lies where a defendant has unjustly retained a benefit to the plaintiff's detriment, and where the circumstances are such that equity and good conscience require restitution.

624. Defendants were unjustly enriched by retaining the economic value of Plaintiff's labor and services without full, lawful, or timely compensation, including by retaining earned wages, gift cards, Maroon Dollars, credits, and other economic benefits that should have been paid or accounted for to Plaintiff.

625. Defendants were further unjustly enriched by deriving institutional and economic benefit from Plaintiff's academic work, research participation, and continued enrollment while simultaneously delaying, withholding, or leveraging Plaintiff's transcript and academic credentials in a manner unrelated to any legitimate educational purpose.

626. Defendants' enrichment was unjust because it resulted from improper payroll practices, inaccurate or manipulated records, withholding of compensation, and bad-faith conduct that deprived Plaintiff of the fair value of his labor and academic participation.

85

627. Plaintiff has no adequate remedy at law to fully redress Defendants' unjust enrichment because the nature, extent, and valuation of the benefits retained by Defendants—including payroll records, stored-value instruments, credits, and internal accounting—are within Defendants' exclusive possession and control and require equitable accounting and restitution.

628. This claim is pleaded in the alternative to Plaintiff's legal and statutory claims, including wage and contract claims, to the extent such claims are found inapplicable, unenforceable, or insufficient to fully restore the benefits unjustly retained by Defendants.

**WHEREFORE**, Plaintiff respectfully demands restitution and disgorgement of all sums and benefits by which Defendants have been unjustly enriched; an order compelling a full and fair accounting of all compensation, gift cards, Maroon Dollars, credits, and other benefits derived from Plaintiff's labor or participation; prejudgment and post-judgment interest; costs of suit; and such other equitable relief as this Court deems just and proper under Illinois law.

## COUNT 67 NEGLIGENCE — NEGLIGENCE PER SE (BASED ON VIOLATIONS OF ILLINOIS STATUTES)

*(Illinois Common Law – Pleaded in the Alternative)*

629. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

630. At all relevant times, Defendants owed Plaintiff duties of reasonable care under Illinois law, including duties arising from statutes, regulations, and common law principles enacted to protect individuals such as Plaintiff from foreseeable harm in employment, educational, and campus environments.

631. Defendants owed Plaintiff statutory duties, including but not limited to duties imposed by Illinois statutes and regulations governing:
(a) lawful payment of wages and maintenance of accurate payroll records;
(b) restrictions on child labor on premises controlled by Defendants;
(c) lawful handling and reporting of compensation and payroll-related information; and
(d) maintenance of safe facilities and protection from known safety hazards on campus.

632. The statutes and regulations giving rise to these duties were enacted for the protection of a class of persons that includes Plaintiff, and to prevent the types of harm Plaintiff suffered.

633. Defendants breached their duties of care, and violated the foregoing statutory and regulatory duties, by engaging in acts and omissions including but not limited to:
(a) failing to maintain accurate payroll and timekeeping records;
(b) issuing or permitting improper compensation practices and recordkeeping irregularities;
(c) tolerating or permitting apparent violations of child labor restrictions on University premises; and
(d) failing to address known or reported safety hazards on campus facilities.

634. Under Illinois law, Defendants' violations of the above-referenced statutes and regulations constitute negligence per se to the extent such violations establish a breach of a duty designed to protect Plaintiff and others similarly situated.

635. Independently and in the alternative, Defendants' conduct constituted common-law negligence because Defendants failed to exercise reasonable care under the circumstances, creating foreseeable risks of harm to Plaintiff.

636. As a direct and proximate result of Defendants' negligent acts and statutory violations, Plaintiff suffered damages including economic loss, interference with employment and educational opportunities, and other compensable injuries as alleged herein.

637. This claim is pleaded in the alternative to Plaintiff's statutory wage, contract, and equitable claims, to the extent such claims do not fully address the injuries caused by Defendants' breach of statutory and common-law duties.

**WHEREFORE**, Plaintiff respectfully seeks compensatory damages, costs of suit, prejudgment and post-judgment interest, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 68 NEGLIGENT SPOLIATION OF EVIDENCE

(Illinois Common Law – Equitable and Remedial Relief)

638. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

639. At all relevant times, Defendants had possession, custody, or control over material documents, records, and electronically stored information relevant to Plaintiff's employment, payroll, discipline, grievances, and academic status, including but not limited to payroll records, Workday time entries, disciplinary documentation, server logs, access logs, audit trails, and electronic communications.

640. Under Illinois law, once litigation, administrative proceedings, or internal investigations are reasonably foreseeable, a party has a duty to take reasonable steps to preserve material evidence that may be relevant to such claims.

641. Defendants knew or reasonably should have known that litigation or administrative proceedings were likely after Plaintiff reported wage irregularities, safety violations, assault, retaliation, and record manipulation, and after Plaintiff filed grievances and complaints placing Defendants on notice of potential claims.

642. Despite this duty, Defendants negligently failed to preserve material evidence by permitting or causing the deletion, alteration, "roll-back," overwriting, or improper maintenance of payroll records, Workday entries, electronic logs, and related digital data, and by failing to implement reasonable preservation measures to safeguard such evidence.

643. Defendants' negligent failure to preserve evidence materially impaired Plaintiff's ability to obtain, analyze, and present evidence necessary to prove his claims, including evidence concerning payroll accuracy, hours worked, disciplinary justifications, and the timing and motive of adverse actions.

644. As a direct and proximate result of Defendants' negligent spoliation of evidence, Plaintiff has suffered prejudice to his legal rights, increased litigation burden, loss of evidentiary support, and related damages, the full extent of which is presently unknown due to the destruction or alteration of evidence.

645. An actual controversy exists regarding Defendants' preservation obligations and the appropriate remedial and equitable relief necessary to prevent further prejudice and to restore a fair evidentiary posture.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Declare that Defendants breached their duty to preserve material evidence through negligent spoliation;
b. Order immediate preservation of all remaining relevant documents and electronically stored information, including payroll systems, Workday data, server logs, cloud backups, emails, and access records;
c. Order forensic imaging and preservation of relevant systems by a neutral, independent forensic expert under Court supervision;
d. Award Plaintiff the reasonable costs and expenses necessary to investigate, reconstruct, or analyze missing or altered data;
e. Consider and impose appropriate remedial measures and evidentiary sanctions permitted under Illinois law to address the prejudice caused by spoliation; and
f. Grant such other and further relief as the Court deems just and proper.

## COUNT 68 INTENTIONAL (BAD-FAITH) SPOLIATION OF EVIDENCE

(Illinois Common Law – Equitable and Remedial Relief)

646. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

87

647. Plaintiff alleges that, after Plaintiff engaged in protected reporting and filed complaints and grievances, Defendants knowingly, intentionally, and in bad faith altered, deleted, manipulated, or caused the alteration or deletion of material records and electronically stored information, including but not limited to payroll records, Workday time entries, disciplinary documentation, audit trails, and related electronic data.

648. Such intentional acts included, but were not limited to, deliberate "roll-backs" of time records, fabrication or revision of disciplinary materials, suppression of audit logs or metadata, and other manipulations undertaken to conceal wrongdoing, to manufacture pretext for disciplinary or adverse academic action, and to impede Plaintiff's ability to establish the truth of the underlying events.

649. At the time of these acts, Defendants knew or reasonably should have known that litigation, administrative proceedings, or formal disputes were likely or imminent, and that the altered or destroyed evidence was material to those proceedings.

650. Under Illinois law, the intentional or bad-faith destruction or alteration of evidence for the purpose of depriving an opposing party of proof is wrongful and warrants heightened remedial and equitable relief to address resulting prejudice and to protect the integrity of the adjudicative process.

651. Defendants' intentional spoliation directly and substantially prejudiced Plaintiff by impairing his ability to prove payroll irregularities, to rebut pretextual disciplinary justifications, and to establish the timing, motive, and scope of Defendants' retaliatory conduct.

652. An actual controversy exists regarding the scope of Defendants' intentional spoliation, the continuing risk of further destruction or alteration of evidence, and the appropriate remedial measures necessary to restore a fair evidentiary posture.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Enter findings that Defendants intentionally and in bad faith spoliated material evidence;
b. Order immediate and comprehensive preservation of all remaining relevant documents and electronically stored information, including forensic preservation of payroll systems, Workday data, servers, audit logs, backups, and email systems;
c. Order forensic imaging and analysis by a neutral, independent expert under Court supervision;
d. Impose appropriate remedial and evidentiary measures permitted under Illinois law, including adverse evidentiary inferences, limitations on defenses, or other curative relief necessary to address the prejudice caused by spoliation;
e. Award Plaintiff the reasonable costs and expenses incurred in investigating, reconstructing, or addressing the effects of spoliation, to the extent permitted by law; and
f. Grant such other and further relief as the Court deems just and proper.

**COUNT 69 BREACH OF FIDUCIARY DUTY (COMMON LAW) — AGAINST TRUSTEES AND SENIOR ADMINISTRATORS**

653. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

654. Plaintiff alleges that certain Defendants, including members of the Board of Trustees, senior officers, deans, and high-level administrators, exercised extraordinary control and discretionary authority over Plaintiff's education, employment, discipline, records, and access to institutional processes, creating a relationship of trust and confidence beyond an ordinary arm's-length relationship.

655. By virtue of their positions and authority, these Defendants assumed fiduciary or fiduciary-like duties of loyalty, good faith, candor, and reasonable care with respect to matters uniquely entrusted to them, including oversight of disciplinary proceedings, protection of student and student-employee safety, safeguarding of institutional integrity, and stewardship of restricted or designated funds and benefits.

656. Under Illinois common law, fiduciary or confidential relationships may arise where one party places trust and reliance in another who has superior power, influence, or control, and where the trusted party is aware of and accepts that reliance.

657. Defendants knew that Plaintiff reasonably relied on their representations, governance, and oversight to ensure fair disciplinary procedures, accurate recordkeeping,

88

lawful payroll practices, and protection from retaliation and harm, and Defendants accepted and exercised that trust.

658. Defendants breached their fiduciary or fiduciary-like duties by engaging in or permitting conduct including, but not limited to:
(a) failing to investigate or remediate credible reports of assault, safety hazards, and serious misconduct;
(b) permitting or directing the manipulation, alteration, or concealment of payroll, employment, or disciplinary records;
(c) allowing the misuse of University resources or restricted funds for improper purposes; and
(d) prioritizing institutional self-protection or the shielding of wrongdoers over the protection of Plaintiff and the integrity of University processes.

659. Defendants' breaches were undertaken knowingly, in bad faith, or with reckless disregard for Plaintiff's rights and interests, and constituted an abuse of the trust and authority reposed in them.

660. As a direct and proximate result of these breaches, Plaintiff suffered damages including economic loss, loss of educational and career opportunities, reputational injury, emotional distress, and other compensable harm.

**WHEREFORE**, Plaintiff respectfully demands judgment against those Defendants who breached fiduciary or fiduciary-like duties for compensatory damages, exemplary damages where permitted by law, disgorgement of any improperly obtained benefits, equitable remediation as appropriate, costs of suit, and such other relief as this Court deems just and proper.

## COUNT 70 FALSE LIGHT INVASION OF PRIVACY (COMMON LAW)

661. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

662. Defendants gave publicity to false, misleading, or materially incomplete statements, portrayals, and records concerning Plaintiff by disseminating them within the University and to third parties with a legitimate expectation of further distribution, including administrators, faculty, staff, decision-makers involved in discipline and employment, and prospective academic or employment evaluators.

663. The false or misleading matters publicized by Defendants included, but were not limited to:
(a) fabricated or altered disciplinary records;
(b) false assertions that Plaintiff violated University policies or legal requirements;
(c) misleading portrayals suggesting dishonesty, misconduct, or unfitness; and
(d) selective or distorted presentations of events designed to justify adverse academic and employment actions.

664. These publications placed Plaintiff in a false light before others in a manner that would be highly offensive to a reasonable person, particularly given the academic, professional, and reputational significance of disciplinary and employment records in an elite educational institution.

665. Defendants knew the published matters were false or misleading, or acted with reckless disregard for their truth or falsity, including by affirming or relying upon fabricated records and narratives despite contrary information available to them.

666. Defendants' conduct went beyond isolated internal evaluation and instead constituted dissemination sufficient to satisfy the publicity requirement under Illinois law, as the false portrayals were shared among multiple decision-makers and were foreseeably likely to influence third parties' perceptions of Plaintiff.

667. As a direct and proximate result of Defendants' false-light conduct, Plaintiff suffered reputational harm, emotional distress, humiliation, anxiety, loss of educational and employment opportunities, and economic damages.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants for compensatory damages, punitive damages where permitted by law, injunctive relief requiring retraction,

correction, and expungement of false or fabricated records, costs of suit, and such other relief as the Court deems just and proper.

## COUNT 71 RETALIATORY DISCHARGE (ILLINOIS COMMON LAW)

668.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

669.     Illinois recognizes a narrow but well-established common-law cause of action for retaliatory discharge where an employer terminates or constructively discharges an employee in retaliation for the employee's reporting of illegal conduct or refusal to participate in unlawful activity, in violation of a clearly mandated public policy of this State.

670.     At all relevant times, Plaintiff was employed by Defendants in multiple student-employee roles and was subject to Defendants' authority and control with respect to hiring, scheduling, discipline, continuation of employment, and termination.

671.     Plaintiff engaged in conduct protected by clearly mandated Illinois public policy, including but not limited to:
(a) reporting unpaid wages, underpayment, and payroll record manipulation;
(b) reporting violations of wage-and-hour requirements applicable under Illinois law;
(c) reporting apparent tax and payroll irregularities;
(d) reporting unsafe working conditions and safety hazards on University premises; and
(e) refusing to acquiesce in or remain silent about unlawful practices affecting himself and others.

672.     Shortly after Plaintiff engaged in these protected activities, Defendants took adverse employment actions against Plaintiff, including but not limited to terminating his student employment positions, constructively discharging him from additional roles, cancelling future employment opportunities, and initiating or relying upon fabricated or pretextual disciplinary measures.

673.     The temporal proximity between Plaintiff's protected reporting and Defendants' adverse actions, combined with Defendants' reliance on altered or selectively enforced records and procedures, supports a reasonable inference that Plaintiff's protected conduct was a substantial and motivating factor in Defendants' decision to terminate and exclude Plaintiff from employment.

674.     Defendants' actions were undertaken in retaliation for Plaintiff's protected reporting and were intended to punish, silence, and deter Plaintiff and others from reporting unlawful conduct, in direct contravention of Illinois's strong public policy favoring the exposure of illegal practices and the protection of whistleblowers.

675.     As a direct and proximate result of Defendants' retaliatory discharge and related conduct, Plaintiff suffered lost wages and benefits, loss of current and future employment opportunities, economic damages, emotional distress, and reputational harm.

676.     Illinois has a strong and clearly mandated public policy favoring the reporting of unlawful conduct, protection of workplace safety, integrity of wage and payroll practices, and protection of individuals who raise concerns regarding illegal or unsafe activity.

677.     Defendants' retaliatory conduct, interference with Plaintiff's employment and education, and misuse of disciplinary mechanisms directly contravened these fundamental public policy interests of the State of Illinois.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants for compensatory damages, punitive damages to the extent permitted under Illinois law, costs of suit, and such other relief as the Court deems just and proper.

## COUNT 72 WRONGFUL ACADEMIC / DISCIPLINARY EXPULSION (ILLINOIS COMMON LAW)

678.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

90

679.     Under Illinois common law, while private educational institutions are afforded discretion in academic and disciplinary matters, they may be held liable where disciplinary or academic expulsion is arbitrary, capricious, retaliatory, undertaken in bad faith, or carried out in material deviation from the institution's own published policies and procedures.

680.     Plaintiff was subject to Defendants' disciplinary authority as a enrolled student and student-employee and was entitled to fair consideration, good-faith decision-making, and substantial compliance with Defendants published disciplinary and grievance procedures.

681.     Defendants expelled Plaintiff through a disciplinary process that was fundamentally unfair, including but not limited to: (a) reliance on fabricated, altered, or selectively presented evidence; (b) withholding or ignoring exculpatory information known to Defendants; (c) denying Plaintiff a meaningful opportunity to participate, respond, or be supported during the process; and (d) materially deviating from Defendants' own written disciplinary, grievance, and procedural rules.

682.     The disciplinary charges and expulsion were not imposed for bona fide academic or conduct-related reasons but were instead imposed in retaliation for Plaintiff's prior complaints, whistleblowing activity, and reporting of unlawful or unsafe conduct.

683.     Defendants acted arbitrarily and in bad faith by invoking disciplinary mechanisms as a pretext to silence Plaintiff, shield institutional misconduct, and remove Plaintiff from the University rather than to fairly adjudicate alleged conduct.

684.     As a direct and proximate result of Defendants' wrongful expulsion, Plaintiff suffered substantial harm, including loss of academic standing, expulsion from his degree program, delayed or withheld transcripts, loss of future educational and career opportunities, reputational injury, economic damages, and emotional distress.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants for compensatory damages, equitable relief including expungement of disciplinary records and appropriate academic remediation or reinstatement, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 73 PROMISSORY ESTOPPEL (ILLINOIS COMMON LAW)

*(Illinois Common Law — Pleaded in the Alternative)*

685.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

686.     Defendants made clear, definite, and unambiguous promises to Plaintiff, including but not limited to promises that Plaintiff would be afforded: (a) fair and good-faith disciplinary and grievance procedures; (b) continued access to his educational program absent legitimate grounds for discipline; (c) eligibility for student employment and academic opportunities consistent with published policies; and (d) good-faith consideration and implementation of documented accommodations.

687.     Defendants reasonably expected and intended that Plaintiff would rely on these promises, as they were made in official University materials, policies, communications, and representations governing enrollment, employment, discipline, and student rights.

688.     Plaintiff reasonably and foreseeably relied on Defendants' promises by enrolling at the University, continuing his academic program, accepting and maintaining student employment roles, investing substantial tuition, labor, and time, complying with University procedures, and refraining from seeking alternative educational or employment opportunities.

689.     Defendants failed to honor these promises by acting arbitrarily and in bad faith, including by deviating from their own procedures, imposing pretextual discipline, denying fair process, and excluding Plaintiff from academic and employment opportunities without legitimate justification.

91

690.     Plaintiff suffered substantial detriment as a direct and proximate result of his reliance on Defendants' promises, including loss of educational standing, lost employment and income, delay or denial of transcripts, loss of future academic and career opportunities, economic damages, and emotional distress.

691.     Enforcement of Defendants' promises is necessary to avoid injustice, as Plaintiff's reliance was reasonable, foreseeable, and induced by Defendants' own representations and conduct.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants for damages and equitable relief necessary to prevent injustice, including appropriate compensation, corrective relief, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 74 EQUITABLE ESTOPPEL (Illinois Common Law)

692.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

693.     Defendants, through their officers, administrators, and agents, knowingly made material representations and omissions concerning Plaintiff's academic standing, disciplinary exposure, employment status, and continued eligibility to remain enrolled and employed at the University.

694.     These representations and omissions included, among other things: assurances of ongoing good standing, silence regarding alleged violations while Plaintiff continued to work and enroll, and conduct indicating that Plaintiff faced no imminent disciplinary or academic consequences.

695.     Defendants knew or reasonably should have known that Plaintiff would rely on these representations and omissions in deciding whether to continue his education, maintain student employment, comply with internal processes, refrain from seeking alternative opportunities, and rely on University procedures for protection and redress.

696.     Plaintiff reasonably and detrimentally relied on Defendants' representations and silence by continuing enrollment and employment, investing tuition and labor, participating in grievance and disciplinary processes in good faith, and foregoing other educational or employment opportunities.

697.     After inducing Plaintiff's reliance, Defendants abruptly reversed course and asserted positions inconsistent with their prior representations and conduct, including by initiating or reviving disciplinary actions, imposing adverse academic and employment consequences, and justifying such actions on grounds previously concealed or contradicted.

698.     Plaintiff suffered prejudice and injustice as a direct result of Defendants' inconsistent positions, including loss of educational standing, employment opportunities, and the ability to protect his rights in a timely manner.

699.     Under Illinois law, equity requires that Defendants be estopped from asserting positions inconsistent with their prior representations, omissions, and course of conduct where such inconsistency would result in injustice.

**WHEREFORE**, Plaintiff respectfully requests equitable relief estopping Defendants from denying or contradicting their prior representations and conduct, together with such corrective, declaratory, and other equitable relief as the Court deems just and proper under Illinois law.

## COUNT 75 CIVIL AIDING AND ABETTING (ILLINOIS COMMON LAW)

700.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

701.     Under Illinois common law, a defendant is liable for civil aiding and abetting where the                                                                                         defendant:
(a) had actual knowledge that another's conduct constituted a breach of duty or a tortious act;                                                                                         and
(b) knowingly and substantially assisted, encouraged, or facilitated that conduct.

92

702. Certain Defendants had actual knowledge that other Defendants were engaging in wrongful and tortious conduct directed at Plaintiff, including but not limited to retaliation for protected activity, falsification and manipulation of payroll and disciplinary records, concealment of assault and safety complaints, interference with Plaintiff's academic and employment opportunities, and spoliation of evidence.

703. Despite such knowledge, these Defendants knowingly and substantially assisted the wrongful conduct by, among other things: (a) approving, directing, or ratifying adverse academic and employment actions based on fabricated or manipulated records; (b) providing access to confidential information, systems, or records used to justify or conceal misconduct; (c) coordinating or participating in the suppression or obstruction of Plaintiff's grievances and complaints; (d) failing to intervene or halt known wrongdoing while possessing authority and capacity to do so; and (e) facilitating or acquiescing in the continuation of retaliatory or deceptive practices.

704. The assistance provided by these Defendants was substantial and was a proximate cause of the injuries suffered by Plaintiff, including loss of employment, expulsion, economic damages, reputational harm, emotional distress, and impairment of Plaintiff's ability to protect his rights.

705. Defendants' conduct was knowing, willful, and in conscious disregard of Plaintiff's rights and of foreseeable harm to Plaintiff.

WHEREFORE, Plaintiff seeks compensatory damages, punitive damages where permitted, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 76 FRAUDULENT CONCEALMENT (ILLINOIS COMMON LAW)

706. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

707. Defendants possessed material facts concerning matters directly affecting Plaintiff's employment, academic standing, disciplinary exposure, payroll compensation, safety complaints, and grievance outcomes, including but not limited to: manipulation of payroll records, existence and alteration of disciplinary documentation, safety and assault investigations, and the true bases for adverse actions taken against Plaintiff.

708. Defendants concealed or suppressed these material facts by affirmative acts and omissions, including delaying disclosure, withholding records, providing partial or misleading explanations, failing to disclose known adverse information, and maintaining silence where disclosure was required.

709. Defendants owed Plaintiff a duty to disclose such material facts by virtue of their special relationship with Plaintiff as a university exercising control over Plaintiff's education, employment, disciplinary process, records, and immigration-sensitive status, and by Defendants' exclusive control over the relevant information.

710. Defendants concealed these facts with the intent that Plaintiff rely on the absence of disclosure and continue to act under false assumptions regarding his standing, rights, and exposure, including by continuing enrollment, employment, participation in internal grievance processes, and refraining from timely pursuit of external remedies.

711. Plaintiff reasonably relied on Defendants' concealment and omissions to his detriment, including by foregoing alternative employment or educational opportunities, continuing to rely on internal procedures, and losing the opportunity to protect himself from escalating adverse actions.

712. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff suffered damages including economic loss, loss of employment and educational opportunities, impairment of legal rights, emotional distress, and other compensable injuries.

93

713. Defendants' concealment also prevented Plaintiff from discovering the full extent of Defendants' misconduct within the applicable limitations periods.

**WHEREFORE**, Plaintiff seeks compensatory damages, equitable relief, application of fraudulent-concealment tolling to all applicable limitations periods, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

### COUNT 77 NEGLIGENT RETENTION

714. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

715. At all relevant times, Defendants employed and retained certain employees, agents, and representatives who interacted with Plaintiff in academic, employment, disciplinary, payroll, and safety-related capacities.

716. Prior to and during the relevant period, Defendants knew or reasonably should have known that these individuals posed a foreseeable risk of harm to Plaintiff and others, based on prior complaints, reported misconduct, documented grievances, observed behavior, and/or violations of university policies and applicable standards.

717. Despite such knowledge, Defendants negligently retained these individuals and permitted them to continue exercising authority and control over Plaintiff, including access to payroll systems, disciplinary processes, confidential records, and physical workspaces.

718. While retained by Defendants, these individuals engaged in wrongful conduct including, but not limited to, harassment, retaliation, falsification or manipulation of employment and disciplinary records, concealment of misconduct, and in at least one instance, physical assault.

719. Defendants' failure to remove, discipline, restrict, or adequately monitor these individuals constituted negligent retention and created a foreseeable and unreasonable risk of harm to Plaintiff.

720. As a direct and proximate result of Defendants' negligent retention, Plaintiff suffered injuries including loss of employment and educational opportunities, economic loss, emotional distress, reputational harm, and other compensable damages.

**WHEREFORE**, Plaintiff seeks compensatory damages, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

### COUNT 78 FAILURE TO PROTECT / NEGLIGENT SECURITY
*(Illinois Common Law)*

721. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

722. At all relevant times, Defendants owned, operated, managed, and controlled the University campus and its facilities, including academic buildings, libraries, workplaces, and other premises where Plaintiff studied and worked.

723. Defendants owed Plaintiff a duty of reasonable care to provide safe premises and to take reasonable measures to protect students and student-employees from foreseeable criminal acts and safety risks occurring on University property.

724. Defendants knew or reasonably should have known of specific threats and foreseeable risks to Plaintiff's safety, including prior harassment, intimidation, safety complaints, and the presence of individuals with a known propensity for misconduct.

725. Despite such knowledge, Defendants failed to take reasonable protective measures, including but not limited to:
(a) failing to investigate and respond appropriately to reports of threats and assault;
(b) failing to implement safety precautions or restrictions concerning the assailant;
(c) failing to provide warnings, escorts, or interim protective measures; and
(d) failing to enforce or follow existing safety and disciplinary policies designed to prevent harm.

94

726.    As a direct and proximate result of Defendants' failure to protect and negligent security measures, Plaintiff was assaulted on University premises and suffered physical injury, emotional distress, humiliation, and other damages.

727.    Defendants' failure to protect Plaintiff from foreseeable harm constituted a breach of their duty of care under Illinois common law.

**WHEREFORE**, Plaintiff seeks compensatory damages, equitable relief requiring appropriate safety measures and policy compliance, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 79 GENERAL NEGLIGENCE (ILLINOIS COMMON LAW)

728.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

729.    At all relevant times, Defendants owed Plaintiff duties of reasonable care under Illinois law arising from Plaintiff's status as a student and student-employee, including duties to reasonably administer academic and employment systems, maintain safe environments, keep accurate records, protect privacy, and conduct disciplinary and grievance processes in a fair and non-negligent manner.

730.    Defendants breached these duties through acts and omissions including, but not limited                                                                                   to:
(a) negligent administration of payroll, recordkeeping, and timekeeping systems;
(b) negligent handling of disciplinary and grievance procedures;
(c) negligent management of safety complaints and foreseeable risks of harm;
(d) negligent handling and disclosure of confidential and sensitive information; and
(e) negligent institutional decision-making affecting Plaintiff's education, employment, and records.

731.    Defendants knew or reasonably should have known that such negligent conduct would foreseeably cause harm to a student and student-employee subject to Defendants' authority, control, and administrative systems.

732.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered foreseeable injuries including economic loss, loss of educational and employment opportunities, emotional distress, reputational harm, and other compensable damages.

733.    Plaintiff did not assume the risk of Defendants' negligent conduct and was not contributorily negligent in causing his injuries.

**WHEREFORE**, Plaintiff seeks compensatory damages, costs of suit, and such other relief as the Court deems just and proper under Illinois law.

## COUNT 80 ACCOUNTING (EQUITABLE)

*(Illinois Common Law)*

734.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

735.    Defendants exercised exclusive custody, control, and possession over complex and interrelated financial records relating to Plaintiff's student employment and compensation, including but not limited to payroll records, Workday time entries, wage calculations, gift cards, Maroon Dollars, tax reporting data, reimbursements, and related accounting systems.

736.    These financial records reflect transactions and practices that are material to Plaintiff's claims, including whether Plaintiff was fully and lawfully compensated for work performed, whether wages were paid through nonstandard or improper mechanisms, and whether payroll records were altered, misclassified, or concealed.

737.    Plaintiff does not have access to these records and cannot reasonably obtain them without judicial intervention, as the relevant information is uniquely within Defendants' possession and control.

95

738.     The financial transactions and compensation practices at issue are sufficiently complex and opaque that an ordinary legal remedy would be inadequate to determine the full scope of amounts owed, withheld, misclassified, or converted.

739.     Defendants' control over the relevant records, combined with allegations of payroll irregularities, record manipulation, and concealment, renders an equitable accounting necessary to ascertain the true state of accounts between the parties.

740.     Equity therefore requires that Defendants be compelled to provide a full and complete accounting of all wages, payments, credits, gift cards, Maroon Dollars, and other remuneration connected to Plaintiff's employment and participation during the relevant period.

**WHEREFORE**, Plaintiff respectfully requests that this Court order Defendants to provide a full and accurate accounting; require disclosure and production of all relevant payroll and compensation records; award restitution of all sums determined to be owed; grant prejudgment interest where appropriate; and award such other equitable relief as the Court deems just and proper under Illinois law.

## COUNT 81 DECLARATORY JUDGMENT — RECORD & TRANSCRIPT EXPUNGEMENT

*(735CS 5/2-701)*

741.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

742.     An actual, present, and justiciable controversy exists between Plaintiff and Defendants concerning the accuracy, propriety, and continued maintenance of Plaintiff's academic, disciplinary, and employment records, including transcript notations and internal files that affect Plaintiff's education, employment prospects, and professional standing.

743.     Defendants have created, altered, maintained, and/or relied upon records that Plaintiff contends are inaccurate, incomplete, misleading, retaliatory, or derived from improper or unlawful processes, including records associated with discipline, termination, payroll, and expulsion.

744.     Defendants continue to maintain and rely upon these records, and such reliance has ongoing and concrete consequences for Plaintiff, including interference with applications, employment opportunities, and further education.

745.     Plaintiff contends that Defendants lack lawful or equitable grounds to maintain, publish, or rely upon the challenged records in their current form, while Defendants assert the contrary, creating an immediate and substantial dispute appropriate for declaratory relief.

746.     Declaratory relief is necessary and appropriate to resolve the parties' rights and obligations, to clarify the status of Plaintiff's records, and to prevent continuing and future harm.

747.     An award of declaratory relief will terminate the uncertainty and controversy giving rise to this action and will serve a useful purpose by guiding the parties' future conduct.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a declaratory judgment: (a) declaring that the challenged academic, disciplinary, and employment records are inaccurate, improperly maintained, or unlawfully relied upon; (b) ordering correction, expungement, or annotation of such records, including Plaintiff's transcript, as justice requires; and (c) granting such other declaratory or equitable relief as the Court deems just and proper under Illinois law.

## COUNT 82 RESPONDEAT SUPERIOR / VICARIOUS LIABILITY

*(Illinois Common Law)*

96

748. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

749. At all relevant times, the individual Defendants who committed the acts and omissions alleged in this Complaint were employees, agents, servants, or representatives of Defendant University of Chicago and/or other institutional Defendants.

750. The tortious acts and omissions alleged herein, including but not limited to retaliation, record falsification, spoliation of evidence, defamation, invasion of privacy, negligent and intentional infliction of emotional distress, negligence, and failure to protect, were committed by such individuals while acting within the course and scope of their employment or agency, and in furtherance of Defendants' institutional business and interests.

751. Alternatively, Defendants authorized, directed, ratified, or knowingly permitted the wrongful conduct of their employees and agents, or failed to take reasonable steps to prevent such conduct despite knowledge of the risk of harm.

752. Under the doctrine of respondeat superior, Defendants are vicariously liable for the acts and omissions of their employees and agents committed within the scope of employment or agency.

WHEREFORE, Plaintiff seeks judgment against Defendants for all damages, equitable relief, costs of suit, and other relief attributable to the tortious acts of Defendants' employees and agents, as determined by the Court, under Illinois law.

## COUNT 83 CONSTRUCTIVE TRUST (EQUITABLE RELIEF)

753. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

754. Defendants wrongfully obtained, retained, controlled, or exercised dominion over money, wages, benefits, credits, gift cards, Maroon Dollars, and other financial or property interests rightfully belonging to Plaintiff, as alleged throughout this Complaint.

755. Defendants' acquisition and retention of such property resulted from wrongful conduct, including but not limited to payroll manipulation, wage underpayment or nonpayment, misclassification of compensation, misuse of payment instruments, retaliation, fraud, concealment, and abuse of institutional authority.

756. As a result of Defendants' misconduct, Defendants hold identifiable funds or property interests that, in equity and good conscience, belong to Plaintiff.

757. Illinois law authorizes the imposition of a constructive trust where property has been wrongfully acquired or retained under circumstances involving fraud, breach of duty, abuse of confidence, or other inequitable conduct, and where legal remedies are inadequate.

758. Legal remedies alone are insufficient because the precise amounts, locations, and disposition of the wrongfully retained funds and benefits are within Defendants' exclusive knowledge and control, and because Defendants' conduct involved concealment, manipulation of records, and inequitable use of institutional power.

759. Equity therefore requires the imposition of a constructive trust over all such funds, benefits, credits, and property interests wrongfully retained by Defendants, together with any traceable proceeds, interest, or benefits derived therefrom, for the benefit of Plaintiff.

WHEREFORE, Plaintiff respectfully requests that the Court impose a constructive trust over all monies, benefits, credits, and property wrongfully obtained or retained by Defendants; order restitution and disgorgement of such property to Plaintiff; require an equitable accounting as necessary to identify the trust res; and grant such other and further equitable relief as the Court deems just and proper under Illinois law.

## COUNT 84 INJUNCTIVE RELIEF (EVIDENCE PRESERVATION AND NON-SPOLIATION)

760. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

97

761. An actual and ongoing controversy exists regarding the preservation of material evidence relevant to Plaintiff's employment, payroll, disciplinary, academic, and grievance matters.

762. As alleged herein, Defendants have altered, deleted, "rolled back," concealed, or failed to preserve material evidence, including but not limited to payroll records, Workday time entries, disciplinary files, electronic communications, audit logs, access records, and metadata, after Defendants knew or reasonably should have known that disputes, grievances, administrative proceedings, or litigation were reasonably foreseeable.

763. Defendants maintain exclusive custody, control, and access to the electronic systems, servers, databases, cloud storage, and physical records containing such evidence, and Plaintiff has no independent ability to preserve or secure this material absent Court intervention.

764. There is a substantial risk that additional relevant evidence will be lost, altered, overwritten, or destroyed through routine data retention practices, continued system access, or intentional misconduct unless immediate injunctive relief is granted.

765. Plaintiff lacks an adequate remedy at law to prevent further spoliation because monetary damages cannot restore destroyed or altered evidence or cure the resulting prejudice to Plaintiff's ability to prove his claims.

766. The balance of equities favors injunctive relief, as preservation imposes minimal burden on Defendants while the loss of evidence would cause irreparable harm to Plaintiff and undermine the integrity of these proceedings.

767. Injunctive relief is necessary to maintain the status quo and to ensure that this Court can adjudicate Plaintiff's Illinois statutory and common-law claims on a complete and accurate evidentiary record.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order:

a. Enjoining Defendants and all persons acting in concert with them from destroying, altering, deleting, overwriting, concealing, or modifying any documents, data, or electronically stored information relevant to Plaintiff;

b. Ordering immediate preservation of all payroll systems, Workday records, audit logs, server logs, access logs, emails, cloud backups, disciplinary records, grievance files, academic records, and related metadata;

c. Requiring Defendants to suspend routine data-destruction or retention policies as to such materials;

d. Authorizing forensic preservation or imaging by a neutral expert if necessary to prevent further spoliation; and

e. Granting such other and further equitable relief as this Court deems just and proper under Illinois law.

## COUNT 85 DECLARATORY AND INJUNCTIVE RELIEF

*(Illinois Declaratory Judgment Act / Equitable Relief)*

768. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

769. An actual, present, and justiciable controversy exists between Plaintiff and Defendants regarding Plaintiff's rights and Defendants' obligations arising under Illinois law and Defendants' own published policies governing student employment, disciplinary proceedings, grievance procedures, payroll administration, recordkeeping, confidentiality, and protection against retaliation.

770. Defendants have taken and continue to take adverse positions inconsistent with their published policies and Illinois common-law and statutory duties, including but not limited to positions concerning:
a. the propriety of Plaintiff's terminations and expulsion;
b. the accuracy and legitimacy of Plaintiff's payroll, disciplinary, and academic records;
c. Defendants' compliance with grievance and disciplinary procedures; and

98

d. Defendants' ongoing obligations to refrain from retaliation, concealment, or misuse of records.

771. Plaintiff contends that Defendants violated applicable Illinois statutory and common-law duties and materially deviated from their own published policies, while Defendants deny or dispute those violations and continue to maintain records and positions that adversely affect Plaintiff's legal rights, reputation, and future opportunities.

772. Declaratory relief is necessary and appropriate to resolve these uncertainties and to define the legal relationship between the parties, because Plaintiff faces continuing and concrete harm from Defendants' ongoing maintenance, use, and reliance upon disputed records and determinations.

773. Injunctive relief is also necessary to prevent ongoing and future harm, as Defendants remain in a position to continue retaliatory conduct, improper reliance on disputed records, interference with Plaintiff's academic and employment prospects, and further deviation from applicable duties and procedures.

774. Plaintiff has no adequate remedy at law to fully address these ongoing and prospective harms, and absent declaratory and injunctive relief, Plaintiff will continue to suffer irreparable injury not compensable by damages alone.

775. Plaintiff does not seek formal mandamus relief, but seeks equitable orders compelling Defendants to comply with their own published policies and procedures, which Illinois courts may grant through declaratory and injunctive relief.

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Enter a declaratory judgment determining that Defendants violated applicable Illinois statutory and common-law duties and materially failed to comply with their own published policies in connection with Plaintiff's employment, discipline, grievances, and expulsion;

b. Declare that Defendants' reliance on fabricated, altered, incomplete, or procedurally defective records and determinations is improper and unlawful;

c. Enter appropriate injunctive relief prohibiting Defendants from continuing retaliatory conduct against Plaintiff, including further misuse, dissemination, or reliance upon disputed disciplinary, payroll, or academic records;

d. Order Defendants to take corrective action consistent with Illinois law, including correction, clarification, or expungement of improper records, and compliance with applicable grievance and procedural safeguards;

e. Award Plaintiff costs of suit and such other and further equitable relief as this Court deems just and proper.

## COUNT 86 ABUSE OF PROCESS (ILLINOIS COMMON LAW)

776. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

777. At all relevant times, Defendants initiated, invoked, and pursued formal and quasi-judicial disciplinary and administrative processes against Plaintiff, including but not limited to disciplinary summonses, investigations, hearings, and related proceedings conducted under the University's published policies and procedures.

778. These disciplinary and administrative mechanisms constitute "process" under Illinois common law because they are institutional procedures with coercive effect, capable of imposing serious consequences on Plaintiff's education, employment, immigration status, reputation, and future opportunities.

779. Defendants initiated and utilized these processes after Plaintiff engaged in protected and lawful activities, including reporting safety hazards, wage and payroll irregularities, tax concerns, assault, and other misconduct, and after Plaintiff filed grievances and complaints.

780. Defendants had an ulterior and improper purpose in invoking these disciplinary processes, namely to retaliate against Plaintiff, to silence or deter further reporting and

grievances, to create a pretextual record adverse to Plaintiff, and to protect the institution and certain individuals from scrutiny or accountability.

781. Defendants misused and abused the disciplinary process by:
a. Reviving stale or long-past allegations contrary to Defendants' own policies and ordinary disciplinary practices;
b. Proceeding without good-faith investigation or contemporaneous evidence;
c. Relying on altered, incomplete, or fabricated records;
d. Denying Plaintiff meaningful procedural participation or safeguards; and
e. Employing the process as a tool of coercion, punishment, and retaliation rather than for its intended purpose of fair adjudication.

782. Defendants' conduct constituted a misuse of process because the disciplinary machinery was employed primarily to achieve objectives outside the legitimate scope of the process, rather than to resolve bona fide disciplinary concerns.

783. As a direct and proximate result of Defendants' abuse of process, Plaintiff suffered substantial harm, including loss of employment, expulsion, reputational injury, emotional distress, economic damages, interference with academic and professional opportunities, and increased legal and administrative burdens.

**WHEREFORE**, Plaintiff seeks compensatory damages, punitive damages, costs of suit, and such other relief as this Court deems just and proper under Illinois law.

## COUNT 87 MISCELLANEOUS, SUPPLEMENTAL, AND ALTERNATIVE COMMON-LAW, STATUTORY, AND EQUITABLE CLAIMS

*(Pled in the Alternative and Without Waiver)*

### General Allegations

784. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

785. This Count is pled pursuant to Rule 8(d) of the applicable Rules of Civil Procedure (or state-law equivalents), in the alternative, cumulatively, and without waiver, to ensure full adjudication of all legal and equitable rights arising from Defendants' conduct.

786. Plaintiff alleges that Defendants' acts and omissions, as described herein, give rise to multiple causes of action sounding in **tort, contract, equity, restitution, fiduciary duty, statutory liability, and remedies**, some of which may overlap factually or legally, and some of which may ultimately be deemed alternative theories of recovery.

787. Plaintiff expressly pleads that **each of the claims set forth below may contain multiple internal elements, sub-claims, factual predicates, theories of liability, and remedies**, including but not limited to legal damages, equitable relief, restitution, disgorgement, punitive damages, statutory enhancements, costs, and attorneys' fees, to the extent permitted by law.

### A. Property and Possession-Based Claims

*(Actual or, in the Alternative)*

788. Defendants are liable for **Trespass to Chattels**, in that Defendants intentionally and without authorization interfered with Plaintiff's personal property, causing actual damage, deprivation of use, loss of value, and/or impairment of condition.

789. In the alternative, Defendants are liable for **Replevin / Claim and Delivery**, in that Plaintiff has an immediate right to possession of specific, identifiable personal property wrongfully held, retained, concealed, transferred, or controlled by Defendants.

790. Defendants are further liable for **Detinue**, in that Defendants wrongfully detained Plaintiff's personal property after initially lawful or conditional possession, despite Plaintiff's demand for return.

100

791.     Defendants are liable under the doctrine of **Trover**, which modern courts treat as conversion, in that Defendants wrongfully appropriated Plaintiff's property for their own use and benefit.

792.     Defendants are additionally liable for **Unjust Retention of Property**, an equitable claim arising where Defendants' continued possession or control of Plaintiff's property is inequitable and unjust, and where legal remedies are inadequate.

## B. Fraud and Deceit-Based Claims

*(Actual or, in the Alternative)*

793.     Defendants are liable for **Fraud / Intentional Misrepresentation**, in that Defendants knowingly made false representations of material fact, or concealed material facts, with the intent to induce Plaintiff's reliance; Plaintiff justifiably relied; and Plaintiff suffered damages.

794.     Defendants are liable for **Fraudulent Concealment**, in that Defendants failed to disclose material facts under circumstances giving rise to a duty to disclose, including fiduciary, confidential, or special relationships.

795.     Defendants are liable for **Constructive Fraud**, in that Defendants breached fiduciary or confidential duties owed to Plaintiff, resulting in unfair advantage or harm, irrespective of intent.

796.     Where applicable by statute, Defendants are liable for **Civil Theft / Statutory Theft**, in that Defendants knowingly obtained or exercised control over Plaintiff's property with felonious or criminal intent, entitling Plaintiff to enhanced damages, statutory penalties, attorneys' fees, and costs.

## C. Equitable and Restitutionary Claims

*(Actual or, in the Alternative)*

797.     Defendants are liable for **Unjust Enrichment**, in that Defendants received and retained benefits at Plaintiff's expense under circumstances rendering such retention inequitable.

798.     Defendants are liable under **Quantum Meruit**, for the reasonable value of services, property, or benefits conferred upon Defendants and knowingly accepted.

799.     Defendants hold Plaintiff's property, funds, or proceeds as **Constructive Trustees**, as equity demands imposition of a constructive trust to prevent unjust enrichment, fraud, or abuse of confidence.

800.     Plaintiff is entitled to an **Equitable Accounting**, as Defendants exercised exclusive control over funds, records, or transactions such that the true amount owed cannot be determined without judicial accounting.

801.     Plaintiff is entitled to an **Equitable Lien** upon specific property or proceeds wrongfully obtained, retained, or improved through Defendants' misconduct.

## D. Contract-Related and Reliance-Based Claims

*(Actual or, in the Alternative)*

802.     Defendants are liable for **Breach of Contract**, whether express, implied-in-fact, or implied-in-law.

803.     Defendants breached the **Implied Covenant of Good Faith and Fair Dealing** by acting arbitrarily, dishonestly, or in bad faith to deprive Plaintiff of the benefits of the agreement.

804.     Defendants are liable under **Promissory Estoppel**, in that Plaintiff reasonably relied on Defendants' promises to Plaintiff's detriment, and injustice can be avoided only by enforcement.

805. Defendants are liable for **Money Had and Received**, a common-law restitution claim applicable where Defendants possess money or funds belonging in equity and good conscience to Plaintiff.

### E. Fiduciary and Trust-Based Claims

*(Actual or, in the Alternative)*

806. Defendants are liable for **Breach of Fiduciary Duty**, including duties of loyalty, care, disclosure, and good faith, entitling Plaintiff to damages, disgorgement, and equitable relief.

807. Defendants are liable for **Aiding and Abetting Breach of Fiduciary Duty**, in that Defendants had knowledge of a fiduciary breach and substantially assisted or encouraged it.

808. Defendants are liable for **Misappropriation**, in that they wrongfully used, diverted, or exploited Plaintiff's entrusted property, funds, or interests.

### F. Business and Economic Torts

*(Actual or, in the Alternative)*

809. Defendants are liable for **Tortious Interference with Contract**, by intentionally and unjustifiably inducing breach or disruption of Plaintiff's contractual relationships.

810. Defendants are liable for **Tortious Interference with Prospective Economic Advantage**, by wrongful acts directed at Plaintiff's reasonable business expectancies.

811. Defendants are liable for **Civil Conspiracy**, in that Defendants agreed and acted in concert to commit unlawful acts or lawful acts by unlawful means, resulting in injury to Plaintiff.

### G. Real Property-Related Claims (If Applicable)

*(Actual or, in the Alternative)*

812. Defendants are liable for **Trespass to Land**, **Ejectment**, **Quiet Title**, and/or **Waste**, to the extent Defendants wrongfully entered, occupied, claimed, or damaged real property in which Plaintiff holds an interest.

### H. Remedy-Focused Claims and Relief

813. Plaintiff seeks **Declaratory Judgment** to determine the rights, duties, and legal relations of the parties.

814. Plaintiff seeks **Injunctive Relief**, including temporary, preliminary, and permanent injunctions, to prevent ongoing or future harm.

815. Plaintiff seeks **Disgorgement** of ill-gotten gains obtained through Defendants' misconduct.

816. Plaintiff seeks **Punitive and/or Exemplary Damages**, where Defendants' conduct was willful, malicious, fraudulent, or in reckless disregard of Plaintiff's rights.

### Reservation of Rights

817. Plaintiff expressly reserves the right to **assert additional counts, theories, statutory claims, and remedies** as discovery proceeds, including claims presently unknown or not fully ascertainable, and pleads that **additional claims may follow** based on the same nucleus of operative facts.

### COUNT 88 VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (DISCRIMINATION AND RETALIATION)

818. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

819. This action is also brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which prohibits employment discrimination based on race, color, religion, sex, or national origin, and prohibits retaliation against employees who oppose

102

such discrimination. Plaintiff has satisfied all administrative prerequisites, having filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and having received a Notice of Right to Sue.

820. At all relevant times, Plaintiff was an "employee" of Defendant University of Chicago within the meaning of Title VII, holding numerous student-employment positions. Defendant is an "employer" subject to the provisions of Title VII.

## A. DISCRIMINATION BASED ON NATIONAL ORIGIN, CASTE, AND RELIGION

821. Plaintiff is a member of protected classes under Title VII, including national origin (Indian), caste, and religion. Defendants were aware of Plaintiff's protected characteristics.

822. Defendants subjected Plaintiff to adverse employment actions and disparate treatment based on these protected characteristics. Specifically, Defendants discriminated against Plaintiff in the terms, conditions, and privileges of his employment by: a. Subjecting Plaintiff to harassment, derogatory remarks, and a hostile work environment based on his national origin and caste; b. Applying disciplinary and employment policies to Plaintiff in a manner more stringent and harsher than those applied to similarly situated employees outside Plaintiff's protected classes (e.g., selectively terminating Plaintiff for alleged work-hour violations while ignoring identical violations by other employees, such as the individual identified as Fariha Sameen); c. Denying Plaintiff employment opportunities, promotions, and shifts that were granted to employees not of Plaintiff's national origin or caste; and d. Terminating Plaintiff's employment and fabricating disciplinary records to justify said termination based on discriminatory animus.

823. Defendants' discriminatory treatment of Plaintiff was severe, pervasive, and altered the conditions of his employment, creating a hostile work environment that interfered with his work performance and emotional well-being.

## B. RETALIATION IN VIOLATION OF TITLE VII

824. Plaintiff engaged in protected activity under Title VII by: a. Opposing practices prohibited by Title VII, including reporting and filing internal complaints regarding discrimination based on national origin, caste, and religion in the workplace; ***b. Filing a formal grievance on or about February 1, 2025***, alleging discriminatory treatment and wrongful termination; c. Participating in investigations regarding workplace safety and wage violations; and d. Complaining about the hostile work environment. Defendant retaliated and expelled plaintiff on Feb 25 2025 (in less than 25 days)

825. In retaliation for Plaintiff's protected activity, Defendants subjected Plaintiff to materially adverse employment actions, including but not limited to: a. The abrupt and unjustified termination of Plaintiff's employment on or about January 7, 2025; b. The cancellation of employment interviews and job opportunities; c. The escalation of disciplinary actions shortly after the filing of the Union Grievance; d. The fabrication of evidence and disciplinary records to justify his expulsion and termination; and e. Constructive discharge through the creation of intolerable working conditions.

826. The temporal proximity between Plaintiff's protected activity (February 1, 2025 grievance) and the adverse actions (immediate disciplinary summons and expulsion) creates an inference of causal connection. Defendants' stated reasons for the adverse actions are pretextual and were adopted to cover the retaliatory animus.

## C. DAMAGES

827. As a direct and proximate result of Defendants' violations of Title VII, Plaintiff has suffered significant damages, including lost wages and benefits, loss of employment opportunities, severe emotional distress, humiliation, and damage to his professional reputation.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants for: a. Compensatory damages for back pay, front pay, lost benefits, and emotional distress; b. Punitive damages for Defendants' malicious and reckless conduct; c. Injunctive relief requiring Defendants to reform their employment practices and prevent future discrimination and retaliation; and d. Costs of suit, reasonable attorney's fees, and such other relief as the Court deems just and proper.

## VII. PRAYER FOR RELIEF

828.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's Dipesh Singla favour after **fair jury trial** and against all Defendants, jointly and severally, and grant the following relief:

### I. DECLARATORY RELIEF

*(28 U.S.C. §2201)*

A declaration that Defendants violated Plaintiff's rights under (but not limited to):

- **Title IX**
- **Title VI**
- **ADA Title II / Title III**
- **Section 504 of the Rehabilitation Act**
- **42 U.S.C. §1983** (First Amendment, Equal Protection, Procedural and Substantive Due Process, Fourth Amendment, Informational Privacy)
- **Computer Fraud and Abuse Act (CFAA)**
- **Stored Communications Act (SCA)**
- **Electronic Communications Privacy Act (ECPA)**
- **Federal Spending Clause obligations**
- **False Claims Act retaliation protections**
- **Applicable Illinois statutory and common law, and Defendants' own published policies and procedures.**

**A declaration that:**

1. The **disciplinary findings, hearing, procedures, and expulsion** were **unlawful, void, retaliatory, discriminatory, fabricated, and constitutionally defective**.

2. The **University of Chicago acted as a state actor** for purposes of §1983 through SEVIS delegation, UCPD police authority, entwinement with federal funding, and performance of public functions.

3. Defendants engaged in **deliberate indifference**, **retaliation**, **fabrication of evidence**, **failure to protect**, and **suppression of exculpatory evidence**.

### II. INJUNCTIVE RELIEF

*(28 U.S.C. §2202; Ex parte Young doctrine)*

**Plaintiff seeks:**

**A. Prohibitory Injunctions**

**Enjoining Defendants from:**

- Any form of **retaliation**, direct or indirect.
- **Surveillance**, monitoring, or intimidation through UCPD or other agents.
- Accessing, viewing, or disseminating **Plaintiff's educational, medical, employment, or personal data**.
- Disclosing or suggesting **stigmatizing allegations** or defamatory information.
- Interfering with **Plaintiff's educational, professional, immigration, or employment prospects**.

**B. Structural Reforms**

Requiring the University to:

104

- Overhaul **disciplinary procedures** to ensure constitutional due process.
- Implement mandatory retraining on **Title IX, Title VI, ADA, §504, constitutional standards, evidence integrity, privacy law**, and **retaliation prohibitions**.
- Require training on Illinois retaliation prevention, record integrity, Illinois payroll compliance, and Illinois confidentiality obligations.
- Establish **independent oversight or auditing** for federal-funding compliance and reporting.
- Implement **monitoring or reporting requirements** to the Court for a defined period.

### C. Equitable and Prospective Injunctive Relief (State Law)

Appropriate injunctive relief tailored to prevent ongoing and future harm under Illinois law, including but not limited to orders:

1. prohibiting further retaliatory or unlawful conduct against Plaintiff;
2. requiring Defendants to preserve all relevant evidence;
3. requiring compliance with applicable Illinois statutory and common-law duties; and
4. compelling Defendants to follow their own published grievance, disciplinary, record-keeping, and accommodation procedures.

### D. Federal Agency Notification

The Court may order **referral to appropriate federal agencies** for:

- Review of **federal funding compliance**
- Review of **F-1 sponsorship, CPT, OPT, and SEVIS authority**
- Review of **Title IX, Title VI, ADA, §504 compliance**
- Review of FERPA Authorizations/Records and access

### III. COMPENSATORY DAMAGES

**Including, but not limited to:**

1. **Economic Damages:**
   o Tuition paid
   o Lost wages (union and non-union roles)
   o Lost scholarships
   o Lost future earning capacity
   o Lost enjoyment of life, and relationships
   o Costs associated with wrongful expulsion
   o Lost academic/job/internship opportunities
   o Immigration-related costs
   o Professional and educational derailment
   o Back pay, lost benefits, and associated compensation for all student-employment positions wrongfully terminated, disrupted, or rendered unavailable due to Defendants' conduct.
   o Front Pay

2. **Non-Economic Damages:**
   o Emotional distress

105

- o Mental anguish, humiliation, reputational harm, and academic disruption.
- o Anxiety, trauma, torture, humiliation, defamation, conditions similar to PTSD
- o Damage to academic and professional reputation
- o Loss of educational, research, and career opportunities

3. **Restitutionary Damages:**

- o Full **tuition reimbursement**
- o Compensation for **denied disability accommodations**
- o Compensation for **retaliatory job terminations**
- o Restitution and disgorgement of all monies, wages, benefits, credits, or other payments wrongfully withheld, retained, or obtained by Defendants, including funds obtained through improper payroll practices or record manipulation.

4. **Consequential and Economic Damages:**

- o An award of consequential and economic damages, including lost employment opportunities and other financial losses proximately caused by Defendants' unlawful conduct.

5. **Conditional Reinstatement or Equitable Relief in Lieu Thereof:**

- o To the extent permitted by Illinois law and deemed equitable by the Court, reinstatement to Plaintiff's former student-employment positions and/or academic program or, in the alternative, front pay, equitable compensation, or other appropriate relief where reinstatement is impracticable or inequitable.

## IV. PUNITIVE DAMAGES

Punitive damages are sought where legally permitted, including under but not limited to:

- **§1983** (malicious or reckless constitutional violations)
- **CFAA, SCA, ECPA** (where allowed)
- Federal common-law standards applicable to fabricated evidence, conspiracy, and civil-rights violations
- Illinois statutory and common-law standards for willful, wanton, malicious, reckless, or oppressive conduct, including but not limited to retaliation, abuse of institutional process, spoliation of evidence, and reckless disregard for Plaintiff's rights and safety.

Grounds include:

- **Fabrication of evidence** ("Travel Notification Form")
- **Pretextual and retaliatory expulsion**
- **Deliberate indifference** to safety and disability
- **Suppression of exculpatory information**
- **Retaliatory campaign to silence a whistleblower**
- **Institutional abuse of authority**

## V. STATUTORY DAMAGES & REMEDIES

Plaintiff seeks all remedies available under:

- Title IX
- Title VI

106

- ADA
- §504 Rehabilitation Act
- §1983
- CFAA
- SCA
- ECPA
- False Claims Act retaliation
- Spending Clause enforcement
- Informational Privacy doctrine
- Applicable Illinois statutes, including but not limited to the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois Whistleblower Act, including actual damages, statutory remedies, penalties, and equitable relief as permitted by law.
- Costs of suit under Illinois law, including filing fees, expert fees, and reasonable attorneys' fees where authorized by Illinois statute or common law.
- Pre-judgment and post-judgment interest as allowed by Illinois law.

## VI. ATTORNEY'S FEES AND COSTS

Including but not limited to fees under:

- **42 U.S.C. §1988**
- **ADA & §504 fee-shifting provisions**
- **Title IX fee provisions**
- **CFAA, SCA, ECPA** statutory fee entitlements

## VII. ADDITIONAL EQUITABLE & ANCILLARY RELIEF

The following remedies are requested, and phrased in forms federal courts allow:

### A. Recognition of Socioeconomic Vulnerability

A judicial acknowledgment of Plaintiff's **financial hardship and power disparity**, relevant to equitable balancing, retaliation analysis, and remedial design.

### B. Recognition of Persecuted / Marginalized Status

Acknowledgment of Plaintiff's **minority and marginalized identity**, as relevant to assessing discrimination and harm.

### C. Public Accountability Measures

1. A **public statement** or acknowledgment of wrongdoing (content to be reviewed by Plaintiff).
2. **Institutional reform commitments** to prevent recurrence.

### D. Court-Directed Findings of Fact on Constitutional Questions

Including Plaintiff's request to:

- Clarify constitutional questions raised by institutional misconduct
- Address complex issues concerning **state-action doctrine**, **UCPD authority**, **SEVIS delegation**, and **informational privacy**

### E. Forensic Review and Record Correction

Orders compelling a neutral forensic review or audit, where appropriate, of Plaintiff's academic and employment records, including:

107

6. identification and correction of fabricated, altered, or inaccurate records;
7. expungement of unlawfully created or retaliatory disciplinary materials; and
8. preservation and forensic examination of relevant electronic systems and records, subject to proportionality and Court supervision.

### F. Any Other Relief

Such other and further legal or equitable relief as this Court deems just, proper, and necessary under Illinois law.

Any other relief the Court deems:

- Just

- Proper

- Equitable

- Necessary to remedy constitutional and federal statutory violations

And therefore, Plaintiff seeks damages in an amount to be determined at trial but presently estimated to exceed **One Billion U.S. Dollars (USD $1,000,000,000),** inclusive of compensatory, punitive, consequential damages, and other damages and relief court consider just for plaintiff.

## VIII. MOTIONS

829. Plaintiff moves for appointment of counsel, as indigent, unemployed, and faces complex legal issues, per Local Rules 83.35, 83.36, and 28 U.S.C. § 1915(e)(1). Such relief as the Court deems appropriate regarding referral to pro bono resources, in light of the complexity and public-interest nature of the issues presented.
830. Plaintiff moves to proceed in forma pauperis, unable to pay fees due to financial hardship, per Local Rule 3.3 and 28 U.S.C. § 1915.
831. Plaintiff respectfully moves this Honourable Court to permit service of summons via email, Social Media, or, alternatively, through assistance of the Clerk or U.S. Marshal, in light of Plaintiff's current residence outside the United States and limited ability to effect personal service.

## IX. Preservation of Jurisdiction and Rights

832. Plaintiff acknowledges that administrative charges remain pending before the IDHR, and etc, Plaintiff expressly states that this Complaint does not assert any cause of action under, and nothing in this pleading is intended to invoke judicial review of, or interfere with, any matter presently before the admin agencies. Plaintiff does not request that this hon'ble Court conduct, assume, supervise, replace, or otherwise interfere with any ongoing administrative agency case.
833. Filing this federal action does not constitute an election of remedies, does not waive administrative rights. Plaintiff also expressly reserves all rights to pursue available state, municipal, or other non-federal remedies in the appropriate for a now or at a later time.
834. Plaintiff proceeds in this action pro se and has filed an application to proceed in forma pauperis due to indigency. Plaintiff has been unable to retain private counsel despite reasonable efforts. Plaintiff does not seek to impose any obligation on Defendants regarding legal representation, and any decision by Defendants to retain counsel is solely within their discretion.
835. Plaintiff brings this action, to address and redress alleged retaliatory conduct arising from protected whistleblowing, grieving, and complaint activity, and to prevent continued harm to Plaintiff and others similarly situated. Plaintiff further asserts that the issues raised herein have broader implications for the protection of whistleblowers and the public interest.
836. Plaintiff reserves all rights to seek review of any adverse rulings through appropriate appellate procedures.

## X. JURY DEMAND

837. Plaintiff hereby **demands a trial by jury** on all issues so triable as a matter of right under Federal Rule of Civil Procedure 38 and the Seventh Amendment to the United States Constitution.

Respectfully submitted,

***Signature***

Dipesh Singla

*Pro Se* Plaintiff

Dated: 9 April 2026

+17734571046 and +917973996818

dipeshsingla668@gmail.com (preferred)

#184, NAC, Shivalik Enclave, Manimajra, Chandigarh, 160101

**Exhibit 1: EEOC Right to Sue letter 16 March 2026**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 03/16/2026

**To:** Mr. Dipesh Singla
5118 South Blackstone Ave (Old address) Apt 1N
Chicago, IL 60615
Charge No: 440-2025-07788

EEOC Representative and email:    EVA BARAN
INVESTIGATOR
EVA.BARAN@EEOC.GOV

### DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2025-07788.

On behalf of the Commission,

Digitally Signed By:Amrith Kaur Aakre
03/16/2026
Amrith Kaur Aakre
District Director

110

Cc:
NA NA
University of Chicago
5801 S Ellis Avenue
Chicago, IL 60637

Scott Velasquez
6030 S. Ellis
Chicago, IL 60637

Bridget Collier
University of Chicago
5525 South Ellis Avenue Suite B
Chicago, IL 60637

Please retain this Notice for your records.

111

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

112

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 440-2025-07788 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 440-2025-07788 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- **Only one** major life activity need be substantially limited.

- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

113

Enclosure with EEOC Notice of Closure and Rights (05/25)

are not considered in determining if the impairment substantially limits a major life activity.

☐ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

☐ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

☐ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

☐ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

☐ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.

114