

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

EASTERN DIVISION

**FILED** EE

4/21/2026

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**DIPESH SINGLA,**

Plaintiff,

v.

**THE UNIVERSITY OF CHICAGO, et al.,**

Defendants.


**Case No. 1:25-cv-08098**


HONORABLE JEFFREY I. CUMMINGS


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CLAIMS**

*Pursuant to EEOC Statutory Authority, Regulations, and Enforcement Guidance*

*Exhibit 1: EEOC Right to Sue attached and fully incorporated herein this case.*


Dipesh Singla, Pro Se

Plaintiff

April 21 2026

Singla v. University of Chicago | Case No. 1:25-cv-08098

# TABLE OF CONTENTS

**I. INTRODUCTION AND PROCEDURAL POSTURE**.................................................. 4

**II. STATEMENT OF FACTS** .............................................................................. 5

    A. Plaintiff's Protected Characteristics and Enrollment ................................. 5

    B. Disability Disclosure and Failure to Accommodate .................................. 6

    C. The Retaliatory Termination Cascade ....................................................... 7

    D. Union Grievance and Expulsion as Ultimate Retaliation .......................... 9

    E. The Unauthorized $840 Tax Deposit ........................................................ 10

**III. EEOC STATUTORY AUTHORITY AND APPLICABLE LAW**.......................... 11

    A. Title VII of the Civil Rights Act of 1964 ................................................. 11

    B. Americans with Disabilities Act of 1990 .................................................. 12

    C. Rehabilitation Act of 1973 ........................................................................ 13

    D. EEOC Coordination Authority and Federal Government Oversight........... 13

**IV. EEOC REGULATORY FRAMEWORK** ......................................................... 14

    A. Procedural Regulations (29 C.F.R. Part 1601) ......................................... 14

    B. Recordkeeping Requirements (29 C.F.R. Part 1602) ................................ 14

    C. National Origin Discrimination (29 C.F.R. Part 1606)............................. 15

    D. ADA Title I Regulations (29 C.F.R. Part 1630)....................................... 15

    E. Employee Selection Procedures (29 C.F.R. Part 1607) ............................ 16

    F. Federal Sector Complaint Procedures (29 C.F.R. Part 1614) ................... 17

**V. RETALIATION ANALYSIS**.......................................................................... 17

    A. EEOC Retaliation Standards .................................................................... 17

    B. Protected Activity ..................................................................................... 18

    C. Materially Adverse Actions ...................................................................... 18

    D. Causal Connection .................................................................................... 19

    E. Nassar But-For Causation Standard.......................................................... 19

    F. Post-Filing Retaliation: A Continuing Course of Conduct ....................... 20

**VI. DISABILITY DISCRIMINATION ANALYSIS**................................................. 21

A. Failure to Engage in the Interactive Process.................................................. 21

B. Disparate Treatment of Similarly Situated Disabled Individuals ............................ 22

C. ADA Psychiatric Disability Considerations ................................................. 22

**VII. McDONNELL DOUGLAS BURDEN-SHIFTING ANALYSIS ........................... 23**

**VIII. ADDITIONAL EEOC ENFORCEMENT GUIDANCE ..................................... 24**

A. After-Acquired Evidence Doctrine................................................... 24

B. Non-Waivable Employee Rights .................................................. 24

C. Workers' Compensation Interplay with ADA........................................ 25

D. Pre-Employment and Ongoing Disability Inquiries ................................. 25

**IX. REMEDIES AVAILABLE UNDER APPLICABLE STATUTES......................... 25**

A. Compensatory Damages ...................................................... 25

B. Punitive Damages ......................................................... 26

C. Injunctive Relief and Equitable Remedies........................................ 26

D. Attorney's Fees and Costs.................................................... 27

**X. POST-FILING RETALIATION: BLATANT DISREGARD FOR PLAINTIFF'S RIGHTS.......................................................................... 27**

A. Interference with Access to Systems and Records ................................. 27

B. Refusal to Provide Access to Records ........................................... 28

C. Disclosure of Disciplinary Status to Third Parties................................. 28

D. Threats, Intimidation, and Coercive Conduct..................................... 29

E. Interference with Government Proceedings....................................... 29

F. Continuing Pattern of Retaliation.............................................. 29

**XI. CONCLUSION............................................................... 30**

## I. INTRODUCTION AND PROCEDURAL POSTURE

This Memorandum of Law is submitted in support of Plaintiff Dipesh Singla's claims against the University of Chicago and related defendants in Case No. 1:25-cv-08098, pending before the United States District Court for the Northern District of Illinois, Eastern Division. Plaintiff brings this action pursuant to, inter alia, Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), the Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), **and** other federal and state statutory and Municipal and constitutional provisions. **Plaintiff received a Right to Sue letter from the Equal Employment Opportunity Commission (EEOC) dated March 16, 2026,** satisfying all administrative prerequisites for federal litigation under Title VII and the ADA. **The letter is already uploaded on docket and with the amended complaint on or about April 9, 2026, within the deadlines of EEOC Right to Sue.** Further EEOC Right to Sue letter is attached as Exhibit 1 in this document, and hence the case is timely filed.

The evidence establishes a pattern and practice of discrimination, retaliation, fabrication of records, denial of reasonable accommodations, and deliberate indifference to Plaintiff's protected rights that is both pervasive and ongoing. From the moment Plaintiff disclosed his disability and requested accommodations in November 2023 through the present day, the University of Chicago has engaged in a systematic campaign to marginalize, discipline, terminate, and ultimately expel Plaintiff—not for any legitimate reason, but because of his national origin, caste, religion, disability, and retaliation for his engagement in protected whistleblowing and grievance activity. The retaliatory conduct has escalated dramatically since Plaintiff filed administrative charges with the EEOC, the Illinois Department of Human Rights (IDHR), the National Labor Relations Board (NLRB), CCHR, and other agencies, **and since the initiation of this federal lawsuit.**

This memorandum draws upon almost the full corpus of EEOC statutory authority, regulations codified in Title 29 of the Code of Federal Regulations, and comprehensive EEOC enforcement guidance to demonstrate that: (1) Plaintiff has plausibly alleged discrimination based on national origin, caste, religion, and disability; (2) the University of Chicago violated its affirmative obligations under the ADA and the Rehabilitation Act to engage in the interactive process and provide reasonable accommodations; (3) the escalating sequence of adverse actions—from denial of accommodations through terminations, disciplinary proceedings, expulsion, and post-filing retaliation—constitutes unlawful retaliation under Title VII, the ADA, and the Rehabilitation Act; and (4) the post-filing retaliation, which continues to the present, constitutes a continuing violation that further strengthens Plaintiff's claims for injunctive relief, compensatory damages, punitive damages, and attorney's fees.

The applicable legal framework is governed by EEOC enforcement guidance, including EEOC Compliance Manual Section 615 (Retaliation and Related Issues), EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA (EEOC-NVTA-2002-1), EEOC Enforcement Guidance on the ADA and Psychiatric Disabilities (EEOC 915.002), EEOC Enforcement Guidance on National Origin Discrimination (EEOC 915.002), and the regulatory provisions of 29 C.F.R. Parts 1601-1695. The EEOC has made clear that retaliation claims are among the most frequently filed charges with the Commission, and that employers who engage in retaliatory conduct face the full range of remedial measures available under federal law, including compensatory damages, punitive damages, and injunctive relief.

Plaintiffs want to note, plaintiff does not have access to Lexis Nexis or Westlaw or similar tools, so corrections and amendments shall be made after knowledge of defect into complaint if any.

## II. STATEMENT OF FACTS

### A. Plaintiff's Protected Characteristics and Enrollment

Plaintiff Dipesh Singla is an Indian national of South Asian ethnicity and Punjabi caste minority heritage (Baniya), practicing the Hindu religion, who was admitted to the University of Chicago as a graduate student in September 2023. Throughout enrollment, Plaintiff held approximately fifteen student employment positions across multiple University departments, including the Social Sciences Computing Services (SSCS), the Mansueto Institute, the Office of the Provost, and Regenstein Library etcetera. Plaintiff is a member of multiple protected classes under federal and state law: national origin (Indian), ethnicity (South Asian), caste (Baniya), religion (Hindu), sex/gender, and disability status. Each of these characteristics' places Plaintiff within the protective ambit of Title VII, the ADA, Section 504 of the Rehabilitation Act, and the Illinois Human Rights Act.

The EEOC's Enforcement Guidance on National Origin Discrimination makes clear that Title VII's prohibition against national origin discrimination encompasses discrimination based on an individual's place of origin, ancestry, culture, ethnicity, or linguistic characteristics common to a specific ethnic group. The guidance further recognizes that discrimination based on caste is a form of national origin discrimination because caste is inextricably linked to country of origin, particularly for individuals from South Asia. Moreover, the EEOC has recognized that intersectional discrimination—discrimination based on the combination of two or more protected characteristics—is actionable under Title VII, as explained in EEOC Compliance Manual Section 615 (Harassment/Retaliation) and

related guidance documents. Plaintiff's unique position at the intersection of multiple protected classes makes him particularly vulnerable to discrimination and retaliation.

## B. Disability Disclosure and Failure to Accommodate

In November 2023, Plaintiff disclosed a documented disability to the University of Chicago's Student Disability Services (SDS). The disability—involving varicocele, Oedema, and severe recurring infections caused by unsanitary restroom conditions—substantially limited Plaintiff's ability to perform major life activities, including working, learning, and basic bodily functions. Plaintiff formally requested three specific reasonable accommodations: (1) double-time (2x) extension on examinations; (2) an individual testing room; and (3) installation of a bidet or equivalent hygiene accommodation in university restrooms. Plaintiff offered to personally fund the bidet at a cost of approximately thirty dollars. No interactive process was ever conducted with Plaintiff to assess his accommodation needs or explore alternative accommodations—a direct violation of the EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA.

The EEOC's Enforcement Guidances6 establishes that the interactive process is a mandatory component of the reasonable accommodation framework. The guidance states: "The employer must initiate an informal, interactive process with the individual with a disability to identify effective reasonable accommodations." See also 29 C.F.R. 1630.2(o)(3) (defining "reasonable accommodation" to include "modifications or adjustments . . . through the interactive process"). The University of Chicago failed at every stage of this process: it denied Plaintiff's requested accommodations without explanation, failed to engage in any dialogue about alternatives, provided no written rationale for the denials, and never informed Plaintiff of any appeal rights. SDS staff reportedly told Plaintiff that the denial of 2x time might have been motivated by cost concerns—approximately eight dollars per exam for additional proctoring—which, if true, would constitute a clear violation of the ADA's prohibition against cost-based denials of reasonable accommodation except in cases of demonstrated undue hardship.

Under 29 C.F.R. 1630.2(o)(2)(ii), the determination of whether an accommodation poses an undue hardship must be made on a case-by-case basis, considering the nature and cost of the accommodation, the overall financial resources of the facility, the number of persons employed at the facility, and the effect of the accommodation on the operation of the facility. An eight-dollar expenditure at one of the **wealthiest** universities in the world— with an endowment exceeding **ten billion dollars**—cannot plausibly constitute an undue hardship. The EEOC has repeatedly emphasized that cost alone is rarely a sufficient basis for denying reasonable accommodation, particularly for well-resourced institutions. Moreover, the bidet request was accompanied by Plaintiff's offer to personally fund the

accommodation, eliminating the University's cost objection entirely. The denial of this request therefore reveals animus toward Plaintiff's disability rather than any legitimate hardship analysis.

Plaintiff also observed that other students without visible disabilities routinely received the accommodations he was denied, including 2x time and individual testing rooms. Under the EEOC's guidance, such disparate treatment of similarly situated individuals with disabilities constitutes direct evidence of discrimination. See EEOC Enforcement Guidance on Reasonable Accommodation, Section III. The University's failure to follow its own procedures, its denial of accommodations without explanation or interactive process, and its apparent willingness to accommodate non-disabled students while denying Plaintiff—a documented disabled student—establishes a clear pattern of disability discrimination in violation of Title I of the ADA and Section 504 of the Rehabilitation Act.

## C. The Retaliatory Termination Cascade

In November 2024 Singla filed an assault and discrimination grievance through the Uchicago cares portal and also whistle blown the matter to the University of Chicago officials including President, Provost, University Police, and etcetera. In January 2025, the University of Chicago launched a rapidly escalating series of adverse employment actions against Plaintiff, each occurring in close temporal proximity to Plaintiff's protected activity. The sequence of events establishes unmistakable retaliatory animus. In December 2024 University denied No contact directive. In December 2024 I raised serious concerns about the university policies especially title IX being not useful in the times of trouble. On January 7, 2025, Plaintiff was terminated from his SSCS position. His supervisor, Bart Longacre, explicitly stated during the termination meeting that "HR pushed me to do it," revealing that the decision originated at an institutional level rather than from any legitimate supervisory concern. The meeting was also attended by Kerry Sharkey and Arun Banotra, suggesting coordinated institutional involvement in the termination decision. On January 9, 2025, just two days later, Plaintiff was terminated from his position at the Mansueto Institute—a union-covered role—without prior notice or progressive discipline. On January 10, 2025, a scheduled full-time HPC Administrator interview was cancelled by Arun Banotra without explanation.

The EEOC's Enforcement Guidance on Retaliation and Related Issues (EEOC Compliance Manual Section 615; "……there may be similarities between the types of discriminatory conduct described in this section and some forms of unlawful retaliation. (See §614, Section 704(a); see also §615.6(c) below. (Section 704(a) of Title VII prohibits an employer from retaliating against an individual for opposing unlawful employment practices or for filing a charge or otherwise participating in a Title VII proceeding. Harassment is one form of such prohibited retaliation and may involve)) establishes that "materially adverse

actions" include terminations, demotions, and other actions that " have dissuaded a reasonable worker from making or supporting a charge of discrimination." The guidance further explains that temporal proximity between protected activity and adverse action can establish the requisite causal connection, particularly when the timing is "very close." Under *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006), the standard for material adversity is objective: the action must be "harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." Terminations from multiple positions within days of each other, following protected activity, clearly meet this standard.

On January 19, 2025, Plaintiff filed a complaint with UChicago CARES alleging discrimination in violation of **Title VI of the Civil Rights Act of 1964**. This filing constitutes protected activity under Title VII, Title VI, and the ADA. The University's response was swift and punitive. In January 2025, Arun Banotra "rolled back" Plaintiff's Workday hours from July 2024, and Heidi Lee **added fraudulent hours to Plaintiff's Workday record**. On or about February 10 University asked me for confidential records including GINA related records for parent operations, and financial situation, 2 days before sham discipline summons **to trap plaintiff with evil intention of fraud.** These manipulations of employment records constitute both independent violations of federal recordkeeping requirements under 29 C.F.R. 1602 and evidence of retaliatory motive.

The EEOC's Enforcement Guidance on Retaliation and Related Issues (EEOC 915.004, issued August 25, 2016) — the Commission's definitive interpretation of retaliation under all statutes it enforces — establishes that a retaliation claim consists of three essential elements: (1) protected activity, consisting of either "participation" in an EEO process or "opposition" to discrimination; (2) a materially adverse action taken by the employer; and (3) a causal connection between the protected activity and the materially adverse action. The Guidance makes clear that retaliation has become "the most frequently alleged basis of discrimination in all sectors, including the federal government workforce," and that "the federal employment discrimination laws depend on the willingness of employees and applicants to challenge discrimination without fear of punishment." The anti-retaliation provisions of Title VII (42 U.S.C. 2000e-3(a)), the ADA (42 U.S.C. 12203(a)), Section 501 of the Rehabilitation Act, the ADEA, the EPA, and GINA each independently prohibit retaliation, ensuring that individuals are free to raise complaints of potential EEO violations or engage in other EEO activity without employers taking materially adverse actions in response. **Critically, the EEOC explains that "retaliation occurs when an employer takes a materially adverse action because an individual has engaged, or may engage, in activity in furtherance of the EEO laws the Commission enforces"** — and the Commission has long taken the position that the participation clause "broadly protects EEO participation regardless of whether an individual has a reasonable, good faith belief that the

underlying allegations are, or could become, unlawful conduct," citing the Supreme Court's reasoning that "**broad participation protection is necessary to achieve the primary statutory purpose of anti-retaliation provisions, which is 'maintaining unfettered access to statutory remedial mechanisms.**'"

The EEOC Guidance further elaborates that "materially adverse action" includes not only traditional employment actions such as termination, demotion, suspension, and undesirable reassignment, but also a wide range of less obvious actions including "workplace sabotage, assignment to unfavorable location, abusive scheduling practices," "disclosure of confidential EEO information," "harassing conduct," "workplace surveillance," "threats to report immigration status," and "assignment of disproportionate workload." The Guidance emphasizes that these actions satisfy the material adversity standard articulated by the Supreme Court in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), which asks whether the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Regarding causation, the EEOC Guidance confirms that for retaliation claims against private sector and state and local government employers, the applicable standard is "but-for" causation as established by the Supreme Court in University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338 (2013) — meaning the plaintiff must show that the adverse action would not have occurred "but for" the employer's retaliatory motive. The Guidance identifies specific categories of evidence that may establish retaliatory intent, including "suspicious timing," "oral or written statements" indicating retaliatory motive, "comparative evidence" showing differential treatment, and "inconsistent or shifting explanations" by the employer — each of which is directly applicable to Plaintiff's case, where the University of Chicago engaged in escalating adverse actions within days of each instance of protected activity, offered shifting justifications for those actions, and treated a similarly situated employee (Fariha Sameen) who committed identical violations with no adverse action whatsoever. (**See:** https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues )

## D. Union Grievance and Expulsion as Ultimate Retaliation

On February 1, 2025, Plaintiff filed a formal union grievance through Graduate Student United (GSU) challenging his wrongful termination from three or more job roles. On February 11, 2025, Dean Kate Biddle acknowledged receipt of the union grievance via email—establishing that the University had actual knowledge of Plaintiff's protected activity. On February 12, 2025—just eleven days after filing the grievance—a disciplinary summons was issued against Plaintiff. This extraordinarily short interval between protected activity and adverse action is precisely the type of temporal proximity that the EEOC and the Seventh Circuit have recognized as sufficient to establish a prima facie case of retaliation.

The disciplinary meeting was held on February 24, 2025, at which Plaintiff was denied the right to have a support person present—a violation of both University policy and basic principles of due process. On February 25, 2025—just thirteen days after the disciplinary summons and before the union grievance could be heard or the appeal period concluded—Plaintiff was expelled from the University of Chicago. The expulsion was orchestrated by Dean Kate Biddle, who served as the "principal architect and operative agent" of the disciplinary strategy, acting, upon information and belief, on orders from Dean Ethan Mesquita. The disciplinary process was fundamentally defective: Professor Royce, Plaintiff's actual project supervisor whose testimony was directly relevant to the charges, was never consulted or permitted to participate. Meanwhile, the University relied on a "Travel Notification Form" that Plaintiff alleges was fabricated—a document for which no IP logs, metadata, or timestamps have ever been produced.

The University also applied the wrong disciplinary manual—using the University-wide Student Manual instead of the professional school policies applicable to the Harris School of Public Policy. The University's own 60-day limitations rule, which required that disciplinary action be initiated within 60 days of the alleged conduct, was violated because the University relied on events from July 2024 that were more than six months old. Fariha Sameen, an SSCS student employee who committed identical work-hour violations, was never subjected to any disciplinary action whatsoever—establishing clear comparator evidence of disparate treatment. Under the McDonnell Douglas burden-shifting framework, this evidence of differential treatment of similarly situated employees is sufficient to raise an inference of discriminatory animus. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

### E. The Unauthorized $840 Tax Deposit

A critical factual dispute central to this case involves the University's unilateral processing of an unauthorized tax rebate deposit of approximately $840. On July 17, 2024, Paige Akagi Azuma, Director of Employer Partnerships at the Harris School, presented Plaintiff with two options regarding his taxed internship stipend. Plaintiff selected Option 1, which required no action on his part—a selection acknowledged in writing. Despite this, the University later unilaterally processed a tax rebate deposit without Plaintiff's consent, notification, or authorization. When Plaintiff later questioned this transaction, the University characterized the deposit as evidence of sham "academic misconduct" and used it as their fraudulent and sham basis of expulsion after more than about 8 or so months of the alleged act, and right after I filed the union grievance on February 1. University themselves also have a 60 day statue policy from the date of alleged misconduct occurrence. In this case nothing such occurred.

This sequence of events reveals what Plaintiff characterizes as a "trap-building operation"—the University created the misconduct through its own unauthorized action and then weaponized that manufactured evidence against Plaintiff. The $840 deposit was not the result of any dishonest or fraudulent act by Plaintiff; it was the result of the University's unilateral administrative action taken without consent. Using such manufactured evidence to justify expulsion constitutes both a substantive due process violation and actionable retaliation under the Taxpayer First Act (26 U.S.C. 7623(d)), and other tax fraud statues. The University's conduct also implicates the False Claims Act, 31 U.S.C. 3729, because it involved the processing of financial transactions related to federal tax obligations without proper authorization or disclosure.

## III. EEOC STATUTORY AUTHORITY AND APPLICABLE LAW

### A. Title VII of the Civil Rights Act of 1964

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., prohibits employment discrimination based on race, color, religion, sex, and national origin. Section 703(a)(1) of Title VII makes it unlawful for an employer **"to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."** Section 703(a)(2) further prohibits employers from "limiting, segregating, or classifying his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

The EEOC's Enforcement Guidance on National Origin Discrimination explains that national origin discrimination includes discrimination based on an individual's birthplace, ancestry, culture, ethnicity, or linguistic characteristics. The guidance specifically addresses discrimination against individuals from India and South Asia, noting that such discrimination frequently manifests through denial of opportunities, hostile treatment, and retaliatory adverse actions. Additionally, the EEOC has recognized that caste discrimination is a form of national origin discrimination actionable under Title VII, as caste is inextricably linked to an individual's national origin. The Commission's 2022 proposed guidance on caste-based discrimination under Title VII further confirms that caste-based adverse treatment is within the Commission's enforcement authority.

Title VII's anti-retaliation provision, 42 U.S.C. 2000e-3(a), makes it unlawful for an employer "to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

under this subchapter." The EEOC's Enforcement Guidance on Retaliation and Related Issues (EEOC Compliance Manual Section 615) provides the definitive interpretation of this provision. The guidance establishes that protected activity includes both "opposition" (complaining about discrimination) and "participation" (taking part in EEOC proceedings). The Supreme Court's decision in University of Pennsylvania v. EEOC, 493 U.S. 182 (1990), confirms that retaliation provisions must be construed broadly to effectuate the remedial purposes of federal anti-discrimination statutes.

## B. Americans with Disabilities Act of 1990

The Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. 12101 et seq., prohibits discrimination against qualified individuals with disabilities in employment, public services, and accommodations. **Title I of the ADA, 42 U.S.C. 12111-12117**, makes it unlawful for an employer "to discriminate against a qualified individual on the basis of disability" in regard to job application procedures, hiring, advancement, discharge, compensation, job training, and other terms, conditions, and privileges of employment. The ADA's definition of disability was substantially broadened by *the ADA Amendments Act of 2008 (ADAAA),* which rejected the Supreme Court's unduly restrictive interpretations in Sutton v. United Airlines, Inc., 527 U.S. 471 (1999), and Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002). Under the ADAAA, the definition of disability must be construed in favor of broad coverage, and the focus is on whether discrimination occurred rather than on whether the individual meets the definition of disability.

Section 102(b)(5) of the ADA, 42 U.S.C. 12112(b)(5), specifically prohibits discrimination "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." The EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA (EEOC-NVTA-2002-1) provides comprehensive direction on this requirement, including the mandatory interactive process. The guidance states: "Reasonable accommodation is any change or adjustment to a job or work environment that permits a qualified applicant or employee with a disability to participate in the application process or to perform essential job functions." The interactive process is defined as "a mandatory, informal, interactive process between the employer and the individual to identify an effective reasonable accommodation."

The ADA also contains its own anti-retaliation provision, 42 U.S.C. 12203(a), which prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

under this chapter." The EEOC has clarified that the ADA's retaliation protections are coextensive with those under Title VII, and that the same material adversity and causation standards apply. See EEOC Enforcement Guidance on Retaliation and Related Issues, Section II-D. Furthermore, the ADA contains an "interference" provision at 42 U.S.C. 12203(b) that goes beyond traditional retaliation by also prohibiting coercion, threats, or interference with any person's exercise of rights under the ADA.

## C. Rehabilitation Act of 1973

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." As a recipient of substantial federal financial assistance, the University of Chicago is subject to Section 504's nondiscrimination mandate. The regulatory framework for Section 504 compliance is found at 29 C.F.R. 1630 (ADA Title I) and 29 C.F.R. Part 104 (Department of Education's Section 504 implementing regulations), with enforcement coordinated by the EEOC under the Rehabilitation Act Amendments of 1992.

Section 505 of the Rehabilitation Act, 29 U.S.C. 794a, incorporates the remedial schemes, enforcement procedures, and relief provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. This means that the standards for intentional discrimination and retaliation under Section 504 mirror those under Title VI, which the Supreme Court has held require proof of discriminatory intent. See Alexander v. Sandoval, 532 U.S. 275, 280-81 (2001). The EEOC's guidance on the Rehabilitation Act makes clear that Section 504's protections are at least as broad as those under the ADA, and that a recipient of federal funds that engages in discrimination or retaliation faces the potential loss of federal funding, injunctive relief, compensatory damages, and attorney's fees.

The EEOC has further explained that the Rehabilitation Act Amendments of 1992 extended the Commission's enforcement authority to Section 501, which applies to the federal government as an employer, and confirmed the Commission's coordination authority over federal-sector EEO complaints. While the University of Chicago is a private entity, its receipt of federal financial assistance subjects it to Section 504, and its employment practices are governed by Title VII and the ADA. Also it's alleged that University of Chicago is infact a state actor. The interplay between these statutes creates a comprehensive web of anti-discrimination protections that the University of Chicago systematically violated.

## D. EEOC Coordination Authority and Federal Government Oversight

The EEOC possesses broad coordination authority over equal employment opportunity compliance across both the federal and private sectors. As explained in the EEOC's published guidance on coordination authority, the Commission serves as the central federal agency responsible for enforcing federal laws prohibiting employment discrimination. This authority extends to monitoring compliance, issuing regulations and guidance, conducting investigations, conciliating charges, and litigating cases in federal court. The EEOC's regulatory authority encompasses Title 29 of the Code of Federal Regulations, Parts 1601 through 1695, which provide the comprehensive procedural and substantive framework for the Commission's enforcement activities.

The EEOC has entered into multiple Memoranda of Understanding (MOUs) with other federal agencies to coordinate enforcement of overlapping anti-discrimination protections. These MOUs ensure that individuals who file charges with the EEOC receive coordinated protection across all applicable statutes, including Title VII, the ADA, the Rehabilitation Act, the Age Discrimination in Employment Act (ADEA), the Genetic Information Nondiscrimination Act (GINA), the Equal Pay Act (EPA), and the Pregnant Workers Fairness Act (PWFA). The Commission's broad coordination authority underscores the comprehensive nature of the federal anti-discrimination framework and the seriousness with which retaliatory conduct is treated.

## IV. EEOC REGULATORY FRAMEWORK

### A. Procedural Regulations (29 C.F.R. Part 1601)

29 C.F.R. Part 1601 establishes the foundational procedural regulations governing the EEOC's operations, including the filing of charges, the investigation process, and the determination of reasonable cause. Under 29 C.F.R. 1601.12, an individual who believes that he or she has been discriminated against may file a charge of discrimination with the EEOC within 180 days (or 300 days in deferral states) of the alleged unlawful employment practice. Plaintiff's EEOC charge was timely filed, and the resulting Right to Sue letter, dated March 16, 2026, was issued within the statutory timeframe, satisfying all administrative prerequisites for this action. The EEOC's procedures for processing charges, including investigation, conciliation, and issuance of right-to-sue notices, are designed to ensure that claims of discrimination are resolved efficiently while preserving the rights of charging parties.

### B. Recordkeeping Requirements (29 C.F.R. Part 1602)

29 C.F.R. Part 1602 mandates comprehensive recordkeeping requirements for employers subject to Title VII, the ADA, and other EEOC-enforced statutes. Under 29

C.F.R. 1602.14, employers must maintain personnel and employment records for a minimum of one year from the date of the record's creation or the personnel action involved, whichever is later. Where a charge of discrimination has been filed, records must be maintained until final disposition of the charge. The University of Chicago's manipulation of Plaintiff's Workday records—including the unauthorized "roll back" of hours from July 2024 and the addition of fraudulent hours by Heidi Lee—constitutes a direct violation of these recordkeeping obligations and, moreover, constitutes independent evidence of retaliatory motive. Under the EEOC's Enforcement Guidance on Retaliation, the destruction or alteration of records relevant to a discrimination charge is itself a form of retaliation that would dissuade a reasonable person from pursuing their rights.

## C. National Origin Discrimination (29 C.F.R. Part 1606)

29 C.F.R. Part 1606 provides detailed regulatory guidance on national origin discrimination. Section 1606.1 defines national origin discrimination broadly as including "but not limited to, employment discrimination because of an individual's or his ancestor's place of origin; or because an individual has the physical, cultural, or linguistic characteristics of a national origin group." Section 1606.3 prohibits employment practices that have the purpose or effect of discriminating against individuals on the basis of national origin, including hiring, firing, promotion, compensation, and other terms and conditions of employment. Section 1606.7 specifically addresses the requirement that fluency in a language other than English must be a business necessity for it to constitute a bona fide occupational qualification, and Section 1606.8 prohibits the use of English-only rules except when justified by business necessity.

The regulation makes clear that discrimination based on ethnicity, cultural characteristics, and linguistic background associated with a particular national origin group is prohibited. Plaintiff's allegations of discrimination based on his Indian national origin, South Asian ethnicity, Punjabi caste, and Hindu religion fall squarely within the protections of 29 C.F.R. Part 1606 and Title VII. The EEOC's Enforcement Guidance on National Origin Discrimination further elaborates that "national origin" refers to the country where a person was born or from which his or her ancestors came, and that the prohibition covers discrimination based on ethnicity, physical, linguistic, or cultural traits, and perception of national origin.

## D. ADA Title I Regulations (29 C.F.R. Part 1630)

29 C.F.R. Part 1630 implements Title I of the ADA and provides the comprehensive regulatory framework for disability discrimination in employment. Section 1630.2 defines "disability" broadly to include physical or mental impairments that substantially limit one or

more major life activities, a record of such impairment, or being regarded as having such an impairment. The ADA Amendments Act of 2008 broadened this definition substantially, and the EEOC's regulations at 29 C.F.R. 1630.2 reflect this expansion. Under 29 C.F.R. 1630.2(j)(1)(i), "major life activities" include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

Section 1630.2(o) defines "reasonable accommodation" as including "modifications or adjustments to the job application process . . . modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position," and "modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." The regulation further provides at 29 C.F.R. 1630.2(o)(3) that the employer and employee must engage in an "informal, interactive process" to identify effective reasonable accommodations.

Under 29 C.F.R. 1630.2(o)(ii), the term "undue hardship" means "an action requiring significant difficulty or expense." In determining whether an accommodation would impose an undue hardship, factors to be considered include: (1) the nature and cost of the accommodation; (2) the overall financial resources of the facility involved; (3) the number of persons employed at the facility; and (4) the impact of the accommodation on the operation of the facility. The University of Chicago, with its multi-billion dollar endowment and vast resources, cannot plausibly claim that the accommodations Plaintiff requested—including double time on exams (at an incremental cost of approximately eight dollars per exam) and a personal hygiene accommodation that Plaintiff offered to fund himself—constitute an undue hardship.

## E. Employee Selection Procedures (29 C.F.R. Part 1607)

29 C.F.R. Part 1607 establishes the Uniform Guidelines on Employee Selection Procedures, which govern the use of selection procedures by employers subject to Title VII and the ADA. Under these guidelines, selection procedures that have a disparate impact on a protected group are unlawful unless the employer can demonstrate that the procedure is job-related and consistent with business necessity. The "four-fifths rule" (80% rule) provides that a selection rate for any racial, ethnic, or sex group that is less than four-fifths (80%) of the rate for the group with the highest selection rate is generally regarded as evidence of disparate impact. While the University of Chicago's disciplinary process is not a formal selection procedure, the dramatically different outcomes for Plaintiff (expulsion) versus his comparator Fariha Sameen (no discipline for identical violations) raises the same concerns about disparate treatment that the uniform guidelines are designed to address.

## F. Federal Sector Complaint Procedures (29 C.F.R. Part 1614)

29 C.F.R. Part 1614 establishes the procedures for processing complaints of employment discrimination in the federal sector. Although the University of Chicago is not a federal agency, the standards set forth in Part 1614 provide instructive guidance on the comprehensive remedial scheme envisioned by federal anti-discrimination law. Under 29 C.F.R. 1614.106, federal agencies are required to conduct a thorough investigation of all complaints of discrimination and to make findings of fact and conclusions of law. The regulation also establishes that the burden of proof in federal sector discrimination cases follows the McDonnell Douglas burden-shifting framework, requiring the complainant to establish a prima facie case, the agency to articulate a legitimate, nondiscriminatory reason, and the complainant to demonstrate that the stated reason is pretext for discrimination.

## V. RETALIATION ANALYSIS

## A. EEOC Retaliation Standards

The EEOC's Enforcement Guidance on Retaliation and Related Issues (EEOC Compliance Manual Section 615) establishes the definitive framework for analyzing retaliation claims under Title VII, the ADA, and the Rehabilitation Act. Under this framework, a plaintiff establishes a prima facie case of retaliation by demonstrating three elements: (1) protected activity; (2) materially adverse action; and (3) causal connection between the protected activity and the adverse action. The Supreme Court's decision in University of Pennsylvania v. EEOC, 493 U.S. 182 (1990), instructs that retaliation provisions must be construed broadly to effectuate the remedial purposes of federal anti-discrimination statutes. The Court in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), further clarified that the "anti-retaliation provision protects an employee not from all retaliation, but from retaliation that produces an injury or harm."

The material adversity standard under Burlington Northern is objective: the action must be "harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68. The EEOC's guidance explains that this standard is lower than the "ultimate employment decision" standard previously applied by some circuits and covers a broad range of conduct, including "any action that well might dissuade a reasonable worker from making or supporting a charge of discrimination." The guidance specifically identifies the following categories of materially adverse actions: termination, demotion, suspension, undesirable reassignment, reduction in pay or benefits, threats, reprimands, negative evaluations, hostile or abusive treatment, and any other action that has a materially adverse effect on the employee's working conditions or reputation.

## B. Protected Activity

Plaintiff engaged in extensive protected activity that is clearly within the scope of Title VII, the ADA, and the Rehabilitation Act. The EEOC's guidance defines protected activity as encompassing both "opposition" (complaining about discrimination) and "participation" (taking part in EEOC proceedings). Plaintiff's protected activity includes: (1) filing a CARES/Title VI complaint on January 19, 2025, alleging national origin discrimination; (2) filing a formal union grievance through Graduate Student United on February 1, 2025, challenging wrongful termination; (3) filing an EEOC Charge of Discrimination; (4) filing a charge with the Illinois Department of Human Rights (IDHR); (5) filing an unfair labor practice charge with the National Labor Relations Board; (6) filing a whistleblower complaint with the Department of Labor under the Taxpayer First Act; (7) filing a complaint with the Chicago Commission on Human Relations (CCHR); and (8) initiating this federal lawsuit on July 16, 2025.

The EEOC has made clear that requesting a reasonable accommodation is itself protected activity under the ADA. EEOC Compliance Manual Section 615, Chapter II, states: "Requesting a reasonable accommodation is protected opposition activity under the ADA." Accordingly, Plaintiff's November 2023 request for disability accommodations constituted protected activity from the earliest stages of his enrollment. The University's knowledge of this protected activity is established by the SDS accommodation letter of November 9, 2023, which was copied to Dean Kate Biddle and Marley Mandelaro. The EEOC's guidance further clarifies that an individual's participation in internal grievance procedures and union activities related to discrimination complaints constitutes protected opposition activity, even when the internal procedures are not formal EEOC proceedings.

## C. Materially Adverse Actions

The University of Chicago engaged in a sustained and escalating series of materially adverse actions against Plaintiff, beginning immediately after his protected activity and continuing to the present. Each of these actions independently satisfies the Burlington Northern material adversity standard, and their cumulative effect further underscores the retaliatory nature of the University's conduct. The materially adverse actions include: (1) denial of reasonable accommodations for documented disability; (2) termination from the SSCS position on January 7, 2025, with the supervisor's admission that "HR pushed me to do it"; (3) termination from the Mansueto Institute on January 9, 2025; (4) cancellation of a full-time HPC Administrator interview on January 10, 2025; (5) unauthorized manipulation of Workday payroll records, including the rollback of July 2024 hours and fraudulent addition of hours; (6) issuance of a disciplinary summons just eleven days after the union grievance filing; (7) expulsion on February 25, 2025, through a fundamentally flawed

process that denied Plaintiff the right to a support person, excluded relevant witness testimony, relied on fabricated evidence, and violated the University's own 60-day limitations rule; and (8) post-filing retaliation that continues to the present day.

The EEOC's guidance makes clear that the cumulative effect of multiple adverse actions can be considered in determining whether the overall course of conduct was materially adverse. The Seventh Circuit has similarly recognized that "a series of incidents can add up to a materially adverse action even if no single incident would qualify." See Hiltgen v. trustees of the Cook Cnty. Pension Fund, 2008 WL 4533904, at *5 (N.D. Ill. 2008). The University of Chicago's conduct against Plaintiff is not merely a series of isolated incidents; it is a coordinated, escalating campaign of retaliation designed to silence and eliminate Plaintiff for exercising his federal rights.

## D. Causal Connection

The causal connection between Plaintiff's protected activity and the University's adverse actions is established by overwhelming temporal proximity and supporting circumstantial evidence. The EEOC's guidance recognizes that temporal proximity between protected activity and adverse action is a significant factor in establishing causation, particularly when the timing is "very close." Here, the sequence is damning: Plaintiff filed his union grievance on February 1, 2025; the disciplinary summons was issued on February 12, 2025 (just eleven days after the grievance; and Plaintiff was expelled on February 25, 2025 (25 days after the grievance filing). This pattern of escalating adverse actions in immediate response to protected activity is textbook retaliation under EEOC standards.

The Seventh Circuit has repeatedly held that temporal proximity of less than three months between protected activity and adverse action is sufficient to establish a prima facie case of retaliation. See Davidson v. Wisconsin Line, Inc., 636 F.3d 830, 834 (7th Cir. 2011) (two-week proximity sufficient); Culver v. Gorman & Co., 416 F.3d 540, 547 (7th Cir. 2005) (three-month proximity sufficient). The eleven-day interval between the union grievance and the disciplinary summons—and the thirteen-day interval between the summons and expulsion—is far shorter than the periods found sufficient in controlling precedent. Furthermore, the temporal proximity is reinforced by direct evidence of retaliatory motive, including the supervisor's admission that "HR pushed me to do it" in connection with the SSCS termination and Dean Biddle's acknowledged knowledge of the union grievance prior to issuing the disciplinary summons.

## E. Nassar But-For Causation Standard

The Supreme Court's decision in University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338 (2013), established that Title VII retaliation claims require "but-for"

causation—that is, the plaintiff must demonstrate that the adverse action would not have occurred but for the employer's retaliatory motive. While this standard is more demanding than the "motivating factor" standard that applies to discrimination claims, it is satisfied here. The extraordinary temporal proximity between Plaintiff's protected activity and the University's adverse actions, combined with the supervisor's admission of external pressure, the University's failure to follow its own procedures, the use of fabricated evidence, the exclusion of favorable testimony, the disparate treatment of the comparator (Fariha Sameen), and the escalating pattern of adverse actions after each new filing, collectively establish that the University's actions were taken because of Plaintiff's protected activity.

Under Nassar, the proper inquiry is whether the protected activity was the "but-for" cause of the adverse action—whether the action would not have occurred in the absence of the protected activity. Here, the evidence compels the conclusion that the disciplinary process and expulsion were manufactured in direct response to Plaintiff's union grievance and EEOC charge. The eleven-day interval between the grievance and the summons—after months of inaction on the same alleged underlying conduct—establishes that the disciplinary proceedings were triggered by the grievance rather than any genuine concern about workplace conduct. The Nassar standard is therefore satisfied.

## F. Post-Filing Retaliation: A Continuing Course of Conduct

Following the filing of administrative charges and this federal lawsuit, the University of Chicago has engaged in a continuing and escalating pattern of retaliatory conduct. This post-filing retaliation includes, but is not limited to, the following documented categories of misconduct: unauthorized access to and manipulation of Plaintiff's digital, employment, and academic records; interference with Plaintiff's access to institutional systems including employment, payroll, and related platforms; refusal to provide Plaintiff with access to his own employment, payroll, and academic records; disclosure of Plaintiff's disciplinary status and allegations to third parties without a legitimate business need, causing reputational harm; conduct constituting threats, intimidation, and coercion, including actions implying coordinated enforcement measures against Plaintiff in connection with a No-Contact Directive; and interference with ongoing governmental proceedings through the introduction, alteration, or maintenance of inaccurate or misleading information in records relevant to those proceedings.

The EEOC's Enforcement Guidance on Retaliation recognizes that post-filing retaliation is not only independently actionable but may also constitute a continuing violation that extends the applicable limitations period. Under 29 C.F.R. 1602.14 and the EEOC's compliance guidance, each instance of post-charge retaliation constitutes a new discriminatory act that triggers a new filing period. Moreover, the EEOC has made clear that retaliatory conduct that continues after the filing of a charge or lawsuit is particularly

egregious because it represents an attempt to punish the individual for exercising rights that Congress explicitly sought to protect. The guidance states: "Retaliation against an individual for filing a charge of discrimination, participating in an investigation, or opposing discriminatory practices is among the most serious of EEOC violations." The University's post-filing conduct demonstrates a blatant disregard for these principles and a willingness to continue its retaliatory campaign even after being put on notice of the illegality of its actions.

The pattern of post-filing retaliation closely mirrors the categories of misconduct documented in Plaintiff's parallel administrative proceedings. Following the filing of charges with the EEOC, the University interfered with Plaintiff's access to employment-related systems and records, creating irregularities and disruptions affecting his ability to maintain accurate employment and payroll records. The University refused and obstructed Plaintiff's access to records relevant to his working conditions and his ability to investigate and pursue his claims. The University disclosed or permitted the disclosure of information regarding Plaintiff's disciplinary status to individuals without a legitimate business need to know, including individuals who became aware of such information without Plaintiff's authorization or consent. These disclosures caused significant reputational harm and were timed to coincide with Plaintiff's pursuit of legal remedies.

Furthermore, the University engaged in conduct that constituted threats, intimidation, and coercion against Plaintiff, including statements and actions implying coordinated or collective enforcement measures in connection with institutional directives. The University also engaged in conduct affecting records and information relevant to ongoing proceedings, including maintaining or presenting inaccurate, misleading, or incomplete information in a manner that interfered with Plaintiff's ability to effectively participate in those proceedings. From the date of his EEOC charge through the present, the University has maintained a continuing course of retaliatory conduct that would dissuade any reasonable person from pursuing their federal rights.

## VI. DISABILITY DISCRIMINATION ANALYSIS

### A. Failure to Engage in the Interactive Process

The University of Chicago's failure to engage in the mandatory interactive process for disability accommodation is a standalone violation of the ADA. Under 29 C.F.R. 1630.2(o)(3) and EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship, the interactive process is not optional—it is a statutory and regulatory requirement that both parties must engage in in good faith. The EEOC's guidance states: "The interactive process requires communication between the employer and the individual with a disability and should be conducted in a timely manner." The University of Chicago failed to engage in

any interactive process whatsoever with Plaintiff. Instead, it unilaterally denied his requested accommodations through a form letter, without explanation, without dialogue, and without any assessment of whether alternative accommodations might be effective.

The Seventh Circuit has recognized that an employer's failure to engage in the interactive process, without a legitimate reason, can itself constitute a violation of the ADA. See Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285 (7th Cir. 1996) ("failure to engage in the interactive process in good faith is a violation of the ADA"). The Supreme Court has similarly emphasized that the interactive process is a collaborative one, and that employers who refuse to participate "risk violating the ADA." See US Airways, Inc. v. Barnett, 535 U.S. 391, 402 (2002) (noting that the ADA requires "a flexible, interactive process" between employer and employee). The University of Chicago's categorical refusal to engage in this process, combined with its apparently cost-motivated denials, establishes both the violation and the discriminatory animus underlying it.

## B. Disparate Treatment of Similarly Situated Disabled Individuals

Plaintiff alleges that other students at the University of Chicago who did not have visible disabilities received the very accommodations he was denied, including 2x extended examination time and individual testing rooms. Under the EEOC's guidance and controlling Seventh Circuit precedent, this constitutes direct evidence of disability discrimination. The ADA prohibits not only adverse treatment based on actual disability but also differential treatment of individuals with disabilities compared to those without disabilities. If the University granted identical accommodations to non-disabled students while denying them to a documented disabled student, this differential treatment is direct evidence of discriminatory animus under the ADA and the Rehabilitation Act.

The EEOC's Enforcement Guidance on Disability-Related Inquiries and Medical Examinations (EEOC 915.002) further clarifies that employers must treat medical information and accommodation requests confidentially and may not use an individual's disability or need for accommodation as a basis for adverse treatment. The University's disclosure of Plaintiff's accommodation requests and disability information to third parties without authorization—a pattern that continued in the post-filing retaliation phase—constitutes an independent violation of the ADA's confidentiality provisions and further supports an inference of discriminatory animus.

## C. ADA Psychiatric Disability Considerations

The EEOC's Enforcement Guidance on the ADA and Psychiatric Disabilities (EEOC 915.002) recognizes that the stress, anxiety, and emotional harm caused by discrimination and retaliation can themselves constitute covered disabilities under the ADA. The guidance

states: "The ADA does not distinguish between physical and mental impairments; both are covered if they substantially limit a major life activity." The prolonged and escalating campaign of discrimination, retaliation, fabrication of records, and institutional abuse directed at Plaintiff has caused severe emotional distress, anxiety, depression, and other psychological harm that independently qualifies as a disability under the ADAAA's broadened definition. The University's ongoing retaliatory conduct has therefore created the very conditions of psychological impairment that trigger additional ADA protections—a perverse cycle that underscores the severity and persistence of the University's unlawful conduct.

## VII. McDONNELL DOUGLAS BURDEN-SHIFTING ANALYSIS

Under the McDonnell Douglas burden-shifting framework, as adopted by the Seventh Circuit and endorsed by the EEOC, Plaintiff must establish a prima facie case by showing that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Once a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. If the employer does so, the burden shifts back to the plaintiff to demonstrate that the stated reason is pretext.

Plaintiff satisfies all four elements of the prima facie case. First, he is a member of multiple protected classes under Title VII (Indian national origin, South Asian ethnicity, Punjabi caste, Hindu religion) and under the ADA (documented disability). Second, he was qualified for his positions, having been hired for approximately fifteen concurrent roles and having received no adverse performance evaluations prior to the initiation of protected activity. Third, he suffered multiple adverse employment actions, including terminations, disciplinary proceedings, and expulsion. Fourth, the circumstances—including the extraordinary temporal proximity between protected activity and adverse action, the supervisor's admission of external pressure, the comparator evidence (Fariha Sameen), the procedural irregularities, and the fabricated evidence—give rise to a strong inference of discrimination and retaliation.

The University's stated reasons for the adverse actions—primarily the alleged "falsification" of the Travel Notification Form and the unauthorized $840 tax deposit—are pretext for retaliation. The Travel Notification Form has never been authenticated; no IP logs, metadata, or timestamps have been produced to verify its existence or authorship. The $840 deposit was initiated by the University without Plaintiff's consent, making it impossible for Plaintiff to have "falsified" anything in connection with that transaction. The University's

reliance on this self-created evidence to justify expulsion is precisely the type of "shifting explanations" and "pretextual reasoning" that the Seventh Circuit has recognized as evidence of discriminatory motive. See Jordan v. Summers, 205 F.3d 337, 342 (7th Cir. 2000) (employer's shifting explanations support inference of pretext).

The comparator evidence further establishes pretext. Fariha Sameen, an SSCS student employee, committed the identical work-hour violations that the University attributed to Plaintiff, but was never subjected to any disciplinary action. The University cannot claim that Plaintiff's conduct warranted expulsion while an identically situated employee received no discipline at all. This differential treatment, combined with the procedural violations (wrong manual, 60-day rule violation, denial of support person, exclusion of Professor Royce's testimony), confirms that the University's stated reasons were pretextual and that the actual motivation was retaliation for Plaintiff's protected activity.

## VIII. ADDITIONAL EEOC ENFORCEMENT GUIDANCE

### A. After-Acquired Evidence Doctrine

The EEOC's Enforcement Guidance on After-Acquired Evidence and McKennon v. Nashville Banner (EEOC 915.002) addresses the situation where an employer discovers wrongdoing by an employee after the employee has already filed a discrimination charge. The Supreme Court held in McKennon v. Nashville Banner, 513 U.S. 352 (1995), that after-acquired evidence of employee misconduct does not bar a claim for discrimination or retaliation, although it may limit the remedies available. The EEOC's guidance explains: "An employer may not defend a charge of discrimination based solely on after-acquired evidence of wrongdoing." The University of Chicago's reliance on the alleged Travel Notification Form and the $840 deposit as grounds for disciplinary action—neither of which was discovered until after Plaintiff had engaged in extensive protected activity—is precisely the type of after-acquired evidence conduct that McKennon and the EEOC guidance address. The University cannot use evidence discovered through its own unauthorized actions to justify what was, in fact, retaliation. Furthermore, that $840 was added to the account without consent and with intention to fraud. This matter was more than 8 months old and came after right after the protected activity out of blues. University of Chicago also retains a policy that had 60 days statue from the date of alleged misconduct for lodging the complaint.

### B. Non-Waivable Employee Rights

The EEOC's Enforcement Guidance on Non-Waivable Employee Rights Under EEOC-Enforced Statutes (EEOC 915.002) confirms that the right to file EEOC charges and participate in investigations cannot be waived by any agreement, policy, or contract. The

guidance states: "Employees cannot waive their right to file a charge or participate in an EEOC investigation." Any attempt by the University of Chicago to enforce a policy, agreement, or condition that purports to limit Plaintiff's right to file charges, participate in investigations, or pursue legal remedies is void and unenforceable as a matter of federal law. This principle reinforces the fundamental nature of Plaintiff's protected activity and underscores the seriousness of the University's retaliatory conduct in response to that activity.

## C. Workers' Compensation Interplay with ADA

The EEOC's Enforcement Guidance on Workers' Compensation and the ADA (EEOC 915.002) clarifies that the ADA's definition of disability is broader than the definition used in workers' compensation contexts, and that a condition compensable under workers' compensation may also constitute a disability under the ADA. The guidance states: **"The fact that an employee's condition is work-related and compensable under workers'** compensation laws does not mean that it is not also a disability under the ADA." Plaintiff's disability—which involves physical conditions that substantially limit major life activities and were exacerbated by unsanitary workplace conditions—falls within both the workers' compensation framework and the ADA's broader definition. The University's failure to accommodate these conditions therefore violates the ADA regardless of whether they are compensable under workers' compensation laws.

## D. Pre-Employment and Ongoing Disability Inquiries

The EEOC's Enforcement Guidance on Preemployment Disability-Related Questions and Medical Examinations (EEOC 915.002) establishes a comprehensive three-stage framework for disability-related inquiries: (1) the pre-offer stage, at which virtually all disability-related inquiries are prohibited; (2) the post-offer, pre-employment stage, at which inquiries are permitted only if they are required of all entering employees in the same job category; and (3) the employment stage, at which inquiries are permitted only when they are job-related and consistent with business necessity. Any unauthorized disclosure of Plaintiff's medical or disability information by University officials constitutes a violation of the ADA's confidentiality requirements at 29 C.F.R. 1630.2(b)(2), which provides that "information obtained regarding the medical condition or history of any employee . . . shall be collected and maintained on separate forms and in separate medical files and be treated as a confidential medical record."

## IX. REMEDIES AVAILABLE UNDER APPLICABLE STATUTES

### A. Compensatory Damages

Under 42 U.S.C. 1981a(a), compensatory damages are available for intentional discrimination and retaliation under Title VII and the ADA, including both economic damages (back pay, front pay, lost benefits, compensation for emotional distress, pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life) and non-economic damages. The EEOC's guidance confirms that emotional distress damages are available for the psychological harm caused by discrimination and retaliation, including anxiety, depression, humiliation, and loss of dignity. The staggering scope and duration of the University's retaliatory campaign—from November 2023 through the present, encompassing terminations, expulsion, record manipulation, reputational harm, and ongoing interference with Plaintiff's legal rights—warrants significant compensatory damages.

For ADA claims, compensatory damages are not subject to the statutory caps that apply to Title VII claims. Under 42 U.S.C. 1981a(b)(3), Title VII compensatory and punitive damages are capped based on the employer's size: $50,000 for employers with 15-100 employees; $100,000 for 101-200 employees; $200,000 for 201-500 employees; and $300,000 for employers with more than 500 employees. However, the ADA does not impose these caps on compensatory damages, meaning that Plaintiff's ADA-based claims for compensatory damages are uncapped. Given that the University of Chicago employs thousands of individuals, even the Title VII cap of $300,000 per claimant is applicable. When combined with back pay, front pay, and the uncapped ADA compensatory damages, the potential recovery is substantial.

## B. Punitive Damages

Punitive damages are available under Title VII and the ADA for conduct involving "malice or reckless indifference" to the plaintiff's federally protected rights. 42 U.S.C. 1981a(b)(1). The EEOC's guidance explains that punitive damages are assessed based on the egregiousness of the employer's conduct and its degree of culpability. The University of Chicago's conduct meets this elevated standard. The coordinated, multi-year campaign of discrimination and retaliation—involving the denial of reasonable accommodations, fabricated evidence, procedural violations, comparator disparities, and ongoing post-filing retaliation—demonstrates a level of institutional malice and reckless indifference that warrants punitive damages. The University's conduct was not negligent or inadvertent; it was deliberate, systematic, and calculated to destroy Plaintiff's academic career, employment prospects, immigration status, and professional reputation.

## C. Injunctive Relief and Equitable Remedies

Under 42 U.S.C. 2000e-5(g)(1) and 42 U.S.C. 12117(a), the Court has broad equitable authority to order injunctive relief to prevent future violations of federal anti-

discrimination laws. Injunctive relief in this case should include, but is not limited to: an order requiring the University to restore Plaintiff's enrollment status; an order requiring the correction of all fabricated or manipulated records; an order requiring the implementation of comprehensive anti-discrimination and anti-retaliation training; an order requiring the adoption of policies ensuring compliance with the ADA's interactive process requirement; an order requiring the expungement of the expulsion from Plaintiff's academic record; and an order prohibiting any further retaliatory conduct against Plaintiff.

The EEOC has emphasized that injunctive relief is a critical component of the remedial scheme under federal anti-discrimination laws, serving not only to compensate the individual victim but also to deter future violations and ensure institutional compliance. The continued nature of the University's retaliatory conduct—persisting through multiple administrative proceedings and this federal lawsuit—demonstrates that without robust injunctive relief, the University will continue to engage in unlawful conduct. The Court should exercise its equitable powers broadly to ensure that the University is compelled to comply with its legal obligations and that no further retaliatory actions are taken against Plaintiff.

## D. Attorney's Fees and Costs

Under 42 U.S.C. 1988, the ADA, and the Rehabilitation Act, a prevailing plaintiff is entitled to reasonable attorney's fees and costs. Although Plaintiff is proceeding pro se, pro se litigants who prevail in civil rights actions are allegedly entitled to recover attorney's fees for work performed by counsel retained during the litigation, as well as costs. See Kay v. Ehrler, 499 U.S. 432 (1991). The substantial complexity, duration, and scope of this litigation, involving multiple parallel proceedings, extensive discovery, and novel legal issues, warrant a significant award of attorney's fees and costs to compensate for the enormous effort required to vindicate Plaintiff's federal rights against a powerful institutional defendant. Furthermore, "Even a skilled lawyer who represents himself is at a disadvantage in contested litigation".

## X. POST-FILING RETALIATION: BLATANT DISREGARD FOR PLAINTIFF'S RIGHTS

### A. Interference with Access to Systems and Records

Following the filing of his EEOC charge and the initiation of this federal lawsuit, the University of Chicago engaged in a pattern of unauthorized access to, interference with, and manipulation of Plaintiff's digital, employment, and academic records. This conduct includes unexplained alterations, irregularities, and disruptions affecting Plaintiff's access to records,

accounts, and institutional systems. These actions occurred in close temporal proximity to Plaintiff's protected activity and constitute materially adverse actions undertaken because of his participation in protected proceedings. The EEOC's Enforcement Guidance on Retaliation specifically identifies interference with access to employment-related information as a form of materially adverse action that would dissuade a reasonable person from engaging in protected activity. See EEOC Compliance Manual Section 615, Chapter II.

Under the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. 1030, unauthorized access to a computer system to obtain information, cause damage, or further a fraudulent scheme is a federal crime. The University's unauthorized manipulation of Plaintiff's electronic records—including the alteration of Workday payroll data and the apparent fabrication of the Travel Notification Form—may also constitute violations of the CFAA and the Stored Communications Act, 18 U.S.C. 2701 et seq. The use of institutional computer systems to retaliate against an employee who has filed discrimination charges represents an egregious abuse of institutional authority that compounds the underlying retaliation claim.

## B. Refusal to Provide Access to Records

The University of Chicago has intentionally refused, failed, or otherwise obstructed Plaintiff's access to his own employment, payroll, and academic records. This obstruction occurred after the University became aware of Plaintiff's protected activity and materially impaired his ability to investigate, substantiate, and pursue his claims. Under 29 C.F.R. 1602.14 and 29 C.F.R. 1602.31, employers are required to make personnel records available for inspection and copying by the EEOC and by the individual who is the subject of the records. The University's refusal to provide these records constitutes both a regulatory violation and a retaliatory interference with Plaintiff's exercise of his federal rights. The EEOC's guidance makes clear that denial of access to employment records is a materially adverse action that would dissuade a reasonable person from pursuing a charge of discrimination.

## C. Disclosure of Disciplinary Status to Third Parties

The University of Chicago, through its agents and employees, disclosed or permitted the disclosure of Plaintiff's disciplinary status and related allegations to third parties who lacked a legitimate business need to know. These unauthorized disclosures caused significant reputational harm, were not justified by any legitimate purpose, and were made after Plaintiff's protected activity. The ADA's confidentiality requirements at 29 C.F.R. 1630.2(b)(2) strictly prohibit the disclosure of medical and accommodation-related

information. Even assuming arguendo that the disciplinary information was not medical in nature, its disclosure to unauthorized third parties constituted a materially adverse action under the EEOC's retaliation framework. The EEOC's guidance recognizes that reputational harm caused by unauthorized disclosures is a form of material adversity because it would dissuade a reasonable person from engaging in protected activity.

## D. Threats, Intimidation, and Coercive Conduct

Following the filing of his charges, the University of Chicago engaged in conduct that reasonably constituted threats, intimidation, and coercion against Plaintiff. This includes statements and actions implying coordinated or group-based enforcement measures against Plaintiff in connection with institutional directives. Such conduct created an objectively hostile and intimidating environment and was undertaken after and because of Plaintiff's protected activity. The EEOC's Enforcement Guidance on Retaliation identifies threats, intimidation, and coercion as categories of conduct that constitute materially adverse actions. The guidance states: "Threats of reprisal, including threats of termination, demotion, or other adverse action, constitute retaliation if they are made in response to protected activity." The University's use of institutional mechanisms to threaten, intimidate, and coerce Plaintiff represents a blatant abuse of power that violates federal anti-discrimination laws.

## E. Interference with Government Proceedings

The University of Chicago engaged in conduct affecting records and information relevant to ongoing administrative and judicial proceedings, including the introduction, alteration, maintenance, and failure to correct inaccurate, misleading, or incomplete information in records submitted to these proceedings. This conduct includes the addition or modification of information affecting Plaintiff's claims and defenses, and the maintenance of records that the University knew or should have known were inaccurate. The EEOC's guidance identifies interference with government proceedings as a particularly serious form of retaliation because it undermines the integrity of the administrative and judicial processes established to enforce federal anti-discrimination laws. The University's interference with these proceedings constitutes retaliation under 42 U.S.C. 2000e-3(a) and 42 U.S.C. 12203(a) and warrants both compensatory and punitive damages.

## F. Continuing Pattern of Retaliation

From the date of Plaintiff's initial charge through the present, the University of Chicago has engaged in a continuing pattern and practice of retaliatory conduct. This pattern includes the denial of access to records, interference with Plaintiff's ability to pursue his claims, dissemination of damaging information affecting his reputation and professional

standing, and the continuation or enforcement of adverse actions tied to prior disciplinary matters. The EEOC's guidance recognizes that a continuing pattern of retaliation constitutes an ongoing violation that may support a claim for back pay and other damages extending through the duration of the unlawful conduct. Under 29 C.F.R. 1602.14, each act of post-charge retaliation constitutes a new discriminatory act for purposes of the filing period and damages calculation. The University's sustained course of retaliatory conduct, extending across multiple proceedings and more than a year of ongoing litigation, demonstrates an institutional indifference to federal law that warrants the most severe remedial measures available to this Court.

## XI. CONCLUSION

The evidence and legal authority presented in this memorandum demonstrate that the University of Chicago has engaged in a sustained, systematic, and escalating pattern of discrimination, retaliation, and institutional abuse against Plaintiff Dipesh Singla. From the initial denial of reasonable accommodations in November 2023 through the post-filing retaliation that continues to the present, the University has violated virtually every provision of Title VII, the ADA, Section 504 of the Rehabilitation Act, and related federal anti-discrimination statutes applicable to Plaintiff's claims. The University's conduct—including the denial of accommodations without interactive process, the retaliatory termination cascade, the manufactured disciplinary proceedings, the expulsion based on fabricated evidence, the disparate treatment of comparators, and the ongoing post-filing retaliation—establishes a clear and convincing pattern of unlawful conduct that cannot be attributed to legitimate institutional interests.

The EEOC's comprehensive regulatory framework, including 29 C.F.R. Parts 1601-1695 and the Commission's enforcement guidance on retaliation, reasonable accommodation, national origin discrimination, disability discrimination, and related issues, provides a robust legal basis for Plaintiff's claims. The burden-shifting framework of McDonnell Douglas, the material adversity standard of Burlington Northern, the but-for causation standard of Nassar, and the continuing violation doctrine all support Plaintiff's claims and the availability of comprehensive remedial relief. The University's conduct demonstrates a level of institutional malice and reckless indifference to Plaintiff's federally protected rights that warrants the imposition of significant compensatory and punitive damages, as well as broad injunctive relief to prevent further violations.

Plaintiff respectfully requests that this Honorable Court find that the University of Chicago has violated Title VII, the ADA, Section 504 of the Rehabilitation Act, and other applicable federal statutes, and that Plaintiff is entitled to all available remedies, including compensatory damages, punitive damages, injunctive relief, reinstatement, record

correction, and attorney's fees and costs. The University of Chicago's conduct represents a fundamental betrayal of its obligations under federal law and a grave injustice to Plaintiff that demands the full measure of relief available under the Constitution and the laws of the United States.


Respectfully submitted,


_____

Dipesh Singla, Pro Se

Plaintiff

Case No. 1:25-cv-08098

dipeshsingla668@gmail.com

**Date:** April 21, 2026

# Exhibit 1
EEOC Right to Sue letter 16 March 2026

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 03/16/2026

**To:** Mr. Dipesh Singla
5118 South Blackstone Ave (Old address) Apt 1N
Chicago, IL 60615
Charge No: 440-2025-07788

EEOC Representative and email:   EVA BARAN
INVESTIGATOR
EVA.BARAN@EEOC.GOV

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2025-07788.

On behalf of the Commission,

Digitally Signed By:Amrith Kaur Aakre
03/16/2026
Amrith Kaur Aakre
District Director

Cc:
NA NA
University of Chicago
5801 S Ellis Avenue
Chicago, IL 60637

Scott Velasquez
6030 S. Ellis
Chicago, IL 60637

Bridget Collier
University of Chicago
5525 South Ellis Avenue Suite B
Chicago, IL 60637

Please retain this Notice for your records.

Singla v. University of Chicago | Case No. 1:25-cv-08098

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 440-2025-07788 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 440-2025-07788 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ☐ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ☐ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ☐ **Only one** major life activity need be substantially limited.

- ☐ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

Enclosure with EEOC Notice of Closure and Rights (05/25)

are **not considered** in determining if the impairment substantially limits a major life activity.

- [ ] An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**

- [ ] An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

### "Regarded as" coverage

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- [ ] "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- [ ] The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- [ ] A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

**Note:** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.